## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SPEECH FIRST, INC.,

*Plaintiff,*

v.

ALEXANDER CARTWRIGHT, in his official
capacity as President of the University of
Central Florida; DANA JUNTENEN, in her
official capacity as Director of the University
of Central Florida Office of Student Rights
and Responsibilities and Assistant Dean of
Students; MATTHEW HALL, in his official
capacity as Vice President for Information
Technology and Chief Information Officer;
CHRISTINA KHAN, JAMES MANGAN,
RESHAWNA CHAPPLE, JILLIAN
STURDIVANT, MICHELLE FITZGERALD,
ANDREA L. SNEAD, KERRY WELCH,
EDWANNA ANDREWS, MICHAEL
PRESTON, SHANE LAND, ANGELA
WILLIAMS, RONNIE KOROSEC, all in
their official capacities as members of the
Just Knights Response Team; BEVERLY J.
SEAY, TIFFANY ALTIZER, KEN
BRADLEY,  BILL CHRISTY, JEFF
CONDELLO, JOSEPH CONTE, DANNY
GAEKWAD, JOSEPH HARRINGTON,
SABRINA LA ROSA, CARYL MCALPIN,
HAROLD MILLS, MICHAEL OKATY,
JOHN SPROUIS, all in their official
capacities as members of the University of
Central Florida Board of Trustees,

*Defendants.*

Case No. _____

**VERIFIED
COMPLAINT**

- 1 -

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution against Defendants for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet the University of Central Florida and its officials have created a series of rules and regulations that restrain, deter, suppress, and punish speech about the political and social issues of the day. These restrictions on protected speech disregard decades of precedent. Three restrictions are particularly egregious.

3.      First, the University's discriminatory-harassment policy disciplines students who engage in "verbal acts, name-calling, [or] graphic or written statements (via the use of cell phone or the internet)" that other students find offensive or "humiliating." This overbroad restriction on protected speech violates the First Amendment.

4.     Second, the University's computer policy forbids students from transmitting or displaying "images, sounds, or messages that reasonably could be perceived as being harassing, invasive, or otherwise unwanted." It likewise forbids students from using "university messaging systems" to send "harassing or hate messages." This policy—violations of which can lead to the loss of computer or network privileges and even formal discipline—is vague, overbroad, and incompatible with the First and Fourteenth Amendments.

5.     Third, the University employs a bias response team—called the Just Knights Response Team ("JKRT")—that is comprised of University administrators (including a police officer) to police "bias-related incidents." A "bias-related incident" is formally defined as "any behavior or action directed towards an individual or group based upon [the] actual or perceived identity characteristics or background" of the complainant, "without regard to whether the act is legal, illegal, intentional, or unintentional." Bias-related incidents can occur on or off campus, including on social media and other digital platforms. Students accused of "bias-related incidents" can be summoned for meetings with University officials for "discussion, counseling, training, [or] consensus-building." The JKRT poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague, overbroad definition of "bias-related

incident" that triggers those processes—violate the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

7.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

8.     Venue is proper under 28 U.S.C. §1391 because all Defendants "reside" here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

9.     Plaintiff, Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University.

10.     The University of Central Florida is a public university organized and existing under the laws of Florida.

11.     Defendant Alexander Cartwright is President of the University. Cartwright is responsible for the enactment and enforcement of University

policies, including the policies challenged here. Cartwright is sued in his official capacity.

12.     Defendant Dana Juntenen is Director of the University Office of Student Rights and Responsibilities and Assistant Dean of Students. Juntenen is responsible for the enactment and enforcement of University policies, including the policies challenged here. Juntenen is sued in her official capacity.

13.     Defendant Matthew Hall is Vice President for Information Technology and Chief Information Officer of the University. Hall is responsible for the enactment and enforcement of the University's computer network and information services policies, including the computer policies challenged here. Hall is sued in his official capacity.

14.     Defendants Christina Khan, James Mangan, Reshawna Chapple, Jillian Sturdivant, Michelle Fitzgerald, Andrea L. Snead, Kerry Welch, Edwanna Andrews, Michael Preston, Shane Land, Angela Williams, and Ronnie Korosec are members of the Just Knights Response Team. They are sued in their official capacities.

15.     Defendants Beverly J. Seay, Tiffany Altizer, Ken Bradley, Bill Christy, Jeff Condello, Joseph Conte, Danny Gaekwad, Joseph Harrington, Sabrina La Rosa, Caryl McAlpin, Harold Mills, Michael Okaty, and John Sprouis are members of the University Board of Trustees. The Board of Trustees serves as the final authority responsible for University policies,

including the policies challenged here. These Defendants are sued in their official capacities.

## BACKGROUND

### I.   College Students and Their First Amendment Rights

16.    "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

17.    The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students

must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

18.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

19.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

20.     The University is aware of this precedent. In 2019, President Cartwright's predecessor, Thad Seymour, co-signed a letter with every other public university president in Florida recognizing "the principles of freedom of

speech and freedom of expression in the United States and Florida constitutions."

## II. Universities' Use of Speech Codes and Bias Response Teams to Chill Speech

21.     Instead of promoting the "robust exchange of ideas," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967), universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

22.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights in Education (FIRE), are "university regulations prohibiting expression that would be constitutionally protected in society at large." *Spotlight on Speech Codes 2019* at 10, FIRE, bit.ly/2GAyfKJ.

23.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down as violating the First and Fourteenth Amendments. *Id*. at 10, 26; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a

consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

24.    In addition to speech codes, universities are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams."

25.    Living up to their Orwellian name, bias response teams encourage students to monitor each other's speech and report incidents of "bias" to the University (often anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; indeed, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

26.    Students have been reported to bias response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, bit.ly/2P9iEaj.

27.    After receiving reports of a bias incident, bias-response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

28.    Although universities claim this process is entirely voluntary, they know that students do not see it that way. The U.S. Court of Appeals for the Sixth Circuit did not see it that way, either. It found that an "invitation from

[a bias-response team] to meet could carry an implicit threat of consequence should a student decline the invitation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background of the invitation." *Id.*

29.    A 2017 report from FIRE found that bias-response teams monitor protected expression and lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Bias Response Team Report 2017*, at 28 (Feb. 2017), bit.ly/2P9iEaj. "[T]he posture taken by many Bias Response Teams," the study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

30.    Other universities have discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias response team, citing their "high failure rate" and their tendency to "become almost punitive."

31.     University professors have similarly observed that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), bit.ly/1SaAiDB; *see also* Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

32.     Courts have likewise recognized the chilling effect of bias-response teams that closely resemble the University's. After Speech First challenged similar bias-response teams at the University of Texas and the University of Michigan, both schools disbanded their teams. The Sixth Circuit agreed that Michigan's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). The Fifth Circuit also agreed, stressing that Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020).

### III.   The University's Discriminatory-Harassment Policy

33.   On October 14, 2020, the University published Policy 2-004.2, titled Prohibition of Discrimination, Harassment, and Related Interpersonal Violence.

34.   Policy 2-004.2 bans "discriminatory harassment" that causes a "hostile environment." It defines such harassment as "verbal, physical, electronic or other conduct based upon an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran's status . . . , or membership in other protected classes that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services" and that "meet[s] the description of … *Hostile Environment Harassment*."

35.   "Hostile environment harassment" is defined as "[d]iscriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education," "employment," or "participation in a university program or activity," "when viewed from both a subjective and objective perspective." The University warns that "[a] hostile

environment can be created … by a single or isolated incident, if sufficiently severe" or "serious."

36.     Examples of discriminatory harassment include "verbal acts, name-calling, graphic or written statements (via the use of cell phones or the Internet), or other conduct that may be humiliating."

37.     The University describes discriminatory harassment as "unlawful."

38.     According to the University, discriminatory harassment can occur virtually anywhere, at any time, by any medium. The policy applies to incidents "on campus or other property owned by, controlled by, or affiliated with the University"; to off-campus incidents that occur "in the context of a University employment or education program or activity"; and to off-campus incidents that have "continuing adverse effects on or create[] a hostile environment for students" or University employees. As the University acknowledges, "[t]his means the University may take action against students, registered student organizations … and third-parties for off campus conduct." Policy 2-004.2 disavows any "time limit for a complainant to report" an alleged violation to the University.

39.     University employees who learn of suspected discriminatory harassment, "directly or indirectly," have "a duty to report the information immediately."

40.    Students can make discriminatory-harassment allegations by filing a complaint with the University's Office of Institutional Equity ("OIE")—specifically, by using the "Discrimination, Discriminatory Harassment & Retaliation Complaint Form" on the University's website. The form asks the complainant to describe the alleged harassment and explain how he or she wishes the OIE to resolve the complaint. Students can choose from a list of 17 personal characteristics that were the alleged basis for the discriminatory harassment, such as "gender identity," "gender expression," and "non-religion," or they can check a box that says "other" and specify a reason. The form instructs students to "[s]elect all characteristics that you believe motivated the respondent."

41.    After a student files a complaint, OIE conducts an investigation and notifies the complainant in writing of its findings. If OIE concludes that a respondent has engaged in discriminatory harassment, it informs "the President, Provost, or appropriate Vice President" of that conclusion. Those officials, in turn, "take steps to implement actions that will correct the [respondents'] conduct." Students who are found guilty of discriminatory harassment are subject to disciplinary action, including "discipline through standard procedures" or "other remedies deemed appropriate."

42.    Discriminatory harassment also constitutes a violation of the Golden Rule Student Handbook—the Rules of Conduct for University

students. Violations of the Rules of Conduct subject students to disciplinary action via the student conduct process.

43.     To initiate the student conduct process, the Student Conduct and Academic Integrity ("SCAI") office "will send written notification to the charged student indicating the nature of the activity in question and what university rules were allegedly violated." The notice instructs the student "to attend a required preliminary conference with SCAI to discuss the charges." If the student fails to attend the conference, the University can place a hold on his or her account, "preventing [the student] from registering for future classes until the matter is resolved."

44.     Depending on the nature of the alleged incident, the University can resolve the case through mediation, an informal hearing, or a formal hearing. If a student accepts "responsibility for the charges of violation of the Rules of Conduct," the "matter will be settled by the following outcomes: punitive sanction (Disciplinary Warning, Disciplinary Probation, or Disciplinary Deferred Suspension) as well as educational sanctions (papers, seminars, community service, etc.)." If the student does not admit responsibility for the alleged misconduct, the matter proceeds to a formal hearing. Students who are found liable of disciplinary misconduct face the University's full range of formal disciplinary sanctions.

45.    On top of forbidding students from engaging in discriminatory harassment, the Rules of Conduct also prohibit students from "condoning or encouraging acts of harmful behavior as defined [by the relevant section of the Code] or failing to intervene during an act of harmful behavior while it is occurring." In other words, students can be guilty of misconduct not only for their own speech but also for simply hearing others' "harassing" speech and not intervening. The Rules of Conduct also forbid "[c]omplicity," which is defined as "any act taken with the purpose of aiding, facilitating, promoting, or encouraging the commission of an act prohibited by the Rules of Conduct."

46.    Recent events illustrate how the discriminatory harassment policy can be used to suppress controversial or unpopular opinions on campus. In June 2020, hundreds of students called for tenured psychology professor Dr. Charles Negy to be fired, after he posted controversial opinions about the topic of systemic racism.

47.    University officials, including President Cartwright, Provost Johnson, and Chief Diversity Officer Kent Butler, urged students to file discriminatory harassment complaints against Dr. Negy and implied that he should be fired.

48.    During a June 4, 2020 protest, President Cartwright agreed with a student that Dr. Negy "should have been fired before he got tenure. That is the problem." During the same protest, Provost Johnson told students "[t]he

single best thing they can do to avoid this type of problem"—*i.e.*, protected speech that students dislike—is "to file a complaint about discriminatory behavior."

49.     Based on those complaints, Dr. Negy was subsequently investigated, found to have committed discriminatory harassment, and terminated on January 25, 2020.

## IV.    The University's Computer Policy

50.     The University requires students to sign a user agreement and to register their personal devices with the UCF Information Technology department before they can access the internet over the University network ("ResNet"). The "ResNet User Agreement" sets forth several rules that students must follow to maintain internet access and network privileges.

51.     In September 2016, the University promulgated Policy 4-002.2, which governs "all University … students … who use university information technology resources."

52.     The University forbids students from using the University internet network to "transmit to others or to display images, sounds, or messages that reasonably could be perceived as being harassing, invasive, or unwanted." It also prohibits students from sending "harassing or hate messages" from their University email accounts.

53.     Any "[v]iolation of the computer and network rules and policies shall result in disciplinary action," "up to and including termination." If the University finds a violation to be sufficiently serious, it will refer the matter "to the appropriate university officials, such as the dean of students of the division vice president for appropriate disciplinary action." In any event, violations "generally result in immediate loss of network and computer access and privileges."

54.     The University's computer policy does not elaborate on the terms "hate," "harassing," "invasive," or "unwanted." Nor does it provide any examples of prohibited behavior.

## V.     The University's Just Knights Response Team

55.     The University maintains a bias response team, which it calls the Just Knights Response Team ("JKRT"). The JKRT, according to the University, is "an inter-divisional team that assesses bias incidences in order to coordinate university resources for the creation of effective interventions and future incident prevention programming."

56.     The JKRT is comprised of high-ranking officials from nearly every University department overseeing student life, including the UCF campus police department. The JKRT's members include Commander James Mangan (who leads a 20-officer UCF campus police department); the Executive Director of the Florida Consortium of Public Universities; the Director of UCF Global;

and senior representatives from the University's offices of Housing and Residence Life, Student Development and Enrollment Services, Social Justice and Advocacy, Recreation and Wellness Center, Student Care Services, and Faculty Relations.

57.    The JKRT was created to "act as a clearinghouse for any bias-related incidents that may occur on UCF campuses."

58.    To that end, the JKRT "receive[s], monitor[s], refer[s], and, as necessary, coordinate[s] university resources to these incidents." It "provides a safe space for students" who "are witnesses to or targets of bias" and "ensure[s] comprehensive responses" to bias-related incidents.

59.    The JKRT defines a bias-related incident as "any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics or background."

60.    Bias is described as "offensive" actions based on personal characteristics, including "race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability, veteran status, military status, or sexual orientation." The JKRT warns that "[s]uch acts may result in creating a hostile environment and may have a negative psychological, emotional, or physical impact on an individual, group, and/or community."

61.    According to the JKRT, "[b]ias-related incidents occur without regard to whether the act is legal, illegal, intentional, or unintentional. While these acts do not necessarily rise to the level of a crime, a violation of state law, university policy, or the student code of conduct," "a bias act may contribute to creating an unsafe, negative, unwelcoming environment of the victim, or anyone who shares the same social identity as the victim, and/or community members at the university."

62.    Bias-related incidents can occur on or off campus, including on social media or other digital platforms.

63.    Bias-related incidents can be speech that someone perceives as "confrontation/intimidation," "verbal harassment/slurs/threats," "bullying," "threatening mail/email/on-line harassment," "threatening voice mail/message," or a "written slur or threat." Bias-related incidents can also be "gestures" or "other" actions.

64.    Students can submit complaints about bias incidents online via a "JKRT Intake Form." Complainants are not required to identify themselves or provide their email addresses or phone numbers.

65.    The intake form asks students to specify the date of and location of the alleged incident and to "list the individuals involved (excluding yourself)." It contains entries for the respondent's name, role in a student organization (if any), "phone number (if known)," "email address (if known),"

and UCF Personal Identification Number. It also contains an option to include additional respondents, if applicable.

66.     The form requires complainants to provide a description of the incident and their "desired outcome" and provides an option to include "supporting documentation" for the complaint.

67.     The main page of the JKRT explicitly warns about referrals to other University officials: "By submitting your report, this information may be shared with the Office of Student Conduct (OSC), Office of Student Rights and Responsibility (OSRR), and/or the UCF Police Department (UCFPD)."

68.     In April 2019, a member of the JKRT acknowledged that students come "to [his] office rehearsed in their 'concerns' for their safety and mental health" when conservative organizations invite speakers to campus, and that student "[g]roups get training on what to say to get an event canceled."

69.     The University promotes the JKRT and encourages students to report "bias-related incidents" to it.

70.     In a June 2020 letter, the president of the University reminded the UCF community of the JKRT. "What is needed now is action," he said—"a commitment from our university to not merely celebrate our diversity, but to be actively anti-racist." Because "[s]ystemic racism, sexism, homophobia and other hateful ideologies seek to deny our shared humanity," "[t]hey must be called out and confronted." "[R]eflection" is not enough, the president

continued, and "must be paired with action and a commitment to stand against racism in all its forms. At UCF, hate and bias-related incidents are responded to by the Just Knights Response Team, which serves as a resource for our entire community to help ensure a safe and inclusive UCF experience."

71.    The interim dean likewise wrote a letter in June 2020 that reminded the UCF community that "any social or racial bias can be reported to [the JKRT]."

72.    University professors have listed the JKRT as a resource on class syllabi.

73.    The University's Multicultural Student Center has used its Twitter account to encourage students to use the JKRT to stand up "against prejudice in our community."

74.    An OIE investigation report revealed that the JKRT received eleven reports against a professor, Dr. Negy, after University officials encouraged students to report him. The University later terminated Dr. Negy for "discriminatory harassment" and other alleged misconduct.

75.    When it receives reports, the JKRT "creates timely interventions" and attempts to respond to every report within 48 hours.

76.    The JKRT's interventions can "involve a variety of activities including discussion, mediation, training, counseling and consensus building."

77.    The JKRT's intervention involve not just the persons who are "impacted by" bias incidents, but also "the persons involved in" bias incidents.

78.    "Failure to comply with oral or written instruction from duly authorized University officials (i.e. faculty, staff, administration, residence hall staff) acting within the scope of their job duties or law enforcement officers acting in the performance of their duties," constitutes "disruptive behavior" under the University's code of conduct and subjects a student to formal discipline.

79.    The University refers to this entire scheme of reporting, investigating, and responding as "the Just Knights Response Team (JKRT) protocol."

## VI.   The Effect of the University's Policies on Speech First's Members

80.    Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech that is covered by the University's harassment policy, computer policy, and bias-incidents policy, and they credibly fear that the expression of their deeply held views will be considered "biased" and reported to the JKRT.

81.    One Speech First member ("Student A") is a junior at the University.

82.    Student A is politically conservative and holds views that are unpopular and in the minority on campus.

83.    Student A believes that affirmative action is deeply unfair, because it helps one racial group (e.g., African Americans) by harming other racial groups (e.g., whites and Asian Americans).

84.    Student A believes that abortion is immoral, that a baby is not a woman's "property" just because it is not outside of the womb, and that abortion is another form of slavery.

85.    Student A believes that a person is either a man or a woman, that a man cannot become a woman because he "feels" like one, and that a woman cannot become a man because she "feels" like one. Student A does not want to be forced to call people by the gender of their choice.

86.    Student A believes the government should not be in the business of marriage and should not be able to force religious organizations to recognize marriages with which they disagree.

87.    Student A believes that illegal immigration is dangerous and ruins economies. He believes that people can be "illegal aliens."

88.    Student A also strongly supports the Second Amendment and believes that efforts to take guns away from Americans are deeply dangerous.

89.    Finally, Student A supports Israel and believes that the Palestinian movement is anti-Semitic.

90.    Student A enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

91.    Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Orlando.

92.    Because he has strong views on these issues, Student A wants to speak passionately and repeatedly about these matters. He wants to point out the flaws in fellow students' arguments and encourage them to change their minds or, at a minimum, to understand his views.

93.    But the University's harassment and computer policies and the Just Knights Response Team make Student A reluctant to openly express his opinions.

94.    Student A does not fully express himself or talk about certain issues, however, because he fears that sharing his beliefs may be considered "discriminatory harassment." He fears that other students will find his views "unwanted" or "humiliating" or claim that his views "interfere[] with" their educational opportunities. Student A believes that many of the topics that he wants to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." Student A's fears are grounded in his own personal experiences on campus.

95.     Student A's fears are amplified by the fact that the University can punish him not only for committing "discriminatory harassment" himself, but also for "complicity" or "failing to intervene" during someone else's "discriminatory harassment."

96.     Student A also wants to use the University email system to contact other students in support of conservative initiatives and to oppose controversial student-government proposals. But Student A does not fully express himself or talk about certain issues because he fears that doing so will be considered a violation of the ResNet User Agreement and UCF Policy 4-002.2, and that he will lose his network privileges or even face disciplinary sanctions as a result. Student A fears that other students will characterize emails asserting his views as "harassing," "invasive," "unwanted," or "hate messages."

97.     Finally, Student A does not fully express himself or talk about certain issues because he fears that other students, faculty members, or others will report him to the Just Knights Response Team for committing a "bias-related" offense. Student A worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student A is afraid that the Just Knights Response Team will keep a record on him, share the allegations with others

within the university, call him in for meetings, or refer the allegations to the Office of Student Rights and Responsibility or the UCF police department.

98.   Student A is aware of the recent investigation and subsequent termination of former University Professor Charles Negy, after he expressed his own opinions on Twitter in June 2020. Seeing a psychology professor investigated and fired for his private speech only heightens Student A's fear of expressing his views. If a tenured professor can be fired for speech, Student A worries what will happen to him.

99.   Another Speech First member ("Student B") is a junior at the University.

100.   Student B is politically conservative and holds views that are unpopular and in the minority on campus.

101.   Student B believes that affirmative action produces hate and resentment, not actual solutions to problems. Student B disagrees with "diversity training" and does not believe that all white people are racist. She does not support the Black Lives Matter movement.

102.   Student B is pro-life and does not think women should be allowed to have "convenience" abortions.

103.   Student B supports people who are in the LGBTQ community, but there are many things she doesn't understand, like the new use of students' preferred pronouns. Student B will try her best to be polite with fellow

students, but she doesn't believe anyone should be forced to use certain pronouns.

104.   Student B strongly disagrees with illegal immigration. She believes people should come to the United States legally, learn English, pass the citizenship test, and follow the rules. She believes that most of the people who come to this country illegally will not pay taxes and will end up on welfare.

105.   Student B is a strong supporter of the Second Amendment. She believes that law-abiding citizens should have the right to own guns and to protect themselves from others and, in particular, the government.

106.   Finally, Student B believes allowing biological men who are transgender to play in women's sports is terrible and anti-feminist, because biological men are bigger, stronger, and faster than most biological women. Similarly, she believes allowing children to transition to a different gender is wrong. Student B believes that her views are grounded in common sense but that many find them to be "transphobic."

107.   Student B enrolled in the University because she wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

108.   Student B wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Orlando.

109.   Because she has strong views on these issues, Student B wants to speak passionately and repeatedly about these matters. She wants to point out the flaws in fellow students' arguments and encourage them to change their minds or, at a minimum, to understand her views.

110.   But the University's harassment and computer policies and the Just Knights Response Team make Student B reluctant to openly express her opinions.

111.   Student B does not fully express herself or talk about certain issues, however, because she fears that sharing her beliefs may be considered "discriminatory harassment." She fears that other students will find her views "unwanted" or "humiliating" or claim that her views "interfere[] with" their educational opportunities. Student B believes that many of the topics that she wants to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." Student B's fears are grounded in her own personal experiences on campus.

112.   Student B's fears are amplified by the fact that the University can punish her not only for committing "discriminatory harassment" herself, but also for "complicity" or "failing to intervene" during someone else's "discriminatory harassment."

113.   Student B also wants to use the University email system to contact other students in support of conservative initiatives and to oppose

controversial student-government proposals. But Student B does not fully express herself or talk about certain issues because she fears that doing so will be considered a violation of the ResNet User Agreement and UCF Policy 4-002.2, and that she will lose her network privileges or even face disciplinary sanctions as a result. Student B fears that other students will characterize emails asserting her views as "harassing," "invasive," "unwanted," or "hate messages."

114.  Finally, Student B does not fully express herself or talk about certain issues because she fears that other students, faculty members, or others will report her to the Just Knights Response Team for committing a "bias-related" offense. Student B worries that there are other students who will "catch her" engaging in "biased" speech and that the University will take action against her. For example, Student B is afraid that the Just Knights Response Team will keep a record on her, share the allegations with others within the university, call her in for meetings, or refer the allegations to the Office of Student Rights and Responsibility or the UCF police department.

115.  Student B is aware of the recent investigation and subsequent termination of former University Professor Charles Negy, after he expressed his own opinions on Twitter in June 2020. Seeing a psychology professor investigated and fired for his private speech only heightens Student B's fear of

expressing her views. If a tenured professor can be fired for speech, Student B worries what will happen to her.

116.   Another Speech First member ("Student C") is a junior at the University.

117.   Student C holds conservative political beliefs that are unpopular and in the minority on campus.

118.   Student C is strongly opposed to illegal immigration. He believes that it is terrible that certain people cut the line and get government benefits. Student C believes that he should be allowed to say that certain people are "illegal" immigrants—because they are here illegally. Student C believes that his views are correct, but that many consider them to be "racist."

119.   Student C finds the issues surrounding gender identity to be confusing. Student C wants to be respectful of others, but he thinks many of the things he hears about gender identity are strange and not normal. Student C thinks that his views will be considered "transphobic" by some people.

120.   Student C strongly supports the Second Amendment. He believes that Americans should have the right to bear arms, even assault rifles, in order to protect themselves from others and from the government.

121.   Student C enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

122.   Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Orlando.

123.   Because he has strong views on these issues, Student C wants to speak passionately and repeatedly about these matters. He wants to point out the flaws in fellow students' arguments and encourage them to change their minds or, at a minimum, to understand his views.

124.   But the University's harassment and computer policies and the Just Knights Response Team make Student C reluctant to openly express his opinions.

125.   Student C does not fully express himself or talk about certain issues, however, because he fears that sharing his beliefs may be considered "discriminatory harassment." He fears that other students will find his views "unwanted" or "humiliating" or claim that his views "interfere[] with" their educational opportunities. Student C believes that many of the topics that he wants to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." Student C's fears are grounded in his own personal experiences on campus.

126.   Student C's fears are amplified by the fact that the University can punish him not only for committing "discriminatory harassment" himself, but

also for "complicity" or "failing to intervene" during someone else's "discriminatory harassment."

127.   Student C also wants to use the University email system to contact other students in support of conservative initiatives and to oppose controversial student-government proposals. But Student C does not fully express himself or talk about certain issues because he fears that doing so will be considered a violation of the ResNet User Agreement and UCF Policy 4-002.2, and that he will lose his network privileges or even face disciplinary sanctions as a result. Student C credibly fears that other students will characterize emails asserting his views as "harassing," "invasive," "unwanted," or "hate messages."

128.   Finally, Student C does not fully express himself or talk about certain issues because he fears that other students, faculty members, or others will report him to the Just Knights Response Team for committing a "bias-related" offense. Student C worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student C is afraid that the Just Knights Response Team will keep a record on him, share the allegations with others within the university, call him in for meetings, or refer the allegations to the Office of Student Rights and Responsibility or the UCF police department.

129.   Student C is aware of the recent investigation and subsequent termination of former University Professor Charles Negy, after he expressed his own opinions on Twitter in June 2020. Seeing a psychology professor investigated and fired for his private speech only heightens Student C's fear of expressing his views. If a tenured professor can be fired for speech, Student C worries what will happen to him.

130.   Students A, B, and C are not alone. Tellingly, more than four in ten students who responded to UCF's February 2020 Campus Climate Survey either disagreed or were unsure if they agreed with the statement "I can openly express my political views/worldviews in the surrounding community." According to the survey, bias or harassment based on individuals' political views occurs more frequently at the University than traditional forms of bullying.

## COUNT I
### Violation of the First Amendment
### (Discriminatory-Harassment Policy)

131.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

132.   The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to

survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id*. A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

133. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's

opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

134. The University's discriminatory harassment policy is unconstitutionally overbroad. By its terms, the policy plainly applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be perceived as "harassing" or "humiliating."

135. While a university might be able to prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the University's verbal-harassment rule goes far beyond that.

136. The Supreme Court has also consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations are" therefore "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "[A]ny restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly

tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

137.  "The First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

138.  By restricting offensive speech about personal characteristics such as race, ethnicity, or gender, the discriminatory-harassment policy is a content-based and viewpoint-based restriction on protected speech. The University has no compelling interest in suppressing the unfettered exchange of viewpoints. Even if the University could identify a compelling interest, its viewpoint-discriminatory ban is not narrowly tailored to further that interest.

139.  Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
## Violation of the First Amendment
## (Computer Policy)

140.  Plaintiff repeats and realleges each of the prior allegations in this complaint.

141.  The University's computer policy prohibits students from "transmit[ting]" or "display[ing] images, sounds, or messages that reasonably

could be perceived as being harassing, invasive, or otherwise unwanted." It also prohibits using "university messaging systems" to send "harassing or hate messages."

142.   Violations of the computer policy "result in disciplinary action," including the "immediate loss of network and computer access and privileges" and other punishments.

143.   The computer policy is unconstitutionally overbroad. There are a substantial number of instances in which the policy cannot be applied consistent with the First Amendment. According to the policy itself, the legality of a post depends entirely upon the perceptions of a recipient, observer, or listener.

144.   This overbroad policy chills protected speech and expression.

145.   Defendants adopted this unconstitutional policy under color of state law.

**COUNT III**
**Violation of the First and Fourteenth Amendments: Void for Vagueness**
**(Computer Policy)**

146.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

147.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary

goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see also In re Hunt*, 835 F.3d 1277, 1279 (11th Cir. 2016) (An "impossibly vague" law or regulation "guarantees arbitrary enforcement of the law and denial of fair notice to the public.").

148. "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id*. (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id*. (quoting *Grayned*, 408 U.S., at 108-09).

149. This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for

fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

150.   The harassment provision of the computer policy lacks any definitions, detail, context, or notice to students about what sorts of messages the University views as "hate," "harassing," "invasive," or "unwanted." The only clue the policy provides is that the acceptability of certain "images, sounds, or messages" turns on what an observer or recipient "perceive[s]." This provision is "impossibly vague" and therefore unconstitutional." *Hunt*, 835 F.3d at 1279.

151.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT IV
## Violation of the First Amendment
## (JKRT)

152.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

153.   The University's definition of "bias-related incident" encompasses speech that is fully protected under the First Amendment.

154.   The "bias-related incidents" policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

155.   The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

156.   Even if students cannot be formally disciplined for committing "bias incidents," the JKRT protocol objectively chills speech by threatening students with negative consequences and by subjecting them to burdensome administrative processes (including meetings with University administrators). *Schlissel*, 939 F.3d 756; *Fenves*, 979 F.3d 319.

157.   This overbroad policy chills protected speech and expression.

158.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT V
## Violation of the First and Fourteenth Amendments: Void for Vagueness
## (JKRT)

159.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

160.   The University's definition of a "bias-related incident," which applies to "gestures," "confrontation/intimidation" and "other" undefined actions, is amorphous and subjective.

161.   This amorphous standard creates a serious risk that the policy will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

162.   The University's policy on "bias-related incidents" is thus void for vagueness.

163.   Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.   A declaratory judgment that the University's discriminatory-harassment policy violates the First and Fourteenth Amendments;

B.   A declaratory judgment that the University's computer policy violates the First and Fourteenth Amendments;

C.   A declaratory judgment that the "bias-related incidents" policy, as enforced by the JKRT, violates the First and Fourteenth Amendments;

D.   A permanent injunction barring Defendants from enforcing the University's discriminatory-harassment policy;

E.   A permanent injunction barring Defendants from enforcing the University's computer policy;

F.   A permanent injunction ordering Defendants to disband the JKRT;

G.   A permanent injunction barring Defendants from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias-related incidents;

H.   A preliminary injunction granting the relief specified above during the pendency of this action;

I.   Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

J.   All other relief to which Plaintiff is entitled.

Respectfully submitted,

Dated: February 16, 2021          */s/ Daniel Shapiro*

J. Michael Connolly (pro hac vice forthcoming)
Cameron T. Norris (pro hac vice forthcoming)
James F. Hasson (pro hac vice forthcoming)
Daniel Shapiro (FL Bar #1011108)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
daniel@consovoymccarthy.com

## VERIFICATION

I, Nicole Neily, declare as follows:

1.     I am the President of Speech First, Inc., the plaintiff in this case.

2.     I have reviewed this complaint.

3.     For the allegations within my personal knowledge, I believe them all to be true.

4.     For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on February, 16 , 2021


Nicole Neily, President of Speech
First, Inc.