# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SPEECH FIRST, INC.,

*Plaintiff*,

v.

ALEXANDER CARTWRIGHT, in his official capacity as President of the University of Central Florida, et al.,

*Defendants*.

Case No. 6:21-cv-00313

**Oral Argument Requested**

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LEGAL AUTHORITY

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Speech First, Inc., works to restore the freedom of speech on college campuses. It has members who attend the University of Central Florida, including Students A, B, and C. Speech First challenges three University policies that violate its members' constitutional rights:

1. The policy on "discriminatory harassment." UCF Policy 2-004.2(IV)(B).
2. The policy on sending "harassing or hate messages," UCF Policy 4-002.2(B)(7)(b), or messages that "reasonably could be perceived as being harassing, invasive, or otherwise unwanted," *ResNet User Agreement*, it.ucf.edu/resnet/user-agreement/.
3. The policy on "bias-related incidents," as enforced by the Just Knights Response Team, *Bias-Related Incidents*, jkrt.sdes.ucf.edu/bias/.

Speech First asks this Court to preliminarily enjoin Defendants from enforcing these policies during this litigation. Fed. R. Civ. P. 65; Local Rule 4.06. Speech First notified Defendants of this motion. Local Rule 6.02.

Speech First is entitled to preliminary relief. The challenged policies are likely unconstitutional because they impose vague, overbroad, content-based, and viewpoint-based restrictions on protected speech. Deprivations of free speech are a classic form of irreparable harm. And because the policies are likely unconstitutional, the equities and public interest necessarily favor an injunction. For all these reasons, which are detailed below, the Court should grant this motion and enter a preliminary injunction.

## MEMORANDUM OF LEGAL AUTHORITY

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972). "The college campus" is supposed to "serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). But the University of Central Florida has enacted three policies that restrain, deter, suppress, and punish speech.

***First***, the University's discriminatory-harassment policy bans certain speech—"verbal acts," "name-calling," and "graphic or written statements"— "based upon" someone's "national origin," "non-religion," "gender identity," "political affiliations," and other protected classifications. This overbroad, viewpoint-based restriction on speech violates the First Amendment.

***Second***, the University's computer policy forbids students from sending "hate messages" or messages that "could be perceived as being harassing, invasive, or otherwise unwanted." Contrary to popular belief, the First Amendment has no exception for "hate speech" or "harassment." The computer policy's vague, overbroad restrictions on speech violate the Constitution.

***Third***, the University maintains a bias-response team, called the Just Knights Response Team (JKRT). Comprised of University administrators (including a police officer), the JKRT monitors "bias-related incidents" on and off

campus. A "bias-related incident" is anything, even if "unintentional," that is "directed towards an individual or group based upon actual or perceived identity characteristics or background." Students accused of "bias-related incidents" can be summoned for "discussion, counseling, training, [or] consensus-building" or referred for formal discipline. Bias-response teams like the JKRT, in effect and by design, are "the clenched fist in the velvet glove of student speech regulation." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020). The JKRT's bureaucratic processes—and the vague, overbroad definition of "bias-related incident" that triggers them—violate the First and Fourteenth Amendments.

Speech First will likely prevail on the merits of these constitutional claims. Because it readily satisfies the remaining criteria for a preliminary injunction, this Court should grant its motion.

## BACKGROUND

The University regulates its students in several ways. Three of those policies cross the constitutional line: its discriminatory-harassment policy, its computer-use policy, and its JKRT protocol for bias-related incidents.

## I.   The Discriminatory-Harassment Policy

In the fall of 2020, the University published Policy 2-004.2, titled "Prohibition of Discrimination, Harassment, and Related Interpersonal Violence." Policy 2-004.2 bans "discriminatory harassment" that causes a "hostile

environment." Shapiro Decl., Ex. A at 9. It defines such harassment as "verbal, physical, electronic or other conduct based upon" a "protected class" that "interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services" and that "meet[s] the description of … *Hostile Environment Harassment.*" Ex. A at 9. "Protected class" includes an individual's "race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, [and] veteran's status." Ex. A at 9.

Hostile-environment harassment is defined as discriminatory harassment that is "so severe or pervasive" that, "when viewed from both a subjective and objective perspective," it "unreasonably interferes with, limits, deprives, or alters" the "terms or conditions of education" or "participation in a university program or activity." Ex. A at 5. The University warns that "[a] hostile environment can be created … by a single or isolated incident." Ex. A at 5.

Discriminatory harassment, according to the University, is "unlawful.*"* Ex. A at 7. Examples include "verbal acts, name-calling, graphic or written statements (via the use of cell phones or the Internet), or other conduct that may be humiliating." Ex. A at 9. According to the University, it can punish

discriminatory harassment that occurs on or off campus. Ex. A at 2-3. There is no "time limit for a complainant to report" such conduct to the University. Ex. A at 20.

Students report discriminatory harassment to the University's Office of Institutional Equity (OIE). OIE then conducts an investigation and gives written findings. Students found guilty of discriminatory harassment are subject to discipline. Ex. B at 3. Discriminatory harassment also violates the Golden Rule Student Handbook—the code of conduct for University students. Violations of the code subject a student to discipline. Ex. C at 33. The University tells students that the "Rules of Conduct should be read broadly and are not designed to define prohibited conduct in exhaustive terms." Ex. C at 24.

On top of forbidding students from engaging in discriminatory harassment themselves, the code of conduct also prohibits students from "condoning or encouraging" discriminatory harassment and from "failing to intervene … while it is occurring." Ex. D at 5.008(4)(h). The code of conduct also forbids "[c]omplicity," which means "aiding, facilitating, promoting, or encouraging" discriminatory harassment. Ex. D at 5.008(20).

The University applies its discriminatory-harassment policy to protected speech. In June 2020, after tenured psychology professor Dr. Charles Negy posted controversial opinions about systemic racism, University officials urged students to file discriminatory-harassment complaints against him. Ex. E

(0:57-1:07), https://bit.ly/2ZHX0hc; Ex. F (0:35-0:50), https://bit.ly/3sjNmNO; Ex. G. (2:27-2:50), https://bit.ly/3aH1uL4. Based on those complaints, Negy was investigated and fired for discriminatory harassment. Ex. H.

## II.    The Computer Policy

The University also regulates what students can say on the internet. The University requires students to sign a user agreement and register their personal devices to access its network. The ResNet User Agreement contains rules that students must follow to maintain internet access. Ex. I. The Agreement forbids students from using the University's network to "transmit to others or to display images, sounds, or messages that reasonably could be perceived as being harassing, invasive, or otherwise unwanted." Ex. I at 2. Further, in September 2016, the University promulgated Policy 4-002.2, which governs "all University … students who use university information technology resources." Ex. J at 1. The Policy prohibits students from sending "harassing or hate messages" from their University email accounts. Ex. J at 4.

The University's computer policy does not elaborate on the terms "hate," "harassing," "invasive," or "unwanted"; nor does it provide any examples of prohibited behavior. But the University is emphatic that it does "not tolerate hate speech" and that it will "take decisive action to stamp out" discrimination "[w]henever we find [it]." Ex. K.

Any violation of the University's computer policies "shall result in disciplinary action," "up to and including termination." Ex. I at 4. Even without formal discipline, violations "generally result in immediate loss of network and computer access and privileges." Ex. I at 5.

## III. The Bias-Related Incidents Policy and the JKRT Protocol

The University maintains a bias-response team, which it calls the Just Knights Response Team. The JKRT is "an inter-divisional team that assesses bias inciden[ts]" to, among other things, create "effective interventions." Ex. L at 3. The JKRT is comprised of high-ranking officials from several University departments, including the campus police. Ex. M.

The JKRT is "a clearinghouse for any bias-related incidents that may occur on UCF campuses." To that end, the JKRT "receive[s], monitor[s], refer[s], and, as necessary, coordinate[s] university resources to these incidents." Ex. L at 2. It "provides a safe space for students" who "are witnesses to or targets of bias" and "ensure[s] comprehensive responses" to bias-related incidents. Ex. L at 2.

The JKRT defines a bias-related incident as "any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics or background." Ex. N at 1. Bias occurs when students say something "offensive" based on, for example, "race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability,

veteran status, military status, or sexual orientation." Ex. N at 1. Such speech, according to the University, "may contribute to creating an unsafe, negative, unwelcoming environment of the victim, or anyone who shares the same social identity as the victim." Ex. N at 1. Something can be a bias-related incident whether it is "legal, illegal, intentional, or unintentional," and whether it occurs on or off campus, including over the internet. Ex. N at 1. All that matters is whether "sufficient objective facts" are present that "a reasonable person" could conclude that "the behavior or actions in question may be motivated by bias towards the status of a targeted individual or group." Ex. N at 2.

Students submit complaints about bias-related incidents via a JKRT intake form. The intake form asks students to specify the date and location of the alleged incident and "list the individuals involved." Ex. O. It contains entries for the accused students' name, student organization (if any), phone number, email address, and University Personal Identification Number. Ex. O. The form instructs complainants to describe the incident, specify their "desired outcome," and provide "supporting documentation" as appropriate. Ex. O. Complainants are not required to identify themselves.

When the University receives complaints about bias-related incidents, it initiates "the [JKRT] protocol." Ex. N at 2. The JKRT "track[s]" bias-related incidents and "will receive, monitor, refer, and, as necessary, coordinate university resources to these incidents." Ex. L at 1. The JKRT warns complainants

that, "[b]y submitting your report, this information may be shared with the Office of Student Conduct (OSC), Office of Student Rights and Responsibility (OSRR), and/or the UCF Police Department (UCFPD)." Ex. P. The JKRT also attempts to respond to every report within 48 hours, Ex. BB, and it uses the reports to "creat[e] timely interventions," Ex. L at 3. Interventions can "involve a variety of activities including discussion, mediation, training, counseling and consensus building." Ex. L at 3. The interventions include both "the persons involved in and impacted by bias inciden[ts]," though the JKRT tries to be "sensitive to the rights of all parties involved." Ex. L at 3.

The University promotes the JKRT and encourages students to report "bias-related incidents" to it. In June 2020, President Cartwright stressed that "hate and bias-related incidents are responded to by the Just Knights Response Team." Ex. Q. The JKRT, he continued, reflects the University's "commitment … to be actively anti-racist"—to take "action" instead of relying solely on "reflection." Ex. Q. Because "[s]ystemic racism, sexism, homophobia and other hateful ideologies seek to deny our shared humanity," he said, "[t]hey must be called out and confronted." Ex. Q. Around the same time, the interim dean of the College of Sciences reiterated that "any social or racial bias can be reported to [the JKRT]." Ex. R. The University's Multicultural Student Center also urges students to stand up "against prejudice in our community" by reporting

other students to the JKRT, Ex. S, and University professors list the JKRT on class syllabi. Ex. T at 6-7; Ex. U at 8.

Given the University's expansive definition of "bias-related incident," the JKRT protocol often targets protected expression. For example, in April 2019, a JKRT member acknowledged that, when conservative groups invite speakers to campus, other students come "to [his] office rehearsed in their 'concerns' for their safety and mental health" to get the event "canceled." Ex. V. The JKRT also received at least ten reports about Dr. Negy's speech before the University fired him last month. Ex. W at 240.

## IV. Speech First and This Litigation

Plaintiff, Speech First, is a nationwide membership organization dedicated to preserving human and civil rights secured by law, including the freedom of speech. Neily Decl. ¶2. Speech First protects the rights of students at colleges and universities through litigation and other lawful means. Neily Decl. ¶2.

Speech First has several members who currently attend the University, including Students A, B, and C. Neily Decl. ¶¶3-8. These students' views are "unpopular and in the minority on campus." *E.g.*, Student A Decl. ¶4. For example, Student A believes "affirmative action is deeply unfair." Student A Decl. ¶5. Student B doesn't believe she should be "forced to use" other people's preferred pronouns and thinks "allowing biological men who are transgender to

play in women's sports is terrible and anti-feminist." Student B. Decl. ¶¶5, 10. Student C has "strong[]" views about immigration and "believe[s] that [he] should be able to say that certain people are 'illegal' immigrants." Student C Decl. ¶5.

Students A, B, and C want to "engage in open and robust intellectual debate" with their fellow students and to "speak passionately and repeatedly" about these issues in class, online, and in the broader community. Student A Decl. ¶¶13-14; Student B Decl. ¶¶12-13; Student C Decl. ¶¶9-10. But they do not fully express their beliefs or discuss certain topics because they know about the University's policies and do not want to face the negative repercussions. Student A Decl. ¶15; Student B Decl. ¶14; Student C Decl. ¶11. According to the students, Dr. Negy's recent firing only confirmed their fears that the University will wield its policies against unpopular speech. *E.g.*, Student A Decl. ¶20. And the students' reluctance to speak freely is further magnified by the fact that the University also forbids "condoning or encouraging," "failing to intervene" against, or "[c]omplicity" in another student's misconduct. Student A Decl. ¶17; Student B Decl. ¶16; Student C Decl. ¶13.

## ARGUMENT

Speech First is entitled to a preliminary injunction if four things are true:

11

1. It has "a substantial likelihood of success on the merits."

2. It will suffer "irreparable injury unless the injunction is granted."

3. The "harm from the threatened injury outweighs the harm the injunction would cause the opposing party."

4. And the injunction "would not be adverse to the public interest."

*Gonzalez v. Gov'r of Ga.*, 978 F.3d 1266, 1270-71 (11th Cir. 2020). In First Amendment cases, the first factor is decisive. When a policy likely violates the First Amendment, the remaining factors necessarily favor an injunction. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That's the case here.

## I.    Speech First is likely to prevail on the merits.

The First Amendment "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Its protections are strongest on the campuses of public colleges and universities. *See Healy*, 408 U.S. at 180; *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957); *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989); *Solid Rock*, 478 F. Supp. at 102. Universities that try to police speech that is "biased," "hateful," "harassing," or "discriminatory" thus have a poor track record in court. A "consistent line of

cases" has "uniformly found" such "campus speech codes unconstitutionally overbroad or vague." *Fenves*, 979 F.3d at 338-39 & n.17 (collecting ten cases).

These policies are overbroad because they sweep in "a substantial amount of speech that is constitutionally protected." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). There is no First Amendment exception for "harassing" or "hate" speech. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001); *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). So policies that regulate this speech impose "'content-based, viewpoint-discriminatory restrictions.'" *Saxe*, 240 F.3d at 206. It is "a core postulate of free speech law" that the government cannot "discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

Further, these policies are often void for vagueness. The Due Process Clause prohibits policies that use terms so vague that individuals of "ordinary intelligence" have "no reasonable opportunity to know what is prohibited," that lack "explicit standards," or that encourage "ad hoc," "subjective" enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). This prohibition is even "more stringent" for policies, like college speech codes, that affect "the right of free speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Speech codes that rely on loose, subjective standards are void for vagueness because students cannot know in advance (and administrators can arbitrarily decide) what's prohibited. *See Coates v.*

13

*Cincinnati*, 402 U.S. 611, 614 (1971); *McCauley v. Univ. of V.I.*, 618 F.3d 232, 250-51 (3d Cir. 2010).

The policies challenged here suffer from these same defects. The University's discriminatory-harassment policy, computer policy, and bias-related incidents policy likely violate the First and Fourteenth Amendments.

### A.   The discriminatory-harassment policy is overbroad and viewpoint-discriminatory.

The University's discriminatory-harassment policy is overbroad. While universities can regulate harassing *conduct*, the University concedes that its policy regulates speech—"verbal acts, name-calling, [and] graphic or written statements." Ex. A at 9. In fact, the policy targets "political" speech and speech on the most controversial issues of the day, including "race," "gender identity," and "religion" and "non-religion." Ex. A at 9. The policy thus "strikes at the heart of moral and political discourse—the lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment." *Saxe*, 240 F.3d at 210.

The discriminatory-harassment policy does not honor the line between punishable conduct and protected speech that the Supreme Court drew in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). Interpreting Title IX, *Davis* defined "sexual harassment" as behavior that is "so severe, pervasive, and objectively offensive that it denies its victims ... equal access to education." *Id.* at 652. The *Davis* standard intentionally excludes "a single

14

instance of one-on-one peer harassment," even if "sufficiently severe." *Id.* at 652-53. The *Davis* Court adopted this narrow standard because a broader one would collide with the First Amendment. *See id.* at 649-52; *id.* at 667 (Kennedy, J., dissenting). The University, however, ignores *Davis*'s limits. Because its policy covers "severe *or* pervasive" harassment, it reaches "a single or isolated incident, if sufficiently severe." Ex. A at 5 (emphasis added). And instead of barring harassment that *denies* someone's education, the University bans harassment that "interferes with, limits, deprives, or alters" it. Ex. A at 5. The University has no legitimate basis to go beyond *Davis*'s limits. *See Fenves*, 979 F.3d at 337 n.16; *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008).

Even if the discriminatory-harassment policy had hewed to *Davis*, it still would violate the First Amendment because it discriminates by content and viewpoint. The University's policy does not bar "harassment"; it bars "*discriminatory* harassment*." Specifically, it bars only harassment that is "based upon" various "protected classes" (*e.g.*, race, sex, religion, and political affiliation). Ex. A at 9. This is content discrimination because the University allows harassment that is not "addressed to one of the specified disfavored topics." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). And it is viewpoint discrimination because the University is targeting speech on these topics that discriminates or offends. *Id.* at 391-93; *Iancu*, 139 S. Ct. at 2300; *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1184-85 (6th Cir. 1995). The University has no legitimate

15

interest in drafting its policy this way. *R.A.V.*, 505 U.S. at 395-96; *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993).

### B.   The computer policy is overbroad and vague.

The University's computer policy is similarly overbroad. The challenged provisions *only* regulate speech; they govern "messages" and what students can "transmit" and "display." Exs. I-J. Their broad bans on messages that are "harassing," "hate," "invasive," or "unwanted" impose content-based, viewpoint-based restrictions on a limitless amount of protected speech. *See Dambrot*, 55 F.3d at 1182-85; *DeJohn*, 537 F.3d at 319-20; *McCauley*, 618 F.3d at 251-52. The overbreadth is magnified by the fact that the computer policy turns on "the subjective reaction of the listener," *McCauley*, 618 F.3d at 252, and does not require any minimum amount of severity or pervasiveness, *DeJohn*, 537 F.3d at 320.

The computer policy is also void for vagueness. The University does not define or elaborate the meaning of "harassing," "hate," or "invasive"—terms that "are general and elude precise definition." *Doe*, 721 F. Supp. at 867. Worse, each of these terms—especially "unwanted"—is "subjective," since "different people find different things" harassing, hateful, invasive, or unwanted. *Dambrot*, 55 F.3d at 1184.

The ResNet User Agreement adds another layer of vagueness by asking whether the message "reasonably *could be perceived* as being" harassing, invasive, or unwanted. Ex. I at 2 (emphasis added). Perceived by whom? The particular recipient? An average student? The University? The policy is vague because it never specifies "whose sensibilities must be offended." *Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983), *on reh'g*, 723 F.2d 1164 (5th Cir. 1984); *accord Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1321-22 (11th Cir. 2017) (en banc majority op. of Marcus, J.). Even if it did specify the relevant audience, the policy remains impenetrable because, by its terms, it covers messages that "reasonably could be perceived" as harassing, invasive, or unwanted—even if the message is not *in fact* harassing, invasive, or unwanted. "This vagueness is inconsistent with the command of the First Amendment." *Wollschlaeger*, 848 F.3d at 1322-23.

### C. The bias-related incidents policy, as enforced by the JKRT protocol, is overbroad and vague.

The University's policy on bias-related incidents suffers from the same overbreadth and vagueness problems. The definition of bias-related incidents expressly covers speech—including "[s]igns," "mail/email," "[t]elephone" calls, "[c]onfrontation/intimidation," "[v]erbal harassment," and "other"—even if the speech is entirely "legal." Ex. N at 3. By targeting speech that is "biased," "offensive," and "based upon" specific classifications, Ex. N at 1, the policy is a content-based, viewpoint-based regulation on protected expression. *R.A.V.*, 505

U.S. at 391-93. The definition of "bias-related incident" is also vague. It turns on unpredictable assessment of how speech "may be" perceived, and it applies even if a student's bias was "unintentional." Ex. N at 1. The terms "bias" and "offensive" are also undefined and subjective. Ex. N at 1. As a member of the JKRT acknowledged in a different setting, "I am not sure we can actually define bias. It's too subjective." Ex. X.

Although bias-related incidents "do not necessarily rise to the level of … a violation of … university policy," Ex. N at 1, policies that "fall short of a direct prohibition" still violate the First Amendment when they have an objective "chilling" effect on speech, *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Objective chill can occur through "[i]nformal measures" such as "indirect 'discouragements,'" "'threat[s],'" "'coercion, persuasion, and intimidation.'" *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950). Bias-response teams like the JKRT—as two appellate courts found in cases brought by Speech First—objectively chill students' speech. *See Fenves*, 979 F.3d at 333 (University of Texas's Campus Climate Response Team); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (University of Michigan's Bias Response Team).

The JKRT "acts by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. From beginning to end, the JKRT

18

is designed to send a clear message to students: If you engage in a "bias-related incident," you are in trouble. The very name Just Knights Response Team "suggests that the accused student's actions have been prejudged to be [unjust]" and "could result in far-reaching consequences." *Id.* The JKRT's terminology— "bias," "incident," "victim," "targets," "witnesses," etc.—also suggests serious misconduct. *See id.* ("Nobody would choose to be considered biased"); *Fenves*, 979 F.3d at 338 ("The CCRT describes its work, judgmentally, in terms of 'targets' and 'initiators' of incidents."). That the University "invites anonymous reports" to the JKRT likewise "carries particular overtones of intimidation to students whose views are 'outside the mainstream.'" *Fenves*, 979 F.3d at 338. And because the JKRT is comprised of high-level university administrators, a student "could be forgiven for thinking that inquiries from and dealings with the [JKRT] could have dramatic effects such as currying disfavor with a professor, or impacting future job prospects." *Schlissel*, 939 F.3d at 765. Experts thus agree that these teams objectively chill students' speech. *See* Ex. Y at 5; Ex. Z at 2-3; Ex. CC; *Fenves*, 979 F.3d at 338.

The JKRT's "ability to make referrals" is one particular way that it "objectively chills speech." *Schlissel*, 939 F.3d at 765; *accord Fenves*, 979 F.3d at 333. Right on the homepage, the JKRT has a "[d]isclaimer" warning students that it can "share[]" reports of bias incidents to the University's disciplinary bodies: "the Office of Student Conduct (OSC), Office of Student Rights and

Responsibility (OSRR), and/or the UCF Police Department (UCFPD)." Ex. P. Referrals, in turn, can "*lead* to" formal discipline and, at a minimum, "initiate[] the formal investigative process, which itself is chilling." *Schlissel*, 939 F.3d at 765. Students need look no further than Dr. Negy for a recent example of how this process can play out.

The JKRT also chills speech with its so-called "protocol," Ex. N at 2—a kind of "'process-is-punishment' mechanism that deters people from speaking out," Ex. Y at 28. Committing a "bias-related incident" can get a student "report[ed]," "track[ed]," "monitor[ed]," investigated, and referred for discipline. Ex. L at 1-2; Ex. P. It can also trigger a JKRT "intervention," such as a request to meet for "discussion," "mediation," "training," "counseling," or "consensus building." Ex. L at 3. Though these meetings are ostensibly "voluntary," students do not see them that way. *See Schlissel*, 939 F.3d at 765. Especially not at the University, which prohibits "[f]ailure to comply with oral or written instruction from duly authorized University officials." Ex. C at 48.

In sum, the JKRT protocol "is sufficiently proscriptive to objectively chill student speech." *Fenves*, 979 F.3d at 333. Because the JKRT protocol is the consequence for committing a "bias-related incident," and because the University's definition of "bias-related incident" is plainly unconstitutional, Speech First is likely to succeed on this claim.

## II.    Speech First satisfies the remaining preliminary-injunction criteria.

Because Speech First is likely to prevail on its constitutional claims, the other criteria for a preliminary injunction are necessarily satisfied.

***Irreparable Harm***: The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Otto*, 981 F.3d at 870; *KH Outdoor*, 458 F.3d at 1271-72.

***Balance of Harms & Public Interest***: Because the University is a state actor, the "third and fourth requirements for a preliminary injunction—damage to the opposing party and public interest—can be consolidated." *Otto*, 981 F.3d at 870 (cleaned up). And it's "clear" that "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [policy]." *Id*.

## III.    The Court should decline to require an injunction bond.

No bond is needed here. Courts have broad discretion to "elect to require no [bond]." *BellSouth Telecomms., Inc. v. MCIMetro Access Trans. Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Bonds are usually reserved for injunctions, unlike this one, that "prevent[] commercial, money-making activities." *APR Energy, LLC v. First Inv. Grp. Corp.*, 88 F. Supp. 3d 1300, 1324 (M.D. Fla. 2015). And "[w]aiving" the bond is "particularly appropriate" in cases, like this

one, that allege "the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 2020 WL 5757809, at *25 n.25 (N.D. Ga. Sept. 28, 2020).

## CONCLUSION

The Court should grant Speech First's motion and preliminarily enjoin Defendants from enforcing the challenged policies during this litigation.

Respectfully submitted,

Dated: February 22, 2021          /s/ Daniel Shapiro

J. Michael Connolly (pro hac vice forthcoming)
Cameron T. Norris (pro hac vice forthcoming)
James F. Hasson (pro hac vice forthcoming)
Daniel Shapiro (FL Bar # 1011108)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
daniel@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

## CERTIFICATE OF SERVICE

On February 22, 2021, this document and its attachments were filed with the Court via the Court's ECF system and were emailed to Youndy Cook, Vice President and General Counsel of the University of Central Florida.

*/s/ Daniel Shapiro*