# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SPEECH FIRST, INC.,

*Plaintiff,*

v.

ALEXANDER CARTWRIGHT, in his official capacity as President of the University of Central Florida; et al.,

*Defendants.*

Case No. 6:21-cv-00313

## DECLARATION OF DANIEL SHAPIRO

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for plaintiff Speech First, Inc.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

3.      The following materials attached as exhibits are true and accurate copies of pages from public websites that were downloaded as PDF files between February 17, 2021, and February 21, 2021.

> a.      Exhibit A is UCF Policy 2-004.2, "Prohibition of Discrimination, Harassment and Related Interpersonal Violence," effective on October 14, 2020 and accessed on

February 17, 2021 at https://policies.ucf.edu/documents/2-004.pdf.

b.  Exhibit B is UCF Policy 3.0134, "Complaints and Grievances Alleging Discrimination, Discriminatory Harassment or Retaliation," effective October 22, 2020 and accessed on February 17, 2021 at https://www.eeo.ucf.edu/documents/GrievancesAllegingDiscrimination.pdf.

c.  Exhibit C is the University's student handbook for the 2020-2021 academic year (the "Golden Rule Student Handbook"), accessed on February 17, 2021 at https:// goldenrule.sdes.ucf.edu/ wp- content/ uploads/ sites/ 64/ 2020/08/2020-2021-Golden-Rule.pdf.

d.  Exhibit D is UCF Policy 5.008, "Rules of Conduct," effective December 3, 2020 and accessed on February 17, 2021 at https://regulations.ucf.edu/chapter5/documents/5.008RulesofConductFINALJuly19.pdf.

e.  Exhibit E is a tweet from UCF Knight News containing a video of President Cartwright speaking to UCF students, published on June 14, 2020 and accessed at https://twitter.com/UCFKnightNews/status/1272310037617291264 on February 17, 2021.

f.    Exhibit F is a tweet from UCF Knight News containing a video of Interim Provost Michael Johnson speaking to UCF students, published on June 14, 2020 and accessed at https://twitter.com/UCFKnightNews/status/1272292827997835266 on February 17, 2021.

g.    Exhibit G is a tweet from the University's official account containing a video of Interim Chief of Equity, Inclusion and Diversity Kent Butler speaking to students, published at https://twitter.com/UCF/status/1268646860937482247 on June 4, 2020 and accessed on February 17, 2021.

h.    Exhibit H is a letter sent by then-Interim Dean of the University College of Sciences Tosha Dupras entitled "Notice of Intent to Terminate," sent on January 13, 2021 and accessed on February 17, 2021 at https://legalinsurrection.com/wp-content/uploads/2021/01/UCF-Negy-2021-01-13-notice_of_Intent_C_Negy_Final_copy.pdf.

i.    Exhibit I is the University Office of Information Technology "ResNet User Agreement," accessed on February 17, 2021 at https://it.ucf.edu/resnet/user-agreement/.

j.    Exhibit J is UCF Policy 4-002.2, "Use of Information Technologies and Resources," effective on September 1, 2016

3

and accessed on February 17, 2021 at https://policies.ucf.edu/documents/4-002.pdf.

k.    Exhibit K is a tweet from University President Cartwright, published on June 1, 2020 and accessed on February 17 at https://twitter.com/UCFCartwright/status/12675017331876 41344?s=20.

l.    Exhibit L is the "About" page from the JKRT's website, accessed on February 17, 2021 at https://jkrt.sdes.ucf.edu/about/.

m.    Exhibit M is the "Contact the Team" page from the JKRT's website, accessed on February 17, 2021 at https://jkrt.sdes.ucf.edu/contact/.

n.    Exhibit N is the "Bias-Related Incidents" page from the JKRT's website, accessed on February 17, 2021 at https://jkrt.sdes.ucf.edu/bias/.

o.    Exhibit O is the "JKRT Intake Form" from the JKRT's website, accessed on February 17, 2021 at https://cm.maxient.com/reportingform.php?UnivofCentralFlorida&layout_id=40.

p.    Exhibit P is the "Home" page from the JKRT's website, accessed on February 17, 2021 at https://jkrt.sdes.ucf.edu.

q.      Exhibit Q is an article from UCF Today entitled "Our Future Is Inclusion," published by President Cartwright on June 2, 2020 and accessed on February 17, 2021 at https://www.ucf.edu/news/our-future-is-inclusion/.

r.      Exhibit R is an email from then-Interim Dean of the University College of Sciences Tosha Dupras, published on June 3, 2020 and accessed on February 17, 2021 at https://knightnews.com/wp-content/uploads/2020/06/Messagefrom InterimDean.pdf

s.      Exhibit S is a tweet from the University Multicultural Student Center, published on June 6, 2020 and accessed on February 17, 2021 at https://twitter.com/MSC_UCF/status/1269302463292674048.

t.      Exhibit T is a document published by the Clemson University Office of Teaching Effectiveness and Innovation entitled "Diversity and Inclusion Syllabus Statements," accessed on February 17, 2021 at https://www.clemson.edu/otei/documents/Teaching%20Review%20Resources/Diversity_InclusionSyllabiSamples.pdf.

u.    Exhibit U is a Spring 2019 syllabus for a University course entitled "Health and Wellness for the Performing Artist," accessed on February 17, 2021 at https://webcourses.ucf.edu/courses/1315810/assignments/syllabus.

v.    Exhibit V is a tweet from JKRT Member Michael Preston, published on April 2, 2019 and accessed on February 17, 2021 at https://twitter.com/MPrestonEdD/status/1113038015797096448.

w.    Exhibit W is a University Office of Institutional Equity report entitled "In re: OE Case No. 2019.01225," issued on January 13, 2021 and accessed on February 17, 2021 at https://legalinsurrection.com/wp-content/uploads/2021/01/UCF-Negy-OIE-Investigative-Report-Case-2019-01255-FINAL.pdf

x.    Exhibit X is a tweet from JKRT member Michael Preston, published on April 6, 2019 and accessed on February 17, 2021 at https://twitter.com/MPrestonEdD/status/1114622182590750721.

y.    Exhibit Y is the "Bias Response Team Report 2017" published by the Foundation for Individual Rights in Education (FIRE), accessed at https://www.thefire.org

/presentation/wp-content/uploads/2017/03/01012623/2017-brt-report-corrected.pdf on January 4, 2020.

z.    Exhibit Z is an article from the Iowa City Press-Citizen entitled "University of Iowa changing course on bias response team," published on August 18, 2016 and accessed on February 17, 2021 at https://www.press-citizen.com /story/news/education/university-of-iowa/2016/08/18/university-iowa-changing-course-bias-response-team/88962048/.

aa.    Exhibit AA is the "Key Findings" summary of the University's 2020 Campus Climate Survey, published in June 2020 and accessed on February 20, 2021 at https://diversity.ucf.edu/wpcontent/uploads/sites/4/2020/08/2020_Climate-Survey-Student-FINAL.pdf.

bb.    Exhibit BB is the "Bias-Related Incident Report" page of the JKRT website, accessed on February 20, 2021 at https://jkrt.sdes.ucf.edu/report/.

cc.    Exhibit CC is an article from the New Republic entitled "The Rise of 'Bias Response Teams' on Campus," published on March 30, 2016 and accessed on February 17, 2021 at https://newrepublic.com/article/132195/rise-bias-response-teams-campus.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 22, 2021.

_/s/ Daniel Shapiro_____
Daniel Shapiro

# EXHIBIT A



UNIVERSITY OF CENTRAL FLORIDA

**Office of the President**

| SUBJECT: | Effective Date: | Policy Number |
| --- | --- | --- |
| Prohibition of Discrimination, Harassment and Related Interpersonal Violence | 10/14/2020 | 2-004.2 |
| | Supersedes: | Page | Of |
| | 2-004.1 | 1 | 30 |
| | Responsible Authority: | |
| | Director, Institutional Equity | |

**TABLE OF CONTENTS**

I.        APPLICABILITY/ACCOUNTABILITY
II.      DEFINITIONS
III.     POLICY STATEMENT
IV.     PROHIBITED CONDUCT UNDER THIS POLICY
        A.     DISCRIMINATION
        B.     DISCRIMINATORY HARASSMENT
        C.     SEXUAL, GENDER-BASED, OR TITLE IX SEXUAL HARASSMENT
        D.     SEXUAL ASSAULT
        E.     SEXUAL EXPLOITATION
        F.     RELATIONSHIP VIOLENCE
        G.     STALKING
        H.     RETALIATION
        I.     COMPLICITY
V.      UNDERSTANDING THE DIFFERENCE BETWEEN PRIVACY AND CONFIDENTIALITY
VI.     EMPLOYEE REPORTING RESPONSIBILITIES
        A.     TITLE IX REPORTING OBLIGATIONS (RESPONSIBLE EMPLOYEES)
        B.     DEAN, DIRECTOR, DEPARTMENT HEAD, AND SUPERVISOR REPORTING OBLIGATIONS
        C.     CLERY REPORTING OBLIGATIONS (CAMPUS SECURITY AUTHORITY EMPLOYEES)
        D.     CHILD ABUSE REPORTING OBLIGATIONS (ALL EMPLOYEES)
VII.    COMPLAINANT OPTIONS FOR REPORTING PROHIBITED CONDUCT
        A.     REPORTING TO LAW ENFORCEMENT

      B.      REPORTING TO THE UNIVERSITY
VIII.   ACCESSING CAMPUS AND COMMUNITY RESOURCES & SUPPORTIVE MEASURES
      A.      REMEDIAL AND PROTECTIVE MEASURES
      B.      INTERIM ACTIONS
IX.     INAPPROPRIATE AMOROUS RELATIONSHIPS
      A.      STUDENT CONTEXT
      B.      EMPLOYMENT CONTEXT
X.      PREVENTION, AWARENESS AND TRAINING PROGRAMS
XI.     OBLIGATION TO PROVIDE TRUTHFUL INFORMATION
XII.    PROCEDURES
      A.      WHERE THE RESPONDENT IS A STUDENT OR REGISTERED STUDENT
           ORGANIZATION
      B.      WHERE THE RESPONDENT IS AN EMPLOYEE OR A DIRECT SUPPORT
           ORGANIZATION EMPLOYEE
      C.      WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE
      D.      WHERE THE RESPONDENT IS A THIRD-PARTY
XIII.   RELATED INFORMATION
      A.      STUDENTS AS RESPONDENTS
      B.      EMPLOYEE AND THIRD PARTIES AS RESPONDENTS
      C.      STATE AND FEDERAL LAW
XIV.   CONTACTS:  TITLE IX COORDINATOR
 XV.    INITIATING AUTHORITY

## I.    APPLICABILITY/ACCOUNTABILITY

This policy applies to the university community, which includes all students, employees, registered student organizations; direct support organizations' non-student employees (DSOs), and third parties. The university prohibits discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual, gender-based, or Title IX sexual harassment, complicity in the commission of any act prohibited by this policy, retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). Definitions for all forms of prohibited conduct can be found in Section IV of this policy. This policy pertains to acts of prohibited conduct committed by or against students, university and DSO employees and volunteers, registered student organizations, and third parties when:

1.    the conduct occurs on campus or other property owned by, controlled by, or affiliated with the university;

2.    the conduct occurs in the context of a university employment or education program or activity, including, but not limited to, university-sponsored study abroad, research, on-line, or internship programs; or

3.    the conduct occurs outside the context of a university employment or education program or activity, but has continuing adverse effects on or creates a hostile environment for students, university and DSO employees

and volunteers, or third-parties while on campus or other property owned by, controlled by or affiliated with the university or in any university employment or education program or activity.  This means that the university may take action against students, registered student organizations, DSOs, and third-parties for off-campus conduct if the conduct is specifically prohibited by law or university policies and regulations; may take action against university employees or volunteers for activities which fall outside the scope of employment but adversely affect the legitimate interests of the university; and may take action against students, university and DSO employees and volunteers, registered student organizations, and third-parties if the conduct poses (or demonstrates that the student's, employee's or third-party's continued presence on university premises poses) a danger to the health, safety or welfare of the university community; or if the conduct is disruptive to the orderly processes and functions of the university.

## II.    DEFINITIONS

**Campus Security Authority (CSA).** Individuals who are members of the campus police department; any individual who has responsibility for campus security but who does not constitute a member of the campus police department; any individual or organization specified in the university's statement of campus security policy as an individual or organization to which students and employees should report criminal offenses; and any employee of the university who has significant responsibility for student and campus activities, including but not limited to, student housing, student discipline and campus judicial proceedings.  CSAs at UCF include but are not limited to members of the campus police department, Student Affairs officials, Housing and Residence Life officials, Fraternity and Sorority Life professional staff (or related positions), athletic administrators (including Director, Assistant Directors, Coaches, and Trainers), Student Conduct officials, Office of Institutional Equity professional staff, faculty and staff advisors to registered student organizations, administrators at any UCF campus and instructional site, any individual who has the authority and the duty to take action or respond to particular issues on behalf of the university, and any individual who has significant responsibility for students and campus activities.  .

**Coercion.**  An unreasonable pressure for sexual activity. Coercion is more than an effort to persuade, entice, or attract another person to have sex. Conduct does not constitute coercion unless it impairs an individual's freedom of will to choose whether to participate in the sexual activity.

**Complainant.**  An individual who discloses having been subjected to any prohibited conduct under this policy, regardless of whether that person makes a report or seeks action under this policy. The university recognizes that an individual may choose to self-identify as a victim or a survivor. For consistency in this policy, the university uses the term complainant to maintain the neutrality of the policy and procedures.

**Confidential Employee.** Any employee who is entitled under state law to have privileged communications. Confidential employees will not disclose information about prohibited conduct to the university without the permission of the student or employee (subject to the exceptions set forth in the confidentiality section of this policy). Confidential employees and resources at the University of Central Florida are the following:

- Health Services employees
- Counseling and Mental Health Services employees
- Employee Assistance Program employees
- Ombuds Office employees
- Victim Services employees
- Student Legal Services employees
- Volunteer chaplains

**Consent.** An understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. The lack of a negative response, lack of resistance or protest, and silence are not consent. An individual who is incapacitated such as by alcohol and/or other drugs both voluntarily or involuntarily consumed may not give consent. Past consent to sexual activity does not imply ongoing future consent.

a. Responsibility: It is the responsibility of the initiator of the sexual activity to obtain clear and affirmative responses of a willingness to participate at each stage of sexual involvement.

b. Incapacitation:  a state where an individual cannot make rational, reasonable decisions because of age, mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated due to the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition. A person who is incapacitated lacks the capacity to give consent because they cannot understand the facts, nature, or extent of the sexual interaction. An individual may be incapacitated by force, threat, coercion, manipulation, reasonable fear of injury, intimidation, use of position of influence, or through the use of one's mental or physical helplessness or incapacity. Factors used to evaluate consent are found in this policy.

c. Standard: A determination of whether consent exists will be based on the information the initiator of the sexual act knew or should have known as a sober, reasonable person. Being impaired by alcohol or other drugs does not relieve an initiator of a sexual act from obtaining consent.

**Course of conduct.** Two or more acts, including but not limited to acts in which a person directly, indirectly, or through third-parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another

person, or interferes with another person's property.

**Direct Support Organization.**  An organization that is a subsidiary corporation of the university and is certified by the University of Central Florida Board of Trustees per Florida Statute 1004.28 to support the mission and goals of the university and the best interest of the state of Florida.

**Employee.**  Any individual employed by the University of Central Florida, including all full-time and part-time faculty, employees classified as Administrative and Professional (A&P), employees classified as University Support Personnel System (USPS), post-doctoral employees, resident assistants, graduate students with classroom responsibilities, professional research assistants, and OPS non-student employees.

**Force.**  The use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and/or coercion that overcome resistance.

**Hostile Environment Harassment**: Discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective.

In evaluating whether a hostile environment exists, the university will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct;
- Whether the conduct was physically threatening;
- The effect of the conduct on the complainant's mental or emotional state;
- Whether the conduct was directed at more than one person;
- Whether the conduct arose in the context of other discriminatory conduct or other misconduct;
- Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or university programs or activities; and
- Whether the conduct implicates concerns related to academic freedom or protected speech.

A hostile environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical.  However, an isolated incident, unless sufficiently serious, does not amount to Hostile Environment Harassment.

**Privileged Communication.** A private statement that must be kept in confidence by the recipient for the benefit of the communicator. Some examples of a privileged communication are statements made between an attorney and a client, a doctor and a patient, and a priest and a penitent.

**Prohibited Conduct.** For purposes of this policy, prohibited conduct refers to discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual, gender-based, or Title IX sexual harassment, complicity in the commission of any act prohibited by this policy, retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy.

**Quid Pro Quo Harassment**: Discriminatory harassment where submission to or rejection of unwelcome conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing).

**Respondent.** Any individual or group who has been accused of violating this policy.

**Responsible Employee.** Any university or DSO employee who is not a confidential employee. Responsible employees include but are not limited to faculty (full-time and part-time), staff (full-time and part-time), resident assistants, and graduate students with classroom responsibilities. Responsible employees also include all those employees identified as Campus Security Authorities (CSAs). The university reserves the right to designate other individuals involved in university-sponsored/related activities as responsible employees on a case-by-case basis.

**Student.** Any individual defined as a student in the University of Central Florida's Regulation UCF-5.006(3) and *The Golden Rule Student Handbook*.

**Substantial Emotional Distress.** Significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

**Third-Party.** Any contractor, vendor, visitor, applicant or other non-student or non-employee/volunteer affiliated with the university.

## III.    POLICY STATEMENT

The University of Central Florida is committed to maintaining a safe and non-discriminatory learning, living and working environment for all students, university and DSO employees and volunteers, registered student organizations, and third parties. Academic and professional excellence can exist only when each member of our community is assured an atmosphere of safety and mutual respect. All members of the university community are responsible for the maintenance of an environment in which people are

free to learn and work without fear of discrimination, discriminatory harassment, or interpersonal violence. Discrimination diminishes individual dignity and impedes equal employment and educational opportunities.

The university does not unlawfully discriminate in any of its education or employment programs and activities on the basis of an individual's race, color, ethnicity, national origin, religion, or non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in any other protected classes as set forth in state or federal law. To that end, this policy against Discrimination, Harassment and Related Interpersonal Violence (the "Policy") prohibits specific forms of behavior that violate state and federal laws, including but not limited to Title VII of the Civil Rights Act of 1964 ("Title VII"), Title IX of the Education Amendments of 1972 ("Title IX"), the Violence Against Women Reauthorization Act of 2013 ("VAWA"), Florida's Civil Rights Act (Sections 760.10 and 110.1221) and related state and federal anti-discrimination laws. Such behavior may also require the university to fulfill certain reporting obligations under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), as amended by VAWA, and Florida state law regarding reporting suspected child abuse and neglect.

The university prohibits discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual, gender-based , or Title IX sexual harassment, complicity in the commission of any act prohibited by this Policy, retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this Policy (collectively, "Prohibited Conduct"). Religious discrimination includes failing to reasonably accommodate an employee's or student's religious practices where the accommodation does not impose an undue hardship.  Disability discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability where the accommodations do not impose an undue hardship.  These forms of Prohibited Conduct are unlawful and undermine the mission and values of our academic community. In addition, inappropriate amorous relationships with employees in positions of authority can undermine the university's mission when those in positions of authority abuse or appear to abuse their authority.

The university adopts this Policy with a commitment to: (1) eliminating, preventing, and addressing the effects of Prohibited Conduct; (2) fostering a safe and respectful university community; (3) cultivating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct; (4) providing a fair and impartial process for all parties in the investigation and resolution of such reports; and (5) identifying the standards by which violations of this Policy will be evaluated and disciplinary action may be imposed. In addition, the university conducts ongoing prevention, awareness, and training programs for employees and students to facilitate the goals of this Policy.

A student, employee, or registered student organization determined by the university to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including permanent separation from the university. Third-parties or DSOs who commit acts of Prohibited Conduct may have their relationships with the university terminated and/or their privileges of being on university premises withdrawn.

It is the responsibility of every member of the university community to foster an environment free of Prohibited Conduct. All members of the university community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. The university will support and assist community members who take such actions.  Also, many university employees must report Prohibited Conduct to the university (see Section IX below).

Retaliation against any individual who, in good faith, reports or participates in the reporting, investigation, or adjudication of and/or is a party to an investigation related to Prohibited Conduct is impermissible, unlawful and will not be tolerated by the university.

This policy applies to all reports of Prohibited Conduct occurring on or after the effective date of this Policy. Where the date of the Prohibited Conduct precedes the effective date of this Policy, the definitions of misconduct in effect at the time of the alleged incident(s) will be applied. The procedures under this Policy, however, will be used to investigate and resolve all reports made on or after the effective date of this Policy, regardless of when the incident(s) occurred.


## IV.    PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this Policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the complainant or respondent. Prohibited Conduct includes the following specifically defined forms of behavior: discrimination, discriminatory harassment, sexual, gender-based or Title IX sexual harassment, sexual assault, sexual exploitation, relationship violence, stalking, complicity, and retaliation. These definitions may overlap with Florida criminal statutes in some cases and provide greater protection in other instances.

A.    <u>DISCRIMINATION</u>

Discrimination is any unlawful distinction, preference, or detriment to an individual that is based upon an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in other protected classes set forth in state or federal law and that: (1) excludes an

individual from participation in; (2) denies the individual the benefits of; (3) treats the individual differently with regard to; or (4) otherwise adversely affects a term or condition of an individual's employment, education, living environment or participation in a university program or activity.

Discrimination includes failing to provide a reasonable accommodation, consistent with state and federal law, to persons with disabilities. The University of Central Florida is committed to achieving equal educational and employment opportunity and full participation for persons with disabilities. Also, discrimination includes failing to reasonably accommodate an employee's or student's religious practices where the accommodation does not impose an undue hardship.  For more information regarding discrimination, please visit www.oie.ucf.edu.

B.    DISCRIMINATORY HARASSMENT

Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon an individual's race, color, ethnicity, national origin, religion,  non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting the description of either *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above.

Discriminatory harassment may take many forms, including verbal acts, name-calling, graphic or written statements (via the use of cell phones or the Internet), or other conduct that may be humiliating or physically threatening.

C.    SEXUAL, GENDER-BASED, OR TITLE IX SEXUAL HARASSMENT

Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment* are present.

Sexual harassment also may include inappropriate touching, acts of sexual violence, suggestive comments and public display of pornographic or suggestive calendars, posters, or signs where such images are not connected to any academic purpose. A single incident of sexual assault (as defined below) may be sufficiently severe to constitute a hostile environment.

Gender-based harassment includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment* are present.

University investigations of incidents that meet the Title IX Sexual Harassment definition will be investigated pursuant to UCF Policy 2-012 Title IX Grievance Policy. Title IX Sexual Harassment includes conduct that occurs on the basis of sex in a university education program or activity in the United States that satisfies one or more of the following:

- An employee conditioning the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct (i.e., Quid Pro Quo);
- Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to an education program or activity (i.e., hostile environment); or
- Sexual assault (as defined by the Clery Act), or "dating violence," "domestic violence," and "stalking" (as defined by the VAWA).

And also meets the following criteria:  The conduct is alleged to have occurred:

    a. On or after August 14, 2020;
    b. Against a person located in the United States; and,
    c. In or as part of the university's activity or program.

D.    <u>SEXUAL ASSAULT</u>

Sexual assault consists of sexual contact that occurs without consent.  Sexual contact includes but is not limited to the following behaviors:

1. touching, kissing, fondling (whether over or under clothing) of an individual for the purpose of sexual gratification; and/or
2. contact, however slight, between the mouth, anus, or sex organ of one individual with either the anus or sex organ of another individual; and/or
3. contact, however slight, between the anus or sex organ of one individual and any other object.

**The university offers the following guidance on consent and assessing incapacitation:**

A person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity. The lack of a negative response or protest does not constitute

consent. Lack of resistance does not constitute consent. Silence and/or passivity also do not constitute consent. Relying solely on non-verbal communication before or during sexual activity can lead to a misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Consent to one form of sexual activity does not, by itself, constitute consent to another form of sexual activity. For example, one should not presume that consent to oral-genital contact constitutes consent to vaginal or anal penetration. Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent.

Once consent has been given to a particular sexual activity, it may be withdrawn at any time. An individual who seeks to withdraw consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once consent is withdrawn, the sexual activity must cease immediately.

In evaluating consent in cases of alleged incapacitation, the university asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? and if not, (2) Should a sober, reasonable person in the same situation have known that the other party was incapacitated? If the answer to either of these questions is "YES," consent was absent, and the conduct is likely a violation of this Policy.

A person may or may not be incapacitated as a result of drinking or using drugs. Alcohol-related or recreational drug-related incapacity results from a level of alcohol/drug ingestion that is more severe than minor impairment, being under the influence, drunkenness, or intoxication.  A person could be incapacitated due to other reasons which may include: sleep, prescribed or over the counter medication, and/or mental, or physical disability.  The impact of alcohol and drugs varies from person to person.

A person seeking to initiate sexual activity is not expected to be a medical expert in assessing incapacitation. The potential initiator must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, evidence of incapacity may be detected from context clues, such as:
- Slurred or incomprehensible speech;
- Bloodshot eyes;
- The smell of alcohol on their breath;
- Shaky equilibrium or unsteady gait;
- Vomiting;
- Incontinence;

- Combativeness or emotional volatility;
- Unusual behavior; and/or
- Unconsciousness.

Context clues are important in helping to determine incapacitation. These signs alone do not necessarily indicate incapacitation. A person who is incapacitated may not be able to understand some or all of the following questions:

- *"Do you know where you are?"*
- *"Do you know how you got here?"*
- *"Do you know what is happening?"*
- *"Do you know who is here with you?"*

One should be cautious before engaging in sexual contact when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to abstain from all sexual activity.

**Being impaired by alcohol or other drugs is no defense to any violation of this Policy.**

E.   <u>SEXUAL EXPLOITATION</u>

Sexual exploitation is purposely or knowingly doing or attempting to do any of the following:

- Exposing of one's body in such a manner that another party reasonably could be offended or to display sexual behavior which another person reasonably finds offensive;
- Voyeurism, including trespassing, spying, or eavesdropping for the purpose of sexual gratification;
- Soliciting sex acts from a minor by oral, written, or electronic means;
- Possessing, producing, or disseminating child pornography;
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without consent;
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);
- Subjecting another person to human trafficking; or
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

F.   RELATIONSHIP VIOLENCE

Relationship violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. Relationship violence includes "dating violence" and "domestic violence," as defined by VAWA. Consistent with VAWA, the university will evaluate the existence of an intimate relationship based upon the complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. Relationship violence may also include any form of Prohibited Conduct under this Policy, including sexual assault, stalking, and physical assault. Relationship violence may involve a pattern of behavior used to establish power and control over another person through fear and intimidation or may involve one-time conduct. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional, and/or physical and may be directed towards the former partner, their property, or other individuals. Examples of relationship violence may include, but are not limited to:

- Slapping;
- Pulling hair;
- Punching;
- Damaging another person's property;
- Driving recklessly to scare someone;
- Name calling;
- Humiliating another person in public;
- Harassment directed toward a current or former partner or spouse; and/or
- Threats of abuse such as threatening to hit, harm, or use a weapon on another (whether the complainant or acquaintance, friend, or family member of the complainant), or other forms of verbal threats.

Harmful behavior that includes, but is not limited to, the true threat of or actual physical assault or abuse and/or harassment, is prohibited pursuant to *The Golden Rule*. Harmful behavior will be addressed under this Policy if it involves discriminatory harassment, sexual, gender-based, or Title IX sexual harassment, relationship violence, or is part of a course of conduct under the stalking definition.

G.   STALKING

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience

substantial emotional distress.  Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, phones, texts, or other similar devices or forms of contact.

Stalking may include, but is not limited to:
- Non-consensual communications (face-to-face, telephone, email);
- Threatening or obscene gestures;
- Surveillance/following/pursuit;
- Showing up outside the targeted individual's classroom or workplace;
- Sending gifts and/or notes (romantic, bizarre, sinister, or perverted); and/or
- Making threats.

H.   RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in or being a party to any proceeding under this policy, including requesting supportive measures (remedial and/or protective) for the purpose of interfering with any right or privilege secured by this Policy.  Retaliation includes threatening, intimidating, discriminating, harassing, coercing and any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct.  Also, an individual may be found to have engaged in retaliation when they were not a party to the initial report of discrimination. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct. In determining whether an act constitutes retaliation, the full context of the conduct will be considered, including the individual right to freedom of speech.

Retaliation can include, but is not limited to, actions taken by the university, actions taken by one student against another student, actions taken by an employee against another employee or student, or actions taken by a third-party against a student or employee.  See UCF Policy 2-700 *Reporting Misconduct and Protection from Retaliation* for additional information on prohibited retaliation.

I.   COMPLICITY

Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

## V.   UNDERSTANDING THE DIFFERENCE BETWEEN PRIVACY AND CONFIDENTIALITY

The university is committed to protecting the privacy of all individuals involved in the investigation and resolution of a report under this policy. The university also is committed to providing assistance to help students, university and DSO employees and volunteers, and third parties make informed choices. With respect to any report under this policy, the university will take reasonable efforts to protect the privacy of participants, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report and to take steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.  Privacy and confidentiality have distinct meanings under this Policy.

> **Privacy**: Privacy means that information related to a report of Prohibited Conduct will be shared with a limited number of university employees who "need to know" in order to assist in support of the complainant and in the assessment, investigation, and resolution of the report. All employees who are involved in the university's response to reports of Prohibited Conduct receive specific training and guidance about sharing and safeguarding private information in accordance with state and federal law.

> The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act ("FERPA"), as outlined at http://registrar.ucf.edu/ferpa.  The privacy of an individual's medical and related records generally is protected by the Health Insurance Portability and Accountability Act ("HIPAA") and/or state laws governing protection of medical records.  Access to an employee's personnel records may be restricted in accordance with Florida law and applicable collective bargaining agreements.

> **Confidentiality**: Confidentiality exists in the context of laws that protect certain relationships, including with medical and clinical care providers (and those who provide administrative services related to the provision of medical and clinical care), mental health providers, counselors, victim advocates, and ordained clergy, all of whom may engage in confidential communications under Florida law. Under Florida law, these confidential employees must report to authorities if an individual discloses they are a minor (under 18), a judge subpoenas the university to release information to the court, an individual expresses homicidal or suicidal intent, or the confidential employee receives knowledge that a minor (under 18), elder, or person with an intellectual disability is at risk for abuse. The university has designated individuals who have the ability to have privileged communications as confidential employees. When information is shared by an individual with a confidential employee or a community professional with the same legal protections, the confidential employee (and/or such community professional) cannot reveal any information that could identify the individual to any third-party except where required or permitted by law. For example, information may be disclosed when: (i) the individual gives written consent for its disclosure; (ii) there is a concern that the

individual will likely cause serious physical harm to self or others; or (iii) the information concerns conduct involving suspected abuse, neglect, or exploitation of a minor under the age of 18 or a vulnerable adult (as defined in Florida Statutes Section 415).

## VI.    EMPLOYEE REPORTING RESPONSIBILITIES

A.    RESPONSIBLE EMPLOYEE <u>REPORTING OBLIGATIONS</u>

An employee's responsibility to report under this Policy is governed by the employee's role at the university. Confidential employees are not required to report Prohibited Conduct to the university when the disclosure is made while serving in the role that entitles them under state law to have privileged communications. Responsible employees are required to immediately report to the university's Office of Institutional Equity all relevant details (obtained directly or indirectly) about an incident of sex/gender-based discrimination or harassment, sexual harassment, Title IX sexual harassment, sexual assault, sexual exploitation, relationship violence, and/or stalking (as defined herein) that involves any student as a complainant, respondent, and/or witness, including dates, times, locations, and names of parties and witnesses.[1] Reporting is required when the responsible employee knows (by reason of a direct or indirect disclosure) or should have known of such sex/gender-based discrimination or harassment, sexual harassment, Title IX sexual harassment, sexual assault, sexual exploitation, relationship violence, and/or stalking. Responsible employees include but are not limited to faculty (full-time and part-time), staff (full-time and part-time), resident assistants, graduate students with classroom responsibilities, CSAs, and DSOs. This manner of reporting may help inform the university of the general extent and nature of Prohibited Conduct on and off campus so the university can track patterns, evaluate the scope of the problem, and formulate appropriate campus-wide responses. If a responsible employee is uncertain if specific conduct constitutes conduct that must be reported, the responsible employee should contact the Office of Institutional Equity for assistance with making this determination.

Responsible employees are not required to report information disclosed (1) at public awareness events (e.g., "Light Up the Night," Clothesline Project, candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"); (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"); or (3) as part of coursework submitted to an instructor in connection with a course assignment. Even in the absence of such obligation, all employees are encouraged to contact the Title IX coordinator if they

become aware of information that suggests a safety risk to the university community or any member thereof. The university may provide information about students' Title IX and/or other civil rights and about available university and community resources and support at Public Awareness Events.  Also, Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all student subjects of IRB Research.

B.     DEAN, DIRECTOR, DEPARTMENT HEAD, AND SUPERVISOR REPORTING OBLIGATIONS

Under this Policy, deans, directors, department heads, and supervisors are required to report to the Office of Institutional Equity all relevant details about an incident of Prohibited Conduct where either the complainant or the respondent is an university or DSO employee or volunteer. Reporting is required when such deans, directors, department heads and supervisors know (by reason of direct or indirect disclosure) or should have known of such Prohibited Conduct.  If a dean, director, department head or supervisor is uncertain if specific conduct constitutes conduct that must be reported, the Office of Institutional Equity should nevertheless be contacted for assistance with making this determination.

All university and DSO employees and volunteers are strongly encouraged to report to law enforcement any conduct that could potentially present a danger to the community or may be a crime under Florida law.

C.     CLERY REPORTING OBLIGATIONS

Under the Clery Act, certain university employees are designated as CSAs. The function of a CSA is to report to the UCF Police Department those allegations of Clery Act and/or VAWA crimes that they receive and believe were made in good faith.  This includes crimes where the victim chooses to remain anonymous.  Based on information reported to CSAs, the university includes statistics about certain criminal offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the university to issue emergency notifications and timely warnings to the university community about certain reported crimes that may pose a serious or continuing threat to the campus community. Consistent with the Clery Act and UCF Policy 3-116 *Emergency Notification (UCF Alert) System*, the university will never include a complainant's personal identifying information when issuing an emergency notification and/or timely warning to the university community.  Pastoral counselors and professional counselors are exempt from reporting when a crime is reported to them and they are functioning within the scope of that recognition or licensure, unless

required by law.

D.    <u>CHILD ABUSE REPORTING OBLIGATIONS</u>

All university and DSO employees and volunteers are mandated reporters of child abuse, neglect or abandonment as defined by Chapter 39 of the Florida Statutes and must comply with Florida's mandated reporting laws. *See* Florida Statutes Sections 39.201 to 39.205 and UCF Policy 2-005 *Youth Protection* for additional information on reporting of child abuse.  These laws and university policy require any person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected to report such knowledge or suspicion to the Florida Department of Children and Families (DCF), regardless of where it occurs.  For purposes of this section, the age of the person at the time of the incident of child abuse, neglect, or abandonment (not the time when the employee is made aware or has reasonable cause to suspect the abuse) triggers the reporting duty. In addition, Florida Statutes and Board of Governors Regulation require the UCF Police Department and certain administrators (president, provost, senior/executive vice presidents, vice presidents, associate vice presidents, associate/vice provosts, deans, chief of police, equal opportunity programs director, intercollegiate athletics director, internal audit director, Title IX coordinator, and university compliance officer) upon receiving information from faculty, staff, or other institutional employees of known or suspected child abuse, abandonment, or neglect committed on university property, or during a university-sponsored event or function to report such knowledge or suspicion to the DCF. The law further prohibits UCF administrators from knowingly and willfully preventing another person from reporting such activity. Reports can be made to the DCF by:
- Fax: 1-800-914-0004 (Form available at
- https://www.myflfamilies.com/service-programs/abuse-hotline/docs/faxreport.pdf)
- Web:  https://reportabuse.dcf.state.fl.us/
- Florida Abuse Hotline: 1-800-96ABUSE (1-800-962-2873) (Or TDD: 1-800-453-5145)

If a child is in imminent danger, dial 911 first and then report to DCF.

## VII.    COMPLAINANT OPTIONS FOR REPORTING PROHIBITED CONDUCT

There are two channels for reporting Prohibited Conduct – to the university and/or to law enforcement. A complainant may choose to report through either channel or to both as these reporting options are not mutually exclusive. Therefore, complainants may choose to pursue both the university process and the criminal process concurrently. The university will support complainants in understanding, assessing, and pursuing these options.

The first priority for any individual should be personal safety and well-being. In addition to seeking immediate medical care, the university encourages all individuals to seek immediate assistance from 911, UCF Police, and/or local law enforcement. This is the best option to ensure preservation of evidence. The university also strongly urges that law enforcement be notified immediately in situations that may present imminent or ongoing danger.

A.    REPORTING TO LAW ENFORCEMENT

Conduct that violates this Policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the State of Florida criminalizes and punishes some forms of sexual assault, relationship violence, sexual exploitation, stalking, and physical assault. *See* Chapters 741, 784, and 794 of the Florida statutes. Whether or not any specific incident of Prohibited Conduct may constitute a crime is a decision made solely by law enforcement. Similarly, the decision to arrest any individual for engaging in any incident of Prohibited Conduct is determined solely by the law enforcement agency responsible for investigating the incident. Such decisions are based on a number of factors, including availability of admissible evidence.

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to take all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the university urges complainants (or others who become aware of potential criminal conduct) to report Prohibited Conduct immediately to local law enforcement by contacting:

    i.     911 (for emergencies)
    ii.    University Police (for non-emergencies): (407) 823-5555
              24/7 Emergency Abroad Hotline: (407) 823-0595
    iii.   State Police (for conduct occurring off campus) (850) 410-7000
    iv.   Orange County Sheriff's Office: (407) 254-7000
    v.    Seminole County Sheriff's Office: (407) 665-6600
    vi.   City of Orlando Police Department: (407) 246-2470
    vii.   Brevard County Sheriff's Office: (321) 264-5201
   viii.   Osceola County Sheriff's Office: (407) 348-1100
    ix.   Volusia County Sheriff's Office: (386) 943-7866
    x.    Lake County Sheriff's Office: (352) 343-2101
    xi.   Marion County Sheriff's Office: (352) 402-6000

Police have unique legal authority, including the power to seek and execute search warrants, collect forensic evidence, make arrests, and assist in seeking an injunction. Although a police report may be made at any time, complainants should be aware that delayed reporting may diminish law enforcement's ability to take certain actions, including collecting forensic

evidence and making arrests. The university will assist complainants in notifying law enforcement if they choose to do so. Under limited circumstances posing a threat to the health or safety of any university community member, the university may independently notify law enforcement.

B.     REPORTING TO THE UNIVERSITY

Complainants (or others who become aware of an incident of Prohibited Conduct) are encouraged to report the incident to the university by contacting the Office of Institutional Equity by telephone, email, or in person during regular office hours (8am-5pm, M-F):

>   Office of Institutional Equity
>   12701 Scholarship Drive, Suite 101
>   Orlando, FL 32816-0030
>   (407) 823-1336
>   oie@ucf.edu; https://oie.ucf.edu  https://letsbeclear.ucf.edu

There is no time limit for a complainant to report Prohibited Conduct to the university under this Policy; however, the university's ability to respond may diminish over time, as evidence may erode, memories may fade, and respondents may no longer be affiliated with the university. This statement does not relieve responsible employees of their obligation to report sex/gender-based discrimination or harassment, sexual harassment, Title IX sexual harassment, sexual assault, relationship violence, sexual exploitation and/or stalking involving a student immediately to the Office of Institutional Equity. If the respondent is no longer a student, or university or DSO employee or volunteer,  the university will provide reasonably appropriate remedial measures, assist the complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

To encourage reporting, any individual (including a bystander or third-party) who makes a good faith report of Prohibited Conduct will not be subject to disciplinary action by the university for the reporter's own personal use of alcohol or drugs at or near the time of the incident provided any such violations did not harm or place the health or safety of any other person at risk.  The university may offer support, resources, and educational counseling to such an individual.

VIII.   ACCESSING CAMPUS AND COMMUNITY RESOURCES AND SUPPORTIVE MEASURES

The university offers a wide range of resources for all students and employees to provide

support and guidance in response to any incident of Prohibited Conduct. Comprehensive information on accessing university and community resources is contained online at the following sites:

- UCF Let's Be Clear: https://letsbeclear.ucf.edu
- Discrimination and discriminatory harassment where the respondent is a university or DSO employee or volunteer, or third-party: https://oie.ucf.edu
- Related student code violations where the respondent is a student: https://oie.ucf.edu/ or http://osrr.sdes.ucf.edu/
- Office of Student Rights and Responsibilities: http://osrr.sdes.ucf.edu
- Student Conduct and Academic Integrity:  https://scai.sdes.ucf.edu/
- Victim Services: http://victimservices.ucf.edu
- Student Care Services: http://scs.sdes.ucf.edu

Available resources include but are not limited to: emergency and ongoing assistance; health, mental health, and victim-advocacy services; options for reporting Prohibited Conduct to the university and/or law enforcement; and available support with academics, housing, and employment.  For more information about resources and supportive measures, please visit https://letsbeclear.ucf.edu/.

A.  REMEDIAL, SUPPORTIVE AND PROTECTIVE MEASURES

The university offers a wide range of resources for students, and university and DSO employees and volunteers whether as complainants, witnesses, or respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report of Prohibited Conduct. The university will offer reasonable and appropriate measures to protect a complainant and respondent, and facilitate the complainant's continued access to university employment or education programs and activities. These measures may be both remedial (designed to address a complainant's safety and well-being and continued access to educational opportunities) or protective (designed to reduce the risk of harm to an individual or community). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, suspension from employment, and pre-disciplinary leave from employment (with or without pay). Remedial and protective measures are available regardless of whether a complainant pursues a complaint or investigation under this Policy.  Also, remedial measures may be taken before the university's determination of whether the Prohibited Conduct occurred, as well as when the respondent is not affiliated with the university.

The university will maintain the privacy of any remedial and protective measures provided under this Policy to the extent practicable and will promptly address any violation of the remedial and protective measures. The

university has the discretion to impose and/or modify any remedial or protective measure based on all available information, and is available to meet with a complainant or respondent to address any concerns about the provision of remedial or protective measures.

The university will provide reasonable remedial and protective measures to third parties as appropriate and available, taking into account the role of the third-party and the nature of any contractual relationship with the university.

B.    INTERIM ACTIONS

In addition to remedial and protective measures, an interim action may be imposed on a student or student organization in accordance with *The Golden Rule* prior to the resolution of an investigation. Also, an employee may be placed on paid or unpaid administrative leave prior to the resolution of an investigation.  Such actions may be taken when, in the professional judgment of a university official, a threat of imminent harm to persons or property exists. Interim administrative action is not a sanction. It is taken in an effort to protect the safety and well-being of the complainant and/or respondent, of others, of the university, or of property. Interim administrative action is preliminary in nature; it is in effect only until there is a resolution of the student or employee conduct matter.

With regard to a student or student organization, university officials designated to impose an interim action through *The Golden Rule* include, but are not limited to, the vice president of Student Development and Enrollment Services (SDES) or designee, and the director of the Office of Student Conduct and Academic Integrity or designee, upon notifying the vice president of SDES.  With regard to an employee, the provost or designee and/or the employee's supervisor will impose an interim action.

## IX.    INAPPROPRIATE AMOROUS RELATIONSHIPS

For the purposes of this Policy, "amorous relationships" are defined as intimate, sexual, and/or any other type of amorous encounter or relationship, whether casual or serious, short-term or long-term.

A.    STUDENT CONTEXT

All faculty and staff must be aware that amorous relationships with students are likely to lead to difficulties and have the potential to place faculty and staff members at great personal and professional risk. The power difference inherent in the faculty-student or staff-student relationship means that any amorous relationship between a faculty or staff member and a student is potentially exploitative or could at any time be perceived as exploitative and should be avoided. Faculty and staff members engaged in such

relationships should be sensitive to the continuous possibility that they may unexpectedly be placed in a position of responsibility for the student's instruction or evaluation. In the event of a charge of sexual harassment arising from such circumstances, the university will in general be unsympathetic to a defense based upon consent when the facts establish that a faculty-student or staff-student power differential existed within the relationship.

### 1.     Undergraduate Students

Subject to the limited exceptions herein, all university and DSO employees and volunteers are prohibited from pursuing or engaging in an amorous relationship with any undergraduate student.

### 2.     Graduate Students

With respect to graduate students (defined as any student enrolled at the university for post-baccalaureate education in any discipline or professional program), all university and DSO employees and volunteers are prohibited from pursuing or engaging in an amorous relationship with a graduate student under that individual's authority. Situations of authority include, but are not limited to: teaching; formal mentoring or advising; supervision of research; employment of a student as a research or teaching assistant; exercising substantial responsibility for grades, honors, or degrees; and involvement in disciplinary action related to the student.

Students and university and DSO employees and volunteers alike should be aware that pursuing or engaging in an amorous relationship with any graduate student will limit the employees' or volunteers' ability to teach, mentor, advise, direct work, employ, and promote the career of the student involved.

### 3.     Graduate Students in Positions of Authority

Like faculty and staff members, graduate students may themselves be in a position of authority over other students; for example, when serving as a teaching assistant in a course or when serving as a research assistant and supervising other students in research. The power difference inherent in such relationships means that any amorous relationship between a graduate student and another student over whom they have authority is potentially exploitative and should be avoided. All graduate students currently or previously engaged in an amorous relationship with another student are prohibited from serving in a position of authority over that student. Graduate students also should be sensitive to the continuous possibility that they may unexpectedly be placed in a position of responsibility for another student's instruction or evaluation.

### 4.     Pre-existing Relationships with Any Student

The university recognizes that an amorous relationship with a university or DSO employee or volunteer may exist prior to the time that an undergraduate student enrolls at the university or may have existed and terminated prior to the undergraduate student's

enrollment.  Similarly, the university recognizes that with graduate students, an amorous relationship with a university or DSO employee or volunteer may exist (or have previously existed and terminated) prior to the time the employee or volunteer is placed in a position of authority over the graduate student. A "position of authority" includes teaching; formal mentoring or advising; supervising research; exercising responsibility for grades, honors, or degrees; considering disciplinary action involving the student; or employing the student in any capacity – including but not limited to student employment and internships, work study, or as a research or teaching assistant.  Where there is a pre-existing amorous relationship that relationship must be disclosed to the Office of Institutional Equity, which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost). This disclosure must be made by the employee in a position of authority immediately if the student is an undergraduate, and prior to accepting a supervisory role of any type over any graduate student.

Unless effective steps have been taken in conjunction with Human Resources and/or the applicable dean or vice president to eliminate any potential conflict of interest in accordance with this Policy, all university and DSO employees and volunteers currently or previously engaged in an amorous relationship with a student are prohibited from being in a position of authority over that student.

Similarly, all graduate students currently or previously engaged in an amorous relationship with another student are prohibited from serving in a position of authority over that student.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.

5.      If an Amorous Relationship Occurs with Any Student

If, despite these warnings, a university or DSO employee, or graduate student becomes involved in an amorous relationship with a student in violation of this Policy, the employee or graduate student must disclose the relationship immediately to the Office of Institutional Equity, which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost). Absent an extraordinary circumstance, no relationships in violation of this Policy will be permitted while the student is enrolled, or the faculty or staff member is employed by the university. In most cases, it will be unlikely that an acceptable resolution to the conflict of interest will be possible, and the employees' employment standing or the graduate student's position of authority may need to be adjusted until there is no longer a supervisory or other authority relationship over the student.

In addition to the amorous relationship itself, a university or DSO employee or graduate student's failure to report the existence of an amorous relationship that is prohibited by this Policy is also a violation of this Policy and may be cause for separation from the university. The university encourages immediate self-reporting, and will consider this factor in the context of any resolution that may be able to be reached.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.

B.   <u>EMPLOYMENT CONTEXT</u>

Amorous relationships between supervisors and their subordinate employees or volunteers often adversely affect decisions, distort judgment, and undermine workplace morale for all persons, including those not directly engaged in the relationship. Any university employee who participates in supervisory or administrative decisions concerning an employee or volunteer with whom that individual has or has had an amorous relationship has a conflict of interest in those situations. These types of relationships, specifically those involving spouses and/or individuals who reside together, also may violate the State Code of Ethics for Public Officials as well as UCF Policy3-008 *Employment of Relatives*.

Accordingly, the university prohibits all university and DSO employees from pursuing or engaging in amorous relationships with employees whom they supervise. No supervisor shall initiate or participate in institutional decisions involving a direct benefit or penalty (employment, retention, promotion, tenure, salary, leave of absence, etc.) to a person with whom that individual has or has had an amorous relationship. The individual in a position of authority can be held accountable for creating a sexually hostile environment or failing to address a sexually hostile environment and thus should avoid creating or failing to address a situation that adversely impacts the working environment of others.

1.   Pre-existing Amorous Relationships Between Supervisors and Subordinate Employees or Volunteers

The university recognizes that an amorous relationship may exist prior to the time an individual is assigned to a supervisor. Supervisory, decision-making, oversight, evaluative or advisory relationships for someone with whom there exists or previously has existed an amorous relationship is unacceptable unless effective steps have been taken to eliminate any potential conflict of interest in accordance with this Policy. The current or prior existence of such a relationship must be disclosed by the employee in a position of authority prior to accepting supervision of the subordinate employee or volunteer to the Office of Institutional Equity (OIE), which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost).

Once OIE, Human Resources or Office of the Provost has determined that the disclosed relationship constitutes a conflict of interest, in consultation with the appropriate university administrators, the relevant dean or vice president will determine, at their sole discretion, whether and how the conflict of interest can be eliminated through termination of the situation of authority.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.

2.      If an Amorous Relationship Occurs or has Occurred between a Supervisor and her/his Subordinate Employee or Volunteer

If, despite these warnings, an employee or DSO enters into an amorous relationship with someone over whom that individual has supervisory, decision-making, oversight, evaluative, or advisory responsibilities in violation of this Policy, then that employee must disclose the existence of the relationship immediately to the Office of Institutional Equity, which may alert other offices as appropriate (i.e. Human Resources or the Office of the Provost).  Once OIE, Human Resources, or the Office of the Provost has determined that the disclosed relationship constitutes a conflict of interest, in consultation with appropriate university administrators, the relevant dean or vice president will determine, at their sole discretion, whether and how the conflict of interest can be eliminated through termination of the situation of authority. An acceptable resolution to the conflict of interest may not be possible. If the conflict of interest cannot be eliminated, the supervisor's employment standing may need to be adjusted. In addition to the amorous relationship itself, a supervisor's failure to report the existence of the relationship with a subordinate employee is also a violation of this Policy. The university encourages immediate self-reporting, and will consider this factor in the context of any resolution that may be able to be reached.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.

## X.      PREVENTION, AWARENESS AND TRAINING PROGRAMS

The university is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. Incoming students and new employees receive mandatory primary prevention and awareness programming as part of their orientation, and returning students and current employees receive ongoing training and related education and awareness programs. The university provides training, education and awareness programs to students, employees, registered student organizations, and DSOs to ensure a broad understanding of this Policy and the topics and issues related to maintaining an education and employment environment free from harassment and discrimination.  Accordingly, students and employees are expected to attend the ongoing training and awareness programs and review this Policy so that they can contribute to the commitment of maintaining a safe and non-discriminatory learning, living and working environment for all members of the university.

For a description of the university's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, see the university's annual security reports found online at: https://police.ucf.edu/crime-statistics.

## XI.    OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

All university community members are expected to provide truthful information in any report, investigation, or proceeding under this Policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under *The Golden Rule Student Handbook* (for students or student organizations), and any other applicable and appropriate university policy and regulations (for employees). This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

## XII.    PROCEDURES

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the respondent's relationship to the university (student, employee, registered student organization, DSO, or third party). Each set of procedures referenced below is guided by the same principles of fairness and respect for complainants and respondents. The procedures referenced below provide for a prompt and equitable response to reports of Prohibited Conduct. The procedures designate specific timeframes for major stages of the process, provide for thorough and impartial investigations that afford the complainant and respondent notice and an opportunity to present witnesses and evidence, and assure equal and timely access to the information that will be used in determining whether a Policy violation has occurred. The university applies the preponderance of the evidence standard when determining whether this Policy has been violated. "Preponderance of the Evidence" means that it is more likely than not that a Policy violation occurred.

A.    <u>WHERE THE RESPONDENT IS A STUDENT OR REGISTERED STUDENT ORGANIZATION</u>
The procedures for responding to reports of Title IX Sexual Harassment and Prohibited Conduct committed by students and registered student organizations are detailed in UCF Policy 2-012 *Title IX Grievance Policy* and UCF's *The Golden Rule Student Handbook* (http://goldenrule.sdes.ucf.edu/).

B.    <u>WHERE THE RESPONDENT IS A UNIVERSITY OR DSO EMPLOYEE</u>
The procedures for responding to reports of Title IX Sexual Harassment and Prohibited Conduct committed by employees and DSOs are detailed in UCF Policy 2-012 *Title IX Grievance Policy* and UCF's Office of Institutional Equity's *Discrimination Grievance Investigation Process.*
https://oie.ucf.edu/documents/OIEInvestigationProcedures.pdf

C.    <u>WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE</u>

- The student-respondent procedures will apply if the respondent's primary status is as a student.

- The employee-respondent procedures will apply if the respondent's primary status is as an employee.

- If there is a question as to the predominant role of the respondent, the university will determine which of the procedures applies based on the facts and circumstances (such as which role predominates in the context of the Title IX Sexual Harassment or Prohibited Conduct). The student-respondent procedures typically will apply to graduate students except in those cases where the graduate student's assistantship role predominated in the context of the Title IX Sexual Harassment or Prohibited Conduct. Further, where a respondent is both a student and an employee (including but not limited to graduate students), the respondent may be subject to any of the sanctions applicable to students or employees.

D.   <u>WHERE THE RESPONDENT IS A THIRD-PARTY</u>

The university's ability to take appropriate corrective action against a third-party will be determined by the nature of the relationship of the third-party to the university. The university will determine the appropriate manner of resolution consistent with the university's commitment to a prompt and equitable process under federal law, federal guidance, and this Policy.

## XIII.   RELATED INFORMATION

A.   <u>STUDENTS AS RESPONDENTS</u>

The Golden Rule:  http://goldenrule.sdes.ucf.edu/

UCF Policy 2-012 Title IX Grievance Policy

B.   <u>EMPLOYEES AND THIRD PARTIES AS RESPONDENTS</u>

Regulation UCF-3.001 Non-Discrimination; Affirmative Action Programs
http://regulations.ucf.edu/docs/notices/3.001Non-DiscrimAffirmActionsPrograms_Nov10.pdf

Regulation UCF-3.0134 Grievances Alleging Discrimination
http://regulations.ucf.edu/docs/notices/3.0134GrievancesAllegingDiscrimination_finalMay09_000.pdf

UCF Policy 2-012 Title IX Grievance Policy

UCF Policy 2-700 Reporting Misconduct and Protection from Retaliation

C.      STATE AND FEDERAL LAWS

Florida Civil Rights Act of 1992
http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&S
earch_String=&URL=0700-0799/0760/0760PARTIContentsIndex.html

Florida Statute 39.201 Mandatory reports of child abuse, abandonment, or
neglect; mandatory reports of death; central abuse hotline.
http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&S
earch_String=&URL=0000-0099/0039/Sections/0039.201.html

Title VI of the Civil Rights Act of 1964
https://www.gpo.gov/fdsys/pkg/USCODE-2010-title42/pdf/USCODE-2010-
title42-chap21-subchapV.pdf

Title VII of the Civil Rights Act of 1964
https://www.eeoc.gov/laws/statutes/titlevii.cfm

Title IX of the Education Amendments of 1972
https://www.gpo.gov/fdsys/pkg/USCODE-2013-title20/pdf/USCODE-2013-
title20-chap38.pdf

Section 504 of the Rehabilitation Act of 1973
https://www.dol.gov/agencies/oasam/centers-offices/civil-rights-
center/statutes/section-504-rehabilitation-act-of-1973

The Age Discrimination in Employment Act of 1967
https://www.eeoc.gov/laws/statutes/adea.cfm

The Genetic Information Nondiscrimination Act of 2008
https://www.eeoc.gov/laws/statutes/gina.cfm

The Equal Pay Act of 1963
https://www.eeoc.gov/laws/statutes/epa.cfm

## XIV.   CONTACTS

The Title IX coordinator is charged with monitoring the university's compliance with Title
IX, ensuring appropriate education and training, coordinating the university's
investigation, response, and resolution of all reports under this Policy and ensuring
appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its
effects. UCF's Office of Institutional Equity oversees reports involving students, employees,
registered student organizations, DSOs, and third parties. The university also has
designated deputy Title IX coordinators who may assist the Title IX coordinator in the
discharge of these responsibilities. The Title IX coordinator and deputy Title IX

coordinators receive ongoing appropriate training to discharge their responsibilities. Concerns about the university's application of Title IX may be addressed to the Title IX coordinator. Additionally, concerns about the university's application of Title VII and/or other federal and state anti-discrimination laws may be addressed to the Office of Institutional Equity.  The Title IX coordinator and Office of Institutional Equity can be contacted by telephone, email, or in person during regular office hours as follows:  12701 Scholarship Drive, Suite 101, Orlando, FL 32816-0030; Phone:  407-823-1336; Email: oie@ucf.edu.  The identities and contact information for the Title IX coordinator and Deputy Title IX Coordinators can be found at https://letsbeclear.ucf.edu

External reporting options include the United States Department of Education, Clery Act Compliance Team (at clery@ed.gov); the United States Department of Education, Office for Civil Rights (at OCR@ed.gov or 800-421-3481); the Equal Employment Opportunity Commission (at info@eeoc.gov or 800-669-4000); and/or the Florida Commission on Human Relations (800-342-8170).

## XV.    INITIATING AUTHORITY

President

<div style="border:1px solid black; padding:10px;">

**POLICY APPROVAL**
**(For use by the Office of the President)**

Policy Number: 2-004.2

University Policies and
Procedures Committee Chair: _[signature]_   Date: 10/6/20

President or Designee: _[signature]_   Date: 10/14/20

</div>

History 2-004 6/9/2017; 2-004.1 11/30/2017; EP-20-4 8/13/2020

# EXHIBIT B

**UCF-3.0134 Complaints and Grievances Alleging Discrimination, Discriminatory Harassment or Retaliation.**

(1)   This regulation outlines the procedures to be used for processing complaints/grievances alleging unlawful discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment, or retaliation.  Federal and state laws protect employees, students, and other members of the University community against discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment and retaliation. University policies have been developed to explain that protection and to offer solutions when discrimination is alleged on the basis of an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy, parental status, gender identity or expression, and sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran status (as protected under the Vietnam Era Veterans' Readjustment Assistance Act), or membership in any other protected classes as set forth in state or federal law.

(2)   The Office of Institutional Equity's Investigation Procedures are the university's procedures for addressing allegations that an employee or third party engaged in discrimination, discriminatory harassment, sexual harassment or retaliation against an individual for reporting, in good faith, any discrimination or  discriminatory harassment or participating in or being a party to any investigation or proceeding related to the University's Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy, No. 2-004. The University's Title IX Grievance Policy, UCF Policy 2-012, sets forth the university's procedures for addressing allegations that an employee or third party engaged in Title IX Sexual Harassment. Reports in which a student is alleged to have engaged in discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment or retaliation are governed by Student Conduct rules and procedures set out in the Golden Rule Student Handbook and the University's Title IX Grievance

Policy, UCF Policy 2-012. These procedures respond to the University's obligations under various laws to provide equal opportunity in employment and educational programs, and to provide access. A list of statutory and regulatory authorities is maintained on the Office of Institutional Equity's homepage.

(3)  Processing Complaints/Grievances Alleging Discrimination.

    (a)  When an allegation of unlawful discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment or retaliation is involved, the individual may elect to submit a written complaint/grievance under this procedure.  Unless specifically prohibited by the terms of an applicable collective bargaining agreement, the complainant/grievant may submit a complaint/grievance directly to the university's Office of Institutional Equity.  A representative of that office will communicate with those involved in the complaint/grievance.

    (b)  An employee complaint/grievance submitted through other grievance procedures, but which alleges discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment, or retaliation will be submitted to the Office of Institutional Equity.

    (c)  Where a complaint/grievance is submitted to the Office of Institutional Equity alleging discrimination, discriminatory harassment, or sexual harassment, the complainant will be notified in writing of the findings of the investigation.  Where a complaint/grievance is submitted to the Office of Institutional Equity alleging Title IX Sexual Harassment, the grievance will be handled through the procedures described in the University's Title IX Grievance Policy, UCF Policy 2-012. Findings from this procedure may be considered in an employee grievance initiated

under other procedures, but no grievance will be processed through more than one university administrative forum.

(4)  Unlawful Retaliation.  Federal and state laws protect every individual who makes a good faith report of discrimination, discriminatory harassment, sexual harassment, or Title IX Sexual Harassment, or participates in or is a party to any investigation or proceeding regarding discrimination or discriminatory harassment from acts of retaliation. Retaliation is defined as any adverse action taken against a person for making a good faith report of discrimination, discriminatory harassment, sexual harassment, or Title IX Sexual Harassment, or participating in any proceeding related to such a report.  Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in the protected activity.

(5)  Substantiated discrimination, discriminatory harassment, sexual harassment, Title IX Sexual Harassment, and retaliation complaints/ grievances will be addressed with appropriate corrective action. The Office of Institutional Equity will inform the President, Provost, or appropriate Vice President when an investigation concludes with findings of unlawful discrimination, discriminatory harassment, sexual harassment or retaliation, and in the case of substantiated Title IX Sexual Harassment, when the decision-maker finds, following the live hearing, that Title IX Sexual Harassment has occurred.  The President, Provost, or appropriate Vice President will take steps to implement actions that will correct the conduct. These include but are not limited to changes in regulations, policies, or procedures; discipline administered through standard procedures; changes in the complainant's status to achieve a non-discriminatory environment; or other remedies deemed appropriate.

*Authority: BOG Regulation 1.001. History–New 12-27-83, Formerly 6C7-3.134, Amended 1-6-93, 4-23-03; Formerly 6C7-3.0134, Amended 5-18-09, 10-27-17, 10-22-20.*

# EXHIBIT C



# THE GOLDEN RULE
# STUDENT HANDBOOK

## 2020-2021



**CONTENTS**

**Introduction** 3

**Golden Rule Review Committee** 4

**Student Rights and Responsibilities** 7

**Scope, Authority, and Student Conduct Records** 21

**Rules of Conduct** 24

**Student Conduct Review Process; Sanctions** 33

**Student Conduct Appeals** 41

**Scope; Authority; Principles of Group Responsibility;
Violations of Law and Rule of Conduct Violations;
Registered Student Organizational Conduct Record** 45

**Organizational Rules of Conduct** 48

**Organization Conduct Review Process; Sanctions; Appeals** 54

**Procedures for Academic Misconduct; Student Academic Behavior Standards** 63

**Student Academic Appeals** 69

**Appeals of Graduate Program Actions for Decisions** 74

**University Registrar** 78

**Student Health Services** 81

**Office of Student Involvement** 84

**Student Union** 92

**To All University of Central Florida Community Members:**

The University of Central Florida is a community brought together by the tenets of the UCF Creed: Integrity, Scholarship, Community, Creativity, and Excellence. These are the values that guide our conduct, performance, and decisions. To be successful at UCF, there is an expectation that you embrace and promote these core values in everything you do as a sign of your membership in the UCF community.

Whether you are a new or continuing undergraduate, graduate or professional student at UCF, there are certain responsibilities that you must uphold as a member of our community. **The Golden Rule** is a compilation of policies and procedures from different university areas intended to define your rights and responsibilities as a student and provide you with a better understanding of your role as a member of the UCF community.

**The Golden Rule** is published once a year but can be revised at any time to reflect new and modified information deemed critical by the University. Changes will be communicated through online resources and other means, at which time the revisions will supersede published information.

The Office of Student Rights and Responsibilities (OSRR) within the Division of Student Development and Enrollment Services (SDES) is delegated the responsibility for reviewing, assembling, and communicating information included in **The Golden Rule.** Students are given the opportunity to influence the rules that they are expected to adhere through the Golden Rule Review Committee.

UCF values diversity and inclusion of all in our community. Accordingly, the University prohibits discrimination on the basis of race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status), gender identity or expression, sexual orientation, marital status, physical or mental ability (including learning disabilities, intellectual disabilities), political affiliations, veteran's status or membership in any other protected classes as set forth in state or federal law.

For more information or further clarification, please contact OSSR at 407-823-4638, visit their website, http://osrr.sdes.ucf.edu for the most current version of **The Golden Rule** or email them at osrr@ucf.edu.

Go Knights! Charge ON!


Maribeth Ehasz, Ph.D.
Vice President
Student Development and Enrollment Services

## The Golden Rule Review Committee (GRRC)

This committee shall be established for the purpose of responding to the changing needs of the student body with regard to the Golden Rule. It is intended to give the students a voice in determining the rules to which they shall adhere.

a. Membership

1. Membership to the committee shall consist of 7 students, 4 of which shall be appointed by the Student Body President and 3 shall be selected by the Vice President for Student Development and Enrollment Services.
2. There shall be an application and selection process established by the Office of Student Rights and Responsibilities.
3. An eighth (8th) member of the Golden Rule Review Committee shall be appointed by the Vice President for Student Development and Enrollment Services. This member shall act as an alternate and shall reserve voting privileges in absence of a voting committee member.
4. It is suggested that the Judicial Advisor of the Student Government Association be considered for appointment to the committee.
    (i) If the committee is already full, the Judicial Advisor may be included as an additional non-voting member.

b. Ex-Officio

1. Any student enrolled at the University shall be permitted to attend GRRC meetings.
    (i) These students shall be considered ex-officio.
    (ii) They also shall have the right to debate on any proposal but shall not have the power to vote.
2. No faculty, staff, and/or administrator shall be considered ex-officio.

c. Advisors

1. At least one representative from the OSRR shall maintain an advisory role in the Committee and shall advise the members of the Committee as well as any student in attendance.
2. Staff members with expertise regarding particular sections of the Golden Rule should make themselves available to advise the members upon the Committee's request.

d. Notification

The existence of the committee shall be publicized to the student body.

1. At the beginning of each semester, a message shall be sent through appropriate distribution channels inviting all students to attend committee meetings.
2. The committee shall maintain a webpage which shall contain information on the meeting times, location, proposals under review and voting records and which shall be clearly linked from the online version of the Golden Rule and Responsibilities. The proposal shall then be sent to all members of the Committee via e-mail within 48 hours of receiving the proposal.

e. Powers of the Proposal Process

1. The Committee shall recommend changes to the Golden Rule to the appropriate administrative body.
2. Any student may make a proposal to the Committee.

3.    All proposals made by faculty, staff, administration, or members of the committee shall be submitted to the representative for Student Rights and Responsibilities.

4.    All proposals which are approved by a majority vote of the student members of the committee shall be submitted by the committee in writing to the Vice President for Student Development and Enrollment Services or designee.

    (i)    The Vice President for Student Development and Enrollment Services or designee shall notify the committee in writing of the decision regarding the proposal.

    (ii)    If the Vice President for Student Development and Enrollment Services or designee chooses not to incorporate the proposal into the Golden Rule, he/she shall outline the reasons for choosing not to do so in memorandum.

5.    When reviewing sections of the Golden Rule for which the content is mandated by another University document, the Committee may propose changes to sections in such a document which are reflected in the Golden Rule through the appropriate administrative channels.

f.  Presence

1.    The Committee shall meet at least once each month during the fall and spring semesters

    (i)    All members of the committee shall be notified of the time and place of each meeting.

    (ii)    The Committee shall propose no changes to this section of the Golden Rule which can be construed to eliminate the mandate for the Committee to exist.

2.    Quorum shall be defined as the presiding officer, being the Chair or Vice Chair, and at least two additional voting members of the committee.

g.  Attendance Policy

At the first meeting of each semester, the committee shall establish its own attendance policy.

h.  Transition Policy

At the conclusion of the Spring Semester, the Chair of the Golden Rule Review Committee, or designee, shall create a transition packet for the subsequent Chair.

1.    The transition packet shall be provided to the current Golden Rule Review Committee Advisor in both electronic and hard copy form.  It is the responsibility of the Advisor to provide this packet to the new Chair upon selection.

2.    The transition information should include the following:

    (i)    Leadership Positions of the current committee

    (ii)    Accomplishments

    (iii)    Recommendations

    (iv)    Attendance Policy

    (v)    Sample Meeting Agenda and Minutes

## UCF-5.006 Student Rights and Responsibilities

**(1)   Student Rights.**  Upon enrollment, students are entitled to the following freedoms and rights, provided the exercise thereof is accomplished in accordance with University procedures and does not result in disruption or disturbance as elsewhere described in the Regulations.

(a)     Participation in Student Government Association and its elective process.

(b)     Membership in Registered Student Organizations.

(c)     Freedom of expression. The basic freedoms of students to hear, write, distribute, and act upon a variety of thoughts and beliefs are guaranteed. Freedom of expression carries with it the responsibility for seeing that the essential order of the University is preserved.

(d)     Freedom to hold public forums. The University desires to create a spirit of free inquiry and to promote the timely discussion of a wide variety of issues, provided the views expressed are stated openly and are subject to critical evaluation. Restraints on free inquiry are held to a minimum and are consistent with preserving an organized society in which peaceful, democratic means for change are available. Guest lecturers or off-campus speakers sponsored by student groups may appear on the UCF campus following arrangements with the designated University authority for such appearances.

(e)     Freedom to hear, write, distribute, and act upon a variety of thoughts and beliefs. This freedom is subject to the following:

1.     Written materials identified by authorship and sponsorship may be sold or distributed on campus within the guidelines of propriety and responsible journalism. The distribution of such material, as is arranged by the Director of Office of Student Involvement, is permissible for registered student organizations provided steps have been taken to preserve the orderliness of the campus.

2.     Solicitation, whether printed materials or otherwise, on campus is prohibited except as provided in University Regulation UCF-4.010.

3.     The distribution of materials or circulation of petitions to captive audiences such as those in classrooms, at registration, in study areas or in residential units is not allowed without prior permission. Such permission may be requested from the appropriate university official.

(f)     Peaceful assembly. Student gatherings must neither disrupt or interfere with the orderly educational operation of the institution, nor violate state or local laws, or University regulations.

(g)     Fair and impartial proceeding. These matters shall include, but not be limited to:

1.     Disciplinary proceedings involving an alleged violation of academic and nonacademic rules.

2.     Refunds and charges. The status of a student charged with a violation of University rules shall not be affected pending final disposition of the charges except in the case of administrative action (also known as an interim action). For specific procedures and rights of students during the Student Conduct Review Process, see later section entitled "Student Conduct Review Process."

(h)     Confidentiality of student records. Each University office and agency which generates, collects, and disseminates information on students must follow the

guidelines for confidentiality of those records in their possession. For further information see "Student Record Guidelines."

**(2)  Student Responsibilities.**  A student at the University is deemed to have given his or her consent to the policies of the University and the Florida Board of Governors and to the laws of the State of Florida.  Each student is responsible for reviewing the rules and regulations of the University and for abiding by them.

**(3)  Definitions.**

    (a)    The term "Academic Integrity Panel" is comprised of one faculty and one staff/faculty member and two students selected from the Student Conduct Board.

    (b)    The term "Advisor" or "Support Person" refers to any individual who provides support, guidance or advice to a party involved in a Student Conduct Review Process. The Advisor or Support Person of the involved party's choice may assist and/or accompany the party throughout the Student Conduct Review Process. This person shall not speak for, or present the information on behalf of the party who requested the Advisor or Support Person's attendance. As used in this regulation and in Regulation UCF-5.009, the term 'Advisor' does not include an advisor as defined under 34 CFR 106.45; refer to University Policy 2-012 for information about 'Advisor' under the University's Title IX Grievance Policy.

    (c)    The term "Clery Act" refers to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act.  The Clery Act is a federal law that requires institutions of higher education to provide current and prospective students and employees, the public, and the federal government with crime statistics and information about campus crime prevention programs and policies. Among other crimes, the Clery Act requires that colleges and universities report forcible sex offenses including sexual assault and rape.  The Clery Act was amended by the Violence Against Women Reauthorization Act of 2013.

    (d)    The term "Community ReEngagement and Educational Development (CREED) Program" is a committee composed of an equal number of faculty/staff and students appointed by the Director of Student Conduct and Academic Integrity (SCAI) or designee to review the disciplinary status of a student, or the removal of a "Z Designation" on a student's transcript.

    (e)    The term "Complainant" refers to anyone who discloses having been subjected to sex discrimination, which includes sexual assault/misconduct, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, retaliation, or complicity in the commission of any act prohibited by the Rules of Conduct section UCF-5.008(5) or the Organizational Rules of Conduct section UCF-5.012(5), regardless of whether that person makes a report or seeks action under that policy.

    (f)    The term "Consent" means an understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent cannot be obtained by force, threat, coercion, manipulation, reasonable fear of injury, intimidation, use of position of influence, or through the use of one's mental or physical helplessness or incapacity. The lack of a negative response, lack of protest or resistance, silence and passivity are not consent. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. Past consent to sexual activity does not imply ongoing future consent.

1. Responsibilities - It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement.
2. Standard - A determination of whether consent exists will be based on the information the initiator of the sexual act knew or should have known as a sober, reasonable person.  Being impaired by alcohol or other drugs does not relieve an initiator of a sexual act from obtaining consent.
3. Incapacitation – Incapacitation is a state where an individual cannot make rational, reasonable decisions because of age, mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated due to the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition. A person who is incapacitated lacks the capacity to give consent because they cannot understand the facts, nature, or extent of the sexual interaction.
4. Duration of Consent - Consent must be ongoing throughout sexual activity, for each sexual act, and can be withdrawn at any time.
5. Within each sexual encounter, there may be separate individual sexual acts involved. Consent to one act by itself does not constitute consent to another act. If verbal consent is not given, ongoing active participation is required for consent.
6. The existence of a dating or sexual relationship between the persons involved, or the fact of past sexual relations have occurred between the parties, is not an indicator of consent for any current or future sexual encounter.
7. An individual who seeks to withdraw consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once consent is withdrawn, the sexual activity must cease immediately.
8. Scope of Consent - Consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another.

(g) The term "Continuously Enrolled" is defined as being enrolled in classes without a break of two or more consecutive regular semesters/terms (i.e., Fall and Spring, or Spring, Summer, and Fall).

(h) The term "Deputy Title IX Coordinator" is defined as a university employee who is responsible for assisting with the coordination of the University's efforts to comply with and carry out its responsibilities under Title IX. UCF's Deputy Title IX Coordinators are Dana Juntunen, Brandi Stuart, and Abigail Malick.

(i) The term "Director of SCAI" refers to the Director of Student Conduct and Academic Integrity.

(j) The term "Hold" refers to a service indicator placed on a student's record that includes but is not limited to: prevent modification to registration; access to transcripts; and re-enrollment following a separation from the University

(k) The term "mandated assessment" refers to a process which is used to evaluate the student's risk of harm to self or others, and to take appropriate actions to ensure the safety of the student or others if risk is present, completed by a licensed mental health professional or other appropriate licensed medical provider.

(l) The term "Off Campus" refers to any location not defined as University premises.

(m) The term "Overlay" refers to a notification on a student's university transcript that states the student is not in good standing.

(n)     The term "Preponderance of Evidence" means that evidence, considered as a whole, shows that the fact sought to be proved is more probable than not.  This is the standard used in adjudicating all disciplinary cases within the Student Conduct Review Process.

(o)     The term "Record Sealing" refers to when a student's disciplinary record cannot be examined except by a court order or designated officials.

(p)     The term "Relevant Information" means information that has been shown to directly support the position of a party throughout the University's investigative process or Student Conduct Review Process.

(q)     The term "Respondent" refers to any student or registered student organization who has been accused of sex discrimination, which includes sexual assault/misconduct, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, retaliation, or complicity as defined in Rules of Conduct section UCF-5.008(5) or the Organizational Rules of Conduct section UCF-5.012(5).

(r)     The term "Responsible Employee" is defined as any employee, and Direct Support Organization non-student employee, who is not a confidential employee as defined in the University's *Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy*. Responsible Employees include (but are not necessarily limited to) Faculty (full-time and part-time), Staff (full-time and part-time), Resident Assistants, and graduate students with classroom responsibilities.  Responsible employees also include those employees identified as Campus Security Authorities (CSAs).  The University reserves the right to designate other individuals involved in university-sponsored/related activities as Responsible Employees on a case-by-case basis.

(s)     The term "Sanction" refers to outcome(s) imposed on students and registered student organizations found in violation of any Rules of Conduct or Organizational Rules of Conduct.

(t)     The term "Sex Discrimination" refers to any unlawful distinction, preference or detriment to an individual that is based upon an individual's sex that: (1) excludes an individual from participation in; (2) denies the individual the benefits of; (3) treats the individual differently with regards to; or (4) otherwise adversely affects a term or condition of an individual's employment, education, living environment, or participation in a university program or activity. Sex discrimination includes sexual assault/misconduct, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, retaliation, or complicity.

(u)     The term "Sexual Contact" means physical contact of a sexual nature between individuals and includes but is not limited to:  (i) touching, kissing, fondling (whether over or under clothing) of an individual for the purpose of sexual gratification; and/or (ii) contact, however slight, between the mouth, anus or sex organ of one individual with either the anus or sex organ of another individual; and/or (iii) contact, however slight, between the anus or sex organ of one individual and any other object.

(v)     The term "Student" means any person enrolled in one or more classes at the University, either full time or part time, study abroad student, online students, continuing education students, students pursuing undergraduate, graduate or professional studies, either degree seeking or non-degree seeking. Persons who withdraw after allegedly violating the Rules of Conduct, or who are not officially

enrolled for a particular academic term but who have a continuing relationship with the University are also "students." Individuals who have been accepted for admission and have paid an enrollment deposit are considered "students" for limited purposes (including the Student Conduct Review Process).

(w)     The term "Student Conduct Board" means any person or persons authorized by the Director of SCAI or designee to gather information and make proposed findings regarding whether a student or registered student organization has violated the Rules of Conduct or Organizational Rules of Conduct and to propose sanctions that may be imposed.

(x)     The term "Title IX" refers to the Title IX of the Education Amendments of 1972 which is a federal law that protects people from discrimination based on sex in education programs or activities which receive Federal financial assistance. Title IX states that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance". Additionally, Title IX prohibits discrimination on the basis of pregnancy as well as Title IX sexual harassment (defined in UCF-5.006(12)).

(y)     The "Title IX Coordinator" is defined as a university employee who is responsible for coordinating the University's efforts to comply with and carry out its responsibilities under Title IX. UCF's Title IX Coordinator is Matt Ricke.

(z)     The term "University" means the University of Central Florida.

(aa)    The term "University Community" refers, collectively and individually, to students, University officials, Trustees, and all visitors, contractors, and guests to the University or any of its campuses, facilities or events.

(bb)    The term "University Official" includes any person employed by the University (i.e. faculty, staff, administration, and residence hall staff) acting within the scope of their job duties.

(cc)    The term "University Premises" includes all land, buildings, facilities, and other properties in the possession of or owned, used, controlled by the University, or its direct support organizations.

(dd)    The term "VAWA" refers to the Violence Against Women Reauthorization Act of 2013, which amended the Violence Against Women Act and the Clery Act to provide new requirements for schools to prevent and respond to sexual violence, relationship violence and stalking. Some of these requirements include providing primary prevention education and awareness programs for all incoming students and employees; collecting statistics on relationship violence and stalking, in addition to current requirements to collect sexual assault statistics; issuing Complainants a written notice of their rights; and adopting grievance policies that are prompt, fair, and impartial as well as administered by trained officials.

(ee)    The term "VP of SDES" refers to the Vice President of Student Development and Enrollment Services.

(ff)    The term "Witness" refers to any person who directly observed an incident or has direct or indirect knowledge related to an incident

**(4)  Smoking.** While on UCF property, students will uphold the smoke-free campus policy (http://smokefree.sdes.ucf.edu/) to ensure a healthy and clean environment for everyone. Smoking of any kind is prohibited in all facilities and areas of the UCF campus.

**(5)  Medical Emergencies.** The University of Central Florida highly encourages students and registered student organizations to call for medical assistance whenever an individual

experiences severe intoxication/impairment or serious injury after consuming alcohol and/or drugs. Students and registered student organizations may be reluctant to call for help for themselves or others due to potential involvement from law enforcement officials or SCAI. Due to the serious or life-threatening nature of these medical emergencies, the University of Central Florida urges students to contact emergency medical services or the law enforcement officials if alcohol-related and/or drug-related medical emergencies arise. The university's primary goal is to create a safe environment for its students. Procedures and expectations regarding these incidents have been outlined in the SCAI Rules of Conduct Controlled Substance and Drug Violations and Alcoholic Beverages section and the Organizational Rules of Conduct section.

**(6)  Student Care Services.**  To provide comprehensive and consistent care for students experiencing academic, financial or personal challenges, Student Care Services (SCS), under Student Rights and Responsibilities provides support to students identified as needing additional on-campus or off-campus resources.  Student Care Services staff review referrals from students, faculty, staff and/or other parties who are concerned about behavior exhibited by a student.  The goal of Student Care Services is to intervene and support the student before a situation reaches crisis level. Student Care Services staff will reach out to the student to assess what resources would be beneficial and collaboratively develop an action plan to reduce obstacles affecting success at UCF.  Student Care Services staff will assist the student in coordinating with campus resources currently being utilized and will work with the student to monitor progress. Depending upon the circumstances, the referring person may receive feedback about the student's action plan. Students have the right to inspect and review all information submitted to Student Care Services.

**(7)  Student of Concern Team.** In order to support student success, the University may utilize additional campus resources to assist the student.  This may include collaboration with the Student of Concern Team (SOCT), a multidisciplinary group that reviews potential concerns presented by the UCF community regarding student behavior. The SOCT offers additional knowledge of university resources and procedures and may make further recommendations regarding action plan items for student success.  Students of concern are presented to the team at the discretion of the Office of Student Rights and Responsibilities and/or Student Care Services.

    (a)    The team may enlist the services of various campus units on an as needed basis, including but not limited to Counseling and Psychological Services, Student Health Services, Academic Services, Housing and Residence Life, First Year Advising and Exploration, Student Conduct, and the University of Central Florida Police Department.

    (b)    The role of Student Health Services and Counseling and Psychological Services on the Student of Concern Team will be consultative in nature. When the involved student has been a patient or client of either agency, the staff representative will maintain the confidentiality of the student's clinical information and will make recommendations for action based solely upon the information provided in the meeting or as guided by clinical and licensure best practices.

    (c)    Student Care Services staff has additional campus support systems in place to assess students engaging in behavior that may pose a risk to themselves or others. This includes but is not limited to the University Crisis Team, Mandated Assessment Procedure, and Involuntary Withdrawal Procedure.

**(8)  University Crisis Team.**  The University may refer students who are viewed to be engaging in behavior(s) that pose risks to themselves or others to the University Crisis Team for possible action. Such behaviors include, but are not limited to: suicidal behavior, self-injury, threats to harm others, disruptive behavior, disordered eating, and endangerment to the community.

(a)     The Assistant Dean of Students or designee will convene the team members in order to review each case and decide on the best course of action. The team is comprised of the following persons and/or their designee(s): Student Health Services Executive Director, Counseling and Psychological Services Director, UCF Police Department Chief, Student Care Services Associate Director, Student Conduct and Academic Integrity Director, Associate Dean for Academic Services,  Housing and Residence Life Director, Deputy General Counsel, Assistant Dean of Students and Student Development and Enrollment Services Associate VP and Dean of Students.

(b)     Various campus units may enlist the services of the team. These include but are not limited to Student Accessibility Services, Recreation and Wellness Center, Wellness and Health Promotion Services, Office of Fraternity and Sorority Life, Athletics, Alcohol and Other Drug Intervention Services, Undergraduate Studies, and Graduate Studies.

(c)     The role of Student Health Services and Counseling and Psychological Services representatives on the Crisis Team will be consultative in nature. When possible, Student Health Services and Counseling and Psychological Services representatives will not confer on a case for which they are (or have been) serving in a direct provider relationship with the involved student. When the involved student has been a client at UCF Counseling and Psychological Services, the Counseling and Psychological Services representatives or designee will maintain the confidentiality of the student's clinical information and will make recommendations for action based solely upon the information provided in the meeting or as guided by clinical and licensure best practices.

**(9)  Mandated Assessment Procedure.**  This University procedure is established for behaviors or actions that result in hospitalization from imminent danger to self or others via the Baker Act (F.S. 394.463) or Marchman Act (Chapter 397, Florida Statutes), significant acts or threats of violence to others, chronic eating disorders, dramatic and/or expansive displays of self-mutilation, behaviors that are significantly disruptive to the UCF community and /or diminish the ability of a student to care for oneself.  Whenever the UCF Police provide transportation of a UCF student to the hospital for involuntary examination, the police will file a report with the OSRR. In addition, anyone may also file reports about students of concern with Student Care Services.

(a)     Once a report is received regarding a UCF student hospitalization via the Baker Act or the Marchman Act, Student Care Services may utilize the mandated assessment session(s) to evaluate a student's risk of harm to self or others, and to take appropriate actions to ensure the safety of the student or others if risk is present. In addition, the mandated assessment session(s) are designed to assist students in developing a safety and/or well-being plan and provide students with educational resources.  A member of Student Care Services will contact the student in a timely manner and require an initial meeting between a Student Care Services staff member and the student to inform the student of their rights and responsibilities regarding the incident.

(b)     All students identified as threatening self-harm or having attempted suicide must complete a mandated assessment with a licensed mental health professional and/or a physical assessment with a licensed medical provider. Examples of a licensed mental health professional include a Student Health Services psychiatrist, a Counseling and Psychological Services clinician, or a community based

licensed mental health professional or licensed psychiatrist of the student's choice. Student Care Services will require proof of participation for the mandated assessment with a licensed mental health professional and/or proof of a physical assessment with an appropriate medical provider. The student must meet with Student Care Services within ten (10) business days following release to complete a follow up appointment. Student must provide proof of assessment within twenty (20) business days following release or prior to return to the university (in the event a student withdraws for the remainder of the semester or is placed on Medical Withdrawal).  Failure to comply may result in disciplinary action or the convening of the University Crisis Team.

(c)   In cases where more protective action is needed based on more severe behavior/conduct (e.g., behavior endangering others, threats to harm others, behavior significantly disruptive to the UCF community), the Assistant Dean of Students or designee may initiate one or both of the following:

1.   Interim Suspension followed by initiating the Student Conduct Review Process;

2.   Convening of the University Crisis Team to consider the initiation of the Involuntary Withdrawal Procedure.

**(10)  Involuntary Withdrawal Procedure.**

(a)   Introduction.

1.   The University of Central Florida is committed to ensuring equality of educational opportunity while cultivating an environment that is safe for the campus community and supportive of student learning. The University will seek to intervene where a student's behavior interferes with the rights of others within the University community or where the student presents a significant risk of harm to the health, safety, well-being and/or property rights of others.  In such situations, safety and security concerns are paramount, and the University must react as promptly as feasible under the circumstances.  University officials may consider a number of reasonable security and health and safety measures, including, but not limited to, requesting emergency assistance and seeking psychiatric evaluation, hospitalization, and treatment for mental illness as appropriate under the law.  Additionally, the University may determine that it is necessary for the student to be involuntarily withdrawn from the University for the protection of others.  This section outlines the procedures to be used by the University in making an involuntary withdrawal decision.

2.   This involuntary Withdrawal Procedure will be applied in a nondiscriminatory manner, and decisions will be based on consideration of the student's conduct, actions, and statements and not on knowledge or belief that the student has a disability.

3.   The purpose of the Involuntary Withdrawal Procedure is for the University to be able to take urgent action when circumstances present a Significant Risk based on reasonably available information at the time. It will be necessary for the University to act promptly and for the benefit of the community as a whole, even if that means that, in consideration of later-presented information, the procedure ultimately concludes in favor of the student's continued enrollment (with or without conditions).  Where the involuntary withdrawal procedure is invoked but the student is permitted

to continue enrollment with no conditions, the University will take reasonable steps to assist the student in resuming their academic endeavors with as little disruption as feasible under the circumstances.

(b)    Direct Threat. When a student's behavior is deemed to pose a direct threat risk to the health and safety of the community, the Associate Vice President and Dean of Students ("Dean of Students") or their designee may initiate an involuntary withdrawal of the student on behalf of the university.  The Dean of Students or designee will consult with the University Crisis Team before a final decision is made on the involuntary withdrawal of the student.  A student poses a Direct Threat when the student's behavior poses a "Significant Risk" to the health or safety of the student or others, or of significant property damage, or of substantial disruption to the lawful activities of others or the educational process or orderly operation of the University, and reasonable modifications of policies, practices, or procedures will not sufficiently mitigate the risk.  Significant Risk is defined as the high probability of harm, threats of harm, or disruption and not just a slightly increased, speculative, or remote risk of such.  Significant Risk is identified based on information that is reasonably available at the time of consideration. Information may be provided to the University through different means, including an incident report to Office of Student Rights and Responsibilities (OSRR), a police report, information provided following a hospitalization, or any other reliable source.

(c)    Interim Involuntary Withdrawal.

1.    A student may be involuntarily withdrawn from the University on an interim basis ("Interim Involuntary Withdrawal") if the Assistant Dean of Students or designee determines, based upon information reasonably available at the time, that the student poses a Direct Threat as defined above.  A student will remain on Interim Involuntary Withdrawal pending the outcome of the Interim Involuntary Withdrawal Review. An Interim Involuntary Withdrawal may be imposed prior to a meeting of the University Crisis Team.

2.    A student will be notified of Interim Involuntary Withdrawal through a written notice outlining the Interim Involuntary Withdrawal procedure, including the time, date, and location of the Interim Involuntary Withdrawal Review.

3.    A student under Interim Involuntary Withdrawal shall be given an opportunity to present information to the University Crisis Team within three (3) business days from the effective date of the Interim Involuntary Withdrawal, to review the following issues only:

a.    The reliability of the information concerning the student's behavior and,

b.    Whether or not the student's behavior poses a Direct Threat, as defined above.

4.    If upon conclusion of the Interim Involuntary Withdrawal review, the University Crisis Team determines the student will remain on Interim Involuntary Withdrawal based on the above defined issues, the University Crisis Team will proceed with the Involuntary Withdrawal procedures as outlined below.

(d)     Involuntary Withdrawal – Notice to Student. A student subject to Involuntary Withdrawal is entitled to the following:

     1.     Notice of intent to remove the student pursuant to this policy stating the reasons for the proposed action.

     2.     The opportunity to examine the psychiatric or other evaluations provided to the University Crisis Team and to discuss them.

     3.     The opportunity to present relevant information for consideration of his/her case personally, or by a licensed mental health professional working with that student, if the student is not capable of self-representation.

     4.     The opportunity to have an advisor of the student's own choice accompany the student to any meetings or proceedings described in this procedure. The advisor may not present on behalf of the student or otherwise participate in the meeting or proceeding.

     5.     The right to appeal.

(e)     Involuntary Withdrawal – Meeting of the University Crisis Team. The Assistant Dean of Students or designee will call a meeting of the University Crisis Team no earlier than five (5) business days after notifying the student of the proposed Involuntary Withdrawal. The student will be notified of the time, date, and location of the University Crisis Team meeting. The student may be present at this meeting and may present information in support of him/herself. Following the student's presentation, the team shall meet in a confidential deliberation. At the conclusion of this confidential deliberation, the team shall make a recommendation to the Dean of Students or designee, based upon the Team's review of all available information at the time of the meeting, as to whether the University should:

     1.     involuntary withdraw the student due to Direct Threat;

     2.     make no changes to the student's status;

     3.     allow continued enrollment with conditions; or

     4.     if the student is on Interim Involuntary Withdrawal at the time, reinstate the student with or without conditions.

(f)     Involuntary Withdrawal – Notifying Student of Recommendation and Decision. The Dean of Students or designee will make a final decision regarding the student's enrollment status based on the totality of information available to the University and considering both the University Crisis Team's recommendation and any information presented by the student. The Dean of Students or designee will notify the student in writing within two business days of the final decision regarding the student's enrollment status.

(g)     Involuntary Withdrawal – Appeal. In the event a student disagrees with the decision of the Dean of Students or designee, the student may appeal the decision. The appeal must be made in writing to the Vice President for SDES, or designee, within three (3) business days after the date of the notification to the student of the decision. A student may appeal the decision based on one or more of the following criteria:

     1.     Irregularities in fairness and stated procedures that could have affected the outcome of the decision.

2.      Discovery of new and significant information that could have affected the outcome and that was not known or could not reasonably have been discovered and/or presented at the time of the meeting.

3.      The outcome is extraordinarily disproportionate to the reported behavior. The Vice President of SDES or designee, shall, within three (3) business days, sustain the initial decision or return the case to the University Crisis Team for re-consideration. The Vice President's decision to sustain the initial decision is final action.  If the matter is returned for re-consideration, the process will resume at the step outlined in subsection (e), above.

(h)     Upon being involuntarily withdrawn, the student may no longer enroll in classes, may not be an active member of a registered student organization, may no longer use University facilities, must vacate University owned housing, may no longer be permitted on University property, and may not be employed by UCF. Additionally, an involuntarily withdrawn student may be entitled to whatever refunds of tuition, fees, and room and board charges as would be appropriate given the timing of the withdrawal.

(i)     Students who are involuntarily withdrawn from the University shall have a hold placed on their records, which will prevent them from being readmitted or reenrolled at the institution except as stated in this paragraph. A student may request readmission or reenrollment at the University and provide the Dean or Students or designee with documentation from an appropriate healthcare provider of their choice who has conducted a proper assessment of the student and concluded that the student is ready and able to safely return to the University and does not pose a Direct Threat as defined above. . In cases where the Dean of Students or designee has imposed other conditions for readmission, it is the responsibility of the student to provide documentation of compliance with such conditions.

(j)     A student who is considered for but ultimately not subject to Involuntary Withdrawal may be subject to conditions on continued enrollment at the University. In such cases, the student will be provided with a written summary of any such conditions and must meet all conditions in order to maintain student status. A student who fails to meet such conditions may be later subject to involuntary withdrawal by the Dean of Students or designee or may be subject to charges through the University's Student Conduct Review Process for failure to comply.

(k)     The current voluntary medical withdrawal process should not be used to handle withdrawals where a Direct Threat is evident or where a violation of the Rules of Conduct has allegedly occurred. Information for students seeking a medical withdrawal is available in the Catalog.

(l)     As a general principle, the University prefers to use the Student Conduct Review Process in instances of misconduct, without regard to whether the student has a physical or mental condition that might be contributing to the misconduct. The Involuntary Withdrawal Procedure is to be employed in those situations in which the regular Student Conduct Review Process is not applicable or, due to safety concerns, cannot be applied in a sufficiently timely fashion.

**(11)  Student Conduct Procedures for Sex-Based Misconduct (Non-Title IX Sexual Harassment).**

(a)  These procedures apply to alleged violations of UCF Regulation 5.008(5) and 5.012(5), but do not apply to 5.008(6) Title IX Sexual Harassment (see paragraph (12) below).

(b)  The University of Central Florida is committed to fostering an environment in which all members of our campus community are safe, secure, and free from sex discrimination, including sexual misconduct, stalking, and relationship violence, listed and defined in the Rules of Conduct (UCF-5.008) and Organizational Rules of Conduct (UCF-5.012).Our community expects that all interpersonal relationships and interactions – especially those of an intimate nature – be grounded upon mutual respect and open communication. When learning of conduct or behavior that may not meet these standards, community members are expected take an active role in promoting the inherent dignity of all individuals. For a more exhaustive list of the community's rights and expectations as it relates to Title IX Policy and Procedures, please reference University Policy 2-004.1 Prohibition of Discrimination, Harassment and Related Interpersonal Violence. Allegations of Title IX Sexual Harassment (as defined in the University's Title IX Grievance Policy, UCF Policy 2-012) are governed by paragraph (12) below.

(c)  The university encourages any faculty, staff, student or non-student who thinks that he or she has been subjected to sex discrimination or retaliation by another student, member of the faculty or staff, or third party affiliated with the University to immediately report the incident to the Office of Institutional Equity. Reports may be filed at https://letsbeclear.ucf.edu.

(d)  The University strives to promote the safety and well-being of all students and employees. This information is applicable to students and employees regardless of their sex, gender, sexual orientation, gender identity, or gender expression.

(e)  Rights of the Complainant and the Respondent. Any individual ("Complainant") who discloses having been subjected to sex discrimination, including sexual assault/misconduct, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, retaliation, or complicity, and any individual or registered student organization ("Respondent") who has been accused of sex discrimination, including sexual assault/misconduct, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, retaliation, or complicity,  are afforded the following rights throughout the university's investigative process and the student conduct review process  (except in cases involving alleged Title IX Sexual Harassment as defined in the University's Title IX Grievance Policy, UCF Policy 2-012, see paragraph (12) below). These rights provide a fair process for both parties. These rights are in addition to the rights afforded in the student conduct review procedures outlined in University Policy 2-004.1 Prohibition of Discrimination, Harassment and Related Interpersonal Violence, and referenced in UCF-5.009 (students) and UCF-5.013 (student organizations) of the University Regulations. Complainant and Respondent rights include the following:

1.  Both the Complainant and Respondent are permitted to have an advisor or support person accompany them throughout the university's investigative process and student conduct review process.  This person will not represent the Complainant or Respondent, address witnesses,

investigator(s), the hearing body, any other party, or otherwise directly participate throughout the university's investigative process and/or student conduct review process.  In addition, if the selected person is a witness, the person cannot be an advisor or support person.

2.      Both the Complainant and the Respondent have the right to remedial and protective measures and shall be notified of available assistance at the University.

3.      Both the Complainant and Respondent will have equal opportunity to present relevant witnesses and other information during the investigative process and during a formal hearing. Prior to the initiation of the student conduct review process, the investigator has the discretion to determine the relevance of any proffered evidence and to include or exclude certain types of evidence. In general, the investigator will not consider statements of personal opinion, rather than direct observations or reasonable inference from the facts, or statements as to any party's general reputation for any character trait.

4.      If the investigative process results in a recommendation to initiate the student conduct review process, both the Complainant and Respondent will receive notice to attend a preliminary conference meeting with SCAI and be informed of the available resolution options in the student conduct review process.

5.      During the Student Conduct Review Process, both the Complainant and Respondent shall be informed of the Administrative Hearing Officer assigned to the case and shall have the opportunity to challenge the impartiality of the individual within three (3) business days of notification.

6.      Both the Complainant and Respondent will be afforded similar and timely access to any information made available through the investigative process and/or that will be used during the student conduct review process.

7.      If the matter proceeds to a formal hearing, both the Complainant and Respondent may submit a list of proposed questions related to the alleged incident to be asked during the formal hearing. The relevancy of proposed questions will be determined by the hearing officer. During a formal hearing, all questions shall be asked through the hearing officer. Both Complainant and Respondent should not be questioned directly by one another nor by either's advisor; instead, questions for each shall be asked by the hearing officer based on proposed questions submitted by the other party.

8.      Both the Complainant and Respondent will have equal opportunity to present relevant witnesses and other information during the investigative process. Such evidence, as deemed relevant to the investigation and used in authoring the investigative findings report, shall be presented during the student conduct review process. Relevancy and timeliness will be determined by the investigator(s). All evidence and witnesses must be submitted by the Complainant and Respondent no later than the conclusion of the investigative findings report review period prior to the report being sent to OSRR. If OSRR determines that there is "cause," then OSRR will make a written recommendation, including a copy of OIE's investigative report and all other supporting information, to SCAI. A

finding of "cause" at this stage is not a finding of a violation. SCAI will charge the student and/or registered student organization through the Student Conduct Review Process when there is evidence of facts which reasonably allow the university to conclude that a violation of 5.008(5) or 5.012(5) may have occurred.

9. Both the Complainant and Respondent will have equal opportunity to present relevant witnesses and other information during a formal hearing review process. Neither the Complainant nor Respondent will have irrelevant past conduct, including sexual history, discussed during the formal hearing. The issue of relevancy shall be determined by the hearing officer.

10. Both the Complainant and the Respondent will be provided access to participate, during the entire formal hearing in person, via videoconference, by telephone, or by other means available.

11. At least five (5) business days before the formal hearing, the Complainant may submit a written statement describing the impact of the Prohibited Conduct on the Complainant and expressing a preference about the sanction(s) to be imposed. At least five (5) business days before the formal hearing, the Respondent may submit a written statement explaining any factors that the Respondent believes should mitigate or otherwise be considered in determining the sanction(s) imposed. SCAI will ensure that the Complainant and the Respondent each have an opportunity to review any statement submitted by the other party before the start of the formal hearing. The purpose of the statement(s) is to assist the hearing officer in proposing a sanction. Therefore, the statement(s) will be given to the hearing body for consideration only if the hearing officer makes a proposed finding of in violation on one or more allegations of sex-based misconduct (other than Title IX sexual harassment) addressed in the formal hearing.

12. Both the Complainant and Respondent will be informed, concurrently and in writing, of the outcome of the investigative process, the Student Conduct Review Process, and the outcome of the appeal process

13. Both the Complainant and the Respondent have the right to appeal the outcome of the Student Conduct Review Process on the basis outlined in the applicable Student Conduct Appeals section UCF-5.010 (individual student) or UCF-5.013 (registered student organizations).

14. Both the Complainant and Respondent will be given periodic status updates throughout the investigative process and the Student Conduct Review Process.

(g) Administrative hearing officers who hear cases of sex-based misconduct (other than Title IX sexual harassment) receive annual training on how to conduct fair and impartial hearings for these types of cases.

(12) Title IX Sexual Harassment Procedures for Student Conduct Review Process.

(a) Federal law, specifically Title IX of the Education Amendments of 1972 (Title IX), prohibits discrimination on the basis of sex in education programs or activities. Part of Title IX's prohibition regarding sex discrimination includes acts of Title IX Sexual Harassment as defined in the University's Title IX Grievance

Policy, UCF Policy 2-012. Title IX also prohibits retaliation for making a good faith report of Title IX Sexual Harassment or participating in or being a party to any proceeding involving allegations of Title IX Sexual Harassment.

(b) Rights of the Complainant and the Respondent. The rights of the Complainant and Respondent in a Title IX Sexual Harassment matter are explained in the University's Title IX Grievance Policy, UCF Policy 2-012.

(c) Procedures Governing Title IX Sexual Harassment Allegations. The policy and procedures which govern the investigation and live hearing process for allegations of Title IX Sexual Harassment are found in the University's Title IX Grievance Policy, UCF Policy 2-012.

(d) Administrative hearing officers who hear cases of Title IX Sexual Harassment receive annual training on how to conduct fair and impartial hearings for these types of cases.

## UCF-5.007

**Student Conduct and Academic Integrity; Scope; Student Conduct Records; Medical Emergencies (Alcohol & Drug)**

**(1) Scope**

    (a)   The Rules of Conduct shall apply to all undergraduate students, graduate students and students pursuing professional studies, including those attending its regional campuses and/or off campus instructional sites.  The Rules of Conduct shall be deemed a part of the terms and conditions of admission and enrollment of all students.  The right of all students to seek knowledge, debate ideas, form opinions, and freely express their ideas is fully recognized by the University of Central Florida. The Rules of Conduct apply to student conduct and will not be used to impose discipline for the lawful expression of ideas.  Specific restrictions on time and place of meetings and assemblies are found in other University regulations or policies.

    (b)   These Rules of Conduct apply to all student conduct that occurs on University premises or online, or at activities officially approved by the University of Central Florida or which are sponsored or conducted by University groups and organizations, regardless of location.

    (c)   Off-Campus Conduct.  The University may take action against a student for off-campus conduct if the conduct is specifically prohibited by law or the Rules of Conduct; or if the conduct poses (or demonstrates that the student's continued presence on University premises poses) a danger to the health, safety or welfare of the University community; or if the conduct is disruptive to the orderly processes and functions of the University.

    (d)   Failure to comply with duly established laws or University regulations may subject violator(s) to appropriate civil authorities.

**(2) Authority**

    (a)   The Florida Board of Governors Regulation 6.0105 requires each university to establish a Student Disciplinary System, including a code of conduct, to apply to student disciplinary proceedings.

    (b)   These regulations are designed to ensure fairness and due process in student disciplinary proceedings.

    (c)   Generally, authority necessary to enforce the student conduct regulations is vested in the Vice President for Student Development and Enrollment Services or designee. Selected functions of this authority are shared with faculty, staff and students. Some functions of student conduct administration are assisted through review boards or committees.

**(3) Violations of Law and Rule of Conduct Violations.**  A student who commits offenses against the laws of municipalities, states, or the United States, is subject to prosecution by those authorities and may be subject to disciplinary action under University rules when the conduct violates institutional standards.  Student shall not be forced to present self-incriminating evidence; however, the University is not required to postpone disciplinary proceedings pending the outcome of any civil or criminal case.  The student conduct review process is not a criminal or judicial proceeding and is designed to address student behavior; therefore, alleged violations of the Rules of Conduct will be addressed independently of any penalty imposed by the courts for the criminal offense.

**(4) Student Conduct Records**

    (a)    Maintenance of Records.  A student's conduct case record will be maintained in Student Conduct and Academic Integrity (SCAI) and if applicable, the Office of Institutional Equity.  The case record of a student found responsible for charge(s) against them, with sanctions less than disciplinary suspension, dismissal and/or expulsion, will generally be maintained in SCAI (and, if applicable, the Office of Institutional Equity) for seven years from the calendar year of record, after which they are destroyed.  The case record of a student who has been placed on disciplinary suspension, dismissal and/or expulsion will be permanently maintained as official records by SCAI.

    (b)    Release of Records.  The release of student disciplinary records will be governed by applicable federal and state laws regarding the privacy of educational records.

    (c)    Sealing of Records: For information regarding sealing of records, please see UCF-5.010(4).

**(5) Evaluation of Student Conduct Review Process.**  The Student Conduct Review Process will be evaluated periodically by the Golden Rule Review Committee.  All proposed changes shall be evaluated for approval by the appropriate administrative body.

**(6) Medical Emergencies.**  The University of Central Florida highly encourages students to call for medical assistance whenever an individual experiences severe intoxication or serious injury after consuming alcohol and/or other drugs. Students may be reluctant to call for help for themselves or others due to potential involvement from law enforcement officials or SCAI. Due to the serious or life-threatening nature of these medical emergencies, the University of Central Florida urges students to contact emergency medical services or law enforcement officials if alcohol-related and/or drug-related medical emergencies arise. The university's primary goal is to create a safe environment for its students.

    (a)    University of Central Florida students who receive medical attention due to drug and/or alcohol related emergencies may be exempted from disciplinary action by the Director of SCAI following the Director's review of the circumstances. Students exempted by the Director from disciplinary action in this manner will be referred for assessment and follow-up services in lieu of the student conduct review process.

    (b)    Students who receive medical assistance for drugs and/or alcohol emergencies may receive exemption for violations of the Rules of Conduct Section 10(a)-10(d) and/or 11(a)-11(c); however, exemption for other Rules of Conduct violations may not be granted. The Director of SCAI or designee reserves the right to review each incident individually to determine whether the student will be exempt from disciplinary action. The Director of SCAI or designee maintains the right to recommend additional requirements for students who are referred for assessment and fail to meet the requirements of their assessment. For subsequent incidents, appropriate interventions will be handled on a case by case basis.

    (c)    Students who seek medical assistance on behalf of another student impaired by drugs and/or alcohol may be exempted by the Director of SCAI from disciplinary action for violations of the Rules of Conduct Section 10(a)-10(d) and/or 11(a)-11(c).  However, exemption for other violations of the Rules of Conduct will not be granted.

    (d)    For parental notification regarding alcohol and/or other drug-related incidents, refer to the Parental Notification Policy on SCAI website: https://scai.sdes.ucf.edu/parental-notification/.

(e)     Additional information regarding alcohol and/or other drug-related emergencies can be found on the SCAI website at https://scai.sdes.ucf.edu/medicalemergencies/.

## UCF-5.008  Rules of Conduct

The following defined and described actions include, but are not limited to, conduct for which disciplinary action may be taken at the University of Central Florida.  Students are responsible for the observation of all University policies and regulations. Each student is expected to abide by these rules of conduct, and administrators are expected to enforce them.  These Rules of Conduct should be read broadly and are not designed to define prohibited conduct in exhaustive terms.  Additional rules and regulations may be revised during the year; announcements will be made on adoption of the changes or additions.  The right of all students to seek knowledge, debate ideas, form opinions, and freely express their ideas is fully recognized by the University of Central Florida. The Rules of Conduct apply to student conduct and will not be used to impose discipline for the lawful expression of ideas.  Students are prohibited from engaging in:

**(1)  Academic Misconduct**
  (a)  Unauthorized assistance: Using or attempting to use unauthorized materials, information or study aids in any academic exercise unless specifically authorized by the instructor of record.  The unauthorized possession of examination or course related material also constitutes cheating.
  (b)  Communication to another through written, visual, electronic, or oral means. The presentation of material which has not been studied or learned, but rather was obtained through someone else's efforts and used as part of an examination, course assignment or project.
  (c)  Commercial Use of Academic Material: Selling of course material to another person, student, and/or uploading course material to a third party vendor without authorization or without the express written permission of the University and the Instructor. Course materials include but not limited to class notes, Instructor's power points, tests, quizzes, labs, instruction sheets, homework, study guides, and handouts.
  (d)  Falsifying or misrepresenting the student's own academic work.
  (e)  Plagiarism: Whereby another's work is used or appropriated without any indication of the source, thereby attempting to convey the impression that such work is the student's own.
  (f)  Multiple Submissions: Submitting the same academic work for credit more than once without the express written permission of the instructor.
  (g)  Any student who knowingly helps another violate academic behavior standards is also in violation of the standards.
  (h)  Soliciting assistance with academic coursework and/or degree requirements.  The solicitation of assistance with an assignment, lab, quiz, test, paper, etc., without authorization of the instructor of record or designee is prohibited.  This includes but is not limited to asking for answers to a quiz, trading answers, or offering to pay another to complete an assignment.  It is considered Academic Misconduct to solicit assistance with academic coursework and/or degree requirements, even if the solicitation did not yield actual assistance (for example, if there was no response to the solicitation).

**(2)  Possessing and/or Providing False and Misleading Information and/or Falsification of University Records**

(a)     Withholding related information, or furnishing false or misleading information (oral or written) to University officials, university and non-university law enforcement officers, faculty or staff.

(b)     Possession, use or attempted use of any form of fraudulent identification.

(c)     Forgery, alteration or misuse of any University document, material, file, record or instrument of identification.

(d)     Deliberately and purposefully providing false or misleading verbal or written information about another person.

(e)     Falsification, distortion, or misrepresentation of information during an investigation, the Student Conduct Review Process, including knowingly initiating a false complaint.

**(3) Disruptive Conduct**

(a)     Any act that impairs, interferes with, or obstructs the orderly conduct, processes, and functions of the University or any part thereof or the rights of one or more individuals.

(b)     Any act which deliberately impedes or interferes with the normal flow of pedestrian and vehicular traffic.

(c)     Any act which intentionally interferes with the election processes of any University registered student organization or sponsored student group.

(d)     Misuse of any University safety equipment, firefighting equipment, or fire alarms.

(e)     A false report of an explosive or incendiary device, which constitutes a threat or bomb scare.

(f)     Breach of peace: an act, which aids, abets, or procures another person to breach the peace on the University premises or at University sponsored/related functions.

(g)     Failure to comply with oral or written instruction from duly authorized University officials (i.e. faculty, staff, administration, residence hall staff) acting within the scope of their job duties or law enforcement officers acting in the performance of their duties, including failure to identify oneself to these persons when requested to do so.

(h)     Failure to produce identification upon request by a University official (i.e. faculty, staff, administration, residence hall staff), acting within the scope of their job duties or law enforcement officers acting in the performance of their duties.

(i)     Hindering or interfering with the student conduct review process by failing to obey the notice from a university official to appear for a student conduct meeting or hearing; and/or attempting to discourage an individual's proper participating in, or use of, the student conduct review process.

(j)     Violation of any other University regulation or policy as described in the UCF Regulations, UCF Policies and Procedures, or University department publicized policy.

(k)     Failure to comply with applicable law and University regulations and procedures for solicitation and fundraising activities on campus.

**(4) Harmful Behavior**

(a)     Physical harm or threat of physical harm to any person. This harmful behavior policy may not apply in those instances where it is found that a student is acting in self-defense.

(b)     Verbal, digital, or written abuse, threats, intimidation, coercion and/or other conduct that endangers the health, safety, or wellbeing of others, or which would place a reasonable person in fear of bodily injury or death.  This definition,

however, shall not be interpreted to abridge the rights of the University community to freedom of expression protected by the First Amendment of the United States Constitution and any other applicable law.

(c)   Discriminatory Harassment:  Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon a protected class as defined in University Policy 2-004, or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting 194 the description of either Hostile Environment Harassment or Quid Pro Quo Harassment, as defined in University Policy 2-004.1 Prohibition of Discrimination, Harassment, and Related Interpersonal Violence.

(d)   Bullying: Defined as behavior of any sort (including communicative behavior) directed at another, that is severe, pervasive, or persistent, and is of a nature that would cause a reasonable person or group in the target's position substantial emotional distress and undermine his or her ability to work, study, or participate in University life or regular activities, or which would place a reasonable person in fear of injury or death.

(e)   Stalking: defined as conduct not of a sexual nature that is repeated, unwanted conduct toward or contact with another person that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress. Such conduct is direct, indirect, or through a third party using any type of action, method, or means.  Cyber stalking is also included in this definition.

(f)   Invasion of Privacy and Unauthorized Recording.

    1.   Making, using, disclosing or distributing a recording of a person in a location or situation in which that person has a reasonable expectation of privacy and is unaware of the recording or does not consent to it; and any other conduct that constitutes an invasion of the privacy of another person under applicable laws and regulations. Such conduct includes, without limitation, unauthorized recording of personal conversations, images, meetings or activities.

    2.   Unauthorized recording of a class or of organizational or University meetings, where there exists a legal expectation of privacy, and any use, disclosure, or distribution of any such recording.

    3.   Engaging in acts of voyeurism, including but not limited to peeping or surreptitiously recording another when there is a reasonable expectation of privacy.

    4.   Any notice, consent or other requirement under applicable laws and regulations must be fulfilled in connection with authorizing, making, using, disclosing or distributing any recording, where there is a legal expectation of privacy.

(g)   Retaliation against or harassment of complainant(s), other person(s) alleging misconduct, or anyone who participates in an investigation.

(h)   Condoning or encouraging acts of harmful behavior as defined above or failing to intervene during an act of harmful behavior while it is occurring.

**(5)  Sex-Based Misconduct (Non-Title IX Sexual Harassment)**

(a)   Sexual Assault. Sexual assault means sexual contact without consent.

(b)     Sexual Harassment. Sexual harassment means any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present. Sexual Harassment may include inappropriate touching, acts of sexual violence, suggestive comments and public display of pornographic or suggestive calendars, posters, or signs where such images are not connected to any academic purpose. A single incident of sexual contact without consent may be sufficiently severe to constitute sexual harassment.

(c)     Gender-Based Harassment: Gender-based harassment is discriminatory harassment that is based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present.

(d)     Obscene or Indecent Behavior: Exposure of one's body in such a manner that another party reasonably could be offended or to display sexual behavior which another person reasonably finds offensive.

(e)     Voyeurism: Trespass, spying, or eavesdropping for the purpose of sexual gratification.

(f)     Solicitation of a Minor: soliciting sexual acts from a minor by oral, written, or electronic means.

(g)     Child Pornography: possessing, producing or the dissemination of child pornography

(h)     Relationship Violence: Relationship Violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. Relationship Violence may include sexual assault, stalking, and physical assault. Relationship Violence may involve a pattern of behavior used to establish power and control over another person through fear and intimidation or may involve one-time conduct. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional, and/or physical and may be directed towards the former partner, their property, or other individuals.  Examples of Relationship Violence may include, but are not limited to: slapping; pulling hair; punching; damaging another person's property; driving recklessly to scare someone; name calling; humiliating another person in public; harassment directed toward a current or former partner or spouse; and/or threats of abuse, such as threatening to hit, harm, or use a weapon on another (whether Complainant or acquaintance, friend, or family member of the Complainant), or other forms of verbal threats.

(i)     Stalking: Stalking under this provision occurs where a person engages in a course of conduct of a sexual nature that is directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress.  A "course of conduct" is two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or

about another person, or interferes with another person's property. Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, phones, texts, or other similar devices or forms of contact. Stalking may include, but is not limited to: non-consensual communications (face to face, telephone, e-mail); threatening or obscene gestures; surveillance/following/pursuit; showing up outside the targeted individual's classroom or workplace; sending gifts and/or notes (romantic, bizarre, sinister, or perverted); and/or making threats.

(j)     Sexual Exploitation:  Sexual Exploitation is purposely or knowingly doing or attempting to do any of the following:

1.     Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;

2.     Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;

3.     Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);

4.     Subjecting another person to human trafficking; or

5.     Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

(k)     Any attempted acts of sex-based misconduct are also violations of this policy.

## (6)  Title IX Sexual Harassment

(a) Title IX Sexual Harassment is defined as any conduct on the basis of sex which occurs (i) on or after August 14, 2020; (ii)-against a person located in the United States; and (iii) in or as part of the University's education program or activity, which satisfies one or more of the following:

1. Unwelcome conduct that a reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity;

2. Sexual assault (as defined in the Clery Act), which includes any sexual contact that occurs without consent;

3. Dating violence (as defined in the Violence Against Women Act (VAWA) amendments to the Clery Act), which includes any act of violence or threatened act of violence committed by a person: (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (B) where the existence of such a relationship shall be determined based on a consideration of the length of the relationship; the type of relationship; and the frequency of interaction between the persons involved in the relationship.

4. Domestic violence (as defined in the VAWA amendments to the Clery Act), which includes any felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under Florida statute or by any other person against an adult or youth

victim who is protected from that person's acts under the domestic or family violence laws of Florida.

    5. Stalking (as defined in the VAWA amendments to the Clery Act), meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to (a) fear for their safety or the safety of others; or (b) suffer substantial emotional distress.

(b) Retaliation, including but not limited to conduct meant to intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX of the Education Amendments of 1972 or its implementing regulations or UCF Policy 2-012.

**(7) Larceny/Property Damage**

   (a)   Unauthorized use, possession, or theft of property or service. Such property may be personal or public.

   (b)   Damaging or defacing of University property or the property of another person whether or not it is on University premises.

   (c)   Tampering with or damaging fire safety equipment.

**(8) Hazing**

   (a)   Hazing is any action or situation that recklessly or intentionally endangers the mental or physical health and/or safety of a student for purposes including but not limited to: initiation or admission into, association or affiliation with, any registered student organization or other group whether or not officially recognized by the University. Hazing in violation of Florida Statutes may result in felony charges. A student may commit an act of hazing whether the student is a prospective, current, or former member of the organization or group. The actions of active, associate, new and/or prospective members, former members, or alumni of a student organization or group may be considered hazing under this rule.

   (b)   Hazing includes brutality of a physical nature such as whipping, beating, branding, forced calisthenics, exposure to the elements; forced consumption of any food, liquid, liquor, drug, or other substances; or other forced elements; or other forced activity which could adversely affect the mental or physical health or safety of the individual.

   (c)   Hazing includes any activity which could subject the individual to extreme mental stress such as sleep deprivation, forced exclusion from social contact, forced conduct that could result in extreme embarrassment, or any other activity that could adversely affect the mental health or dignity of the individual.

   (d)   Hazing includes forcing, pressuring, or coercing, the student into violation of University policies or federal, state, or local law.

   (e)   Hazing includes soliciting a person to commit or being actively involved in the planning of any act of hazing as defined above where the act of hazing creates a substantial risk of physical injury or death to the person(s) hazed.

   (f)   It is not defense to an allegation of hazing that:

      1.   the consent of the victim had been obtained;

      2.   the conduct or activity that resulted in the death or injury of a person was not part of any official organizational event or otherwise sanctioned or approved by the student organization; or

      3.   the conduct or activity that resulted in the death or injury of a person was not done as a condition of membership into a student organization.

(g)     Hazing does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective.

**(9) Misuse or Unauthorized Use of Facilities and Grounds**

(a)     Misuse or unauthorized use of classroom or laboratory facilities, or University property (as defined by University Regulation UCF-4.036).

(b)     Abusing grounds or building structures including, but not limited to ramps, rails, stair sets and entryways by means of recreational cycling, skating, scootering, or other recreational activities or devices as outlined in University Regulation UCF-4.036.

(c)     Unauthorized entry or attempted entry to any University property (as defined by University Regulation UCF-4.036).

(d)     Unauthorized possession, duplication or use of keys to any University property (as defined by University Regulation UCF-4.036).

**(10) Misconduct at University Sponsored/Related Activities**

(a)     Violation of UCF rules of conduct at UCF sponsored related activities shall also be a violation of the golden rule.

(b)     Violations of a regulation(s) of a host institution sponsored/related activity shall be a violation of the golden rule.

**(11) Controlled Substance and Drug Violations**

(a)     Possessing, consuming, or attempting to possess cannabis in any amount.

(b)     Cultivating, manufacturing, or attempting to obtain cannabis in any amount.

(c)     Possessing, consuming, cultivating, manufacturing, or attempting to possess any controlled substances other than cannabis, except as expressly permitted by law.

(d)     Selling or distributing cannabis or any other controlled substances other than alcohol.

(e)     Possessing or attempting to possess any drug related paraphernalia.

(f)     Misconduct under the influence of controlled substance(s) and/or drugs other than alcohol.

NOTE:  Students who receive medical attention due to drug related emergencies and/or students who call for help on behalf of another student who may be experiencing a drug related emergency may be exempt from disciplinary action. Information regarding exemptions under this rule for drug related emergencies can be found in University Regulation UCF-5.007 and the Student Conduct and Academic Integrity website: http://scai.sdes.ucf.edu/medicalemergencies.

**(12) Alcoholic Beverages Violation**

(a)     Possessing or consuming alcoholic beverages, or possessing or using alcohol-related paraphernalia, except as expressly permitted by the law and University Regulations and/or Policies.

(b)     Selling or distributing alcoholic beverages or alcohol-related paraphernalia, except as expressly permitted by law and University Regulations and/or Policies

(c)     Misconduct under the influence of alcohol

NOTE:  Students who receive medical attention due to drug related emergencies and/or students who call for help on behalf of another student who may be experiencing a drug related emergency may be exempt from disciplinary action. Information regarding exemptions under this rule for drug related emergencies can be found in University Regulation UCF-5.007 and the Student Conduct and Academic Integrity website: http://scai.sdes.ucf.edu/medicalemergencies.

**(13)  Possession of Weapons and/or Dangerous Material**
- (a)　The possession, use, or storage of weapons on property owned or controlled by the University or at events sponsored and/or supported by the University is prohibited, except as specifically outlined in University Policy 3-119.1 (Weapons on University Property and at University Events).
- (b)　Possession or use of fireworks of any description, explosives, or chemicals which are disruptive, explosive, or corrosive are prohibited on University premises or at University sponsored/related activities.

**(14)  Instigation or Participation in Group Disturbances during Demonstrations, Parades, or Picketing**
- (a)　Participation in a demonstration(s), parade(s), or picketing which invades the rights of others, which interferes with the educational function of the University, or which jeopardizes public order and safety.
- (b)　Leading or inciting others to disrupt scheduled and/or normal activities within any campus building or area.

**(15)  Misuse of Computing and Telecommunications Resources**
- (a)　Theft or other abuse of computer facilities and resources
- (b)　Unauthorized entry into a file, to use, read, or change the contents, or for any other purpose.
- (c)　Unauthorized transfer of a file.
- (d)　Use of another individual's identification and/or password.
- (e)　Use of computing facilities and telecommunications resources to interfere with the work of another student, faculty member or University Official.
- (f)　Use of computing facilities and telecommunications resources to send obscene or abusive messages.
- (g)　Use of computing facilities and telecommunications resources to interfere with normal operation of the University computing system.
- (h)　Use of computing facilities and telecommunications resources in violation of copyright laws.
- (i)　Any violation of the University of Central Florida Use of Information Technology and Resources Policy.
- (j)　Any violation of the University of Central Florida ResNet Acceptable Use Policy.

**(16)  Gambling**
- (a)　Play in an unlawful game of chance for money or for anything of value on University premises or at any affair sponsored by a student or student organization.
- (b)　Unlawfully sell, barter or dispose of a voucher or any item for participation in a scheme of chance by whatever name on University premises or at any affair sponsored by a student or registered student organization.
- (c)　Wager on a University team or organization in a competition, with a direct influence in the success of the competition.

**(17)  University Student Residence Violations.**  Violation(s) of any Department of Housing and Residence Life policy, rule or regulation published in hard copy or available electronically via Department of Housing and Residence Life website. A charge under this provision must include a specific citation of which Housing policy or policies the charged student has violated.

**(18)  University Wordmark Violations.**  Unauthorized use of the official University wordmark, Pegasus, monogram, seal, or other graphic identity symbol.

**(19)  Violation of Local, State, and/or Federal Laws.**  Violation of any local, state and/or federal law that may result in a felony or misdemeanor.

**(20)  Complicity**: Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act prohibited by the Rules of Conduct.

## UCF-5.009  Student Conduct Review Process; Sanctions

**(1)  Violation Reports.**  Alleged violations of the UCF Rules of Conduct shall be reported in writing to the Director of the Student Conduct and Academic Integrity (SCAI) or designee. Upon receiving an alleged violation of misconduct, the Director of the SCAI or designee may review relevant information and consult with relevant parties regarding the incident in question. Where deemed necessary to protect the safety and well-being of others, of the university, or of property, the Director of SCAI or designee, upon notifying the VP of SDES or designee, may take immediate action to resolve the safety and/or well-being concern by placing the student on interim suspension. Interim suspension is not a sanction.  An interim suspension is subject to review at a hearing within three (3) business days by the VP of SDES or designee to determine the status of the interim suspension. The outcome of an interim suspension hearing shall remain in effect until the final disposition of formal charges resulting from the circumstances of the case, unless the VP of SDES or designee shall decide otherwise.

    (a)    The Director of the SCAI will refer all information warranting disciplinary action and assign the case to the appropriate staff member. SCAI will send written notification to the charged student indicating the nature of the activity in question and what university rules were allegedly violated.

    (b)    Upon receipt of an incident report SCAI has six months to charge a student with a violation of the Rules of Conduct.  SCAI may exercise discretion when applying the time provision to account for circumstances that warrant a waiver of the six month time limit from the date of discovery.  For Title IX related cases see UCF-5.006(10).

    (c)    Students charged with alleged violations of the Rules of Conduct will receive notice to attend a required preliminary conference with SCAI  to discuss the charges.  If the student fails to attend that conference, a hold may be placed on the student's record, preventing them from registering for future classes until the matter is resolved.  Students who leave the university or withdraw from a class before a disciplinary matter is resolved may be prohibited from future enrollment until such time as the matter is resolved.  The student will receive information regarding the Student Conduct Review Process, including the student's rights during the process, an opportunity to inspect and/or review the information known at the time charges are prepared, and notice on how to contact the Student Government Association Judicial Advisor. At the conclusion of the meeting, the Office of Student Conduct recommends an option for resolution of the disciplinary charges.

**(2)  Options for Resolution of Disciplinary Charges.**

    (a)    Case Dismissal: The Director of SCAI or designee may dismiss a case if it is found to not have sufficient facts or information to substantiate the claim of misconduct, the accused person is not a student, or the action claimed as misconduct is not a violation of the Rules of Conduct.

    (b)    Mediation: Depending on the nature and severity of the alleged violation, SCAI may recommend formal mediation through the Office of Student Rights and Responsibilities as an alternative to disciplinary action. The involved parties must each agree to mediation.  Mediation is confidential.  In mediation, the parties voluntarily meet with an impartial mediator to communicate their concerns and needs to each other and to reach their own agreement on the resolution of the case. The participants in mediation are responsible for keeping their agreement or

renegotiating it, if necessary. In the event that the participants do not agree to mediate or mediate but do not reach a full and final resolution, the case will be referred back for disciplinary action through an informal or a formal hearing. Breach of a mediated agreement may result in a follow up mediation session or the matter may be referred back through the conduct process at the discretion of SCAI. Mediation will not be a resolution option for cases involving allegations of incidents of sexual misconduct and/or interpersonal violence.

(c)   Informal Hearing: At the discretion of SCAI, violations found not to warrant a formal hearing may be referred to an informal hearing. At the informal hearing the charged student has the opportunity to meet with an SCAI member or designee and accept responsibility for the charges of violation of the Rules of Conduct.  At the informal level the matter will be settled by the following outcomes: punitive sanction (Disciplinary Warning, Disciplinary Probation, or Disciplinary Deferred Suspension) as well as educational sanctions (papers, seminars, community service, etc.).  If the matter is not resolved informally, the case will be resolved through a formal hearing. The outcomes from an informal hearing process (decision of responsibility and recommended sanctions) are final and are not eligible to be appealed (UCF-5.010).

(d)   Formal Hearing: If an alleged violation of the Rules of Conduct is not dismissed or otherwise resolved, then SCAI shall present in writing formal charges to the student. Except as set forth in (5) below, the charged student may request either a panel or administrative hearing. The charged student's hearing shall be open only to the charged student, their advisor, the hearing body, witnesses (when called upon), and a representative from SCAI.  For cases of sex-based, the hearing shall also be open to the complainant and advisor. For cases of Title IX Sexual Harassment, the hearing shall also be open to the complainant, advisor, and support person. In cases of alleged Academic Misconduct, the student is required to have an academic integrity hearing as stated in UCF-5.015.

Formal notification shall include:

1.   The student's name and address.
2.   Date, time and location of the formal hearing.
3.   The rule(s) of conduct allegedly violated as known at the time formal charges are prepared.
4.   Names of potential witnesses known at the time formal charges are prepared.
5.   A description of any physical or written documentation known at the time charges are prepared.

**(3)  Formal Hearings.**  There are two types of formal hearings – panel hearings and administrative hearings.

(a)   Panel Hearings.

1.   A panel to consider an individual case shall be randomly selected by SCAI from the Student Conduct Board and shall consist of two (2) faculty and administrative staff members combined, and two (2) student members. One panel member shall be selected by SCAI to chair the hearing and report the proposed finding(s) and recommended sanctions, if any, to the Director of SCAI or designee.
2.   At hearings conducted by a panel, an SCAI staff member shall act as an advisor to the panel.  The Director of SCAI or designee shall receive the

      panel's proposed finding(s) as to "in violation" or "not in violation" of the Rules of Conduct, and consider any sanctions proposed by the panel.

3. The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding(s) of "in violation," they may approve, mitigate or increase the sanctions proposed by the panel.

4. Any decision by the Director of SCAI or designee to alter proposed sanctions or remand a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(b) Administrative Hearings

1. Administrative hearings shall be conducted by one faculty or staff member selected by SCAI from the Student Conduct Board. The charged student shall be informed of the hearing officer assigned to the case and shall have the opportunity to challenge the impartiality of the individual within three (3) business days of notification. The student shall state in writing the basis for such challenge. A hearing officer so challenged will be excused; however, indiscriminate challenges shall not be permitted. In the event that a student has opted not to challenge the impartiality of a hearing office prior to the allotted three (3) business days, the assigned hearing officer shall remain as scheduled.

2. At hearings conducted by an administrative hearing officer, an SCAI staff member shall act as an advisor to the administrative hearing officer. The Director of SCAI or designee shall receive the administrative hearing officer's proposed finding(s) as to "in violation" or "not in violation" of the Rules of Conduct, and consider any sanctions proposed by the administrative hearing officer.

3. The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding(s) of "in violation," they may approve, mitigate or increase the sanctions proposed by the administrative hearing officer.

4. Any decision by the Director of SCAI or designee to alter sanctions or remand a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(c) Conduct of Formal Hearings - The following is furnished as a guide to the sequence of events in a formal hearing. Please note that all formal hearing proceedings are recorded. The recording is part of the official record of the formal hearing and no other recordings are permitted.

1. Reading of charges.
2. Student response of "in violation" or "not in violation."
3. Presentation of information in support of the charges.
4. Opening statement by the charged student.
5. Questioning of the charged student.
6. Presentation and questioning of all other parties.
7. Final questions of the charged student by the hearing body.
8. Closing remarks by the charged student.
9. Hearing is brought to a close.

10. The student is invited to await announcement of the proposed finding(s) and recommended sanction(s), if any.

(d) Deliberations by the hearing body are not part of the hearing and are confidential. Deliberations occur after the closure of the hearing and are not recorded. Following deliberations, the hearing body will prepare a written statement of its proposed finding(s) and, if applicable, recommend sanctions.

(e) Case Record for Formal Hearing - The case record shall consist of the following items:

1. A copy of the formal charges in writing.
2. A recording of the formal hearing.
3. A recording of the announcement of the proposed finding(s) and proposed sanctions, if any.
4. All staff memoranda submitted.
5. All items of physical or written documentation submitted, provided such items are not returned to a rightful owner. In that case, photographs or other facsimiles shall be made before return.
6. The proposed finding(s) and sanction(s) by the hearing panel or administrator, if any.
7. The Director of SCAI's or designee's decision.

(f) Student Conduct Board members for panel and administrative formal hearings are selected through an annual application and interview process with the exception of the justices from the Student Government Association Judicial Branch. All Student Conduct Board members, including justices, receive annual training from SCAI. Student Conduct Board members who serve on hearings related to allegations of sex discrimination, including but not limited to relationship violence, sexual assault, sex harassment, and stalking receive additional training annually.

**(4) Student Rights in the Student Conduct Review Process.**

The following rights shall be explained to each charged student prior to the commencement of any formal disciplinary hearing:

(a) The charged student shall be afforded reasonable written notice, at least five (5) business days prior to the formal hearing, unless waived in writing. Written notice sent to the charged student's electronic and/or physical address listed in the Registrar's records shall constitute full and adequate notice. Written notice shall include:

1. The student's name and address.
2. Date, time and location and nature of the proceeding of the formal hearing.
3. The rule(s) of conduct allegedly violated as known at the time formal charges are prepared.
4. Names of potential witnesses known at the time formal charges are prepared.
5. A description of any written or physical documentation known at the time charges are prepared.

(b) The student may have, at his or her own expense and initiative, an advisor present at the hearing. It is the student's responsibility to make appropriate arrangements for the advisor to attend the hearing, and the hearing shall not be delayed due to scheduling conflicts of the chosen advisor. The advisor may be present to advise the student but shall not speak for or present the case for the student or otherwise participate directly in the proceeding. The student may consult with their advisor

at any time during the hearing. This consultation must take place in a manner that does not disrupt the proceedings. In addition, an advisor may not serve as a witness. If the advisor does not adhere to their defined role in the student conduct review process, they may be removed from the hearing.

(c)     All hearings shall be conducted on the basis that the charged student is not in violation until the preponderance of evidence proves otherwise.  At a hearing, the technical rules of evidence applicable to civil and criminal cases shall not apply. The burden of proof in a student conduct hearing is not on the student charged with a violation of the Rules of Conduct.

(d)     The student may inspect any information presented in support of the charges at least three (3) business days before the formal hearing The University also has the right to review any information the student intends to use at least three (3) business days before the formal hearing. Only such information that is determined "Relevant Information" will be made part of the hearing record.

(e)     The university cannot compel any person to attend a formal hearing. However, all parties may arrange for witnesses to voluntarily present Relevant Information during the proceeding. The student may hear and question adverse parties who testify at the hearing.

(f)     The student shall not be forced to present self-incriminating information; however, the University is not required to postpone disciplinary proceedings pending the outcome of any civil or criminal case. The University's formal hearing is not a criminal or judicial proceeding and is designed to address student behavior; therefore, alleged violations of the UCF Rules of Conduct will be addressed independently of any outcome imposed by the courts for a criminal offense.

(g)     The proposed finding, as well as the Director of SCAI's or designee's determination, of "in violation" or "not in violation" on the charges shall be based solely on the information presented at the formal hearing.

(h)     Should the student fail to attend the scheduled formal hearing, the hearing will be held in the student's absence and the proposed findings, including any recommended sanctions, will be made using the information available at the time of the scheduled formal hearing.

(i)     Only if the proposed finding of the hearing body is that the student is in violation, will prior conduct history be reviewed and potentially affect proposed sanctioning.

(j)     The results of any formal hearing shall be made available to the charged student within ten (10) business days following the hearing. Should SCAI need additional time, the deadline can be extended by the Director of SCAI or designee by notifying the charged student. For academic integrity cases, the results of any formal hearing shall be made available to the charged student within fifteen (15) business days following the hearing. The Director of SCAI or designee shall notify the charged student in writing of the need for additional time.

(k)     The student's enrollment status shall remain unchanged pending the University's final agency action in the matter, except in cases where the VP of SDES or designee determines that the safety, health, or general welfare of the student, any individual, or any part of the University may be involved.

**(5)  Additional Procedures in Cases of Sex-Based Misconduct and Title IX Sexual Harassment**

(a)  In cases involving sex-based misconduct or Title IX sexual harassment, a single hearing officer will be the only option for a formal hearing.

(b)  Where a student is charged with a violation of UCF-5.008(5), the procedures outlined in UCF-5.006(11) and UCF Policy 2-004 will apply in addition to the procedures of the Student Conduct Review Process outlined above.

(c)  Where a student is charged with Title IX Sexual Harassment as prohibited under UCF-5.008(6), the procedures outlined in UCF-5.006(12) and the Title IX Grievance Policy (University Policy 2-012) will apply in place of the procedures of the Student Conduct Review Process outlined above, and the -sanctions outlined below may be applied to violations of UCF-5.008(6) Title IX Sexual Harassment.

(d)  The sanctions outlined below may be applied to violations of UCF-5.008(5) Sex-Based Misconduct (non-Title IX) and UCF5.008(6) Title IX Sexual Harassment.

**(6)  Sanctions.**

(a)  Disciplinary Warning - An official warning that the student's behavior is in violation of the UCF Rules of Conduct, and that if the student is subsequently found in violation of a rule while on Disciplinary Warning, subsequent action may be more severe.

(b)  Disciplinary Probation - Disciplinary Probation status shall be for a specific length of time in which any further violation of the Rules of Conduct puts the student's status with the University in jeopardy. If the student is found "in-violation" for another violation of the Rules of Conduct, while on Disciplinary Probation, more severe sanctions may be imposed. Restrictive conditions may be imposed and vary according to the severity of the offense. While on Disciplinary Probation, restrictive conditions may include, but may not be limited to the following: loss of good standing, which may become a matter of record; denial of the privilege to occupy a position of leadership or responsibility in any University registered student organization, publication, or activity, or ability to represent the University in an official capacity or position; trespass of University facilities or other areas of campus or contact with another specified person(s). Under Disciplinary Probation, the student may continue to attend classes and is given a chance to show capability and willingness to live in accordance with University rules. While on Disciplinary Probation, a hold will be placed on a student's record for record keeping purposes.

(c)  Deferred Disciplinary Suspension - Deferred Disciplinary Suspension is used for offenses found serious enough to warrant Disciplinary Suspension, but where the specific circumstances of the case mitigate the offense or for repeated offenses of a less serious nature. Deferred Disciplinary Suspension is a designated period of time during which a student is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Rules of Conduct. During a Deferred Disciplinary Suspension, the student will be officially suspended from the university, but the suspension will be deferred, meaning that the student may continue to attend classes.  The suspension will be enforced for failure to complete any assigned educational sanctions by the deadline(s) and/or for any subsequent violation of the Rules of Conduct, unless the Director of the OSC determines otherwise in exceptional circumstances. If the student is found in violation for any violation(s) of the Rules of Conduct that occurred while on Deferred Disciplinary Suspension status, including failure to complete any assigned educational sanctions by the deadline(s), the student will be suspended for a

minimum of one (1) semesters, in addition to the educational sanctions imposed for the subsequent violation. Students placed on Deferred Disciplinary Suspension will have a conduct overlay placed on their transcripts for the period of time that the Deferred Disciplinary Suspension is in effect. The conduct overlay is a notation indicating that the student is not in good standing. Deferred Disciplinary Suspension may include the denial of specific university privileges, including but not limited to loss of good standing, which may become a matter of record; denial of the privilege to occupy a position of leadership or responsibility in an University registered student organization, publication, or activity, or ability to represent the University in an official capacity or position; trespass of University facilities or other areas of campus or contact with another specified person(s). The duration of any Deferred Disciplinary Suspension period and the specific restrictions imposed will be determined by SCAI on a case-by-case basis. While on Deferred Disciplinary Suspension, a hold will be placed on a student's record for recordkeeping purposes.

(d)     Disciplinary Suspension - A student involved in an offense warranting consideration of action more serious than Deferred Disciplinary Suspension or one involved in repeated misconduct may face Disciplinary Suspension. During the period of Disciplinary Suspension, a student may not be enrolled in classes, participate in University related activities, whether they occur on or off campus. A student under Disciplinary Suspension may not otherwise be present on University premises unless authorized in writing in advance under conditions approved by the Director of SCAI. Upon being withdrawn, the student may no longer enroll in classes, may not be an active member of a Registered Student Organization, may no longer use university facilities, must vacate university owned housing, may no longer be permitted on university property, may not be employed by the University, and may be entitled to whatever refunds of tuition, fees, and room and board charges as would be appropriate given the timing of the withdrawal.  In determining if and to what extent suspended students shall be authorized to be on University premises, the Director of SCAI or designee shall consider whether the suspension creates an undue hardship on the disciplinary suspended student in regard to considerations that include, but are not limited to, the medical needs of the student. Students placed on Disciplinary Suspension will have a conduct overlay placed on their transcript for the period of time that the Disciplinary Suspension is in effect.—The conduct overlay is a notation indicating that the student is not in good standing. Further, while on Disciplinary Suspension, a hold will be placed on a student's record for record keeping purposes. All assigned educational sanctions must be completed prior to the conclusion of Disciplinary Suspension; otherwise the Disciplinary Suspension will remain in effect.

(e)     Disciplinary Dismissal – Disciplinary Dismissal is a sanction which removes the student from the individual's academic program and separates the student from the University for a period of at least two years and up to seven years.  A dismissed student has none of the rights or privileges of a student of the University. Following Disciplinary Dismissal, the individual must apply for readmission to the University.  Readmission is possible but not guaranteed and will only be considered after the two to seven year time allotted from the effective date of the Dismissal, based on meeting all readmission criteria and obtaining clearance from the Associate Vice President and Dean of Students or designee. This may include

restricted access to campus and/or other specified activities.  Students placed on Disciplinary Dismissal will have a conduct overlay placed on their transcript for the period of time that the Disciplinary Dismissal is in effect. The conduct overlay is a notation indicating that the student is not in good standing. Further, while on Disciplinary Dismissal, a hold will be placed on a student's record for record keeping purposes. All assigned educational sanctions must be completed prior to the conclusion of Disciplinary Dismissal; otherwise the Disciplinary Dismissal will remain in effect.

(f)     Delayed Conferral of Degree – Delay of issuance of a student's diploma for a specified period of time or until the student meets certain conditions.

(g)     Recommendation for Degree Revocation – The University of Central Florida reserves the right to revoke any UCF degree awarded to any student. Reasons for degree revocation may include academic dishonesty, grade change, administrative error, disciplinary misconduct, or student request (see UCF Policy 4-406).

(h)     Disciplinary Expulsion – Disciplinary Expulsion is a sanction which removes the student from the individual's academic program and permanently separates a student from the University without opportunity to graduate or re-enroll at the university in the future.  An overlay will be permanently placed on the student's record. Further, a hold will be permanently placed on a student's record for record keeping purposes.

(i)     Educational Sanctions - In conjunction with a sanction listed above, a student found to have been in violation of any of the Rules of Conduct will be assigned educational requirements such as, but not limited to, reflective/research papers, classes/seminars, community service, interviews, etc. Educational sanctions are intended to provide a student with opportunities to repair the harm of their actions and to engage in meaningful developmental experiences that will help the student in avoiding future violations of University policy.

## UCF-5.010  Student Conduct Appeals

**(1)  Appeals within the Student Conduct Review Process**

    (a)    Students found in violation as a result of a formal hearing may appeal the finding(s) and sanction(s) imposed.  The appeal must be made in writing to the Appellate Officer (VP of SDES or designee) within ten (10) business days after the date the student was notified of the decision by the Director of Student Conduct and Academic Integrity (SCAI) or designee.  The appeal form can be found at http://scai.sdes.ucf.edu/process.

    (b)    Students may appeal the finding and sanction(s) imposed on the basis of one or more of the following:

        1.    Irregularities in fairness and stated procedures of the hearing that could have affected the outcome of the hearing.

        2.    Discovery of new and significant information that could have affected the outcome of the hearing and that was not known or could not reasonably have been discovered and/or presented at the time of the initial hearing.

        3.    The sanction(s) are extraordinarily disproportionate to the violation(s).

    (c)    On the appeal form, the student must state the reason(s) for appeal, the supporting facts, and the recommended solution. This is not a re-hearing of the conduct case. An appeal cannot be filed simply because a student is dissatisfied with the decision. Failure to describe the nature of the information in full detail in the appeal letter will result in the denial of an appeal.

    (d)    The appellate officer shall first determine if sufficient grounds for appeal exist and then, if so, the appellate officer may: deny the appeal, thus sustaining the initial decision; alter the sanction(s); or return the case for a new hearing. Any decision by the appellate officer to alter sanctions or return a case for new hearing shall be accompanied by a concise and explicit written statement that explains the basis for that decision

    (e)    The appellate officer should issue a written decision to the student's appeal within twenty (20) business days of receipt of the appeal. Should the appellate officer require additional time for review beyond the twenty (20) business days, the appellate officer shall notify the charged student in writing of the need for additional time. Decisions of the appellate officer reflect final agency action.

    (f)    Any decision by an appellate officer to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

    (g)    SCAI cannot place an overlay on the student's record until the appeal decision is completed or if the student chooses not to appeal. At such time, if appropriate, a hold and/or overlay, is placed on the student's record.  If the appellate officer upholds the original findings, the effective date of any disciplinary sanction(s) imposed will revert back to the date of the Director of SCAI's or designee's final decision letter.

**(2)  Appeals within the Student Conduct Review Process for Cases Involving Sex-Based Misconduct and/or Title IX Sexual Harassment**

    (a)    Complainants and Respondents in matters involving allegations of Sex-Based Misconduct and/or Title IX Sexual Harassment (as defined in Regulation UCF-5.008(5) and UCF-5.008(6)) may appeal the finding(s) and sanction(s) imposed from a student conduct formal hearing. The appeal must be made in writing to the

Appellate Officer (VP of SDES or designee) within ten (10) business days after the date both the Respondent and Complainant are notified of the decision by the Director of SCAI or designee. The appeal form can be found at https://scai.sdes.ucf.edu/student-appeal/.

(b)     In cases charged under 5.008(5), Complainants and Respondents may appeal the finding and sanction(s) imposed on the basis of one or more of the following:

1.     Irregularities in fairness and stated procedures of the hearing that could have affected the outcome of the hearing.

2.     Discovery of new and significant information that could have affected the outcome of the hearing and that was not known or could not reasonably have been discovered and/or presented at the time of the initial hearing.

3.     The sanction(s) are extraordinarily disproportionate to the violation(s).

(c)     In cases charged under 5.008(6), Complainants and Respondents may appeal the finding and sanction(s) imposed on the basis of one or more of the following:

1.     Procedural irregularity that materially affected the outcome of the matter (i.e., a failure to follow the University's own procedures).

2.     New evidence that was not reasonably available at the time the Determination of Responsibility, or dismissal was made, that could materially affect the outcome of the matter.

3.     The Decision-Maker(s) had a conflict of interest or bias for or against an individual party, or for or against Complainants or Respondents in general, that materially affected the outcome of the matter.

4.     The sanction(s) are extraordinarily disproportionate to the violation(s).

(d)     On the appeal form, the student must state the reason(s) for appeal, supporting facts, and the recommended solution. Failure to describe the nature of the information in full detail in the appeal letter will result in the denial of the appeal.

(e)     The appellate officer shall first determine if sufficient grounds for appeal exist and then, if so, the appellate officer may: deny the appeal, thus sustaining the initial decision; alter sanction(s); or return the case for a new hearing.

(f)     The appellate officer should issue a written decision to the student's appeal within twenty (20) business days of receipt of the appeal. The written decision shall issue to both the Complainant and the Respondent. Should the appellate officer require additional time for review beyond the twenty (20) business days, the appellate officer shall notify the Complainant and Respondent in writing of the need for additional time.  Decisions of the appellate officer reflect final university action.

(g)     Any decision by an Appellate Officer to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

**(3)   Community ReEngagement and Educational Development (CREED) Program**

(a)     The Community ReEngagement and Educational Development (CREED) Program is designated for a student to have the opportunity to demonstrate that in the period following the conclusion of the Student Conduct Review Process, they have taken steps to become a productive and engaged member of the UCF Community.

(b)    Upon completion of one semester of Disciplinary Probation, Deferred Disciplinary Suspension, or Disciplinary Suspension and completion of all educational sanctions, a student can request a review of their disciplinary status through the Community ReEngagement and Educational Development (CREED) Program. Students who have a Z Designation on their transcript are eligible to apply once the duration of their Disciplinary Suspension has ended and all educational sanctions are complete.

    1.    Students who have been found In Violation of a Rule of Conduct that required an investigation by the Office of Institutional Equity (OIE) are ineligible to apply for relief under the CREED Program.

    2.    Students who have been found In Violation of a Rule of Conduct that had a substantially negative impact on a person or group of people, as determined by SCAI, are ineligible to seek relief under the CREED Program.

(c)    Requests must be submitted to the Director of SCAI or designee via an online CREED Program submission form available at www.scai.sdes.ucf.edu/creed. This request can only be submitted once a semester.

(d)    The Director of SCAI or designee will review applications submitted before the semesterly deadline(s) during the application review period(s). Information on application deadlines and review periods can be found at www.osc.sdes.ucf.edu/creed. The Director of SCAI or designee shall conduct a preliminary review to ensure that the student's request meets the necessary eligibility and application requirements. The Director of SCAI or designee must communicate the finding of the preliminary review of the application as well as the date and time of the CREED Review Meeting that has been scheduled for a committee to conduct a review of the student's application, if applicable. The student has three (3) business days from when the Director of SCAI or designee sent their preliminary findings to request an alternate date and time of the CREED Review Meeting.

(e)    Prior to this meeting, the committee will have reviewed the submitted packet and will prepare questions for the student to address, as well as provide the student with the opportunity to further discuss why their disciplinary status should be altered or terminated or why the Z Designation should be removed from the student's transcript. No alterations shall be made to include new or increased sanctions. Should the committee feel that further information and/or documentation is necessary in order to render a recommendation, the review may be temporarily recessed. The student will be given ten (10) business days to produce the information and/or documentation. Upon receipt of the requested information and/or documentation, the committee will reconvene the CREED Review Meeting with the student.

(f)    After the meeting, the committee will issue a recommendation to the Director of SCAI or designee.  The Director of SCAI or designee will provide a final decision to the student in writing within ten (10) business days of receiving the recommendation.

(g)    If the request is denied by the Director of SCAI or designee the final decision shall include a concise and explicit written statement that explains the basis for that decision and suggested action items for the student's success.

(i)    There is no appeal process for a CREED Review Meeting decision.

**(4)  Sealing of Records**

    (a)    A student's conduct record is eligible to be sealed if the incident(s) in question are minor and do not result in disciplinary suspension, disciplinary dismissal, or disciplinary expulsion and/or if the student is not current on disciplinary probation or deferred suspension with all educational sanctions completed in full.

    (b)    A student conduct record may be sealed upon the successful submission and review of appropriate paperwork to SCAI.

    (c)    The factors influencing the decision by the Director of SCAI for sealing are the severity of the violation, effect of the violation on the University community, sanctions applied, completion of sanctions, and ethical development demonstrated by the student.

    (d)    There is no appeals process regarding student conduct record sealing.

**UCF-5.011**

**Scope; Authority; Principles of Student Group Responsibility; Violations of Law and Rule of Conduct Violations; Conduct Records; Medical Emergencies (Alcohol & Drugs)**

**(1) Scope**

    (a)    The organizational conduct regulations (UCF-5.011, 5.012, and 5.013) shall apply to all registered student organizations, including those at its regional campuses and/or at off campus instructional sites, and shall be deemed a part of the terms and conditions of registered student organization registration. The right of all students to seek knowledge, debate ideas, form opinions, and freely express their ideas is fully recognized by the University of Central Florida, including when students come together as a group.

    (b)    The Organizational Rules of Conduct apply to all registered student organizations for conduct that occurs:

        1.    On University premises; or

        2.    During or while participating in University and/or organization sponsored or related activities; or

        3.    During school sessions, holidays, breaks, and university closures; or

        4.    Against students or non-students.

    (c)    The University may take action against a registered student organization for off-campus conduct if the conduct is specifically prohibited by law or the Organizational Rules of Conduct; or if the conduct poses (or demonstrates that the student organization's continued recognition at the University poses) a danger to the health, safety or welfare of the University community; or if the conduct is disruptive to the orderly processes and functions of the University.

**(2) Authority**

    (a)    The Florida Board of Governors Regulation 6.0105 requires each university to establish a Student Disciplinary System, including a code of conduct, to apply to student disciplinary proceedings. The Florida Board of Governors Regulation 6.021 requires each university to establish an anti-hazing policy as part of the student code of conduct.

    (b)    These regulations shall ensure a fair and impartial process in registered student organizational disciplinary proceedings and guarantee the integrity of the university.

    (c)    Generally, authority necessary to enforce the organizational student conduct regulations is vested in the Vice President for Student Development and Enrollment Services or designee. Selected functions of this authority are shared with faculty, staff and students. Some functions of student conduct administration are assisted through review boards.

**(3) Definitions.** Definitions for terms used in this section, as well as in the Organizational Conduct Review Process, are located in UCF-5.006(3).

**(4) Principles of Student Group Responsibility.**

    (a)    Any registered student organization can be held responsible for its actions or the actions of a collection of its members acting together. Misconduct on the part of an individual member(s) may not automatically be sufficient to initiate the Organizational Conduct Review Process.

    (b)     Students may be held accountable as individuals under the Rules of Conduct for their conduct, whether the students are acting in an individual capacity or the students are acting as a member of a registered student organization.

    (c)     The following criteria will be used to determine if a registered student organization can be held responsible for the actions of one or more individuals when those actions result in a violation of the Organizational Rules of Conduct:

        1.     A violation arises out of an organization-sponsored, financed, or otherwise sanctioned activity or event, where the organization provided the context for the violation.

        2.     A pattern of individual violations has occurred and/or continues to occur within the organization without adequate control, response, or disciplinary action on the part of the registered student organization or its executive board members or officers.

        3.     The action resulting in the violation has received either the implied or overt consent of the registered student organization or any executive board members or officers of the registered student organization.

        4.     The registered student organization or any executive board member or officer of the registered student organization fails to report and take reasonable action against invitees/members responsible for the Organizational Rules Conduct violation.

        5.     The registered student organization overtly places or implicitly allows active members of the registered student organization to be in a position to act on behalf or with authority of the organization.

        6.     The registered student organization chooses to protect one or more individual offenders who are active members of the registered student organization from official actions.

    (d)     Should a reported incident occur where an organization is named as allegedly violating an Organizational Rule of Conduct, the University may hold an investigation to gather facts to help provide further context to the original complaint.

**(5) Medical Emergencies.** The University of Central Florida highly encourages students and registered student organizations to call for medical assistance whenever an individual experiences severe intoxication or serious injury after consuming alcohol and/or drugs. Students and registered student organizations may be reluctant to call for help for themselves or others due to potential involvement from the law enforcement officials or Student Conduct and Academic Integrity (SCAI). Due to the serious or life-threatening nature of these medical emergencies, the University of Central Florida urges students to contact emergency medical services or law enforcement officials if alcohol-related and/or drug-related medical emergencies arise. The university's primary goal is to create a safe environment for its students. Procedures and expectations regarding these incidents have been outlined in SCAI Rules of Conduct Controlled Substance and Drug Violations and Alcoholic Beverages section and the Organizational Rules of Conduct section.

    (a)     Alcohol Emergencies - University Expectations for Student Groups. Student groups may be eligible for exemptions from disciplinary action when a representative of an organization at a student group event calls for emergency assistance on behalf of a person experiencing an alcohol related emergency. Student groups that seek medical assistance for alcohol emergencies may receive exemption for violations of the Organizational Rules of Conduct Section UCF-

5.012 6(a)-6(f); however, exemption for other Organizational Rule of Conduct violations may not be granted. Student groups may be eligible for this exemption on a case by case basis at the discretion of the Director of SCAI. Additional information regarding alcohol emergencies can be found at the SCAI website.

(b)     Drug-Related Emergencies - University Expectations for Student Groups. Student groups may be eligible for exemptions from disciplinary action when a representative of an organization at a student group event calls for emergency assistance on behalf of a person experiencing a drug-related emergency. Student groups that seek medical assistance for drug-related emergencies may receive exemption for violations of the Organizational Rules of Conduct Section UCF5.012 7(a)-7(d); however, exemption for other Organizational Rule of Conduct violations may not be granted. Student groups may be eligible for this exemption on a case by case basis at the discretion of the Director of SCAI. Additional information regarding drug-related emergencies can be found at the SCAI website.

**(6) Violations of Law and Rule of Conduct Violations.** Students who commit offenses against the laws of municipalities, states, or the United States are subject to prosecution by those authorities and may be subject to disciplinary action by the University when their conduct violates institutional standards. Students shall not be forced to present self-incriminating evidence; however, the University is not required to postpone disciplinary proceedings pending the outcome of any civil or criminal case. The Student Organization Conduct process is not a criminal or judicial proceeding and is designed to address registered student organization behavior as outlined in the Principles of Student Group Responsibility, above; therefore, alleged violations of the Organizational Rules of Conduct will be addressed independently of any penalty imposed by the courts for the criminal offense.

**(7) Student Organizational Conduct Records**

(a)     Maintenance of Records. A registered student organization's or other student group's conduct case record will be maintained in SCAI. The case record of a registered student organization found responsible for charge(s) against them, with sanctions less than organizational suspension or revocation, will generally be maintained in SCAI for seven years from the calendar year of record, after which they are destroyed. The case record of a registered student organization that has been suspended or whose registration has been revoked will be permanently maintained by SCAI.

(b)     Release of Records. The release of registered student organization and other student group disciplinary records will be governed by applicable federal and state laws regarding the privacy of education records.

# UCF-5.012  Organizational Rules of Conduct

Registered student organizations are expected to abide by these Organizational Rules of Conduct, and administrators and faculty are expected to enforce them. The prohibition on hazing found in Section (10), below, shall apply equally to registered student organizations and other student groups, whether or not officially recognized by the University. These rules should be read broadly and are not intended to define prohibited conduct in exhaustive terms.  These rules may be revised during the year; announcements will be made on adoption of changes or additions.  The right of all students to seek knowledge, debate ideas, form opinions, and freely express their ideas is fully recognized by the University of Central Florida, including when students come together as student group; accordingly, the the rules below will not be used to impose discipline for a student group's lawful expression of ideas. Spacific restrictions on time and place of meetings and assemblies are found in other University regulations or policies and student groups are expected to follow those restrictions. The following is a non-exhaustive list of prohibited conduct for which disciplinary action may be taken at the University of Central Florida.

**(1)  Theft, Disregard for Property**
- (a)     Malicious or unwarranted damage or destruction of another's property;
- (b)     Taking, attempting to take, or keeping in its possession property or services not belonging to the registered student organization.
- (c)     Misuse or mishandling of organizational funds by any officer, member, or other individual.

**(2)  Possessing and/or Providing False and Misleading Information and/or Falsification of University Records**
- (a)     Withholding related information, or furnishing false, misleading, incomplete, or incorrect information (oral or written).
- (b)     Possession, use or attempted use of any form of fraudulent identification.
- (c)     Forgery, alteration or misuse of any University document, material, file, record or instrument of identification.
- (d)     Deliberately and purposefully providing false or misleading verbal or written information about another person.
- (e)     Falsification, distortion, or misrepresentation of information during an investigation, the student conduct review process, including knowingly initiating a false complaint

**(3)  Disruptive Conduct**
- (a)     Any act that impairs, interferes with, or obstructs the orderly conduct, processes, and functions of the University or any part thereof or the rights of one or more individuals.
- (b)     Obstructing the free movement of other students around the campus, interfering with the use of University facilities, preventing the normal operation of the University; or conducting any event that interferes with the normal progress of academic events on campus.
- (c)     Engaging in obscene or indecent conduct.
- (d)     Failure to comply with the administrative policies as enacted by the University.
- (e)     Failure to comply with the directions of University officials or authorized agents acting in the performance of their duties.  Registered student organization officers and members shall comply with all directions or requests of University officials, University police officers or authorized agents in a timely manner.

(f)    Hindering or interfering with the Organizational Conduct Review Process by failing to obey the notice from a university official to appear for a student conduct meeting or hearing and/or attempting to discourage an individual's proper participating in, or use of, the Organizational Conduct Review Process.

(g)    Participating in any event with a registered student organization that is currently on Organizational Disciplinary Probation (with restrictive conditions) or Organizational Deferred Suspension (with restricitive Conditions), is currently suspended, or that has had their UCF registration revoked.

(i)    Failure to comply with any other University regulation or policy as described in the UCF Regulations, UCF Policies and Procedures, or University department publicized policy.

**(4) Harmful Behavior**

(a)    Physical violence towards another person or group.

(b)    Discriminatory Harassment: Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon a protected class as defined in University Policy 2-004, or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting the description of either Hostile Environment Harassment or Quid Pro Quo Harassment, as defined in University Policy 2-004 Prohibition of Discrimination, Harassment, and Related. Interpersonal Violence.

(c)    Bullying: Defined as behavior of any sort (including communicative behavior) directed at another, that is severe, pervasive, or persistent, and is of a nature that would cause a reasonable person or group in the target's position substantial emotional distress and undermine his or her ability to work, study, or participate in University life or regular activities, or which would place a reasonable person in fear of injury or death.

(d)    Verbal, digital, or written abuse, threats, intimidation, coercion and/or other conduct that endangers the health, safety or well-being of another person or group, or which would place a reasonable person in fear of bodily injury or death. This definition, however, shall not be interpreted to abridge the rights of the University community to freedom of expression protected by the First Amendment of the United States Constitution and any other applicable law.

(e)    Failure to respect the privacy of other individuals.

(f)    Retaliation against or harassment of Complainant(s), other person(s) alleging misconduct, or anyone who participates in an investigation of harassment.

(g)    Condoning or encouraging acts of harmful behavior as defined above or failing to intervene on an act of harmful behavior while it is occurring.

**(5) Sex-Based Misconduct**

(a)    Sexual Assault. Sexual assault means sexul contact without consent.

(b)    Sexual Harassment: Sexual harassment means any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present. Sexual Harassment may include inappropriate touching, acts of sexual violence, suggestive comments and public display of pornographic or suggestive calendars, posters, or signs where such images are not connected to any academic purpose.

A single incident of nonconsensual sexual contact (as defined above) may be sufficiently severe to constitute sexual harassment.

(c) Gender-Based Harassment: Gender-based harassment is discriminatory harassment that is based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present.

(d) Obscene or Indecent Behavior - Exposure of one's body in such a manner that another party reasonably could be offended or to display sexual behavior which another person reasonably finds offensive.

(e) Voyeurism - Trespass, spying, or eavesdropping for the purpose of sexual gratification.

(f) Solicitation of a Minor – soliciting sexual acts from a minor by oral, written, or electronic means.

(g) Child Pornography – possessing, producing or the dissemination of child pornography

(h) Stalking: Stalking occurs when there is a coordinated course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress.  A "course of conduct" is two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, phones, texts, or other similar devices or forms of contact. Stalking may include, but is not limited to: non-consensual communications (face to face, telephone, e-mail); threatening or obscene gestures; surveillance/following/pursuit; showing up outside the targeted individual's classroom or workplace; sending gifts and/or notes (romantic, bizarre, sinister, or perverted); and/or making threats.

(i) Sexual Exploitation: Sexual Exploitation is purposely or knowingly doing or attempting to do any of the following:
1. Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
2. Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
3. Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);
4. Subjecting another person to human trafficking; or

(k) Any attempted acts of Sex-Based Misconduct are also violations of this policy.

**(6) Alcohol Related Misconduct**
(a) Use and/or possession of alcoholic beverages, except as expressly permitted by law and University regulations/policies.

(b)     Sale and/or distribution of alcoholic beverages, except as expressly permitted by the law and University regulations/policies.

(c)     Furnishing or causing to be furnished any alcoholic beverage to any person under the legal drinking age.

(d)     Behavior under the influence of alcohol.

(e)     Furnishing or causing to be furnished any alcoholic beverage to any person in a state of noticeable intoxication.

(f)     Failure of a registered student organization to take all necessary steps to see that no person under the legal drinking age possesses alcoholic beverages at functions it sponsors or within any property or transportation it owns, operates, and/or rents.

NOTE: Registered student organizations may be eligible for exemptions from disciplinary action when a representative of an organization at a registered student organizational event calls for emergency assistance on behalf of a person experiencing an alcohol related emergency. Information regarding exemptions under this rule for alcohol related emergencies can be found in University Regulation UCF–5.011 and the Student Conduct & Academic Integrity website: http://scai.sdes.ucf.edu/medicalemergencies..


**(7)  Drug Related Misconduct**

(a)     Unlawful use and/or possession of any narcotic or other controlled substances, and possession and/or use of drug paraphernalia.

(b)     Sale and/or distribution of any narcotic or other controlled substances.

(c)     Cultivation and/or manufacture of any narcotic or other controlled substances.

(d)     Attempt to obtain any narcotic or other controlled substances, except as expressly permitted by law.

NOTE: Registered student organizations may be eligible for exemptions from disciplinary action when a representative of an organization at a registered student organizational event calls for emergency assistance on behalf of a person experiencing a drug related emergency. Information regarding exemptions under this rule for drug related emergencies can be found in University Regulation UCF – 5.011 and the Student Conduct and Academic Integrity website: http://scai.sdes.ucf.edu/medicalemergencies.

**(8)  Unauthorized Entry.**  Unauthorized entry, attempted entry, or loitering in private or restricted areas that are owned and/or operated by the University.

**(9)  Gambling**

(a)     Play or sponsor of an unlawful game of chance for money or for anything of value on University premises or at any affair sponsored by a registered student organization.

(b)     Unlawful sale, barter, or disposition of a voucher or any item for participation in a scheme of chance by whatever name on University premises or at any activity sponsored by a registered student organization

(c)     Wagering on a University team or organization in a competition, with or without intent to have a direct influence in the success of the competition

**(10)  Hazing**

(a)     Hazing is any action or situation that recklessly or intentionally endangers the mental or physical health and/or safety of a student for purposes including but not limited to initiation or admission into, or association or affiliation with, any registered student organization or other group whether or not officially recoginized by the University.   Hazing which violates Florida Statutes may result

in felony charges. A student may commit an act of hazing whether the student is a prospective, current, or former member of the organization or group. The actions of active, associate, new and/or prospective members, former members, or alumni of a registered student organization or other student group may be considered hazing under this rule.

(b)    Hazing includes brutality of a physical nature such as whipping, beating, branding, forced calisthenics, exposure to the elements; forced consumption of any food, liquor, liquid, drug, or other substances; or other forced elements; or other forced activity which could adversely affect the mental or physical health or safety of the individual.

(c)    Hazing includes any activity that could subject the individual to extreme mental or physical stress such as sleep deprivation, forced exclusion from social contact, forced conduct that could result in extreme embarrassment, or any other activity that could adversely affect the mental or physical health or dignity of the individual.

(d)    Hazing includes forcing, pressuring, coercing, or requiring the violation of University policies, federal, state, or local law.

(e)    Hazing includes soliciting a person to commit or being actively involved in the planning of any act of hazing as defined above where the act of hazing creates a substantial risk of physical injury or death to the person(s) hazed.

(f)    It is not a defense to an allegation of hazing that:
1.    the consent of the victim had been obtained;
2.    the conduct or activity that resulted in the death or injury of a person was not part of any official organizational event or otherwise sanctioned or approved by the student organization or group; or
3.    the conduct or activity that resulted in the death or injury of a person was not done as a condition of membership into a student organization.

(g)    Hazing does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective.

(h)    All student groups, whether or not registered with the University and whether or not officially recognized by the University are subject to the same hazing prohibitions set out in this section (10). With regard to student groups that are not registered students organizations, and against which there is an allegation of hazing, the principles of group responsibility and scope provisions of University Regulation 5.011(1)(b), (1)(c), and (4) shall apply, as well as the conduct proceeding procedures of University Regulation 5.013.

**(11)  Outstanding Debt.**  Failure to pay on and off campus vendors in a timely manner.  Groups shall not knowingly enter into purchase or rental agreements that are beyond the resources of the organization's ability to pay. The University will not cover outstanding debts of registered student organizations.

**(12)  Use of Facilities.**  Failure to comply with University regulations and procedures for campus events and/or use of campus facilities or grounds.  Those individuals acting on behalf of an organization that reserve facilities should check with the University department or office responsible for the facility to guarantee that all procedures have been followed.

**(13)  Fire Safety and Sanitation**
(a)    Tampering with or damage to fire safety equipment.

(b)    Causing, condoning, or encouraging the creation of any situation involving incendiary or other chemicals or substances, explosives, or fire that reasonably may result in danger to another's person or property.

(c)    Possession or use of illegal fireworks, incendiary devices, or dangerous explosives.

(d)    Failure to properly maintain a registered student organization's facilities or property (or surrounding property) such that a potential danger to the health and safety of the occupants or members of the University and surrounding community is created.

**(14)  Advertising**

(a)    Origination or circulation of any advertising media that contains matter that violates federal, state and/or local laws.

(b)    Origination or circulation of any advertising media containing false or misleading information.

**(15) Solicitation and Fundraising.**  Failure to comply with applicable law and University regulations and procedures for solicitation and fundraising activities on campus.

**16)  University Wordmark Violations.**  Unauthorized use of the University's name, abbreviation, trademarks or wordmarks, including the Pegasus, monograms, seal, or other graphic identity symbols. The phrases "UCF" or "University of Central Florida" (or some form thereof) cannot precede the title of the organization.  This section refers to but is not limited to, the registered student organization's: domain name, web address, promotional materials, and uniforms/shirts.

**(17)  Academic Misconduct**

(a)    Unauthorized academic assistance: Using or attempting to use unauthorized materials, information or study aids in any academic exercise unless specifically authorized by the instructor of record.

(b)    The unauthorized possession of examination or course related material.

(c)    Commercial Use of Academic Material: Selling of course material to another person, student, and/or uploading course material to a third party vendor without authorization or without the express written permission of the University and the Instructor. Course materials include but are not limited to class notes, Instructor's power points, tests, quizzes, labs, instruction sheets, homework, study guides, handouts, etc.

(d)    Knowingly helping any student violate academic behavior standards.

**(18)  Violation of Local, State, and/or Federal Laws.**  Violation of any local, state and/or federal law that may result in a felony or misdemeanor.

**(19) Complicity.** The following offenses, or the aiding, assisting, condoning, or attempting to commit these offenses, constitute violations of the Organizational Rules of Conduct.

## UCF-5.013 Organization Conduct Review Process; Sanctions; Appeals

**(1) Violation Reports**

(a) Alleged violations of the UCF Organizational Rules of Conduct shall be reported in writing to the Director of Student Conduct and Academic Integrity or designee. Incident reports can be submitted for information purposes only, for information purposes with the requirement that the registered student organization attend an academic integrity seminar, or to initiate the student conduct review process.  Upon receiving an incident report, the Director of SCAI or designee may review relevant information and consult with relevant parties regarding the incident in question. Where deemed necessary to protect the health and safety of any individual, the student body, or any part of the University or its community, the Director of SCAI or designee, upon notifying the VP of SDES or designee, may take immediate action to resolve the situation by placing the registered student organization on interim organizational suspension. Interim organizational suspension is not a sanction. Interim organizational suspension is preliminary in nature; it is in effect only until there is a resolution of the registered student organization conduct matter. Interim organizational suspension is subject to review at a hearing within ten (10) business days by the VP of SDES or designee to determine the status of the interim organizational suspension. The outcome of an interim organizational suspension hearing shall remain in effect until the final disposition of formal charges resulting from the circumstances of the case, unless the VP of SDES or designee shall decide otherwise.

(b) The Director of SCAI will refer all information warranting disciplinary action and assign the case to the appropriate staff member. SCAI will send written notification to the chief officer of the registered student organization at their UCF mailing address indicating the nature of the activity in question and what Organizational Rules of Conduct were allegedly violated.  The chief officer of the registered student organization shall serve as the organization's representative in the organization conduct review process.

(c) Upon receipt of an incident report SCAI has six months to charge a registered student organization with a violation of the Organizational Rules of Conduct. SCAI may exercise discretion when applying the time provision to account for circumstances that warrant a waiver of the six month time limit from the date the violation report was filed.

(d) A registered student organization charged with alleged violations of the Organizational Rules of Conduct (see UCF-5.012) will receive notice to attend a mandatory preliminary conference with SCAI.  If the registered student organization fails to attend the mandatory preliminary conference without providing a satisfactory reason for the absence, the registered student organization may be placed on immediate social probation until such time as the registered student organization completes the mandatory preliminary conference. During the mandatory preliminary conference the registered student organization will receive information regarding the Registered Student Organization Conduct Review Process, including the registered student organization's rights during the process; an opportunity to inspect and/or review the information known at the time charges were prepared and how to contact the Student Government Association Judicial Advisor. At the conclusion of the

mandatory preliminary conference, one of the following will occur: case dismissal, mediation, informal hearing, or formal hearing.

(e) Social probation includes but is not limited to the prohibition of the following: any on or off campus fundraisers, socials, intramural competitions, receptions, service projects, conferences, retreats, etc. The organization may also not be able to update its registration until such time that it appears before a hearing.  Groups under social probation may gather at regularly scheduled business meetings.

**(2) Options for Resolution of Disciplinary Charges**

(a) Case Dismissal: The Director of SCAI or designee may dismiss a case if it is found to not have sufficient facts or evidence to substantiate the claim of misconduct or the misconduct is not a violation of the organizational rules of conduct.

(b) Mediation: Depending on the nature and severity of the alleged violation, SCAI may recommend formal mediation through the Office of Student Rights and Responsibilities as an alternative to disciplinary action. The involved parties must each agree to mediation. Mediation is a confidential process where the parties voluntarily meet with an impartial mediator to communicate their concerns and needs to each other and to reach their own agreement on the resolution of the case. The participants in mediation are responsible for keeping their agreement or renegotiating it, if necessary. In the event that the participants do not agree to mediate or mediate but do not reach a full and final resolution, the case will be referred back to SCAI for disciplinary action through an informal or a formal hearing.  Breach of a mediated agreement may result in a follow up mediation session or the matter may be referred back through the conduct process at the discretion of SCAI.

(c) Informal Hearing: At the discretion of SCAI, violations found not to warrant a formal hearing may be referred to an informal hearing.  At the informal hearing the charged registered student organization has the opportunity to meet with an SCAI staff member and accept responsibility for the charges of violation of the Organizational Rules of Conduct.  At the informal level the matter will be settled by the following outcomes: punitive sanction (organizational warning, organizational probation, organizational probation with restrictions, deferred organizational suspension) as well as educational sanctions (papers, seminars, community service, etc.).  If the matter is not settled informally, the case will be resolved through a formal hearing.

(d) Formal Hearing: If an alleged violation of the Organizational Rules of Conduct is not dismissed or otherwise resolved, then SCAI shall present in writing formal charges to the registered student organization.  The charged registered student organization may request either a panel or administrative hearing.  The charged registered student organization's hearing shall only be open to the charged registered student organization's chief officer, their advisor, the hearing body, witnesses (when called upon), a representative from SCAI, and a university staff member from an appropriate office (Office of Student Involvement, Office of Fraternity and Sorority Life, Recreation and Wellness Center, etc.).

**(3) Formal Hearings.**  There are two types of formal hearings – panel hearings and administrative hearings.

(a) Panel Hearings.

1. A panel to consider an organizational case shall be comprised of members from the SCAI Student Conduct Board.  The panel shall consist of two (2)

faculty and administrative staff members combined and two (2) student members that have been trained by SCAI to hear organizational cases. One panel member shall be selected by SCAI to chair the hearing and report the proposed finding(s) and sanction(s), if any, to the Director of SCAI or designee.

2. At hearings conducted by a panel, a SCAI staff member shall act as an advisor to the panel. The Director of SCAI shall receive the panel's proposed finding(s) as to "in violation" or "not in violation" of the Organizational Rules of Conduct and consider any sanctions proposed by the panel.

3. The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding of "in violation," they may approve, mitigate or increase the sanctions proposed by the panel.

4. Any decision by the Director of SCAI or designee to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(b) Administrative Hearings

1. Administrative hearings shall be conducted by a faculty or staff member from the Student Conduct Board trained by SCAI to hear organizational cases. The charged registered student organization shall be informed of the hearing officer assigned to its case and shall have the opportunity to challenge the impartiality of the individual within three (3) business days of notification. The charged registered student organization shall state in writing the basis for such challenge. A hearing officer so challenged will be excused; however, indiscriminate challenges shall not be permitted. In the event that a charged registered student organization has opted not to challenge the impartiality of a hearing officer prior to the allotted three (3) business days, the assigned hearing officer shall remain as scheduled.

2. At hearings conducted by an administrative hearing officer, a SCAI staff member shall act as an advisor to the administrative hearing officer. The Director of SCAI or designee shall receive the administrative hearing officer's proposed finding(s) as to "in violation" or "not in violation" of the Organizational Rules of Conduct, and consider any sanctions proposed by the administrative hearing officer.

3. The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding(s) of "in violation," they may approve, mitigate or increase the sanctions proposed by the administrative hearing officer.

4. Any decision by the Director of SCAI or designee to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(c) Conduct of Formal Hearings - the following is furnished as a guide to the events in a formal hearing. Please note that all formal hearing proceedings are recorded. The recording is part of the official record of the hearing and no other recordings are permitted.

1. Reading of charges.

2. Registered student organization response of "in violation" or "not in violation."

3.  Presentation of information in support of the charges.
4.  Opening statement by the charged registered student organization.
5.  Questioning of the charged registered student organization by the hearing body.
6.  Presentation and questioning of witnesses in support of the charges.
7.  Presentation and questioning of witnesses by the charged registered student organization.
8.  Final questions of the charged student organization by the hearing body.
9.  Closing remarks by the charged registered student organization.
10. Hearing is brought to a close.
11. Registered student organization is scheduled for a meeting to discuss the hearing body's proposed finding(s) and recommended sanction(s), if any.

(d) Deliberations by the panel or the administrative hearing officer are not part of the hearing and are confidential. Deliberations occur after the closure of the hearing and are not recorded.

(e) Case Record for Formal Hearing - The case record shall consist of the following items:
1.  A copy of the formal charges in writing.
2.  A recording of the formal hearing.
3.  All staff memoranda submitted.
4.  All items of physical or written documentation submitted, provided such items are not returned to a rightful owner. In that case, photographs or other facsimiles shall be made before return.
5.  The Director of SCAI's decision.

(f) Student Conduct Board members for panel and administrative formal hearings are selected through an annual application and interview process with the exception of the justices from the Student Government Association Judicial Branch. All Student Conduct Board members, including justices, receive annual training from SCAI. Student Conduct Board members who serve on hearings related to allegations of sex discrimination, including but not limited to relationship violence, sexual assault, sex harassment, and stalking receive additional training annually.

**(4)  Registered Student Organization Rights during the Formal Conduct Review Process -** The following rights shall be explained to the charged registered student organization before the commencement of a formal disciplinary hearing:

(a) The charged registered student organization shall be afforded written notice, at least five (5) business days prior to a formal hearing, unless waived in writing.  Written notice sent to the chief student officer of the charged registered student organization's electronic and/or physical address shall constitute full and adequate notice.  Written notice shall include:
1.  The name of the organization, the chief student officer's name and organization's address, if applicable.
2.  Date, time and location of the formal hearing
3.  Alleged Organizational Rule of Conduct Violation(s) known at the time formal charges are prepared.
4.  Names of potential witnesses known at the time that formal charges are prepared.
5.  A description of any physical or written documentation known at the time charges are prepared.

Provided that the required notice stated above has been given to the registered student organization along with its representative(s) but a representative failed to attend a scheduled formal hearing without providing a satisfactory reason for the absence, the organization may be placed on immediate social probation until such time as the organization completes the formal hearing and any further steps in the conduct process.  The organization will also not be able to update its registration while on social probation.

(b)　The registered student organization may have at their own expense and initiative, an advisor present at the hearing. It is the registered student organization's responsibility to make appropriate arrangements for the advisor to attend the hearing, and the hearing shall not be delayed due to scheduling conflicts of the chosen advisor.  The advisor may be present to advise the registered student organization but shall not speak for or present the case for the registered student organization or otherwise participate directly in the proceeding.  A registered student organization may consult with their advisor at any time during the hearing.  This consultation must take place in a manner that does not disrupt the proceedings.  A registered student organization's advisor must not be connected to the actual conduct case or a related case.  In addition, an advisor may not serve as a witness.  If the advisor does not adhere to their defined role in the student conduct review process, they may be removed from the hearing. SCAI shall maintain a list of impartial advisors and resources available to the registered student organization.

(c)　All hearings shall be conducted on the basis that the charged registered student organization is not in violation until the preponderance of evidence proves otherwise. At a student conduct organizational hearing, the technical rules of evidence applicable to civil and criminal cases shall not apply. The burden of proof in a student conduct hearing is not on the registered student organization charged with a violation of the Organizational Rules of Conduct.

(d)　The registered student organization's chief officer or designee may inspect any information presented in support of the charges. Information may be presented in support of the charged student organization.

(e)　The university cannot compel any person serving as a witness to attend a registered student organizational hearing. However, all parties to a registered student organizational conduct hearing may arrange for witnesses to voluntarily present relevant information during the proceeding.  Pertinent information may be accepted as information for consideration by the person or body conducting the registered student organizational formal hearing. The registered student organization may hear and question adverse witnesses who testify at the registered student organizational formal hearing.

(f)　The registered student organization shall not be forced to present information that incriminates its individual members; however, the University is not required to postpone disciplinary proceedings pending the outcome of any civil or criminal prosecution.

(g)　Should the registered student organization fail to attend the scheduled formal hearing, the hearing will be held in the registered student organization's absence and the proposed findings, including any recommended sanctions, will be made using the information available at the time of the scheduled formal hearing.

(h)    The proposed finding(s), as well as the Director of SCAI's determination, of "in violation" or "not in violation" on the charges shall be based solely on the information presented at the registered student organizational formal hearing.

(i)    Only if the proposed finding(s) of the hearing body is that the registered organization is in violation, will prior conduct history be reviewed and potentially affect the proposed sanctioning.

(j)    The final decision shall be furnished in writing to the registered student organization within fifteen (15) business days following the hearing. Should SCAI need additional time, the deadline can be extended by the Director of SCAI or designee by notifying the charged organization.

(k)    The registered student organization's registration status shall remain unchanged pending the University's final decision in the matter except in cases where the VP of SDES or designee determines that the safety, health, or general welfare of any individual, or any part of the University may be involved.

**(5)  Additional Procedures in Cases of Sex-Based Misconduct.** Where a registered student organization is charged with sexual misconduct and other identified sex-based misconduct, the procedures outlined in UCF-5.006(11) will apply in addition to the procedures of the Organization Conduct Review Process.

**(6)  Sanctions for Registered Student Organizations**

(a)    Organizational Warning: An official warning that the organization's behavior is in violation of the Organizational Rules of Conduct and that if the organization is subsequently found in violation of a rule, subsequent action may be more severe.

(b)    Organizational Probation: A period of time during which any further violation of the Organizational Rules of Conduct puts the registered student organization's status with the University in jeopardy.   Restrictive conditions may also be imposed as part of organizational probation and will vary according to the severity of the offense. Restrictive conditions may include barring or limiting some or all of the organization's activities and/or privileges (including, but not limited to:  social activities; intramural competition; organizational competition; Homecoming; eligibility to receive any University award or honorary recognition; privilege to occupy a position of leadership or responsibility in any University registered student organization governing body, publication, or activity; or ability to represent the University in an official capacity or position). If a registered student organization is found "in violation" for another violation of the Organizational Rules of Conduct while on organizational probation, more severe sanctions may be imposed.

(c)    Organizational Deferred Suspension – Organizational deferred suspension is used for offenses found serious enough to warrant organizational suspension, but where the specific circumstances of the case mitigate the offense or for repeated offenses of a less serious nature. Organizational deferred suspension is a designated period of time during which a registered student organization is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Organizational Rules of Conduct. During an organizational deferred suspension, the registered student organization will be officially suspended from the university, but the organizational suspension will be deferred, meaning that the registered student organization may continue to operate with sanction-specific restrictions. Organizational suspension will be enforced should the registered student organization fail to complete any of the assigned sanctions by the deadline(s) and/or for any subsequent violation of the Organizational Rules of Conduct unless the

Director of SCAI determines otherwise in exceptional circumstances. If the registered student organization is found in violation for any violation of the Organizational Rules of Conduct that occurred while on deferred suspension status, including failure to complete any assigned sanctions by the deadline(s), the registered student organization will be suspended for a minimum of two (2) semesters in addition to any educational sanctions imposed for the subsequent violation. Registered student organizations on organizational deferred suspension may be limited in their abilities to represent the University in intramural sporting events, extracurricular activities, or official functions. The duration of any organizational deferred suspension period and the specific restrictions imposed will be determined by SCAI on a case-by-case basis.

(d) Organizational Suspension: While on organizational suspension the registered student organization loses it University recognition and/or registration for a temporary period of time.  While an organization is suspended, it may not use University resources or participate as an organization in any University activities or events unless authorized in writing in advance under conditions approved by the Director of SCAI or designee. Additional provisions may be assigned that further outline University expectations while on Organizational Suspension Status.

(e) Revocation of UCF Registration: Permanent severance of the organization's relationship with UCF.

(f) Recommendation for Charter Revocation: An official request to a national office that the local chapter's charter be revoked.

(g) Educational Sanctions: In conjunction with any sanction listed above, a registered student organization found to have been in violation of any of the Organizational Rules of Conduct will be assigned educational sanctions that are proportional to the violation such as, but not limited to: reflective/research papers, classes/seminars, community service, restitution, interviews, etc.  If a registered student organization has any outstanding educational sanctions at the conclusion of organizational probation or organizational suspension, the organizational probation or organizational suspension will remain in effect pending completion of the educational sanctions.

**(7) Appeal within the Registered Student Organization Review Process**

(a) A student organization found in violation as a result of a hearing may appeal the finding(s) and sanction(s) imposed. The appeal must be made in writing to the appellate officer (VP of SDES or designee) within ten (10) business days after the date the registered student organization was notified of the decision by the Director of SCAI.

(b) Registered student organizations may appeal the finding(s) and sanction(s) imposed on the basis of one or more of the following:

1. Irregularities in fairness and stated procedures of the hearing that substantially affected the outcome of the hearing.

2. Discovery of new and significant information that would be likely to change the outcome of the hearing and that was not known or could not reasonably have been discovered and/or presented at the time of the initial hearing.

3. The sanction(s) are extraordinarily disproportionate to the violation(s).

(c) On the appeal form, the registered student organization must state the reason(s) for appeal, the supporting facts, and the recommended solution. This is not a re-hearing of the conduct case. An appeal cannot be filed simply because a registered student

organization is dissatisfied with the decision. Failure to describe the nature of the information in full detail in the appeal letter will result in the denial of an appeal.

(d) The appellate officer shall first determine if sufficient grounds for appeal exist and then, if so, may either deny the appeal, thus sustaining the initial decision and sanction(s), or do one of the following:

   1. If the registered student organization alleges that the sanction was disproportionate to the violation(s) and the appellate officer finds the sanction to be disproportionate, the appellate officer may alter the sanction; or.

   2. If the registered student organization alleges that there was a defect in procedure or new information was presented which was sufficiently substantial to have affected the outcome and the appellate officer agrees, the appellate officer will order a new hearing.

(e) The registered student organization shall receive a written decision to the appeal. There is no definitive timeline for receiving an appeal response. It depends on many factors including the complexity of the case and the information mentioned in the appeal, as well as the appellate officer's appeal load at that particular time. Decisions of the VP of SDES or designee reflect final agency action.

(f) Any decision by Appellate Officer to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(g) If the Appellate Officer upholds the original findings, the effective date of any disciplinary sanction(s) imposed will revert back to the date of the Director of SCAI's final decision letter.

**(8) Community ReEngagement and Educational Development (CREED) Program**

(a) The Community ReEngagement and Educational Development (CREED) Program is designated for a student organization to have the opportunity to demonstrate that in the period following the conclusion of the Student Conduct Review Process, they have taken steps to become a productive and engaged organizational member of the UCF Community.

(b) Upon completion of one semester of the Organizational Probation or Organizational Deferred Suspension and upon completion of all educational sanctions/requirements, a registered student organization can request modification of their organizational disciplinary  status through the CREED Program.

   1. Registered student organizations that have been found in violation of a Organizational Rule of Conduct that required an investigation by the Office of Institutional Equity (OIE) are ineligible to apply for relief under the CREED program.

   2. Registered student organizations that have been found in violation of a rule of conduct that had a substantially negative impact on a person or group of people, as determined by SCAI, are ineligible to seek relief under the CREED program.

(c) Requests must be submitted to the Director of SCAI or designee via an online Student Organization CREED Program Submission form that can be found at https://scai.sdes.ucf.edu/creed-program/.

(d) The CREED Program is designed for registered student organizations to have the opportunity to demonstrate that in the period following a violation of the Organizational Rules of Conduct, they have taken steps to become productive and engaged members of the UCF community. Student organizations that simply fulfill

the minimum requirements of their sanction(s) will not be eligible for the CREED Program.

(e)   Upon receipt of the CREED Program form, the Director of SCAI or designee Shall conduct a preliminary review to ensure that the registered student organization's request meets the necessary eligibility and application requirements. The Director of SCAI or designee must communicate the finding of the preliminary review of the application as well as the date and time of the "CREED review meeting" that has been scheduled for a committee to conduct a review the registered student organization's application, if applicable. The organization has three (3) business days from when the Director of SCAI or designee sent their preliminary findings to request an alternate date and time for the "CREED review meeting."

(f)   Prior to this meeting, the committee will have reviewed the packet and will prepare questions to be addressed, as well as provide the opportunity to further discuss why the registered student organization's organizational disciplinary status should be altered or terminated. No alterations shall be made to include new or increased sanctions. Should the committee feel that further information and/or documentation is necessary in order to render a recommendation, the review may be temporarily recessed. The registered student organization will be given ten (10) business days to produce the information and/or documentation the committee requested. Upon receipt of the requested information and/or documentation, the committee will reconvene the CREED review meeting with the registered student organization.

(g)   After the meeting, the committee will issue a recommendation to the Director of OSCAI or designee. The Director of SCAI or designee will provide a final decision to the registered student organization in writing within ten (10) business days of receiving the recommendation. (h) If the request is denied by the Director of SCAI or designee the decision shall include a concise and explicit written statement that explains the basis for that final decision.

(i)   There is no appeal process for a Registered Student Organization Disciplinary CREED Review meeting decision.

## UCF-5.015 Student Academic Behavior Standards

(1)  The Office of Undergraduate Studies, College of Graduate Studies, Registrar's Office, and the Office of Student Rights and Responsibilities will review this regulation periodically.

(2)  UCF is committed to a policy of honesty in academic affairs. Conduct that comprises a breach of this policy may result in academic action and/or disciplinary action. Academic action affects student assignments, examinations or grades. Disciplinary action could affect student enrollment status.

(3)  Academic misconduct includes but is not limited to cheating, plagiarism, assisting another in cheating or plagiarism, and commercial use of academic materials.  Violations of academic misconduct at the undergraduate and graduate level are listed and defined in the Rules of Conduct (UCF-5.008)

(4)  Alleged violations of the UCF Rules of Conduct (Academic Misconduct) shall be reported in writing to the Director of Student Conduct and Academic Integrity (SCAI) or designee. When an instructor becomes aware of an alleged violation of academic misconduct, the instructor must document the alleged violation(s) through the Academic Misconduct Report Form (AMR), available at http://scai.sdes.ucf.edu. Upon receiving an alleged violation of academic misconduct, the Director of SCAI or designee may review relevant information and consult with relevant parties regarding the incident in question.

   (a)   The Director of SCAI will refer all information warranting disciplinary action to the SCAI.  SCAI will send notification to the student indicating the nature of the activity in question and what university rules were allegedly violated.

   (b)   Upon receipt of an AMR form SCAI has six months to charge a student with a violation of academic misconduct.  SCAI may exercise discretion when applying the time provision to account for circumstances that warrant a waiver of the six month time limit from the date of discovery.

   (c)   Students charged with alleged violations of academic misconduct will receive notice to attend a required preliminary conference with SCAI to discuss the charges. If the student fails to attend the conference, a hold will be placed on the student's record, preventing them from registering for future classes until the matter is resolved. Students who leave the university or withdraw from a class before a disciplinary matter is resolved may be prohibited from future enrollment until the matter is resolved. The purpose of this meeting is to provide the student with information regarding the student conduct review process, including the student's rights during the process; an opportunity to inspect and/or review the information known at the time charges are prepared, and notice of how to contact the impartial advisor. At the conclusion of the meeting, SCAI will recommend an option for resolution of the academic misconduct charges.  These options are case dismissal, informal hearing, or academic formal hearing

**(5)  Options for Resolution of Academic Misconduct**

   (a)   Case Dismissal: The Director of SCAI or designee may dismiss a case if: the reported case fails to have sufficient facts or information to substantiate the claim

of academic misconduct; or the reported violation is not seen to warrant punitive disciplinary action; or the reported behavior reported as academic misconduct is not a violation of the Rules of Conduct. An informal conference may be held where the student may be instructed to complete an educational requirement to demonstrate what was learned from the reported behavior. Upon successful completion of the educational requirement, the reported incident will be dismissed.

(b)  Informal Hearing: At the discretion of SCAI, violations found not to warrant a formal hearing may be referred to an informal hearing. At the informal hearing, the charged student has the opportunity to meet with a SCAI staff member or designee and accept responsibility for the charges of violation of academic misconduct.  At the informal hearing level the matter will be settled by the following outcomes: punitive sanction (disciplinary warning, disciplinary probation, deferred disciplinary suspension) as well as educational sanctions (papers, seminars, community service, etc.).  If the matter is not resolved informally, the case will be resolved through a formal hearing. The outcomes from an informal hearing process (decision of responsibility and recommended sanctions) are final and are not eligible for appeal.

(c)  Formal Hearings: If an alleged violation of academic misconduct is not dismissed or otherwise resolved, then SCAI shall present in writing formal charges to the student. The charged student's formal hearing shall be open only to the charged student/co-charged students involved in the same incident, selected advisor, witnesses (when called upon), and a representative from SCAI. Formal notification shall include:

1.  The student's name and address.

2.  Date, time and location of the formal hearing.

3.  The rule(s) of conduct allegedly violated as known at the time formal charges were prepared.

4.  Names of potential witnesses known at the time formal charges were prepared.

5.  A description of any physical or written documentation known at the time charges were prepared.

(d)  Academic Integrity Formal Hearings: Students going through the Academic Integrity formal hearing process may elect an Administrative Academic Integrity Formal Hearing or a Panel Academic Integrity Formal Hearing.

1.  Administrative Academic Integrity Formal Hearing

a.  Administrative Academic Integrity formal hearings shall be conducted by one faculty member from the Student Conduct Board. The charged student shall be informed of the hearing officer assigned to the case and shall have the opportunity to challenge the impartiality of the individual within three (3) business days of notification. The

student shall state in writing the basis for such challenge. A hearing officer so challenged will be excused; however, indiscriminate challenges shall not be permitted.  In the event that a student has opted not to challenge the impartiality of a hearing officer prior to the allotted three (3) business days, the assigned hearing officer shall remain as scheduled.

b.   At hearings conducted by an administrative hearing officer, a SCAI staff member shall act as an advisor to the administrative hearing officer.  The Director of SCAI or designee shall receive the administrative hearing officer's proposed finding(s) as to "in violation" or "not in violation" of the Rules of Conduct, and consider any punitive and or educational sanctions proposed by the administrative hearing officer.

c.   The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding(s) of "in violation," they may approve, mitigate or increase the sanctions proposed by the administrative hearing officer.

d.   Any decision by the Director of SCAI or designee to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

2.   Academic Integrity Panel Hearings.

a.   A panel to consider an individual case shall be randomly selected by SCAI from the Student Conduct Board and shall consist of at least one (1) faculty member, one (1) additional faculty or administrative staff member, and two (2) student members. One panel member shall be selected by SCAI to chair the hearing and report the finding(s) and recommended sanctions, if any, to the Director of SCAI or designee.

b.   For panel hearings, aSCAI staff member shall act as an advisor to the panel.  The Director of SCAI or designee shall receive the panel's proposed finding(s) as to "in violation" or "not in violation" of the Rules of Conduct, and consider any punitive or educational sanctions proposed by the panel.

c.   The Director of SCAI or designee may accept the proposed finding(s) of "in violation" or "not in violation" or remand the case for rehearing. If the Director of SCAI or designee accepts the proposed finding(s) of "in violation," they may approve, mitigate or increase the sanctions proposed by the panel.

d.   Any decision by the Director of SCAI or designee to alter proposed sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

(e)    Following the Academic Integrity Formal Hearing:

    1.    Undergraduate students found "in violation" will be prescribed punitive and educational conduct sanctions appropriate to the findings and recommendations. SCAI will report the outcome from the academic integrity hearing back to the instructor of record and department chair.  In consultation with the college dean or designee, the instructor and the department chair will determine if further course or academic action should be imposed. If the undergraduate program recommends further course or program action, the undergraduate program must notify SCAI and Academic Services. Final results of the academic integrity hearing and/or course or program action must be made available to the student in writing within fifteen (15) business days following the date of the hearing.

    2.    Undergraduate students found "not in violation" will be notified within fifteen (15) business days. SCAI will report the findings back to the instructor, department chair, and college dean or designee. Students may have proposed course or academic action removed and the instructor may determine a new grade since no violation was found.

    3.    For graduate students found "in violation", SCAI notifies the instructor, Associate Dean of Graduate Studies, and the Dean or designee of the Academic College in which the graduate student resides. The college dean or designee will in turn notify the graduate program that a student is in violation and ask if the program wishes to invoke any program-level academic action(s). The student's graduate program will determine if program action is necessary. If deemed necessary, recommendation of program action will be made using the *Probation/Dismissal Form* and/or *Conditional Retention Plan*. This information will be forwarded to the College of Graduate Studies. SCAI will be notified if the graduate program recommends additional program action. The results of any hearing and/or program action should be available for the student within fifteen (15) business days.

    4.    For graduate students found "not in violation" of academic misconduct, SCAI notifies the instructor, Associate Dean of Graduate Studies and the Dean or designee of the Academic College in which the graduate student resides. The graduate student may have their proposed course or program action removed and the instructor may determine a new grade since no violation was found.

(f)    Appeals:

    1.    Undergraduate or graduate students found "in violation" as the result of an academic integrity formal hearing may appeal the finding(s) and sanction(s) imposed by the Director of SCAI. The appeal must be made in writing to the appellate officer (Provost or designee) within ten (10) business days after the date the student was notified of the decision by the Director of SCAI. Students may appeal the finding and sanction(s) imposed on the basis of one or more of the following:

a.   Irregularities in fairness and stated procedures of the hearing that could have affected the outcome of the hearing.

b.   Discovery of new and significant information that could have affected the outcome of the hearing and which was not known or could not reasonably have been discovered and/or presented at the time of the hearing.

c.   The sanction(s) are extraordinarily disproportionate to the violation(s).

2.   Any decision by an appellate officer to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

3.   The appellate officer should issue a written decision to the student's appeal within twenty (20) business days of receipt of the appeal. Should the appellate officer require additional time for review beyond the 20 business days, the appellate officer will notify the charged student in writing of the need for additional time. Decisions of the Provost or designee reflect final agency action.

4.   Any decision by the Provost or designee to alter sanctions or return a case shall be accompanied by a concise and explicit written statement that explains the basis for that decision.

5.   Undergraduate students may appeal program sanctions provided by the student's undergraduate program, per UCF-5.016. Graduate Students may appeal program sanctions provided by the student's graduate program, per UCF-5.017. Students found "in violation" for academic misconduct are not eligible for academic appeal regarding the final grade issued by the course of the reported violation.

**(6)  Z Designation for Undergraduate Student Academic Misconduct**

(a)   A Z designation denotes a student was found "in violation" of academic misconduct while enrolled in a course.  A Z designation does not affect a student's grade point average.

(b)   Z designations will remain on a student's transcript if:

1.   The student is found "in violation" of academic misconduct and the punitive sanction is disciplinary suspension for one or more semesters, disciplinary dismissal, or expulsion; or

2.   The student is found "in violation" of academic misconduct twice during their UCF academic career.

a.   The punitive sanction received in either academic misconduct case has no bearing on the Z designation being permanently placed on the student's transcript.

        b.     A Z designation will be placed in association with both courses in which the student was found "in violation" of academic misconduct.

(c)    If a student is found "in violation" of academic misconduct a Z designation will be placed on their transcript in association with the final course letter grade recorded (ex. ZA, ZB, ZC, ZD, ZF).

(d)    A Z designation will be denoted on the student's transcript as a ZW if a student withdrew from the course prior to the conclusion of the conduct process and was subsequently found "in violation" of academic misconduct.

(e)    OSC will communicate with the Registrar's Office to have Z designations placed on student's transcript following the conclusion of the Conduct Review Process.

(f)    Students have the opportunity to improve the letter grade recorded in association with a course in which they were found "in violation" of academic misconduct through the use of grade forgiveness.  The Z designation however will still remain on the student's transcript.

(g)    A student can attempt to have a Z designation permanently removed through participating in the Community ReEngagement and Educational Development (CREED) Program.

(h)    A Z designation will remove a student from consideration for academic awards and honors (e.g. President's List and Dean's List) for the academic semester in which the violation occurred.

**UCF-5.016**
**Student Academic Appeals**

**(1) General Policy**

    (a)    This regulation shall apply to undergraduate and graduate students seeking to appeal a final course grade or an undergraduate program decision. The professional judgement exercised by an instructor in assigning a specific grade or in conducting a class is excluded from the provisions of this regulation except as noted.

    (b)    This regulation does not apply to appeals of graduate programs actions or decisions by a faculty member, program, or college, including termination from an academic program, or to the assignment of grades for Thesis or Dissertation credit hours. Appeals from such actions are discussed in and may only be brought under Regulation UCF-5.017.

    (c)    Grounds for a grade appeal must fall under at least one of the following:

        1.    Alleged deviation from established and announced grading policy;

        2.    Alleged errors in the application of grading procedures;

        3.    Alleged deviation from University syllabus policy that could have impacted the resulting grade; and

        4.    Alleged lowering of grades for non-academic reasons, including discrimination. (A grade appeal alleging discrimination in violation of University policy will be referred to the Office of Institutional Equity. The University is entitled to a reasonable period of time to review allegations of discriminations contained in an appeal, and the University may accordingly extend deadlines applicable to the University for the purposes of reviewing such allegations).

    (d)    Grounds for an undergraduate program appeal must fall under at least one of the following:

        1.    Alleged deviation from program or university policies as outlined in the Undergraduate Catalog or Undergraduate Program Handbook(s);

        2.    Alleged errors in the application of policies or procedures;

        3.    Alleged probation or dismissal due to non-academic reasons; and

        4.    Alleged undergraduate program action discrimination and/or sexual harassment in the undergraduate program, department or college. (An appeal alleging discrimination in violation of University policy will be referred to the Office of Institutional Equity. The University is entitled to a reasonable period of time to review allegations of discriminations contained in an appeal, and the University may accordingly extend deadlines applicable to the University for the purposes of reviewing such allegations).

**(2) The following assumptions are adopted:**

    (a)    Resolution of student academic appeals should be made as informally as possible.

    (b)    Students and faculty are entitled to a fair and timely resolution of academic appeals.

    (c)    The burden of proof in a student academic appeal is on the student.

    (d)    Students have access to published materials and student government to help them become familiar with and understand procedures for handling academic appeals.

Students may consult with a student government advisor for advice regarding the student's rights and responsibilities with respect to this appeal process.

(e)  Faculty members and administrators have access to published materials and University staff to help them be aware of and understand procedures to address academic appeals.

(f)  The University as an institution and its faculty are entitled to procedures that ensure the maintenance of academic standards.

(g)  The University is entitled to a reasonable period of time to review allegations of discrimination contained in an appeal, and the University may accordingly extend deadlines applicable to the University for purposes of reviewing such allegations.

(h)  All communication between the student and any University personnel must be made via a university provided email account (e.g. knights.ucf.edu or ucf.edu).

**(3)  Resolution of Student Appeals at the Unit Level**

(a)  The initial appeal, for final grades or an undergraduate program action, must be initiated within ninety (90) business days of the undergraduate program action or final grade posting.

(b)  Step 1:  All student academic appeals of allegedly wrongful academic action(s) by an instructor or administrator shall first be brought to the attention of the person whose action is being appealed. (The instructor of the course or administrator whose action is being appealed will be referred to in this regulation as the Responding Party.) If the issue cannot be resolved with the decision of the Responding Party, or if the Responding Party is not available, the student must pursue a Step 2 solution with the unit head, usually the chair or director of the unit.

(c)  Step 2: The student must submit the appropriate appeal form, available at the following URL: www.dtl.ucf.edu/gradeappeal. The unit head or designee, in consultation with the Responding Party, should make reasonable efforts to communicate with the student and resolve the problem. This communication shall normally take place within ten (10) business days of the complaint being forwarded to the unit head or designee. The unit head or designee will provide the student with a written final unit-level decision. The written decision must include the contact information of the appropriate associate dean or designee to contact regarding the appeal process if dissatisfied with the final unit level decision.

1.  If the Responding Party is not available to discuss the problem, the resolution should wait, if at all possible, until such time as the Responding Party can return to the campus, but not more than (90) business days.

2.  If the unit head or designee and/or associate dean or designee determines that an emergency exists requiring that the problem be solved prior to the availability of the Responding Party (e.g. in a case of probable delayed graduation), the unit head or dean or designee shall make reasonable efforts to inform the Responding Party of the situation. The Responding Party may elect to submit a written statement and/or to designate a replacement to aid in solving the problem.

**(4)  Resolution of Student Academic Appeals at the College Level**

(a)  Step 3:  If the student is dissatisfied with the outcome, then the student may proceed to Step 3 of the process.  Within ten (10) business days of receipt of the unit head's or designee's decision, the student must schedule an appointment with

the appropriate associate dean or designee of the college in which the action occurred. That individual will review the student's concerns, inform the student of their ability to seek the assistance of a student government advisor and explain the Student Academic Appeals process. The associate dean or designee shall issue a written recommended resolution, including a concise and explicit written statement that explains the basis for the recommended resolution, within ten (10) business days of the meeting outlined above. Each party has ten (10) business days from the issuance of the written recommended resolution to review the written recommended resolution.

(b)    Step 4:  If the student does not accept the written recommended resolution of the associate dean or designee, then the student must submit a written appeal to the associate dean or designee. The college will have ten (10) business days from that notice to form an Ad Hoc Student Academic Appeals Committee. This committee will review the student's appeal regarding the awarded grade and/or the academic program action and, if appropriate, suggest a resolution.

(c)    The Committee shall, at a minimum, be presented with the following information:
1. Electronic appeal form submitted by the student.
2. A written final decision of the unit head or designee.
3. Recommended resolution of the associate dean or designee.
4. Information submitted by the student.
5. Information submitted by the Responding Party.

**(5)  Composition of the Ad Hoc Student Academic Appeals Committee**

(a)    Each college shall establish an Ad Hoc Student Academic Appeals Committee whenever required and the Committee shall be considered dissolved upon submission of the Committee's recommendation to the college dean.

(b)    The committee shall be made up of at least two and no more than five full-time instructional faculty members and an equal number of students. The college shall make a reasonable effort to select students of comparable academic classification as the student initiating the appeal.

(c)    Quorum for the Committee shall be two (2) faculty members and two (2) students.

(d)    Student members shall be selected by the associate dean or designee from a panel of students. This panel shall be appointed by the Vice President of Student Development and Enrollment Services and/or the Dean of the College of Graduate Studies. The list of students appointed to the student panel shall be maintained by the Office of Student Conduct and furnished upon a request from a college.

(e)    The parties will be informed of the names of the Ad Hoc Student Academic Appeal Committee members seated to hear the appeal. Any member may be challenged for cause by either party within three (3) days of notification of the names of the members assigned to the Ad Hoc Student Academic Appeals Committee. The validity of such challenges shall be decided by the Assistant Dean and Executive Director of Student Rights and Responsibilities or designee. If a challenge is upheld, the college dean or designee shall appoint a replacement from the college's full-time instructional faculty members or the student panel.

**(6)  Ad Hoc Student Academic Appeals Committee Guidelines.**

(a)    The following guidelines should be adhered to when a committee is conducting a review of an appeal:

1. The Committee will function as an objective, fact-finding body when examining all available and relevant information concerning the student's appeal of a grade or program action by the Responding Party. Such information may include the student's written appeal, written and/or oral information provided by the Responding Party, statements made by both parties before the Committee, and any other information the committee may deem relevant.

2. The time limits specified in the following review procedure may be extended by mutual agreement of the parties.

3. The committee should make reasonable efforts to meet for review of the case within twenty (20) business days.  If the committee cannot meet within the 20 days, the university will inform the parties of the need for additional time.   Should either party fail to attend the scheduled appeal hearing, the hearing will be held in the party's absence with the understanding that the proposed outcomes and resolutions will be made using the information available at the time of the appeal hearing in the party's absence.

4. The associate dean or designee will convene the committee, establish procedural rules for conducting the meeting, serve as its chair, and will vote in the case of a tie. The meeting is not covered by Sunshine laws and is thus closed to outside parties and will not be recorded.

5. The student and Responding Party shall be invited to meet with the committee.  Participating individuals in the appeal may appear through virtual (electronic) means at the committee meeting.  Each shall be allowed adequate time to respond to the appeal and material as submitted, to answer any questions from committee members, and to present additional information needed to clarify the issues involved.

6. After meeting with both parties, the committee will deliberate and issue a recommendation by majority vote to the college dean. The committee will (1) decide if the student has demonstrated that there were grounds for the appeal and, if there were grounds, (2) suggest what resolution should be implemented. This decision may let the grade/action as recommended by the associate dean or designee in Step 3 stand as is, or alter the recommended grade/action. If the decision of the committee is to alter the recommended Step 3 decision of the associate dean or designee, only the faculty members on the Board will be involved in deciding what the alteration will be. The committee chair will ensure that the committee's majority opinion, rationale, and recommended findings and resolutions are recorded and forwarded to the college dean within five (5) days of the conclusion of the Committee hearing.

(b) The college dean will prepare a written decision on the appeal within five (5) business days of the receipt of the Committee's recommendation. The college dean may do one of the following with the Committee's recommendation: accept it, reject it, or modify it. If the college dean rejects or modifies the Committee's recommendation, then the college dean's written decision must include a statement of reason for the action. The college dean will send a copy of the Committee's recommendation along with the college dean's written decision to the student, the Responding Party, the Provost, the unit head, and the appropriate

dean of undergraduate or graduate studies. The college dean's decision shall be the final decision on the college level.

**(7)  Final Appeal**

    (a)    Step 5:  If dissatisfied with the college dean's decision, the student may, within ten (10) business days, file a written request for review with the dean of undergraduate studies or the dean of graduate studies, or designee (depending upon the classification of the student), clearly stating the basis for review and the resolution sought by the student.

    (b)    The dean of the college of undergraduate studies, or designee, or dean of the college of graduate studies, or designee, shall serve as the final appellate officer. The final appellate officer should issue a written decision to the student's appeal within twenty (20) business days of receipt of the appeal. Should the final appellate officer require additional time for review beyond the 20 business days, the final appellate officer will notify the student in writing of the need for additional time.

    (c)    Acting as the University President's representative, the decision of the dean of undergraduate studies, or designee, or the dean of graduate studies, or designee, shall represent final agency action. Copies of the dean's, or designee's written decision shall be sent to the student, the college dean, the unit head, the Director of OSC, the Responding Party, the Provost, and the appropriate dean of undergraduate or graduate studies.

## UCF-5.017   Appeals of Graduate Program Actions or Decisions

(1)   **Review of Academic Performance.**

    (a)    The primary responsibility for monitoring a student's progress to degree (or program completion) rests with the graduate program, although the College of Graduate Studies also monitors a student's progress and takes appropriate actions if performance standards as specified by the program and University are not maintained. Satisfactory progress to degree (or program completion) requires an ongoing evaluation of a student's performance in a program as indicated by satisfactory grades within courses, successful performance on program competency exams, progress in thesis and dissertation research, the maintenance of the standards of academic and professional integrity expected in a particular discipline or program, and any other measures of progress as customarily used in the program.  Academic probation or even dismissal of the student from the program may occur when the individual is not making satisfactory progress to degree (or program completion).

    (b)    A graduate program may also recommend dismissal if the student fails to maintain the standards of academic and professional integrity, meet or exceed the professional competencies of the discipline, or maintain the competence necessary for the welfare of faculty, fellow students, staff, patients, clients, or others encountered in internships, externships, or other classes required by the degree program. A student's performance in clinical settings may be evaluated by clinical supervisors or other clinicians in conjunction with instructors of record and/or faculty advisors.

    (c)    A student may be immediately terminated from a clinical assignment and/or graduate program when, in the professional judgment of a qualified clinician, faculty supervisor or instructor of record, client/patient welfare could be at risk. In cases where client/patient welfare could be at risk, graduate programs may forego published procedures for advising, mentoring or probation if documentation from clinical or faculty supervisors indicate immediate action was necessary to protect the welfare of others.   When immediate action is taken, the graduate program must inform the student in writing of the action and the reasons for the action.  The student may appeal such action as a graduate program action under this Regulation.

    (d)    Misconduct associated with research or misconduct in laboratory assignments may result in immediate termination from the assignment and/or the graduate program when the misconduct places clients, researchers, subjects or the university at risk

    (e)    It is incumbent on the graduate program to give the student an opportunity to discuss the pending action with the program director and provide additional relevant information prior to making a recommendation of probation or dismissal. A student does not have to agree with the action in order for the program to move forward with a recommendation of probation or dismissal.

    (f)    The Dean of the College of Graduate Studies has final authority over probation and dismissal recommendations and will execute them accordingly.

        1.    Once dismissed, a student may apply to UCF as a student in another program, or as a non-degree student. Readmitted students are prohibited from taking courses in the program from which they were dismissed.

    2.   A student can only be reinstated to the previous graduate program by either submitting a new application to the program with a new admissions decision, or through a formal grievance process. (See Grievance Procedures in following section).

**(2) Other Procedures.** Graduate students disputing a graduate program action (including the evaluation of their progress to degree) as described above, have several routes of appeal depending on the nature of the grievance.

    (a)   In the appeal of a grade in a specific course (excluding thesis or dissertation credit hours) students are referred to Regulation UCF-5.016 for the grade appeal procedures.

    (b)   For issues resulting from a failure to maintain academic behavior standards such as cheating, plagiarism, etc., students are referred to Regulation UCF 5.015 (and, as appropriate, student conduct review procedures).

    (c)   Misconduct associated with research will follow procedures determined by the Office of Research and Commercialization.

    (d)   All other grievances, including the appeal of grades issued in Thesis and Dissertation credit hours, follow the Procedure for Other Grievances of Graduate Students as outlined in this Regulation.

**(3) Applicability of graduate program action appeal procedure:**

    (a)   This regulation applies to graduate student appeals of decisions made by the College of Graduate Studies, an academic college or graduate degree program based on:

        1.   Alleged deviation from program or university policies as outlined in the Graduate Catalog or Graduate Program Handbook(s)

        2.   Alleged errors in application of policies or procedures

        3.   Alleged probation or dismissal due to non-academic reasons

        4.   Alleged deviation from the University's syllabus policy

        5.   Alleged discrimination and/or sexual harassment in the program, department or college. (An appeal alleging discrimination and/or sexual harassment in the program, department or college will be referred directly to the Office Institutional Equity.  The University is entitled to a reasonable period of time to review allegations of discrimination contained in a graduate student appeal, and the University may accordingly extend deadlines applicable to the University for purposes of reviewing such allegations.)

    (b)   Decisions based on professional judgment of an instructor, faculty member or clinical supervisor in the assignment of a grade or assessment of a student's performance in a class are excluded from the provisions of this regulation except as noted above. Probation or dismissal due to unsatisfactory performance on competency exams, research, or progress in thesis or dissertation research may not be appealed based on the student's disagreement with the professional judgment of an instructor, faculty member or advisor. Students may appeal based on alleged errors in process or alleged non-academic reasons.

    (c)   Students placed on probation or dismissed by the College of Graduate Studies for not maintaining at least a 3.0 GPA may not appeal the academic program or academic college's decision to not submit a Conditional Retention Plan (CRP).  A CRP may be offered to a student when, in the discretion of the academic program, extenuating circumstances warrant such an exception; however, graduate programs are not obligated to provide a CRP.

**(4)  Procedure for Other Grievances of Graduate Students.**  Students are entitled to a fair and timely resolution of appeals. This procedure is intended for graduate students having complaints regarding specific actions or decisions by a faculty member, program or college, including termination from an academic program, for reasons that are not covered in Section 2(a)-2(c) above.  The graduate student is encouraged to first discuss the matter within the academic unit of the grievance and attempt to resolve the grievance informally.  The formal procedure is as follows:

(a)    Step 1 -Program and Department Level: The graduate student appealing the decision of a program, must state the nature of the grievance in writing to the graduate program director, including a brief narrative of the grievance, the parties involved, and a statement of the remedy being requested. All appeals must be submitted using the form located at https://graduatecouncil.ucf.edu/appeals-committee. This statement must be submitted by the graduate student within six (6) months of the notification date of the occurrence of the program action being appealed.

(b)    Dependent on the nature of the grievance, the graduate program director will in ten business days following receipt of the grievance either make a recommendation about the grievance to the unit head or refer the grievance to the unit/ program graduate committee to examine the issue at their next scheduled meeting. The unit/program graduate committee may invite the aggrieved student and others having information about the case to attend the meeting and present information and arguments about the grievance.  If so invited, the graduate student can have a personal advisor at the meeting, but the advisor can only confer with the student and not participate in the committee meeting. The unit/ program graduate committee will make a recommendation about the grievance to the graduate program director.

(c)    The graduate program director will consider the input of the unit/ program graduate committee and make a recommendation to the unit head about the grievance. The unit head will then make a final decision about the grievance at the program/ unit level and inform the student of the decision within ten business days after receiving the recommendation from the graduate program director.

(d)    Step 2 - College Level: Should the graduate student disagree with the decision of the unit head, the student has ten business days to file a written appeal of the decision with the academic college graduate coordinator (or the Dean of the College of Graduate Studies in the case of interdisciplinary programs with no academic college assigned to oversight of the program). It is incumbent on the student to explain in the appeal why the unit/program decision is in error and should be reexamined. At each appeal level, the basis for the appeal must be the same as the original appeal or must articulate new information discovered as part of the appeal process itself. If the basis for the appeal changes, the student will be considered to be initiating a new appeal that must begin at the initial level of the appeal process (and which must be timely).

(e)    Dependent on the grievance, the academic college graduate coordinator will, in ten business days following receipt of the appeal, either make a recommendation to the college dean about the grievance or refer the grievance to the college graduate committee to examine the issue at their next scheduled meeting. The college graduate committee may invite the aggrieved student and others having information about the case to attend the meeting and present information about

the grievance. If so invited, the graduate student can have a personal advisor at the committee meeting, but the advisor can only confer with the student and not participate in the committee meeting. The college graduate committee will make a recommendation about the grievance to the college graduate coordinator.

(f)     The academic college graduate coordinator after considering the input of the college graduate committee will make a recommendation to the college dean about the grievance. The college dean will then make the final decision about the grievance at the academic college level, and inform the student of the decision within ten business days after receiving the recommendation from the college graduate coordinator.

(g)     Step 3 - College of Graduate Studies Level: Should the graduate student disagree with the decision of the academic college dean, the student has ten business days following receipt of the college decision to file a written appeal of the decision at the university-level with the Dean of the College of Graduate Studies.  It is incumbent on the student to explain in the appeal why the academic college decision is in error and should be reexamined.

(h)     Dependent on the appeal, the Dean of the College of Graduate Studies will within ten business days following receipt of the appeal either make a decision about the grievance or refer the appeal to the Appeals Subcommittee of the Graduate Council to examine the issue at a scheduled meeting. The Appeals Subcommittee may invite the aggrieved student as well as others having information about the grievance to attend and present information about the grievance. If so invited, the graduate student can have a personal advisor at the meeting, but the advisor can only confer with the student and not participate in the committee meeting. The Appeals Subcommittee will submit a recommendation to the Dean of the College of Graduate Studies concerning the grievance.

(i)     The Dean of the College of Graduate Studies will consider the input of the Appeals Subcommittee of the Graduate Council and make a final decision about the grievance for the university. There is no appeal beyond the level of Dean of the Graduate College as this person is vested with the final authority by the President of the University.

## University Registrar

**(1) Student Record Guidelines**

Student records submitted become the property of the University and cannot be returned to the student or released to a third party. Copies of student records will be released only upon receipt of a written request signed by the student. Student records are stored in paper form or are digitally scanned. Once the student has been absent from the University for three academic years, all records are transferred to optical disk storage and the paper copies destroyed.

(a) Family Educational Rights and Privacy Act (FERPA)

The procedures for protecting the confidentiality of student records are based on state regulations and the federal Family Educational Rights and Privacy Act of 1974. FERPA affords students certain rights with respect to their education records. They are:

1.  The right to inspect and review the student's education records within 30 days of the day the University receives a written request for access. Students should submit to the University Registrar, dean, head of the academic department, or other appropriate official, written requests that identify the record(s) they desire to inspect. The University official will make arrangements for access and notify the student of the time and place where the records may be inspected. If the records are not maintained by the University official to whom the request was submitted, that official shall advise the student of the correct official to whom the request should be addressed;

2.  The right to request the amendment of the student's education records that the student believes are inaccurate or misleading. The student may ask the University to amend a record that he or she believes is inaccurate or misleading. The student should write the University official responsible for the record, clearly identify the part of the record to be changed, and specify why the current record is inaccurate or misleading. If the University decides not to amend the record as requested by the student, the University will notify the student of the decision and advise the student of his or her right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided to the student when notified of the right to a hearing;

3.  The right to consent to disclosures of personally identifiable information contained in the student's education records, except to the extent that FERPA authorizes disclosure without consent. One exception that permits disclosure without consent is disclosure to school officials with legitimate educational interests. A school official is a person employed by the University in an administrative, supervisory, academic or research, or support staff position (including law enforcement unit personnel and health staff); a person or company with whom the University has contracted (such as an attorney, auditor, or collection agent); a person serving on the Board of Trustees; or a

student serving on an official committee, such as a disciplinary or grievance committee, or assisting another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility;

4. The right to file a complaint with the U.S. Department of Education concerning alleged failures by a State University to comply with the requirements of FERPA. The name and address of the office that administers FERPA is:

   Family Policy Compliance Office
   U.S. Department of Education
   400 Maryland Avenue, SW
   Washington DC, 20202-4605

5. Directory Information FERPA authorizes the University to classify certain information concerning students as "directory information," which means that it may be released to anyone upon request. In accordance with Florida Statutes Section 228.093, the University is required to release student directory information to independent vendors upon request. Directory information at UCF includes:
   - Name;
   - current mailing address;
   - telephone number;
   - e-mail address;
   - date of birth;
   - major field of study;
   - dates of attendance;
   - enrollment status;
   - degrees and awards received;
   - participation in officially registered activities and sports; and
   - Athlete's height and weight.

   All other student information will be released in accordance with FERPA; in most cases this requires the student's prior written and signed consent. The University extends to students the opportunity to withhold any or all information, including "directory information." To do this, students must complete the "Directory Disclosure/ Release Authorization" form available at the Registrar's Office (MH 161) or online at http://registrar.ucf.edu, requesting that this information be withheld. The Golden Rule outlines the University procedures for confidentiality. For additional information describing FERPA policy, enter the Department of Education Family Policy Compliance Office website at http://www.ed.gov/offices/OM/fpco/.

**(2) Student Communication Responsibility Policy**
   (a) To communicate in a more expedient manner, UCF uses e-mail as the primary means of notifying students of important university business and information

dealing with registration, deadlines, financial assistance, scholarships, tuition and fees, etc.

(b) To avoid missing important communications from the university, students must ensure that the university has an up-to-date "preferred" e-mail address, as well as both a permanent and mailing (local) address.

(c) It is critical that students maintain and regularly check their "preferred" e-mail account for official announcements and notifications. Communications mailed to a student's "preferred" email address are considered official notice. The university does not accept responsibility if official communication fails to reach a student who has not notified the university of a change of e-mail or mailing address.

(d) Please ensure that your e-mail address, as well as your permanent and mailing (local) address and telephone number are current with the university at all times.

Students can update their contact information on the web at: http://my.ucf.edu

## Student Health Services

(1) **Drug-Free Workplace/Drug-Free Schools Policy Statement**
This is a statement of the standards of conduct and disciplinary sanctions to be imposed for the unlawful possession, use or distribution of illicit drugs and alcohol by UCF students and employees on UCF property or as part of any of its activities. The unlawful manufacture, distribution, dispensation, possession or use of a controlled substance or the unlawful possession or use of alcohol is prohibited in and on UCF owned and controlled property or as part of any of its activities. Any UCF employee or student determined to have violated this policy shall be subject to disciplinary action for misconduct, action which may include termination or expulsion and referral for criminal prosecution. No employee or student is to report to work, class or any University activity while under the influence of illegal drugs or alcohol. Violation of these policies by an employee or student will be reason for evaluation and possible intervention or treatment for alcohol and other drug abuse or dependency disorders. The University's alcoholic beverages policy is stated below.

(2) **Campus Alcoholic Beverages Policy**
(a) Policy- The sale, service, possession, and consumption of alcoholic beverages shall comply with state and federal laws, city and county ordinances, and the licensing agreement with on-campus distributors which allows for the sale and service of alcoholic beverages. In addition, the University has formulated the following policies governing the sale, service, possession, and consumption of alcoholic beverages on campus.

(b) Guidelines- The sale or service of alcoholic beverages to persons younger than 21 years of age is prohibited.
1. Possession or consumption of alcoholic beverages is prohibited by persons younger than 21 years of age.
2. Possession or consumption of alcoholic beverages in open or unsealed containers is prohibited, except in designated areas or as approved with special events.
3. Individuals are responsible for their actions, regardless of whether or not their mental or physical state may be affected by mind-altering chemicals such as alcohol and other drugs.
4. Student organizations may develop more stringent regulations regarding alcohol use.

(c) Location- The sale of alcoholic beverages on the University campus may be permitted only in licensed areas by licensed on-campus distributors.
1. The sale or service of alcoholic beverages to individuals of legal age will be permitted at other select campus locations for catered functions by properly authorized distributors.
2. The serving, possession or consumption of alcohol by individuals of legal age may be permitted in private residential rooms in the residence halls and other on-campus housing, unless otherwise prohibited by the governing organization. Consumption of alcoholic beverages in public or common areas within on-campus residential units shall follow guidelines provided by their governing organization.

(d) Approval Procedure for Student Groups- Prior approvals for students or student organizations to host an event where alcoholic beverages are present in non-licensed campus locations must be obtained from the associate Vice President for Campus Life or designee.

    1. The following information must be supplied by the student organization and approved by the appropriate University officials, no less than 15 calendar days prior to the event(s). The required form may be obtained from the Office of Student Involvement. These arrangements include but are not limited to:

        a. Sponsoring organization and nature of event;

        b. Date, beginning and ending times and location of event;

        c. Number in attendance and method of registering guests;

        d. Method of designation for those of age/underage;

        e. Contained area where alcohol consumption is permitted;

        f. Type of alcohol along with food and alternative non-alcoholic beverages to be provided;

        g. Method of security including number of campus police officers;

        h. Person to be contacted at event in case of questions or problems.

    2. When an event is properly scheduled to take place in a location for which a campus concession holds a license, alcoholic beverages are to be sold through the concession and their license. Groups or organizations that seek to sell beer or wine along with a non-alcoholic choice at other locations on campus must obtain approval to secure a beer or wine license from the Director of Business Services prior to making application for the license. With approval, the license is then to be obtained by the organization from the Alcoholic Beverages and Tobacco Division of the Department of Business Regulations.

**(3) Student Organizations**

(a) Active registered student organizations must secure in writing permission to serve or consume alcoholic beverages on property owned or operated by the University of Central Florida for the purpose of engaging in any activity to benefit either their own organization directly, or a program that their organization may sponsor, as follows:

    1. Student Union and inside the Pegasus Circle - Director of the Student Union or designee

    2. Outdoor area immediately adjacent to any building - officially designated building manager for that facility

    3. Other outdoor open spaces on the campus - designated sponsors, i.e. Lake Claire - Director of the Recreation and Wellness Center or designee.

    4. Inside any building - officially designated building manager for that facility

(b) Permission by active registered student organizations to use any space on each regional campus or its host institution's campus for the purpose of providing or consuming alcoholic beverages must be secured in writing in advance by the Director of Campus Life on each regional campus.

**(4) Drug/Alcohol Counseling, Treatment, or Rehabilitation and/or Re-entry Programs Available to UCF Student and Employees**

Substance Use Disorders Prevention, Treatment & Recovery Services are available at the UCF Student Health Center.  A variety of health promotion services, including education, assessment for substance use disorders, interventions, treatment and recovery support are provided to UCF students by clinicians at Student Health Services. Confidential screening and assessment is available for students who are interested in feedback regarding risk and protective factors associated with their self-reported substance use.

Student Health partners with other campus and community entities to support services that encourage individuals and student organizations to make safer, responsible choices that enhance their personal and academic success at UCF.

### Applicable Legal Sanctions Under Federal, State and Local Law for the Unlawful Possession or Distribution of Illicit Drugs and Alcohol

(a)     In the U.S. Department of Justice, Drug Enforcement Agency 1989 edition of Drugs and Abuse the following statement is provided regarding applicable legal sanctions under federal law for the unlawful possession or distribution of illicit drugs. "The foundation of the federal fight against drugs is Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, commonly known as the Controlled Substance Act (CSA). The basic Provisions of that law were strengthened by the Congress in 1984 and again with the Anti-Drug Abuse Act of 1986. The CSA provides penalties for unlawful manufacturing, distribution, and dispensing of controlled substances. The penalties are basically determined by the schedule of the drug or other substance, and sometime are specified by drug name, as in the case of marijuana. As the statute has been amended since its initial passage in 1970, the penalties have been altered by Congress." Florida laws (directed to discourage persons from driving under the influence of drugs or alcohol) have severe penalties including mandatory minimum incarceration sentences. Other sanctions include:

- Suspension or revocation of driver's license;
- Suspension of vehicle registration and return of license plates, in the case of a multiple offender;
- Mandatory blood testing to determine alcohol or drugs levels; and
- Mandated assessment and counseling, and fines.

**(5)     Biennial Review by UCF of its Drug-Free Workplace/Drug-Free School Policy Compliance**

The Division of Student Development and Enrollment Services and Human Resources office will review, on a biennial basis, the effectiveness of the programs stated in its Drug-Free Workplace/Drug-Free Schools Policy Statement and will implement changes to the programs if they are needed in accordance with the Drug-Free Schools and Communities Act amendments of 1989 (Public law 101-226). This review will also be conducted to ensure that the disciplinary sanctions stated in the UCF Policy Statement are consistently enforced.

## Office of Student Involvement

**(1) Student Activities and Organizations**

The University supports a variety of student organizations as a belief in their co-curricular value, their role in the general education of students, and their being an asset to the University community. Opportunities for student involvement in student organizations include student government, academic, honorary, athletics, religious, special interests, cultural, international and service groups. Student organizations play an important role in the total University life and must, therefore, exercise judgment and responsibility in the planning and implementation of their activities. This judgment and responsibility extends to individual members and officers of organizations. Organizations and individuals must also observe certain regulations for rational and effective operation in the University community.

    (a)    Student Organizations

        1.    Benefits of Involvement

The University of Central Florida (UCF) recognizes the importance of active and effective student organizations. Research clearly shows that those students who choose to become involved in some form of organized activity do better academically, persist through graduation, and gain valuable career related and life skills, and experience greater personal development when compared to those students who choose not to get involved. These benefits are even more enhanced for those students who take on leadership roles within student organizations.

        2.    The Ability to Organize

The University encourages students to organize themselves and to pursue personal and/or professional interests. Further, the University supports the choice to form and affiliate with an organization and strives to remove administrative barriers that would hinder such involvement.

        3.    University Oversight

The University has the responsibility to exercise appropriate oversight over student organizations and their related activities. This includes the official registration of all student organizations through the Office of Student Involvement as well as oversight for the appropriate time, place and manner of all activities, events, etc. Policies and procedures related to the conduct of student organizations are presented below.

**(2)    Approval and Registration of Student Organizations**

    **(a)    New Student Oganization Registration**

Any student association, group, or organization other than the Student Government Association is eligible for active registration as a registered student organization. Approval and registration is permitted and completed upon the recommendation of the Student Government Association, the review and concurrence of the Office of Student Involvement, compliance with all registration requirements and the approval of the Associate Vice President for Student Development and Enrollment Services or designee. In order to comply with the University's commitment to non-discrimination, student organizations shall not discriminate in membership or leadership on the basis of race, color, religion, sex, national origin, age, ability,

marital status, sexual orientation, gender identity, gender expression, genetic information, or veteran status.  Social fraternities and sororities permitted to do so by Title IX of the Educational Amendments of 1972 may restrict membership on the basis of sex and will not be denied registration on that basis.  Student organizations whose primary purpose or mission is religious which adopt eligibility criteria for leadership positions based on religious beliefs will not be denied registration on that basis.

1.      Registration Process

To be considered for approval and registration, a student organization must submit to the Office of Student Involvement a list of UCF student members and their UCFID numbers, a list of all officers and their UCFID numbers, the signature of two officers and the faculty/staff advisor(s),  the organization's constitution and completion of officer training (minimum two officers).  Proposed student organizations must have a minimum of twelve UCF student members, exceptions to this rule can be requested and approved by the director of the Office of Student Involvement or designee for Regional Campus Organizations, College of Medicine Organizations, Organizations affiliated with a National Governing Body, and Organizations classified as Graduate.  Exceptions to this rule can be requested and approved by the director of the Office of Student Involvement or designee for Regional Campus Organizations, College of Medicine Organizations, Organizations affiliated with a National Governing Body, and Organizations classified as Graduate.  A proposed student organization, with a mission/purpose that appears to duplicate that of an existing organization, may not be approved or recognized. No student organization may be set up so that any individual benefits monetarily from its existence.

2.      Privileges of Registration

Student organizations registered by the University may be granted the following privileges:

a.      The privilege to use University facilities depending on availability, program and guidelines;

b.      The privilege to request Student Government Association activity and

service fees provided said organization adheres to the Student Body Constitution, the Student Body Statutes, and all Student Government financial regulations;

c.      The privilege to establish dues and sponsor money-raising projects;

d.      The privilege to use the University's name as part of the organization's name as per Organizational Rules of Conduct;

e.      The privilege to invite guest speakers to campus;

f.      The privilege to grant awards and honors to organization members.

g.      The privilege of access to campus for recruiting, fundraising, and publicity;

h.      The privilege of a free organizational website;

i.      The privilege of access to resources provided by university departments and offices;

j.      The privilege to apply for cubicle and storage space on campus;

k.    The privilege to program with SGA agencies;
l.    The privilege to participate, as a group, in University-sponsored events

3.    In seeking, securing, and maintaining the privilege to be registered, each student organization must agree in writing to abide by all university policies, procedures, and regulations and to hold harmless the University for any actions or activities of the organization. Approval and registration of student organizations by the University shall not imply support for any student organization's purpose, philosophy or activities. While faculty and staff members of the University serve in advisory capacities to student organizations, it is presumed that students of legal adult age are adults, and therefore, make and are accountable for their decisions and behaviors as individuals and as members of the organization. The University will not assume any legal liability for any student organization's activities per Florida Administrative Code.

**(b)    Re-registration and**
Organizations which have been approved and wish to maintain registion with the Office of Student Involvement shall re-register and complete officer training annualy, based on the date of the oranization's last registration.   In addition organizations are required to re-register within 10 school days of any change of information for the organization (e.g. elections, officer change, advisor change).. The report must include a current listing of the organization's membership and officers, the signature of at least two current officers and the faculty/staff advisor(s), and the organization's contact information.

Complete membership and officer lists should be made available to the Office of Student Involvement upon request.  Should an organization fail to register each fiscal year (July 1st through June 30), by attending Orientation and submitting an Update Form, that organization shall be considered inactive.

**(c)    Inactive Organizations**
Organizations that fail to re-register with in 15 months of their  last registration or fail to meet any of the other requirements listed above will be considered inactive. Inactive organizations may only be reactivated by following the aforementioned registration process.

**(d)    Constitutions**
Changes made to an organization's existing constitution must be submitted to and approved by the Office of Student Involvement in order to take effect. Organization are required to follow their current contsitutions in implementing any revisions

**(3)    Funds and Expenditures**
Complete financial statements shall be made available to the Office of Student Involvement upon request. Registered organizations may receive operating and programming funds from Student Government Association through an application process. All approved Student Government Association funding will be disbursed and expended through the Activity and Service Fee Business Office. Student organizations receiving funds must comply with Student Government, Activity and Service Fee Business Office, and Office of Finance and Accounting Guidelines.  In the event an organization is inactive, organizational funds shall be

distributed as per its constitution, but cannot be distributed to an individual or other student organization.

**(4)** **Membership**

Membership in any student organization is limited to:

(a)     Any UCF student who is paying activity and service fees and is currently or continuously enrolled with the University of Central Florida.

(b)     Any Valencia College Downtown student that meets it's institution's eligibility for student organization membership, as long as the organization's constitution, bylaw or National Governing documents does not prohibit it.

Organizational membership requirements must also be satisfied. UCF employees may be non-voting members if the organization's national constitution and by-laws allow for it.  In order to comply with the University's commitment to non-discrimination, all students who enroll at the University will be assured equal access to educational programs and related opportunities, including student organizations and related programming, without regard to race, color, religion, sex, national origin, age, ability, marital status, sexual orientation, gender identity, gender expression, and veteran status

*Title IX of the Educational Amendments of 1972 makes an exception for social fraternities and sororities with regard to sex for membership criteria.*

**(5)** **Student Eligibility for Leadership and Officer Positions**

(a)     Registered Student Organizations may not discriminate in membership or in officer positions on the basis of race, color, sex, national origin, age, ability, marital status, sexual orientation, gender identity, gender expression, genetic information, or veteran status.  However, Student Organizations whose primary purpose or mission is religious may adopt eligibility criteria for officer positions which are consistent with those beliefs.

(b)     The University has established the following minimum requirements for student leadership and officer positions. Such positions may be elected or appointed and shall include without limitation, only as the University deems appropriate in its sole discretion, student government officials, officers of active registered student organizations, members of University department- sponsored groups, and members of University committees. Student leadership and officer positions which require current enrollment in a specific academic program must fulfill the academic requirements of the program in maintaining satisfactory academic progress towards degree completion as determined by the University Registrar. These minimum requirements may be reviewed for waiver only under extraordinary circumstances as deemed appropriate by the University in its sole discretion.

1.     During fall and spring semesters, a student leader must be currently enrolled as an activity and service fee-paying half-time student (currently defined as at least six (6) credit hours as an undergraduate degree- seeking student or a post-baccalaureate student, or at least five (5) credit hours in a graduate degree- seeking program or at least three (3) credit hours if registered for dissertation or thesis hours). The student is not required to be enrolled during summer term; however, the student must be continuously enrolled for the minimum number of hours stated above during the preceding spring semester and following fall semester. Exceptions shall be made, upon appeal, for students in their last semester prior to graduation.

2.　A student leader must have a minimum institutional grade point average for their current academic career (i.e., undergraduate or graduate). This is a grade point average of 2.5 for Undergraduate Students and 3.0 for Post-Baccalaureate or Graduate Students, for all hours earned: a. toward UCF classes (i.e., UCF Cumulative GPA), or b. at a previous educational institution, if the student is in their first semester (within their current academic career) at UCF.

3.　A student leader must be in good academic and disciplinary standing, defined as not being on academic or disciplinary probation.

4.　A student leader must be free of financial or disciplinary holds on University records.  Upon notification of ineligibility, students have two (2) weeks to gain eligibility before removal from leadership position.  Students who do not meet the above minimum requirements may submit a written appeal to the Eligibility Appeals Board through the Office of Student Involvement within 2 weeks from the first day of being alerted of their eligibility delinquency by the Office of Student Involvement. The appeal should address the causes for ineligibility and reasons for believing that the problems have been resolved.  The Eligibility Appeals Board is made up of students (3) appointed by the Student Body President and faculty (1) and staff (2) appointed by the Director of the OSC. The board elects their chairperson, who votes only in case of a tie. The Eligibility Appeals Board shall resolve the issue within four weeks. The Eligibility Appeals Board is the deciding body that, upon hearing the appeal may waive the eligibility requirements for that semester. Students may only  be granted one appeal per criterion every two consecutive regular semesters (fall and spring).

5.　Valencia College Downtown Students that are a members of an organization must student that meets it's institution's eligibility for student organization leadership positions.

The Eligibility Appeals Board may review the academic record of students in those positions of leadership or responsibility. The decisions of the Eligibility Appeals Board are final.

The Student Government Association has established eligibility requirements for selected positions within student government. These requirements and governing procedures are presented in their election and eligibility statutes, which are made available to any student upon request, as well as to all candidates filing for office.

**(6)　Faculty or Staff Advisor**
All organizations shall have a contracted UCF employee, as defined by Human Resources, faculty or staff advisor in order to be considered for approval and registration. The advisor has no voting rights in organizational decisions. Additionally, a faculty or staff advisor is required in order to receive Student Government Association funding.

**(7)　Event Management**
(a)　Event Management for Events
1.　　Potentially Hazardous Events/SAFE Form

    a.      This regulation applies to the holding of potentially hazardous events on university controlled property. Excepted from this regulation are official events which are scheduled annually in university publications (classes, orientation, registration, etc.).

    b.      The provisions of this regulation are in addition to the provisions of other University regulations and university policies related to campus events.

    c.      A potentially hazardous event is defined as any activity that could reasonably be expected to create a risk of harm to persons or of defacement or damage to public or private property. Examples of potentially hazardous events include, but are not limited to: bonfires; lighting of fireworks; events involving helicopters or other aircraft; motor vehicle races; gatherings in excess of 400 persons, including unregistered campus athletic events; marches (including any organized walks or runs); parades; outdoor events involving animals; any event involving the distribution of alcohol; and any event on Memory Mall.

    d.      Any event that meets the above criteria would require the organization to complete a SAFE Form at least 15 days prior to event date.

    e.      Full regulation can be found at regulations.ucf.edu

        i.      UCF-4.0292 Potentially Hazardous Events

(b)      Responsibility

The sponsoring organization is responsible for implementation of this procedure.

    1.      Loud Speakers and Sound Equipment

Active registered organizations must secure in writing permission to use amplified sound on  campus (including Research Pavilion) for the purpose of engaging in any activity to benefit either their own organization directly or a program that their organization may sponsor, as follows:

    a.      Student Union and inside the Pegasus Circle - Director of the Student Union or designee (see Student Union Amplified Sound Policy);

    b.      Outdoor area immediately adjacent to any building—officially designated building manager for that facility;

    c.      Other outdoor open spaces on the campus - designated sponsors, i.e., Lake Claire - Director of the Recreation and Wellness Center;

    d.      Inside any building - officially designated building manager for that facility.

    e.      Permission by active registered student organizations to use any space on each regional campus or its host institution's campus for the purpose of such fundraising must be secured in writing in advance from the Director of Campus Life on each regional campus.  All registered student events must be in compliance with local, state, and federal law.

    2.      Admission Fees

Student organizations wishing to charge admission to an event should receive prior approval from the Office of Student Involvement. No admission fees may be charged to students for activity and service fee funded events pursuant to applicable Florida statutes.

3. Contracts

No student is permitted to represent the University as a signatory on contracts.

4. Student Organization Contests, Campaigns, or Petitions

Any student organization sponsoring a fundraising campaign, contest, competition or petition must register with the Office of Student Involvement. This does not pertain to Student Government Association elections.

**(8)** **Campus Demonstrations and Other Outdoor Events**

(a) Subject to the limitations of this and related regulations, outdoor areas of the the University campus may be used for demonstrations and other exercises of free speech and assembly.  Such use must not interferewith the conduct of classes or University activites and must not infringe on the rights of.  All general requirements for use of the University buildings and outdoor areas of campusset forth in University regulations UCF-4.029, UCF-4.0292, UCF-4.0293, and UCF-4.0294 apply to uses of University grounds under this regulation.

(b) No campus buildings, other indoor facilities, or athletic or recreational facilities may be used for demonstrations or assemblies unless specifically permitted in writing by the campus authority specifically responsible for the building or facility.

(c) University organizations and University-related organizations may organize, conduct, or participate in demonstrations and other exercises of free speech and assembly on University grounds, except for non-common outdoor areas.All information regarding most up-to-date policies concerning University buildings and outdoor areas of campus are set forth in University Regulations UCF-4.029, UCF-4.0292, UCF-4.0293, and UCF-4.0294.

(d) Non-university organizations and persons may conduct spontaneous expressive activities, and other exercises of free speech and assembly, on outdoor areas of the University campus that are otherwise accessible to the campus community for common use, but must abide by the reasonable time, place, and manner restrictions set forth in this and related University regulations (see also University Regulations UCF-4.029, 4.0292, and 4.0294), including that such use be lawful and non-disruptive. A person making use of the outdoor areas of the University's campus for expressive activities does not have the right to limit access to those outdoor areas or to conduct commercial activities in conjunction with the person's expressive activitiesCampus demonstrations that will take the form of or involve a parade or march on campus must follow the requirements of Regulation UCF-4.0292, "Potentially Hazardous Events."  This is required so that necessary safety precautions can be taken, particularly where the parade or march route will cross lanes of vehicular or pedestrian traffic.

**(9)** **Advertising and Signs**

Exterior signage is allowed for students sponsored activities, clubs and events to promote student participation.

(a)     Student organizations may use exterior signs to advertise activities, clubs, and events three times per semester.

(b)     All signs must be registered and properly "stickered". Stickers may be applied for at the Office of Student Involvement and are issued by the director or his/her designee. Stickers may only be issued for 5 days increments, with provisions for renewal.

(c)     A maximum of three wood signs may be posted for advertising an activity, club or event.

(d)     All signs must be removed by the posting organization within 24 hours after the registered event or immediately after the fifth day if the signs are not renewed. Signs not removed within the specified timeframe will be removed by Physical Plant and a $50.00 per sign charge levied. The sign will be released after the fine has been paid at the "Cashiers" office, and credited to the appropriate account.

(e)     The placement of printed materials on vehicles, light posts, benches, trees and exterior doors are not permitted.

(f)     Signs must adhere to the following standards:
    1.    The maximum size of a sign is 4 feet by 8 feet.
    2.    Signs must be free standing and not staked into the ground or hung, fastened or attached to shrubbery, trees, and light posts. Signs are not permitted in any street median.
    3.    All signage must be placed in a minimum of 50 feet from any motor vehicle intersection.
    4.    Signs can only be placed in locations designated on the UCF Signage Location Map.
    5.    Any signs in violation of any of the above stated regulations will be removed by Facilities Operations and a $50.00 per sign charge levied. The sign will be released after the fine has been paid at the "Cashiers" office, and credited to Account # 2421000, object code #499000.

(g)     These posting rules do not apply to Student Government elections.

**Student Union**

**(1) In-line Skating, Skateboarding, and Scooters Procedure**

    (a) Each building of the University will have properly posted signs prohibiting in-line skating, skateboarding, and scooters within or adjacent to building structures. The building manager is responsible for posting the signs with the assistance of the Physical Plant.

    (b) Any staff or faculty member shall discourage anyone from in-line skating, skateboarding, or using scooters within the confines of each building or adjacent to the property, the disruptive individual will be referred to the Division of Student Development and Enrollment Services or Human Resources as applicable. In the case of a person not affiliated with the University, University Police will issue a Trespass Warning according to policy. The University Police will assist the reporting party as necessary.

    (c) This procedure applies to all hallways within University buildings and stairways and entranceways adjacent to the exterior of each building.

    (d) In-line skating, skateboarding, and scooters are prohibited on the roadways and in parking garages/lots.

    (e) The University Police Department is responsible for enforcing this procedure.

    (f) Scooters used by persons with disabilities to aid in their mobility are exempt from this policy.

**(2) Solicitation on Campus**

    (a) General Policy

        1. All business entities and all natural and legal persons (hereinafter referred to as "Vendor(s)") wishing to solicit business or otherwise engage in any form of commerce on the Orlando campus of the University of Central Florida ("UCF") must coordinate such activities through UCF's Director of Student Union or designee. The conduct of all such activities shall be confined to that area of campus situated within the boundaries of Pegasus Circle from Centaurus Drive to Aquarius Agora Drive.

        2. Vendors wishing to utilize the free speech area must secure permission from the Director of Office of Student Involvement or designee.

    (b) Procedure

    Vendors must comply with the following guidelines to reserve and allocate space for the conduct of solicitation: Market Day Guidelines

        1. Contact UCF's Student Union Event Services to request space. Space is limited. Reservations must be made in advance at UCF's Student Union Office, Room 312. All fees for the reservation of space must be paid at the time the reservation is made. (See Student Union Event Services for current fee schedule.) UCF reserves the right to require any Vendor to submit proof of insurance coverage for comprehensive and general liability insurance in amounts deemed acceptable by UCF.

        2. Placement of Vendors within the bounds of Pegasus Circle will be at the sole discretion of UCF's Student Union Event Services staff.

3. Vending space will be clearly designated for Vendors upon their arrival at set up time. Displays may not extend beyond the allotted space.

4. UCF's Student Union reserves the right to restrict the participation of any Vendor or Vendors.

5. If a Vendor is not set up by 10:00 a.m., UCF may, but is not obligated to, remove the Vendor's equipment, if any, and will consider such Vendor a NO SHOW. This information will be noted in Vendor's file and could impact future reservations.

6. The market will end promptly at 5:00 p.m. UCF's Student Union patio will be open to load merchandise and equipment from 5:00 p.m. - 6:00 p.m. Vendors must completely vacate UCF's Student Union patio by 6:00 p.m.

7. In case of inclement weather, the market may be canceled at the sole discretion of Student Union staff. If the market is canceled, reservation fees will be refunded to UCF's Vendors who paid the fees. No prorated refunds will be issued if the market is held and inclement weather occurs during the day.

8. Vendors are to purchase a parking pass on the days they will be on campus. Parking is available in Lot T-600 after the vendor unloads the materials and merchandise at UCF's Student Union.

9. UCF is not responsible for any loss, theft, or damage to Vendors' equipment or goods. Vendors are responsible for the security of their property.

10. Vendors must adhere to the requirements established by UCF's Student Union for the safety of the event and any rules as may be mandated by UCF's Department of Environmental Health and Safety.

11. UCF shall not tolerate the placement of tables, displays, tents, or other activities for solicitation purposes outside Pegasus Circle. UCF's Police will be responsible for monitoring all such activities outside Pegasus Circle. Those violating this policy will be instructed to leave immediately and may be issued a no-trespass warning by UCF Police.

(c) Campus Locations for Solicitation

1. Posted materials should not be fastened to or hung from shrubbery or trees; drawn, taped, painted or otherwise displayed on sidewalks, walls, glass and painted surfaces, or building exteriors. No holes may be dug into the ground (except for wood stakes) nor nails or tacks hammered into trees.

2. Solicitors and tradesmen, including students, faculty and other University personnel, are prohibited from conducting business transactions with individuals or organizations on campus unless a permit has been issued. Permits to conduct such business with students and student organizations may be issued by the Director of the Student Union or for all others by the Director of Business Services.

(d) Exception to Policy

Officially registered, active student organizations of UCF desiring an exception to the above policy must secure, in advance, the written permission of either the

Director of the Student Union or other individual listed below to use, free of charge, space on UCF property to conduct a solicitation to benefit only the student organization. No person or entity outside of the student organization shall participate in the solicitation or receive any financial or other benefit or thing of value from the solicitation. Examples of such solicitations include but are not limited to, bake sales and similar fundraising activities, distribution of literature, speakers, giveaway promotions, or signing of petitions. On UCF's Orlando campus, permission must be secured as follows:

1. Student Union and inside the Pegasus Circle and Ferrell Commons Courtyards from the Director of the Student Union or designee.
2. Residence Halls and outside areas immediately adjacent thereto - from the Director of Housing or designee.
3. Greek Park area from the Director of Office of Fraternity and Sorority Life or designee.
4. UCF Arena and areas immediately adjacent thereto - from the Director of the UCF Arena or designee.
5. Inside any other building and outside areas immediately adjacent thereto - from the officially designated building manager of that facility or designee (identification of the building manager for a particular facility may be obtained from the Office of the Vice President for Administration and Finance.
6. Recreation and Wellness Center and Intramural Sports area – from the Director of Recreation and Wellness Center.

On the regional campuses or their host institutions, permission to use space to conduct solicitations must be secured from the Director of Campus Life on that regional campus and, as may be required, from the appropriate official of that host institution.

Failure of active student organizations to comply with this solicitation policy and procedure may result in student disciplinary action taken against such organizations, including the loss of the privilege to engage in solicitations on UCF property, the loss of the privilege to register as a student organization, as well as other disciplinary action.

(e)     Responsibility the Associate Vice President for SDES or designee shall be responsible for implementing this policy.

# EXHIBIT D

**UCF-5.008     Rules of Conduct**

The following defined and described actions include, but are not limited to, conduct for which disciplinary action may be taken at the University of Central Florida.  Students are responsible for the observation of all University policies and regulations. Each student is expected to abide by these rules of conduct, and administrators are expected to enforce them.  These Rules of Conduct should be read broadly and are not designed to define prohibited conduct in exhaustive terms.  Additional rules and regulations may be revised during the year; announcements will be made on adoption of the changes or additions.  The right of all students to seek knowledge, debate ideas, form opinions, and freely express their ideas is fully recognized by the University of Central Florida. The Rules of Conduct apply to student conduct and will not be used to impose discipline for the lawful expression of ideas.  Students are prohibited from engaging in:

(1)  Academic Misconduct

    (a)  Unauthorized assistance: Using or attempting to use unauthorized materials, information or study aids in any academic exercise unless specifically authorized by the instructor of record.  The unauthorized possession of examination or course related material also constitutes cheating.

    (b)  Communication to another through written, visual, electronic, or oral means. The presentation of material which has not been studied or learned, but rather was obtained through someone else's efforts and used as part of an examination, course assignment or project.

    (c)  Commercial Use of Academic Material: Selling of course material to another person, student, and/or uploading course material to a third party vendor without authorization or without the express written permission of the University and the Instructor. Course materials include but not limited to class notes, Instructor's power points, tests, quizzes, labs, instruction sheets, homework, study guides, and handouts.

    (d)  Falsifying or misrepresenting the student's own academic work.

    (e)   Plagiarism: Whereby another's work is used or appropriated without any indication of the source, thereby attempting to convey the impression that such work is the student's own.

    (f)  Multiple Submissions: Submitting the same academic work for credit more than once without the express written permission of the instructor.

(g)     Any student who knowingly helps another violate academic behavior standards is also in violation of the standards.

(h)     Soliciting assistance with academic coursework and/or degree requirements.  The solicitation of assistance with an assignment, lab, quiz, test, paper, etc., without authorization of the instructor of record or designee is prohibited.  This includes but is not limited to asking for answers to a quiz, trading answers, or offering to pay another to complete an assignment.  It is considered Academic Misconduct to solicit assistance with academic coursework and/or degree requirements, even if the solicitation did not yield actual assistance (for example, if there was no response to the solicitation).

(2)  Possessing and/or Providing False and Misleading Information and/or Falsification of University Records

(a)     Withholding related information, or furnishing false or misleading information (oral or written) to University officials, university and non-university law enforcement officers, faculty or staff.

(b)     Possession, use, or attempted use of any form of fraudulent identification.

(c)     Forgery, alteration or misuse of any University document, material, file, record or instrument of identification.

(d)     Deliberately and purposefully providing false or misleading verbal or written information about another person.

(e)     Falsification, distortion, or misrepresentation of information during an investigation, the Student Conduct Review Process, including knowingly initiating a false complaint.

(3)  Disruptive Conduct

(a)     Any act that impairs, interferes with, or obstructs the orderly conduct, processes, and functions of the University or any part thereof or the rights of one or more individuals.

(b)     Any act which deliberately impedes or interferes with the normal flow of pedestrian and vehicular traffic.

(c)     Any act which intentionally interferes with the election processes of any University registered student organization or sponsored student group.

(d)     Misuse of any University safety equipment, firefighting equipment, or fire alarms.

(e)     A false report of an explosive or incendiary device, which constitutes a threat or bomb scare.

(f)     Breach of peace: an act, which aids, abets, or procures another person to breach the peace on the University premises or at University sponsored/related functions.

(g)     Failure to comply with oral or written instruction from duly authorized University officials (i.e. faculty, staff, administration, residence hall staff) acting within the scope of their job duties or law enforcement officers acting in the performance of their duties, including failure to identify oneself to these persons when requested to do so.

(h)     Failure to produce identification upon request by a University official (i.e. faculty, staff, administration, residence hall staff), acting within the scope of their job duties or law enforcement officers acting in the performance of their duties.

(i)     Hindering or interfering with the student conduct review process by failing to obey the notice from a university official to appear for a student conduct meeting or hearing; and/or attempting to discourage an individual's proper participating in, or use of, the student conduct review process.

(j)     Violation of any other University regulation or policy as described in the UCF Regulations, UCF Policies and Procedures, or University department publicized policy.

(k)     Failure to comply with applicable law and University regulations and procedures for solicitation and fundraising activities on campus.

(4)  Harmful Behavior

(a)     Physical harm or threat of physical harm to any person. This harmful behavior policy may not apply in those instances where it is found that a student is acting in self-defense.

(b)     Verbal, digital, or written abuse, threats, intimidation, coercion and/or other conduct that endangers the health, safety, or wellbeing of others, or which would place a reasonable person in fear of bodily injury or death.  This definition, however, shall not be interpreted to abridge the rights of the University community to freedom of expression protected by the First Amendment of the United States Constitution and any other applicable law.

(c)     Discriminatory Harassment: Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon a protected class as defined in University Policy 2-004, or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting

the description of either Hostile Environment Harassment or Quid Pro Quo Harassment, as defined in University Policy 2-004 Prohibition of Discrimination, Harassment, and Related Interpersonal Violence.

(d)     Bullying: Defined as behavior of any sort (including communicative behavior) directed at another, that is severe, pervasive, or persistent, and is of a nature that would cause a reasonable person or group in the target's position substantial emotional distress and undermine his or her ability to work, study, or participate in University life or regular activities, or which would place a reasonable person in fear of injury or death.

(e)     Stalking: defined as conduct not of a sexual nature that is repeated, unwanted conduct toward or contact with another person that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress. Such conduct is direct, indirect, or through a third party using any type of action, method, or means.  Cyber stalking is also included in this definition.

(f)     Invasion of Privacy and Unauthorized Recording.

1.     Making, using, disclosing or distributing a recording of a person in a location or situation in which that person has a reasonable expectation of privacy and is unaware of the recording or does not consent to it; and any other conduct that constitutes an invasion of the privacy of another person under applicable laws and regulations. Such conduct includes, without limitation, unauthorized recording of personal conversations, images, meetings or activities.

2.     Unauthorized recording of a class or of organizational or University meetings, where there exists a legal expectation of privacy, and any use, disclosure, or distribution of any such recording.

3.     Engaging in acts of voyeurism, including but not limited to peeping or surreptitiously recording another when there is a reasonable expectation of privacy.

4.     Any notice, consent or other requirement under applicable laws and regulations must be fulfilled in connection with authorizing, making, using, disclosing or distributing any recording, where there is a legal expectation of privacy.

(g)     Retaliation against or harassment of complainant(s), other person(s) alleging misconduct, or anyone who participates in an investigation.

(h)      Condoning or encouraging acts of harmful behavior as defined above or failing to intervene during an act of harmful behavior while it is occurring.

(5)  Sex-Based Misconduct (Non-Title IX Sexual Harassment)

(a)      Sexual Assault:  Sexual assault means sexual contact without consent.

(b)      Sexual Harassment. Sexual harassment means any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present. Sexual Harassment may include inappropriate touching, acts of sexual violence, suggestive comments and public display of pornographic or suggestive calendars, posters, or signs where such images are not connected to any academic purpose.  A single incident of sexual contact without consent may be sufficiently severe to constitute sexual harassment.

(c)      Gender-Based Harassment: Gender-based harassment is discriminatory harassment that is based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions for Discriminatory Harassment as defined in UCF Policy 2-004 are present.

(d)      Obscene or Indecent Behavior: Exposure of one's body in such a manner that another party reasonably could be offended or to display sexual behavior which another person reasonably finds offensive.

(e)      Voyeurism: Trespass, spying, or eavesdropping for the purpose of sexual gratification.

(f)      Solicitation of a Minor: soliciting sexual acts from a minor by oral, written, or electronic means.

(g)      Child Pornography: possessing, producing or the dissemination of child pornography.

(h)      Relationship Violence: Relationship Violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. Relationship Violence may include sexual assault, stalking, and physical assault. Relationship Violence may involve a pattern of behavior used to establish power and control over another person through fear and intimidation or may involve one-time conduct. A

pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional, and/or physical and may be directed towards the former partner, their property, or other individuals. Examples of Relationship Violence may include, but are not limited to: slapping; pulling hair; punching; damaging another person's property; driving recklessly to scare someone; name calling; humiliating another person in public; harassment directed toward a current or former partner or spouse; and/or threats of abuse, such as threatening to hit, harm, or use a weapon on another (whether Complainant or acquaintance, friend, or family member of the Complainant), or other forms of verbal threats.

(i)     Stalking: Stalking under this provision occurs where a person engages in a course of conduct of a sexual nature that is directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress. A "course of conduct" is two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, phones, texts, or other similar devices or forms of contact. Stalking may include, but is not limited to: non-consensual communications (face to face, telephone, e-mail); threatening or obscene gestures; surveillance/following/pursuit; showing up outside the targeted individual's classroom or workplace; sending gifts and/or notes (romantic, bizarre, sinister, or perverted); and/or making threats.

(j)     Sexual Exploitation: Sexual Exploitation is purposely or knowingly doing or attempting to do any of the following:

1.      Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;

2.      Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;

3. Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);

4. Subjecting another person to human trafficking; or

5. Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

(k) Any attempted acts of sex-based misconduct are also violations of this policy.

(6) Title IX Sexual Harassment

(a) Title IX Sexual Harassment is defined as any conduct on the basis of sex which occurs (i) on or after August 14, 2020; (ii) against a person located in the United States; and (iii) in or as part of the University's education program or activity, which satisfies one or more of the following:

1. Unwelcome conduct that a reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity;

2. Sexual assault (as defined in the Clery Act), which includes any sexual contact that occurs without consent (consent and sexual contact are defined in UCF-5.006(3));

3. Dating violence (as defined in the Violence Against Women Act (VAWA) amendments to the Clery Act), which includes any act of violence or threatened act of violence committed by a person: (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (B) where the existence of such a relationship shall be determined based on a consideration of the length of the relationship; the type of relationship; and the frequency of interaction between the persons involved in the relationship.

4. Domestic violence (as defined in the VAWA amendments to the Clery Act), which includes any felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under Florida statute or by any other

person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of Florida.

5.      Stalking (as defined in the VAWA amendments to the Clery Act), meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to (a) fear for their safety or the safety of others; or (b) suffer substantial emotional distress.

(b)      Retaliation, including but not limited to conduct meant to intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX of the Education Amendments of 1972 or its implementing regulations or UCF Policy 2-012.

(7) Larceny/Property Damage

(a)      Unauthorized use, possession, or theft of property or service. Such property may be personal or public.

(b)      Damaging or defacing of University property or the property of another person whether or not it is on University premises.

(c)      Tampering with or damaging fire safety equipment.

(8) Hazing

(a)      Hazing is any action or situation that recklessly or intentionally endangers the mental or physical health and/or safety of a student for purposes including but not limited to: initiation, admission into, association, affiliation with, or the perpetuation or furtherance of a tradition or ritual of any registered student organization or other group whether or not officially recognized by the University operating under registration with the University or any student group operating with official sanction of the University. Hazing in violation of Florida Statutes may result in felony charges.  A student can be found to have committed an act of hazing whether the student is a prospective, current, or former member of the organization or group.  The actions of active, associate, new and/or prospective members, former members, or alumni of a student organization or group may be considered hazing under this rule.

(b)      Hazing includes brutality of a physical nature such as whipping, beating, branding, forced calisthenics, exposure to the elements; forced consumption of any food, liquid,

liquor, drug, or other substances; or other forced elements; or other forced activity which could adversely affect the mental or physical health or safety of the individual.

(c)   Hazing includes any activity which could subject the individual to extreme mental stress such as sleep deprivation, forced exclusion from social contact, forced conduct that could result in extreme embarrassment, or any other activity that could adversely affect the mental health or dignity of the individual.

(d)   Hazing includes forcing, pressuring, or coercing, the student into violation of University policies or federal, state, or local law.

(e)   Hazing includes soliciting a person to commit or being actively involved in the planning of any act of hazing as defined above where the act of hazing creates a substantial risk of physical injury or death to the person(s) hazed.

(f)   It is not defense to an allegation of hazing that:

    1.   the consent of the victim had been obtained;

    2.   the conduct or activity that resulted in the death or injury of a person was not part of any official organizational event or otherwise sanctioned or approved by the student organization; or

    3.   the conduct or activity that resulted in the death or injury of a person was not done as a condition of membership into a student organization.

(g)   Hazing does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective.

(9)  Misuse or Unauthorized Use of Facilities and Grounds

(a)   Misuse or unauthorized use of classroom or laboratory facilities, or University property (as defined by University Regulation UCF-4.036).

(b)   Abusing grounds or building structures including, but not limited to ramps, rails, stair sets and entryways by means of recreational cycling, skating, scootering, or other recreational activities or devices as outlined in University Regulation UCF-4.036.

(c)   Unauthorized entry or attempted entry to any University property (as defined by University Regulation UCF-4.036).

(d)   Unauthorized possession, duplication or use of keys to any University property (as defined by University Regulation UCF-4.036).

(10)  Misconduct at University Sponsored/Related Activities

    (a)      Violation of UCF rules of conduct at UCF sponsored related activities shall also be a violation of the golden rule.

    (b)      Violations of a regulation(s) of a host institution sponsored/related activity shall be a violation of the golden rule.

(11)  Controlled Substance and Drug Violations

    (a)      Possessing, consuming, or attempting to possess cannabis in any amount.

    (b)      Cultivating, manufacturing, or attempting to obtain cannabis in any amount.

    (c)      Possessing, consuming, cultivating, manufacturing, or attempting to possess any controlled substances other than cannabis, except as expressly permitted by law.

    (d)      Selling or distributing cannabis or any other controlled substances other than alcohol.

    (e)      Possessing or attempting to possess any drug related paraphernalia.

    (f)      Misconduct under the influence of controlled substance(s) and/or drugs other than alcohol.

NOTE:  Students who receive medical attention due to drug related emergencies and/or students who call for help on behalf of another student who may be experiencing a drug related emergency may be exempt from disciplinary action. Information regarding exemptions under this rule for drug related emergencies can be found in University Regulation UCF-5.007 and the Student Conduct and Academic Integrity website: http://osc.sdes.ucf.edu/medicalemergencies.

(12)  Alcoholic Beverages Violation

    (a)      Possessing or consuming alcoholic beverages, or possessing or using alcohol-related paraphernalia, except as expressly permitted by the law and University Regulations and/or Policies.

    (b)      Selling or distributing alcoholic beverages or alcohol-related paraphernalia, except as expressly permitted by law and University Regulations and/or Policies.

    (c)      Misconduct under the influence of alcohol.

NOTE:  Students who receive medical attention due to alcohol related emergencies and/or students who call for help on behalf of another student who may be experiencing a drug related emergency may be exempt from disciplinary action. Information regarding exemptions under this rule for drug related emergencies can be found in University Regulation UCF-

5.007 and the Student Conduct and Academic Integrity website:
http://osc.sdes.ucf.edu/medicalemergencies.

(13)  Possession of Weapons and/or Dangerous Material

    (a)    The possession, use, or storage of weapons on property owned or controlled by the University or at events sponsored and/or supported by the University is prohibited, except as specifically outlined in University Policy 3-119.1 (Weapons on University Property and at University Events).

    (b)    Possession or use of fireworks of any description, explosives, or chemicals which are disruptive, explosive, or corrosive are prohibited on University premises or at University sponsored/related activities.

(14)  Instigation or Participation in Group Disturbances during Demonstrations, Parades, or Picketing

    (a)    Participation in a demonstration(s), parade(s), or picketing which invades the rights of others, which interferes with the educational function of the University, or which jeopardizes public order and safety.

    (b)    Leading or inciting others to disrupt scheduled and/or normal activities within any campus building or area.

(15)  Misuse of Computing and Telecommunications Resources

    (a)    Theft or other abuse of computer facilities and resources

    (b)    Unauthorized entry into a file, to use, read, or change the contents, or for any other purpose.

    (c)    Unauthorized transfer of a file.

    (d)    Use of another individual's identification and/or password.

    (e)    Use of computing facilities and telecommunications resources to interfere with the work of another student, faculty member or University Official.

    (f)    Use of computing facilities and telecommunications resources to send obscene or abusive messages.

    (g)    Use of computing facilities and telecommunications resources to interfere with normal operation of the University computing system.

    (h)    Use of computing facilities and telecommunications resources in violation of copyright laws.

      (i)      Any violation of the University of Central Florida Use of Information Technology and Resources Policy.

      (j)      Any violation of the University of Central Florida ResNet Acceptable Use Policy.

(16)  Gambling

      (a)      Play in an unlawful game of chance for money or for anything of value on University premises or at any affair sponsored by a student or student organization.

      (b)      Unlawfully sell, barter or dispose of a voucher or any item for participation in a scheme of chance by whatever name on University premises or at any affair sponsored by a student or registered student organization.

      (c)      Wager on a University team or organization in a competition, with a direct influence in the success of the competition.

(17)  University Student Residence Violations.  Violation(s) of any Department of Housing and Residence Life policy, rule or regulation published in hard copy or available electronically via Department of Housing and Residence Life website. A charge under this provision must include a specific citation of which Housing policy or policies the charged student has violated.

(18)  University Wordmark Violations.  Unauthorized use of the official University wordmark, Pegasus, monogram, seal, or other graphic identity symbol.

(19)  Violation of Local, State, and/or Federal Laws.  Violation of any local, state and/or federal law that may result in a felony or misdemeanor.

(20)  Complicity: Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act prohibited by the Rules of Conduct.

*Authority: BOG Regulations 1.001 and 6.0105.  History – Formerly 6C7-5.0042, New 6-18-09, Amended 7-19-12, 9-5-13, 11-20-14, 10-29-15, 7-28-16, 7-20-17, 1-18-18, 7-19-18, 7-18-19, 6-18-20, 10-22-20, 12-3-20.*

# EXHIBIT E

 **UCF Knight News**
@UCFKnightNews

•••

#UCFireHim #UCFProtest | During the protest, UCF President Alexander Cartwright asked about how "we change this institution to be a more inclusive one?"



5.1K views    0:00 / 1:16  🔊 ⤢

7:28 PM · Jun 14, 2020 from UCF Reflection Pond · Twitter for iPhone

# EXHIBIT F



**UCF Knight News**
@UCFKnightNews

•••

#UCFFireHim | During the protest, interim Provost Michael Johnson said he believes students previously filed complaints in the feedback forms of course evaluations, which are designed for faculty to review, and that could be why UCF didn't hear it.



6:20 PM · Jun 14, 2020 from UCF Reflection Pond · Twitter for iPhone

# EXHIBIT G

 **UCF** 😷 ✓
@UCF

···

"Fight with us, not against us."



▶  24.2K views        >> Dr. Butler?        0:01 / 3:48  🔊  ⤢

**A Message from Dr. S. Kent Butler on Addressing Wrongs**

During UCF's student virtual forum, interim chief Equity, Inclusion and Diversity officer spoke from his heart in response to students' requests for swifter change regarding recent racist incidents.

4:52 PM · Jun 4, 2020 · Twitter Media Studio

# EXHIBIT H



UNIVERSITY OF CENTRAL FLORIDA

**Office of the Dean**
**College of Sciences**
12716 Pegasus Dr.,
Orlando, FL 32816

Dr. Charles Negy                                                                                    January 13, 2021

## NOTICE OF INTENT TO TERMINATE

Dear Dr. Negy:

This letter is to notify you of the university's intent to terminate your employment at the close of business on Monday, January 25, 2021, for misconduct. This notice is required under Article/Section 16.4 (b) of the 2019-2021 BOT-UFF Collective Bargaining Agreement (CBA). You were placed on paid administrative leave (PAL) on January 5, 2021, and you will remain on PAL, pending final disposition of this proposed personnel action.

As you know, beginning in June 2020 the university received a high volume of reports regarding your conduct in the classroom. Many of the concerns brought to the university's attention were complaints about discrimination, bias, and unfair treatment of students in the classes you have taught.  The university also heard from persons who were supportive of you and your teaching.  However, based on the reports received, the Office of Institutional Equity (OIE) began an inquiry on June 4, 2020 into the allegations involving your actions and comments toward students. OIE informed you on July 17, 2020 that an investigation would be conducted concerning allegations that you subjected multiple students and employees to discriminatory harassment, engaged in unprofessional conduct, and failed to fulfill your obligations to report a complaint of discrimination to an appropriate university official with the authority to take action.

OIE has completed a report on its investigation. (An electronic copy of that report is provided to you as an attachment to this notice.) OIE's findings include:

- You repeatedly violated Regulation UCF- 3.001 (Non-Discrimination; Affirmative Action) and UCF Policy 2-004.1 (Prohibition of Discrimination, Harassment and Related Interpersonal Violence) by creating a hostile learning environment for your students through discriminatory harassment. Additionally, your conduct in the classroom violated UCF's Employee Code of Conduct.
- You repeatedly violated UCF Policy 2-700.1 (Reporting Misconduct and Protection from Retaliation) by deterring students from filing complaints about your classroom conduct.

- You violated Regulation UCF-3.001 (Non-Discrimination; Affirmative Action Programs) when you failed to report that a student disclosed to you that she had been sexually assaulted by one of your teaching assistants in February 2014. In addition, instead of directing the victim to appropriate university resources, you discouraged her from reporting the incident and advised her to be more conscientious when choosing her friends.
- You violated UCF Policy 2-700.1 (Reporting Misconduct and Protection from Retaliation) and the UCF Employee Code of Conduct (regarding Honesty and Integrity: Our Guiding Principles) by providing false information during OIE's investigation.

Details about each of these findings are too numerous to fully document here; they may be found in OIE's investigative report. Note that none of the findings by OIE are related to your Twitter postings as OIE found they were protected by your First Amendment rights. In addition, some of the complaints about your spoken or written comments to students about sensitive or controversial matters were found to be permissible based on academic freedom.  The university respects your right to exercise academic freedom in making those comments, although that does not mean that your views on such matters and those of the university are the same.

All these findings by OIE are serious. It is very disconcerting that you would provide false information during an investigation. OIE listed nine examples of false information you provided to OIE during its investigation, specifically you:

1. Provided false information with regard to the tenure-related comment about the university being unable to fire you unless you raped a student;
2. Denied having bribed a health clinic representative while in Peru for a UCF study-abroad program;
3. Denied having told students that God does not exist;
4. Denied having told students that minorities never invented anything that impacted society;
5. Denied that you ever used the term "Black privilege" with your students;
6. Denied that you told a male GTA that you hoped a female GTA for whom he was covering some duties was "compensating him but that is none of my [your] business";
7. Denied ever using the term "faggot" in class;
8. Denied discussing the sexual assault allegations against Brett Kavanaugh and related Congressional hearings; and
9. Denied ever discussing cerebral cortices during your class lectures.

The other findings by OIE are related to actions and comments by you that are serious. Incidents like the unreported sexual assault and the hostile learning environment due to discriminatory harassment of students in your classes (i.e., derogatory statements about protected classes including race, religion, sex, and gender identity, as well as unwelcome comments of a sexual nature) were not reported by students as they should have been in large part because again and again you discouraged students from submitting complaints about your conduct. You repeatedly gave students the impression that you were insulated from complaints because of tenure. In other words, your frequent emphasis of your power advantage over your students was a deterrent to their reporting their concerns about your classroom conduct.

According to CBA 16.3, penalties imposed for misconduct depend on the seriousness of the offense(s) and any aggravating or mitigating circumstances. Discriminatory harassment, deterring students from reporting, failing to report a sexual assault, and dishonesty are all serious. Your repeated references to tenure as insulation from consequences for complaints about your actions and comments toward your students is considered by the university to be a significant aggravating circumstance.

Therefore, the university intends to terminate you in accordance with terms and procedures in the CBA. As permitted by CBA 16.7, you are not being provided with six months' notice because the university has determined that your actions, e.g., failing to report and discouraging the report of a sexual assault that was disclosed to you, "jeopardize the safety or welfare of … students."

Effective immediately, you are hereby directed not to return to any UCF campus or to any UCF-occupied space off the main UCF campus without notifying me in advance and receiving my approval. If I approve of your return, an escort will be arranged for you. From now until the end of your PAL, you are forbidden to contact any current UCF employees (except me and anyone I approve for you to contact) or students personally or via telephone, email, text, social media, or in any other way without my approval in advance. You are also to refrain from contacting former UCF students, former UCF employees, donors, and research sponsors in any way while you are on PAL. You must surrender any UCF property that is in your possession or under your control including, but not limited to, identification cards, keys, books, laptops, and other computers and equipment. Any such UCF property that is not currently on campus must be returned to me by noon, Friday, January 15, 2021. I will need to know as soon as possible if you wish to come to campus on January 15, 2021, to return UCF property or to retrieve any personal items that you need immediately from your office so that arrangements can be made for an escort. If I learn that you have not abided by these directions, your insubordination will be considered additional grounds for your termination. Any UCF property that is not returned to me on time will be considered stolen.

I also remind you that the UCF Policy 2-700.1 prohibits retaliation against any person who you think has or may have submitted a complaint against you or who you think has or may have participated in OIE's investigation. Any retaliation by you will be additional grounds for your termination.

The university desires to reduce the risk of error in taking an action such as this against you and is therefore interested in receiving and considering any relevant information you may wish to provide concerning this matter. In accordance with CBA 16.4 (b), you have ten calendar days, or until 9:00 AM on Monday, January 25, 2021, to provide a written response regarding this notice and/or the findings in the attached report that pertain to the grounds listed above. Any response should be addressed to me in the COS Dean's Office, CSB 201.

If you intend to provide your written response to this notice in hardcopy form in person, please let me know by noon, Friday, January 22, 2021, so that an escort can be arranged for you. You may notify me of your intention via email at Tosha.Dupras@ucf.edu. If you prefer, you may also submit your written response to me at that email address no later than 9:00 AM on Monday, January 25, 2021.

After any timely written response from you is reviewed, a final decision on your proposed termination will be rendered based upon all information available. You will receive a letter from the university communicating that decision as soon as practicable.

Sincerely,

Tosha Dupras
Interim Dean, College of Sciences

Attachment (1):          Investigative Report by OIE

cc:      Alexander N. Cartwright, President
         Michael D. Johnson, Interim Provost and Vice President for Academic Affairs
         Florian Jentsch, Chair, Department of Psychology
         Youndy C. Cook, Interim Vice President and General Counsel
         Sherry G. Andrews, Associate General Counsel and Associate Provost
         Rhonda L. Bishop, Vice President for Compliance and Risk
         Nancy F. Myers, Director, Office of Institutional Equity
         Carl Metzger, Chief, UCF Police

# EXHIBIT I

# USER AGREEMENT

**IMPORTANT NOTICE**: The use of any file sharing program for downloading or uploading copyrighted materials is **strictly prohibited**. All students caught violating this, or any other university network use rule will be immediately disconnected from the network and reported to the Office of Student Rights and Responsibilities for disciplinary action.

To use a computer on the UCF Network, you must adhere to the following rules:

The university supports open access to electronic communication and information. Nevertheless, the preservation of an open computing and communications environment requires adherence by users to a set of standards and policies for the responsible use of computing systems, software and telecommunication networks. In accordance with FAC Rule 6C7-4.037, university computing and telecommunications resources shall not be used as follows:

> *To impersonate another individual or to misrepresent an authorization to act on behalf of other individuals or the university.*

> *To modify the original attribution of electronic mail*

*To send anonymous messages without clearly and correctly identifying the sender.*

*To make unauthorized or illegal use of the intellectual property of others without the prior written permission of the owner or the copyright holder of the information.*

*To transmit to others or to display images, sounds, or messages that reasonably could perceived as being harassing, invasive, or otherwise unwanted.*

*To carry out commercial or other for profit purposes without prior express written approval of the provost and vice president for Academic Affairs of the university.*

*To conduct programs which do not directly relate to, or are in support of, the academic, research, or administrative activities of the university.*

*To attempt to undermine the security or the integrity of the university's computing systems or telecommunications networks, to attempt to gain unauthorized access, or to intercept or decode passwords or similar access control information.*

*To intentionally damage, disable, or impair computing or telecommunications equipment or software.*

*To acquire or utilize software that does not adhere to applicable software licenses and copyright laws or is not consistent with university software policies.*

*To introduce viruses or other destructive software in university computer facilities.*

*To engage in activities which are not consistent with the provisions of Chapter 815, Florida Statutes, Computer Crimes Act, Title 18 United States Code, Electronic Communications Privacy Act of 1986, or the Telecommunications Act of 1996.*
*"Chain Letters" or similar material are prohibited.*

All members of the university community are expected to adhere to university policies regarding the security and use of individual user id's and passwords. Members of the university community are held responsible for any violation of university policies which involve the use of their computer account. Unauthorized use of a university computer account is expressly prohibited.

Computer users shall comply with all applicable federal, state and local laws and regulations governing the use of computer and telecommunication technology, as well as all Applicable rules and regulations of the university and the Florida Board of Regents.

Case 6:21-cv-00313-GAP-GJK Document 8-1 Filed 02/26/21 Page 167 of 566 PageID 237

Violation of the computer and network rules and policies shall result in disciplinary action. Serious violations of university policies shall be referred to the appropriate university officials, such as the dean of students or the division vice president for appropriate disciplinary action. Any violation of the rules and policies described above shall generally result in immediate loss of network and computer access and privileges.

Suspected criminal violations of federal, state or local laws shall be reported to the University Police Department, appropriate law enforcement agencies or any other applicable authorities or agencies. However, unauthorized or fraudulent use of university computing and telecommunication resources can result in felony prosecution as provided for in Florida Statutes, Chapter 775, Florida Criminal Code.

ResNet users are permitted to use only one device on any ResNet port at one time. All devices connected to ResNet must be properly registered by the student assigned to the port where the devices are connected. ResNet users are not permitted to register other users' devices under their own ResNet account – doing so would constitute a violation of the UCF Golden Rule.

# EXHIBIT J



University of
**Central
Florida**

Office of the President

| SUBJECT: | Effective Date: | Policy Number: |
|---|---|---|
| | 9/1/2016 | 4-002.2 |
| Use of Information Technologies and Resources | **Supersedes:** | **Page      Of** |
| | 4-002.1 | 1        8 |
| | **Responsible Authority:** Vice President for Information Technologies and Resources | |

**DATE OF INITIAL ADOPTION AND EFFECTIVE DATE** 5/21/2008

**APPLICABILITY/ACCOUNTABILITY**

This policy applies to all University of Central Florida students, employees, and others who use university information technology resources.

**POLICY STATEMENT**

The University of Central Florida's computing and telecommunications resources provide a wide range of capabilities for students and employees to communicate, store, and process information that is essential to the academic, research, and administrative functions of the university. It is the policy of the University of Central Florida that all students and employees use these resources ethically, responsibly, and in compliance with all applicable federal and state laws, university policies, and as prescribed by this policy's procedures.

Any violation of this policy and procedures may result in immediate loss of network and computer access privileges, seizure of equipment, or removal of inappropriate information posted on university-owned computers or university-supported Internet sites. In addition to these corrective actions, failure to comply with this policy and procedures may result in disciplinary action up to and including termination.

## DEFINITIONS

**Computing Resource**. Personal computers, laptops, and portable computing and communication devices, such as tablets, and smartphones, servers, mainframes, data storage systems, and similar equipment capable of processing, accessing, displaying, storing, or communicating electronic information.

**Credentials**. A combination of user name, password, and possibly additional information such as a PIN or biometric scan that together are required to access a computer system or information resource.

**Departmental Security Coordinator**. A designated employee who serves as the primary contact between the respective department or business unit and the Information Security Office (ISO) for all matters relating to information security.

**Electronic Information Resource**. Data or information in electronic format and the computing and telecommunications resources through which such resources are accessed or used.

**Electronic Messages**. For purposes of this policy, electronic messages include electronic mail, text messages, videos, images, or sound files that are sent from a computing resource through a computer network.

**Internet Cloud Storage**. Data stored in third party data centers, e.g., CrashPlan, Dropbox, iCloud, Google Drive, OneDrive, Box, etc.

**Restricted Data.** Any confidential or personal information that is protected by law or policy and that requires the highest level of access control and security protection, both in storage or in transit. Further defined in UCF policy 4-008.1 *Data Classification and Protection*.

**Telecommunications Resource**. Wired or wireless voice or data communications circuits or networks and associated electronic equipment.

**User**. A person who makes use of or accesses university computing, telecommunications, or electronic information resources.

## BACKGROUND

Computer accounts are provided to students and employees as a privilege associated with membership in the university community and with varying access rights according to institutional role and job duties.

UCF students and employees are generally free to use UCF computing, telecommunications, and electronic information resources as necessary to carry out their assigned responsibilities, subject to the authorized use of those resources as described in this policy and other UCF

policies. The university reserves the right to disconnect or remove university or privately-owned equipment, or restrict use thereof at any time as required to maintain the functionality, security, or integrity, of university computing and telecommunications resources.

This policy is not intended to abridge academic freedom or the constitutional guarantees of freedom of speech or freedom of expression.

## PROCEDURES

A. User Responsibilities

1. Users are responsible for any activity originating from their accounts that they can reasonably be expected to control. Credentials must not be shared with others.

2. Users shall comply with all applicable user conduct codes and rules, laws, and regulations governing the use of computer and telecommunications resources. Examples include laws regarding libel, privacy, copyright, trademark, obscenity, and child pornography; the Florida Computer Crimes Act; the Electronic Communications Privacy Act; and the Computer Fraud and Abuse Act.

3. Except in isolated or occasional circumstances, the computing and telecommunications resources of the university shall be used only for purposes directly related to or in support of the academic, research, service, or administrative activities of the university. If a university employee wishes to use university facilities, students, equipment, materials, or software for personal or outside professional purposes, permission must be obtained in advance using form AA-21 (faculty members) or HR-12 (A&P or USPS).

4. Users shall not attempt to undermine the security or the integrity of computing systems or telecommunications networks and shall not attempt to gain unauthorized access to these resources. Users shall not employ any computer program or device to intercept or decode passwords or similar access control information. If security breaches are observed or suspected, they must be immediately reported to the appropriate system administrator, departmental security coordinator, and the university information security officer.

5. Users shall not use computer or telecommunication systems in such a manner as to degrade or disrupt the normal operation of voice or data networks or university computer systems or to intentionally damage or disable computing or telecommunications equipment or software.

6. Users shall ensure that software acquisition and utilization adheres to the applicable software licenses and U.S. copyright law. Users shall maintain sufficient

documentation to prove that all software installed on any computing resource assigned to them was legally obtained and is installed in conformance with the applicable license(s). Backup copies of software may be made only if expressly permitted by the applicable license(s).

7. To maintain proper functioning of computer and networking hardware and software, system administrators and individual users shall take reasonable care to ensure their computing resources are free of viruses or other malicious software through installation and frequent updating of antivirus and antimalware software, and frequent updates of operating systems and applications.

8. Users of university computing facilities and telecommunications networks shall use these resources prudently and avoid making excessive demands on these facilities in a manner that would knowingly impair access to or use of these resources by others.

B. Use and Misuse of Computing and Telecommunications Resources

1. The university's computing and telecommunications resources shall not be used to impersonate another individual or misrepresent authorization to act on behalf of other individuals or the university. All messages transmitted through university computing resources and telecommunications networks must correctly identify the sender.

2. The computing and telecommunications resources of the university shall not be used to make unauthorized or illegal use of the intellectual property of others, including copyrighted music, videos, films, texts, images, and software.

3. The computing and telecommunications resources of the university shall not be used for unapproved commercial purposes, or for personal financial gain, without express written approval from the provost and executive vice president or his or her designee.

4. Users are reminded of the university's commitment to a civil and non-discriminatory environment.  Employees, including student employees, shall not transmit to others or intentionally display in the workplace materials or messages that could reasonably be perceived as invasive of another's privacy; pornographic; harassing; or disruptive to the operations of the university or any part thereof.

5. Users shall not use university computer or telecommunications resources to download, intentionally view, store, or transmit images that could reasonably be regarded as obscene or pornographic.

6. The university provides telephone systems and long distance services for official university business. University employees are allowed to make incidental use of the telephone system for necessary personal calls but must reimburse the university for

4-002.2 *Use of Information Technologies and Resources* 4

any toll calls incurred through personal use that exceed $90 per year, per Policy 4003.1.

7. The university provides email and other electronic messaging systems only for official university business. University employees are allowed to make incidental use of such systems for necessary personal messaging. The following uses of university messaging systems by students and employees are prohibited under this policy:

   a. chain letters
   b. harassing or hate messages
   c. threatening or abusive messages sent to individuals or organizations
   d. messages that include malware, phishing, or hoaxes
   e. spamming or high volume email transmission other than those specifically allowed by the Broadcast Distribution of Electronic Mail Policy (4-006.1)
   f. for commercial use or personal financial gain
   g. false identification (any messages that misrepresent or fail to accurately identify the true originator)
   h. messages that contain or direct users to computer viruses, worms, or other harmful software
   i. any illegal activity or crime

8. The university and its employees are prohibited from using any university resources in support of a political campaign or for campaign fund raising, even under a reimbursement arrangement. An example of prohibited use would be a university employee using university electronic messaging or Web or telephone resources to solicit support of a political candidate or to raise funds for a candidate.

C. Access to and Disclosure of Electronic Information

1. Users should be aware that their uses of university computing and telecommunications resources are not completely private. The university does not routinely or without cause monitor individual use of these resources; however, the normal operation and maintenance of these resources require the backup and caching of data and communications, logging of activity, monitoring of general usage patterns, and other such activities. In addition, information stored on university computing resources or passed through university telecommunications networks may be accessible to the public through public record laws, subpoenas, interception, or other means.

2. The university may specifically monitor the activity or accounts of individual users of university computing and telecommunications resources, including individual

login sessions and the content of individual communications, without advance notice when:

   a. the user has voluntarily made such information accessible to the public, as by posting to a listserv, blog, or Web page

   b. it reasonably appears necessary to do so to protect the integrity, security, or functionality of university or other computing resources or to protect the university from liability

   c. there is reasonable cause to believe that the user has violated or is violating a university policy, a regulation, or a law

   d. an account appears to be engaged in unusual or excessive activity

   e. it is otherwise required by subpoena or court order

3. Access to and disclosure of electronic information shall be governed by the following provisions.

   a. Professional ethics dictate that any person having access to proprietary or restricted information shall:

      1) use that access only to the extent required to discharge the assigned responsibilities of that person's position

      2) not disclose any such information except to the extent authorized or required under this policy or applicable rules or laws

      3) not use, in any manner, such information or knowledge for personal gain

   b. A university employee may not read, view, listen to, or otherwise access electronic messages or the contents of computer systems of another user without the knowledge or consent of that user, except: (i) under the limited circumstances provided for in this policy or (ii) upon express prior authorization from the provost and executive vice president, his or her designee, the general counsel, or the UCF Police Chief or designee. Such prior authorization shall be given in writing and must clearly state the purpose of granting such access. Information accessed in authorized instances shall not be disclosed except as provided in this policy or with prior written authorization from the university's provost and executive vice president, his or her designee, the general counsel, or the UCF Police. Such prior authorization to disclose shall be given only in cases involving an actual or possible breach of system security, a violation of law, a violation of university regulation or policy, or dereliction of duty or responsibility on the part of a university user.

   c. Any suspected abuse or misuse of university computing and telecommunications resources should be reported to the Information Security Office (407-823-3863 or

infosec@ucf.edu). Proper pursuit of such cases may require that person to disclose relevant information to supervisors or designated investigators.

   d.   Employees who access restricted data are expected to sign the UCF Confidentiality Agreement.

**RELATED DOCUMENTS**

The following related policies are available online at: http://www.policies.ucf.edu/

Policy 2-100.4 *Florida Public Records Act—Scope and Compliance*
Policy 2-103.2 *Use of Copyrighted Materials*
Policy 4-001.1 *Retention Requirements for Electronic Mail*
Policy 4-003.1 *Telecommunications Services*
Policy 4-006.1 *Broadcast Distribution of Electronic Mail*
Policy 4-007 *Security of Mobile Computing, Data Storage, and Communication Devices*
Policy 4-008.1 *Data Classification and Protection*

Potential Outside Activity, Employment, and Conflict of Interest and Commitment Disclosure (AA-21): http://compliance.ucf.edu/conflict-of-interest/

A&P and USPS Permission to Use UCF Personnel, Equipment, Facilities, Students, or Services: http://hr.ucf.edu/files/HR12_PermissionToUseServices.pdf

UCF Confidentiality Agreement: http://www.hr.ucf.edu/files/ConfidentialityAgreement.pdf

**INITIATING AUTHORITY** Provost and Executive Vice President

---

### POLICY APPROVAL
#### (For use by the Office of the President)

Policy Number: 4-002.2

Initiating Authority: _Joel C. Nachman_     Date: _8·31·16_

University Policies and
Procedures Committee Chair: _Brenda L Bishop_   Date: _8/30/16_

President or Designee: _John C. Hitt_     Date: _9/1/16_

---

History 4-002 5/21/2008, 4-002.1 5/13/2014

# EXHIBIT K



**Dr. Alexander N. Cartwright**
@UCFCartwright

•••

At @UCF, we do not tolerate hate speech and must be unequivocally anti-racist in our words, actions and online behavior. Whenever we find discrimination in our community, we will take decisive action to stamp it out. jkrt.sdes.ucf.edu

1:02 PM · Jun 1, 2020 · Twitter Web App

# EXHIBIT L

# About



The JKRT team is here to provide assistance in the unfortunate event that you have experienced or witnessed a hate or bias related incident. This site is designed to allow the reporting of bias incidents to the JKRT team to ensure the most appropriate university response.

UCF is also committed to tracking patterns of bias and other incidents at the University that might prevent the community from thriving. It is our goal, as a team, to effect positive change in our campus community by providing a platform for individuals to report hurtful actions that have occurred. In return, we will create an open and transparent university community response to the handling of these incidents.

JKRT is intended to be a resource for anyone who wants to examine issues of bias, discrimination, or hate. Whatever your reasons are for visiting this site, please be assured that UCF holds as one of its goals to create a more inclusive and diverse campus. We are also committed to providing a safe and welcoming living and learning community for all our students.

- [The Definition of a Bias-Related Incident](#)

- Report an Incident
- [Resources for Additional Help](#)

# Purpose Statement

The purpose of the *Just Knights Response Team* (JKRT) is to act as a clearinghouse for any bias-related incidents that may occur on UCF campuses. In this role, the JKRT will receive, monitor, refer, and, as necessary, coordinate university resources to these incidents that impact the university community.

The team, made up of UCF faculty, staff, and students, provides a safe space for students, who are witnesses to or targets of bias, to communicate experiences, to ensure comprehensive responses, and proactively address issues of civility and respect.

## Our Goals

- Create a socially just campus for all UCF Knights
- Provide learning opportunities that develop cultural competency
- Promote the safety and success of all UCF students
- Enhance the President's goal of creating a more inclusive and diverse campus
- Help cultivate community and campus partnerships in support of the city/state initiative

- Provide advocacy and support for UCF students
- Support retention and graduation of underrepresented student populations

## Our Policy

The Just Knights Response Team (JKRT) is an inter-divisional team that assesses bias incidences in order to coordinate university resources for the creation of effective interventions and future incident prevention programming. The JKRT creates timely interventions to incidents that are sensitive to the rights of all parties involved. It is intended that any JKRT programming or intervention will be educational at its core. It will involve a variety of activities including discussion, mediation, training, counseling and consensus building. Through the voluntary participation of the persons involved in and impacted by bias incidences, the JKRT's interventions and prevention programming will foster a sense of civility and campus community encompassing respect and understanding that supports a multicultural and diverse campus environment.

# EXHIBIT M



**Just Knights
Response Team**





# Contact the Team



## Christina Khan
### Director, UCF Global

407-823-2337
Christina.khan@ucf.edu



## Commander James Mangan
### Commander, UCF Police



# Dr. Reshawna Chapple
## Assistant Professor, Social Work

---



# Jillian Sturdivant Co-Team Lead
## Assistant Director, Housing and Residence Life

---



# Michelle Fitzgerald
## Assistant Director, Facilities Recreation and Wellness Center

407-823-2408

michelle.fitzgerald@ucf.edu

---



## Andrea L. Snead Co-Team Lead

Assistant Director, Inclusive Recreation, Risk Management, Sport Clubs Recreation and Wellness Center



## Dr. Kerry Welch

Associate Vice President Student Development and Enrollment Services



## Dr. Edwanna Andrews Team Lead

Interim Assistant Vice President, Director Social Justice and Advocacy



## Dr. Michael Preston

Executive Director, Florida Consortium of Metropolitan Universities



## Shane Land

Assistant Director, Intramural Sports Recreational and Wellness Center



## Angela Williams

Case Manager, Student Care Services



# Dr. Ronnie Korosec
## Faculty Relations

📞        407-823-1535

✉️        jkrt@ucf.edu

## UPCOMING EVENTS

**FEB**
**17**

Yoga (virtual)

**FEB**
**17**

Koru Basic Mindfuln

**MORE EVENTS**

## PAGE NAVIGATION

HOME

WHO WE ARE

WHAT WE COVER

REPORT INJUSTICE

RESOURCES

CONTACT

## CONTACT US

Just Knights
Response Team

 **407-823-1535**

 **JKRT@UCF.EDU**

# UNIVERSITY OF CENTRAL FLORIDA

A-Z Index | About UCF | Contact UCF | Internet Privacy Policy | Online Degrees | Pegasus |
Policies | Regulations | UCF News

4000 Central Florida Blvd. Orlando, Florida 32816 | 407.823.2000 |  Accessibility Statement

© University of Central Florida

# EXHIBIT N

# Bias-Related Incidents

A bias-related incident is any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics or background. This bias motivates an individual to act in an offensive manner towards an individual or group including but not limited to: race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability, veteran status, military status, or sexual orientation. Such acts may result in creating a hostile environment and may have a negative psychological, emotional, or physical impact on an individual, group, and/ or community.

Bias-related incidents occur without regard to whether the act is legal, illegal, intentional, or unintentional. While these acts do not necessarily rise to the level of a crime, a violation of state law, university policy, or the student code of conduct; a bias act may contribute to creating an unsafe, negative, unwelcoming environment of the victim, or anyone who shares the same social identity as the victim, and/or community members at the university.

Incidents which occur on campus that are not covered by formal policies and procedures but have the effect of

harming individuals or groups may be addressed by the Just Knights Response Team (JKRT) protocol. The protocol may be initiated in cases when it is clear that the incidents have harmful effects on persons or groups based upon their race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability, veteran status, military status, or sexual orientation.

# Hate and Bias Crimes

A criminal offense committed against a person or property which is motivated, in whole or in part, by the offender's bias against a race, religion, disability, ethnic/national origin groups or sexual-orientation group (per U.S. Department of Justice Hate Crimes Data Collection Guidelines). To constitute a bias-related incident, sufficient objective facts must be present to lead a reasonable person to conclude that the behavior or actions in question may be motivated by bias towards the status of a targeted individual or group.

## Types of Bias-Related Incidents

Types of incidents may include (but are not limited to) the follow:

- Physical injury
- Damage to property
- Graffiti/Signs

- Threatening mail/email/on-line harassment
- Threatening voice mail/message
- Telephone harassment
- Confrontation/intimidation
- Stalking
- Bullying
- Verbal harassment/Slurs/Threats
- Written Slur or Threat
- Gestures
- Other

# EXHIBIT O



# JKRT Intake Form

## Intake Form

What can you do if you experience acts of bias or hate? Report the incident to the Just Knight Response Team (JKRT). This team was created to help individuals who have been impacted by hate or bias-related incidents. Please take the time to complete this form to the best of your ability. This website has a variety of links and resources available for your use.

Your full name (optional):

Preferred Name (optional):

Best Phone Number to Reach You:

Your email address (optional):

Date of incident (Required):

mm/dd/yyyy

Time of incident (Required):

Specific location (Required):

## Involved Parties

Please list the individuals involved (excluding yourself), including as many of the listed fields as you can provide.

Name or Organization

Select Role

UCF PID (optional)

Phone number (if known)

Email address (if known)

Add another party

# Incident Details

Description of the Incident (Required)

Desired Outcome (Required)

# Supporting Documentation

Photos, video, email, and other supporting documents may be attached below. 5GB maximum total size.

**Attachments require time to upload, so please be patient after submitting this form.**

| Choose files to upload | Choose Files |
| --- | --- |

☐ Email me a copy of this report

Submit report

# EXHIBIT P

# Just Knights
# Response Team





# Home

---

📞 [407-823-1535](tel:407-823-1535)

---

✉️ [jkrt@ucf.edu](mailto:jkrt@ucf.edu)

---

The University of Central Florida is committed to providing a safe and inclusive campus experience. *Justice for All Knights* is our commitment to addressing instances of bias on campus.

**Disclaimer:** By submitting your report, this information may be shared with the Office of Student Conduct (OSC), Office of Student Rights and Responsibility (OSRR), and/or the UCF Police Department (UCFPD)

OTHER RESOURCES

Read More about the Team

Learn About Bias Incidents

Fill Out the Report Form

# News & Announcements

No news articles at this time.

**MORE NEWS**

UPCOMING EVENTS

**FEB**
**17**

Yoga (virtual)

**FEB**
**17**

Koru Basic Mindfuln

**MORE EVENTS**

PAGE NAVIGATION

HOME

WHO WE ARE

WHAT WE COVER

REPORT INJUSTICE

RESOURCES

CONTACT

## CONTACT US

Just Knights
Response Team

 **407-823-1535**

 **JKRT@UCF.EDU**

# UNIVERSITY OF CENTRAL FLORIDA

A-Z Index | About UCF | Contact UCF | Internet Privacy Policy | Online Degrees | Pegasus | Policies | Regulations | UCF News

4000 Central Florida Blvd. Orlando, Florida 32816 | 407.823.2000 |  Accessibility Statement

© University of Central Florida

# EXHIBIT Q

UCF TODAY | UCF NEWS | STORIES OF IMPACT • INNOVATION | ORLANDO, FL

SECTIONS

COLLEGES & CAMPUS NEWS

# Our Future Is Inclusion

UCF's President emphasized the university's commitment to be actively anti-racist and urges Knights to participate in the virtual conversation about race and unity this Friday.

BY UCF PRESIDENT ALEXANDER N. CARTWRIGHT | JUNE 2, 2020



So many members of our community are hurting right now, shattered by recent deaths that echo the long history of racial injustices that have plagued our country.

As I write this, I realize words are inadequate to address this pain. But I share in the horror of George Floyd's murder and understand the pain and anger it has sparked.

What is needed now is action — a commitment for our university to not merely celebrate our diversity, but to be actively anti-racist.

Systemic racism, sexism, homophobia and other hateful ideologies seek to deny our shared humanity. They must be called out and confronted. They do not reflect the values of our UCF community.

## Learning From Each Other

One way we can take immediate action is to learn from each other.

Because we cannot gather in the traditional way, this Friday from 2 to 3:30 p.m., we will host a virtual conversation about race and unity with the campus community. More information will be shared soon.

Listening to each other's stories helps each of us learn and grow. We welcome discussions about lived experiences along with suggestions for how we can collectively move forward on our campus.

Educational tools such as the Smithsonian National Museum of African American History and Culture's newly launched "Talking About Race" online portal provide valuable resources for self-reflection.

Still, reflection must be paired with action and a commitment to stand against racism in all its forms. At UCF, hate and bias-related incidents are responded to by the Just Knights Response Team, which serves as a resource for our entire community to help ensure a safe and inclusive UCF experience.

Connections to other campus support networks are provided by UCF's Office of Social Justice and Advocacy.

## Change Starts at UCF

Change starts with each one of us, including leaders across the university who must actively embrace diversity and inclusive excellence in their words and actions, especially in mentoring and hiring. It will take all of us working on critical race issues to build a better UCF.

UCF is not perfect. I want us to demonstrate to the world what can be achieved when more of us work together toward a shared humanity.

Since welcoming you to come to UCF, I have said that our university looks like the future of America. Looking like the future of America is a great start but not sufficient. We must be the example for the rest of the country and world for how a community fully commits to inclusive excellence.

Black Lives Matter. You matter.

Together,

*Alexander N. Cartwright*
*UCF President*

MORE TOPICS

Inclusive Excellence   Diversity and inclusion   president   Alexander N. Cartwright

f SHARE   TWEET   SHARE

---

RELATED STORIES



**UCF Announces Athletics Leadership Updates**



**UCF Committed to Building on Athletics' Momentum**



**Thank You For All You Do**



**Why We Remain Hopeful**



**UCF Today's Top 20 Stories of 2020**



**UCF's Top 30 Photos from 2020**



**Get to Know UCF's President and First Lady**



**Announcing UCF's New Senior Vice President for Administration and Finance**

UNIVERSITY OF CENTRAL FLORIDA

   

About UCF | Contact Us | Faculty | Online Degrees | Pegasus | Policies | Privacy Notice | Public Records | Regulations | UCF News

4000 Central Florida Blvd. Orlando, Florida, 32816 | 407.823.2000
© University of Central Florida

# EXHIBIT R

**A Message From the Interim Dean**

## Interim Dean, Tosha Dupras <tosha.dupras@ucf.edu>
Wed 6/3/2020 7:04 PM



Dear Staff, Faculty and Students of the College of Sciences,

I am deeply shocked and saddened by the recent and continued events across the U.S. involving violence against the black community. While these events are rooted in a long history of systemic and institutional racism in the U.S., there are no rationalizations nor amends that can be made for the fact that there are individuals throughout the U.S. whose lives are unsafe on a daily basis because of the color of their skin. Those in positions of power and/or privilege have a choice – to remain silent or to speak up.  This is not the time for complacency or indifference.

As the Interim Dean of the College of Sciences, and by the virtue of my skin color, I recognize my role as one of power and privilege.  It is from this seat, and my own personal convictions, that I condemn hatred in any form.  It is my stance as the leader of the college, that I am committed to providing a safe environment for individuals of all races, ethnicities, sexual orientation and religious beliefs. The College of Sciences strives to be a welcoming community of inclusivity where we can work, learn and interact with each other in a safe space.

I recognize that, considering recent events, and the embedded systemic and institutional racism found throughout our nation, that many of our staff, faculty and students may feel marginalized, fearful, excluded or unsafe. How can we show our compassion and humanity? We extend a hand, we speak out and we reach out to support our friends, colleagues and students of color.  To our black and brown faculty, staff and students: I see you, I support you and I grieve with you. **#backlivesmatter #COSCares**

I am proud to work at an institution whose President has spoken out against racism (see President Cartwright's message here), and has committed to creating an inclusive environment at UCF.  Justice for all Knights is part of the university's commitment to creating an inclusive and safe campus, and any social or racial bias can be reported to jkrt@ucf.edu. Those student who would like further involvement can volunteer with Social Justice and Advocacy (http://sja.sdes.ucf.edu/).  I urge you all to participate in the virtual conversation about race and unity to be held this Friday (June 5th) from 2:00 to 3:30pm.

*"It's going to take all of us to do better – to be better – to change our society."*

S. Kent Butler

Interim Chief Equity, Inclusion and Diversity Officer, UCF

Sincerely,

**TOSHA DUPRAS, PH.D.**
**Interim Dean, College of Sciences**

UCF College of Sciences  |  COSMarketing@ucf.edu  |  sciences.ucf.edu/

**Share this email:**

   

**Manage** your preferences | **Opt out** using **TrueRemove®**
Got this as a forward? **Sign up** to receive our future emails.
View this email **online**.

4000 Central Florida Blvd.
Orlando, FL | 32816 US
This email was sent to megan.turner@knights.ucf.edu.
*To continue receiving our emails, add us to your address book.*

emma

# EXHIBIT S

 **MSC_UCF**
@MSC_UCF

MSC is proud of students for using their voice by standing up against prejudice in our community. We want to take the time to highlight the resources available to students to report instances of prejudice or bias. The Just Knights Response team is a great resource to use for help



12:17 PM · Jun 6, 2020 · Twitter for iPhone

# EXHIBIT T

# Diversity & Inclusion Syllabus Statements

The following resources are drawn from multiple U.S. institutions and can serve as examples of inclusive language for syllabus creation.

## Brown University

*Preparation*; When crafting a diversity statement you might consider the following questions:

- What are your discipline's conventions and assumptions? How might students with varying backgrounds respond to them?
- What role does your respect for and engagement with diversity in the classroom play in your personal teaching philosophy?
- What positive learning outcomes can come from respecting difference in the classroom? How can you highlight these?
- What do you want your students to know about your expectations regarding creating and maintaining a classroom space where differences are respected and valued?
- Is your statement inclusive of different types of diversity, including, but not limited to: race, gender, ethnicity, sexual orientation, age, socioeconomic status, religion, and disability?
- Which campus resources would you like to direct your students to for further support?
- What kind of classroom environment would your students like to see? How might you include them in the conversation about standards for classroom civility?

*Sample Statement*;

It is my intent that students from all diverse backgrounds and perspectives be well-served by this course, that students' learning needs be addressed both in and out of class, and that the diversity that the students bring to this class be viewed as a resource, strength and benefit. It is my intent to present materials and activities that are respectful of diversity: gender identity, sexuality, disability, age, socioeconomic status, ethnicity, race, nationality, religion, and culture. Your suggestions are encouraged and appreciated. Please let me know ways to improve the effectiveness of the course for you personally, or for other students or student groups.

Important note: Given the sensitive and challenging nature of the material discussed in class, it is imperative that there be an atmosphere of trust and safety in the classroom. I will attempt to foster an environment in which each class member is able to hear and respect each other. It is critical that each class member show respect for all worldviews expressed in class. It is expected that some of the material in this course may evoke strong emotions, please be respectful of others' emotions and be mindful of your own. Please let me know if something said or done in the classroom, by either myself or other students, is particularly troubling or causes discomfort or offense. While our intention may not be to cause discomfort or offense, the impact of what happens throughout the course is not to be ignored and is something that I consider to be very important and deserving of attention. If and when this occurs, there are several ways to alleviate some of the discomfort or hurt you may experience:

1. Discuss the situation privately with me. I am always open to listening to students' experiences, and want to work with students to find acceptable ways to process and address the issue.
2. Discuss the situation with the class. Chances are there is at least one other student in the class who had a similar response to the material. Discussion enhances the ability for all class participants to have a fuller understanding of context and impact of course material and class discussions.
3. Notify me of the issue through another source such as your academic advisor, a trusted faculty member, or a peer. If for any reason you do not feel comfortable discussing the issue directly with me, I encourage you to seek out another, more comfortable avenue to address the issue.

*Link* for more information; https://www.brown.edu/sheridan/teaching-learning-resources/inclusive-teaching/statements

### Carnegie Mellon University

*Preparation*; When creating a diversity statement for your syllabus, please consider the following questions

- How do you, concretely, recognize and value diversity in your classroom? (For instance, do you have systems in place to ensure everyone's voice will be heard? Do you use a variety of examples to illustrate concepts? Do you have guidelines for respectful discussions?)
- How can diversity – as represented in your discipline, course content, and classroom – be an asset for learning?
- How will issues related to diversity arise in your course and classroom? And, how will you handle them (ideally) when they do? (For instance, does your discipline or course content explicitly or implicitly raise sensitive or controversial topics related to diversity and inclusion? How might students from different social and cultural backgrounds respond to disciplinary norms?)
- Do you seek input from your students on classroom climate (i.e., to what extent they they feel included and how)?
- What relevant resources exist on campus that could be useful to your students (e.g., Center for Diversity and Inclusion, Intercultural Communication Center, Office of Title IX Initiatives)?
- Your statement should articulate to your students why being inclusive matters to you, specifically, and how that relates to your discipline, course, and desired classroom climate.
- It can be helpful to consider your discipline's history with underrepresented groups, and how disciplinary conventions might work to facilitate or become obstacles to inclusion.
- After drafting your statement, check whether the rest of your syllabus and course design matches your diversity statement in tone and spirit, that is to say, is also positive and inclusive (see additional resources on creating an inclusive learning environment):
- Be inclusive by recognizing different types of diversity in your statement.

*Sample*;

"'A university is a place where the universality of the human experience manifests itself.' -Albert Einstein

In keeping with the spirit of Einstein's viewpoint, the Department of Communication Studies is committed to providing an atmosphere of learning that is representative of a variety of perspectives. In this class, you will have the opportunity to express and experience cultural diversity as we focus on issues such as: gender and communication in small groups, communication in the multicultural group, and cross-cultural and intercultural work group communication. In addition, writing assignments and daily activities have been designed to encourage individuality and creative expression. You are encouraged to not only take advantage of these opportunities in your own work, but also, learn from the information and ideas shared by other students."

Link for more information: https://www.cmu.edu/teaching/designteach/syllabus/checklist/diversitystatement.html

## University of Southern California

*Preparation*; Diversity & Inclusion Syllabus Checklist

RELEVANT CONSIDERATIONS (not to be included in the syllabus document)

- Personal Definitions
  - Identification of the many diversities present in your course and your assumptions made about students' skill level, device use, lifestyle, comfort, etc.

- Departmental Definition
  - Review of school's working definition of Diversity and Inclusion from its Five-Year Plan.

RECOMMENDED COURSE POLICY (included in the syllabus)

- Communication
  - Encouragement of students to contact instructor outside of class. Specifications of how students should contact instructor (e.g., USC email) and the time frame in which instructor will respond (e.g., within 48 hours).

- Technology
  - Instruction on how students in need of course-required technology can obtain it (e.g., loaner laptop) and training on the technology.

- Discussion Etiquette
  - Statement of required professional language/terms used in the field and expected to be used by students. Statement of behavioral expectations for online and/or classroom discussions.

REPRESENTATIVE CONTENT (may be included in the syllabus, referred to in the syllabus, and/or present elsewhere in the course)

- Current events
  - Inclusion of real world events, both local and global/international, when pertinent to course learning objectives and in support of weekly topics.

- Perspectives & voices
  - Inclusion of traditionally un- or under-represented perspectives and voices woven throughout, not included as an add-on, one-off, or separate section.

- Instructor impartiality
  - Provision of instructor-created content that demonstrates fair attention to topics and issues regardless of personal beliefs and without revealing one's bias or appearing to push a personal agenda.

CONTENT FORMAT (may be included in the syllabus, referred to in the syllabus, and/or present elsewhere in the course)

- Types
  - Inclusion of content in multiple formats when possible, such as a video interview with an expert on the topic as well as a research article or textbook chapter.

- Images
  - Provided content containing images, such as slides and videos, is described/captioned, and reflects the diversity of students in the course/at USC.

- Accessibility
  - Linked content follows recommended best practices for access: videos are captioned and transcripts provided, documents are .pdf or .doc, documents use headings rather than individually-styled text, etc.  For assistance, contact DSP.

- OERs (Open Educational Resources)
  - Inclusion of free and openly licensed course content to replace or supplement for-purchase content, such as an e-textbook.  For more information, visit USC Libraries OER Guide

ASSIGNMENT/ASSESSMENTS (may be included in the syllabus, referred to in the syllabus, and/or present elsewhere in the course)

- Formative assessment
  - Description of formative assessments, providing students with multiple low-stakes opportunities to assess and improve their performance.

- Summative assessment
  - Description of the diverse modes of expression through a variety of assessment types (group projects, case-based role plays, partner quiz, multimodal presentations, etc.) in addition to, or instead of, traditional types (multiple choice, essay/paper, etc.).

- Description
  - Reference to assignment descriptions that will be disseminated and include the course learning objective the assignment supports, brief narrative paragraph prompt, scaffolded steps to complete the assignment, and grading rubric.  See CET Assignment Description Template

GRADING (may be included in the syllabus, referred to in the syllabus, and/or present elsewhere in the course)

- Grading rubrics
  - Reference to the use of grading rubrics for all assignments/assessments to demonstrate clarity, transparency, specificity, fairness, and attempts at objectivity.

*Link for more information*; http://webcache.googleusercontent.com/search?q=cache:BZQOpgngP9EJ:cet.usc.edu/cet/wp-content/uploads/2017/06/diversity_inclusion_syllabus_checklist.docx+&cd=16&hl=en&ct=clnk&gl=us

Mount Holyoke College

Preparation; Checklist for Designing an Inclusive Syllabus

What and how students will learn: The Learning-Centered UDL Syllabus

- Vision/Goal Statement
- Detailed course schedule
- Research and writings from authors of diverse backgrounds and offering multiple perspectives
- Experiential learning: Relevant and connected to students' life experiences and funds of knowledge and real-world issues
- Variety of in-and out-of-class learning activities that allow students to learn in different ways and through various modalities
- Clear student learning objectives related to course content AND the required learning processes
- Assignments offer multiple options, flexibility, choice, various ways of developing and demonstrating knowledge
- Scaffolding of extensive assignments with options for review, feedback, revision
- Fair and clear assessment criteria: Rubrics, checklists, rationales for grading
- Learning objectives and assignments/assessments are well aligned

What will help students to learn: Inclusive and Supportive Course Policies

- Disability Accommodation and Inclusive Learning Statement with hyperlinks to campus and other resources
- Inviting Office Hours Statement
- Expansive Academic Honesty Statement with hyperlinks to campus and other resources
- Pronoun Policy
- Course Value & Norms Statement

Rhetoric

- Welcoming and inviting tone
- Use of personal pronouns
- Cooperative language

Redundancy across modes

- Use of icons & logos
- Images of key authors, textbooks
- Visuals to represent main concepts
- Word clouds
- Visual representation of grade distribution
- Digital syllabus on course website

Readability & Accessibility

- Clear hierarchical structure of document, using headings
- Table of Contents with in-document hyperlinks
- Text: 12-14 point sans serif font; 1.5 line spacing; bold or underline to emphasize text

- Text distribution: digestible sections for learners with reading disabilities, non-native English speakers, attention-deficits
  - Text boxes
  - Columns
  - White space
  - Margins
  - Bullet points
  - Tables
- Accessible color design
- Alternative text for images (Format picture, Properties, Alt Text)
- Check with accessibility checker
- Flexible text that can be altered by the user

## Montana State University

*Sample (diversity statement vs inclusivity statement)*;

==Diversity statement==: Respect: Students in this class are encouraged to speak up and participate during class meetings. Because the class will represent a diversity of individual beliefs, backgrounds, and experiences, every member of this class must show respect for every other member of this class. (Adopted from California State University)

==Inclusivity Statement==: I support an inclusive learning environment where diversity and individual differences are understood, respected, appreciated, and recognized as a source of strength. We expect that students, faculty, administrators and staff at MSU will respect differences and demonstrate diligence in understanding how other peoples' perspectives, behaviors, and worldviews may be different from their own. (Adopted from University of Northern Colorado)

## University of Central Florida

*Sample*;

One way to promote a safe and caring classroom community is to encourage each student's unique voice, perspective, and presence. The following diversity statement gives professors language for explaining how students' contributions will be valued:

The University of Central Florida considers the diversity of its students, faculty, and staff to be a strength and critical to its educational mission. UCF expects every member of the university community to contribute to an inclusive and respectful culture for all in its classrooms, work environments, and at campus events. Dimensions of diversity can include sex, race, age, national origin, ethnicity, gender identity and expression, intellectual and physical ability, sexual orientation, income, faith and non-faith perspectives, socio-economic class, political ideology, education, primary language, family status, military experience, cognitive style, and communication style. The individual intersection of these experiences and characteristics must be valued in our community.

Title IX prohibits sex discrimination, including sexual misconduct, sexual violence, sexual harassment, and retaliation. If you or someone you know has been harassed or assaulted, you can find resources available to support the victim, including confidential resources and information concerning reporting options at www.shield.ucf.edu and http://cares.sdes.ucf.edu/.

If there are aspects of the design, instruction, and/or experiences within this course that result in barriers to your inclusion or accurate assessment of achievement, please notify the instructor as soon as possible and/or contact Student Accessibility Services.

For more information on diversity and inclusion, Title IX, accessibility, or UCF's complaint processes contact:

- Title IX – EO/AA - http://www.eeo.ucf.edu/ & askanadvocate@ucf.edu

- Disability Accommodation – Student Accessibility Services - http://sas.sdes.ucf.edu/ & sas@ucf.edu

- Diversity and Inclusion Training and Events – www.diversity.ucf.edu

- Student Bias Grievances – Just Knights response team - http://jkrt.sdes.ucf.edu/

- UCF Compliance and Ethics Office - http://compliance.ucf.edu/ & complianceandethics@ucf.edu

- Ombuds Office - http://www.ombuds.ucf.edu

*Link for more information;* http://fctl.ucf.edu/TeachingAndLearningResources/DiversityAndInclusion/

## Centenary College of Louisiana

*Sample (class diversity statement vs statement on diversity);*

Class Diversity Statement: Centenary College of Louisiana—and your professor—value human diversity in all its richly complex and multi-faceted forms, whether expressed through race and ethnicity, culture, political and social views, religious and spiritual beliefs, language and geographic characteristics, gender, gender identities and sexual orientations, learning and physical abilities, age, and social or economic classes. Enrich yourself by practicing respect. For questions, concerns, or more information, contact your professor and/or Centenary's Diversity Chair, listed here: http://www.centenary.edu/globalengagement/diversity.

Statement on Diversity: We value human diversity in all its richly complex and multi-faceted forms, whether expressed through race and ethnicity, culture, political and social views, religious and spiritual beliefs, language and geographic characteristics, gender, gender identities and sexual orientations, learning and physical abilities, age, and social or economic classes. We respect the value of every member of the class, and everyone in the class is encouraged to share his or her unique perspective as an individual, not as a representative of any category. Multicultural and intercultural awareness and competencies are key leadership skills, and we intend to present material and classroom activities that respect and celebrate diversity of thought, background, and experience. College is supposed to challenge assumptions and to provide new and sometimes uncomfortable ways of looking at issues, but if you feel uncomfortable regarding content or perspectives that are presented or discussed by professors, guest speakers, or other students we encourage you to contact one of your instructors immediately so that we can discuss those feelings. We would like to use your preferred language when addressing you, so please let us know if your preferred name (or the pronunciation of that name) differ from what we are using and we ask that each of you let us know your preferred gender pronouns. Your suggestions on how to incorporate diversity in this course in a meaningful way are appreciated and encouraged.

*Link for more information;* https://www.centenary.edu/files/resources/sample-diversity-statements-for-course-syllabi.pdf

## The University of Kansas

*Sample;*

"This is an Inclusive Classroom"

At KU, administrators, faculty, and staff are committed to the creation and maintenance of "inclusive learning" spaces. These are classrooms, labs, and other places of learning where you will be treated with respect and dignity and where all individuals are provided equitable opportunity to participate, contribute, and succeed.

In [our classroom/insert course here], all students are welcome regardless of race/ethnicity, gender identities, gender expressions, sexual orientation, socio-economic status, age, disabilities, religion, regional background, Veteran status, citizenship status, nationality and other diverse identities that we each bring to class.

Your success at KU and beyond is enhanced by the innovation and creativity of thought that inclusive classrooms facilitate. The success of an inclusive classroom relies on the participation, support, and understanding of you and your peers. We encourage you to speak up and share your views, but also understand that you are doing so in a learning environment in which we all are expected to engage respectfully and with regard to the dignity of all others.

Any student who has difficulty affording groceries or who lacks a safe and stable place to live and believes this may affect their performance in the course is urged to contact me or Student Affairs for support (studentaffairs@ku.edu). Other resources you may find helpful:

- Student Emergency Assistance Fund: https://studentaffairs.ku.edu/emergency-assistance-students
- Free food at the Campus Cupboard: http://www.cco.ku.edu/food/
- Free Legal Services for Students: www.legalservices.ku.edu

If you have any questions or concerns do not hesitate to raise them in class or with me directly.

*Link for more information*; https://cte.ku.edu/creating-inclusive-syllabus


## Stonehill College

*Sample* (classroom accommodation statement vs diversity and inclusion statement);

Classroom Accommodation Statement: Stonehill College is committed to providing a welcoming, supportive and inclusive environment for students with disabilities. The Office of Accessibility Resources (OAR) provides a point of coordination, resources and support for students with disabilities and the campus community. If you anticipate or experience physical or academic barriers based on disability, please let me know so that we can discuss options. You are also welcome to contact OAR to begin this conversation or to establish reasonable accommodations for this or other courses. OAR is located within the Academic Services & Advising Suite in Duffy 104. For additional information please call (508) 565-1306 or email accessibility-resources@stonehill.edu.

Diversity and Inclusion Statement: Stonehill College embraces the diversity of students, faculty, and staff, honors the inherent dignity of each individual, and welcomes their unique cultural and religious experiences, beliefs, and perspectives. We all benefit from a diverse living and learning environment, and the sharing of differences in ideas, experiences, and beliefs help us shape our own perspectives. Course content and campus discussions will heighten your awareness to these differences.

There are many resources for anyone seeking support or with questions about diversity and inclusion at Stonehill. Resources are infused throughout the Mission Division, Academic Affairs, and Student Affairs. If you'd like more information on how to get connected to resources, the Office of Intercultural Affairs is a good first stop: Location: Duffy 149, Phone: 508-565-1409, Email: diversity@stonehill.edu.

If you are a witness to or experience an act of bias at Stonehill, you may submit a bias incident report online or on the Stonehill App. If you would like to learn more on bias incident prevention and response, or submit a report please visit: http://www.stonehill.edu/offices-services/intercultural-affairs/bias-response-protocol/

A personal note from your professor... If you ever have a concern about my behavior or that of another student in the class, please, please feel free to approach me in person, by email, or with an anonymous note under my door... whatever it takes so that I can continue to work on creating an inclusive classroom environment. Thank you.

*Link for more information*; https://www.stonehill.edu/offices-services/ctl/teaching-resources/suggested-syllabus-statements/

## University of Maryland, Baltimore County

*Sample* (diversity, civility and respect);

Diversity Statement on Civil Dialogue: I hope the course challenges us to engage with issues that touch our and others' lives personally and politically and to develop ways of thinking and acting to address them in nuanced, conscious, and accountable ways. Questions, personal insights, experiences, and emotions about the materials and topics are always welcome in class. I do not expect that we share the same views on the topics we cover (in fact I hope we do not). We all need to speak up, especially when we do not agree with each other's views, but do so in a respective manner. The range of views you hold and the experiences you bring into the classroom will make our learning experiences much more interesting and enriching. In order to ensure an environment for robust intellectual debate, please do not video or audio record in class.(Example from Autumn Reed's FYS 107Y-01, U.S. Orientalism)

Diversity Statement on Respect: Students in this class are encouraged to speak up and participate during class meetings. Because the class will represent a diversity of individual beliefs, backgrounds, and experiences, every member of this class must show respect for every other member of this class. (From California State University, Chico's Office of Diversity and Inclusion).

*Link for more information*; https://fdc.umbc.edu/creating-a-welcoming-classroom/

## University of Michigan

*Sample* (religious/cultural observance, point of view, discussion guidelines, accessibility and accommodations, student mental health and well-being, attendance, participation, and universal learning, title ix statement, plagiarism);

Religious/Cultural Observance: Persons who have religious or cultural observances that coincide with this class should let the instructor know in writing (by e-mail for example) by [date].  I strongly encourage you to honor your cultural and religious holidays!  However, if I do not hear from you by [date], I will assume that you plan to attend all class meetings.

Point of View: The readings, class lecture, and my comments in class will suggest a particular point of view.  This perspective is my own and **does not have to be yours**!  I encourage you to disagree with the ideas in the readings and lectures as well as the perspectives of your colleagues in the course.  **Please express yourself**!!  A significant part of a college education is learning about the complexity of various issues; therefore, it is important that we listen and respect one another but we do not have to agree.  A richer discussion will occur when a variety of perspectives are presented in class for discussion.

Accessibility and Accommodations: If you think you need an accommodation for a disability, please let us know at your earliest convenience.  Some aspects of this course, such as the assignments, in-class activities, or the way we teach may be modified to facilitate your participation and progress.  As soon as you make us aware of your needs, we can work with you, the Office of Services for Students with Disabilities, or the Adaptive Technologies Computing Site to help determine appropriate accommodations.  We will treat any information about your disability with the utmost discretion.

Student Mental Health and Well-being: University of Michigan is committed to advancing the mental health and wellbeing of its students. If you or someone you know is feeling overwhelmed, depressed, and/or in need of support, services are available. For help, contact **Counseling and Psychological Services (CAPS)** at (734) 764-8312 and https://caps.umich.edu/ during and after hours, on weekends and holidays, or through its counselors physically located in schools on both North and Central Campus. You may also consult **University Health Service (UHS)** at (734) 764-8320 and https://www.uhs.umich.edu/mentalhealthsvcs, or for alcohol or drug concerns, see www.uhs.umich.edu/aodresources.  For a listing of other mental health resources available on and off campus, visit:http://umich.edu/~mhealth/.

<mark>Discussion Guidelines (multiple examples)</mark>

- Example 1 (from U-M Faculty Member Evelyn Alsutany, American Culture)
Class Conduct: A positive learning environment relies upon creating an atmosphere where diverse perspectives can be expressed, especially in a course that focuses on pressing and controversial social and political issues. Each student is encouraged to take an active part in class discussions and activities. Honest and respectful dialogue is expected. Disagreement and challenging of ideas in a supportive and sensitive manner is encouraged. Hostility and disrespectful behavior is not acceptable. Just as we expect others to listen attentively to our own views, we must reciprocate and listen to others when they speak, especially when we disagree with them. However, in this class, our emphasis will be on engaging in the mutual exploration of issues as presented in the course readings as scholars rather than in defending points of view we have formed outside the classroom.

- Example 2 (from U-M Faculty Member Alisse Portnoy, English)
In our structured and unstructured discussions and dialogues, we also will have many opportunities to explore some challenging, high-stakes issues and increase our understandings of different perspectives. Our conversations may not always be easy; we sometimes will make mistakes in our speaking and our listening; sometimes we will need patience or courage or imagination or any number of qualities in combination to engage our texts, our classmates, and our own ideas and experiences. Always we will need respect for others. Thus, an important second aim of our course necessarily will be for us to increase our facility with the sometimes difficult conversations that arise inside issues of social justice as we deepen our understandings of multiple perspectives – whatever our backgrounds, experiences, or positions.

- Example 3 (From U. of S. Carolina Center for Teaching Excellence, http://www.sc.edu/cte/guide/syllabus/statements.shtml)
In order to learn, we must be open to the views of people different from ourselves. In this time we share together over the semester, please honor the uniqueness of your fellow classmates and appreciate the opportunity we have to learn from one another. Please respect each others' opinions and refrain from personal attacks or demeaning comments of any kind. Finally, remember to keep confidential all issues of a personal or professional nature that are discussed in class.

<mark>Attendance, Participation, and Universal Learning</mark>: Attendance and participation are highly important in this [small, collaborative, seminar-style] class. If you must be absent because of an emergency or illness, please make every effort to speak with me about it beforehand, if possible, or after the next class. I will excuse such absences with a doctor's note or other form of official documentation. Please notify me of absences due to religious observance or University sporting events as soon as you can, or by the *third week of the semester*. Keep in mind that more than two unexcused absences will begin to affect your final grade.

I am committed to the principle of universal learning. This means that our classroom, our virtual spaces, our practices, and our interactions be as inclusive as possible. Mutual respect, civility, and the ability to listen and observe others carefully are crucial to universal learning. Active, thoughtful, and respectful participation in all aspects of the course will make our time together as productive and engaging as possible. I will give you midterm feedback on your participation.

If you have a particular need, please arrange a meeting with me so I can best help you learn in this course. I will treat as private and confidential any information that you share. I also suggest you contact Services for Students with Disabilities (SSD) at the start of the semester. Please ask SSD to forward any necessary information to me.

Here is the contact information for Services for Students with Disabilities:

- Location: G-664 Haven Hall

- Phone: (734) 763-3000

- Website: http://ssd.umich.edu/

Your success in this class is important to me. If there are circumstances that may affect your performance in this class, please let me know as soon as possible so that we can work together to develop strategies for adapting assignments to meet both your needs and the requirements of the course.

==Title IX Statement==: Title IX makes it clear that violence and harassment based on sex and gender is a Civil Rights offense subject to the same kinds of accountability and the same kinds of support applied to offenses against other protected categories such as race, national origin, etc. If you or someone you know has been harassed or assaulted, you can find the appropriate resources here:

- UM Sexual Assault and Prevention Center (SAPAC) 24-hour confidential crisis line (734) 936-3333 * http://sapac.umich.edu/

- UM Counseling and Psychological Services (CAPS) (734) 764-8312 * http://caps.umich.edu/

- University of Michigan Police (DPSS) (734) 763-1131 (or 911 for emergency) * http://www.dpss.umich.edu/

- UM Office of Student Conflict Resolution (724) 936-6308 * http://oscr.umich.edu

- UM Newnan Academic Advising Center (734) 764-0332 * https://lsa.umich.edu/advising

==Plagiarism==: The LSA Office of Academic Affairs defines plagiarism as "representing someone else's ideas, words, statements or other work as one's own without proper acknowledgment or citation" (see https://lsa.umich.edu/lsa/academics/academic-integrity/academic-misconduct.html). New writing challenges can tax your writing fluency, and entering new academic discourses can test your abilities to synthesize and take ownership over source texts and concepts. My job as instructor in this course is to help you through these obstacles so that you can find your footing as a writer in new domains. Your job as a student is to keep the faith, so to speak, and work through these new domains until you regain confidence. This work requires patience, planning, and focus.

Much plagiarism occurs as a result of a lack of care in regard to reading, note taking, and citation practices, or from procrastination, and/or panic. Care, timeliness, and communication will eliminate most of the risk. If you have questions about whether or not you should give credit to a source in your work, you may clarify it with me. In general, though, I recommend always the citing sources you have consulted as well as those you borrow from directly. *If you are having difficulty with an essay, please contact me right away!* That's what my email address and office hours are for.

*Link for more information*; https://sites.lsa.umich.edu/inclusive-teaching/2017/08/24/inclusive-syllabus-language/

*Developed for Clemson University by the "Dive-In to Teaching Diversity and Inclusion Across Disciplines" Faculty Learning Community, 2019. Sponsored by the Division of Inclusion and Equity.*

# EXHIBIT U



## THE4085-0M01, THE5677-0M01, MUS4674-0M01, MUS5677-0M01: Health & Wellness for the Performing Artist

Department of Theatre, School of Performing Arts,
College of Arts and Humanities
3 Credit Hours

## Instructor Information

- Instructor: **Christopher Niess**
- Office Location: Office/T234 THEATRE WING School of Performing Arts
- Office Hours: TBA and by appointment - visit the **Doodle schedule** to sign up for an appointment
- Phone: Office/ 407.823.0874
- Digital Contact: niess@ucf.edu

## Teaching Assistants

- GTA(s): **Sarah Hubert, Jessica Johnson, Joshua Kimball, Amy Livingston, Janice Munk**
- Email: **sarah.hubert@Knights.ucf.edu, jessicajaye35@Knights.ucf.edu, joshua.kimball@Knights.ucf.edu,** Amy Livingston TBD, **janicemunk@Knight.ucf.edu.**

## Course Information

- Term: Semester 2019
- Course Numbers & Sections: THE 4085   THE 5677   MUS 4674   MUS 5677   ALL ARE SECTION 0M01
- Course Name for all sections: Health & Wellness for the Performing Artist
- Credit Hours: 3
- Class Meeting Days: Thursdays
- Class Meeting Time: 4:30 - 5:45
- Class Location: MUSIC wing - School of Performing Arts M150
- Course Modality: M

## Enrollment Requirements

Course Prerequisites (if applicable): MUT 2127, or THE 2000, or Instructor Permission

Course Co-requisites (if applicable): None.
Other Enrollment Requirements (if applicable): None.

## Course Description

This course will focus on performing artists' health and related topics. Topics include: basic musculoskeletal anatomy and physiology, breathing coordination, The Alexander Technique, Body Mapping, care of the voice, discipline-based injury cause and prevention, wellness practices for the mind and body, and effective practice and performance.

## Course Materials and Resources

- **CREATIVITY AND THE PERFORMING ARTIST: BEHIND THE MASK.** Paula Thomson and S. Victoria Jaque. Academic Press/Elsevier. ISBN 978-0-12-804051-5
- **IT STARTS WITH FOOD.** Dallas and Melissa Hartwig. Victory Belt/VB Publishing ISBN 13: 978-1-628600-54-4
- You will also have numerous reading assignments that will be available on Webcourses@UCF.

Please be sure to order your textbook as soon as possible.  There are no reading assignments from the textbooks for the first three weeks so you will have time to get one ordered.  Some possibilities besides the bookstore include used book sellers at these links. Better World, e-Bay, eCampus, Amazon

### Optional Materials/Resources

- none

## Student Learning Outcomes

- Student will recognize and evaluate the body's anatomy and physiology as it relates to the movement patterns of live performance, reflected in quiz scores and daily practice.
- Student will recognize and identify physical and psychological health issues for performing artists, reflected in class discussion, journaling and quizzes.
- Student will develop strategies for injury prevention in one's own performance, including hearing protection, care of the voice and body maintenance, reflected in daily practice and research presentations.
- Student will begin to develop new habits, warmup routines and activities for maximizing performance potential and minimizing performance anxiety, reflected in daily practice and journaling.

# Course Activities

## Assignments

- Attendance/Participation/Quizzes
- Group Discussion Journal
- Body Mapping Exercise

(see details below)

## Final Projects/Examinations

- Reflection/Process Presentation
- Final "Written" Examination

(see details below)

## Required Resources

- You will need to have access to a computer with an internet connection to access webcourses.

## Activity Submissions

### Webcourses

Webcourses is an online course management system (accessed through **my.ucf.edu** and then the "Online Course Tools" tab) which will be used as a medium for turning in assignments and a forum for communicating with your teammates. Under the "Discussion" section, you will have a designated forum section. My recommendation is to check Webcourses every 2-3 days for updates from your teammates or myself.

### Technology/Software Requirements

Students will be expected to have access to a computer frequently, as all writing assignments used will be typed out and not handwritten. The software you use to write your assignments is irrelevant, as long as you follow my writing guidelines outlined later in my syllabus. I recommend to have access to a computer weekly.

### Internet Usage

You will be expected to have daily access to the internet and email, since I may be emailing you constantly about assignment updates, additions and changes. All students at UCF are required to obtain a **Knight's Email account** and check it regularly for official university communications. If you do not own a computer, there are computers accessible to you in all UCF's computer labs, and most computer labs have computers connected to the internet. For further information on computer labs, please see the following website: http://registrar.sdes.ucf.edu/webguide/index_quickfind.aspx.

## Make-up Exams and Assignments

Per university policy, you are allowed to submit make-up work (or an equivalent, alternate assignment) for university-sponsored events, religious observances, or legal obligations (such as jury duty). If this participation conflicts with your course assignments, I will offer a reasonable opportunity for you to complete missed assignments and/or exams. The make-up assignment and grading scale will be equivalent to the missed assignment and its grading scale. Please contact me ahead of time to notify me of upcoming needs.

## Course Requirements

### Class Protocols

- You must have access to the internet and an active **Knightsmail**

**Knightsmail** is the sole email address server used to communicate with students in this class.

- Movement activities will be an important part of this class. On most days we will do such activities as walking, getting in and out of a chair, floor activities, etc. You may wish to bring a yoga or pilates mat or beach towel for the floor work. You should wear comfortable, loose-fitting clothes that do not restrict your movement.

- The movement activities are an important part of getting the maximum benefit from the class. The movement activities are designed and organized for your benefit, most people enjoy them greatly and feel better for having done them. Therefore if you have a physical condition that prevents some physical activity please consult with the instructor to plan alternative physical activity that will not injure or impede you..
- Reading and listening assignments are posted well in advance. Please do these assignments before that topic is discussed in class so that you may participate knowledgeably.
- Turn off all cell phones and other electronic communication devices during class. You may use your laptop in class only for taking class notes. Using a laptop in class for other purposes (surfing internet, Facebook, poker, texting, email, etc.) is unauthorized and will result in the loss of laptop privileges in class.

**Webcourses@UCF**

- This syllabus and numerous resources and supplementary materials are housed under the MUS 5674/MUS 4674 number at Webcourses@UCF, accessible to you through your Online Course Tools tab on your MyUCF page. You will be able to review recent assignments and your current course grade, and I will use Webcourses@UCF to post announcements and supplemental materials. Discussion group assignments will be completed through Webcourses@UCF and your program notes assignments will be submitted this way as well. Webcourses is best accessed by Firefox on Mac or Internet Explorer on PC.

**Communication**

- The most reliable way to contact me is through email (niess@ucf.edu). You can generally expect a brief response in twenty-four to thirty-six hours during the week, a little longer on weekends. Complex or extended topics are best discussed either in a personal meeting or on the telephone. Please review the following email policies:
- Include "Subject" headings: use something that is descriptive and refer to a particular assignment or topic. I do not respond to email that has a blank or misleading subject heading.
- I read all email personally, so in your salutation address me by name. You may address me as Christopher, or Professor Niess. I do not respond to email that fails to address me in the salutation or addresses me as "Yo Teach," "Hey Prof," or whatever other hip greeting that students use among themselves.
- Sign your e-mail messages with your first and last name. I do not respond to "anonymous" e-mail.

# Missed Assignments/Make-Ups/Extra Credit

## *Make-up Exams Policy*

- Make-up examinations will be administered strictly according to university policy governing authorized events and activities. All other make-up examinations are at the sole discretion of the instructor and will be given only rarely and only in extraordinary circumstances.
- Consult the course calendar carefully to ensure that you do not have irreconcilable conflicts with course deadlines. For the purpose of this course please note that weddings, vacations, family reunions, etc., do not constitute "extraordinary circumstances." If you discover that these or similar events will prevent you from completing all the course requirements on time then you should drop the course.

## *Extra Credit Policy*

The extra credit policy is that no extra credit is given. Be diligent with your readings, listening, and other activities. Spend at least some time and effort with the course several times a week. Don't fall behind; set a

schedule and stick to it. If you do these things then you should do well in the course and will have no need for extra credit.

### Grades of "Incomplete"

The current university policy concerning incomplete grades will be followed in this course. Incomplete grades are given only in situations where a student has successfully completed most of the course requirements and unexpected emergencies (illness, accident, family emergency) prevent a student from completing final course requirements by the end of the semester. Your instructor is the final authority on whether you qualify for an incomplete. Incomplete work must be finished by the deadline indicated on the Incomplete Form or the "I" will automatically be recorded as an "F" on your transcript.

### End of Term Pleas and Appeals

All students will be awarded the grade you earn. Please do not embarrass me or yourself with end-of-term appeals for a higher grade based upon non-course criteria. Asking for a higher grade because of factors extraneous to your performance in the course is unethical, unfair to other students, and will not receive a sympathetic audience from the instructor.

### Syllabus Changes

I reserve the right to make changes to the syllabus and schedule as appropriate. Students will be given as much notice as possible about any changes and the reason for them.

## Evaluation and Grading

Your course grade will be based on the following assignments:

- **Attendance/Participation/Quizzes**. This course is experiential and activity-based. Regular attendance, punctuality, and participation in all class activities is a significant part of the grade. You will potentially receive 250 points calculated using a percentage of your attendance in face-to-face (F2F) sessions, participation in online prompted discussions, and timed quizzes on assignments. Unexcused tardiness, early departure from class or non-participation in discussions will result in no credit for that F2F session or project. Participation will be assessed based upon participation in any exercise/discussions for that session."
- **Journal**. You will keep a group "performer's discussion/journal" during the semester – chronicling and sharing your ideas and development regarding breath support and alignment, body mapping, and other principles related to health in the performance process. You may be given occasional prompts through webcourses@ucf on a variety of topics to help guide your journaling, but it will be your responsibility to maintain an adequate 'conversation' (at minimum once a week) centered on your developing work habits. Journals will be reviewed as part of the participation grade, and will be used for the Reflexion/Process Presentation at the end of the semester.
- **Body Mapping -**  Project based on understanding body mechanics through imagery (to aid healthy movement in practice and performance. You will complete a "Body Map", according to Alexander Theory, which is worth up to 50 points.
- **Reflection/Process Presentation --** .Reflection project is based on developing personal physical practice -- it is presented orally to the class (material presented based on observations chronicled in the online journal; and in the actual presentation, demonstrating healthy alignment, physical ease and lack of tension)
- **Final Examination** -- Based on terminology used throughout the class -- in both readings and in F2F sessions.

**Consult webcourses@ucf for schedule and details on the course assignments.**

.

| Assignment | Potential points | Letter Grade | % | Actual Points |
|---|---|---|---|---|
| Attendance/Participation/Quizzes | 250 | A | 94 – 100% | 470 - 500 |
| Body Mapping | 50 | A- | 90 – 93% | 450 - 469 |
| Reflection/Research Project (Journal) | 100 | B+ | 88 – 89% | 440 - 449 |
| Written Examination | 75 | B | 84 – 87% | 420 - 439 |
|  |  | B- | 80 – 83% | 400 - 419 |
| Total | 500 | C+ | 78 – 79% | 390 - 399 |
|  |  | C | 74 – 77% | 370 - 389 |
|  |  | C- | 70 – 73% | 350 - 369 |
|  |  | D+ | 68 – 69% | 340 - 349 |
|  |  | D | 64 – 67% | 320 - 339 |
|  |  | D- | 60 – 63% | 300 - 319 |
|  |  | F | below 60% |  |

# Attendance Policy

*90% of success in life is just showing up—Woody Allen*

On-time attendance at all class meetings is expected. Research has repeatedly demonstrated that students who attend class regularly do better in the course than students who frequently miss class. Class will begin promptly at 4:30 and end promptly at 5:45. Part of your grade will be calculated from class participation. Please note the following policies related to attendance:

University Policy (Undergraduate Catalog):  "Reasons for acceptable absences may include illness, serious family emergencies, special curricular requirements (e.g., judging trips, field trips, professional conferences), military obligations, severe weather conditions, and religious holidays."

- I reserve the right to take attendance on any class day and use that as part of you class participation grade. If you are not in class at the beginning of class when attendance is taken then you will be counted as absent that day.
- If you know that you will need to be absent on a given day or must leave class early please notify me in advance.
- Important:I must receive Program Verification forms for off-campus activities (concerts, school visitations, field trips, etc.) a minimum of two (2) weeks before the activity that will cause you to miss class. It is your responsibility to submit these forms to me and to take the initiative in rescheduling or making up any class work missed due to these activities.

*Federal Financial Aid Compliance Information*

All faculty members are required to document students' academic activity at the beginning of each course. In order to document that you began this course, please complete the academic activity quiz on Webcourses by the

end of the first week of classes, or as soon as possible after adding the course, but no later than **January 13**. Failure to do so will result in a delay in the disbursement of your financial aid.

Academic Activity Assignment: Attend class before **January 15, 2016**.

## Academic Honesty

Plagiarism and Cheating of any kind on an examination, quiz, or assignment will result at least in an "F" for that assignment (and may, depending on the severity of the case, lead to an "F" for the entire course) and may be subject to appropriate referral to the Office of Student Conduct for further action. See the UCF Golden Rule for further information. I will assume for this course that you will adhere to the academic creed of this University and will maintain the highest standards of academic integrity. In other words, don't cheat by giving answers to others or taking them from anyone else. I will also adhere to the highest standards of academic integrity, so please do not ask me to change (or expect me to change) your grade illegitimately or to bend or break rules for one person that will not apply to everyone.

## Course Accessibility Statement

The University of Central Florida is committed to providing reasonable accommodations for all persons with disabilities. This syllabus is available in alternate formats upon request. Students with disabilities who need accommodations in this course must contact the professor at the beginning of the semester to discuss needed accommodations. No accommodations will be provided until the student has met with the professor to request accommodations. Students who need accommodations must be registered with Student Disability Services, Ferrell Commons, 7F, Room 185, phone (407) 823-2371, TTY/TDD only phone (407) 823-2116, before requesting accommodations from the professor.

## Campus Safety Statement

Emergencies on campus are rare, but if one should arise in our class, everyone needs to work together. Students should be aware of the surroundings and familiar with some basic safety and security concepts.

- In case of an emergency, dial 911 for assistance.
- Every UCF classroom contains an emergency procedure guide posted on a wall near the door. Please make a note of the guide's physical location and consider reviewing the online version at http://emergency.ucf.edu/emergency_guide.html.
- Students should know the evacuation routes from each of their classrooms and have a plan for finding safety in case of an emergency.
- If there is a medical emergency during class, we may need to access a first aid kit or AED (Automated External Defibrillator). To learn where those items are located in this building, see http://www.ehs.ucf.edu/workplacesafety.html (click on link from menu on left).
- To stay informed about emergency situations, sign up to receive UCF text alerts by going to my.ucf.edu and logging in. Click on "Student Self Service" located on the left side of the screen in the tool bar, scroll down to the blue "Personal Information" heading on your Student Center screen, click on "UCF Alert," fill out the information, including your e-mail address, cell phone number, and cell phone provider, click "Apply" to save the changes, and then click "OK."
- Students with special needs related to emergency situations should speak with their instructors outside of class.
- To learn about how to manage an active-shooter situation on campus or elsewhere, consider viewing this video. You CAN Survive an Active Shooter

## Deployed Active Duty Military Students

If you are a deployed active duty military student and feel that you may need a special accommodation due to that unique status, please contact your instructor to discuss your circumstances.

## Copyright

This course may contain copyright protected materials such as audio or video clips, images, text materials, etc. These items are being used with regard to the Fair Use doctrine in order to enhance the learning environment. Please do not copy, duplicate, download or distribute these items. The use of these materials is strictly reserved for this online classroom environment and your use only. All copyright materials are credited to the copyright holder.

## Third-Party Software and FERPA

During this course you might have the opportunity to use public online services and/or software applications sometimes called third-party software such as a blog or wiki. While some of these could be required assignments, you need **not** make any personally identifying information on a public site. Do not post or provide any private information about yourself or your classmates. Where appropriate you may use a pseudonym or nickname. Some written assignments posted publicly may require personal reflection/comments, but the assignments will not require you to disclose any personally identity-sensitive information. If you have any concerns about this, please contact your instructor.

### Diversity and Inclusion

The University of Central Florida considers the diversity of its students, faculty, and staff to be a strength and critical to its educational mission. UCF expects every member of the university community to contribute to an inclusive and respectful culture for all in its classrooms, work environments, and at campus events. Dimensions of diversity can include sex, race, age, national origin, ethnicity, gender identity and expression, intellectual and physical ability, sexual orientation, income, faith and non-faith perspectives, socio-economic class, political ideology, education, primary language, family status, military experience, cognitive style, and communication style. The individual intersection of these experiences and characteristics must be valued in our community.

Title IX prohibits sex discrimination, including sexual misconduct, sexual violence, sexual harassment, and retaliation. If you or someone you know has been harassed or assaulted, you can find resources available to support the victim, including confidential resources and information concerning reporting options at www.shield.ucf.edu and http://cares.sdes.ucf.edu/.

If there are aspects of the design, instruction, and/or experiences within this course that result in barriers to your inclusion or accurate assessment of achievement, please notify the instructor as soon as possible and/or contact Student Accessibility Services.

For more information on diversity and inclusion, Title IX, accessibility, or UCF's complaint processes contact:

- Title IX – EO/AA - http://www.eeo.ucf.edu/& askanadvocate@ucf.edu
- Disability Accommodation – Student Accessibility Services - http://sas.sdes.ucf.edu/& sas@ucf.edu
- Diversity and Inclusion Training and Events – ucf.edu
- Student Bias Grievances – Just Knights response team - http://jkrt.sdes.ucf.edu/
- UCF Compliance and Ethics Office - http://compliance.ucf.edu/& complianceandethics@ucf.edu
- Ombuds Office - http://www.ombuds.ucf.edu

Back to University of Central Florida School of Performing Arts

Original intellectual content © Copyright 2018, by Christopher Niess.
All other content © Copyright 2017, University of Central Florida
For technical support, contact Webcourses@UCF Support

## Class Schedule

**THE4085-0M01, MUS4674-0M01  (undergraduate)**

**THE5677-0M01, MUS5677-0M01  (graduate)**

Schedule Spring 2019 Schedule ***Schedule Subject to Change***

| Week/Date | | Topics | Assignments | Due Dates |
|---|---|---|---|---|
| WEEK 0<br><br>JANUARY | TUESDAY 8<br>**ONLINE** | **MODULE 0**<br><br>INTRO and HOUSEKEEPING | **Online Reading 0**:<br><br>**Alexander Technique, Joan Arnold (Links to an external site.)Links to an external site.**<br><br>**Quiz 0 on Syllabus** | WED 9 11:59 pm<br><br>THRS 10 11:59 pm |
| WEEK 1 | THURSDAY 10<br>**F2F** | **MODULE 1**<br><br>Breath and Support of Physical Action | Breath, Capacity and Release of Tension – in-class game, exercises, and coaching:<br><br>(breath-action-and tension – go game, 'vacuuming the lungs', panting sequence, primal sound) | |
| | TUESDAY 15<br>**ONLINE** | | **Journal/Discussion #1**<br><br>**Online Reading 1**:<br><br>from **The Complete Guide to the Alexander Technique (Links to an external site.)Links to an external site.**  (Links to an external site.)Links to an external site.<br><br>Nicholas Brockbank article – **What did Alexander Discover and Why is it Important? (Links to an external site.)Links to an external site.:**<br><br>**Quiz 1 on Reading 0 & 1**: | WED 16 11:59 pm<br><br>THRS 17 11:59 pm |
| WEEK 2 | THURSDAY 17<br>**F2F** | | Downward or backward 'pull' and use of spinal alignment in movement | |

| | | | | |
|---|---|---|---|---|
| | | | Constructive rest, relaxation exercises, Bartenieff fundamental exercise, review of breathing exercises, add the wall exercise (2 versions), | |
| | TUESDAY 22 **ONLINE** | | **Journal/Discussion #2**<br><br>**Reading 2 Review the following diagrams and exercises:**<br><br>**Body Alignment affected by muscular habit: (Links to an external site.)Links to an external site.**<br><br>**short video on neck alignment (Links to an external site.)Links to an external site.**<br><br>**Neck alignment affected by muscular habit: xray 1 (Links to an external site.)Links to an external site.**<br><br>**Neck alignment xray 2 (Links to an external site.)Links to an external site.**<br><br>**Neck alignment xray 3 (Links to an external site.)Links to an external site.**<br><br>**Stretches for the SCMs (Links to an external site.)Links to an external site.**<br><br>**Quiz 2 on Class Material (constructive rest, breathing exercises)** | WED 23 11:59 pm<br><br><br><br><br><br><br><br><br><br><br><br><br><br>WED 23 11:59 pm |
| WEEK 3 | THURSDAY 24 **F2F** | | Review of breathing exercises, the wall exercise, add the chair (sitting, getting in, getting up), review Bartenieff Fundamentals, discuss iliopsoas and sartorius muscles | |
| | TUESDAY 29 **ONLINE** | | **Journal/Discussion #3**<br><br>**Reading 3 Review the following diagrams:**<br><br>(these URLs will take you to Kenhub – an excellent online source for anatomical diagrams. You can view the main diagram without signing up for a free membership, or gain access to videos by signing up. Anyone who is interested in sports or an | WED 30 11:59 pm |

| | | | active lifestyle will find this a great beginning source.) | |
| | | | **Iliopsoas muscle (Links to an external site.)Links to an external site.** | WED 30 11:59 pm |
| | | | sartorius muscle (Links to an external site.)Links to an external site. | |
| | | | **Quiz 3 on iliopsoas and Sartorius function in relation to breath, alignment and the primal control** | |
| WEEK 4 | THURSDAY 31 **F2F** | | Finding your six places of balance.<br><br>Review iliopsoas and sartorius function in relation to freeing the breath and body and alignment while in motion....walking, undulation, sitting, movement while playing instrument, rehearsing, dancing | |
| FEBRUARY | TUESDAY 5 **ONLINE** | | **Journal/Discussion #4**<br><br>**Quiz 4 on MODULE 1** | WED 6  11:59pm<br><br>WED 6  11:59pm |
| WEEK 5 | THURSDAY 7 **F2F** | | Review and Work Day | |
| | TUESDAY 12 **ONLINE** | | | |
| WEEK 6 | THURSDAY 14 **F2F** | | Physical Assessment 1 | |
| | TUESDAY 19 **ONLINE** | | | |
| WEEK 7 | THURSDAY 21 **F2F** | **Module 2:**<br><br>Care and Maintenance of the Powerhouse | | |
| | TUESDAY 26 **ONLINE** | | | |
| WEEK 8 | THURSDAY 28 **F2F** | | | |
| MARCH | TUESDAY 5 **ONLINE** | | | |

| | | | | |
|---|---|---|---|---|
| WEEK 9 | THURSDAY 7 **F2F** | | | |
| | TUESDAY 12 **ONLINE** | SPRING BREAK | | |
| WEEK 10 | THURSDAY 14 **F2F** | SPRING BREAK | | |
| | TUESDAY 19 **ONLINE** | **Module 3:**<br><br>Maintaining Wellness of the Emotional/Intellectual Performer | | |
| WEEK 11 | THURSDAY 21 **F2F** | | | |
| | TUESDAY 26 **ONLINE** | | | |
| WEEK 12 | THURSDAY 28 **F2F** | | | |
| APRIL | TUESDAY 2 **ONLINE** | | | |
| WEEK 13 | THURSDAY 4 **F2F** | YOGA PRACTICE JEREMY HUNT | | |
| | TUESDAY 9 **ONLINE** | | | |
| WEEK 14 | THURSDAY 11 **F2F** | - ESTILL CARE OF THE VOICE<br><br>DR STEVEN CHICUREL STEIN | | |
| | TUESDAY 16 **ONLINE** | | | |
| WEEK 15 | THURSDAY 18 **F2F** | | | |
| FINAL EXAM | **ONLINE** | | | |

| FINAL PROJECT PRESENTATIONS | **THURSDAY APR 25 4:00pm** | | | |
|---|---|---|---|---|

# EXHIBIT V



**Michael Preston**
@MPrestonEdD                                                    ∘∘∘

Replying to @danbureau

I've been working in this arena for 20 years. The biggest difference I can see is how speech is being politicized whereas the speaker being invited it to intentionally spark a "free speech crisis" response. The organizers never intend on the speaker intend on dialogue.

7:15 AM · Apr 2, 2019 · Twitter for Android

**1** Like





**Michael Preston** @MPrestonEdD · Apr 2, 2019        ∘∘∘
Replying to @MPrestonEdD and @danbureau
They intentionally want the speech to be shut down to prove their point so there is an intentional effort to incite.

♡ 1              ⟲              ♡ 1              ⬆



**Michael Preston** @MPrestonEdD · Apr 2, 2019        ∘∘∘
On the other side I find students came to my office rehearsed in their "concerns" for their safety and mental health. Groups get training on what to say to get an event canceled. It's a dance over politics and not free speech itself.

♡              ⟲              ♡ 2              ⬆

# EXHIBIT W

# UNIVERSITY OF CENTRAL FLORIDA
## OFFICE OF INSTITUTIONAL EQUITY

**IN THE MATTER OF:**
**OIE CASE NO. 2019-01225**

## INVESTIGATIVE REPORT

**January 13, 2021**

SUBMITTED BY:  Nancy Fitzpatrick Myers, J.D.
Director, Office of Institutional Equity

1

## I.     INTRODUCTION

From June 4, 2020 through August 2020, the Office of Institutional Equity (OIE) received reports from multiple sources (including phone calls, emails, IntegrityLine reports,[1] Just Knights Response Team (JKRT) reports,[2] and Office of Student Conduct reports) wherein individuals alleged that the Respondent, an Associate Professor in the Department of Psychology, had subjected students to discriminatory harassment in the classroom based on race, ethnicity, national origin, sex, sexual orientation, gender identity, disability, and religion; subjected students to sexual harassment; subjected students to *quid pro quo* harassment based on religion; engaged in unprofessional conduct; and, failed to appropriately report and respond to a student's disclosure of a sexual assault to the University. Some reports indicated support for the Respondent and denied misconduct in the classroom, while others shared their reactions to the Respondent's social media activity and did not identify specific classroom or workplace misconduct. Specifically, OIE initially reviewed approximately 400 hundred emails, over 100 IntegrityLine reports, 10 Just Knights Response Team reports, and two Office of Student Conduct reports related to the Respondent.

Based upon the information provided, OIE initiated an inquiry and contacted multiple witnesses in this matter. OIE is a neutral investigatory office responsible for investigating claims of discrimination and harassment based on protected classifications, as well as retaliation. When investigations reveal the presence of discriminatory, harassing or retaliatory behavior, OIE is responsible for making recommendations to mitigate the effects of the discriminatory conduct. Accordingly, OIE conducted an investigation into this matter, and this investigative report summarizes the investigation, factual background, and findings of OIE arising from this investigation.

As set forth in detail below, on December 19, 2019 and June 4, 2020, the university received multiple reports alleging that the Respondent had made discriminatory statements on his personal Twitter account, which individuals believed constituted cause to terminate the Respondent's employment. OIE reviewed the Twitter account and posts of concern (both in December 2019 and again during this investigation) and analyzed whether those statements constituted protected free speech.  In this regard, it is important to note that the First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern as "a citizen who works for the government is nonetheless a citizen."  The courts have noted that it is their "responsibility" to "ensure that citizens are not deprived of fundamental rights by virtue of working for the government."

---

[1] UCF's IntegrityLine is a secure reporting system administered by an independent third party, NAVEX Global, that is available 24 hours a day for 365 days a year.  NAVEX Global uses their case management system, EthicsPoint, to provide individuals (who may be reluctant to report suspected misconduct through university administrative or central offices) a way to report with complete anonymity. IntegrityLine reports are processed by EthicsPoint and sent to the University Compliance, Ethics, and Risk Office (UCER) to address appropriately. Hereinafter, the IntegrityLine will be referred to as "IL."

[2] UCF's Just Knights Response Team (JKRT), which is made up of UCF faculty, staff, and students, provides assistance in the event that an individual has experienced or witnessed a hate or bias related incident at UCF. In this role, the JKRT will receive, monitor, refer, and, as necessary, coordinate university resources to these incidents that impact the university community.

Although witnesses alleged that the Respondent's Twitter posts were integrated into the course curriculum and, accordingly, did not merit First Amendment protection, OIE found that there was insufficient evidence in the current record to support this allegation. OIE also analyzed whether the Twitter posts, however controversial or repugnant, addressed a matter of public concern as described in First Amendment jurisprudence. OIE found that the Respondent's Twitter posts involved matters of public concern and, accordingly, were protected by the First Amendment and could not be the basis for a finding of misconduct or disciplinary action.

Turning to the allegations regarding classroom misconduct, it is important to note that in matters involving in-class comments by professors, any analysis of statements that are alleged to constitute discriminatory harassment must consider whether the speech was protected under the doctrine of academic freedom. "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." It consists of "the right of an individual faculty member to teach ... without interference from ... the university administration, or his fellow faculty members." That said, it is important to take into "account the unique context in which a college professor speaks such that his students are a 'captive audience' who may find themselves intimidated by the person who has the ability to pass upon them a poor grade." The "principle of academic freedom under the First Amendment serves to protect the utterances in question only if they are germane to course content."

After reviewing the 94 undisputed facts and analyzing which of the 84 disputed facts as captured below were substantiated by the evidence, OIE conducted an in-depth analysis of whether the undisputed and substantiated conduct was protected by academic freedom utilizing the course objectives as described by the Respondent during his OIE interview and each course's syllabus (see Section VIII(B) below). OIE determined that 50 of the Respondent's behaviors were protected by academic freedom, and thus were not subject to the analysis of whether the Respondent had engaged in misconduct. For instance, OIE determined that the following were protected by academic freedom: Respondent's discussion that gender is not a total social construct, Respondent's discussion related to a tribe's practices related to sexual conduct, Respondent's presentation of statistics related Muslims' opinions and statistics related to education and income based on race, Respondent's use of particular videos (*By the Numbers*, *Consent*, *Frederick Wilson II*), Respondent's discussion related to the lack of a necessity for affirmative action and the ineffectiveness of diversity initiatives, and Respondent's presentation in his Cross Cultural Psychology course that the U.S. no longer has systemic racism.

Turning to the remaining behavior that OIE found was not protected by academic freedom, OIE found that there was sufficient evidence to support finding that the Respondent created a hostile learning environment for students in violation of the University's *Non-Discrimination Regulation UCF 3.001*, *Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy UCF 2-004.1* and *Code of Conduct*. This conduct included, but was not limited, to the following: The Respondent told students in his General Psychology courses and Cross Cultural Psychology courses that God did not exist and was not real, God was a figment of their imagination, religion was all make-believe, believers were delusional, childish, irrational, unintelligent and ignorant, and believing in religion was like believing in flying elephants, fairy tales, and Santa Clause. The Respondent also told students that raising children with a religious upbringing was a form of child abuse and issued an exam question that asked:

According to any *reasonable* and *rational* person, telling children that someone is watching them 24/7 and knows every "move they make" and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection.  Students needed to select option "B. child abuse" to receive credit for answering this question correctly. The Respondent told students that Islam was the fastest growing religion in the world, which just baffled him as to why anyone would want to be a "slave to such toxic mythology." He also stated that with regard to Islam, the "crackpots who run the cult called Islam will kill you", and it would be hard to convince him that Islam is a religion of peace. OIE also found that when discussing Frederick Jones, a Black inventor of the portable refrigerator, the Respondent said, "First off, he's not that Black, he's more White than Black." He also told students that Black men have the biggest penises, followed by Whites and Hispanics, followed by Asians.  In addition, on at least one occasion, the Respondent made reference to the difference in penis sizes and then high fived a Black male student. He also told students that minorities should be thanking Whites for creating a modern society. The Respondent said to students, "I wish we would eliminate corporal punishment. I wish those of you who are concerned with racism were just concerned with child abuse but unfortunately, you're not because you don't get anything out of it. Showing yourself as antiracist, you can look in the mirror and get a little boner." He also said that a woman was kind of like a Ford pickup truck, built to take a pounding, as well as that most people referred to women who slept with a lot of men as whores and sluts, but he just called them his best friends.  The Respondent further told students that "all men are a little bit gay because if someone was sucking their dicks and they were going to cum and they then realized that it was a guy doing the sucking, they would still finish."

OIE further found that the Respondent violated *UCF Regulation 3.001 Non-Discrimination; Affirmative Action Programs* in February 2014 when he failed to report and appropriately respond to a student's disclosure of having been sexually assaulted by one of his teaching assistants.  In particular, OIE found that the Respondent attempted to dissuade her from pursuing her allegations against the teaching assistant, placed responsibility for the incident on the student, determined that the teaching assistant must have misinterpreted her actions without speaking with him, and, rather than providing resources to the student, advised her to be "more conscientious when choosing" her friends.

The Respondent also violated the University's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1* by deterring students from filing complaints related to his classroom conduct. Specifically, the Respondent repeatedly told students that he was untouchable because he was tenured, that the university had previously investigated student complaints against him that were dismissed, that he "laughs the whole way" when the University investigates complaints, and that the only way he could be fired was if he raped a student.

The Respondent further violated both the University's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1* and *Code of Conduct (Honesty and Integrity)* by providing false information during OIE's investigation (see Section VII *Consistency* subsection).[3]

---

[3] OIE would note that the office of University Compliance, Ethics and Risk (UCER) participated in the Respondent's interview and reviewed the evidence and findings set forth herein related to policies identified above

In addition to the discriminatory comments supporting the hostile learning environment finding, the Respondent violated the University's *Code of Conduct* when he mocked students, repeatedly used profanity, and made inappropriate comments related to sexual assault during class such as telling students that there were many false rape accusations that plagued college campuses, campuses were unfairly treating men accused of sexual assault, and there was an epidemic of men being kicked out of the university because of false allegations under Title IX even though he admitted during his OIE interview, "I don't know the specifics of Title IX." He also referenced the arrest of Robert Kraft, NFL Patriots owner, and said that Mr. Kraft had done nothing wrong as it was not rape if you had sex with a victim of human trafficking.

OIE's investigation further revealed that the Respondent violated the *2010-2012 UCF BOT-UFF Collective Bargaining Agreement* when he bribed a health clinic representative to provide him with a falsified yellow fever vaccination certificate in 2011 while in Peru for a UCF study abroad program. Based on the totality of the record and findings, OIE recommends that management consider effective disciplinary action, up to and including termination.

Furthermore, upon reviewing the evidence related to the history of reports pertaining to the Respondent, OIE would note that the record did not support that management or central University offices had been notified of the full nature and scope of the allegations against the Respondent until June, 2020.  Nevertheless, OIE reviewed the current reporting options and messaging regarding how to report concerns of this nature, including the University-wide *Let's Be Clear* campaign and website related to reporting sex-based and sexual harassment concerns, the University-wide *Speak Up* campaign related to reporting any concerns of misconduct via the IntegrityLine, the required trainings provided to students that cover how to report concerns of discrimination (*Let's Be Clear* training), and the information provided to students during their orientations. Based on this review, OIE recommends that the university continue the current messaging and providing the available reporting avenues to students.  That said, based on the information related to students' discussions with academic advisors, OIE recommends that additional training be provided to academic advisors regarding how to respond to and how to report concerns of this nature.  Furthermore, during the investigation, OIE noted that the student grade appeal form combines the "other reasons" basis for an appeal with the discrimination basis for an appeal, which may cause students and administrators some confusion.  Accordingly, OIE will work with the appropriate university officials to make these separate grounds for appeal on the form.

Lastly, throughout the course of this investigation, students reported that the Respondent used time in class to espouse his opinions rather than teach relevant course content, provided students with misinformation, failed to provide a complete picture of the issues presented or presented misleading, outdated and inaccurate information (particularly with regard to race), and failed to issue appropriate exam questions.  OIE notes that the findings above do not address these concerns.  Although OIE acknowledges students' understandable concerns related to these allegations of the Respondent's performance as an instructor, course curriculum and course

---

outside of the Nondiscrimination Policy and Nondiscrimination Regulation (i.e. *Code of Conduct* and *Reporting Misconduct and Protection from Retaliation Policy*, No. 2-700.1).  UCER supports the findings under these policies as noted herein.

structure, those concerns are more appropriately reviewed by the College of Sciences and, accordingly, have been referred to the college.

## II.     APPLICABLE STANDARDS OF REVIEW & EVIDENTIARY STANDARD

In the present case, current and former students claimed that the Respondent subjected them to sexual harassment and/or created a hostile environment based on race, ethnicity, national origin, sex, sexual orientation, gender identity/expression, disability, and/or religion.  OIE also received allegations that the Respondent subjected students to *quid pro quo* harassment based on religion; engaged in unprofessional conduct; and, failed to appropriately report and respond to a student's disclosure of sexual assault to the University. During the course of the investigation, OIE received allegations that the Respondent discouraged students from filing complaints regarding his classroom conduct and bribed a health care clinic representative during a UCF study abroad trip. A review of the relevant University policies and regulations below provides the framework used by OIE in its analysis of the allegations.

### Nondiscrimination Policy & Regulation:

The University of Central Florida's *Non-Discrimination Regulation UCF 3.001* and *Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy UCF 2-004.1* (hereinafter *Nondiscrimination Policy*) provides in relevant part:[4]

> The University does not unlawfully discriminate in any of its education or employment programs and activities on the basis of an individual's race, color, ethnicity, national origin, religion, … sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), … physical or mental disability … or membership in any other protected classes as set forth in state or federal law. … Disability discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability where the accommodations do not impose an undue hardship.
> …
> The university prohibits discrimination, as well as discriminatory harassment … Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon an individual's race, color, ethnicity, national origin, religion, non-religion, … sex (including pregnancy and parental status), gender identity or expression, sexual orientation, … physical or mental disability … or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services

---

[4] This University policy and regulation are considered to provide similar protections against sexual harassment and discriminatory harassment as those afforded under the Florida Civil Rights Act of 1992 (§760.10 et seq., §110.1221), Title VI of the Civil Rights Act of 1964 (Title VI), Title VII of the Civil Rights Act of 1964 (Title VII), and Title IX of the Education Amendments of 1972 (Title IX). While not a mirror image of these statutory counterparts, the examination of sexual harassment and discriminatory harassment claims under the University regulation and policy are similar to that under these relevant laws.

meeting the description of either *Hostile Environment Harassment* or *Quid Pro Quo Harassment*.

…

*Hostile Environment Harassment* is defined as discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective.

…

*Quid Pro Quo Harassment* is defined as discriminatory harassment where submission to or rejection of unwelcome conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing).

…

Sexual harassment is defined as any unwelcome sexual advances, request for sexual favors, and other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, or otherwise, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above, are present.

…

Responsible employees are required to immediately report to the University's Office of Institutional Equity all relevant details (obtained directly or indirectly) about an incident of sex/gender-based discrimination or harassment, sexual harassment, Title IX sexual harassment, sexual assault, sexual exploitation, relationship violence, and/or stalking (as defined herein) that involves any student as a complainant, respondent, and/or witness, including dates, times, locations, and names of parties and witnesses.[5]

---

[5] As set forth in the Respondent's *Notice of Investigation* and OIE's July 31, 2020 letter, OIE received allegations that the Respondent engaged in misconduct from 2005 through the 2020 Spring semester, with a higher volume of allegations related to conduct alleged to have occurred between 2016 and 2020.  Although UCF's *Nondiscrimination Policy* was initially issued and became effective on June 16, 2017, UCF's *Nondiscrimination Regulation* (UCF-3.001) was in effect during the relevant time period and, similarly, prohibited sexual harassment and discriminatory harassment, as well as required employees to report discrimination concerns.  Specifically, prior versions of the *Nondiscrimination Regulation* stated that the "University shall not discriminate in offering access to its educational programs and activities … on the basis of race, color, religion, sex, national origin, age, disability, marital status, sexual orientation, and veteran status."  The Regulation further prohibited sexual harassment defined as "unwelcome sexual advances, or requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (a) Submission to such conduct or request is made either explicitly or implicitly a term or condition of an individual's employment or academic achievement; (b) Submission to or rejection of such conduct or request by an individual is used as the basis for employment or academic decisions affecting such individual; or (c) Such conduct or request has the purpose or effect of unreasonably interfering with an individual's employment or academic performance and of creating an intimidating, hostile work or academic environment."  The Regulation further stated that any employee "who has actual knowledge by … receipt of a complaint of discrimination involving any of those employees he or she supervises or over whom he or she has managerial authority, and who does not investigate or report the matter to an appropriate university official with authority to take action with regard to the matter, shall be subject to disciplinary action up to and including dismissal or expulsion."

**Code of Conduct Expectations:**

The University of Central Florida's *Code of Conduct* states in relevant part:

**UCF Ethical Standards**. UCF is founded on integrity and expects members of the university community to demonstrate an unwavering commitment to the highest standards of excellence and ethical behavior.
…
**Honesty and Integrity**. We are fair and honest in all of our activities and avoid actual or perceived conflicts of interests or commitments. We strive for transparency in our actions and do not allow plagiarism, lying, deliberate misrepresentation, theft, fraud, or cheating.
…
**Respect**. We treat everyone with respect and dignity; we embrace, celebrate, and value diversity and inclusion. We respect the ideas of others, even when they differ from our own. We do not tolerate harassment, mistreatment, belittling, harming, or taking advantage of others.
…
**Responsibility and Accountability**. We comply with all applicable laws, regulations, and policies, ensuring that all of our decisions are legal and ethically sound. We recognize our obligation to report unethical and illegal conduct.
…
**Dignity and Respect**. Here at UCF, we treat each other with dignity and respect. We embrace, celebrate, and value diversity, equity and inclusion and that means that we respect the ideas of others, even when they differ from our own.
…
**Engaging, Exploring, and Advancing an Inclusive Culture**. We are strongest as an educational institution, employer, and community leader when we bring diverse thought and experience to our decision-making, teaching, research, and interactions with community members. Accordingly, all members of our university community have a responsibility to treat each other with consideration and respect.
…
**Complying with laws of other countries**. Through our international partnerships and study abroad programs, some of our actions and activities will be subject to the laws of other countries. In addition to following the Employee Code of Conduct, we are required to know and follow these laws.
…
**Anti-corruption and Bribery**. Each of us has an obligation to comply with the U.S. Foreign Corrupt Practices Act and all country-specific anti-bribery and anticorruption laws. These laws generally state that you may not give, promise, or offer anything of value, no matter how small, to anyone for the purpose of improperly influencing a decision, securing an advantage, avoiding a disadvantage, or obtaining or retaining business.

**<u>Reporting Misconduct and Protection from Retaliation Policy</u>**:

The University of Central Florida's *Reporting Misconduct and Protection from Retaliation Policy*, No. 2-700.1, states in relevant part:

> It is prohibited under this policy for an individual to engage in identifiable actions with the intention of preventing or deterring a reasonable person from submitting a report of potential misconduct or participating in a misconduct investigation.
> …
> Failure to cooperate with University of Compliance, Ethics and Risks or providing false information in an investigation could result in disciplinary action up to and including termination.

**<u>Textbook Adoption</u>**:

The University of Central Florida's Regulation UCF-2.032, *Textbook Adoption*, states in relevant part:

> (12) Requiring the use of a textbook … by the instructor of the course, … where the author/instructor anticipates receiving royalties from books … purchased by students enrolled in her/his course is considered a conflict of interest. The author/instructor must report the use of his/her educational materials under these circumstances with the action taken to mitigate the conflict of interest created in the online Potential Outside Activity, Employment, and Conflict of Interest and Commitment Disclosure (AA-21). Mitigation actions include offering the materials to UCF students at reduced or not cost or donating the royalties to a non-profit organization.

**<u>Academic Freedom Doctrines at UCF</u>**:

The University's *Collective Bargaining Agreement 2018-2021* (as ratified on September 19, 2019) provides in relevant part:

> **5.2 Academic Freedom.** Academic freedom is the freedom to teach, both in and outside the classroom, to conduct research, and to publish the results of that research. Consistent with the exercise of academic responsibility, employees shall have freedom to present and discuss their own academic subjects, frankly and forthrightly, without fear of censorship, and to create and select instructional and course materials, and to determine grades in accordance with University grading policy. Objective and skillful exposition of such subject matter, including the acknowledgment of a variety of scholarly opinions, is the duty of every employee. Employees are also free to address any matter of institutional policy or action. As individuals, employees are free to express their opinions to the larger community on any matter of social, political, economic, or other public interest, without institutional discipline or restraint due to the content of those messages. Unless specifically authorized by the administration, employees' opinions do not reflect the policies or official positions of the University of Central Florida.

**5.3 Academic Responsibility.** Academic freedom is accompanied by corresponding responsibility on the part of employees. University faculty are members of a learned profession. As scholars and educators, they should remember that the public may judge their profession and their institution by what they say and do. Accordingly, they shall:

(a) Be forthright and honest in all professional settings, including teaching, advising, service, and the pursuit and communication of scientific and scholarly knowledge;

(b) Observe and uphold the ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge;

(c) Adhere to their proper roles as teachers, researchers, intellectual mentors, or counselors;

(d) Respect students, staff, and colleagues as individuals; treat them in a professional manner; and avoid any exploitation of such persons for private advantage;

(e) Respect the integrity of the evaluation process, by evaluating students, staff, and colleagues fairly according to the criteria the evaluation process specifies;

(f) Contribute to the orderly and effective functioning of their academic unit i.e., program, department, school and/or college and/or the University;

(g) Observe the regulations of the University, provided they do not contravene the provisions of this Agreement; and

(h) Indicate when appropriate that one is not an institutional representative unless specifically authorized as such.[6]

**Evidentiary Principles**:

The standard of proof utilized in OIE's investigations is "preponderance of the evidence," which is defined as that degree of relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true. The burden of persuading the investigator that a decision or action was based on a protected class always rests on the complaining parties and because discrimination cannot be presumed, the investigator may not find discrimination when the evidence is sharply conflicting, unclear or equivocal.

## III.   OIE INVESTIGATION

Although the summary of OIE's investigative steps is typically set forth in detail in this section of OIE's Investigative Report, due to the length of the summary in this matter (25 pages), this summary has been set forth in Attachment A.

---

[6] Nearly identical language is set forth in prior agreements, i.e. University's *Collective Bargaining Agreement* 2015-2018 (as ratified on December 8, 2015):  https://www.collectivebargaining.ucf.edu/proposals/2015-2018FB/2015-11-12AllTAdArticlesBOOK.pdf;  University's *Collective Bargaining Agreement* 2012-2015 (as ratified on August 26, 2014): https://www.collectivebargaining.ucf.edu/CBA/2015-2015CBA_wReopeners2014-15.pdf; University's *Collective Bargaining Agreement* 2010-2012 (as ratified on January 27, 2011): https://www.collectivebargaining.ucf.edu/CBA/2010-12_FINAL.pdf; University's *Collective Bargaining Agreement* 2004-2007:  https://www.collectivebargaining.ucf.edu/CBA/2004-07CBA.pdf.

**IV.**     **SUMMARY OF DISCRIMINATION & FAILURE TO REPORT ALLEGATIONS AGAINST THE RESPONDENT**

**A.     Respondent's Twitter Postings**

On December 19, 2019, an unidentified concerned citizen reported to UCF's University Audit that they had reviewed the Respondent's posts on his personal Twitter account and believed that the Respondent had made "misogynistic, transphobic, racist, anti-immigrant and religiously discriminating comments." The concerns were referred to OIE for further review. OIE reviewed the information provided and the Respondent's Twitter account information. On January 10, 2020, OIE advised that although it was understandable why the reporter found some of the posts concerning and offensive, no further OIE action could be taken as the site was not affiliated with UCF and appeared to be a personal social media platform wherein the speech was protected by the First Amendment . Also, there was no allegation that the Respondent had subjected students or employees to discrimination or discriminatory harassment. Accordingly, OIE advised that it was closing the matter and would re-open it if further information developed in this regard. On June 4, 2020, the university received multiple reports alleging that the Respondent had made additional discriminatory statements on his Twitter account, which individuals believed constituted cause to terminate the Respondent's employment. The university also received allegations that the Respondent's Twitter posts were part of the Respondent's course curriculum. Based on this information, OIE's December 2019 matter related to the Respondent was re-opened for further investigation.

**B.     Respondent's Alleged Discriminatory Comments in the Classroom**

Former and current students and anonymous individuals (hereinafter referred to as "witnesses") alleged that the Respondent had engaged in misconduct in the classroom that had been occurring for multiple years. Specifically, they alleged that the Respondent used derogatory terms and made derogatory statements based on protected classes (race, ethnicity, national origin, sex, sexual orientation, gender identity/expression, disability, and/or religion), made unwelcome comments of a sexual nature, subjected students to *quid pro quo* harassment based on religion; failed to provide disability-related student accommodations; and, failed to appropriately report and respond to a student's disclosure of a sexual assault to the University.

It is important to note that multiple students, who had been enrolled in the Respondent's courses, indicated that they did not have concerns regarding the Respondent's conduct in the classroom. Rather, for some, the Respondent's course was their favorite class at UCF and caused them to think in a more critical way. These students stated that they never observed the Respondent engage in discriminatory conduct, and they believed that his lectures were professional, appropriate and thought provoking. *E.g., Witness 1 Phone Log, Witness 2 Phone Log, Witness 3 Phone Log, Witness 4 Phone Log, Witness 5 Phone Log, Witness 6 Phone Log, Witness 7 and Witness 8 Climate Check Notes (KB), Witness 9 Witness Statement, Witness 10 Climate Check Note (KB), Witness 11 Climate Check Note (KB), Witness 12 Climate Check Note (KB), Witness 13 Climate Check Note (KB), Witness 14 Climate Check Note (LW), Witness 15 Climate Check Note (LW), Witness 16 Climate Check Note (LW), Witness 17 Climate Check Note*

11

(LW), Witness 18 (Student Google Form)[7], Witness 19 Climate Check Note (MK), Witness 20 Climate Check Note, Witness 21 Climate Check Note (MK), Witness 22 Climate Check Note (MK), Witness 23 Climate Check Note (MK), Witness 24 Climate Check Note (MK), Witness 25 Climate Check Note (MK), Witness 26 Climate Check Note (MK), Witness 27 Climate Check Note (MK), Witness 28 Climate Check Note (MK), Witness 29 Climate Check Note (MK), Witness 30 Climate Check Note (MK), Witness 31 Climate Check Note (MK), Witness 32 Climate Check Note (MK), Witness 33 Climate Check Note (MK). This dichotomy of students' perceptions of the classroom experience also was reflected in the Respondent's Student Evaluations of Instructor Summaries. *See Respondent's Student Evaluations Summer 2015-Spring 2020*.

Below is a brief summary of the allegations of misconduct against the Respondent, which will be analyzed in further detail throughout this report.

## 1. Unwelcome Comments of a Sexual Nature

With regard to sexual harassment, witnesses alleged that during the Respondent's courses, he made unwelcome comments of a sexual nature that were not germane to the subject matter of the courses. In his General Psychology courses, the Respondent is alleged to have made the following comments: I was married to a woman, then found out I was sexually interested in men, and am now married to a man; sex with my husband is good and fun, I enjoyed it when men flirted with me; alluded to my partner and ex-wife being swingers; I have visited nudist beaches; I am not circumcised and have a clean penis; I'd have sex with some of you; and, Don't give a teenage girl a check book (i.e., don't give her permission to have sex), because she will have sex with everyone to get them to like her. Also during this course (as well as his other courses), the Respondent was alleged to have talked about practices of a sexual nature of the Sambia tribe and Hopi tribe.

Witnesses alleged that during the Sexual Behavior course, the Respondent made the following statements: You're in this class because you either want to know more about sex or just like sex. I'm in the category that just likes sex; I had sex with women and men from other countries and they are a lot freer when it comes to sex, which is why I want students to travel abroad; Brazilians are always a fun fuck; and, used the word "cunt" to refer to female genitalia.

Witnesses also alleged that during the Cross Cultural Psychology course, the Respondent stated the following: Asians are superior but Black men having bigger penises; You (Black people) may not have everything, but at least you have bigger penises (Respondent then hopped off the stage, found some Black males and high fived them); Black men have the biggest dicks, followed by Whites and Latinos who are similar in size, and Asians have the smallest dicks; I am not circumcised; and, I am a nudist and nudity isn't accepted in society, but I wouldn't mind if

---

[7] On June 9, 2020, two witnesses created a Google form called "Report UCF Professor [Respondent]" and this form was published in a *Knight News* article and on Twitter. The form, which will hereinafter be referred to as the Student Google Form, was designed to provide concerned individuals with an avenue to report their concerns directly to those witnesses rather than the University. These witnesses, in turn, agreed to relay the information provide by others to OIE. These witnesses provided two lists based upon responses they received – a list of anonymous (unnamed by request) reports and a list of named individuals with concerns. These lists were initially provided to OIE on June 15, 2020.

you (the students) practiced nudity in the lecture hall. The allegations regarding sexual comments are explored more fully below in the material facts sections.

### 2.    Sex-Based Comments

Witnesses alleged that the Respondent made derogatory sex-based comments during his courses that were not germane to the subject matter of the courses.  For instance, OIE received an allegation that during a Psychology of Prejudice course, the Respondent said that most people refer to women who sleep with a lot of men as "whores and sluts, but I just call them my best friends."  During his Cross-Cultural Psychology courses, the Respondent allegedly commented that sex workers were "whores", and when someone's feelings were hurt, he "bet their vagina hurts."  OIE also received an allegation that during class, the Respondent said that women were just like a pickup truck because they were pretty and "good for ramming". Similarly, witnesses alleged that in the Sexual Behavior course, when students raised their hands that they would let a woman build their house and let a man take care of their child, the Respondent replied, "well you guys are just weird" as "most normal people would not allow a man to take care of children."  In his General Psychology course, the Respondent allegedly said that it is in a man's nature to move onto a newer model (i.e., a younger significant other), indicated that it was nauseating to even look at his former wife, and referred to a female student as a "cunt" when she disagreed with exploring the origins of the word. The allegations regarding sex-based comments are explored more fully below in the material facts sections.

### 3.    Gender Identity/Expression-Based Comments

Witnesses alleged that the Respondent made derogatory gender identity/expression-based comments during his courses that were not germane to the subject matter of the courses. Specifically, witnesses alleged that in his Cross-Cultural Psychology course, the Respondent stated that transgender is not an "actual thing" because if someone was a transman, they are not a man, they are "actually a woman and a man dressing as a woman is still a man."  Respondent further allegedly stated that individuals that identify as transgender are doing so for the attention. Similarly, in his General Psychology course, the Respondent allegedly made comments such as the following:  People who claim to be gender fluid are mindless sheep; people who are transgender have extreme body dysmorphia or are mentally ill; "You can't alter your body to become female and you can't change your gender like that" and the only thing that can help those who are transgender is to learn to be the sex they were born with; and, as to individuals that identify as non-binary, "well, those people are just confused."  Witnesses further alleged that during the Sexual Behavior course, the Respondent misgendered a panelist from the course's LGBTQ+ panel on an exam. The allegations regarding gender identity/expression-based comments are explored more fully below in the material facts section.

### 4.    Sexual Orientation-Based Comments

Witnesses alleged that the Respondent made derogatory comments based on sexual orientation during his courses that were not germane to the subject matter of the courses.  For instance, OIE received an allegation that during a Psychology of Prejudice course, the Respondent stated, "All men are a little bit gay because if someone was sucking their dicks and

they were going to cum and they then realized that it was a guy doing the sucking, they would still finish." During a Sexual Behavior course, the Respondent allegedly stated that bisexual people are bisexual because they want to have sex with a lot of people. The Respondent also allegedly stated that lesbians did not have a "big sexual appetite." Similarly, during his Cross-Cultural Psychology course, the Respondent allegedly stated that he used to have a wife and "now I am a fag," as well as, "you can call me a fucking fag but it doesn't mean racism is real." The Respondent also allegedly stated that people who participated in PRIDE parades clearly had histrionic personality disorder. The allegations regarding sexual orientation-based comments are explored more fully below in the material facts sections.

### 5.  Disability-Based Comments

Witnesses alleged that the Respondent made derogatory comments based on disability during his courses that were not germane to the subject matter of the courses. For instance, the Respondent allegedly stated that people with mental health issues, like PTSD, were inherently weaker than those without mental health issues; people with mental disorders had a "defect"; and, people with autism will not amount to anything and aren't capable of achieving anything. The allegations regarding disability-based comments are explored more fully below in the material facts sections.

### 6.  Comments Based on Religion

Witnesses alleged that the Respondent made derogatory comments based on religion during his courses that were not germane to the subject matter of the courses. Specifically, OIE received allegations that during his General Psychology course, the Respondent stated that believing in the Bible and other religious texts was like believing in unicorns, flying elephants, Santa Clause or a fairytale, those that believed in a religion were of a "weaker mind" and childish, God did not exist, and "only idiots would place beliefs in a superior being because they're afraid." Witnesses alleged that in his Psychology of Prejudice course, the Respondent referred to believers as "deluded" and "mentally ill." Similarly, in his Cross Cultural Psychology course, the Respondent allegedly stated that Christians were "assholes" and "idiots", there was no God, and people who believed in God were stupid, dumb, unintelligent, delusional, and small-minded. As to Christianity, witnesses further alleged that in both his General Psychology course and Cross Cultural Psychology course, the Respondent described Jesus as being a schizophrenic. He also equated the teaching of religion to children with child abuse. As to the Virgin Mary, the Respondent allegedly stated in both courses that it was scientifically impossible to be pregnant without having sex, and that "for all we know, she could have been raw-doggin it across town" having had sex with various men. The Respondent further allegedly stated that the Virgin Mary was not a virgin and she told the story about the angel and carrying the song of God as a way to save her life after she had been "whoring around." With regard to Islam, the Respondent allegedly stated that it was a myth that followers of Islam were peaceful because the religion was founded on violence and remains violent today, and that it is a "terrorist culture". He further allegedly referred to Muhammad as a "con man", "child rapist," and "pedophile." The Respondent also allegedly equated female students wearing a hijab with having been brainwashed by their religion and country of origin because wearing the hijab was submission to the culture's stereotypes about women being servants. In other words, hijabs were oppressive to

women. Furthermore, students alleged that the Respondent issued exam questions that forced students to select statements contrary to their religious beliefs to receive credit for answering the exam question correctly. The allegations regarding religion-based comments are explored more fully below in the material facts sections.

### 7.   Comments Based on Race/Ethnicity

Witnesses alleged that the Respondent made derogatory comments based on race/ethnicity during his courses that were not germane to the subject matter of the courses. For instance, witnesses alleged that during his General Psychology course and Cross Cultural Psychology course, the Respondent stated that Black people should thank White people for creating our modern society because nothing important was ever invented by someone who wasn't White. In both courses, the Respondent allegedly stated that affirmative action was racism against White people and oppressed White people, and constituted "Black privilege." Also in both courses, the Respondent allegedly said that African Americans and Native Americans did not have cerebral cortexes, and were thus inferior to White people, as well as that minorities were predisposed by nature to be poor and have babies which is why they utilized welfare and food stamps. The Respondent further allegedly stated that systemic racism didn't exist so "Black people just need to get over it," and that Black people suffer problems of their own making and not as a result of years of oppression. Witnesses also alleged that the Respondent stated in class that Asians and Whites were smarter than Blacks because they were more educated.

Witnesses alleged that, during class, the Respondent explained that White people gave Black people the nickname "porch monkey" because it made sense in that Black people were being "lazy and hanging out on the porch". He further allegedly stated that people call him a "wet back" so why can't he call Black people a "porch monkey." He further compared people referencing President Donald Trump as an orangutan with referencing Former President Barack Obama as a monkey. The allegations regarding race/ethnicity-based comments are explored more fully below in the material facts sections.

### C.   Respondent's Alleged Quid Pro Quo Based on Religion

OIE received an allegation that the Respondent, who identified as an atheist, offered students extra credit in the course if they would denounce their religious beliefs in front of the class. It was further alleged that the Respondent offered extra credit to students if they wrote a paper wherein they denounced their own religion. Students also alleged that the Respondent issued what he referred to as "[Respondent's Last Name]'s Challenge," which is when he challenged students to go 24 hours without believing in their God or their religion. The allegations regarding *quid pro quo* harassment are explored more fully below in the material facts sections.

### D.   Respondent's Alleged Response to Student's Sexual Assault Disclosure

A former student (Witness 34) alleged that in February-March, 2014, she and another female student (Witness 35) disclosed to the Respondent that one of his graduate teaching

assistants (Witness 36) had sexually assaulted them.  In response, the Respondent allegedly demanded that the students explain the incidents in detail to him. When they shared that they had been friends with Witness 36 and he had been to their houses, the Respondent rolled his eyes, laughed and said that Witness 36 must have misinterpreted the situations and thought that they wanted more.  He further allegedly said, "Well, that's what happens when you bring boys to your apartment." When they requested assistance so that they could take the class exam, the Respondent replied that there was nothing he could do about removing Witness 36 from class, and the only way he would do anything was if a police officer advised him that Witness 36 was a criminal.  The students also alleged that the Respondent told them that Witness 36 did not "cross the line" and the only way that they would have a case was if they fabricated information to the police, which he wouldn't recommend as they would get in trouble for falsifying evidence.  He then suggested that they pick better friends moving forward.  The Respondent advised Witness 34 that he would not allow her to take the course exam elsewhere or remove Witness 36 from the room during the exam, and said that the best he could do was have her not sit in an aisle seat so that Witness 36 did not have to hand her anything directly.  Thereafter, the Office of Student Rights and Responsibilities allegedly spoke with the Respondent, who refused to allow Witness 34 take the exam in the testing center but allowed her to take the exam in his office.  When Witness 34 arrived, the Respondent allegedly did not recognize her and then said, "Oh you're the one with an issue with my TA." The allegations regarding this alleged sexual assault disclosure are explored more fully below in the material facts sections.

## E.      Non-Discriminatory Misconduct

In addition to the above, witnesses alleged that the Respondent actively discouraged students from filing complaints because he was tenured, engaged in repeated and offensive unprofessional conduct (such as mocking students, using profanity, and treating students with disrespect); used time in class to espouse his opinions rather than teach relevant course content, provided students with misinformation, and failed to provide a complete picture of the issues presented or presented misleading and inaccurate information.

In addition to the above, witnesses alleged that the Respondent made numerous inappropriate comments related to sexual assault during class.  Specifically, the Respondent stated that women alleged that they were raped rather than admitting to themselves that they chose to have sex, which may violate a virtue they hold.  The Respondent also allegedly stated that women "make up" stories about being sexually assaulted and like to accuse men of sexual assault for fun, to get attention, and to ruin men's lives.  He further stated that there are so many false rape accusations that plague college campuses, and that the statistic of one in four is just a feminist stunt. The allegations regarding Respondent's other alleged misconduct are explored more fully below in the material facts sections.

## V.      SUMMARY OF THE RESPONDENT'S RESPONSE TO ALLEGATIONS

As set forth in detail below, the Respondent did not dispute some of the allegations made against him, provided context to some of the statements made, and denied numerous allegations made against him.  The Respondent's response to the allegations is set forth in detail below in sections VI and VII, as well as in his OIE interview summary.

## VI.    MATERIAL FACTS NOT IN DISPUTE

With regard to audio recordings, OIE reviewed approximately 37 hours of recordings of the Respondent's lectures during the 2019 Summer Cross Cultural Psychology course, as well as the 2018 General Psychology course, which captured a portion (not all) of the class lectures. OIE's investigation revealed that the following facts, which are material to determining whether the Respondent violated the University regulation and/or policy, are not in dispute based on the testimonial, audio recording and/or documentary evidence:

*Respondent's Employment & Teaching Assignments*

1. In 1998, UCF hired the Respondent as an Assistant Professor with the Department of Psychology in the College of Sciences. In 2001, the Respondent received tenure. At the time of this report, the Respondent was an Associate Professor with the Department of Psychology.

2. For the last five years, the Respondent received an overall rating of "outstanding" on his annual evaluations. *See Respondent's 2014-15, 2015-16, 2016-17, 2017-18, and 2018-19 UCF Annual Evaluations of In-Unit Faculty Performance*. During 2003, 2009 and 2015, the Respondent received a UCF Teaching Incentive Program (TIP) Award.[8]

3. In the Respondent's Student Evaluation of Instructor Summaries, students provided both positive and negative feedback regarding their experiences in the Respondent's classroom. *See Respondent's Student Evaluation of Instructor Summaries 2015 Fall*.

   a.    For example, the 2015 Fall summaries noted the following: class discussions "made for a welcoming and interesting learning environment, encouraging me to come to class even on those days I really didn't want to"; Respondent's "class is the only class that I took this semester that made me feel like I was being exposed to new and exciting ideas… [Respondent] is such an important professor to have at UCF because he really makes you think about why you believe in the things that you believe and he teaches you valuable critical thinking skills"; Respondent was "passionate" and "very enthusiastic about what he taught"; student liked the Respondent's "sense of humor and the way he presented information [which] made the class enjoyable"; "eye opening course" and "best so far".

   b.    For example, the 2015 Fall summaries also noted the following: "instructor was very rude to students when they asked questions. Would call them out and disrespect them"; Respondent was "very degrading and disrespectful when students answered questions"; "very condescending to students"; "when students got the courage to raise their hands, he seemed to either make fun of what they had to say, make them sound stupid, or cut them off completely"; Respondent "should know that not everybody thinks the same way as he does and just because he feels completely oblivious to other people's thoughts, beliefs and feelings, it doesn't mean he can disrespect them for not sharing his own beliefs. It is part of maturity to accept that not every human being will believe in the same thing as we do therefore we should know that as adults we

---

[8] The UCF TIP award rewards "teaching productivity and excellence", and "recognizes in-unit employee contributions to UCF's key goals of offering the best undergraduate education available in Florida and achieving international prominence in key programs of study." To be eligible for the award, the employee must be (1) classified as in-unit; (2) hold a full-time appointment; (3) have four years of continuous non-OPS service immediately prior to the current year; and, (4) not have received the award during the previous five years. For more information, see: https://facultyexcellence.ucf.edu/award/teaching-incentive-program/.

can't fall into a childish behavior and disrespect somebody else's beliefs and behaviors for not being the same as ours.  If he wants to speak about how he feels about certain topics it's more than fine, it's his right to freedom of speech, but is not a valid excuse to intentionally offend other people."

       c.      Of particular relevance to OIE's investigation, the 2015 Fall summaries noted the following: Respondent disgraces and disrespects all Christian religions; "instructor was rather inconsiderate of different cultures"; "he would repeatedly and openly mock religious views and beliefs"; student felt "a bit sorry for those with religious beliefs who he looked down upon multiple times in the course – although his reasoning was logical to me.  Loved how he fought back against the African American girl who was claiming that he was an 'old white man', albeit I do not think that that entertainment was necessarily appropriate, as it discouraged me from participating in class out of being nervous"; Respondent "is a terrible teacher who preaches racist and sexist undertones, no concern for students, and rambles on and on about sex the whole time"; "he has a way in diminishing religion when he teaches it simply because he doesn't believe in it"; "he poked fun at religious views"; Respondent "is a brainwashing atheist and forces his beliefs on students"; wished Respondent "would communicate his racism in a less confrontational fashion"; "I love that [Respondent] was open to speaking his opinion about religion"; "lack of respect for students of faith is unnecessary"; "really enjoyed how open he was about religion and culture and how he allowed the class to share their views"; Respondent was "extremely harsh on those that may be religious.  Bigotry I feel works both ways and the professor, while interesting, was not very kind".

    4.   During the Respondent's employment with UCF, he was assigned to teach multiple courses.

       a.      Initially, he taught both undergraduate and graduate courses.  The enrollments in Respondent's courses ranged from less than 20 students (i.e. Honors Thesis) to hundreds of students (i.e. General Psychology).

       b.      With regard to graduate courses at UCF, the Respondent previously taught Cross Cultural Psychotherapy and a course pertaining to intellectual assessments.

       c.      In approximately 2010-2011, the Respondent stopped teaching graduate courses after being denied promotion to full professorship.

       d.      The Respondent taught the following undergraduate courses at UCF:  General Psychology (also referred to as Introduction to Psychology), Cross Cultural Psychology, Sexual Behavior (also referred to as Human Sexuality), and, Theories of Personality and Research.

       e.      For at least one Summer session in 2009, the Respondent taught Psychology of Prejudice and used his materials from his Cross Cultural Psychology course. (The Respondent recalled having taught this course for only one semester but student records (Witness 37 and Witness 38) indicated that he was the professor on record for this course during the summer of 2009 and summer of 2010.)

       f.      The Respondent also supervised students' Honors thesis.

       g.      Since approximately 2010, the Respondent has led a study abroad program to Peru during the summer with the exception of the 2020 Summer semester due to the COVID-19 pandemic.

    5.   The syllabus for the Respondent's Cross Cultural Psychology course stated that the course objectives were as follows:  The overall goal of this course is to assist students in

obtaining a broader perspective on humanity by means of critically examining life within other cultural contexts and within one's own cultural context.  Learning about other lifestyles and cultures provide various benefits to students, such as: (a) learn how to think independently of how society or various social groups want you to think. (b) have a better appreciation of the complexities of humanity, (c) become more aware of how arbitrary much of human behavior is, (d) become more sensitive and understanding with others (if warranted), (e) become less egocentric and ethnocentric, (f) realize the availability of behavioral options that were previously unrecognized. Please note that we will be examining course material in both therapeutic and non-therapeutic contexts. Specific ways by which we will accomplish these objectives include: 1) Obtain exposure to the theoretical/descriptive literature written about various cultural groups (nationally and internationally). 2)  View and discuss in class approximately six short- to medium-length videos on issues related to various cultural groups. 3) Have five (5) quizzes or exams.

6.    The syllabus for the Respondent's Sexual Behavior course stated that the course objectives were as follows: The overall purpose of this course is to explore numerous aspects of human sexual behavior, sexuality, and contemporary United States' attitudes toward sex and sexuality. Some of the topics we will cover include, but are not limited to: male and female anatomy, how to maximize one's sexual pleasure with a partner(s), by one's self (masturbation), gender identity, sexual identity, contraception, pregnancy, sexual health, sexual dysfunctions, and prostitution. Please note the following:(1)This course delves into sexually explicit material and information.(2) In this course, we will view educational videos that portray sexually graphic images and sexual activity during class.(3)Sexually explicit language is used in this class.(4)A student who enrolls in this class is voluntarily consenting to view and hear sexually explicit material and information.(5)Anyone not officially enrolled in this course is NOT permitted to "sit in" the course. No "visitors" allowed without Instructor's permission. This course is taught from the perspective that sexual behavior—in many of its forms—is a natural part of life. The fact that some societies, including the United States, have "demonized" and "moralized" many facets of sexual behavior that does not conform to society's standards does not mean that sexual behavior necessarily is pathological, immoral, or "sinful." In fact, one specific goal of this course is to help students develop healthy, appropriate, and positive views about sexual behavior and sexuality *based on the best medical and scientific information available*. Another goal is to help students recognize how free they are to express their sexuality by critically examining the large number of "sexual rules" that society has created—in many instances, arbitrarily—in order to control and suppress human sexual activity. Specific ways by which we will accomplish these objectives include: 1) Obtain exposure to the theoretical, descriptive, and empirical literature written about various aspects of human sexual behavior. 2)  View and discuss in class approximately ten short- to medium-length videos on issues related to various aspects of human sexual behavior. 3)  Consider alternative views on various aspects of human sexual behavior by means of in-class discussions and of guest presentations. 4) Have four (4) quizzes or exams.

7.    The syllabus for the Respondent's General Psychology course stated that the course objectives were as follows: This course introduces you to the fields of study in modern psychology.  After this course, you will be able to answer the following questions: What is psychology?  What do psychologists study?  What are the methods of investigation in psychology?  How do psychologists apply their findings to contribute to human welfare?  This

introductory course will allow you to sample many subfields of Psychology by providing you a "bird's eye-view" of this large and complex discipline. General Psychology is a course that meets the General Education Program Diversity Requirement at UCF.  As such, topics related to gender, ethnicity, sexual orientation, and so on will be discussed as relevant. Humans, in various and sometimes complex ways, are shaped by their cultural and social heritage.  Our cultural heritage influences how we view life and interact with others, and even affects how others perceive and interact with us.  Learning about other cultures requires an openness to new perspectives and requires respect for other people's views, particularly on controversial topics. Please note that respecting the views of others does not mean one has to agree with them; respecting others' views also does not mean that their views cannot be challenged or questioned. Another idea worthy of contemplation is differentiating opinions that are based on some evidence, logic, or history versus opinions that are merely personal beliefs.  People generally struggle to appreciate that distinction and most people think the fact that they believe something makes the belief "real" or valid.  One of your goals as a developing student should be to learn to distinguish between beliefs you hold that have some basis, evidence, or logic, etc. versus beliefs you hold simply because either the belief is comforting or simply because you've never questioned the origin of your beliefs.  In this class, you will have the opportunity to think about issues that you might not think about otherwise and...by the end of the course, you may perceive humans differently than you currently see them.

8.   The syllabus for the Respondent's Personality Theory course stated that the course objectives were as follows: This course is an upper-division introductory course in the subfield of psychology called Personality Psychology. During this semester, you will learn how psychologists investigate personality, the major theories of personality (including information about the theorists themselves), and about some of the latest empirical research on personality. Also, you will gain exposure to some personality tests or inventories that purport to measure various aspects of personality (note: only you will know the results).

9.   The following individuals previously were enrolled as a student in one or more of the Respondent's courses: Witness 39 (2020 Spring Sexual Behavior and 2020 Spring Cross Cultural Psychology); Witness 40 (2018 Spring General Psychology); Witness 41 (2019 Fall Cross Cultural Psychology); Witness 1 (2019 Spring Cross Cultural Psychology); Witness 42 (2015 Fall Sexual Behavior); Witness 43 (2014 Fall General Psychology); Witness 44 (2019 Summer Cross Cultural Psychology); Witness 45 (2012 Spring Sexual Behavior); Witness 46 (2018 Spring Sexual Behavior and 2018 Fall Cross Cultural Psychology); Witness 47 (2020 Spring Cross Cultural Psychology); Witness 48 (2018 Fall General Psychology); Witness 49 (2013 Fall General Psychology); Witness 50 (2014 Spring Cross Cultural Psychology); Witness 51 (2012 Fall General Psychology); Witness 52 (2019 Spring Cross Cultural Psychology); Witness 53 (2019 Summer Sexual Behavior); Witness 54 (2020 Spring Cross Cultural Psychology); Witness 55 (2018 Fall Sexual Behavior); Witness 56 (2019 Spring Cross Cultural Psychology); Witness 57 (2018 Spring Sexual Behavior and 2018 Spring Cross Cultural Psychology); Witness 58 (2018 Fall General Psychology); Witness 34 (2012 Spring Sexual Behavior and 2014 Spring Cross Cultural Psychology); Witness 59 (2018 Fall General Psychology); Witness 60 (2009 Fall Sexual Behavior & 2010 Fall Cross Cultural Psychology); Witness 37 (2009 Summer Psychology of Prejudice); Witness 61 (2018 Spring Cross Cultural Psychology); Witness 62 (2019 Spring Cross Cultural Psychology); Witness 63 (2019 Spring Cross Cultural Psychology);

Witness 64 (2019 Spring Cross Cultural Psychology); Witness 65 (2016 Spring Cross Cultural Psychology); Witness 4 (2009 Fall Cross Cultural Psychology); Witness 66 (2019 Spring Sexual Behavior); Witness 67 (2012 Fall Cross Cultural Psychology); Witness 68 (2016 Fall Cross Cultural Psychology); Witness 69 (2020 Spring Sexual Behavior); Witness 70 (2013 Fall General Psychology); Witness 71 (2020 Spring Sexual Behavior); Witness 72 (2017 Fall Cross Cultural Psychology); Witness 73 (2019 Spring Cross Cultural Psychology); Witness 74 (2016 Fall Sexual Behavior); Witness 75 (2005 Fall General Psychology); Witness 76 (2015 Spring General Psychology); Witness 77 (1999 Fall General Psychology); Witness 78 (2018 Spring Sexual Behavior); Witness 38 (2010 Summer Psychology of Prejudice); Witness 79 (2019 Spring Sexual Behavior and 2020 Spring Cross Cultural Psychology); Witness 5 (2019 Summer Cross Cultural Psychology); Witness 80 (2018 Fall Cross Cultural Psychology); Witness 81 (2018 Spring Sexual Behavior and 2018 Spring Cross Cultural Psychology); Witness 82 (2014 Fall Cross Cultural Psychology); Witness 83 (2017 Fall Sexual Behavior); Witness 84 (2015 Fall Cross Cultural Psychology); Witness 85 (2016 Fall General Psychology); Witness 86 (2018 Spring Cross Cultural Psychology); Witness 87 (2017 Spring Cross Cultural Psychology); Witness 88 (2016 Fall Sexual Behavior and 2017 Spring Cross Cultural Psychology); Witness 89 (2011 Fall Sexual Behavior and 2012 Spring Cross Cultural Psychology); Witness 90 (2018 Spring Sexual Behavior and 2019 Spring Cross Cultural Psychology); Witness 91 (2016 Spring Cross Cultural Psychology); Witness 92 (2018 Spring Cross Cultural Psychology); Witness 93 (2020 Spring Cross Cultural Psychology); Witness 94 (2012 Spring Cross Cultural Psychology); Witness 95 (2018 Fall General Psychology); Witness 18 (2014 Spring Cross Cultural Psychology); Witness 96 (2005 Fall General Psychology); Witness 97 (2018 Spring Cross Cultural Psychology); Witness 98 (2017 Fall Sexual Behavior & 2019 Spring Cross Cultural Psychology); Witness 99 (2012 Fall General Psychology); Witness 100 (2018 Spring Sexual Behavior and 2019 Summer Sexual Behavior); Witness 101 (2020 Spring Sexual Behavior); Witness 102 (2011 Fall General Psychology); Witness 103 (2018 Spring Cross Cultural Psychology); Witness 104 (2019 Summer Cross Cultural Psychology); Witness 105 (2016 Fall Cross Cultural Psychology and 2019 Fall Personality Theory and Research); Witness 106 (2019 Fall Sexual Behavior); Witness 107 (2018 Fall General Psychology); Witness 108 (2019 Spring Cross Cultural); Witness 109 (2020 Spring Sexual Behavior); Witness 110 (2019 Summer Cross Cultural Psychology); Witness 111 (2017 Fall General Psychology); Witness 112 (2018 Spring Sexual Behavior & 2019 Spring Cross Cultural Psychology); Witness 113 (2011 Fall Sexual Behavior and 2012 Fall Cross Cultural Psychology); Witness 114 (2013 Fall General Psychology); Witness 115 (2019 Spring General Psychology); Witness 116 (2019 Summer Cross Cultural Psychology); Witness 117 (2019 Spring Cross Cultural Psychology); Witness 118 (2018 Spring Sexual Behavior); Witness 119 (2010 Fall Sexual Behavior and 2013 Spring Cross Cultural Psychology); Witness 120 (2019 Spring Sexual Behavior); Witness 121 (2018 Fall General Psychology); Witness 122 (2013 Fall General Psychology); Witness 123 (2013 Spring Cross Cultural Psychology); Witness 124 (2018 Fall General Psychology); Witness 125 (2019 Summer Cross Cultural Psychology and 2020 Spring Sexual Behavior); Witness 126 (2010 Spring General Psychology); Witness 127 (2017 Fall Sexual Behavior and 2018 Spring Cross Cultural Psychology); Witness 128 (2003 Fall General Psychology); Witness 129 (2020 Spring Personality Theory and Research); Witness 130 (2016 Fall General Psychology); Witness 131 (2019 Fall Sexual Behavior); Witness 132 (2020 Spring Sexual Behavior); Witness 133 (2018 Fall General Psychology); Witness 134 (2020 Spring Sexual Behavior); Witness 135 (2014 Fall Sexual Behavior and 2015 Spring Cross Cultural Psychology); Witness 136 (2006 Spring

General Psychology); Witness 137 (2019 Fall Cross Cultural Psychology); Witness 138 (2015 Spring Cross Cultural Psychology); Witness 139 (2015 Fall General Psychology); Witness 140 (2018 Fall Cross Cultural Psychology); Witness 141 (2017 Spring Sexual Behavior); Witness 142 (2007 Fall General Psychology); Witness 143 (2019 Summer Cross Cultural Psychology); Witness 144 (2017 Fall Cross Cultural Psychology); Witness 145 (2005 Spring Honors Special Topics); Witness 146 (2010 Spring Sexual Behavior and 2010 Fall Cross Cultural Psychology); Witness 147 (2009 Fall Sexual Behavior and 2010 Fall Cross Cultural Psychology); Witness 148 (2016 Fall Sexual Behavior); Witness 149 (2018 Spring Cross Cultural Psychology); and, Witness 150 (2019 Fall Cross Cultural Psychology).

*Tenure Discussion*

10. Generally, at the beginning of the Respondent's courses and at various other points in the Cross Cultural Psychology courses, the Respondent referenced that he had tenure.  The Respondent told students that tenure allowed him to say "outrageous controversial things" without the students or administration "castigating me in some way." *See Respondent's Interview Summary.*

11. During his August 28, 2018 General Psychology course (*see Recording*), the Respondent told students, "I can say what I said, and that is the way it goes. No one cares, UCF will not say a thing to me. I can talk about racial issues, which I do a lot. We both have freedom of speech and academic freedom. I am not saying that we can call each other names, that is aggressive. But the same things you might find offensive, I can say anything I want as long as I am being polite."

12. During his 2019 Summer Cross Cultural Psychology course (*see Recording – 15; Indentured Slaves Recording*), the Respondent told the students, "At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me."

   a.     The Respondent continued that termination would be against contract and that the tenure protected him from "some of you because you don't like the things I say" and "protects me from my colleagues and administrators."

   b.     The Respondent then discussed a former work colleague, who the Respondent described as being a Christian from Texas. The Respondent shared that this individual "hated my guts and hated what I said in class about religion," and did "everything he could to try and get me fired". The Respondent stated, "In the end, I finally had enough of it, and I went to the Dean. I said this is what he has been doing to me all this time. You better do something about it, or I'll see you in court soon."  The Respondent then said, "And he [the Dean] cut that guy's dick off. And I hope that guy—he's retired now—I hope he is having a miserable time."

13. During his 2019 Summer Cross Cultural Psychology course (*see Recording*), a student asked to photograph one of the Power Point slides.  The Respondent said yes, his life was an open book, and he has had students at UCF complain about him, which gets investigated and he "laughs the whole way through".

14. During his 2019 Summer Cross Cultural Psychology course (*see Recording*), the Respondent told students, "Not only my ideas but the things I say to you, maybe you find

offensive. … I have a little bit of social skills.  I know not to go shopping in Pine Hill and say, hey, can we talk about slavery?  I am a professor and I can say what I want as long as I defend what I say.  You can go cry a river if you want." He then mentioned that a previous student complained and tried to get him in trouble, but the claim was dismissed "in 15 minutes".

*Classroom Comments – Sex-Based & Sexual*

15. During the Respondent's General Psychology and Cross Cultural Psychology courses, he told students that he visits a beach for nudists in Florida.

   a. When asked about this during his OIE interview, the Respondent stated, "Florida is the capital of nude beaches. We have nudist communities, beaches, etc. I do mention that I go there. This is discussed during the sexuality segment of General Psychology."

   b. Witness 111 also noted this when she told OIE that during the 2018 General Psychology course, the Respondent talked about a nude beach, how he frequently visited a nude beach, and that nudity is normal in other cultures.

16. During his 2019 Summer Cross Cultural Psychology course, the Respondent told students that he identified as a nudist, being a nudist was "very fun", and "you can't imagine how liberating it is". He further asked whether the students had heard of Haulover Beach,[9] which he identified as his "favorite hangout", and indicated that "every chance I get, I go there".  After discussing this, he said to an unidentified student, "I didn't mean to get you so excited".

17. During the Respondent's courses, he regularly shared with his students that he identifies as gay today, was previously married to a woman for 30 years, and is now married to a man.

18.  During the Respondent's Sexual Behavior course, the Respondent discussed genitals from a biological standpoint and started the class by asking students to identify the latest terms used to refer to human genitals. On occasion when the students did not respond, the Respondent said "dick" or "puss" to start the exercise.

19. During the Respondent's 2020 Spring Sexual Behavior course, the Respondent referenced the Gräfenberg spot (G-spot) and described where it was supposedly located and how it supposedly had a high concentration of nerves. He explained that when that spot is stimulated, a woman has an orgasm and ejaculates, and the chemistry of the liquid is similar to urine.  The Respondent then stated, "When a woman is ejaculating, she may just be taking a pee."

20. During the Respondent's Sexual Behavior course for at least one semester, the Respondent joked with the students that a woman is "kind of like a Ford pickup truck, built to take a pounding."

   a. During the Respondent's OIE interview, he explained that he made this joke when there was a Ford commercial out around this time that used a similar phrase.  Specifically, the Respondent stated, "That was a commercial that was going on that semester. I said it with a humorous smile, some of the class laughed."

---

[9] Haulover Beach, which is located in South Florida, is described as one of the "best nude beaches in the world" according to its website:  https://www.hainoloverbeach.org/.

b.      OIE inquired of this because an anonymous reporter alleged that during the fall of 2015, the Respondent told students "women were just like a pickup truck" because they are "pretty and good for 'ramming.'"  *See Student Google Form – Anonymous*.

21. During the Respondent's General Psychology course, the Respondent told students about the Sambia tribe in New Guinea.  The Respondent advised the students that when boys in the group turn age 7, the group has a ceremony in the village and the boys say goodbye to their families.  The boys are then taken out of the village to be cared for by only males for a period of ten years. The Respondent further advised the students that this group believes that consuming semen helps the boys grow into men. Accordingly, when the men are raising these boys, they have the boys perform oral sex on the men. When the boys turn 17, the group has another ceremony and are officially declared men, and then are married to women. On at least one occasion, shortly after discussing this practice, the Respondent talked about how "semen is high in protein, it's a protein drink."
a.      During the Respondent's OIE interview, he stated, "I only cover this in General Psychology in the portion of the course combining culture and sex."
b.      OIE notes that there is literature indicating that by the end of the 1980s, the ritual of boy-insemination had been abandoned by the Sambia tribe.

22.  During the Respondent's General Psychology and Cross Cultural Psychology courses, the Respondent told students about the Hopi tribe in Arizona.  The Respondent advised the students that there is a crevasse in the earth where they are located that looks like a vulva. Once a year, the men are expected to put their penis in that crevasse, and it is a symbolic sex act as though they are copulating with the earth.
a.      During the Respondent's OIE interview, he stated that he explains to the students that "the earth is considered like a mother to them, and they want the earth to be fertile."
b.      This was consistent with the recorded November 27, 2018 General Psychology lecture.

23. During all of his courses, except Theories of Personality and Research, the Respondent told students that with regard to the Hopi tribe, when a male child is upset anyone nearby touches his penis.
a.      During the Respondent's OIE interview, he stated that he further advised the students that this was "not meant to arouse" the child "but rather to distract him", and that this was not considered inappropriate or a form of child abuse in that culture.  The Respondent further stated that he shared this as an example of things that "appear to diverge from our point of view, but which those groups don't perceive them as abnormal".  This context was corroborated by Witness 111 (2017 Fall General Psychology).
b.      Two students (Witness 88 and Witness 75) and an anonymous reporter (IL #850) alleged that when the Respondent discussed this practice, he stated that the tribe members were "jerking them off".  Respondent denied using this term and stated that he said the tribe members stroked the penis. Two students (Witness 122 and Witness 111) alleged that the Respondent said "rubbing the child's penis". None of the audio recordings captured this discussion to resolve what terminology was used by the Respondent.

24. In his Cross Cultural Psychotherapy course (doctoral course) and undergraduate Cross Cultural Psychology course (*see Recording*), the Respondent told the students that every group has a culture, not just ethnic or racial groups. For instance, Republicans have a culture, Democrats have a culture, New Yorkers have a culture that is different than Texans' culture. In this context, the Respondent joked that even the Girl Scouts have a culture, and he didn't know what they did besides selling their cookies and preserving their virginity.

25. In his Sexual Behavior course, the Respondent presented a counterargument to the theory that gender is socially constructed.[10] During class, the Respondent showed two videos.  The first video presented a story from the 1960s or 1970s about two boys who were twins.  When the boys were circumcised, the doctor accidentally cauterized one of the boy's penises and, as a result, instructed the parents to raise him as a girl.  The video indicated that although the child was dressed as a girl and given a girl's name, he was odd in the way he walked and talked, which led to kids making fun of him. When he was 15, his parents told him that he had been born a boy and he later died by suicide. The second video was about a man, who identified as heterosexual, was married to a woman, was very allergic to bee stings and had Klinefelter's syndrome.[11]  He received a bee sting and was provided with hormones as part of the treatment.  This impacted his hormones which resulted in him wanting to become a woman. He chose to divorce his wife and become a woman. The videos indicate that the idea that gender is a social construct and that we can just be however society teaches us lacks evidence. Respondent shared with his classes that there are people who do not have any training in biology, and they go around saying that gender is a total social construct.  He further stated that the students can either listen to them or listen to neurologists and biologists who actually study this issue. The Respondent further told students that even though he did not have training in biology, his best opinion was that the part of gender identity that is constructed is how society treats us, but that we already come into the world with a predisposition and a tiny fraction may be something in between (meaning transgender).  *See also Announcement January 28, 2020 Re Gender & Social Construct*.

26. In his General Psychology course, the Respondent discussed society's viewpoint that teenagers should not have sex because they could be emotionally hurt from the experience.  The Respondent used a checkbook as an analogy to make the point that rather than prohibiting sex, individuals should not have secondary reasons to engage in sexual activities.
    a.      The Respondent explained to the students that a person, often a female but not always, who wants to be in a loving relationship with someone who may not want to have sex may give in to having sex in the hopes that the relationship will continue. There are cases where a male will have sex and then lose interest in the female. "Some people will say, 'see?' to indicate that they said that would happen."
    b.      The Respondent continued and told the students to imagine this analogy: "give a girl a checkbook to teach her to manage money, and she is in love with some guy, so she allows him to have access to her checkbook, and he goes on a shopping spree and then leaves her with a

---

[10] The social construction of gender is a theory of knowledge that holds that characteristics typically thought to be immutable and solely biological, such as gender, are products of human definition and interpretation shaped by cultural and historical contexts.

[11] Klinefelter's syndrome is a genetic condition that results when a boy is born with an extra copy of the X chromosome.

balance of $0, and she is crushed. Imagine if someone says, 'See? That's why we shouldn't let girls have checkbooks.'"

    c.    The Respondent then stated that no one would say that girls should have checkbooks. Turning back the subject of teenagers and sex, people should not have sex for any secondary reason (like hooking them into a relationship).  Rather, if someone wants to have sex, it should just be that they want to have sex.

27. On April 29, 2018, the Respondent sent an email to two students who served as Graduate Teaching Assistants (GTAs) for his General Psychology course. Therein, the Respondent referenced the male's coverage of scoring scantrons for the female GTA and said, "I hope [Witness 45] is compensating you well for this!!! But …. it's none of my business…" *See Announcement, April 29, 2018 Message to Witness 151 & Witness 45.*

28. During Respondent's Fall 2018 Sexual Behavior course (and one or two other semesters for this course), the Respondent told the students, "You're in this class because you either want to know more about sex or just like sex. I'm in the category that just likes sex."

29. During his August 28, 2018 General Psychology course (*see Recording*), the Respondent discussed the reasons why people get married and stated, "Maybe they have a family that you like. Or maybe you like them because they make a lot of money, you can relate to that ladies? I am talking about heterosexual women, not lesbians. You may find a charming and attractive man, but you find out he is a Walmart greeter. You need to get out of that. Or you might find someone that is not as attractive, but he is going to law school, there is a chance he might just work out."

30. During the August 28, 2018 General Psychology course (*see Recording*), the Respondent discussed Sigmund Freud's theory that humans are driven by two feelings – sex and aggressiveness. When discussing sexual instinct and the students dieting or controlling their weight, the Respondent stated, "Yeah, and working out in the gym. I work out in the gym for different reasons. Postponing death. You young people are there because you are a piece of meat trying to put yourself on the meat market. Right? I love it when I see mostly guys at the gym working out and looking at themselves in the mirror as they are working out. I am tempted to tell them to masturbate in the bathroom with the mirrors."

31. During the September 4, 2018 General Psychology class (*see Recording*):

    a.    Respondent discussed sensory information and asked students if they had to give up all their senses except one, which one would it be.  After students provided different responses, the Respondent said, "You guys are really weird, at least the ones that participated so far." He then stated, "The people who say they want 'skin' [referring to the sense of touch] usually say it because they like sex." There was uncomfortable laughter and the Respondent replied, "And oh my god, you guys are asexual."

    b.    Respondent then discussed how individuals can associate a song or the smell of a particular perfume with a specific person or a specific time in one's life.  He referenced how he could hear a song that reminded him of his senior year in high school, which was 40 years ago, because learning is permanent. He then referenced how one could smell a perfume or cologne which triggers them to think about a specific person, like when one is walking through the mall.

He asked, "Does anyone have that experience or is it just me?  Some of you have, okay."  He then said to a student, "Really, you haven't had that experience? Have you even had an erection before? I'm sorry, fine be that way." During his Cross Cultural Psychology lecture regarding Blacks, the Respondent made a similar offhand comment when discussing parent's use of corporal punishment when raising children and the impact on those children.  The Respondent shared that these children manifest problems later in life such as antisocial behavior (criminal behavior), problems with those with authority (bosses, teachers, police, etc.), and having higher levels of anxiety.  The Respondent also stated that there were a couple studies showing that Black parents reported using corporal punishment more than White parents.  The Respondent then stated, "I wish we would eliminate corporal punishment. I wish those of you who are concerned with racism were just concerned with child abuse but unfortunately, you're not because you don't get anything out of it. Showing yourself as antiracist, you can look in the mirror and get a little boner."

32. During his 2019 Summer Cross Cultural Psychology course (*see Recording – Peru - 13*), the Respondent discussed verses from the Bible, referred to a verse on a slide, and said, "And of course Muhammad violated this by marrying his daughter in law.  And to make this prohibition, it must have meant that people were having sex with animals, which humans do all over the world."  A student asked, "Do they really?"  The Respondent replied, "Yes, you can go on YouTube and find" this.

33.  During the Respondent's 2019 Summer Cross Cultural Psychology course, the Respondent discussed how Muhammad was 25-years-old when he got married to a 40-year-old woman, which was strange, and that "there aren't many 25-year-old men anywhere in the world, even today, who would like to be involved in a romantic relationship with a 40-year-old woman." The Respondent made a similar comment about older women during his November 27, 2018 General Psychology lecture when describing the Hopi tribe's ritual of having men line up to have sex with the eldest female. After describing the practice, the Respondent stated, "Who would want to bang an 80-year-old woman?"

*Classroom Comments – Gender Identity/Expression*:
34. In his Sexual Behavior course, the Respondent made comments about transgender men after gender reassignment surgery and how their penises are either not pretty, not attractive or didn't look right. During his OIE interview, the Respondent stated that he made these comments "not in a derogatory way, but in a factual way. Artificial penises crafted out of stomach tissue are bizarre. I never said 'gross' or 'disgusting.' I may have said they are not attractive. I don't know. If ever you were to see one, they are not anything close to a real penis. They are bizarre."

35. In his Sexual Behavior course, the Respondent hosted a LGBTQ+ panel each semester.

36. During the 2020 Spring semester, the panel included one individual that identified as cisfemale, one individual that identified as cismale, and one transgender male (Witness 132).
    a.      During the panel, Witness 132 stated that he would get upset when people misgender him.  The Respondent replied, "Just looking at you, I would assume you were a girl and refer to you as such." During his OIE interview, the Respondent stated that this individual "explained to the class that he identifies as a male, but totally – and I mean totally – looks like a

27

woman and made no effort to appear as a male. I am looking at someone who by any account is a female, but who reports he is a male. I'm fine with that – totally respect that."

       b.     Following the panel, the Respondent issued an exam with a question that required students to misgender Witness 132 in order to receive credit for answering the question correctly.  Specifically, the test asked how many males were on the panel. The Respondent's answer key identified that the correct response was "one" even though there had been two panelists that identified as male.

       c.     Thereafter, Witness 132 spoke with the Respondent about the error.

       d.     When the Respondent initially was notified of the error, he sent the following message to his students:

> *Potentially bad items on Exam 3...*
> Okay. I'm on it... I see that I had keyed the wrong answer for the pregnancy question. I will give everyone a point for that. Someone mentioned two other potentially problematic items that I will have to look at later today and make some decisions about. For now, let me say that the very last item--asking you to identify who showed up during our sexual minority panel--was intended to be a straightforward question, that would be an easy question, to reward those who showed up for that day's class. There was no underlying, unconscious, implicit maliciousness on my part about the item. Please.... Apparently one of the panelists interpreted the item as problematic and I am in discussion with that student to better understand what the problem or concern is. I'll let give you an update later tonight about if I need to accommodate your grades anymore due to problematic items. Stay tuned (and...relax, damn it!) Ha...

37. On March 31, 2020, the Respondent sent the following message to his students:

> Dear Sexual Behavior students:
> I just reviewed the test items causing concern. Let me start with the more difficult one.  I now see--in a huge way--what an insensitive and misguided item the last question was.  It just shows you what a socially inept brute I am capable of being. Seriously, to any of the panelists who felt "dissed" by that item, please accept my sincere apology for that blunder. To all students, I'll be giving 2 points to this particular exam. One point for the fraternal twin question, and one point for the last item.  I'll add those two points soon. Finally, one student raised the concern about the item asking which country had the most HIV cases.  The student said S. Africa should have been an option. Agreed. BUT...you had to choose among the countries provided. So, the U.S. was the correct answer.  I do not see a problem with that item. I owe you two points. Stay safe.
> *See Announcement March 31, 2020 Re Exam & Apology.*

       a.     Witness 100 alleged that something similar occurred during the Respondent's 2018 Fall Cross Cultural Psychology class.  Specifically, Witness 100 alleged that one panelist identified as nonbinary and there was a bonus question on the exam asking how many men had been on the panel. When the issue was raised, the Respondent allegedly sent an email saying that the question was just for extra credit so no corrections were made.

       b.     The record demonstrates that Witness 100 was not a student in the Respondent's 2018 Fall Cross Cultural Psychology class.  Rather, she was a student in the Respondent's 2018

Spring and 2019 Summer Sexual Behavior courses. Also, the record supports that the LGBTQ+ panels were held during the Sexual Behavior course rather than the Cross Cultural Psychology courses. Lastly, no other students from the 2018 and 2019 Sexual Behavior courses identified this incident as having occurred, and a review of the exams from that semester also do not include such an exam question. Accordingly, there is insufficient evidence to support Witness 100's allegations in this regard.

*Classroom Comments – Sexual Orientation:*

38. In his Sexual Behavior course, the Respondent stated that the way people participated in gay parades did not garner support for gay people. He further stated that the people he had seen in gay parades who were dressed up "like it's Mardi Gras" and imitated "quasi-sex acts on floats" did not help people like himself ("regular vanilla people") be respected. He further shared his opinion that the individuals who participated in Pride parades who "act[ed] as though they want[ed] a lot of attention" had histrionic personality disorder tendencies. *See Respondent's Interview Summary*. (IL #859 (Witness 54) (spring 2020) alleged that the Respondent told the students that "people, who participates in the LGBT parades, have a histrionic personality disorder. Also, [the Respondent] said if a person from the LGBT community displays an eccentric personality, that person should know that he or she would not be accepted.")

39. In his Sexual Behavior course, the Respondent challenged the theory that the LGBTQ+ community is oppressed. The Respondent shared that as someone who was born in the 1960s, the culture has changed so much in favor of sexual minorities. Although people can still be discriminated against, it's very rare and it's nothing compared to what life was like in the 1960s and 1970s based on his personal experience. The Respondent indicated that he may have said that some young gay people exaggerate their victimhood, because they don't know what life was like previously. In his OIE interview, the Respondent stated that "[a]nyone who is a sexual minority can encounter mistreatment, but nowhere in the world do sexual minorities have it better than in the United States. I do not minimize a specific experience someone shares, but the general assertion that we are oppressed, I do challenge that." *See Respondent's Interview Summary*.

40. During his Sexual Behavior course, the Respondent required students to view a video that was less than 10 minutes related to consent for sexual activity (*Consent (2004)*; https://www.youtube.com/watch?v=5B5NMN7GBA4). Therein, a male and female are about to engage in sexual activity, begin to discuss a consent form, and each have their lawyers on the side of the bed to negotiate the activities that they both consent to engaging in. *See Respondent's Interview Summary & Consent (2004) Video*.

41. When talking about sexual assault during his Sexual Behavior course, the Respondent told students that the statistics related to sexual assault experiences on college campuses is skewed because the way the data was collected was skewed and the researchers equated being kissed without consent to rape. The Respondent further told students that the statistic that one in four women experience sexual assault in college is highly inflated. He then referred the students to the Department of Justice statistics, which stated that the statistics are more like 1 in 100 women are raped on campus and 1 in 40 are sexually assaulted. He then asked students, "Can you imagine if one in four female students were sexually assaulted, yet, people kept sending their

daughters to college."  He further asked, "If during an interview for a job they were told that one in four employees were sexually assaulted on the job, would they continue pursuing that job? No." *See Respondent's Interview Summary*.

<u>*Classroom Comments - Religion*</u>

42. During Respondent's courses, he presented information related to religion.

43. During the Respondent's classes, he told students that there is no evidence of a God, all religions are mythologies, believing in religion is a delusion as believing in things for which there is no evidence constitutes a delusion, religion is a cultural delusion, and believing in religion is like believing in a flying elephant.  *See Respondent's Interview Summary*. (*See also* Interview Statement of Witness 125, who was a student in Respondent's 2019 Summer Cross Cultural Psychology and alleged that the Respondent was "adamant that all religions are mythology. That would not have been a problem if he posed it as an idea or his opinion, but he presented it as a fact. All religions were included as mythology – Christianity, Judaism, Islam, etc., all were included.")

      a.     The Respondent further told students that the difference between religion and mythology is that mythology is just religion that is no longer alive today.  *E.g. Respondent's Statement & Recording – Peru - 6*.

      b.     For instance, in his 2019 Summer Cross Cultural Psychology course (*see Recording*), the Respondent told students, "we call people's religion mythology who are no longer alive today so they won't get upset or insult them.  We call people's mythology religion today if they are still alive.  … Well, one point is there is no difference, all religions are mythologies.  But it is insulting.  If I tell you right now as I have that those of you who believe in say Christianity, it is a mythology, it is not real - that's insulting to you.  My goal is not to insult you, I am being an educator here.  If I were to go down the street and tell people that your religion is mythology, that is insulting."

44. The Respondent told his students how "for most people who believe in religion, their parents take them to church weekly or monthly, but don't take them to multiple other types of religions and let them decide. I tell them that would be an example of religious education, but what we call religious education is really indoctrination, taking them to the same church and reading the same book."

45. In 2012, the Respondent sent the following message to students in his Cross Cultural Psychology course:

Hello, Cross-Cultural students, I am writing to express my views on how some of you have conducted yourself in this university course you are taking with me. It is not uncommon for some-to-many American students, who typically, are first-generation college students, to not fully understand, and maybe not even appreciate the purpose of a university. Some students erroneously believe a university is just an extension of high school, where students are spoon-fed "soft" topics and dilemmas to confront, regurgitate the "right" answers on exams (right answers as deemed by the instructor or a textbook), and then move on to the next course. Not only is this not the purpose of a university (although it may feel like it is in some of your other courses), it clearly is not the purpose of my upper-division course on Cross-Cultural Psychology. The

purpose of a university, and my course in particular, is to struggle intellectually with some of life's most difficult topics that may not have one right answer, and try to come to some conclusion about what may be "the better answer" (It typically is not the case that all views are equally valid; some views are more defensible than others). Another purpose of a university, and my course in particular, is to engage in open discussion in order to critically examine beliefs, behaviors, and customs. Finally, another purpose of a university education is to help students who typically are not accustomed to thinking independently or applying a critical analysis to views or beliefs, to start learning how to do so. We are not in class to learn "facts" and simply regurgitate the facts in a mindless way to items on a test. Critical thinking is a skill that develops over time. Independent thinking does not occur overnight. Critical thinkers are open to having their cherished beliefs challenged, and must learn how to "defend" their views based on evidence or logic, rather than simply "pounding their chest" and merely proclaiming that their views are "valid." One characteristic of the critical, independent thinker is being able to recognize fantasy versus reality; to recognize the difference between personal beliefs which are nothing more than personal beliefs, versus views that are grounded in evidence, or which have no evidence.  Last class meeting and for 15 minutes today, we addressed "religious bigotry."  Several points are worth contemplating: 1. Religion and culture go "hand in hand." For some cultures, they are so intertwined that it is difficult to know with certainty if a specific belief or custom is "cultural" or "religious" in origin. The student in class tonight who proclaimed that my class was supposed to be about different cultures (and not religion) lacks an understanding about what constitutes "culture." (of course, I think her real agenda was to stop my comments about religion). 2. Students in my class who openly proclaimed that Christianity is the most valid religion, as some of you did last class, portrayed precisely what religious bigotry is. Bigots—racial bigot or religious bigots—never question their prejudices and bigotry. They are convinced their beliefs are correct. For the Christians in my class who argued the validity of Christianity last week, I suppose I should thank you for demonstrating to the rest of the class what religious arrogance and bigotry looks like. It seems to have not even occurred to you (I'm directing this comment to those students who manifested such bigotry), as I tried to point out in class tonight, how such bigotry is perceived and experienced by the Muslims, the Hindus, the Buddhists, the non-believers, and so on, in class, to have to sit and endure the tyranny of the masses (the dominant group, that is, which in this case, are Christians). 3. The male student who stood up in class and directed the rest of the class to "not participate" by not responding to my challenge, represented the worst of education. For starters, the idea that a person student or instructor— would instruct other students on how to behave, is pretty arrogant and grossly disrespects the rights of other students who can and want to think for themselves and decide for themselves whether they want to engage in the exchange of ideas or not. Moreover, this "let's just put our fingers in our ears so we will not hear what we disagree with" is … appallingly childish and exemplifies "anti-intellectualism."  The purpose of a university is to engage in dialogue, debate, and exchange ideas in order to try and come to some meaningful conclusion about an issue at hand.  Not to shut ourselves off from ideas we find threatening. Universities, including UCF, have special policies in place to protect our (both professors' and students') freedom to express ourselves. Neither students nor professors have a right to censor speech that makes us uncomfortable. We're adults. We're at a university. There is no topic that is "off-limits" for us to address in class, if even only remotely related to the course topic. I hope you will digest this message, and just as important, will take it to heart as it may apply to you.  *See No. Announcement January 2012.*

46. UCF administrators were made aware of the Respondent's 2012 message to students and did not issue any discipline against the Respondent related to this message. *See Complaint History section below*.

     a.     In fact, according to an *Inside Higher Education* article related to this incident, then-department chair, Witness 152, "said in an e-mail that he supported [the Respondent's] perspective. 'I view [the Respondent's] discussion as protected by the fundamental principles of academic freedom,' he said. 'I am encouraged by the worldwide positive response to his letter, because if critical thinking and debate were not permitted in our public universities, I believe the future of all human rights would be at risk.'"

     b.     Also, then-Provost, Witness 153, "said in an e-mail that the university encouraged faculty members to have classroom discussions that help students think critically. 'We also hope our students will arrive at their own opinions based on those thought-provoking discussions,' he said."

47. On January 10, 2018, the Respondent sent the following email to his students:

Because my time is limited (there is so much to cover in this course), I must rely occasionally on communications with you via "letters" (or messages). I hope you will read all of this and digest it. Yesterday, I had described for you the culture found within the country of Saudi Arabia. Specifically, I said: women who are accused of sex outside of marriage can be (and are) decapitated, in public. … And, … if a daughter or sister is sexually assaulted, OR caught dating a man, OR having pre-marital sex, OR refuses to marry the man her father has ordered her to marry, she may be murdered by her own family (known as "honor killings"). Someone in the class refuted that there are honor killings in Saudi Arabia. … [Respondent then describes his consultations with four UCF colleagues who are from Saudi Arabia, Bangladesh and Iran, and sets forth that they confirmed that honor killings continue to occur in Saudi Arabia, but they are private rather than public matters.] Honor killings occur in the United States on occasion. … In Muslim dominant countries, police will rarely, if ever, prosecute anyone for an Honor killing, and people remain silent about them. … [Respondent asked students to guard "against being defensive about your group."] … Last, most of you have never lived anywhere else besides the United States. You have no idea what life is like in other countries, especially non-White countries. And for those of you who are immigrants in my class, the odds are you only know your family's country of origin *as a child*. As a child, you led a protected, sheltered life. You were not out doing surveys among people in your country, nor were you out critically examining your community. With all due respect (and I say that sincerely), please do not think you are an authority on your parents' culture just because you lived there as a child. Again, odds are, you've never conducted any real critical analysis of your culture of origin, because…you simply lived there as a child."
*See Announcement - January 10, 2018 Re Honor Killings*.

48. During his August 28, 2018 General Psychology course (*see Recording*), the Respondent discussed the purpose of a university and then said, "You just take me on a merry-go-round of little synonyms. It is not real. Heaven. We have the best astronomers in the world. They have identified stars, planets, galaxies that you have never heard of. They have never said, oh there's a heaven with gold and people dancing. You do not know where it is. You just believe it because

someone tells you it is real. Hell. We have oil companies that dig miles below. They never said that there were people down there and a guy with a tail and horns. No, another childish idea."

a.      Further stated, "To celebrate the life of a man you've never met, you've never heard from before, by killing a tree and putting it in your house and narcissistically giving gifts to each other. It is called Christmas. If you stop to think about it, it is pretty bizarre."

b.      Later in the lecture, the Respondent referenced freedom of speech and a student referenced limitations on speech in countries like North Korea and Saudi Arabia.  The Respondent replied, "I may say something that will offend you. I do not enjoy offending you, I just have some opinions on things. I have a bachelor's, master's, PhD. I have opinions. It does not mean I am right. You mentioned Saudi Arabia. Most Muslim countries are not bastions for free speech. The crackpots who run the cult called Islam will kill you. So that is where they have the least amount of free speech."

49. During the 2019 Summer Cross Cultural course (*see Recordings*):

a.      The Respondent indicated that he personally changed in terms of his beliefs when he "encountered someone who changed my way of thinking".  He identified this person as Muhammad.[12]  He then said that when he learned about Muhammad, he concluded that religion was "all make believe."

b.      The Respondent stated that there was a trend during the last ten years where people are leaving the Catholic church and joining some type of evangelical religion.  He referenced the priest sexual abuse scandals as a reason and then said that it also was happening "because evangelical religions are more exciting and energetic, and they have music and they sometimes have dance and stuff. Where the Catholic church, have you ever been to a Catholic sermon? It's like taking two tranquilizers and being given a cup of vodka.  All it does is put you to sleep, it is boring."  Later in the discussion, a student stated that a lot of people in Peru had said that they were not religious and were trying to figure it out.  The Respondent stated, "A lot of people are Catholic in name only. … It's just when they are confronted with death is when they are in church."

c.      Respondent had a discussion with the students about religion and said that "religion has never solved a single social problem". When a student began to react to this statement, he said, "I am talking about believing in an imaginary God and you are talking about social aspects".  He then said, "Let me go on please, let me go on.  I know we are not going to agree on this".  As his lecture progressed, he stated that "people who believe in religion tend to be irrational."  The Respondent then explained how religion serves to provide humans with hope during a time of crisis.

d.      Respondent told students that when he had told other classes that "all religions are mythologies", students "respond saying, like hell, my God is real."  Respondent then said, "No, he is a figment of your imagination."

e.      Respondent shared a passage about the Muslim equivalent to tithing, and stated, "I'm sorry, but Allah does not exist. There's nobody giving anything to Allah. There's no one

---

[12] Muhammad is believed to be the seal of the Messengers and Prophets of God in all the main branches of Islam. Muslims believe that the Quran, the central religious text of Islam, was revealed to Muhammad by God, and that Muhammad was sent to restore Islam, (which they believe did not originate with Muhammad but is the true unaltered original monotheistic faith of Adam, Abraham, Moses, Jesus, and other prophets). The religious, social, and political tenets that Muhammad established with the Quran became the foundation of Islam and the Muslim world.

passing money up in the sky to Allah. It's like Christian churches who tell you to tithe your money to God. No, it's going into the preacher's pockets."

      f.      Also, Respondent referenced religion being a mythology and stated that being raised in a religious upbringing "is a form a child abuse." He also stated, "Teaching children to believe that there is someone watching them all the time, I would say that is child abuse. … You are telling your kid that someone is watching you all the time and if you do not behave well, they are going to punish you and, in fact, even if you are behaving well outwardly, that person knows what you are thinking and feeling and if you have bad thoughts or bad feelings you are going to be punished.  And, if you are really bad in life, which really translates into not conforming to parental or social expectations, you are going to end up in a place where you are going to burn forever.  It does not occur to Christians and Muslims how bizarre and abusive that is to tell children that when they are growing up.  People just think that is normal and you do not understand how pathological that is.  You don't believe or understand how pathological that is.  Talk about creating neurotic people, people who suffer from anxiety, chronic anxiety, it's incredible."

      g.      Respondent referenced *The Myth of Mental Illness* by Thomas Szasz, and said that therapy is like missionary work, and "therapists are servants of mainstream society and trying to get everyone to conform to mainstream society's values."[13]  He asked the class if they knew what missionaries are.  He then stated that he wanted to point out that "missionaries, rarely, if ever, go to upper class neighborhoods because the people in those neighborhoods are more educated and would tell them to leave us alone". Rather, the missionaries go to "countries and communities where there are poor and uneducated and undereducated people". After referencing a group of missionaries in Peru, the Respondent stated that the poor people already have their own religious beliefs, but the missionary's goal is to get them to adopt or modify their own views to views that align with the views of the missionary.  He then told the students that the missionaries will "wave a drumstick" in front of the poor person, and when the poor person tries to reach out for it, the missionary pulls it back.  The missionary then tells the poor person that he wants them to understand that "my God is the real God".  The Respondent then said that the poor person does not want to "let go of their own religious beliefs, but that they are hungry and want the chicken" so they reluctantly agree to "your God is the correct God".  The missionary "holds out the drumstick but again pulls it back when the poor person reaches for it", and "tells them to say it one more time before finally giving them the drumstick".  The Respondent then stated that the missionary "has the audacity of patting himself or herself on the back thinking they are helping them and that they are such a good person", and then equated this to a therapist exploiting vulnerable people as "missionaries exploit poor people". In a separate lecture about this topic, the Respondent said that missionary work was "pretty unethical".  He then stated that everyone has their own religion, yet "missionaries do like therapists and take advantage of vulnerable people". Therapists impose their ideologies on clients and missionaries impose their religion on poor people.

---

[13] A missionary is a member of a religious group sent into an area to promote their faith or perform ministries of service, such as education, literacy, social justice, health care, and economic development. The word was used in light of its biblical usage; in the Latin translation of the Bible, Christ uses the word when sending the disciples to preach the gospel in his name. The term is most commonly used for Christian missions, but can be used for any creed or ideology.

50. On September 12, 2019, the Respondent sent a message to his Cross Cultural Psychology students wherein he discussed the need for students to engage in critical thinking and stated, "let me say something quickly about religion (mythology). I'm a simple man. Let's just take one fundamental tenant of Christianity and Islam: Heaven. For those of you who believe, please tell me precisely where is heaven? Some of you think you're going there after you die, yet I bet you can't tell me where it is. Isn't that...shocking? to believe you're going somewhere so important, yet you are unable to tell me where it is? Do you recognize the absurdity of that?" *See Announcement, September 12, 2019 Re Religion.*

51. On April 8, 2020, the Respondent sent the following message to his Cross Cultural Psychology students regarding *By the Numbers – The Untold Story of Muslim Opinion & Demographics* video: Please be  sure to view this short youtube segment in preparation for your upcoming final exam (on Thursday, April 23rd at 4:30 p.m.).
https://www.youtube.com/watch?v=pSPvnFDDQHk

      a.      When attempting to access this video on YouTube, YouTube first sends a message stating, "This video may be inappropriate for some users."

      b.      To continue, a user must click on a button that states, "I understand and wish to proceed." YouTube sends a second message stating "The following content has been identified by the YouTube community as inappropriate or offensive to some audiences." To access the video, a user must again click on a button that states, "I understand and wish to proceed."

      c.      The video, which is less than 30 minutes, is narrated by Raheel Raza and states, "Every day we're are told that Islamic terrorism has nothing to do with Islam."  It then shows clips of statements made by Hillary Clinton ("Muslims are peaceful and tolerant people and have nothing whatsoever to do with terrorism.") and Barack Obama ("Al-Qaeda's cause is not Islam.").  Ms. Raza continues, "And we are told that Muslims reject the extremists. … What would you say if scientific polls by major research organizations have repeatedly shown a very different picture?"

      d.      The remainder of the video is Ms. Raza's presentation of the viewpoint that "most of the terrorism in the world today involves Muslims in one way or another, and because it directly affects our lives and security," she believes that "we need to be able to have an open, honest and fact-based conversation about [the growing threat of radical Islam]." *See also Summary of Video By the Numbers – The Untold Story – Muslims.*

      e.      The Respondent summarized this video as being "about a Muslim lady in particular that wants reformation of Islam. She lays it out very clearly, all the aspects of Islam that need to be reformed."

      f.      The Respondent indicated that he has assigned viewing of this video for approximately the last two years. During his OIE interview, the Respondent stated, "One among many pedagogical goals of the Cross Cultural Psychology course is to expose people to voices that are silenced within the U.S. within each group, including perspectives that tend to be dismissed in the U.S. 'By the Numbers,' that is an incredible point of view shared by many Muslims but are dismissed by those that want to coddle or protect them."

52. During his 2019 Summer Cross Cultural course, the Respondent told students the following:

      a.      "Islam is [the] fastest growing religion in the world, which just baffles me why anyone would want to be a slave to such toxic mythology."  Later in the lecture, the Respondent

discussed data related to the percentage of Muslims who support Sharia law, which meant support for public lashings, cutting off hands for theft, public execution and murder if one leaves the religion.  He then said, "This is so, so, so shocking and toxic and pathological that I can't believe all the people in the United States who don't want to address this and want to defend Islam and [are] quick to call someone like me an Islamophobe just for pointing this out. … What a toxic cult, what a toxic cult." *See Recordings – 2019 Summer – 13 & Power Points for Arabs and Muslims Lectures*.

      b.     "There is nowhere in the Muslim world where marital rape is illegal.  Men have full rights over their women's bodies.  They can have sex whenever they want to.  I pulled that for you, it's in the Quran."  He then showed Power Point slides with versus from the Quran, and stated, "This is Sharia law as well. … So, I have given you about five verses in the Quran which I think makes it pretty clear the idea that, in Islam, when they say that in the Quran that women are supposed to be treated equally, that is just total nonsense.  Total nonsense from the defensive Muslims." *See Recordings – 2019 Summer – 13 & Power Points for Arabs and Muslims Lectures*.

53. The Respondent issued an exam question to students in the Cross-Cultural Psychology course that asked the following question:  According to any *reasonable* and *rational* person, telling children that someone is watching them 24/7 and knows every "move they make" and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection.  Students needed to select option "B. child abuse" to receive credit for answering this question correctly. *See Respondent's August 14, 2020 Email to OIE*.

54. During his Cross Cultural Psychology course, the Respondent issued an exam question asking: Only one of the following statements is a fact.  Which one?  (a) "Souls" (or "spirits") are real. (b) "Souls" (or "spirits") are not real. (c) There is no credible evidence that "souls" (or "spirits") are real.  To receive credit, students needed to select option (c).  *See Respondent's August 14, 2020 Email to OIE*.

55. During his Cross Cultural Psychology course, the Respondent issued an exam question asking students what Muhammad and Jesus had in common. To get credit for a correct answer, the students needed to select the option that stated there was no evidence of them being who they claimed to be. *See Respondent's Interview Summary*.

56. During the Respondent's General Psychology and Cross-Cultural Psychology courses, the Respondent told students that Muhammad was a con artist/con man, as well as a sociopath and/or psychopath. During his 2019 Summer Cross Cultural Psychology course (*see Recording – 13*), the Respondent referred to Muhammad as a "scam artist".  *See also Review of Arab and Muslim Americans Lecture 1*. During the *Arabid Diaspora* recording, the Respondent can be heard stating that "Muhammad's a sociopath …he's playing people… if you're a reasonable person, this guy was a sociopath, … a crackpot, a liar."

57. During his General Psychology and Cross Cultural Psychology courses, the Respondent told students that Jesus was a schizophrenic. *See Recordings, including 8/21/18 Gen Psych and Arab and Muslim Americans Lecture 1*. During his OIE interview, the Respondent stated that "at

the end of my course, I cover Arabs and Muslims. I do a comparison and contrast between Muhammad and Jesus. I do say that in all likelihood - and if he existed because we don't know much about him aside from the four books in the Bible - in all likelihood he was a schizophrenic. *The Dogma of Christ* by Eric Fromm, which is on the library shelves at UCF, says something similar." The Respondent's lecture in this regard further told students that "Jesus believed that he was sent to this earth to save the whole world.  When they came to take him, he said, 'Take me, that's part of the whole plan.' Jesus ran around the desert thinking he was talking to a God but, in reality, he was just talking to himself. … That was a common delusion that schizophrenics in mental hospitals have, that they are a son of God and here to save the world." *See Respondent's Interview Summary*. The Respondent also told students that Jesus did not have a "virgin birth", was a prophet, and did not come into the world to die for everyone. *See Recording – Peru – Summer 2019 – 13 and Arabid Diaspora Recording*.

58. During his Cross Cultural Psychology course, after sharing versus from the Quran, the Respondent told students that it would be hard to convince him that Islam is a religion of peace. *See Respondent's Interview Summary*.

59. On November 15, 2018, the Respondent sent a letter to students in response to a discussion pertaining to PEW data and oppression of Muslim women.  Therein, the Respondent stated, "Let me translate:  Muslim women are just as 'guilty' of creating oppressive Muslim societies as are men.  YES. YES. One can speculate that the women are just doing what they must do in response to men's authority.  True. But we might also speculate that many Muslim women adhere to Sharia values on their own (give Muslim women some credit for being able to think for themselves please). … Again, Muslim women often are complicit in maintaining and enforcing oppressive beliefs and behaviors among those around them." *See Announcements Nov. 15, 2018 Re PEW data & Muslim Women*.

60. During his Cross Cultural Psychology course, the Respondent told students to take the "[Respondent's] Challenge" wherein he challenged students to go 24 hours without believing in their God or religion. It was a rhetorical challenge as there was no follow up by the Respondent with students about whether they had performed the challenge.  *See Respondent's Interview Summary & Recordings*. During his OIE interview, the Respondent stated, "I told my students - and none of my students think this is anything but rhetorical -to just be a human for 24 hours, stop being White or Black, man or woman, and see how it feels, and they might find it quite liberating. I told them if they went for 24 hours without believing in God, then they can go back to being a believer. It's not a serious challenge." The recordings of his lecture during the 2019 Summer Cross Cultural Psychology course *(#5 & #8)* are consistent with the Respondent's description of this challenge.

*Classroom Comments – Race/Ethnicity*

61. On October 21, 2016, the Respondent sent the following message to students in his Cross Cultural Psychology course:

Good morning, Cross-Cultural Psychology students, Yesterday (10-20-16), we had a small "melt-down" in my Cross Cultural class. Such days seem to occur about once every 3 or 4 years. The last one that occurred was about 4 years ago when a small number of "Christian warriors"

refused to hear anything negatively about their mythology and thought they could band together and silence speech that was inconvenient for them to hear—speech containing information they were unable to refute. Yesterday, it was déjà vu for me. As you were told on the first day of class, my course is not a "self-esteem boosting" course, whereby you get to hear how glorious your ethnic group is and blame any problems afflicting your group on other people. You can find those types of courses in other departments. My course is about applying a critical analysis to distinct groups, particularly one's own group. Being able to examine—in a critical way—the good, the bad, and the ugly about cultural groups (including one's own) is how we learn about ourselves, improve ourselves, and understand how we contribute to the quality of the social interactions we have with dissimilar others. A small number of you expressed disapproval for my coverage of some specific challenges that afflict a sub-group of African Americans in the U.S. Assuming all that I expressed was factually accurate (and you let me know if I ever say anything that is factually inaccurate), we must be willing to confront unpleasant realities that ail some segments of our communities if we are ever going to improve the quality of life for those who reside in those communities. The level of defensiveness manifested by a small number of you was stunning. I'm reminded of that famous line from some movie, "You can't handle the truth." One student said he was offended by seeing the short YouTube by Frederick Wilson—an African American man whose message to African Americans was to recognize that in 2014, if their lives were "messed up," it's because they have messed it up, and that African Americans must accept responsibility for their lives and become educated in order to improve themselves. My goodness, what on earth was "offensive" about that message? That's a message that all people need to hear and accept. A small number of you are stuck in the past, claiming that Jim Crow laws (that happened in the first part of the last century) and slavery (which ended in the middle of two centuries ago) explain why a minority of African Americans struggle with poverty. You cannot prove that. That is a belief that some of you hold onto for your own reasons. We in psychology cannot even prove—as some "Freudians" assert—that what happened to us in childhood explains how we are as adults. That's just a theory. So, imagine how untenable it is to try and explain individuals' behaviors today based on events that happened to people that they never knew from other centuries. A pretty absurd idea, despite how popular that idea is in contemporary United States. There are more proximal causes for the poverty experienced by African Americans—causes that equally explain poverty among Whites, Hispanics, and Asians. Those who are poor (if they are born in the U.S. and are 60 years of age or younger) make bad decisions in life, starting with their conscious decision to quit school. That is a decision they made. No one made them quit school. For the majority of people from poor backgrounds (irrespective of ethnicity), that is the beginning of the end in terms of achieving upward social mobility. Now, add to that bad decision (quitting school) having unprotected sex that can lead to teen pregnancy (and sometimes HIV). Or getting involved in crime. Or using or selling drugs. Those behaviors are behaviors individuals choose to do and the only solution to those problems is to encourage people to: (a) accept responsibility for their lives and (b) make wise decisions. As I said in class, when you misidentify the causes of problems (as religion has done for 1000s of years), you can never solve any problem. As long as people in the U.S. want to explain poor people's problems based on nebulous notions such as "White privilege" and "racism," the problems that afflict such individuals will never be solved. And by the way, for those of you who are "believers" in systematic racism and White privilege, you must explain why the majority of African Americans and Hispanics are doing well in society. How did they achieve relative success in the U.S. while a subgroup of African Americans (and Hispanics, Whites, and Asians) cannot? You must explain

38

how systematic racism causes a minority of African Americans to be poor yet does not stop the majority of African Americans from attaining a middle and upper class life style. No logic can explain such a selective wrath of systematic racism. You must explain why Asian Americans, as a group (that is, on average), are more educated, earn more money, and are less involved in the criminal justice system than the other major ethnic groups if there is rampant systematic racism and White privilege. How did they do it? Millions of people from around the world continue coming to the U.S. legally and illegally. In 2014, 1.3 million came to live in the U.S. legally, and Department of Homeland Security estimates that 1.2 million came to live here illegally. Every year, people worldwide want to live in the U.S. and the vast majority of them are "people of color." Those of you who are believers in systematic racism and White privilege—why do so many people of color from around the world want to live here? Wouldn't word have gotten out and reached their native lands that the U.S. is a horrible place to live due to racial oppression? But they keep on coming, many of them, desperately. What is it that you know about the U.S. that millions of immigrants do not understand? I hope you will give serious consideration to the ideas I've conveyed in this message. For me, a truly educated person is one who can distinguish reality from beliefs—particularly beliefs that are held on to solely because they make you feel good. It's a lifelong process to develop that ability and being in college is just the starting point. *See Announcement October 21, 2016 Re Lack of Systemic Racism*.

62. The following major points of the Respondent's October 21, 2016 message set forth above were consistently taught by the Respondent during his Cross Cultural Psychology course:

- Respondent's course was not a "self-esteem boosting" course for students.
- Black people who are struggling to succeed in the U.S. must accept responsibility for their lives and become educated in order to improve their lives rather than blaming their struggles or challenges entirely on systemic racism. During this discussion, the Respondent told students that there are likely multiple factors that contribute to the problems and struggles that Black individuals experience and although racism is "certainly in the picture", it is not the sole or primary reason. *See Indentured Slaves Recording*.
- The U.S.' history related to Jim Crow laws and slavery do not explain why a minority of Black people struggle with poverty. Their poverty is not the result of systemic racism. Rather, their poverty is caused by their own bad decisions, such as quitting school, having unprotected sex that leads to teenage pregnancy and/or contracting HIV, using or selling drugs, or getting involved in crime. This causation also applies to White, Hispanic and Asian people that experience poverty.
- The only solution to this poverty problem is to encourage people to accept responsibility for their lives and make wise decisions.
- The concepts of systemic racism and White privilege do not explain why Black people experience poverty and reliance on these concepts as being the cause of the poverty prevents the U.S. from solving this issue.
- The concept of systemic racism is inconsistent with Black individuals attaining middle-class and upper-class lifestyles in the U.S.
- The concept of systemic racism is inconsistent with people from around the world coming to live in the U.S. (legally or illegally).

- The concept of systemic racism is inconsistent with data showing that Asian Americans, on average, are more educated, earn more money, and are less involved in the criminal justice system than the other major ethnic groups.

63. During his General Psychology course, the Respondent taught students about stereotypes, including that not all stereotypes are negative. The Respondent taught students that some stereotypes are positive and some are neutral.

     a.     During his 2018 Fall General Psychology course, the Respondent stated that some stereotypes, such as Black people liking watermelon and being good at basketball and Italians liking spaghetti, are not harmful. (When asked to respond to allegations that during his 2017 Fall Sexual Behavior course, he asked the students to raise their hand if they played basketball (which resulted in all Black men but one raising their hand) and then asked the students to raise their hand if they were majoring in a STEM field (which resulted in all the Asian students raising their hands), the Respondent told OIE, "Zero - I have no exercises like this in my courses.")

     b.     The Respondent further stated that there is nothing wrong with people liking certain foods, but Americans have been taught that if someone says something about the foods Hispanics or Blacks like, then this is wrong. The Respondent explained that this discussion had taken place when he discussed the social psychology portion of the course. *Also see 2019 Recording #5 Review* corroborating this discussion.

64. During the Respondent's classes, the Respondent told students that Black people started the slave trade, the slave trade existed for thousands of years before European contact and Black people advocated for slavery with Europeans. Respondent also said that people who complain about Whites for the slave trade curiously get a pass for Black Africans who were equal partners in the slave trade. The Respondent further taught students that the slave trade was initiated based on business reasons (need for physical labor) rather than based on racism, and that approximately 100 years after slaves started coming to what was to become the U.S., pathological racism (which he described as hate for an entire group of people) emerged. *See Respondent's OIE Interview Statement & Indentured Slaves Recording.*

65. During the Respondent's Cross Cultural Psychology courses, he taught students about various paradoxes related to Whites. For instance, during his 2019 Summer Cross Cultural Psychology course:

     a.     The Respondent referenced Whites in the U.S. not knowing the identity of the Prime Minister of England and that there was a White paradox. He then stated that from this group of people (Whites), "the world encountered the most creative and cutting-edge inventions – far more than any other group on the planet." He then stated that people in the U.S. actively try to suppress this information and, apparently in response to reactions students are having, said, "just relax, just relax, this is a university and you can talk about anything". He then discussed the progress humans had made over the last two hundred years with regard to the ability to travel. He then referred to the refrigerator and how prior to this invention, humans had to go out and find fresh meat every day. He then told the class that he suspected that some students in the class believed that an African American invented the refrigerator – specifically, Frederick Jones. The Respondent then said, "First off, he's not that Black, he's more White than Black."

     b.     The Respondent then explained that Mr. Jones did not invent the refrigerator, but instead made the refrigerator (which had already been invented by a White person) portable and

"kudos to him" because people previously could not transport food from one place to another, but he shouldn't get credit for inventing the refrigerator.  He then walked through the items listed on a Power Point slide as having been invented by White people (camera, telephone, cellphone, and automobile) and said that these were "incredible inventions that changed our life the way we know it".  He then discussed the inventions of planes, the television, satellites and the internet. He stated that these inventions were found in other countries, and that "White culture brought all of this to the rest of the world".  He then said to the students, "I told you this is suppressed." Later in the lecture, the Respondent stated, "We don't have a White month heritage", but we do have months to celebrate the contributions of Blacks, Hispanics and Asians. He then said, "And it's because if you compare what Whites have contributed to the world compared to all the non-Whites, it's embarrassing, it's embarrassing the discrepancy". *See Recordings – 2019 Summer – 15*.

  c. In another lecture during the 2019 Summer course, the Respondent told students that they will find almost all of the literature on racism to be about White racism, which has created the image that only Whites are prejudiced. A student asked whether the focus was on White racism because people in power, like Congress, were "mainly White."  The Respondent replied, "No, there are people in the U.S. who that fall under different categories, liberal, progressive, left people, Democrats, who feel guilty over European conquest and the fact that the whole modern world has been created by Whites." *See Recordings – 2019 – 9*.

 66. During the Respondent's Cross Cultural Psychology course, the Respondent told students that the fact that we don't have a White History Month is because it makes people feel bad, and that if every other group can have an ethnic student organization that exists to celebrate their culture and race, Whites ought to have that same right as well. *See Respondent's Interview Summary*.

 67. During the Respondent's classes, the Respondent told students that he had an opinion regarding systemic racism and affirmative action that he would share and the students did not have to agree with his opinion.  During this discussion, the Respondent shared that prior to the Civil Rights Act of 1964, there was race-based discrimination in the U.S. and then even when we had the Civil Rights Act of 1964 which legally prohibited discrimination, there were still people who did not hire Blacks, which was why he was supportive of affirmative action in the 1970s. However, now today, he does not think there is systemic racism in the U.S. and, thus, there is no need for affirmative action.

 68. During his classes, the Respondent showed students a YouTube video of Frederick Wilson, who is a Black male (https://www.youtube.com/watch?v=O2H3MW4G9GM). Therein, Mr. Wilson directed the video to "my Black people" and stated the following:

  a. "Yes, slavery was one of the most horrific things to ever happen in human history. Yes, racism still exists, probably is always gonna exist, just get over that. And yes, there are law enforcement officers out there that take things too far, abuse their power.  They're humans, we're a flawed species."

  b. "With that being said, today we're gonna be talking about personal responsi-damn-bility.  Black people, it is 2014, hate to break this to you, if your life is messed up, it ain't cause of slavery.  Your ass was never a slave, you probably ain't know anybody that was a slave.

You probably don't know nobody that knew nobody that was a slave.  Slavery ended a long time ago.  Yes, it put us in a big hole in this country, but guess what, dig your way out of it."

  c. For the remainder of the video, Mr. Wilson referenced winning the Civil Rights movement, individuals needing to look in the mirror if their life is "messed up" to figure out what they're doing or not doing, and to take responsibility for themselves and their community ("clean your neighborhood up and start keeping it clean").  Mr. Wilson referenced crime, the justice system, police shooting incidents, and misperceptions about Black people.

 69. On March 18, 2018, the Respondent sent the following announcement to his Cross Cultural Psychology students:

I endeavored to offer an--as objective portrayal as possible--of the broad group called "Whites." I was covering some "paradoxes" about Whites and when I started discussing the "intellectual paradox" of Whites, I informed you that, on one hand, the majority of Whites are rather unsophisticated intellectually speaking (the vast majority have not graduated from a university, believe in "Satan," blah, blah, blah). And, on the other hand, I told you that despite that most Whites are quite mundane intellectually, from that group the world's brightest and most creative inventors have emerged to date. As I told you, every single modern invention that changed life as we know it has been invented by a White person. The train, automobile, using electricity for appliances, the light bulb, refrigerator, radio, television, telephone, computer, satellite, internet, rockets, and actually, many more things (microscope, telescope, camera, etc.) I just described your entire modern life, didn't I? THAT SAID, apparently, some of you heard, "Non-Whites never contributed anything to humanity...." I did not say that. I said, every modern invention that changed life as we know it has been invented by a white person (as of today).
Many non-Whites have invented many things.  Many non-Whites improved upon things that were already invented. The light bulb (something most of you would agree changed life in a huge way) was invented by Thomas Edison (a white man).  However, one of his African American assistants (Lewis Latimer) invented a filament for a light bulb that made the light bulb brighter and last longer than the one Edison had created.  Kudos to Latimer.  Refrigerators were first invented by a white European in Scotland (William Cullen), but it was not terribly useful. A white American (Oliver Evans) made the first useful (functioning) refrigerator in 1805. However, an African American (Fred Jones) improved the refrigerator by making it portable (about 140 years after the refrigerator had been invented and in use).  Kudos to Jones. Again, non-Whites have invented lots of things, on a smaller scale, that have improved our lives. The traffic light had been invented by the British (for trains) and had been improved in various ways by other (American) whites, such as William Potts, who in 1920 added the yellow light to serve as a "warning." Yet, the traffic light was improved by an African American (Garrett Morgan). Morgan patented the first automatic electric traffic light that caused cars in both directions to stop for a couple of seconds to reduce accidents at intersections. By the way, Morgan sold the rights to his electric traffic light in 1923 to General Electric for $40,000.  That's $591,000 in today's money!  Dinesh D'Souza--an immigrant from India--in his book "The End of Racism," argued that the reason the United States does not permit Whites to celebrate their culture (either in the form of ethnic student organizations, or with a "White History Month") is because the differential racial achievements would be glaring and embarrassing.  As painful as it is to consider his opinion, his view is...true, I think. Last, all of us--no matter what our ethnic group is--should not rely on others' achievements to make ourselves feel good about ourselves. That is

called "reflected glory" (or "basking in the glory of others") in social psychology and, essentially, when we do that, we're trying to use others' successes to enhance our own self-esteem.  It doesn't work that way.  Real self-esteem comes from one's own accomplishments and achievements (and character), not those from others. We can discuss this more in class if there is a need to discuss it more.

*See Announcement, March 18, 2018 Re White Accomplishments.*

70. On April 4, 2018, the Respondent sent the following announcement to students in his 2018 Spring General Psychology course:

Hello, Gen. psychology students, As it is often the case, I'm a bit fatigued by the time I get to your Tuesday evening class and I may not have expressed myself well when I was discussing the perils of "political correctness."  I will elaborate a bit on this here, if I may, just to make sure you get my point.  I've already explained to you how "PC" came in to existence in the mid-1980s.  So, won't repeat that.  I want you to understand the situation we are in today thanks to "PC."  As I also said last night – but did not elaborate on – it's all around you.  You guys have grown up with it so you don't even notice it.  You know, for example, on college campuses, every single racial group *except Whites* are permitted and encouraged to have their own student organization specifically for the purpose of celebrating their ethnic/racial heritage.  If Whites were to dare ask to do the same thing, people would pounce upon them for being "racist."  How dare those Whites embrace and cherish their ethnic heritage, all the while we minorities have that freedom to openly cherish and embrace our ethnic identities.  On every t.v. commercial, if there is a Black and a White person in the commercial, the White person is the "butt of the joke."  The "dufus."  The one who is portrayed to be dumb, while the Black person is portrayed as the "sane" one.  Every single commercial.  No exception.  If there are a man and a woman, the woman is the "normal" one; the man is the butt of the joke.  The dumb one.  We offer (in this society) scholarships specifically for specific minority groups.  I donate money every now and then to the Hispanic Scholarship Fund for this purpose.  We cannot have a "White Scholarship Fund."  How "racist" that would be.  Entertainers on t.v. (comedians, like Bill Maher) have called President Trump an "orange orangutan."  Audiences laugh.  If he or others would have referred to, in a joke, President Obama as the "black chimpanzee," he (or they) would be fired.  Career over.  We have a very small number of White individuals who hate others, called "White Nationalists." (or "Nazis").  We are obsessed with worrying about them.  Yet we have other "hate groups" that are not White, such as the Nation of Islam, or the New Black Panthers.  There's an estimated 20,000 to 50,000 members of the Nation of Islam.  These are Muslim African Americans who openly hate Whites, Jews, and gay people.  The New Black Panthers openly hate Whites.  But CNN and other news outlets, as well as Sociologists who study "hate groups" rarely if ever want to talk about non-White racists.  We are, again, focused only on White racists.  Today, we cannot have a discussion over whether or not illegal immigration is fair to legal immigrants who have asked for permission to come into our country and play by the rules.  People will accuse of us being "xenophobes" or "racists."  We cannot debate why we continue lowering standards at competitive universities for only two ethnic groups (Blacks and Hispanics) and not for the other two ethnic groups (Whites and Asians) without people calling us "racist."  I mentioned last night, that if anyone, such as myself, point out with facts (I can walk you through the Quran) that Islam is not a religion of "peace."  Islam is very misogynistic, and very racist against Jews and Christians, and even advocates killing non-believers (of Islam) – it's all in the Quran – without

having someone try and silence us with the new buzzword "Islamophobe." We must embrace "diversity" because it is our strength. Yet when I ask my classes why don't we demand "diversity" in the NBA or the NFL (the NBA is 85% Black. If you look at starting players, it jumps up to around 90% Black), no one wants to address that. Why does that profession get to select employees who are only the best.? NO consideration is given to "diversity" on the court or on the field. And finally, professors think twice (and actually, more than twice) before they say anything critical about ethnic groups. Rare is the professor (or anyone on the news) who wants to address the disproportionate murder rates among specific ethnic groups. The number one cause of death among adolescent and young adult African American males in the U.S. is being murdered by another African American (it's the number 2 cause of death for African American females in the same age group). No other ethnic group has that distinction (the number one cause of death for all of other ethnic groups in that age range is a car accident. The number two cause of death is suicide. NOT being murdered by your fellow-ethnic member. But, few people want to talk about that because they'll be accused of simply being a "racist," despite typically wanting to try and do something to stop the high rates of murders in low-income African American communities. So, I've written you a lot here. Do you get my point? This is all the longterm effects of political correctness that started in the 1980 (with a good goal), but very bad ramifications in the manner they achieved their goals. *See Announcement April 4, 2018 Re Political Correctness*.

71. On October 26, 2019, the Respondent sent the following announcement to students in his 2019 Fall Personality Theory and Research, Cross Cultural Psychology, and Sexual Behavior courses:

Just expressing an opinion here, which I am entitled to do once in a while… Finally—Perhaps my beloved Latinos will grow a pair and push back on the "hipper-than-thou-because-we-so-woke" Hispanic a—holes who think they can decide for 500+ million people how they ought to be called. https://www.usatoday.com/story/opinion/2019/10/25/latinx-race-progressives-hispanic-latinos-column/4082760002/?fbclid=lwAR0t5CpqVUx0XkB5m05biNIU1cto8b7aZv9fR9u1ozA9s3CG0b1HfwvdNQ (Links to an external site) If you want to be called "Latinx", great. Just don't impose your idiocy on the rest of us(!). Have a blessed day (lol…). *See Announcements Oct. 26, 2016 Re Latinx*. This link connected students to an article titled "Progressives, Hispanics are not 'Latinx.' Stop trying to Anglicize our Spanish language" and stated that "Hispanic Americans face plenty of challenges as it is. The last thing we need are English-speaking progressives 'wokesplaining' how to speak Spanish."

72. On July 15, 2019, the Respondent sent the following announcement to students in his 2019 Summer Cross Cultural Psychology course:

Hello, Cross-Cultural Psychology students: Today, I pointed out to you that judging the behavior of people from other epochs according to *contemporary* ethics is a questionable practice. And, as I'm accustomed to, when I mention "abortion," I tap into people's emotionally-laden beliefs about "abortion" (on both sides of the issue). Before I say the following, let me state that we (you and me) will not agree on everything. That's fine. We're not getting married (I'm already married…). So, if we don't agree on things, that's not a problem unless the data on some topic is

pretty clear in favor of a particular position on some topic. Let me ramble: Humans who engage in questionable behaviors are renown for **"rationalizing" (justifying)** why their attitudes are good or acceptable. AND…they often use euphemisms to "soften" their questionable behaviors: People who kill innocent animals for fun like to call it "hunting," and a "sport." (sounds so benign...). People who abandon their aging parents in institutions where they will be neglected and sometimes abused like to call it "placing them in a nursing home." (as if they will be "nursed" there, sucking on a breast 24/7…). And, people who don't want their zygote/fetus/baby and want to kill it will call it "an abortion." And to top it off, "abortion" has strategically been framed as a "woman's issue" as a means to shield the practice from scrutiny and criticism. **My point** was…it's easy to be judgmental about people from the past but we (many people; not me) don't realize there's a chance in the future people will look back on OUR civilization and characterize us quite pejoratively all because of practices we support and engage in today. If you don't like the abortion example, I'll try another: perhaps when the earth is on the brink of destruction environmentally in 100 or 200 years, those still alive may look back at us and declare us to have been the most selfish, greedy, and materialistic people the world has ever known—causing THEIR demise(!) Why might they denigrate us and claim we were "evil?" Hmm…let me count the ways: Most of us refuse to take a bus. We want our own car. Not just one car. Each family strives for multiple cars. We're not happy with one television set. We want a t.v. in every room. We're not happy with the phone we have. We salivate over the arrival of the latest I-phone. We're not happy having one bathroom (how inconvenient…). No, we want, 2, 3 or more bathrooms. Single-car garage? Not enough. Double-car garage at 2 the bare minimum. A/C, heat, access to hot water 24/7…all that consumes energy and pollutes. **BUT…WE DON'T CARE.** I promise you: If you lived in 1600 and were wealthy, no matter what your race or country was, you probably would have been just fine owning slaves. You would have been just fine allowing "children" to work in fields and in factories. Bottom line: Throwing great, visionary leaders like George Washington and Thomas Jefferson under the bus because they owned slaves….is misguided. I promise you (although I can't prove this): If MLK, Jr., were not black, the social justice warriors who are influenced by the "me-too" movement would be throwing him under the bus. But…black privilege protects him. **Political correctness at its best.** If you don't agree, no problem. It won't be the first time or the last time we disagree. *See Announcement, July 15, 2019 Re Judging Past with Contemporary Standards & Black Privilege Reference.*

73. During a 2019 Fall Cross Cultural Psychology course, the class discussed financing for college. A student made a statement related to African Americans being disadvantaged and oppressed, and the Respondent replied, "You know me, I don't have tolerance for silliness, show me an African American student with a 3.8 GPA and I'll show you an African American who is dedicated to their studies and will go to college."

74. During a 2019 Summer Cross Cultural psychology course (*see Recording – 7*), when discussing data related to different racial groups' earnings, the Respondent stated, "Right now we are talking about Hispanics and you should write down $42,000 for Hispanics. Notice that, on average, that the group that earns the most in the United States is Asians. So, we hear a lot of talk about white privilege and how the system was created to advantage Whites and yet people just gloss over that fact that on average Asian Americans in the United States are more educated

than any other group, they earn more than any other group, but that does not fit the narrative of White privilege."

75. During a 2019 Summer Cross Cultural Psychology course (*see Recording – 12*), the Respondent discussed how some Black individuals sabotage other Black individuals from performing well in school by accusing them of "trying to be White" if they perform well.  The Respondent explained that this is counterproductive to changing the status of their life (i.e. poverty).  The Respondent then stated, "We also have a subgroup of African Americans who think that society owes them something.  Owes them something because of slavery that happened in the United States and they refuse to work and they live off welfare. … Again, you can find people in every group. … Whites, Hispanics, Black, Natives, but there is a slightly higher percentage of Africans who live off welfare than the other groups. … so moving on here, please don't walk away from my class thinking that the majority of African Americans are on welfare, they are not."

76. During a 2019 Summer Cross Cultural Psychology course (*see Recording – 12*), the Respondent said, "It is my opinion, that I have already expressed to you before, that I think collectively that Black people in the United States experience collectively the most rejection from society overall.  And I am not saying, an African American who stays in school, does well in school and avoids committing crimes will have as good a life as you and I will have.  There are tons of them who do that.  We have Black police officers, we have Black professors, engineers, in every occupation you will find Black people."

*Classroom Comments – Profanity, Opinions & Generalizations*:

77. During his 2019 Summer course, the Respondent told students that he would be talking about multiple groups and that "there is good and bad in every group and I treat them all like shit".

78. During the Respondent's courses, he routinely used profanity, including the terms "fuck," "shit," "ass", and "bitch." *See Respondent's Interview Summary & 2019 Peru Recordings*. During the Respondent's OIE interview, he stated, "I am known to use cuss words on occasion in class. I never use the F word to talk about sex or anyone in the class. I have been known to say, 'Oh f---' when using the computer and trying to set it up correctly. I don't deny that I've said it but it's sporadic, never directed in a hostile way, and more an expression like 'damn' for me. Director Myers asked about the frequency of my use of foul language. I say the word 'shit' once or twice in a semester. I'd be lying to you if I said I didn't say anything else. I wouldn't put it past me. But they are expressions, not directed at students. For instance, if I made a mistake on an exam and had to give credit for two items, I might say 'son of a bitch' or something like that."

      a.     For example, during his 2018 Fall General Psychology course (*see Recording*), the Respondent discussed how humans learn certain behavior, such as needing to brush their teeth every morning.  As another example of learned behavior, he referenced having assigned seating and tied this back to how students have assigned seating when they enter kindergarten. He described how parents bring their children to class and the kindergarten teacher greets the child, shows them to their seat with their name, and then says, "you sit your little ass down."

46

b.      For example, during his 2019 Summer Cross Cultural Psychology course (*see Recording*):

    i.      While discussing religion being a mythology, someone interrupted the class and apologized (apparently having inadvertently entered the classroom). When they left, the Respondent stated, "Bitches!"

    ii.     The Respondent discussed welfare and said, "I worked three years in a grocery store in the largest Mexican ghetto in the United States … and to see so many people paying for food with food stamps and they would have a separate order of things they couldn't buy with food stamps and they would pay for it with their welfare check, and here I am working and I am thinking, 'Why aren't you fucking working.'"

    iii.    The Respondent advised students that he would be talking about different groups and "keep in mind, I am not here to denigrate them.  There is good and bad in every group and I treat them all like shit."

    iv.     When discussing practices in Saudi Arabia, the Respondent asked, "How on earth can people in the U.S. proclaim that all cultures are equally good?"  He then responded, "The answer is, they are just fucking crazy".

    v.      When discussing families encouraging a female family member to die by suicide after they were sexually assaulted, the Respondent asked, "Is this fucking for real? This is just barbaric as shit."

    vi.     After referencing being tenured, the Respondent stated, "Those who are not tenured are kissing your ass by letting you take tests multiple times to get the grade you want, giving you access to power point slides and doing other things to make you happy."

    vii.    When discussing that one of the motivations for believing in a religion is denial that we can die at any minute, the Respondent said, "'Life is a bitch and then you die'" is my motto."

    viii.   While referencing the Biblical story about Noah and the Ark and having a pair of every animal on a boat, the Respondent said, "Can you imagine a pair of every animal on a boat for 40 days. You would be shoveling shit 24/7."

    ix.     While discussing his viewpoint that there is no systemic racism and giving an opportunity for students to challenge this viewpoint, a student referenced Casey Anthony. The Respondent replied, "I hate that bitch but go ahead."

    x.      While discussing bakers that refused to make cakes for a gay couple's wedding, the Responded indicated that he would have told the baker, "Sir, you are not invited to the fucking wedding or to be a part of the party.  You aren't celebrating shit.  Do your job and make the cake."

    xi.     When talking about how stereotypes can be negative, positive or neutral, the Respondent said, "Because many of you are not independent thinkers, you buy into all this bullshit of political correctness."

79. During the Respondent's 2019 Summer course in Peru, the Respondent discussed relativism vs. absolutism during which he referenced a female student he previously had taught who identified as a feminist.  He said that this woman tried to promote feminism all she could and endorsed all of its ideas.  He then told her that since everyone is equal, the next time she uses the bathroom and finds blood in the toilet, she should not call a doctor but instead should go and ask someone at Walmart about her issue.

80. During the Respondent's Sexual Behavior course, he discussed sexually transmitted infections, including HPV. On April 14, 2020, the Respondent sent the following message to his Sexual Behavior course students:

Hello, Sexual Behavior class.
Today, emotions started running a tad high once we delved into the topic of HPV and cancer (likely due to "cancer" being involved).  A lot was said, and I think there is a chance some of you may have not grasped what I had said with 100% accuracy, so I will reiterate here what I said: 1) It is my best educated opinion that, overall, HPV is "not that big of a deal."  Think of your parents, grandparents, great-grandparents, etc.  They ALL were sexually active (in various degrees) and they did not have any option to obtain a vaccination against HPV.  Yet, almost ALL of them never suffered "penile cancer," or "anal cancer," or even "cervical cancer."  Yes, a tiny (tiny) percent did, but the vast majority did not. 2) As I stated, if you've already had sex, the odds are you've already been "infected" or exposed to one or more HPV strands.  But for about 90% of us, we'll never know we have HPV AND (AND...) the virus will "clear up" within two years, especially in young people such as yourselves who typically have healthy immune systems. 3) The CDC *thinks...* once you've been infected with a strand of HPV AND (AND...) it has not affected you AND (AND...) cleared up within a 2 year period, it appears that you will never be "affected" by that HPV strand again in your life.  The CDC may change their position on that, but that was their latest position. 4) I did not say "cervical cancer is no big deal" (just in case you heard that).  I said, "if one is going to have cancer, cervical cancer is one of the best cancers to have." Why? Because unlike other types of cancers (such as breast cancer), cervical cancer is: (a) easily detectable; (b) easy to treat in the early stages [simply by removing abnormal, or even cancerous cells], and (c) it's a very slow-growing cancer.  One has many years in which some form of intervention or treatment can be obtained.  **If someone is diagnosed with cervical cancer, that IS a big deal--as are all cancers!** 5) About 12,000 women are diagnosed each year in the U.S. with cervical cancer.  We have about 165 million women in the U.S. (130 million women who are 18 yrs of age or older).  Those 12,000 women are unfortunate cases, that is for sure, but the odds of any woman (teenager or adult) actually having cervical cancer is very, very low.   IT DOES OCCUR, but not for the vast majority of women. 6) If you have a concern over cervical cancer or genital warts, then you are free to obtain those vaccines.  Note:  If you've already had sex, then the odds are the vaccine will be of no use to you (which is why they want children ages 7, 8, or 9 to obtain the vaccines, because we presume they've not had sex yet).  It is true that if you've had sex, you may NOT have been exposed to any (or all) strands of HPV and thus, getting vaccinated *may*still offer you some level of protection.  But any benefit from the vaccine will be minimalized if you've already been infected by HPV.  To obtain or not to obtain a vaccine for HPV is entirely *your* decision. If you are worried about cervical/anal/penile cancer and genital warts then you can obtain the vaccination and *feel* safer. 7) A few years ago, I was in the UCF Health Clinic and I noticed many displays of posters addressing HPV. There were many statements on those posters such as, "You may not know if you are infected with HPV."  And, "HPV can cause various types of cancer." And, "Both women and men can equally be infected with HPV...."  Personally, I thought the posters were a bunch of fear propaganda (imagine someone saying with a serious tone: "You know men and women equally are killed in car accidents..."  **Duh....** So, I thought, Who is behind such a fear-propaganda campaign?  And in small letters at the bottom of the posters were the words "Merck Pharmaceuticals."  They're one of the companies that produces and sells the vaccines.  Such an

effective way to enrich themselves:  Make the public fearful of a virus that does not affect 90% of us...

I hope this helps.  Please feel free to get other people's opinions on this.  Dr. Elizabeth Rash will give you a lecture on Tuesday about contraceptives and she is an advocate of the vaccine. So, you can hear her opinion on those vaccines.
*See Announcement April 14, 2020 Re HPV & Cancer.*

*Classroom Comments – Disability*:
   81. During his August 28, 2018 General Psychology class, the Respondent showed a video related to beliefs and said that he wanted to discuss autism. He then said, "We had autistic people and Asperger's syndrome. Speaking of IQs, they tend to be in the normal range. About 75 to 85% of individuals with autism also have what we used to call mental retardation. It is now called cognitive or intellectual impairment. 75-80 have some level of that. If you let me use old terms, it is not correct but I am not being nasty. Autism is a social retardation. They vary. Some have mental retardation as well. … The interventions might do some things like stop the outrageous behaviors like head banging. But helping them to become an average functioning adult is never going to happen."

*Respondent's Book, White Shaming*:
   82. The Respondent wrote a book titled "White Shaming."

   83. On March 11, 2019, the Respondent sent an announcement to his General Psychology, Sexual Behavior and Cross Cultural Psychology students which indicated that he was working on a book that he hoped to get published in Fall of 2019, and announced that he had a Twitter account that they could follow.

   84. The electronic version of the Respondent's book titled "White Shaming" was released during the fall of 2019, and the paper version was released during the spring of 2020.

   85. During December 2019, the Respondent used UCF's resources to send an email to students for the 2020 Spring term that *White Shaming* would be an assigned reading for the Cross Cultural Psychology course, they would be required to "write a reaction paper to the book fairly early in the Spring semester", and provided the information on how to obtain the book "now in case you wanted to read it over the holidays."

   86. On March 7, 2020, the Respondent sent an email to his students reminding them that their reaction papers were due in class on March 17, 2020.

   87. On March 13, 2020, the Respondent used UCF resources to identify current students and students from the last year and a half of his courses and sent them an email through UCF's email titled, "From the desk of [Respondent]", which stated, "Blast from the past from [Respondent]... I hope all of you are staying safe during this hysterical time in our history. I write to you because some of you had asked me when the book, *White Shaming: Bullying based on Prejudice, Virtue-Signaling, and Ignorance*, was going to be available in paperback version. It is now available on both Amazon https://www.amazon.com/White-Shaming-Prejudice-Virtue-signaling-

Ignorance/dp/1792407858/ref=sr_1_1?keywords=white+shaming&qid=1584144365&sr=8-1 and B&N https://www.barnesandnoble.com/w/white-shaming-charles-negy/1136281230?ean=9781792407857 Just in case you wanted to obtain a copy of the book. Take care!"

88. On March 13, 2020 (same day as message to students about his book), the Respondent advised the Department Chair, Witness 154, that he sent a message to students over the last year and a half letting them know that his book had been published.  The Respondent advised that he had received both positive and negative responses from students to his message. The Respondent "confess[ed]" that he knew "this was serving in some ways as 'advertisement," that his "primary motive was to reach the students from the classes who had asked to be informed" if the book was published, apologized "if this was a problem," and indicated that he would "not be sending out any more messages about this."  Witness 154 replied, "Thank you for the emails.  I don't think it's a problem, but if someone complains, I'll let you know." *See Email March 13, 2020 Respondent & Dept Char Re Book Outreaches*.

89. On March 16, 2020, the Respondent sent an email to his students asking them to hold off on sending their reaction papers since, due to COVID19, they were not meeting in person as expected and the Respondent was "not thrilled at the thought of receiving 130 emails or canvas messages with papers attached."  He then extended the due date to March 31, 2020.

90. The Respondent required students in his 2019 Fall Cross Cultural Psychology and 2020 Spring Cross Cultural Psychology courses to read *White Shaming*.

91. With regard to using his book *White Shaming* as required course material, the Respondent complied with University policy by completing UCF's Potential Outside Activity, Employment, and Conflict of Interest and Commitment Disclosure (AA-21), which was approved by UCF. The Respondent has represented that proceeds from the book were donated to St. Jude and Make a Wish as required by University policy when a professor's book is assigned as required course material.

*Respondent's Twitter*:

92. The Twitter handle associated with the Respondent was initiated in 2019.  The Respondent posted to this Twitter account numerous times, including making comments related to issues of race and religion.

93. On March 11, 2019, the Respondent sent an announcement to his General Psychology, Sexual Behavior and Cross Cultural Psychology students that said, in part, "I just started a Twitter account (wouldn't want our President to out-do me… ha ha ha…). Feel free to follow me if you'd like!"

94. On January 7, 2020, the Respondent sent an announcement to his current students titled "Follow me on Twitter (optional, of course)".  Therein, the Respondent stated, "Students, If you are interested, you may follow me on Twitter (@CharlesNegy).  In class, I try hard to be a-political and I try to stay focused on the course subject matter.  Of course, my twitter account is

my personal account and I comment on various social issues, including politics on occasion (I'm a registered Independent and I despise all politicians…)."

## VII.    MATERIAL FACTS IN DISPUTE & RESOLUTION OF DISPUTED MATERIAL FACTS

OIE received differing accounts or conflicting evidence as to some material facts. Since the questions are material to the resolution of whether the Respondent violated University regulation or policy, OIE must resolve the disputed facts based on the testimonial and documentary evidence.

The Equal Employment Opportunity Commission (EEOC) has identified five factors to consider when resolving disputed issues of fact that require credibility assessments: 1) the inherent plausibility of the testimony; 2) the demeanor of the person offering the testimony; 3) whether the individual has a motivation to lie; 4) whether the remarks or conduct could be corroborated; and 5) whether the Respondent has a history of similar behavior. None of these factors are necessarily determinative of credibility.[14] Courts have recognized that in a case which involves close questions of credibility and subjective interpretation, the existence of corroborative evidence or lack thereof is likely to be crucial.

The following analysis resolves the disputed facts considered material to determining whether the Respondent violated University policy and/or regulation based upon testimonial, audio recordings, and documentary evidence provided in this matter. Before discussing each disputed material fact below, it is important to note that, along with the factors identified by the EEOC, OIE assessed the following factors in assessing the credibility of the parties and witnesses based on the record.

**Consistency**:  As previously indicated, OIE received reports from multiple sources (phone calls, emails, IntegrityLine reports, JKRT reports, and OSC reports) wherein individuals reacted to the Respondent's Twitter posts and/or made allegations of misconduct against the Respondent. As set forth in detail in OIE's Investigation summary (Attachment A), OIE spoke with over 300 individuals during the course of this investigation (see witness interview summaries, OIE phone logs, climate check call responses), including the Respondent. OIE's analysis of this matter included reviewing the original communications from witnesses about their experiences with the information provided during OIE's interviews.  OIE's analysis also included reviewing approximately 37 hours of audio recordings of the Respondent's lectures.  As a general matter, witnesses remained relatively consistent with what they initially reported and what was described during their OIE interviews.

However, with regard to the Respondent, although he was cooperative and responsive to OIE's questions throughout the investigation, some of the information that he provided was refuted by documentary evidence, as well as audio recordings of his classroom. These inconsistencies weakened his credibility and drew into question whether he was being truthful

---

[14]*See U.S. Equal Employment Opportunity Commission: Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999) at http://www.eeoc.gov/policy/docs/harassment.html.

with regard to his other statements to OIE.  Specifically, during the course of the investigation, OIE identified the following significant instances wherein the documentary or audio evidence clearly conflicted with what the Respondent had represented to OIE:

1)      During his OIE interview, the Respondent "completely" denied that he had told students that unless he raped a student, there was nothing that could be done about what he said in class due to him being tenured.  However, an audio classroom recording captured the Respondent telling his students, "At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you – which I won't, I promise – the university can't fire me.  They just can't fire me."

2)      During his OIE interview, the Respondent denied the allegation that, in 2011, he bribed a health clinic representative to issue a vaccination certificate related to yellow fever so that he could board a flight, stated "[t]hat's a total fabrication", and claimed that he had "actually received a vaccination shot."  However, the Respondent admitted in his book *White Shaming* that he "had never even been vaccinated against yellow fever".  Also, an audio classroom recording captured the Respondent telling his students that the health clinic person "agreed to give me the vaccination certificate for $17.00, and she dated [it] so that I had gotten one dosage 10 days before and the second dose today [day of his trip]."

3)      During his OIE interview, the Respondent denied that he told students that God did not exist.  Rather, he told them that there was no evidence that God existed.  However, audio recordings captured the Respondent telling students that "Allah does not exist", God was a "figment of their imagination", and religion was "make believe".

4)      During his OIE interview, the Respondent denied that he told students that minorities never invented anything that impacted society (rather, he said that non-Whites had invented things on a smaller scale or improved upon things that were already invented).  However, in his March 18, 2018 email to his students, the Respondent stated that "*every single modern invention* that changed life as we know it has been invented by a white person".  Also, an audio recording captured the Respondent telling students that it was a "fact that the *whole modern world* has been created by Whites".

5)      During his OIE interview, the Respondent denied that he ever used the term "Black privilege" in his classes.  However, in his July 15, 2019 message to students, the Respondent stated, "If MLK, Jr., were not black, the social justice warriors who are influenced by the 'me-too' movement would be throwing him under the bus. But…black privilege protects him."

6)      During his OIE interview, the Respondent denied that he had told a male GTA, who was covering proctoring an exam for a female GTA, that he hoped the female GTA "was compensating him but that is none of my business".  The Respondent said that the allegation was "a complete fabrication." However, OIE located the email wherein the Respondent said, "I hope [the female GTA] is compensating you well for this!!! But … it's none of my business…)."

7)      During his OIE interview, the Respondent denied ever using the term "faggot".  However, an audio recording captured the Respondent using this term in class while describing the January 2019 Covington Catholic High School incident in Washington D.C. (OIE notes that the Respondent used the term to describe how this, and other negative terms, were yelled at the

high school students prior to the incident that made national news. The Respondent did not direct the term at any students.)[15]

       8)     During his OIE interview, the Respondent denied discussing the sexual assault allegations against Brett Kavanaugh and related congressional hearings.  Specifically, the Respondent stated, "I never brought up that case in my classes."  However, an audio recording of his class captured the Respondent initiating a discussion about the hearings, the alleged triggering of the accuser's memory during couple's therapy, and Respondent's perception of Justice Kavanaugh being "a squeaky clean conservative person."

       9)     During his OIE interview, the Respondent denied ever discussing cerebral cortices during his class lectures ("I never talked to my students about cerebral cortices"). However, an audio recording of his class captured him telling students, "Our cerebral cortex is very distinct from other animals' cortexes.  It is much more complicated and much more complex.  That allowed us to do things that all the other animals can't do."

      In addition to the above, the Respondent noted that many of the allegations against him had not been noted in his Student Evaluations of Instructor Summaries, and accordingly, lacked credibility.  In other words, he argued, the students were inconsistent in representing that the Respondent had engaged in misconduct by not noting the misconduct in his evaluations at the time of the classes.  He further argued that, instead of the allegations being truthful, they were being launched in reaction to the media attention received related to his Twitter posts.  The Respondent insinuated that the allegations were brought forward at this time as an attempt to censor his conservative and controversial views set forth in his Twitter posts and were part of "a politically motivated witch hunt".

      However, the Respondent is mistaken that the mere absence of the allegations in the evaluations demonstrates that the allegations are false. First, the record clearly shows that the Respondent discouraged reporting and gave an impression that he was essentially bullet-proof to complaints about his conduct in the classroom. As set forth in more detail below, the Respondent repeatedly made clear to his students that tenure and the First Amendment protected him and that anything short of raping a student, the University could not discipline him.  Second, the Respondent told the students stories of prior students having failed at launching complaints about his classroom conduct and how he "laughed all the way through" the process when complaints had been made.  Such stories likely contributed to the lack of reporting on the forms as students would be left with the desired impression – namely, that nothing would be done in response to the complaint so what would be the point of noting their concerns in the evaluations.  Third, students (like many Complainants in investigations of this nature) are generally highly concerned about being subjected to retaliation, particularly when launching a complaint against a tenured professor.  Accordingly, although it is important to consider the timing of allegations and other missed opportunities to report, OIE is not persuaded that the mere absence of the detailed allegations in the student evaluations equates to untruthfulness.

---

[15] The Covington Catholic High School incident took place on January 18, 2019 and involved a confrontation among different groups near the Lincoln Memorial in Washington D.C.  The incident received widespread media attention, particularly the interaction between a White male high school student and a Native American activist. Videos released days later showed that initial media reports had omitted key details of the incident and many stories falsely portrayed the high school students as the aggressors.

**Motive/Benefit/Bias:** OIE also takes into consideration that on June 4, 2020, there was a significant student and community reaction to the Respondent's Twitter posts, including a change.org petition calling for the Respondent's termination that, as of the time of this report, had over 30,000 signatures and was initiated by one of the witnesses who participated in this investigation. (*E.g.* New York Times article titled "University to Investigate Professor Who Tweeted About "Black Privilege"; Knight News article titled "UCF Professor's Controversial Tweets Claim Black Privilege Exists in America"; Orlando Sentinel article titled "UCF Protestors Demand Professor Be Fired for Racist Tweets"). Multiple witnesses indicated a desire in the Respondent not remaining a UCF faculty member – either in reaction to the Respondent's Twitter posts on important social issues, in response to the Respondent's conduct in the classroom, or both. *See Facebook Post by Student (redacted) (7-16-20).* That said, for many witnesses, they had no apparent motive to fabricate the information they relayed to OIE as they had no relationship with the Respondent, were no longer enrolled at UCF, and/or did not have any benefit to gain from participating in OIE's process. When OIE asked about the individuals who had shared concerns with OIE, the Respondent stated that he did not recognize 99% of the names provided to him by OIE since he taught a large number of students each year. When asked if he was aware of any reason why the students listed would have reason to lie about their experiences, the Respondent replied, "Because I don't know all of them, I don't know." He then indicated that he identified one student (Witness 53) who had taken the Respondent's course, made a public records request during the summer of 2020, was active on social medial to recruit individuals to "get me fired", and had "failed my course very badly." With regard to the Respondent, he had a motive to resolve these allegations in his favor to protect his status as a tenured professor, as well as his reputation.

**Interest/Lack of Interest:** As set forth in detail in Attachment A, multiple witnesses and the Respondent participated in substantive interviews with OIE. They were willing to discuss aspects of this case and responded to Investigators' questions. OIE also was advised by some individuals that they did not wish to participate in OIE's investigation or chose not to respond to OIE's outreach after having submitted emails or reports to the university about their experiences with the Respondent. In terms of overall participation, the majority of participants (over 300) were individuals that had been enrolled in at least one of the Respondent's courses from 2018 through Spring 2020. The remaining individuals had been enrolled in at least one of the Respondent's courses between 1999 and 2017. When looking at the specific courses and participation, OIE spoke with approximately 100 individuals from each of the Respondent's General Psychology, Sexual Behavior, and Cross Cultural Psychology courses, approximately 20 that had taken Personality Theory and Research with him, and two that had taken the Psychology of Prejudice course with him.

**Capacity to Recollect or Perceive:** As set forth above, the university received allegations regarding experiences with the Respondent over the course of a number of years, some more than a decade ago. Accordingly, OIE took into consideration the gaps in time between the incidents at issue and reporting, which understandably caused some difficulty in recollecting details (for both witnesses and the Respondent). Due to the scope of allegations made, both in terms of the timeframe and nature of allegations, it is to be expected that there may be some nuance among the descriptions of the statements, as well as the Respondent not recollecting specific details (particularly considering that he has taught these courses multiple times since

1998 to thousands of students).  No other factors, other than the timeframe, were identified as having impacted the Respondent's and witnesses' ability to perceive or recollect the events. The Respondent questioned whether most of the individuals that had shared their experiences with the university were ever enrolled in his courses, implying that the reports were not based on personal experiences and were instead a reaction to his Twitter posts.  As set forth in detail in No. 9 of Section VI (Material Facts Not in Dispute section), OIE confirmed witnesses' enrollment data and used university class rosters when making outreach.

OIE notes that the University received a large volume and multiple types of allegations against the Respondent.  Just about all of these allegations are captured herein.  However, some allegations are not analyzed herein because the alleged conduct would not violate University policies and regulations, was captured in the essence and nature of the allegations analyzed below, pertained to the Respondent's approach to classroom structure, or lacked any corroborating evidence or similar allegation from others.  For example, the analysis below does not include an analysis of the allegations that the Respondent's exam questions asked obscure facts about a video shown in class (such as what was someone wearing or eating) rather than substantive course content; Respondent gave either full credit or no credit for writing assignments; Respondent answered his cell phone during class; Respondent raised his voice in class; Respondent joked that students' grades would be lowered if they disagreed with him; Respondent disagreed with the effectiveness of diversity initiatives in bringing communities together; Respondent made mental health diagnosis of family members, politicians, and a student without treatment; and Respondent discussed how therapy can be an attempt to bring conformity to social norms.

OIE's investigation revealed that the following facts, which are material to determining whether the Respondent violated University policies and/or regulations, are in dispute:

*Respondent's Twitter Posts*

1. **Whether the Respondent required students to follow and/or review his Twitter account posts as part of his course curriculums.**

As set forth above, on December 19, 2019, an unidentified concerned citizen reported to UCF's University Audit that they had reviewed the Respondent's posts on his personal Twitter account and believed that the Respondent had made "misogynistic, transphobic, racist, anti-immigrant and religiously discriminating comments."  On June 4, 2020, the university received multiple reports alleging that the Respondent had made additional discriminatory statements on his Twitter account, which individuals believed constituted cause to terminate the Respondent's employment.

The citizen in the December 2019 report provided the following examples of the Respondent's Twitter posts:
- Only 21% of African Americans and 31% of Hispanics taking the SAT showed "readiness" for college-level work. Most African Americans and Hispanics attend integrated schools and live in mixed neighborhoods. Something is terribly wrong here (it's not just "lack of resources...") (September 24, 2019);

- I once sent our university President (the one who recently resigned over scandal) a message telling him there is no evidence that an African American student struggling in a math class will improve his math ability due to a Pakistani student sitting two rows over.  No response.. (September 25, 2019);
- At Univ. of Central Fl., they're hired a "diversity promoter" who has forced that term on the rest of us Latinos/as. I've polled my 200+ Hispanic students in my 3 classes. NONE of them uses that term. It's a term for zealots, who always want to impose their views on everyone else (October 4, 2019);
- I think *real* racism needs to make a comeback in the U.S., so black folks will stop fabricating they're victims of discrimination (sarcasm... are you listening, Jussie?) (October 5, 2019);
- I have bat-sh*t crazy woke students in my classes who have said publicly that if one is not willing to have sex with every type of race/ethnicity that exists, then one is a "racist."  (I told them to knock themselves out, but I have a preferred "look" on my menu..) (October 26, 2019);
- A tragic state of affairs, for sure. But one that contradicts the liberal, romantic notion that Native Americans are all peaceful pacifists, living in harmony with nature. (November 22, 2019) (response to article titled "William Barr to Announce Plan Addressing Crisis of Missing and Murdered Indigenous People");
- I wish I could be as optimistic about this as you, but I'm not. I anticipate a lot of arrogant (minority) students thinking they "earned" their way into elite institutions while calling us doubters "racists."  This has no end...(my opinion). (November 24, 2019);
- It also says, "I'm a mindless dote who does whatever my father or husband tells me to do..." (November 25, 2019) (response to tweet about wearing the niqab[16]);
- Yeah, that's what we need. More people and immigrants in the U.S. So we can clear more trees to make room for apartment complexes, Walmarts, strip malls, schools, etc. To hell with the quality of life for those of us who live here already (legally, I should add). (November 27, 2019) (response to Mayor Bloomberg calling for more immigrants in the U.S. rather than less);
- Great article. But...I'm not optimistic about this situation changing anytime soon. Universities are obsessed (to use the authors' words) with diversity and employ all machiavellian maneuvers possible to hire and admit conspicuously less qualified Afr. Americans and Hispanics. (December 5, 2019);
- Could this happen in the U.S.? Sure.  Would this happen in the U.S.? Highly unlikely.  Not all cultures are equal. (December 5, 2019) (response to article titled "Woman Heading to Testify at Rape Trial Set on Fire in India")
- Ha...If this is what Europe (and the U.S.) wants, let them see how it works out for them in the end.  Any religion teaching its members that defectors must be murdered is very disturbing. (December 7, 2019);
- The individuals in that photo are *not* simply people who want to be the opposite sex. If we were to still have any capacity for critical thinking, we'd recognize that they suffer from some combination of narcissistic or histrionic personality disorders. (December 7, 2019);

---

[16] A niqab is a veil worn by some Muslim women in public, covering all of the face apart from the eyes.

- You nailed it(!) (maybe not 100% of the time, but 95% of the time!  Can we add journalism to the shelf alongside the social sciences? And ethnic studies? Women/Queer studies...? (December 7, 2019);
- You know, if black people want to pursue science "the black way," let them do it. Let's see what they contribute to humanity. (it's easy to write a "woke" article. Let's see what they produce beyond their cheap talk.) (December 8, 2019);
- Kudos to Florida. Seems like the rest of the country is determined to lower academic standards in the name of "diversity" (December 9, 2019);
- So...only straight actors can play straight roles. Gay actors need not apply....(!) (December 10, 2019) (response to tweet wherein an actor said that for acting to be truly progressive only gay actors should play gay characters);
- If anyone were to sexually assault me, I'd want that POS to go to prison. But I see Harvey Weinstein's accusers are settling for $25 million among them. Is that ($...) what it was all about? If so, isn't that prostitution?  Just asking. (December 11, 2019);
- "Inclusive grading..."  I have proposed in my forthcoming book that U.S. universities not oblige unqualified students to improve their math/reading abilities before applying for admission. Just mail them a diploma the moment they apply. It's much easier. (December 12, 2019);
- I have a hunch that they won't migrate to any Muslim-dominant country... (December 16, 2019); and,
- We should expect many of these kids to eventually sue their parents and/or the clinics that screwed up their biology in the name of "wokeness." (December 17, 2019).

The concerned citizen did not allege that the Respondent had engaged in discriminatory conduct in UCF's workplace or educational environment.

On December 20, 2019, University Audit referred the report to OIE for review. On January 10, 2020, OIE advised University Audit that the social media posts had been reviewed. The Respondent's Twitter site set forth the Respondent's name and described the Respondent as: "Author of 'White Shaming:  Bullying based on Prejudice, Virtue-Signaling, and Ignorance.' (available Jan 2020).  Opinions are my own."  The site further indicated that the Respondent joined in March 2019.  There was no reference on the home page to the Respondent's affiliation with UCF.  *See Respondent's Twitter Page*. Based on the Twitter account not being affiliated with UCF, the Twitter account being a personal social media platform, the posts constituting protected free speech, and there being no evidence or allegations that the Respondent had subjected students or employees to discrimination or discriminatory harassment in the workplace or classroom, OIE determined that further action could not be taken at that time with regard to the posts.  On June 4, 2020 when allegations regarding the Respondent's classroom conduct were received, OIE received allegations that the Twitter account had been integrated into the classroom curriculum – namely, that students had been required to read the Respondent's Twitter posts as part of their course assignments. Accordingly, in addition to opening an investigation regarding the 2020 summer allegations about classroom misconduct, OIE re-opened its December 2019 matter related to the Twitter posts.

During the summer of 2020, the university received multiple reports that the Respondent had posted discriminatory statements on his personal Twitter account, including the following:

- If Omar is found to have had an extramarital affair, shouldn't she be stoned to death according to Sharia Law?  Just asking … (August 28, 2019) [The Respondent's post was in reference to a news report pertaining to Ilhan Omar allegedly breaking campaign finance laws in relation to pursuit of an affair.]

▪ If what is being reported about her were to be true, shouldn't she be stoned by her standards? (just asking…) (October 21, 2019)

- Assuming (like I said "assuming…") there is no man present in most of those children's lives, that *alone* explains much of the observed "inequality" with respect to family income between, say, Blacks vs. Whites. (January 15, 2020) [The Respondent's post was in reference to a post about the percentage of U.S. births to unwed mothers based on ethnicity/race.]

- Blacks/Hisps. perform badly on the SAT. Then get rid of the tests.  Blks/Hisps. rarely selected for Gifted Programs. Eliminate the Programs.  What's next?  Because Whites struggle to make the NBA we'll be eliminating the NBA…? (January 25, 2020) [The Respondent's post was in response to another Twitter user's post that stated, "After a long and protracted battle, Seattle Public Schools approved a proposal that will begin dismantling its gifted program over concerns of racial inequity."]

- If non-black women with braided hair are guilty of "cultural appropriation," Will anyone be accusing black women who "press" their hair "straight" of cultural appropriation?  Don't hold your breath. (March 3, 2020) [The Respondent's post was in reference to an article titled "Kim Kardashian accused of cultural appropriation over braids at Yeezy show."]

- When I tell students that not all cultures are equally good and give them ample examples, I must prepare for complaints of "racism" by students & conflicts with colleagues, etc. We're supposed to believe that non-Western cultures are just as good as Western cultures (wink, wink). (March 17, 2020)

▪ Fine. My course takes a critical look at different major cultural groups with *no* attempt to romanticize or glorify them.  At the end of the course, most brutally honest (i.e., non-defensive) students conclude: not all cultures are equally good.  Good luck in med school. (March 17, 2020)

- They should tie her to a tree and give her 50 lashes with a whip. Where's the Saudi government when we need them? (March 26, 2020) [The Respondent's post was in reference to an article titled "Woman who coughed on $35K worth of grocery store food faces felony charges".]

- I don't know why gay/bisex. men don't like restrictions on them donating blood. About 20-25% of men who have sex with men are HIV+ (compared to <1% of the rest of the population).  And it still takes tests 4 to 6 weeks to indicate if one is HIV+ after having been infected. (April 2, 2020) [The Respondent's post was in response to an article titled "The FDA is Easing Its Ban on Blood Donations from Gay and Bisexual Men."]

- "Critics argue that the SAT and ACT are heavily influenced by race, income, and education levels of parents; question their value in predicting college success and express concern about inequitable access to test prep."  No. The REAL goal is to allow ill-prepared H.S. students from two ethnic group to attend a UC school, at the expense of better-prepared H.S. students from two other ethnic groups.  Just come out and say it, please.  (May12, 2020) [The Respondent's post was in reference to a *L.A. Times* article titled "SAT should be suspended for UC admissions, Napolitano says."]

- Last I had checked, 40-50% of the student bodies at UCLA, Berkeley, Irvine, etc. were Asian Americans.  They will the ones most screwed by this duplicitous move to sneak more less-qualified Blacks and Hispanics into the UC system. So much for "equity…"
- I'm not the 1st one to call this out:  Isn't it curious that "transgender males" don't appear to want to compete in men's sports? Just "transgender females" want to compete in women's sports… I wonder why the discrepancy… (May 17, 2020) [The Respondent's post was in reference to a *Newsweek* article titled "Who has the right to be called a girl |Opinion".]
- Hilarious.  Okay Whiteys.  Get on your knees and start atoning for being white. While you're at it, start sharing your paycheck with random POC and donate your house to a POC. LMAO…
- I'm sorry, Ladies.  But not all of you are saints… (May 21, 2020) [The Respondent's post was in reference to a *Fox 9* article titled "Law professor falsely accused of rape, wins defamation case."]
- Forgive me for being audacious. It's not going to fix the fact that on average, not all ethnic groups value education the same, or are as dedicated to their studies. Reality is ugly. Only some of us are willing to confront it. (May 26, 2020)
- This was a racist, hate crime committed by Blacks. Not only will they probably never be tried for murder, this won't ever count in the column of hate crimes committed by Blacks (thus, contributing to a false image of "hate crimes") RIP.
- This is the most perverse and bizarre country in the world.  Black teens needlessly stab to death a white college student and no one cares. NO ONE cares. When a white person (cop or Georgia rednecks) kill a black man (which certainly were awful), the world comes to an end. [The Respondent's post was in reference to the murder of Tessa Majors, who was a student at Barnard College at the time of her death.]
- "The State has Failed Black People." Yeah, it's not like black people have any agency of their own, to stay in school, be the best student, abstain from crime, gangs, unwanted pregnancies, etc.  It's all the state's fault.  (May 29, 2020) [The Respondent's post was in reference to a *New York Times* article titled "Opinion | Of Course There are Protests.  The State is Failing Black People."]
- Wouldn't it be nice if we could locate the address of each of those looters/vandals, etc. and burn their homes and possessions to the ground? (May 29, 2020) [The Respondent's post was in response to another user's post that stated, "The ease that so many politicians and commentators have at encouraging this anarchy signals a pathology and wickedness, in my opinion.  People's lives are not yours to play with. If you support "burning it down," volunteer your home. Don't volunteer on behalf of others."]
- Dear Rioters: Please go to HER house and loot it first and then burn it to the ground. I have a sneaky suspicion she'll change her attitude180s degrees within seconds. (June 1, 2020) [The Respondent's post was in reference to an article titled "You're On Your Own:  Raleigh Police Chief Says She Will Not Put Officers in Harm's Way to Protect Property."]
- I've often said something similar:  People who think "whites are the problem" would find if whites suddenly disappeared from earth, most social/academic problems experienced by some/many Blacks and Hispanics would still exist. They're confused about the causes of their problems. (June 2, 2020) [The Respondent's post was in response to another user's post that stated, "Assume there's a vaccine against white racism.  Would 70% of black kids STILL be raised in fatherless homes? Would 50% of blacks STILL dropout of many urban

high schools?  Would 25% of young black urban men STILL have criminal records? Would blacks STILL kill 7K blacks every yr.?"]

- I would like EVERYONE to register in a deep way what society would be like if the Police did not exist.  There's a lot of animals among us that we pretend are humans. (June 2, 2020)
- "(a) Black people can't be racist.". (b) "Diversity is our strength" (c) "multiculturalism is beautiful."  The three biggest lies or half-truths of the 21st century.  (June 2, 2020)
- More black individuals asserting themselves against the dubious BLM message. They're raising legitimate questions:  Do blk lives matter ONLY when a white person kills them?
- Slaves? LMAO.  We're in 2020, Jey. Apparently you need a calendar or appt. book. (June 2, 2020)
  - "Jey" responded, "it's not like you can just easily ignore over 100 years of racist keeping you as slaves and taking away your rights."
  - Respondent replied, "Yes you can. What happened to people you don't know has no bearing on your life decisions. If I would have adopted the 'school is for chumps' attitude, or put a gun to people's head to car jack them, do you think I can blame 'those Conquistadors for having subjugated the Aztecs?"
- That's right. Minority idolatry and the new religion of diversity have perverted logic, fairness, and true equality. (June 3, 2020) [The Respondent's post was in reference to a user's post that stated, "If you have always believed that everyone should play by the same rules and be judged by the same standards, that would have gotten you labeled a radical 60 years ago, a liberal 30 years ago and a racist today."]
- Sincere question:  If Afr. Americans as a group, had the same behavioral profiles as Asian Americans (on average, performing the best academically, having the highest income, committing the lowest crime, etc.), would we still be proclaiming "systemic racism" exists? (June 3, 2020)
- Here's a suggestion to those that who think they are being "screwed" and oppressed in the U.S.:  Stay in school.  Be the best students possible.  Avoid crime.  Avoid gangs.  Avoid unwanted pregnancy.  Avoid drugs and alcohol.  Amazing what a little common sense can do you for your destiny. (June 3, 2020)
- This article is spot on (will infuriate folks).  Black privilege is real:  Besides affirm. action, special scholarships and other set asides, being shielded from legitimate criticism is a privilege.  But as a group, they're missing out on much needed feedback.  (June 3, 2020) [The Respondent's post was in reference to an article titled "Instead, The Establishment views blacks as our Sacred Cows, above criticism, but beneath agency".]
- I fear that our leaders shove "Diversity is our strength" down our throats because they know privately what is more likely to happen to us:  tribalism will have us fighting non-stop over EVERYthing.  We may learn "Diversity is divisive." (June 3, 2020)
- How many times can someone tell "You Whites" to shut the f' up before people start to realize: Maybe there's a lot of racism against Whites in this country (and it doesn't matter if some comes from self-loathing Whites). Just asking.

Following their review of the Respondent's Twitter postings, numerous individuals contacted the University and alleged that the postings demonstrated that the Respondent was racist, sexist, homophobic, transphobic, and spreading hate (i.e. IL #768 (Witness 155), Anonymous IL #769-771, Anonymous IL #774-780, IL #781-782 (Witness 156), Anonymous IL #784, Anonymous IL #786-788, IL #837 (Witness 157), Anonymous IL #840-841, Anonymous

IL #843, Anonymous IL #852, Anonymous IL #863, Anonymous IL #869, Anonymous IL #873, Anonymous IL #902, JKRT Report # 00047696, and JKRT Report #00047707 (Witness 47)). For instance, the anonymous reporter in IL #788 stated, "[I]t's impossible to ignore his implicit (or in some cases, explicit) bias against black students, Christians and Muslims, Democrats and other left-leaning people, overweight people, immigrants (aside from Asians, who he appears to uphold as the model minority), sexual assault survivors, and transgendered individuals." In contrast, the anonymous reporter in IL #970 stated, "[The Respondent] did nothing wrong! It's sick to know a school would rather stand behind the lies of the left and condone people's feelings of real matter than support their Professors in the matter of fact and reality. UCF needs to check their priorities." Numerous individuals indicated that the Respondent's comments were not representative of UCF; were inconsistent with UCF's messaging regarding diversity, equity and inclusion; were particularly offensive in light of the national issues related to police and the Black Lives Matter movement; and likely were reflected in the Respondent's course teachings. These individuals further demanded that UCF terminate the Respondent and condemn his Twitter comments.

On September 3, 2020, the University received a JKRT report (#00048928) alleging, "On May 28th, he posted a slanderous comment about Bill Gates when he referred to him as 'Epstein's b*tch'. On May 29th, he glorified violence by stating that it would be nice to find the addresses of looters and burn their houses down. He commented on a video on May 30th referring to the subjects in the video as 'Thugs'. On 31st, he stated that he approved an act of violence. Also on May 31st, he compared a woman to herpes. On June 1st, he again glorified violence by asking rioters to go to the police chief's house and burn her house down. Lastly, on June 3rd, he responded to an apparent student on Twitter, accusing her of being a fascist."

In assessing the social media posts, it is critical to determine whether the Respondent's Twitter comments were part of the course curriculum or outside the classroom and protected by the First Amendment.  In this regard, OIE received allegations that the Respondent required students to follow and/or review his Twitter account posts as part of his course curriculums. Specifically, an anonymous reporter (IL #788) alleged that the Respondent *asked* students to subscribe to his personal Twitter account. Another anonymous reporter (IL #852) alleged that the Respondent was "forcing students to follow his twitter page." Witness 158 alleged that an unidentified person indicated that the Respondent had lectured for half of his course time and then told students to go home and read his Twitter feed for the remainder of the class time.

However, during the course of OIE's investigation, students repeatedly advised OIE that the Respondent did not require review of his Twitter account as part of any of the courses that he taught, did not require students to follow him on Twitter, and did not test students about what he had posted on Twitter.  Students also advised OIE that, at most, the Respondent referred to having a Twitter account and offered his Twitter information for them to review.  He presented this as optional and not as a required reading for the course.  *E.g. Summary Interview Statements of Witness 54, Witness 233, Witness 111, Witness 85, Witness 159, Witness 82, Witness 110, Witness 73, Witness 81, Witness 104, Witness 116, Witness 47, Witness 106, Witness 1, Witness 160, and, Witness 125; Climate Check Notes*. Also, the Respondent denied that he told students to leave class early and to read his Twitter feed for the remaining class time. Rather, the "only

thing I've done is that I put in a course announcement or syllabus that they are free to follow me on Twitter if they want to, but I've never let the class go early for that reason."

In addition to speaking with students that had taken his courses and the Respondent, OIE reviewed the Respondent's written messages to students about his Twitter account (*see Section VI Material Facts Not in Dispute*). These messages did not reveal any evidence to support that the Respondent required students to review his Twitter account as part of the course's curriculum. Similarly, none of the audio recordings reviewed by OIE supported that the Respondent required students to read his personal Twitter account.

As set forth above, only one individual (Witness 158) advised OIE that during one of the Respondent's courses, he lectured to the students for approximately half the class time and then told the students to go home and read his Twitter feed for the remaining class time. Witness 158 could not identify the student(s) that reported this to her nor the class in which it was alleged to have occurred. All students that participated in OIE's investigation denied that the Twitter account was required reading material for the course or that class time had been provided for students to review the Respondent's Twitter account. Taking the record as a whole into consideration, including the lack of corroboration by witnesses, lack of information from Witness 158 about the source of the allegation, lack of documentary or audio recording support for the allegations and the Respondent's denial, OIE finds that there is insufficient evidence to support finding that the Respondent required students to follow and/or review his Twitter account posts as part of his course curriculums.

*Unwelcome Comments of a Sexual Nature*
### 2. Whether, during class, the Respondent used the term "cunt."

Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent used the word "cunt" when talking about arousal and said that "words are just words" as part of the discussion. He further stated that with regard to this term, "We as a society have become too politically correct" and "people are too afraid to say things". Similarly, Witness 78 alleged that during the 2018 Fall Sexual Behavior course, the Respondent used the word "cunt" when referencing female genitalia. Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent explained the origins of the term "cunt" and a female student in the front row stated that the class should not be learning about the term. Witness 95 alleged that the Respondent then called this student a "cunt" for arguing with him. Witness 69 alleged that during the 2020 Spring Sexual Behavior class, the Respondent asked students for all of profane terms to describe anatomy and sex. He then said, "like I don't mean pussy, or cock or cunt", and then said he had no filter. No other students that OIE spoke with provided evidence that the Respondent used the term "cunt" during his courses.

When asked if and how the word "cunt" is used in his courses, the Respondent replied, "In my Sexual Behavior class, when I cover genitals from a biological standpoint, I often like to start the class by finding out what the latest terms are for human genitals. I've taken two classes myself and incorporated them into how I teach my classes, and this is one of those activities. I let them tell me what the most recent, pop, risqué terms are for these things. The whole class is about sex. They start with all kinds of things, and I'm fine with that. They enjoy the exercise. On

occasion, they don't say anything, so I start with – whether it is men or women – I say 'dick' or 'puss,' but if I had said 'cunt', I'm not opposed to that, and that starts the class discussion. I'm not opposed to that." When asked if he ever used the term "cunt" in his General Psychology course, the Respondent replied, "I never used that word in General Psychology. I never even use it in Sexual Behavior except to start that one exercise."

OIE's review of audio recordings of the Respondent's classes did not reveal the Respondent using the word "cunt" during lectures. With regard to the available 2018 General Psychology course audio recordings, there was no evidence that the Respondent called a student a "cunt" as alleged by Witness 95.  As set forth above, OIE spoke with over 120 students in the Sexual Behavior courses and close to 100 students from the General Psychology courses, who did not corroborate these allegations. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent used the term "cunt" during class or directed the term at a female student.  If the term had been used, it likely was as part of the activity described by the Respondent in his Sexual Behavior courses.

### 3.  Whether the Respondent used the word "cunt" while leading an activity at new faculty orientation in 2006 or 2007.

Witness 164 alleged that in 2006 or 2007, during new faculty orientation, the Respondent gave a brief presentation during which he shared that during his classes, he asked his students to say out loud words that we as a culture consider unspeakable.  He indicated that one of the words he used in this exercise was the word "cunt.".  The Respondent then said to the group of about 50 faculty, "Okay, now everybody yell out cunt" (or similar words to this effect), and a "bunch" of people responded by yelling out "cunt."  The Respondent denied having engaged in this conduct. Respondent stated, "I've only attended one new faculty [orientation] meeting ever in 1988, and I've never been asked to talk at one, and I would never start this activity with faculty."

OIE reviewed the agendas for the 2006 and 2007 faculty orientation schedules, which set forth the identities of the various presenters.  The Respondent was not identified on either year's agenda as being a presenter.  The 2006 and 2007 faculty orientation schedules did have a presenter from the Department of Psychology, but again it was not the Respondent.  UCF was able to locate the list of expected attendees for the 2007 faculty orientation, but not the 2006 orientation.  The 2007 list did not include Witness 164 so it appears she may have attended the 2006 orientation.  Witness 164 indicated that the orientation was the only time she believed that she had interacted with the Respondent, which means there is a possibility of misidentification. Taking the record as a whole into consideration, including the gap in time between the event and reporting, the orientation documents provided and the infrequent interaction between Witness 164 and the Respondent, there is insufficient evidence to support finding that the Respondent used the word "cunt" while leading an activity at new faculty orientation in 2006 or 2007.

4. **Whether, during class, the Respondent told students that all men are a little bit gay because if someone was sucking their dicks and they were going to cum and they then realized that it was a guy doing the sucking, they would still finish.**

Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent told students that all men "are a little bit gay because if someone was sucking their dicks and they were going to cum and they then realized" that it was "a guy" doing the sucking, "they would still finish". In response to this allegation, the Respondent stated, "I never made a statement like that in my lifetime. I don't cover this in Cross Cultural Psychology, but I talk about transgender people in El Salvador in my Sexual Behavior course, and it's nowhere near this statement." OIE did not have audio recordings related to this course to review for corroboration and recognizes the significant time delay between the course (2009) and reporting (2020), thereby making this a close question on whether there is a preponderance of evidence. That said, taking the record as a whole into consideration, including Witness 37's lack of motivation to fabricate this allegation, the specificity with which Witness 37 could recall the statement due to its impact when the statement was made, and the Respondent's motivation to deny this allegation coupled with his lack of candor on some other statements attributed to him (*see Consistency section above*), OIE finds that there is sufficient evidence to support finding that in 2009, during his Psychology of Prejudice course, the Respondent told students that all men "are a little bit gay because if someone was sucking their dicks and they were going to cum and they then realized" that it was "a guy" doing the sucking, "they would still finish".

5. **Whether, during class, the Respondent stated that he had sex with women from other countries (who were a lot freer when it comes to sex and was a reason why students should travel broad), stated that he only attended the study abroad program to have sex with women in other countries (and once had his sons come for this reason), and discussed having sex with women and men while abroad.**

Witness 88 alleged that during the Respondent's 2016 Fall Sexual Behavior course, the Respondent stated that he had sex with women from other countries who were a lot freer when it comes to sex (which was why he wanted students to travel abroad), and that he talked about having sex with women and men abroad. Similarly, the anonymous reporter in IL #802 alleged that in 2012-2013, the Respondent "made inappropriate comments regarding what occurs on his study abroad trips (he stated he only goes to have sex with women in other countries and once had his sons come for the same reason)." Similarly, Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent shared, "I had sex with women". During his OIE interview, the Respondent denied these allegations.

OIE did not have audio recordings related to the identified courses to review for corroboration. However, OIE did review available audio recordings of the Respondent's lectures for his 2019 Summer Cross Cultural Psychology course and 2018 General Psychology course and no statements of this nature were identified. Also, OIE spoke with three students from the 2016 Fall Sexual Behavior course and 16 students from the 2018 Fall Cross Cultural Psychology course. Witness 140 was the only witness that made this specific allegation. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that he had sex with women from other countries (who were a lot

freer when it comes to sex and was a reason why students should travel broad), stated that he only attended the study abroad program to have sex with women in other countries (and once had his sons come for this reason), and discussed having sex with women and men while abroad.

6.  **Whether, during class, the Respondent talked about how good the sex was with his husband, stated that he had "fun sex" with his husband, and enjoyed when men flirted with him.**

The anonymous reporters in IL #794 and #810 alleged that in 2018, the Respondent told the class "how he married a woman for 18 years, then met a man in Costa Rica". Witness 85 alleged that during the Respondent's Fall 2016 General Psychology course, the Respondent discussed this in more detail and stated that he was married to a woman, found out he was sexually interested in men, now was married to a man, and talked about "how good the sex was with his husband". Witness 48 alleged that during the Respondent's 2018 Fall General Psychology course, the Respondent told students that he had fun sex with his husband. Witness 121 alleged that during that same course, the Respondent stated that he enjoyed it when men flirted with him.

In response to these allegations, the Respondent stated, "I do tell students that I am gay today, that I was married to a woman for 30 years but now I'm married to a man, but I never talk about my sex life with anyone at UCF, except for Witness 158." The Respondent denied having told students in any of his courses about how good the sex was with his husband, having had "fun sex" with his husband, or enjoying when men flirted with him. The Respondent indicated that he never made statements of this nature to his students.

OIE did not have audio recordings related to Respondent's Fall 2016 General Psychology course to review for corroboration. However, OIE did review audio recordings of some of the Respondent's lectures for his 2018 General Psychology course wherein no statements of this nature were identified. Also, OIE spoke with two students from the 2016 Fall General Psychology course and 52 students from the 2018 Fall General Psychology course. Witness 85, Witness 48 and Witness 121 were the only witnesses that made these kinds of allegations. Also, although Witness 48 and Witness 121 were enrolled in the same course, they alleged different statements were made by the Respondent (fun sex with husband v. enjoying men's flirting). Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students how good the sex was with his husband, he had "fun sex" with his husband, and he enjoyed when men flirted with him.

7.  **Whether, during class, the Respondent indicated that certain races or ethnicities, like Brazilians, were "always a fun fuck".**

The anonymous reporter in IL #791 alleged that when they were a student in the Respondent's 2017 Sexual Behavior course, the Respondent indicated that certain races or ethnicities, like Brazilians, were "always a fun fuck". The Respondent denied these allegations during his OIE interview.

OIE did not have audio recordings related to the Respondent's 2017 Sexual Behavior course to review for corroboration.  However, OIE spoke with three students from two of the Respondent's 2017 Sexual Behavior courses (Spring and Fall) – namely, Witness 83, Witness 127 and Witness 141.  None of these students identified the alleged "fun fuck" comment as having been said during the course.  In fact, Witness 83 indicated that the Respondent had talked about how the culture in Brazil was accepting of gay people.  She also shared that the Respondent talked about his personal life – namely, that he had an ex-wife and a boyfriend in South America.  Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that certain races or ethnicities, like Brazilians, were "always a fun fuck".

8.  **Whether, during class, the Respondent asked students about their genitalia, referenced his own genitalia, and/or described his penis as being uncircumcised.**

Witness 49 alleged that during the 2013 Fall General Psychology course, the Respondent talked about not being circumcised. Similarly, Witness 82 alleged that during his 2014 Fall Cross Cultural Psychology course, the Respondent told the class that he was not circumcised.

UCF also received allegations from anonymous reporters via the Integrity Line alleging similar behavior.  Specifically, in IL #791, the anonymous reporter alleged that during the Respondent's 2017 Sexual Behavior course, the Respondent asked people about their genitalia, spoke of his often and told students that he was uncircumcised.  In IL #847, the anonymous reporter alleged that during the Respondent's 2019 Fall Sexual Behavior course, the Respondent "[s]poke about his own genitals to the class."  Specifically, during one class, the Respondent "spoke about how one's genitals should always be clean— this statement itself was not very concerning considering it was a Sexual Behavior class. He then followed that statement by explaining to the class how he 'doesn't wash his hands' because of 'how clean' his own genitals were." OIE spoke with thirteen students from this course, including Witness 106, who alleged that during that course, "we were talking about STD's. I don't remember the specific STD that we were discussing. [The Respondent] made comments about how if you are interacting with a sexual partner, get tested before you engage and make sure that your partners are clean. [The Respondent] then commented that you don't need to wash your hands if you have clean genitals. [The Respondent] then commented that his genitals were so clean that he didn't need to wash his hands. It was super awkward and uncomfortable".

In response to these allegations, the Respondent stated, "I have never discussed this with students."

Although OIE did not have audio recordings related to the four identified courses (2013 Fall General Psychology, 2014 Fall Cross Cultural Psychology, 2017 Sexual Behavior and 2019 Fall Sexual Behavior) to review for corroboration, it is important to note the consistency of the allegation by individuals in different courses at different timeframes.  Equally important, OIE communicated with four students from the 2013 course (Witness 49, Witness 70, Witness 114 and Witness 122), three students from the 2017 course (Witness 83, Witness 127, and Witness 141), and thirteen students from the 2019 course (including Witness 106). Witness 49 and Witness 106 were the only individuals in these courses to identify this concern.  Similarly,

Witness 82 was the only individual from the 2014 course that spoke with OIE about concerns of this nature. Moreover, of the more than 300 individuals spoken to in regard to this investigation, these three identified students and the two anonymous reporters were the only ones to identify these as statements made by the Respondent. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent asked students about their genitalia, referenced his own genitalia, and/or described his penis as being clean and uncircumcised.

9. **Whether during a class discussion about why people go to the gym or workout, the Respondent told a student, who had shared that they had lost 100 pounds due to health concerns, that they did so because they just wanted to get laid.**

An anonymous reporter (*Student Google* Form - Anonymous) alleged that during a General Psychology course, the Respondent "tried to break me" when discussing why people go to the gym or workout. This student mentioned to the class that he had lost 100 pounds "due to health concerns (literal death) and [the Respondent] boiled it down to [the student] just wanted to get laid." The Respondent denied this allegation and said, "This is a total fabrication. I would never talk to students like that, neither in my office nor in class."

Although OIE reviewed audio related to some of the 2018 Fall General Psychology course lectures and found no evidence of a statement of this nature, it is unclear from the anonymous report when the statement was allegedly made. Without knowing the identity of the individual, OIE was limited in terms of making outreach to the student. That said, OIE did communicate with almost 100 students that had taken a General Psychology course with the Respondent. None of these students identified that Respondent as having made a comment of this nature to a student. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during a class discussion about why people go to the gym or workout, the Respondent told a student, who had shared that they had lost 100 pounds due to health concerns, that they did so because they just "wanted to get laid".

10. **Whether, during classes other than General Psychology, the Respondent referenced the Sambia tribe wherein "boys are used to suck the penises of somewhat older males before the older males are married"; and, "said it like it was a fun fact".**

Witness 88 alleged that during the 2016 Sexual Behavior course, the Respondent discussed the Sambia tribe's practice where " boys are used to suck the penises of somewhat older males before the older males are married", and how this practice was not weird as it was a rite of passage there (New Guinea), but here it would be considered rape. Witness 111 alleged that the Respondent had a similar discussion during the 2017 Fall General Psychology course, and Witness 92 alleged that he discussed this during the 2018 Fall Cross Cultural Psychology course. Witness 83 alleged that the Respondent had a similar discussion during in the 2017 Fall Sexual Behavior class and "said it like it was a fun fact". In addition, the anonymous reporters in IL #794 and IL #810 alleged that during the spring/summer of 2018, the Respondent "spoke about a tribe that made their boys suck the penises of men until they were of a certain age."

As set forth above in Section VI (Material Facts Not in Dispute), the Respondent did not dispute that he discussed the Sambia Tribe's practice of having boys perform oral sex on older men in the tribe. However, he stated that this discussion only took place in his General Psychology courses. With regard to the allegation that he referred to this like it was a fun fact, the Respondent stated, "I have never referred to this as a 'fun fact'. I understand that this is child sexual abuse by our standards. I would never talk about that issue in any humorous way." Taking the record as a whole into consideration, including the consistency of this allegation in multiple reports over different timeframes from students in different courses, the overlap of some of the information throughout his multiple courses, and his corroboration that he discussed the Sambia tribe's prior practice in his General Psychology courses, OIE finds that there is sufficient evidence to support finding that during classes other than General Psychology, the Respondent periodically referenced the Sambia tribe's practice wherein boys performed oral sex on older males in the tribe. However, the record is insufficient to make a finding that he talked about this practice like it was a fun fact. That said, OIE would note that during the November 27, 2018 General Psychology lecture recording, although the Respondent taught the students about this practice in the manner he described, shortly after discussing this practice, the Respondent talked about how "semen is high in protein, it's a protein drink."

**11. Whether, during class, the Respondent alluded to his partner and ex-wife being swingers.**

Witness 121 alleged that during the 2018 Fall General Psychology course, the Respondent alluded to his partner and his ex-wife being swingers.[17]  The Respondent denied ever making a statement of this nature to students.

 OIE's review of the available audio recordings related to this course did not corroborate this allegation. Also, OIE communicated with 52 students from this particular semester, as well as students from multiple other semesters of the Respondent's courses. None of the students other than Witness 121 alleged that the Respondent made a comment of this nature. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during class, the Respondent alluded to his partner and ex-wife being swingers.

**12. Whether, during class, the Respondent frequently referred to himself being a nudist, and that on one occasion when he was talking about how nudity isn't accepted in society, the Respondent stated that he wouldn't mind if the class practiced nudity in the lecture hall.**

Witness 47 alleged that during the 2020 Spring Cross Cultural Psychology course, the Respondent frequently told students that he was a nudist and, on one occasion while talking about how nudity isn't accepted in society, stated that he wouldn't mind if the students practiced nudity in the lecture hall.  *See Witness 47 Interview Summary Statement & Witness 47's JKRT Report #00047707.*

As set forth above, it is undisputed that, during the Respondent's General Psychology and Cross Cultural Psychology courses, he told students that he identified as a nudist and visited a

---

[17] A "swinger" is a person who engages in group sex or the swapping of sexual partners.

beach for nudists in Florida. When asked about Witness 47's allegation, the Respondent replied, "This is a distortion of what I said. The context of this – I'm giving them three criteria by which to judge whether a behavior is acceptable or not. One is cultural norms, and I walk through the pros and cons of this approach, with examples. I then talk about statistical deviation – the more unusual, statistically speaking, a behavior is the more likely it is that it is not acceptable and use an example of how few people own iguanas. The third criterion is behavioral functional analysis and the consequences of the behavior. You ignore whether it is culturally appropriate, and whether it is common. The example I give is shopping while naked. I may have said I am a nudist on one occasion or two. … I tell them that if I had a client that came in and said they were a nudist, and they were going to go shopping while naked, I would say I agree with you and that I'm a nudist, but there is a reality and consequences and you will get arrested. That is the context. When I said, 'I'm a nudist,' I said that if anyone in the class were to come into the class without clothes, I would call the police because you are violating legal and social norms, not because it would bother me personally them coming to class nude. It is not the case that I'm encouraging it or would get a thrill out of it."

OIE communicated with five students from the 2020 Spring Cross Cultural Psychology course (Witness 39, Witness 47, Witness 54, Witness 79 and Witness 93). Witness 47 was the only one of the five students to identify a discussion about nudity as problematic during the 2020 course.

Importantly, during OIE's review of the Respondent's 2019 Summer Cross Cultural Psychology audio recordings, the following discussion took place, which is consistent with the context described by the Respondent during his OIE interview: While discussing three standards by which you can evaluate whether a behavior or belief is normal (cultural norming, statistical deviation and behavioral functional analysis), the Respondent analyzed three situations (polygamy, drinking alcohol and shopping without clothes) under each standard. After analyzing the first two (polygamy and drinking alcohol), he then mentioned shopping while naked. He asked the class if anyone identified as a nudist. He went on and defined a nudist as someone who enjoyed going to a public area where clothing was optional. The Respondent shared that he identified as a nudist but did not make any comments similar to the one alleged by Witness 47.

Taking the record as a whole into consideration, OIE finds that the context for the Respondent's reference to not minding if any of the students were to come into the class without clothes was discussed in the context of explaining the three standards by which students can evaluate whether a behavior or belief is normal – namely, cultural norming, statistical deviation and behavioral functional analysis. The Respondent's reference was that he would not personally be bothered by their nudity in the classroom as he identifies as a nudist, but the behavior would not be acceptable as it violates legal and social norms.

**13. Whether, during the 2018 Spring semester, the Respondent inquired as to the nature of the relationship between a male GTA and female GTA, and, after the male GTA covered one of the female GTA's exams, told the male GTA that the female GTA "should do a lot more than that [take him out to dinner for covering the exam], if you know what I mean", and he hoped the female GTA was compensating him but that it was "none of my business".**

Witness 45, who was a GTA for the Respondent's 2018 Spring General Psychology course, alleged that she requested that another GTA, Witness 151, cover for her with the Respondent's final exam because she had an out-of-state trip on the exam date. Witness 45 alleged that the Respondent asked about the nature of she and Witness 151's relationship. Also, when Witness 151 advised the Respondent that Witness 45 was going to take him to dinner as a thank you for covering the exam, the Respondent stated, "She should do a lot more than that, if you know what I mean."

During his OIE interview, the Respondent did not recognize the names of Witness 45 or Witness 151 and was advised that they were previous GTAs for his course. The Respondent replied, "I don't really remember the names of people who have served as GTAs for me." When asked whether he inquired as to the nature of their relationship or, when Witness 151 covered an exam for Witness 45, told Witness 151 that Witness 45 "should do a lot more than that [taking him out for dinner for covering one of her exams], if you know what I mean" and he hoped Witness 45 was compensating him but that was "none of my business", the Respondent denied "the whole thing" and indicated that the allegations were "a complete fabrication."

As part of the investigation, OIE also spoke with Witness 151. Witness 151 confirmed that he had served as a GTA for the Respondent's General Psychology course during the same semester as Witness 45. Witness 151 shared that Witness 45 had an opportunity to go on a trip to Hawaii, and the only thing that was preventing her from going was her responsibility for the proctoring, grading, and entering of the Respondent's final exam. Witness 151 explained that he and Witness 45 were friends so he offered to take over her final exam responsibilities so she could take the trip. Witness 45 and Witness 151 then discussed this arrangement with the Respondent, who agreed to Witness 151 covering the exam. Witness 45 then went on her trip. Witness 151 stated that the Respondent asked him why he was helping Witness 45 so much. Witness 151 responded that they were friends and lab mates. The Respondent then asked Witness 151 if they were dating. Witness 151 responded that they were not dating and were just friends. The Respondent replied that he hoped Witness 151 "was getting something for helping". When Witness 151 responded that Witness 45 would take him to lunch or dinner, the Respondent said, "Really, that's all? You should be getting a lot more than that." Witness 151 explained to OIE that although the Respondent did not expressly state it, he was "clearly implying" that Witness 45 "owed me something sexual." Witness 151 later told Witness 45 about this interaction.

OIE also obtained copies of correspondence from the Respondent to Witness 151 and Witness 45 that further corroborates the allegations. Specifically, on April 28, 2018, the Respondent sent an email to Witness 151 and Witness 45 confirming that Witness 151 was covering tasks related to the General Psychology course. Specifically, the email stated, "Again,

just so I know what is happening, [Witness 151] is 'volunteering' to (a) scan all the scantrons and (b) enter their scores in the Grade roster?  Do you even access, [Witness 151], to my PSY 2012 grade roster?" *See Announcement – April 28, 2018 Message to Witness 151 & Witness 45*. The following day, the Respondent sent an email to Witness 151 and Witness 45 that stated, "Hi, [Witness 151], Okay. So…now…we need to find a way that will allow you to have access to my grade roster.  What are you doing, Wednesday, May 2nd at 10:30 a.m.?  Could you have the scantrons scored that morning, and then in my office, at 10:30 a.m., while I'm there, you could enter them on my office computer? (I hope [Witness 45] is compensating you well for this!!! But…it's none of my business…).  Let me know. Thanks." *See Announcement – April 29, 2018 Message to Witness 151 & Witness 45*.

Taking into consideration the record as a whole, including Witness 151's corroboration of Witness 45's allegations and the email evidence, as well as the Respondent's complete denial of the matter despite clear documentary evidence, OIE finds that there is sufficient evidence to support finding that the during the 2018 Spring semester, the Respondent inquired as to the nature of the relationship between a male GTA and female GTA, and, after the male GTA agreed to cover one of the female GTA's exams, told the male GTA that he "should be getting a lot more than" a lunch or dinner for covering the exam (implying that the female GTA owed a sexual favor to the male GTA), and then sent an email to the male GTA that stated, "I hope [the female GTA] is compensating you well for this!!! But…it's none of my business…"

### 14. Whether, during class, the Respondent said, "You may think you know a lot about sexual behavior but compared to me, you know jack!"

Witness 161 (*MK Climate Check Note*) alleged that during the first day of class of the Respondent's 2018 Fall Sexual Behavior course, he stated, "You may think you know a lot about sexual behavior but compared to me, you know jack!" The Respondent denied saying this or something of a similar nature.

OIE did not have audio recordings of this class to review for corroboration of this allegation.  Also, Witness 161 was the only student that shared this allegation in response to OIE's outreach to students in this particular course.  Twelve students responded, including Witness 161, but none of the other students identified this statement as having occurred.  Taking the record as a whole into consideration, OIE finds that there is insufficient evidence that at the beginning of the 2018 Fall Sexual Behavior course, the Respondent said, "You may think you know a lot about sexual behavior but compared to me, you know jack!"

### 15. Whether, during class, the Respondent referenced a website where people discussed their sexual fantasies or desires and shared that he was part of the website, which was described as a sexual hookup site.

Witness 121 alleged that during the 2018 Fall General Psychology course, the Respondent referenced a website where people discussed their sexual fantasies or desires, and shared that he was part of this sexual hook-up website. The Respondent denied this allegation and stated, "That is a complete fabrication. Anyone who knows me knows, I'm about to turn 60

and I am horrible at technology. I've heard of things like Grindr and other apps you can use but I don't use them and don't know how to use them."

OIE's review of the available audio recordings related to this course did not corroborate this allegation. Also, OIE communicated with 52 students from this particular semester, as well as students from multiple other semesters of the Respondent's courses. None of the students other than Witness 121 alleged that the Respondent made a comment of this nature. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during class, the Respondent referenced a website where people discussed their sexual fantasies or desires and shared that he was part of the website, which was described as a sexual hookup site.

**16. Whether, during class, the Respondent told the students that some would say he was living the dream because he was in a room full of 18-year-old girls.**

The anonymous reporter in IL #818 alleged that during the 2011 General Psychology course, the Respondent told students that he was "living the dream because he was a 40 year old man in a room full of 18 year old girls." Similarly, Witness 133 alleged that during the 2018 Fall General Psychology course, the Respondent stated that some would say he was living the dream because he was in a room full of 18 years old girls. Witness 95 made a similar allegation regarding this same course. The Respondent denied this allegation and stated, "No offense, but I don't have much interest in women and girls and wouldn't say that. It is a complete fabrication."

Although OIE did not have access to audio recordings related to the 2011 course, OIE dis have access and reviewed the available audio recordings related to the 2018 course. However, this review did not corroborate this allegation. Also, OIE communicated with 52 students from this particular semester, as well as students from multiple other semesters of the Respondent's courses. None of the students other than the anonymous reporter, Witness 133 and Witness 95 alleged that the Respondent made a comment of this nature. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during class, the Respondent told the students that some would say he was living the dream because he was in a room full of 18-year-old girls.

**17. Whether, during class, the Respondent told students, "I'd have sex with some of you".**

Witness 95, who participated in an OIE interview, alleged that during the 2018 Fall General Psychology course, the Respondent was discussing the psychology of different perspectives, and how there are cultural barriers in America that prohibit him from having sex with students. However, in some cultures (such as Middle Eastern cultures), that conduct is acceptable. During this discussion, the Respondent said, "I'd have sex with some of you." Similarly, Witness 60, who was a student in the Respondent's 2009 Fall Sexual Behavior and 2010 Fall Cross Cultural Psychology courses, sent an email to the Provost alleging that during class, the Respondent once told class, "I'd have sex with some of you". Witness 60 did not provide further context to this statement nor did she respond to OIE's outreach. The Respondent denied this allegation and said, "I never have ever dated or wanted to date or wanted to have sex

or tried to have sex with any student. I've had students of both sexes try to convince me to have sex with them and they are crazy – this is a complete fabrication."

OIE's review of the available 2018 General Psychology course recordings did not reveal evidence corroborating this allegation.  Also, as noted with other allegations related to this particular course and semester, OIE communicated with 52 students from this course, as well as students from multiple other courses, and Witness 95 and Witness 60 were the only two that shared this concern.  Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that, during class, the Respondent told students, "I'd have sex with some of you."

**18. Whether, during class, the Respondent asked a female student whether "she wants to get fucked from the top side or bottom side."**

An anonymous reporter from the Respondent's Cross Cultural Psychology course alleged that an unidentified female student told the reporter that the Respondent asked her whether "she wants to get fucked from the top side or bottom side".  *See Student Google Form – Anonymous.* The Respondent denied having made that statement.  There was no other evidence in the record supporting that a statement of this nature had been made by the Respondent.  Accordingly, taking the record as a whole into consideration, including the anonymity of the reporter and the lack of corroboration, OIE finds that there is insufficient evidence to support finding that the Respondent made this statement.

**19. Whether, during class when discussing different body parts, the Respondent told students that women's bodies were made for sex with men; and during his 2020 Spring Sexual Behavior course, he told students that sex was for a man's pleasure and the woman's purpose in sexual relations was impregnation.**

Witness 134 alleged that during the 2020 Spring Sexual Behaviors course, while discussing different body parts, the Respondent "said something like women's bodies are made for sex with men and something like sex with a woman's vagina is the best for a man." Similarly, Witness 69 alleged that during that same course, the class was not conducive to open discussion and the Respondent "shut people down" when they felt differently or disagreed with him.  As an example of this, Witness 69 shared that the Respondent told students how, biologically, sex is only fun for the man and is only made for a man's pleasure. He said that women are not biologically made to enjoy sex and that a woman's purpose in sexual relations is impregnation. A girl in the class disagreed with him. She pointed out that women have a clitoris which is a sexual organ which provides pleasure. When she said this, he basically argued with her that it is a scientific fact that sex is not meant to be pleasurable for women and just completely shut her down."

When asked about the alleged statement about women's bodies being made for sex with men, the Respondent stated, "This is what this may be referring to, but the way it's reported is wrong. The context is HIV infection, and according to the CDC, if a woman is having unprotected sex with a man who is HIV infected, she is 10 times more likely to contract HIV through anal sex than through vaginal sex. The anal tissue is not as flexible as vaginal tissue, and

there is no natural lubrication. It's not shocking; it's toward the end of the semester and is very appropriate pedagogically. The vagina is meant biologically for sex unlike the anus."  When asked about the alleged statement that sex was for a man's pleasure, the Respondent replied, "The only thing I can think of that approximates with that allegation is when I talk about the Kama Sutra, which is a book written by Hindus. I said that I've never read the Kama Sutra, and even though people say it's like a sex manual, that critics say it's a manual about how women can pleasure men. That's the only thing I can recall that's comparable to the allegation."

First, it is important to note that Witness 134 indicated that she had a vague recollection of the details of the course ("There were other comments but I can't recall the exact comments."), and although she recalled some information, she could not provide a lot of details or context despite her interview having occurred shortly after the semester at issue.  Specifically, Witness 134 was interviewed by OIE on June 11, 2020.  In contrast, Witness 69, who spoke with OIE on July 9, 2020, was able to provide detailed information about this class discussion. Witness 69's description of the discussion varies substantially from the Respondent's description of this conversation, particularly with regard to another student's statement about women having a clitoris which is a sexual organ that provides pleasure.  OIE finds that there also is consistency in how Witness 134 and Witness 69 described the discussion (although Witness 69 was able to provide more details).

OIE spoke with 18 students, including Witness 134 and Witness 69, from this course. Of those students that responded to OIE's outreach and were able to provide detailed information about the course (Witness 39, Witness 69, Witness 101, Witness 109, Witness 125 and Witness 132), Witness 134 and Witness 69 were the only students that described this discussion and having a concern about the information therein. Taking the record as a whole into consideration (including the students' lack of motivation to fabricate the allegation, the specificity that Witness 69 provided, and the Respondent's motivation to deny this allegation coupled with his lack of candor on some other statements attributed to him (see *Consistency* section above), OIE notes that this a close question on whether there is a preponderance of evidence.  That said, OIE finds that there is sufficient evidence to support finding that during the 2020 Spring Sexual Behavior course, the Respondent told students that biologically, sex is only fun for the man and is only made for a man's pleasure, women are not biologically made to enjoy sex, and a woman's purpose in sexual relations is impregnation.

**20. Whether, during the 2020 Spring Sexual Behaviors course, the Respondent told the male students in the class, "So men when she orgasms, she's urinating on you."**

Witness 134 alleged that during the 2020 Spring Sexual Behavior course, the Respondent told students that women can ejaculate some urine-like substance during orgasm and said, "So men, when she orgasms, she's urinating on you".

When asked about this allegation at his OIE interview, the Respondent stated, "Here's what I said. The context is a discussion about the Gräfenberg spot (G-spot). I described where it is supposedly at, and how it supposedly has a high concentration of nerves. When that spot is stimulated, a woman has an orgasm and ejaculates. The chemistry of the liquid is similar to urine, and then I said, but not sure if I said this to the guys in the class, that when a woman is

ejaculating, she may just be taking a pee. Something like that. It's meant to be measured humor. It's not to be discriminative or derogatory."

As indicated above, OIE spoke with 18 students from this course, and Witness 134 was the only student that made this allegation as set forth herein. Witness 69 (who was able to provide support to #19 above) did not reference this incident during her detailed interview.  Also, as set forth above, Witness 134 indicated that she had a vague recollection of the details of the course ("There were other comments but I can't recall the exact comments."), and although she recalled some information, she could not provide a lot of details or context despite her interview having occurred shortly after the semester at issue. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during the 2020 Spring Sexual Behavior class, the Respondent told the male students in the class, "So men when she orgasms, she's urinating on you."  Rather, as set forth by the Respondent, the more likely discussion was that the Respondent told the students that when a woman's G-spot is stimulated and the woman has an orgasm and ejaculates, the chemistry of the liquid is similar to urine. The Respondent then said, that when a "woman is ejaculating, she may just be taking a pee".

### 21. Whether, during class, the Respondent told students that most people refer to women who sleep with a lot of men as "whores" and "sluts," but "I just call them my best friends."

Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent joked that most people referred to women who slept with a lot of men as "whores" and "sluts, but I just call them my best friends".  In response to this allegation, the Respondent stated, "In my General Psychology class, 18 years ago maybe, I recall saying how society judges women who like sex, and how we have a double standard which is unfair to women, and we have derogative terms for women who like sex. I said you know what those terms are, but do not recall saying the terms myself. One semester I added that I have a name for them too. I call them friends, then moved on."  For similar reasons set forth above in reference to disputed fact #4, OIE finds that there is sufficient evidence to support finding that during the 2009 Psychology of Prejudice course, the Respondent joked with the students that most people refer to women who sleep with a lot of men as "whores" and "sluts, but I just call them my best friends".

*Sex-Based Comments and Conduct*
### 22. Whether, during class, the Respondent referred to women and sex workers as "whores" or shamed sex workers by referring to them as "whores."

Witness 82 alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent used the word "whore" in reference to certain nationalities of women and their likelihood of turning to sex work. When asked about these allegations, the Respondent replied, "Number one, I deny the whole thing. I have no negative attitudes toward men or women who are prostitutes. I think prostitution should be legal as long as it's consenting adults – I do say that in my Sexual Behavior class. What is reported, though, I deny." OIE did not have access to recordings for this particular course nor other corroborating evidence to support that the Respondent made this statement in the 2014 course or other courses.  Taking the record as a

whole into consideration, OIE finds that there is insufficient evidence that the Respondent referred to women and sex workers as "whores" during class.

### 23. Whether, during class, the Respondent said, "I bet their vagina hurts" or similar phrases, when men expressed disagreement with his lecture.

Witness 137, who participated in an interview with OIE and submitted Integrity Line #877, alleged that she was a student in the Respondent's 2019 Fall Cross Cultural Psychology course and that on several occasions in class, the Respondent "referred to a part of a woman's anatomy when referring to men in disagreement with his ideas" or if someone's feelings were hurt. With regard to comments about women's body parts, such as "I bet their vagina hurts", the Respondent allegedly used "this comment often. He would make these comments if someone's feelings were hurt, though he only used the comment at one student on one occasion. More so, he would make the comment about whichever group we were learning about in class, similar to if someone were to make a comment about someone 'being butt-hurt', which I find similarly offensive. I can't recall the specific dates and times when this comment was made, but I did not appreciate it when he would make this comment." The Respondent denied this allegation and stated, "This is a total fabrication, and I've never used this comment in my life."

OIE did not have access to audio recordings of this course but did speak with 22 students that had been enrolled. Three students provided detailed information about their experience in the class, Witness 137 being one. The other two students (Witness 41 and Witness 150), did not provide information that corroborated Witness 137's experience. In fact, Witness 41 stated that the Respondent had not made any "outright discriminatory" comments, but he did say "stupid things". Witness 41 provided examples of the "stupid things" being related to ethnicity and race, as well as the Respondent being "biased in terms of looking down on anyone who believed in religion". However, he denied that the Respondent made any "overtly sexual" comments. Witness 150 provided detailed allegations about her experience in the classroom, including that the Respondent engaged in repeated misconduct. However, Witness 150 did not identify the behavior described by Witness 137 as having occurred. Similarly, of the 22 students that responded to OIE's outreach for this course, four students declined to participate, five indicated that they had a negative experience but did not provide detailed information (let alone an allegation of conduct as described by Witness 137), and the remaining ten students indicated that they did not have any concerns with how the course was conducted. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence that during the 2019 Fall Cross Cultural Psychology course, the Respondent said, "I bet their vagina hurts" or similar phrases, when students disagreed with his lecture content.

### 24. Whether, during class, the Respondent said that "it was in men's nature to divorce their old wives and move onto a newer model", and it was nauseating to even look at his former wife.

The anonymous reporter in IL #880 alleged that during the 2015 Fall semester, the Respondent "said that it was in men's nature to divorce their old wives and move on to a 'newer model'. I remember plenty of my female classmates feeling offended after that lecture concluded." Witness 42, who identified as having been the anonymous reporter in IL #880, told

OIE that during the 2015 Fall Sexual Behavior course, the Respondent told students that it was a man's instinct to leave his old wife and get a newer model. Witness 95 similarly alleged that during the 2018 Fall General Psychology course, the Respondent told students that it was a man's nature to move onto a newer model (i.e., a younger significant other) and it was nauseating to even look at his former wife.

In response to this allegation, the Respondent stated, "The first half of the statement about a newer model was somewhat close to what I have said in class since I cover some studies that found across many countries that heterosexual men want attractive wives, and women on average want men who are good providers. I deny the second half of the allegation about what I allegedly said about my ex-wife. I show a video in [the] Sexual Behavior [course] where a psychiatrist, who wrote a book about the *Myth of Monogamy*, reports that males across species like variety. That comes up in discussions in class. But the way this is being described sounds off. I don't use the word 'model' since that implies that women are models. Many studies indicate that men may be biologically programmed for variety."

Of the more than 300 students spoken to by OIE, no other students alleged that the Respondent referenced it being in a man's nature to move onto a "newer model" or that it was nauseating to even look at his former wife. Of the available audio recordings reviewed by OIE, including the 2018 General Psychology course, none contained a comment of this nature having been made.  Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that during class, the Respondent said that "it was in men's nature to divorce their old wives and move onto a newer model" or that it was nauseating to even look at his former wife.

**25. Whether, during class, the Respondent told students that they were "weird" if they would allow an all-female construction team to build their house and an all-male daycare to look after their children, and that a man wanting to spend time with children was "inherently strange."**

Witness 42 alleged that during the 2015 Fall Sexual Behavior course, the Respondent asked the students, "How many of you would let a woman build your house or let a man take care of your child."  When about ten students raised their hands, the Respondent said, "Well you guys are just weird. Most normal people would not allow a man to take care of their children." These allegations were also set forth in IL #880, which was filed by Witness 42, wherein Witness 42 further stated, "In the end, I stopped going to his class altogether even though it was past the withdrawal date and I got a failing grade because damaging my GPA was preferable to hearing more of that man indoctrinating other students into his narrow, regressive mindset."

Witness 95 and Witness 40 alleged that during the 2018 Fall General Psychology course, the Respondent asked a similar question related to an all-female construction team and an all-male childcare team, called the students that raised their hands "weird" and further stated that they were weird "because a man wanting to spend time with children was 'inherently strange'."

In response to this allegation, the Respondent stated, "That is a gross distortion of what I said, which is much more appropriate. I am covering gender roles in class, and so I said, 'Here is

a hypothetical question: What would you think if you were having a house built and you discovered that every single construction worker was a woman, and what would you think if you dropped off your child at a daycare the first time and noticed every employee was a male?' They all say different things. All I am saying is this would be countercultural. I did not say anything about the students being weird. I may have said that consistent with our culture, many people would not feel comfortable going into a daycare and finding that every employee was a male. I don't attack them and say they are weird or anything. I have never said anything about how a male wanting to spend time with children is strange, but back to the example of the daycare center, many parents would be concerned if there was a daycare center staffed by all men."

OIE's review of the available audio recording of this course revealed that this discussion occurred within the context provided by the Respondent and did not include referencing the students as "weird" or stating that men wanting to spend time with children was "inherently strange". Also, of the 52 students spoken to by OIE, Witness 95 and Witness 40 were the only students to make this allegation.  Taking the record as a whole into consideration, OIE finds that there is sufficient information that, while discussing gender roles in class, the Respondent asked students about what they thought about having a house built by an all-female construction team or having their child cared for by an all-male daycare facility.  However, there was insufficient information that, during this same discussion, the Respondent told students that they were "weird" if they were comfortable with this scenario or that men wanting to spend time with children was "inherently strange".

### 26. Whether, during class, the Respondent told female students that the only reason they ever dress up and put on make-up is for male attention.

Witness 139 submitted an email alleging that prior to May 2018, the Respondent told female students that the only reason they ever dressed up and put on make-up was for male attention.  Witness 139 declined to participate in an interview with OIE regarding her allegation. When asked about this allegation, the Respondent replied, "I guess there's a context where I would have said this in my General Psychology course. When I cover Freud's view that sex and aggression is the motivation behind all things, I give examples of things we do that might express our interest in trying to attract another person. I talk about working out at a gym, cosmetic surgery, and going to the store to pick out clothes rather than asking a clerk to provide them for us so we can find things that help us look attractive."  None of the other students with whom OIE spoke made an allegation similar to the one submitted by Witness 139. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told female students that the only reason they ever dress up or put on make-up is for male attention.  Rather, the Respondent led a class discussion regarding things people do to attract another person, including improvements to one's physical appearance.

**27. Whether the Respondent gave preference in his treatment of male students over female students, including saying that female students would not be able to keep up in the class, using the term "feminazi" in class,  and upon seeing a student wearing a shirt that said, "THE FUTURE IS FEMALE", laughed at the student and said, "Your shirt is a joke, right? Because it's a man's world" and walked away.**

An anonymous reporter alleged that the Respondent preferred his male students over his female students and said that female students would not be able to keep up in his class.  *See Student Google Form – Anonymous*. The anonymous reporter in IL #833, who identified as a former teaching assistant, alleged that the Respondent preferred male students over female students. Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent "usually called on guys first in class."  Similarly, Witness 92 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent called on males before females in class. Witness 134 alleged that the Respondent used the term "feminazi" during a 2020 Spring Sexual Behavior course.  Witness 134 stated that the Respondent did not directly call someone this term, rather, he said that if people say "this" they are "feminazis".

The Respondent denied these allegations and stated, "My classes are majority women. My last three or four study abroad trips have been 100% women. I don't know what they're referring to. This is a very subjective appraisal on their part. Maybe since they know I'm gay, they are seeing things I don't think are real."

Also, an anonymous reporter in IL # 864, who identified as a graduate student in the Psychology Department at UCF in February 2020, alleged that the reporter, "was wearing a black shirt that had white lettering. The lettering said, 'THE FUTURE IS FEMALE'. I was talking to a friend outside of the faculty suite when [the Respondent] walked past me. I had never met him or seen him before (I had to ask the office assistant who he was after the encounter). He turned to me and said something along the lines of, 'I'm pretty sure the future is male if you take a look at the government' and then immediately laughed. In shock, I responded, 'Excuse me?'. He then said, 'Your shirt is a joke, right? Because it's a man's world' then walked away." During his OIE interview, the Respondent replied to this allegation as follows: "Unless I'm living a double life, I don't ever remember this. I never initiate engagements with students."

Turning to the evidence in the record, with regard to IL #833, in support of the allegation regarding differential treatment, the reporter referenced the Respondent's rejection of the reporter's proposed dissertation topics.  However, the reporter did not provide any comparator evidence to support differential treatment related to dissertation topics or any evidence supporting the allegation of preference for male students. Similarly, although students referenced that Respondent called on men more than women during class, this was not a claim that frequently appeared during discussions or reports to OIE.  Rather, those that complained had a general allegation that, due to the manner in which the Respondent replied to students' disagreement with his lectures, many students did not feel empowered to participate during class and many students stopped participating.  Also, this generalized allegation is difficult to assess without more specificity regarding the demographics of each course, time allotted for class discussion, and tracking of Respondent's record of calling on students.  As set forth above, OIE reviewed a number of class recordings during which the Respondent called on both male and

female students.  No noticeable discrepancy was observed during this review.  Furthermore, no other students reported that the Respondent said that female students would not be able to keep up in his class.

With regard to the term "feminazi", which was alleged by Witness 134, no other students made this allegation, including the other 17 students that OIE spoke to from this course. However, as set forth in Section IV above (Material Facts Not in Dispute), the Respondent demonstrated disagreement with feminist ideas.  Specifically, during his 2019 Summer course in Peru (*see Recording*), the Respondent discussed relativism vs. absolutism during which he mentioned a female student he previously had who identified as a feminist.  He said this woman tried to promote feminism all she could and endorsed all of its ideas.  He said that he told her that since everyone is equal, the next time she uses the bathroom and finds blood in the toilet, she should not call a doctor but instead should go and ask someone at Walmart. That said, the record did not contain any corroborating evidence of the Respondent having used the term "feminazi" during class.  Accordingly, OIE finds that there is insufficient evidence to support finding that the Respondent used the term "feminazi" during class, exhibited preference for his male students over his female students (either through oversight of dissertation topics or calling on students during class), and said that female students would not be able to keep up in his class.

With regard to the incident described by the anonymous reporter in IL #864, OIE notes that the reporter is anonymous, the reporter had to rely on an unknown witness to identify the Respondent, the basis of the unknown witness' ability to identify the Respondent is unclear other than they were an "office assistant", witnesses to the incident were not identified to provide OIE with an opportunity to make outreach, and the Respondent denied that the incident took place. On the other hand, the report contains very specific and detailed information about a limited interaction with the Respondent, one a student is more likely to recall than the Respondent who has interacted with thousands of students. Also, unlike other reports in this matter, the report was made relatively close in time to the date of the alleged incident.  Since the evidence, at most, is even when considering the scales for preponderance of evidence, OIE finds that there is insufficient evidence in the record to support finding that in February 2020, upon seeing a student wearing a shirt that said, "THE FUTURE IS FEMALE", the Respondent laughed at the student and said, "Your shirt is a joke, right? Because it's a man's world" and walked away.

**28. Whether, during class, the Respondent belittled a female student because she said she had a high sex drive, replied that only men do and said that she was just weird.**

An anonymous reporter alleged that in 2017, the Respondent belittled a female student because she said she had a high sex drive, said that only men have a high sex drive, and she's just weird.  *See Student Google Form – Anonymous*. In response to this allegation, the Respondent stated, "One, I deny having said that. Two, that's factually inaccurate. All people, man or woman, have testosterone, and it varies among people. Less testosterone means less libido, and higher testosterone means more libido." None of the more than 300 students with whom OIE communicated with shared that the Respondent made a statement of this nature, including the eight individuals that had been enrolled in the Respondent's 2017 courses (Witness 87, Witness 88, Witness 141, Witness 72, Witness 83, Witness 111, Witness 127, and Witness 144). Taking the record as a whole into consideration, OIE finds that there is insufficient

evidence to support finding that the Respondent belittled a female student because she said she had a high sex drive, replied that only men do and said that she was just weird.

*Gender Identity/Expression-Based Comments*

**29. Whether the Respondent inappropriately asked students to share their gender identity or sexual orientation.**

The anonymous reporter in IL #833 alleged that Respondent asked a teaching assistant to share their gender identity. The Respondent denied asking for personal information from students.  OIE contacted the last two years of GTAs assigned to the Respondent, and none alleged that the Respondent had asked them to share their gender identity. Also, none of the over 300 students that OIE spoke with alleged that the Respondent had inappropriately inquired about students' gender identity. The record does show that the Respondent asked students to volunteer on the LGBTQ+ panel each semester but it was an invitation to the class to participate, and students could choose to participate and share both their gender identity and sexual orientation. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent asked students to share their gender identity in an inappropriate manner.

The anonymous reporter in IL #833 made a similar allegation – namely, that the Respondent "asked about [a teaching assistant's] sexual orientation."  Similarly, Witness 158, who was the Director of the Psychology Advising Center, alleged that the Respondent questioned people/students about their sexual orientation which "feels uncomfortable and invasive". When asked if he ever asked students to share their own sexual orientation identities, the Respondent stated, "Just the LGBTQ+ panel – I would never ask that of anyone not on the panel."  For the reasons that there is insufficient evidence to support that the Respondent asked students to share their gender identity, there is insufficient evidence to support that the Respondent asked students to share their sexual orientation outside the context of the LGBTQ+ panel activity.

**30. Whether the Respondent told students in class that "if you are born male, there is nothing you can do to not be male"; if someone identified as a transgender man, they are not a man, they are actually a woman; a man dressing as a woman is still a man; transgender was not an actual thing; people who are transgender have extreme body dysmorphia; "you can't alter your body to become female and you can't change your gender like that"; and, "the only thing that can help those who are trans is to learn to be the sex they were born with".**

Witness 96, who submitted IL #783, alleged that during the Fall/Spring semester 2005-2006 General Psychology course, the Respondent repeatedly referenced transgender individuals in a negative way, such as, "if you are born male, there is nothing you can do to not be male". Similarly, Witness 82 alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent "made fun" of transgender individuals, said that being transgender is "not a thing," and "if you are born with a penis, you are a man and if born with a vagina, you are a woman". Likewise, Witness 138 alleged that during the Spring 2015 Cross Cultural Psychology course, the Respondent told students that if someone was a transman, they are not a man, they are

actually a woman.  He also allegedly said that a man dressing as a woman is still a man, and that transgender was not "an actual thing". Similarly, Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told students that people who are transgender have extreme body dysmorphia, "you can't alter your body to become female and you can't change your gender like that", and, the "only thing that can help those who are trans is to learn to be the sex they were born with".

In response to these allegations, the Respondent stated, "The whole thing is a fabrication. I never said any of that. … I acknowledge they [transgender individuals] exist, and it's my best opinion based on other's research that there is probably a biological element. I think transgender is a thing – I never said it wasn't." The Respondent also stated, "I don't bring up transgender issues in General Psychology. I only bring transgender issues up in my Sexual Behavior course. I walk students through the surgery process, which suggests that people can change their anatomy. What was reported about statements I have allegedly made is a total fabrication."

OIE notes that there is consistency in the allegations among multiple students in different courses for different timeframes (2005-06, 2014, 2015 and 2018) and specificity with the allegations, which lends to the credibility of the allegations. The record also lacks evidence of these students having a motivation to fabricate allegations whereas the Respondent has motivation to lie (i.e. protect his status as a faculty member and his reputation) and has demonstrated inconsistency in some of the information provided during his OIE interview (see *Consistency* section above). On the other hand, OIE reviewed recordings from the Respondent's courses, including some from the 2018 General Psychology course, and did not hear the Respondent make statements of this nature, including that "transgender is not a thing". Also, the Respondent denied making these statements and claimed that he did not discuss transgender issues during the courses identified by the witnesses.  Aside from the four students that made these allegations, none of the other students that OIE communicated with identified these problematic transgender comments, which included 54 other students from the courses identified by these witnesses. Also, the four witnesses could not corroborate each other's experiences because they were enrolled in four separate courses. Taking the record as a whole into consideration, OIE finds the consistency of the allegations among students from different courses and timeframes, the detailed nature of the information provided, and the Respondent's noted inconsistencies to be persuasive.  According, OIE finds that there is sufficient evidence to support finding that the Respondent told students that "if you are born male, there is nothing you can do to not be male"; if someone identified as a transgender man, they are not a man, they are actually a woman; a man dressing as a woman is still a man; transgender was not an actual thing; people who are transgender have extreme body dysmorphia; "you can't alter your body to become female and you can't change your gender like that"; and, "the only thing that can help those who are trans is to learn to be the sex they were born with".

## 31. Whether the Respondent told students in class that "those who are gender fluid are 'mindless sheep'".

Witness 133 alleged that during the 2018 Fall General Psychology course, the Respondent told students that individuals who claim to be gender fluid are "mindless sheep." Similarly, the anonymous reporter in IL #785 alleged that they had reviewed the Respondent's

Twitter posts and ratemyprofessor.com, which showed that the Respondent "called those who are gender fluid 'mindless sheep'".

The Respondent denied having referred to individuals that identify as gender fluid as "mindless sheep." The Respondent also denied discussing this subject during General Psychology. Rather, he discussed being gender fluid in his Sexual Behavior course and shared that he and a researcher at UCLA had "talked about how many young adults are claiming to be gender fluid, and that there has been an increase in this during the past few years. We don't know if that has to do with greater freedom to claim that or if it's vogue to claim that, and we need to have future studies to determine if it is a real phenomenon or a fad that is occurring right now."

OIE's review of the available 2018 General Psychology course recordings did not reveal the Respondent referring to individuals as "mindless sheep" if they identified as gender fluid. Also, Witness 133 was the only student that reported this conduct during OIE's outreach to over 300 students. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that individuals who identified as gender fluid were "mindless sheep".

32. **Whether the Respondent told students that individuals that identified as gender-neutral or non-binary were "lost", "most young people [were] confused about that kind of stuff", and "transgender people [were] mentally ill".**

The anonymous reporter in IL #833 alleged that when they mentioned that they thought they were gender-neutral or non-binary, the Respondent replied, "[S]he's lost and said most young people are confused about that kind of stuff it doesn't surprise me he would also go on to say that transgender people are mentally ill." The report in IL #833 did not provide a timeframe for the alleged conduct nor identify any witnesses. Witness 95 also alleged that during the 2018 Fall General Psychology course, the Respondent told students that transgender people are mentally ill and individuals that identify as non-binary "are just confused". The Respondent denied having said made these statements and referenced his discussion with the UCLA researcher (see disputed fact #31 above). OIE's review of the available 2018 General Psychology course recordings did not reveal that the Respondent made the alleged statements. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that individuals that identified as gender-neutral or non-binary were "lost", "most young people [were] confused about that kind of stuff", and "transgender people [were] mentally ill".

33. **Whether, during class, the Respondent told students that transgender individuals were identifying as such "for attention" and that some transgender individuals were "not really trans"; as well as that transgender children are "confused" and pressured by their parents to be transgender so that they would feel more special, and people only are transgender because they want to feel special.**

Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that transgender people were just doing it for attention and some transgender individuals were not transgender. Similarly, Witness 162, who participated in an

OIE interview, submitted an anonymous IL report (#827), and was a student in the Respondent's 2019 Fall Personality Theory and Research course, alleged that "[o]ne time during a lecture, [the Respondent] stated that transgender people were coming out for attention and that some trans people are not really trans."  The Respondent then allegedly stated that "attention seeking is a mental illness."  The Respondent's statements caused Witness 162 to withdraw from the class as they identified as transgender and no longer felt welcome in the class. Witness 69 alleged that during the 2020 Spring Sexual Behavior course, the Respondent told students that transgender children were "confused", the children were pressured by their parents to be transgender so that the child would feel more special, and people only are transgender because they want to feel special. Also, the anonymous reporter in IL #976, who did not provide a timeframe for their interaction with the Respondent, alleged that while the Respondent identifies as "a member of the LGBTQ community, he is only respectful of his own experience as a white bisexual man but talks down on other types of people like queer and transgender folk."

In response to allegations that he said transgender individuals were identifying as such for attention and some were "not really trans", the Respondent indicated, "I never said that – as I mentioned, it's possible that gender fluid is a fad to some extent, and I've shared that with students, and future studies will have to explore this."  In response to allegations that he said that transgender children were "confused" and pressured by their parents to be transgender so that they would feel more special, and people only are transgender because they want to feel special, the Respondent stated, "I tell them that there is a growing body of clinical anecdotes both in England and in the US that children who seem to be manifesting the opposite gender interests with parents who want to be sensitive to the transgender phenomenon, these parents have almost encouraged these kids to accept that they will be transgender and take them to therapists who further reinforce that they are transgender.  There are then clinical results that show that the bulk of these kids end up simply being gay, not transgender. Because it's a trend to be talking about transgender people today and accepting them, parents are prematurely encouraging a transgender lifestyle, possibly for the parents' own reasons. Let the kids be who they want to be and let them figure out who they really are. That's what I really say about that."  The Respondent also denied that he referred to transgender individuals as "confused", and indicated that he told students that "the parents are confused more than the kid."

OIE notes that there is consistency in the allegations among multiple students in different courses for different timeframes (2018, 2019 and 2020) and specificity with those allegations (particularly the impact of the statements causing Witness 162 to withdraw from the course), which lends to their credibility. The record also lacks evidence of these students having a motivation to fabricate allegations whereas the Respondent has motivation to lie (i.e. protect his status as a faculty member and his reputation) and has demonstrated inconsistency in some of the information provided during his OIE interview (see *Consistency* section above). On the other hand, OIE reviewed recordings from the Respondent's courses and did not hear the Respondent make statements of this nature.  That said, none of the recordings reviewed pertained to the three witnesses' identified courses. Also, the Respondent denied making these statements and claimed that he did not discuss transgender issues during two of the courses identified by the witnesses (Cross Cultural Psychology and Personality Theory).  Aside from the three students that made these allegations, none of the other students that OIE communicated with identified these problematic transgender comments. Also, the three witnesses could not corroborate each other's

experiences because they were enrolled in three separate courses. Taking the record as a whole into consideration, OIE finds the consistency of the allegations among students from different courses, the detailed nature of the information, the shorter timeframe between the alleged misconduct and report to OIE and the Respondent's noted inconsistencies to be persuasive. According, OIE finds that there is sufficient evidence to support finding that the Respondent told students that that transgender individuals were identifying as such "for attention" and that some transgender individuals were "not really trans"; as well as that transgender children are "confused" and pressured by their parents to be transgender so that they would feel more special, and some people only are transgender because they want to feel special.

**34. Whether, during class, the Respondent told students that if someone wanted to cut off their arm or another body part, we would think it was crazy so why do we think it is okay for transgender people to do it.**

Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that if someone wanted to cut off their arm or another body part, we would think it was crazy so why do we think it is okay for transgender people to do it. The Respondent indicated that he "never said this." OIE's review of class recordings did not reveal the Respondent having made a statement of this nature. Also, no other students made allegations of this nature to OIE, including the 15 other students from this course that OIE communicated with regarding their experience. Also, it is important to note that, as set forth above (#30 and #33), students shared multiple allegations related to the Respondent's comments pertaining to transgender individuals, but did not indicate that the Respondent had made a statement of this nature. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that if someone wanted to cut off their arm or another body part, we would think it was crazy so why do we think it is okay for transgender people to do it.

*Sexual Orientation-Based Comments*
**35. Whether, during class, the Respondent used the term "fag", including referring to himself as a "fag", and said "you can call me a fucking fag, but it doesn't mean racism is real."**

Witness 88 alleged that during either the 2016 Spring Sexual Behavior course or the 2017 Fall Cross Cultural Psychology course, the Respondent referred to himself as a "fag" or "faggot". Witness 144 alleged that during the 2017 Spring Cross Cultural Psychology course, the Respondent told students on the first day of class that he used to have a wife and "now I am a fag". Witness 95 alleged that the Respondent made a similar comment during the 2018 Fall General Psychology course. Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students, "You can call me a fucking fag but doesn't mean racism is real". Also, Witness 115 alleged that during the 2019 Spring General Psychology course, the Respondent used the terms "fag", "fucking homosexual", and "fucking lesbian".

In contrast, Witness 1, who was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, stated that the Respondent may have used the term "fag" or "faggot" and if he did, it was not in a derogatory way. Witness 1 stated that he might have heard the Respondent

use the term "fucking homosexual," but it would have been a rephrase or quote of someone else. Witness 1 shared that he identified as gay and did not take any offense to the terminology that the Respondent used during the course. Similarly, Witness 41, who was a student in the 2019 Fall Cross Cultural Psychology course, stated that the Respondent did not use terms like "faggot."

In his OIE interview, the Respondent stated, "Someone in the letter [OIE Notice of Investigation] said I used the word f-a-g and I've never used this, nor the word faggot." The Respondent denied ever using the term "fag" in class. The Respondent stated, "I never even use that term in my personal life." As to the allegation that he said "you can call me a fucking fag, but it doesn't mean racism is real" during his 2018 Fall Cross Cultural Psychology course, the Respondent stated, "The whole thing is nonsense. Racism is real. What we can debate, and I'm willing to in my classes, is the extent to which racism permeates our culture and holds people back. This whole comment is fabrication."

Turning to the recordings that OIE reviewed (*see 2019 Peru R – 9*), OIE noted that when the Respondent talked about how Whites were not the only group that had racists and how he believed racism from other groups is ignored, a female student asked why some groups are permitted to be racist. The Respondent replied asking, "Are you not aware that Black and Hispanics can make disparaging remarks openly about whites and no one seems to want to condemn them. Are you familiar with the Covington Kids?" (*See footnote 15*). When the student indicated that she was aware of the incident, the Respondent replied, "Okay does that not register with you that here in open space in Washington D.C., a group of crazy Black men who belong to some crazy group were calling White kids *faggots*…called them in front of other, a mix group of people, tourists, look at those *faggots*, look at those incest babies, look at those future school shooters, and no one turned to these Black individuals and say what the hell are you doing, stop being so racist." (Emphasis added.) Of the recordings reviewed by OIE, this was the only instance in which the Respondent used the term "faggots" and it was within the context of describing what had occurred with the Covington high school students.

OIE notes that there is consistency in the allegations among multiple students in different courses for different timeframes (2016, 2017, 2018 and 2019), which lends to their credibility. As set forth above, the record lacks evidence of these students having a motivation to fabricate allegations whereas the Respondent has motivation to lie and has demonstrated inconsistency in some of the information provided during his OIE interview (see *Consistency* section above), including specifically whether he ever used the term "faggot" in the classroom. In his OIE interview, the Respondent emphatically denied ever using the terms "fag" and "faggot" both inside and outside the classroom. Yet, the 2019 recording showed that he was willing to use the term in the limited nature of describing the conduct that triggered the Covington incident. That said, although these five students alleged that he used the term, two students (in different courses) denied that he had done so and the remaining students that OIE communicated with did not identify these problematic terms as having been used by the Respondent in the classroom. Also, the five witnesses could not corroborate each other's experiences because they were enrolled in five separate courses. Taking the record as a whole into consideration, OIE finds the consistency of the allegations among students from different courses, the detailed nature of the information, and the Respondent's noted inconsistencies, particularly with regard to use of these

terms, to be persuasive.  According, OIE finds that there is sufficient evidence to support finding that the Respondent used the term "fag" and "faggot" in the classroom, including referring to himself as a "fag".  However, there is insufficient evidence to support finding that the Respondent told students in the 2018 Fall Cross Cultural Psychology course, "You can call me a fucking fag but doesn't mean racism is real" as there was no corroboration of this phrase in the record.

**36. Whether, during class, the Respondent told students that, due to him now being married to a man, he was going to hell because he was a sinner.**

Witness 121 alleged that during the 2018 Fall General Psychology course, the Respondent told the students during the first class that he grew up in a "normal" household, then married a woman, and now is married to a man so he's "going to hell because he's a sinner".  In response to this allegation, the Respondent stated, "No, I don't think I said that.  It was an off-handed humorous comment if I said it.  I wouldn't put it past me. If I said it, and I don't remember saying it, it would be a passing silly comment."  Taking the record as a whole into consideration, including that OIE's review of the 2018 Fall General Psychology recordings did not reveal the Respondent having made this statement and no other students identifying this comment of concern, OIE finds that there is insufficient evidence to support finding that the Respondent told students in his 2018 Fall General Psychology course that, due to him now being married to a man, he was going to hell because he was a sinner.

**37. Whether the Respondent told students that lesbians did not have a big "sexual appetite" and a student was weird for being sexually active because "lesbians don't have a lot of sex".**

The anonymous reporter in IL #833 alleged that the Respondent told an unidentified teaching assistant at an unknown timeframe "that lesbians did not have a big 'sexual appetite' and that for someone like me to have sex as often as I do is an anomaly he would also go on to say that he would want to do a study on my 'type of lesbian' because it has to be so rare that someone had a sexuality like mine. He would use the excuse that he was a gay man in order to put down my sexual identity." Similarly, Witness 135, who was a student enrolled in the Respondent's 2014 Fall Sexual Behavior and 2015 Spring Cross Cultural Psychology courses, alleged that the Respondent told one of her "queer friends that she was weird for being sexually active because 'lesbians don't have a lot of sex'". *See Email – Witness 135 6-4-2020.* Although Witness 135 initially agreed to speak with OIE further about her allegation, she ultimately chose not to participate in the investigation.  With the exception of Witness 135, none of the more than 300 students that OIE communicated with claimed that the Respondent had made a statement of this nature.

As to these allegations, the Respondent stated, "This is a gross distortion of what I said. In the context of covering testosterone, I give lots of data in that lecture that seems to explain sex drive, such as studies of monkeys and people in prison populations. Studies have shown based on self-reported information that the couples who have the most sex are gay men, followed by heterosexual couples, followed by lesbian couples. I say to them that we'll come back to this point after we cover the studies. At the end I say what we should conclude is that testosterone

controls the sex drive, and then I put the slide back up with the order of couples who have the most sex to the least, and I say the studies probably explain this data." Taking the record as a whole into consideration, including the anonymity of one reporter, the lack of participation by the identified witness, and the lack of corroboration by those that did participate in OIE's process, OIE finds that there is insufficient evidence to support finding that the Respondent told students that lesbians did not have a big "sexual appetite" and a student was weird for being sexual active because "lesbians don't have a lot of sex".

**38. Whether, during a class panel, the Respondent attempted to mislabel a student's sexual orientation.**

The anonymous reporter in IL #847 alleged that during the Respondent's 2019 Fall Sexual Behavior course LGBTQ+ panel activity, the Respondent asked four students to participate and answer questions from the class "about the LGBTQ+ community, their sexualities, and experiences as a LGBTQ+ individuals. Despite [the Respondent] being bisexual himself (so he had proclaimed), he proceeded to invalidate a bisexual girl who agreed to be on the panel because she said she 'had a preference towards girls.' He asked 'so you're a lesbian then?' She said 'no, I'm bisexual.' He said 'but you just said you like girls more.' Another bisexual girl on the panel spoke up against him, saying that the other girl's identity was still valid. He quickly shut her down and moved on to the next question. He was very rude and unprofessional about the exchange." Witness 106 provided a similar description of this panel discussion. This incident was similarly reported by an anonymous reporter on the Student Google Form. *See Student Google Form – Anonymous*.

In response to this allegation, the Respondent stated, "It never happened. I'm bisexual, I just now have a husband. It's a valid phenomenon. I know gay people and heterosexual people who deny that bisexual people exist. The literature supports the existence of bisexual people. I am one of them." It is possible that Witness 106 is the anonymous reporters for the Integrity Line report and Student Google Form rather than there being three separate reporters of this incident. OIE also spoke with 13 students from the 2019 Fall Sexual Behavior course, including Witness 106, and none of the other students reported this panel activity as having been problematic. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent attempted to mislabel a student's sexual orientation during the 2019 Fall Sexual Behavior LTBTQ+ panel activity.

**39. Whether, during class, the Respondent stated that bisexual people are bisexual just because they wanted to have sex with a lot of people.**

Witness 88 alleged that during the 2016 Spring Sexual Behavior course, the Respondent told students that bisexual people were bisexual because they "wanted to have sex with a lot of people". In response to this allegation, the Respondent stated, "I have never said this." No other students shared an allegation of this nature with OIE and none of the recordings reviewed by OIE resulted in this statement having been corroborated. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent stated that bisexual people are bisexual just because they wanted to have sex with a lot of people.

**40. Whether, during class, the Respondent told students that gay individuals were the source of AIDS, and that gay individuals at the start of the AIDS epidemic were dirty and that is why they got AIDS.**

Witness 95 alleged that during the Respondent's 2018 Fall General Psychology course, the Respondent told students that gay individuals were the source of AIDS, gay people were more likely to have AIDS, and that gay individuals at the start of the AIDS epidemic were dirty and that is why they got AIDS. The Respondent stated, "There have been some semesters in General Psychology where I covered STIs, but I don't in most General Psych courses. I do cover HIV, and it is a fact that HIV in the U.S. originated with male gays, but the other things that were elaborated on I did not say.  I did not refer to gay individuals as dirty."  OIE's review of the available 2018 General Psychology recordings did not provide corroborating evidence, and no other students made an allegation of this nature in communications with OIE.  Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence that the Respondent told students that gay individuals were the source of AIDS, and that gay individuals at the start of the AIDS epidemic were dirty and that is why they got AIDS.

*Disability-Based Comments*
**41. Whether, during class, the Respondent told students that mental health issues were a "defect", someone with post-traumatic stress disorder (PTSD) was "weak", and people with mental health issues, like PTSD, are inherently weaker than those without mental health issues.**

The anonymous reporter in IL #805, who identified as having been enrolled in the Respondent's 2017 Fall Cross Cultural Psychology course, alleged that the Respondent said that "having mental health issues is a defect and that someone with a disorder like PTSD is weak." Similarly, Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent told students that people with mental disorders have a "defect." In response to these allegations, the Respondent stated, "I have no training in PTSD, so I never talk about it. I stay close to what I'm trained on. Everybody has emotional challenges every now and again, some more than others; we are all humans. What was reported I said is totally a fabrication."

OIE reviewed the available recordings pertaining to the Respondent's 2018 General Psychology and 2019 Cross Cultural Psychology courses which did not reveal the Respondent having made a comment of this nature.  Although these were not the specific classes identified by the anonymous reporter in IL #805 or Witness 111, if this was part of the Respondent's typical lecture, it likely would have appeared in the recordings reviewed.  Equally important, no other students that communicated with OIE described the Respondent as having made comments of this nature.  Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that mental health issues were a "defect", someone with post-traumatic stress disorder (PTSD) was "weak", and people with mental health issues, like PTSD, are inherently weaker than those without mental health issues.

**42. Whether, during class, the Respondent referenced his ex-wife and former sister-in-law as examples of individuals as having mental health disorders.**

Witness 126, who submitted IL #904 and participated in an OIE interview, alleged that, during the 2010 Spring General Psychology course, the Respondent referenced his ex-wife and former sister-in-law as examples of individuals who had mental health disorders. The Respondent told OIE, "I never shared anything about my wife or sister." As set forth herein, OIE reviewed multiple recordings pertaining to the Respondent's courses.  In none of these recordings did the Respondent reference that his ex-wife and former sister-in-law had mental health disorders.  However, at the beginning of one of the recordings (*2019 CCP Recording 20190101013334-015*), the Respondent said, "Ok so, I think I was in the middle of telling you, I think I was telling you about my ex-sister-in-law."  He then discussed the negative messaging in television commercials related to parents.  There is no further reference to his ex-sister-in-law. Also, no other students shared that a comment of this nature had been made by the Respondent. Although this recording certainly calls into question the Respondent's statement that he *never* shared *anything* about his wife and sister, without the substance of what had been discussed in regard to his ex-sister-in-law, no corroborating evidence, and a long delay between the alleged incident and reporting, the current record has insufficient evidence to support finding that the Respondent referenced his ex-wife and former sister-in-law as examples of individuals as having mental health disorders.

**43. Whether, during class, the Respondent told students that people with autism will not amount to anything and aren't capable of achieving anything.**

An anonymous reporter in the Student Google Form alleged that during the 2014 Fall semester, the Respondent told students that people with autism will not amount to anything and aren't capable of achieving anything. *See Student Google Form – Anonymous*. Similarly, Witness 163 alleged in an email to the University that the Respondent told students in either 2017 or 2018 that "autistic individuals would never be able to live independently". *See Email – Witness 163 6-12-2020*.  During OIE's discussion with Witness 163, she acknowledged that she had never been a student in one of the Respondent's courses and her allegation was based on information provided to her by her boyfriend who had taken a course with the Respondent and what she had read on the Respondent's Twitter page. *See Phone Log 6-30-2020 Witness 163*.

In response to these allegations, the Respondent stated, "For five years, I had worked as a clinical psychologist specifically testing and diagnosing people with autism. … Up to 75-80%, based on studies, of everyone who has an autistic diagnosis also has the diagnosis of cognitive impairment. Their level of cognitive impairment varies from light, to moderate, to severe, to profound. I tell the class that any person that has the dual diagnosis of autism and cognitive impairment, the vast majority will always need adult supervision in their lives. I worked in a school and in a community mental health center. In the school setting, I pulled students out of class to determine if they were autistic and whether they had cognitive impairment. While at the community center, down the road, the same students that I diagnosed in the schools, once they turned 21, were turned out of the school and the parents were looking for services since the adult kids can't function on their own. I evaluated them again and confirmed again they had autism and some level of cognitive impairment, and it's just a fact. I know it doesn't sit well with the

students, especially if they have autistic relatives – and I do. The majority of people with autism and a cognitive impairment will have to have adult supervision. I've had students in the past who have wanted to work with autistic kids who are very discomforted to hear that, and they complain, but I'm entitled to share my clinical experience and the research on this area. What someone has reported I said is derogatory and judgmental and insulting, and that's not what I said."

As set forth in Section VI (Material Facts Not in Dispute) above, OIE's review of the August 28, 2018 General Psychology class recording revealed that the Respondent showed a video related to beliefs and said that he wanted to discuss autism. He then said, "We had autistic people and Asperger's syndrome. Speaking of IQs, they tend to be in the normal range. About 75 to 85% of individuals with autism also have what we used to call mental retardation. It is now called cognitive or intellectual impairment. 75-80 have some level of that. If you let me use old terms, it is not correct but I am not being nasty. Autism is a social retardation. They vary. Some have mental retardation as well. … The interventions might do some things like stop the outrageous behaviors like head banging. But helping them to become an average functioning adult is never going to happen."

Taking the record as a whole into consideration, include the anonymity of one of the reporters, the second-hand information provided by Witness 163, the delay between the alleged incident and report, and the Respondent's detailed description of the context of his discussions regarding individuals with autism, OIE finds that there is insufficient evidence to support finding that the Respondent told students that people with autism will not amount to anything and aren't capable of achieving anything.

## 44. Whether, during class, the Respondent equated Spanish-speaking adolescents to individuals with learning disabilities.

Witness 53 alleged that during the 2019 Summer Sexual Behavior course, the Respondent equated Spanish-speaking adolescents to individuals with learning disabilities. In response to this allegation, the Respondent replied, "Never. That's not factually accurate, either." OIE's review of class recordings did not reveal any statements of this nature and none of the other approximately 300 students that communicated with OIE made an allegation of this nature. Taking the record as a whole into consideration, including the lack of corroboration, OIE finds that there is insufficient evidence to support finding that the Respondent equated Spanish-speaking adolescents to individuals with learning disabilities.

## 45. Whether, during the 2014 Fall semester, the Respondent refused to implement a disability-related accommodation approved by Student Accessibility Services (SAS).

Witness 82, who submitted IL #868 and participated in an OIE interview, alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent refused to allow her to have access to his class notes as part of her disability-related approved accommodations. Specifically, Witness 82 stated that SAS approved her to receive the following accommodations: enlarged print on exams, taking the exam in a separate environment (SDES), extended time, access to professor's notes and having a student note-taker. She alleged that she visited the

Respondent in his office to discuss her accommodations with him.  The Respondent agreed to all of them except granting her access to his class notes.  She alleged that he told her, "I don't give out my notes." When Witness 82 replied that "it's the law", the Respondent allegedly looked at her and said, "I don't do that."  She continued to point out that denying a student an accommodation with a documented disability was against the law, and the Respondent replied, "I don't do that. Is there anything else I can help you with?" Once again, Witness 82 pointed out that denying any student with a documented disability is against the law.  With "a smug look on his face", the Respondent allegedly made a statement about having tenure, which discouraged Witness 82 from following up with anyone regarding the accommodation. Witness 82 stated that she did not argue with the Respondent anymore as she "did not think it was worth it." She stood up and as she was walking out of his office, the Respondent stated, "Good luck."

The Respondent stated, "That never happened. I know by law they are entitled to these services, and the only thing I can think of is that there have been a few times that the office wanted me to provide a transcript of the videos that I show for the hearing impaired, and I have resisted and said, 'don't you guys get paid to sit down and transcribe those videos?' But not complying? Never."

OIE contacted SAS, who confirmed that they did not have any records related to the Respondent not implementing accommodations for Witness 82. SAS also shared that typically they would arrange for class notes to be obtained from another student in the course or volunteer note-taker rather than requesting that the professor's notes be provided to the student since the professor's notes were not being provided to the other students in the course.  Although the detailed nature of Witness 82's allegations lend credibility to her allegations and the record lacks any motivation for Witness 82 to fabricate her allegations, without any corroborating information and the delay between the alleged incident and the report, OIE finds that there is insufficient evidence to support finding that the Respondent refused to implement Witness 82's disability-related accommodations approved by SAS.

*Religious-Based Comments*

**46. Whether, during classes, the Respondent insulted students that had religious beliefs and told them that God did not exist.**
   **a. Specifically, whether the Respondent told students that anyone who believed in God, Jesus, a higher power or religion was childish, ignorant, stupid, dumb, unintelligent, a fool, an idiot, delusional, disillusioned, of a weaker mind, crazy, brainwashed, small-minded or mentally ill.**

Witness 142, who submitted IL #875 and was a student in the Respondent's 2007 Fall General Psychology course, alleged that the Respondent "said that he was indoctrinated because his parents took him to church and that he would not talk to people who believe in something 'stupid.'" Witness 37 alleged that during the 2009 Summer Psychology of Prejudice course, the Respondent told students that those who believed in religion were "deluded" and "mentally ill." Similarly, an anonymous reporter alleged that early in the 2009 Fall semester for the General Psychology course, the Respondent "devoted a lecture to discussion of religion. What started as a topic relevant to psychology quickly devolved into targeting and attempting to humiliate individuals identifying as religious, particularly as Christian. Those identifying as Christian were

asked to identify themselves by standing in the classroom (myself included). [The Respondent] then accused those standing of being 'ignorant,' 'gullible,' and 'childish,' berating them to denounce their religion." *See Student Google Form – Anonymous*. Witness 147, who submitted IL #815, alleged that during either the 2009 Fall Sexual Behavior course or the 2010 Spring Cross Cultural Psychology course, the Respondent told the students that "anyone with any kind of religious belief is both delusional and unintelligent, because they cannot separate fantasy from reality". The anonymous reporter in IL #829 alleged that during the 2010 Summer General Psychology course, the Respondent "was antagonistic and generally insulting to Christianity in a way that had nothing to do with class and showed a complete lack of respect for any Christians (and really anyone religious) in the room. It was extremely uncomfortable and way over the line for a professor to behave this way in a classroom setting."

Witness 99 alleged in her Student Google Form that during the 2012 Fall General Psychology course, the Respondent told students that if they believed in religion, they "were of a weaker mind" and "only idiots would place beliefs in a superior being because they're afraid". Witness 82 alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent told students that Christians were "idiots" and "assholes" because they think that they are right. Witness 138, who submitted an IL report (#811) and participated in an OIE interview, alleged that during the 2015 Spring Cross Cultural Psychology course, the Respondent told students that there was no God and people who believed in God were stupid, dumb and small-minded, and one time "akined a girls religious belief to believing in 'ghosts'". Similarly, Witness 84 alleged that during the 2015 Fall Cross Cultural Psychology course, the Respondent stated that believers were dumb.

Witness 91, who submitted IL # 824, alleged that during the first day of class for the 2016 Spring Cross Cultural Psychology course, the Respondent "said something along the lines of 'I am not here to coddle your beliefs, I am here to piss you off'. And then he proceeded to ask what religious beliefs the class held. When a young girl raised her hand and said she was a Christian, he went off on her and spent 15 minutes condemning her religious identity. The girl walked out of the class in tears and his response was that 'I know I have done my job when someone leaves crying'". When asked about this alleged student interaction, the Respondent stated, "That is a complete fabrication. I would not spend 15 minutes engaging with a student. I also don't ask students what they believe. I don't talk to them unless they want to engage with me individually. I've never seen a student walk out crying, but it's a large class."

The anonymous reporter in IL #796 alleged that during the 2017 Fall General Psychology course, the Respondent told students that "anyone who believed in the Bible or heaven was a fool and a religious bigot as they could not possibly believe in such a thing." The anonymous reporter in IL #797 similarly alleged that on first day of that same course, the Respondent told students that "anyone who believed in God, Jesus, or any higher power was ignorant". Similarly, Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent told students that if they believed in God, they were an idiot. Witness 88 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent called students who believed in God "stupid" and "idiots", and told students that believing in religion was like believing in ghosts and was outdated; they were "slow" if they believed in a religion; and, Muslims, Hindus and Christians were "stupid". Witness 88 further alleged that during the 2017 Fall Cross Cultural

93

Psychology course, the Respondent showed a video pertaining to abstinence and then "made fun of" this Christian view and said that is why Christians are hypocrites, have venereal diseases and have anal sex. Although the Respondent denied having said that Christians were hypocrites, had venereal diseases and had anal sex, he affirmed that he previously showed such a video to students and stated, "I stopped showing that video because of a lack of time, but yes, I did previously show this to students in class. The video is 'A Silver Ring,' which is a 60 Minutes segment." Witness 144, who also was in the 2017 Fall course, alleged that the Respondent told students that believers were delusional.

Similarly, with regard to more recent courses, the anonymous reporter in IL #894 alleged that during the 2018 Cross Cultural Psychology course, the Respondent told students "that people who believed in god were 'stupid'". Witness 86 alleged that during the 2018 Spring Cross Cultural Psychology course, the Respondent told students that he did not like Muslims or Christians because they were "ignorant", and all religious people were "brainwashed". Witness 86 recalled that some students that identified as Muslim, as they were wearing hijabs, then left the class.

Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told students that "if you believe in religion, you are stupid" or "childish", and had been brainwashed. Witness 133 alleged that during this same 2018 course, the Respondent told students that religion is "crap and makes no sense", if you believe in any religion, you are kind of crazy, and students had been "brainwashed" to believe in religion. Witness 112, who was enrolled in the Respondent's 2018 Spring Sexual Behavior and 2019 Spring Cross Cultural Psychology courses, alleged that the Respondent said that believers were" delusional". Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that believing in God was stupid.

Witness 56 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent said that Muslims were "crazy" and have "mental issues". The University also received an allegation that during the 2019 Fall Cross Cultural Psychology course, the Respondent stated, "if you believe in God you should revisit your priorities", "educated people don't believe in God, and that if you believe in God, you can't be an intellectual". Witness 137, who submitted IL #877, alleged that during the 2019 Fall Cross Cultural Psychology course when the Respondent "was discussing Christianity, he commented to a student, 'You're here to learn how to think critically but if you want to continue to believe in a make believe childish god, that is your choice.'" Witness 137 also alleged that during this course, the Respondent told students that the Christian God was a "fairy God" and believers had "childish personalities". The anonymous reporter in Integrity Line #832 alleged that the Respondent made a similar statement during the 2019 Spring Cross Cultural Psychology course ("if they believe in God then they're stupid"). Witness 52 alleged that during this same 2019 course, the Respondent told students that those that believed in religion were "disillusioned". Similarly, Witness 117 alleged that during this same course, the Respondent told students that God was dead, they should believe in science, and people who believed in God were stupid and delusional. Witness 120 alleged that during the 2019 Spring Sexual Behaviors course, the Respondent said that religion and Christianity were dumb. Witness 100 alleged that during the 2019 Summer Sexual Behavior

course, the Respondent told students that people were weak minded, stupid, less than, or scared if they subscribed to a religion.

Witness 54 alleged that during the 2020 Spring Cross Cultural Psychology course, the Respondent stated that people who prescribed to a religion did not have critical thinking skills. Witness 39, who was enrolled in this same course, alleged that he made a statement about believers being delusional.

In contrast, Witness 76, who was a student in the 2015 Spring General Psychology course, alleged that the Respondent did not call the students derogatory names. Witness 160, who was a student in the 2018 Spring General Psychology course, similarly stated that the Respondent did not call the students derogatory names.  Rather, "if you had a view that did not align with his views, he was dismissive or would look down on you without any justification." Witness 165 and Witness 166 stated that during the 2018 Summer Sexual Behavior course, the Respondent did not call students derogatory names. Witness 3, who was a student in the 2018 Fall Sexual Behavior course, stated that the Respondent did not mock students or call them names. Rather, he might have used terms like "moron" but "not directed at anyone, just used in general discussions or storytelling". Witness 167, who was a student in the 2018 Fall Cross Cultural Psychology course, stated, "I did not witness "[the Respondent] to directly insult students, to call them dumb or similar. To me, personally, I felt that [the Respondent] was always respectful." Witness 6, who also was enrolled in the 2018 Fall Cross Cultural Psychology course, stated that the Respondent never called religion stupid, and never commented about Jesus, Mary, Muhammad or any other religious figures.  Witness 6 further stated, "I liked how he would show both sides of things. … He never asked students to give up their religious beliefs… he caused people to ask questions and asked to see articles and facts to support their views as opposed to their opinion." Witness 48, who was enrolled in the 2018 Fall General Psychology course, stated that the Respondent called a particular culture or practice that he was describing as "dumb", rather than a particular student.

Similarly, Witness 1, who was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, stated that he did not recall the Respondent making derogatory comments about religion. Witness 1 stated that the Respondent "was very opinionated with his beliefs. He was open and honest about his beliefs. He was not derogatory about other religions or beliefs. I did not feel that he was trying to attack anyone, he would try to get us to think through things. I'm Roman Catholic. A lot of my friends were in the class with me, and they and I actually enjoyed his class." Although Witness 98, who also was a student in the 2019 Spring course, was disappointed with the way the Respondent approached discussions in this course, particularly with regard to race, she corroborated that he did not directly call students "stupid" or "dumb". Rather, it "was more his demeanor, his facial expressions, his body language and his responses … he would pick apart everything you would say and you would feel less than." Witness 104 stated that during the 2019 Summer Cross Cultural Psychology course, the Respondent did not call his students names, like moron or idiot, but he did use those terms to discuss some of the people that he taught about, like religious figures. Witness 5, who also was a student in the same 2019 Summer course, stated that the Respondent did not mock students or call them names. Rather, he said, "You are not correct" or "That argument is not correct." Witness 106 similarly stated that during the 2019 Fall Sexual Behavior course, she did not witness the Respondent call

a student or their ideas "stupid" or "dumb" or similar terms. However, he countered students' comments with things like, "I am older than you", "I have more experience", "I know more than you", "we are not getting into this" or "moving on" and he proceeded forward with his lecture. Witness 2, who also was a student in the 2019 Fall Sexual Behavior course, stated that the Respondent did not call students derogatory names.  Rather, he used those terms in the general sense like, "I was talking to some moron who believed X," but this was not directed at any specific student.

In response to these allegations, the Respondent denied that he stated "whomever believes in God is ignorant and needs a reality check" or a statement of a similar nature.  As to being deluded or mentally ill, the Respondent stated, "I never said this. It's a human need that we have and we need to understand that people will be taken care of after they pass, that we will see our loved ones again after they pass." As to saying that if people believed in a religion, they "were of a weaker mind" and that "only idiots would place beliefs in a superior being because they're afraid", the Respondent replied, "I categorically deny that."  The Respondent also denied that he said that people who believed in God were stupid, dumb or small-minded, and "categorically" denied referencing Christians as "idiots" and "assholes". He also denied that he said that Muslims were "crazy" and had "mental issues."  In response to the allegations that during the 2017 Fall Cross Cultural Psychology class, he called students who believed in God "stupid" and "idiots" and stated that believing in ghosts and God was outdated, they were "slow" if they believed in religion; and Muslims, Hindus and Christians were "stupid", the Respondent stated, "These allegations are a total fabrication. I would take this opportunity to note that no one made that comment in any of the course feedback."  As to the allegation that he told students that "if you believe in religion, you are stupid" or "childish", the Respondent stated, "I think I said something about how Einstein characterized it as childish, but I don't recall saying anything like this." As to the allegation that during a Summer Sexual Behavior course, he said that people were weak minded, stupid, less than, or scared if they subscribed to a religion, the Respondent stated, "There is no way in hell I said that, and they can search the entire course, which is online, and see that I never said that." As to the allegation that during his Fall 2019 Cross Cultural Psychology course, he stated that the Christian God was a "fairy God" and believers had "childish personalities", the Respondent stated, "This is total nonsense. … This allegation is total fabrication."

When asked about the allegation that during the 2019 Spring Cross Cultural Psychology course, he said that those who believed in religion were disillusioned, the Respondent stated, "Half the things that have been reported by students are insulting, I've never ever said. Also, this is incidentally discussed in General Psych or Sexual Behavior since this isn't part of the course content, but I'd respond to a student if it comes up. I spend one week – two class meetings – in Cross Cultural talking about religion. I do assert that it is a cultural delusion to believe in religion, but I do not use the derogatory terms. I want to believe I would see my family again after they die; these are deep human needs. My opinion is these students are offended by my views and they are walking away forming the idea that I've said these things in a much more pejorative and insulting way than I have."

As to the allegation that he referred to believers as "delusional", the Respondent stated, "Like Richard Dawkins, I support the idea that believing in a religion is a cultural delusion. The

way it was reported sounds unacceptable. What I would say is that believing in a religion is a delusion, a cultural delusion – a whole culture that believes in the religion. I would say that I am not the only one who thinks this way. Richard Dawkins does as well. It is well within my course content and relevant to the topic I am covering, and I am being as scientific as I possibly can about that." As to saying that anyone with a religious belief was unintelligent and delusional, the Respondent replied, "I categorically deny that allegation." As to the allegation that during his 2020 Spring Cross Cultural Psychology course, he referred to believers as delusional, the Respondent stated, "I would make a statement that believing in religion is a delusion. In General Psych, it would be an incidental comment in response to what someone else is saying; same in Sexual Behavior. It is front and center in the Cross Cultural course. Yes, this same type of discussion has occurred across the sections of Cross Cultural. I have not said they were unintelligent. I still say and hold the position that believing in things for which there is no evidence constitutes a delusion. I am not personalizing it the way some of the students are alleging I am."

During his OIE interview, the Respondent was asked about the allegation that during his Fall 2018 General Psychology course, he said that religion was crap and makes no sense; and similarly stated that if you believed in any religion you were kind of crazy and that students had been brainwashed to believe in religion. The Respondent replied, "I deny it all and all those words. I do believe that many of us who believe in religion have been indoctrinated by our parents. Even then, I elaborate on it. I talk about how for most people who believe in religion, their parents take them to church weekly or monthly, but don't take them to multiple other types of religions and let them decide. I tell them that would be an example of religious education, but what we call religious education is really indoctrination, taking them to the same church and reading the same book. I don't use the word 'crap' or 'brainwashing.'"

In addition to speaking with the Respondent and students that had been enrolled in his courses, OIE reviewed recordings of the Respondent's lectures. During one of the 2019 Summer Cross Cultural Psychology recordings (*see Recording - Peru – Summer 2019 -3*), the Respondent indicated that he personally changed in terms of his beliefs when he "encountered someone who changed my way of thinking". He identified this person as Muhammad. He then said that when he learned about Muhammad, he concluded that religion was "all **make believe**." In the class recordings (*see Recording 2019 – 8*), the Respondent shared the story of Sodom and Gomorrah from the Bible (Genesis 19:1-36) and stated, "The Bible doesn't say that he's going to destroy the city because people are turning gay – it's kind of implied that – it's just that they're disobeying God." He then described that "Lot's wife turned around and God turned her into a pile of salt" and that this was "a **pretty childish** story". *See also Power Point Arab & Muslim Americans Lecture 1, slide 49*, (referred to passage from the Bible as a "childish story"). Similarly, in a recording from this same course (*see Recording – Peru – Summer -2019 – 13*), the Respondent talked about religion providing an answer to our origin and referenced the Adam and Eve story from the Bible. He then said that this was a "**childish story**", students "latch onto the childish story", we are "narcissistic for believing we are so special that someone is looking after us and has our back", and people who believe in religion have a **lack of education**. Also, a recording of the Respondent's November 6, 2018 General Psychology course revealed that the Respondent told students the following: "With all due respect to you, I say this very sincerely,

many of you struggle to separate fantasy from reality.  You think Satan is real, many of you in here, and you understand that is a childish concept.  There's no such thing as a Satan or devil."

Turning to the documentary evidence, OIE reviewed the Respondent's September 12, 2019 message to his Cross Cultural Psychology students wherein he discussed the need for students to engage in critical thinking and stated, "let me say something quickly about religion (mythology). I'm a simple man. Let's just take one fundamental tenant of Christianity and Islam: Heaven. For those of you who believe, please tell me precisely where is heaven? Some of you think you're going there after you die, yet I bet you can't tell me where it is. Isn't that...shocking? to believe you're going somewhere so important, yet you are unable to tell me where it is? Do you recognize the absurdity of that?" *See Announcement – Sept. 12, 2019 Re Religion; see also Announcement Jan. 2012 Re Religious Bigotry.*  Also, in his March 18, 2018 message to his students wherein he discussed "intellectual paradoxes," the Respondent stated, "I informed you that, on one hand, the majority of Whites are **rather unsophisticated intellectually** speaking (the vast majority have not graduated from a university, **believe in "Satan,"** blah, blah, blah). *See Announcement – March 18, 2018 Email Re White Accomplishments.*

In the student's 2015-2019 evaluations of the Respondent's courses, students provided the following relevant feedback:
- "When students ask questions, more that 75% of the time the question is not actually answered; rather the student is mocked and/or the answer given has no clear link to the question. If a student would point out a flaw in his logic or even claim that he's showing a clear bias, he would argue that he's not bias and that we students are being hypersensitive and/or are 'just plain dumb'." *See Respondent's Student Evaluation 2016 Fall.*
- "We understand your personal view on matters. Please stop degrading people for having a different opinion. Ex: 'You snowflakes', 'You're all delusional', etc. You can express your view without insulting everyone." *See Respondent's Student Evaluation 2017 Fall.*
- Respondent told the students that "whomever believes in God is ignorant and needs a reality check." *See Respondent's Student Evaluation 2018 Spring.*
- When asked, "What suggestions do you have for improving the course and/or how the instructor taught it, a student responded, "not call people who believe in religion childish maybe?" *See Respondent's Student Evaluation 2019 Fall.*

First, as noted above, OIE does not find the lack of a large number of reports about this alleged conduct represented in the student evaluations to be persuasive evidence that the conduct did not occur.  Second, OIE notes that there is consistency, although not verbatim, in the allegations among multiple students in 15 different semesters capturing a lengthy timeframe (2009-2020) - namely, that the Respondent directed derogatory terms and statements at those with religious beliefs.  Also, the students provided detailed information about the comments.  This consistency and detailed nature of information lend strong credibility to the allegations. On the other hand, multiple students over a portion of this same timeframe (2015-2020) denied that the Respondent called students derogatory names, such as stupid, moron, idiot, etc.  Rather, they stated that the Respondent used some of the derogatory terms when referring to an idea he disagreed with or a specific religious person that was the focus of his lecture. They also said that the Respondent used those terms in a "general sense like, 'I was talking to some moron who

believed X.'" It is important to note that these students' experiences only overlapped with two of the fifteen semesters discussed herein (specifically, 2018 Fall General Psychology and 2019 Spring Cross Cultural Psychology). This raises the question of why students appeared to have experienced the classes differently when the Respondent discussed religion. As set forth above, the record lacks evidence of any of these students having a motivation to fabricate allegations whereas the Respondent has a motivation to lie and demonstrated inconsistency in some of the information provided during his OIE interview (see *Consistency* section above).

With regard to some of the allegations, it is possible that when the Respondent stated that believing in a religion is delusional and that religion is a cultural delusion, both of which are undisputed by the Respondent, students understandably interpreted these statements as him saying that believers were delusional. Or when he referred to a religious story as a "childish story", which the documentary evidence supports he did, or referred to the existence of hell as "another childish idea", students interpreted these statements as him saying that believers were childish. The distinction in semantics that the Respondent is making is a distinction without a difference as he clearly equated those with religious beliefs to being delusional and believing in childish stories. This is consistent with the Respondent's student evaluations and OIE's witness interviews where students, including those that were generally positive in their review of the Respondent, repeatedly noted that the Respondent treated religious beliefs with disrespect throughout his courses. The class recordings demonstrated some of this disrespect, such as when the Respondent referred to a belief in an afterlife as "absurd" and noted that people who believed in religion lacked an education. Correlating having religious beliefs to being uneducated, as well as correlating believing in Satan to being intellectually unsophisticated, is not that far from saying that a religious individual is ignorant and unintelligent. Also, he did not dispute that he told students that believing in a religion was like believing in flying elephants, which was a derogatory jab toward those with religious beliefs. Furthermore, as set forth in more detail in Section VI (Material Facts Not in Dispute) above, during his 2019 Summer course, when discussing his belief that religion had never solved a single social problem and a student was having a reaction to this statement, the Respondent flippantly stated, "People who believe in religion tend to be irrational." Similarly, during this course, he joked that attending a Catholic sermon was "like taking two tranquilizers and being given a cup of vodka. All it does is put you to sleep, it is boring." Accordingly, taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that throughout three of the Respondent's courses (General Psychology, Sexual Behavior, and Cross Cultural Psychology), the Respondent repeatedly made derogatory statements about individuals with religious beliefs, including that they were delusional, childish, unintelligent and ignorant.

However, the record does not support finding that the Respondent specifically stated that believers were "stupid", "dumb" or "idiots" as none of the recordings support him having made comments of this nature, including during the 2018 Fall General Psychology course where one of the students alleged that the Respondent said, "If you believe in religion, you are stupid." That said, according to those students that denied he called students derogatory names, the Respondent referred to religious figures, religious practices or religious ideas as stupid, dumb, or idiotic. One of the recordings demonstrated that the Respondent referred to the Christmas tradition of exchanging gifts and having a Christmas tree in one's house as "pretty bizarre". Accordingly, the record supports that it is more likely than not that the Respondent used the

derogatory terms (stupid, dumb, idiot, absurd) during some of his courses in reference to specific religious practices or religious figures.

Lastly, the record does not support finding that the Respondent had students identify themselves as believers and stand up while the Respondent ridiculed them. Only one student made this allegation out of the more than 300 students spoken with by OIE, and none of the recordings or documentary evidence supported that such an activity had been engaged in by the Respondent. Similarly, the record does not support finding that the Respondent told students that Christians are hypocrites, have venereal diseases and have anal sex.

### b. Whether the Respondent told students that believing in God was like believing in fairy tales, and the Bible was a "joke" or "crazy book".

Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent equated religious faith to fantasy. Witness 122 alleged that during the 2013 General Psychology course, the Respondent told students that believing in the Bible and other religious texts was like believing in unicorns. Witness 85 alleged that during the 2016 Fall General Psychology course, the Respondent told students that if anyone believed in God or any other religion, they were believing in a fairy tale and were not ready for college-level classes because their thought process was based on fairytale-like beliefs. He allegedly further stated that they should leave the class if they believed in God, and some people left. The anonymous reporter in IL #797 alleged that on first day of the 2017 Fall General Psychology course, the Respondent told students that "believing in God was like believing in a purple elephant flying around the room." Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that belief in God was a fiction. Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told students that believing in religion was like believing in a flying elephant or Santa Claus. An anonymous reporter alleged that during a 2019 Fall course, as students left for the holiday break, the Respondent said something to the effect of "have a great Christmas. Enjoy praying to a fake man who lives in the sky". *See Student Google Form – Anonymous*.

Similarly, Witness 54 alleged that during the 2020 Spring Cross Cultural Psychology course, the Respondent described religious books and the Bible as works of fiction. Witness 83, who submitted IL #881 and participated in an OIE interview, alleged that during the 2017 Fall Sexual Behavior course, the Respondent told a student during class "that the Bible was a joke that it couldn't be taken seriously. The student had already expressed that she was offended but [the Respondent] kept going and laughing while talking directly to this student about it. He called the Bible 'that crazy book'". Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told students that the Bible was a "fairytale", "stupid", and "that crazy book full of fairy tales". Witness 98 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent told the students that the Bible was a joke.

As to the allegation that he told students that if anyone believed in God or religion, they were believing in a fairy tale or mythology and were not ready for college-level classes because their thought process was based on fairytale-like beliefs, the Respondent replied, "I deny the whole thing with one exception: I do say that all religions are mythologies." As to the allegation

that in his 2018 Fall Cross Cultural Psychology course, he said that believing in God was a fiction, the Respondent stated, "I never said what was reported." As to the allegation that he stated that believing in religion was like believing in a flying elephant or Santa Claus, the Respondent stated, "Wouldn't you want to ask what the evidence is? If someone claimed angels or devils exist, wouldn't you want to ask about what the evidence is? I don't remember anything about Santa Claus but did refer to a flying elephant." As to the allegation about unicorns, the Respondent stated, "I did not make that statement. I've never used unicorns as an analogy. I don't know why I would be saying that in General Psychology because we don't talk about religion. I don't have a formal lecture on religion in General Psychology. I've never said that." As to the allegation that he referred to the Bible as "that crazy book full of fairy tales" during his Fall 2017 Sexual Behavior course, the Respondent stated, "I'm not sure why I'd be talking about the Bible in Human Sexuality, but I do think the Bible and similar books are mythological and have no connection to reality. Making gratuitously insulting comments, I would not have said that." As to the allegation that during his Spring 2019 Cross Cultural Psychology course, he said that the Bible was a "joke", the Respondent stated, "I don't think I said that. I have said some of the stories are funny." As to the allegation that during his Spring 2020 Cross Cultural course, he described religious books and the Bible as works of fiction, the Respondent stated, "Mythological, sure. I may have used 'fiction'."

Turning to the other evidence in the record, as set forth in Section VI (Material Facts Not in Dispute) above, OIE's review of the Respondent's 2019 Summer Cross Cultural Psychology course recordings revealed that the Respondent had a discussion with the students about how "religion has never solved a single social problem", and then stated, "I am talking about believing in an **imaginary** God and you are talking about social aspects". Similarly, the Respondent told students that God was "a **figment of your imagination**", and he had come to the conclusion that religion was "all **make believe**." Likewise, in his 2019 Spring student evaluation, a student noted the following: "I strongly did not like how he let us know his views. He is a strong atheist and I am a Christian. He gives all the information but also jokes that God **isn't real**. Very disrespectful." *See Respondent's Student Evaluation 2019 Spring*. Furthermore, as noted above, a recording of the Respondent's November 6, 2018 General Psychology course revealed that the Respondent told students, "With all due respect to you, I say this very sincerely, many of you struggle to separate fantasy from reality.  You think Satan is real, many of you in here, and you understand that is a childish concept.  There's no such thing as a Satan or devil."

Taking the record as a whole into consideration, including the Respondent's admission that he compared believing in religion to believing in flying elephants and likely referred to the Bible as fiction, the consistency in allegations from multiple students over multiple courses, the recordings demonstrating that the Respondent referred to religion as "make believe" and God being "imaginary" and a "figment of your imagination", OIE finds that there is sufficient evidence to support finding that throughout the Respondent's courses (particularly, Cross Cultural Psychology and General Psychology), the Respondent repeatedly told students that believing in God was like believing in fairy tales, purple flying elephants, and Santa Clause; told students that the Bible was a joke and fiction; and, as students left for the holiday break during the 2019 Fall semester, the Respondent said something to the effect of "have a great Christmas. Enjoy praying to a fake man who lives in the sky".

### c. Whether the Respondent told students that God did not exist or was not real.

Witness 94, who submitted IL #842 and had enrolled in the Respondent's 2012 Spring Cross Cultural Psychology course, alleged that during every "class, [the Respondent] would rant about his religious beliefs. It was more than just ranting though. He would consistently put down other religions and beliefs, and talk about it the entire 2 hour and 50 minute class period. He NEVER covered the material in the class yet he would always say 'we will get to the chapter on religion' when a student would challenge his point of view. I wound up withdrawing from the course because I could not stand his comments anymore and how he never covered the material. Since it was in Spring 2012, I do not remember any specific comments he made but I can 100% back up the fact that he only ever talked about his religious beliefs and continuously put all other religious beliefs down." Similarly, the anonymous reporter in IL #976 alleged that during "almost every single lecture [the Respondent] aimed to discredit anyone who had religious beliefs starting off his first lecture ever with 'Can anyone tell me where heaven is? Exactly, because it doesn't exist.' While he may be an atheist, which I can respect, he constantly looked down upon 'believers' and made them out to be ignorant and less than." Similarly, Witness 50, who submitted IL #845 and was enrolled in the Respondent's 2014 Spring Cross Cultural Psychology course, alleged that the Respondent "seemed to imply that the only reason any of his students were religious was simply because they refused to think critically about their beliefs."

Witness 87 alleged that on the first day of the 2017 Spring Cross Cultural Psychology course, the Respondent told students that if they were Christians, they would not do well in the course and God was not real.  Similarly, Witness 144 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent told students that God was not real.

Witness 168, who served as a GTA for the Respondent, alleged that either during the 2018 Fall or 2019 Spring semester, a student visited the Respondent during office hours about an exam question regarding the existence of God.  The Respondent told the student that "the correct answer is that there is no God."  When the student stated that they were not comfortable marking that as the answer due to their personal religious beliefs, the Respondent reiterated that the correct answer was that there is no God.

Similarly, Witness 121 alleged that during the 2018 Fall General Psychology course, the Respondent discussed his beliefs on atheism and sexuality and said that God didn't exist.  It was further alleged that he then had the following exchange with a female student:  Student: "I believe in God"; Respondent: "How do you know God exists?"; Student responded with her thoughts on this; Respondent: "You're wrong, God doesn't exist." Witness 48, who also took the 2018 Fall General Psychology course, alleged that the Respondent further stated that by doing simple research and thinking on your own, you would come to the conclusion that there is no God just like he did. Similarly, Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that if they were Christian or religious in some way, "you are just doing it because you need to believe in something and can't deal with [the] real world." The anonymous reporter in IL #799 alleged that during 2018 Fall General Psychology class, the Respondent said within the first hour of class, "People who love their little Jesus don't realize all he was, was schizophrenic. And if that offends you, it's because you won't accept it because you need it to make you feel better about your life."

Witness 110, who was enrolled in the 2019 Summer Cross Cultural Psychology, alleged that he told students that religion was not real, religion was created to satisfy people, and the idea of religion was funny. Witness 63 similarly alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent told students that God and heaven were not real. Witness 48 alleged that during the 2019 Fall Cross Cultural Psychology course, after the Respondent stated that Jesus was a schizophrenic, "If that offends you, it's because you won't accept it because you need it to make you feel better about your life."

During his OIE interview, when asked about the allegation that he told students that there was no God, the Respondent stated, "I say that there is no evidence for a God. I don't know if there is a God or not. Students will tell me that is my opinion, but I say no, that's a fact because there is no evidence. If I said there was no God, that would be my opinion." As to the allegation that during his Fall 2018 Cross Cultural Psychology course, he said that if you are Christian or religious in some way "you are just doing it because you need to believe in something and can't deal with real world", the Respondent stated, "I can't recall that. If I were to say it, I would not tell a student that God does not exist. About 8-10 years ago, I had a controversy in my class that became national news about religious bigotry. An Orlando Sentinel person came to my office and said, 'do you tell students there is no God?' I told him there is no evidence of God. I told him it was not my opinion; there is no evidence of a personal God. I do say there is no evidence of a soul or angels or a devil or personal God, but that's what I say – there is no evidence." Further, "I said something like, we're all humans, we're all afraid of death, and talked about the psychological needs that are satisfied through believing in a religion. We all need that emotional attachment to our loved ones, and I walked them through these motives. Even if they don't like what I said, I did so in a professional, pedagogical way, not the way it's been reported."

During his OIE interview the Respondent also was asked about the allegation that on the first day of his Fall 2018 General Psychology course, he discussed his beliefs on atheism and sexuality and said that God didn't exist, as well as the allegation about his exchange with a female student wherein he told her that God did not exist. In response, the Respondent stated, "I deny this allegation. I let them know where I'm coming from and I don't elaborate. If the student were to say that to me on the first day of class, I just can't imagine myself wanting to debate that since it's so out of place. I would have said 'more power to you' or something like that." As to the allegation that he told students that by doing simple research and thinking on their own, they would come to the conclusion that there is no God just like he did, the Respondent stated, "If someone is bringing up religion in General Psych, I could see myself saying that is how I arrived at my conclusions, but I can't see myself telling students that they should do that."

When asked about an exam question requiring students to select that there is no God to get credit, the Respondent stated, "If there is any item, it would say something like, whether there is evidence for a god, which is different from proclaiming there is or is not a god. Proclaiming there is a god is an opinion; posing there is no evidence of god is a fact."

During OIE's discussion with Witness 13, who was a student in the Respondent's 2019 Cross Cultural Psychology, she indicated that she had a positive experience in the course and that he did not engage in discriminatory behavior.  That said, Witness 13 acknowledged that during class, the Respondent said that God was not real. On the other hand, Witness 4 shared with OIE that he identified as a Christian and his Dad had died of early onset Alzheimer's disease.  He shared this with the Respondent and his frustrations about why God would have such a disease. In response, the Respondent did not reply that there was no God. Instead, he said, "If you are a believer, go all the way.  In your beliefs, your Dad is going to heaven and will see God." Witness 4 stated, "He was right.  I need to take comfort in that in my struggles to understand. Even though he's an atheist, he was right."

Turning to the 2019 Summer course recordings (*see Recordings*), the Respondent discussed his concerns about the threat of war. During this discussion, he stated, "I think religion is a problem for humanity," and referenced that he understood that many in the class had religious beliefs.  He then stated, "You are free to believe how you want. I won't try to change your mind", but then said that "all religions are make-believe".  He explained that there was no evidence to support the religion and that people had invented religion and souls.  In these recordings, the Respondent can be heard sharing a passage about the Muslim equivalent to tithing, and stated, "I'm sorry, but **Allah does not exist**. There's nobody giving anything to Allah. There's no one passing money up in the sky to Allah. It's like Christian churches who tell you to tithe your money to God. No, it's going into the preacher's pockets." Similarly, in the 2020 Spring lecture regarding Muslims recordings (*see Recordings Arabs & Muslims Lecture 3*), the Respondent is heard reviewing information related to Muslim women and stated, "**I am telling you from a non-believer point of view that Allah does not exist**, someone is making this up and claiming that it is Allah that is saying this."

Although the Respondent attempted to distinguish that his classroom statements were that there was no evidence of a God rather than having said that there was no God, God is not real or God did not exist, the record demonstrated that he did not limit these comments to there is no evidence.  The recordings showed that he said that "Allah does not exist", God was a "figment of their imagination", and religion was "make believe".  According, taking the record as a whole into consideration, including the undisputed statements in the recordings, the consistency in the students' allegations, and the Respondent's statements being inconsistent with the record, OIE finds that there is sufficient evidence to support finding that during two of the Respondent's courses (General Psychology and Cross Cultural Psychology), the Respondent repeatedly told students that there was no God, God was not real and God did not exist. However, there is insufficient evidence to support finding that the Respondent told students that if they were Christians, they would not do well in the course or that by doing simple research and thinking on their own, they would come to the conclusion that there is no God just like he did.

> **d.   Whether the Respondent told students that religion was evil, harmful, or ridiculous, or that anyone who was not an atheist ought to be dead.**

The anonymous reporter in Integrity Line #803 alleged that during the 2017 Spring Cross Cultural Psychology course, the Respondent told students that "religion is evil, harmful, ridiculous…." The Respondent shared with OIE that on one of his evaluations (2019 Fall Cross

Cultural Psychology course), a student alleged that he told the class that "anyone who was not an atheist ought to be dead". The Respondent denied having made this specific statement or a statement of this nature. No other students made such allegations throughout the course of this investigation nor was a statement of this nature heard on the recordings available to OIE. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that religion was evil, harmful, or ridiculous, or that anyone who was not an atheist ought to be dead.

### e. Whether the Respondent told students that teaching Christianity, Islam or any religion to children constituted child abuse.

Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent equated being raised with religion to child abuse. Witness 103 alleged that during the 2018 Spring Cross Cultural Psychology course, the Respondent told students that teaching children about hell, which is a concept of Christianity, is child abuse. During his OIE interview, the Respondent advised OIE that he issued an exam question to his Cross Cultural Psychology students "asking them, from a secular point of view, whether the idea that someone was watching a child 24/7 and, even though they are behaving outwardly, this person knows their inner throughs would constitute child abuse. It was about religion in general, not Christianity in specific." He also stated, that during class, it was "a general comment on religion".

As set forth in Section VI (Material Facts Not in Dispute) above, the Respondent issued an exam question that asked: According to any *reasonable* and *rational* person, telling children that someone is watching them 24/7 and knows every "move they make" and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection. Students needed to select option "B. child abuse" to receive credit for answering this question correctly. Also, as set forth in Section VI, OIE's review of the 2019 Summer recordings pertaining to the Cross Cultural Psychology course revealed that, while discussing the purpose of religion, the Respondent referenced religion being a mythology and stated that being raised in a religious upbringing "is a form a child abuse." He also stated, "Teaching children to believe that there is someone watching them all the time, I would say that is child abuse. … It does not occur to Christians and Muslims how bizarre and abusive that is to tell children that when they are growing up." *See Recordings – 2019 Summer - #6 & #8*. Accordingly, taking the record as a whole into consideration, OIE finds that there is sufficient evidence that the Respondent repeatedly told his Cross Cultural Psychology students that providing children with a religious upbringing, including Christians and Muslims, constitutes child abuse.

### 47. Whether, during class, the Respondent told students that the Virgin Mary was not a virgin when she got pregnant with Jesus, did not get pregnant by immaculate conception, and got pregnant by "raw-doggin it across town", by "being a whore" or by "being a slut".

An anonymous reporter (IL #828) alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent said that "the way the Virgin Mary really got pregnant was because she was 'raw-doggin it across town'". Witness 88 alleged that during that same course,

the Respondent stated that "Mary had to come up with some story so that she did not get killed for being pregnant." Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told students that with regard to the Virgin Mary, it was scientifically impossible to be pregnant without having sex, "for all we know, she could have been raw-doggin it across town," and she could have been having sex with various men. Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that the Virgin Mary was not a virgin, and she just saw a way that she could save her life after she had been "whoring" around. Witness 167, also in this 2018 course, recalled that the Respondent said that "Mary had probably had intercourse with someone else and made the story of the immaculate conception up to protect herself. He said she then proceeded to raise Jesus according to this narrative." Similarly, Witness 56 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent said that Mary, the mother of Jesus, was "just a slut who got pregnant outside of marriage and, to avoid being stoned to death and killed, she lied and said it was God who got her pregnant".

In response to these allegations, the Respondent stated, "She [Mary] hardly ever comes up in my lectures. Any time she does, this is what I say. First, it is true that you cannot get pregnant without sex. Second, consistent with her culture at the time, if Mary had gotten pregnant out of wedlock, her people would have considered her 'a whore' (with air quotes) and murdered her. Someone got the idea to concoct the story that she was impregnated divinely. I say this in a disinterested and dispassionate way, no smile or smirk on my face. I have never said 'raw-doggin it across town' to a student. The term 'raw-dogging' is awful. 'Whore' is a legitimate word used in the Bible several times. I say exactly what I just said. The words 'raw-dogging' or 'slut' have never come out of my mouth in reference to the Virgin Mary."

OIE's review of the available 2018 General Psychology course recordings did not reveal the Respondent referring to the Virgin Mary as "raw-doggin it across town" nor as a slut or a whore. A review of the 2019 Summer Cross Cultural Psychology recordings similarly did not reveal the Respondent having made these comments. As set forth above, OIE spoke to numerous students from both the General Psychology courses and Cross Cultural Psychology courses. With regard to the 2018 General Psychology course, OIE communicated with 44 students from this course and Witness 95 was the only student to identify the "raw-doggin" comment as having been made.  With regard to the 2017 Cross Cultural Psychology course, OIE spoke with two students from that course – neither of whom corroborated the anonymous reporter's allegation. With regard to using the term "whoring" or "slut", Witness 140 and Witness 56 were the only witnesses to allege use of those terms with regard to the Virgin Mary. Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told either his General Psychology or Cross Cultural Psychology students that the Virgin Mary got pregnant by "whoring", "being a slut", or "raw-doggin it across town".  Instead, the record supports that with regard to the Virgin Mary, the Respondent taught students that you cannot get pregnant without sex, and, consistent with her culture at the time, if Mary had gotten pregnant out of wedlock, her people would have considered her 'a whore' (with air quotes) and murdered her. Someone then got the idea to concoct the story that she was impregnated divinely.

**48. Whether, during class, the Respondent told students that Muslims largely support terrorism and violence, and that Islam was not a religion of peace.**

The anonymous reporter in IL #817 alleged that in 2018, the Respondent told students that there was "some truth to Muslims being terrorists." Witness 107 alleged that on the first day of class in the 2018 Fall General Psychology course, the Respondent stated that with regard to Islam, it was a myth that they were peaceful, the religion was founded on violence, they remain violent today, and they force people to convert to Islam. Witness 95 alleged that, during this same course, the Respondent stated that radical Islam was evil and caused people to do evil things.  When a student in the front row got upset, the Respondent called her culture a "terrorist culture", said she "was just as brainwashed as the terrorists were," and said "maybe you are a terrorist". Witness 160, who was student in the 2018 Spring General Psychology course, alleged that the Respondent criticized Muslim culture and said that what they did was wrong. Witness 160 further stated that the Respondent generalized all Middle Eastern people as in the case of female castration. He said, "All Muslim people do this or that, and it's all bad." He compared Western values to Middle Eastern values and said their values are bad.  Witness 57 alleged in an email to the University that in 2018-19, the Respondent told students multiple times that Muslims were most likely to be terrorists. Witness 167 stated that during the 2018 Fall Cross Cultural Psychology course, the Respondent said, "I don't like Islam."

Similarly, the anonymous reporter in IL #803, who indicated they had been a student in the Respondent's 2019 Spring Cross Cultural Psychology course, alleged that the Respondent told students that "people should criticize the teachings of Islam. He tries to convince the class that Muslims (in the US) largely support terrorism ideology or believe in violent tactics." The anonymous reporter in IL #832, who indicated that they were a student in the same course, alleged that the Respondent told students that all Muslims "are terrorists, he backed this claim by saying fundamentalists are all terrorist which is not true. Fundamentalism in religion is following religious text as it is written. There is fundamentalism in every religion that has a scripture. When I tried to mention this fact [the Respondent] told me that I condone terrorism and that I should be ashamed. He then asked me to name one religiously charged terrorist attack that wasn't done by Muslims, so I answered. Being Jewish, it is not difficult to think of multiple terror attacks."  Witness 73, who also took Cross Cultural Psychology during the 2019 Spring semester, alleged that the Respondent told students that 40% of Muslims support terrorism. Witness 116, who was a student in the 2019 Summer Cross Cultural Psychology course, alleged that the Respondent told students that Islam was a cruel religion, referenced language from the Quran,[18] and then said that the passage was "advocating for violence" and "advocating for lowering the position of women."  Similarly, Witness 125 alleged that during this same course, the Respondent told students that Islam was the worst or most harmful religion and "he's going to show us why." He "showed videos and materials that highlighted fundamentalist Islam and went into detail on things we hear about, like honor killings and terrorist groups. He focused on the extremism of that religion but did not focus on what the majority of that religion practices." Witness 137 alleged that during the 2019 Fall Cross Cultural Psychology course, the Respondent told students that the Islamic faith was terrorist.

---

[18] The Quran is the Islamic sacred book, believed to be the word of God as dictated to Muhammad by the archangel Gabriel and written down in Arabic.

In support of these allegations, students referenced how the Respondent posted a link to a video called *By the Numbers – The Untold Story of Muslim Opinion & Demographics* and instructed students to review the video.  OIE received a copy of the Respondent's April 4, 2020 message to students about this video.  Therein, the Respondent stated: Please be sure to view this short youtube segment in preparation for your upcoming final exam (on Thursday, April 23rd at 4:30 p.m.). https://www.youtube.com/watch?v=pSPvnFDDQHk. As set forth in Section VI (Material Facts Not in Dispute) above, this video presents Dr. Raheel Raza's viewpoint that "most of the terrorism in the world today involves Muslims in one way or another, and because it directly affects our lives and security," she believes that "we need to be able to have an open, honest and fact-based conversation about the growing threat of radical Islam."

When asked to respond to allegations that he told his General Psychology students that it was a myth that Muslims were peaceful and that their religion was founded on violence, the Respondent replied, "In General Psychology? If it did come up in General Psychology, the subject came up from someone else, and I might have commented on it. I typically don't address this content in General Psychology. I spend a lot of time on the topic of Muslims in my Cross Cultural Psychology course." When asked about the allegations that he said that Islam was not a religion of peace and most Christians and Muslims ignore their religious texts, the Respondent replied, "Again, what I say over a 15-minute period is now being reduced to three seconds. During my Cross Cultural Psychology classes where I am discussing Muslims, I'm walking the students through verses in the Quran. If anyone has read this book, and many Americans have not, they would be abhorred by the verses therein such as that Jews should be murdered, Christians should not be friends, and infidels should be killed. There are many verses like this. … After I covered these horrific verses with the students, I said that Muslims nevertheless claim that Islam is a religion of peace. I don't get that sense from the text. I explained to the students that the people who say that Islam is a religion of peace are individually peaceful people, but they are overlooking these horrific verses and mandates from the Quran. During these classes, I also walked the students through how Christians also ignore most of the Bible. You don't find Christians anywhere today who look at their neighbor who mows their lawn on Sunday and decide to go kill them since that's what is said in the Bible.[19] Muslims are advocating that Islam needs a reformation because too many Muslims are adhering to Islam in its original intent."

When asked if he discussed Islam as a violent religion, the Respondent replied, "I already covered how there are aspects of Islam that advocate killing anyone who is not a Muslim. There are verses that advocate killing Jews, beheading infidels, and not trusting Christians. I tell students to fact check those verses, and said that it would be hard to convince me that this is a religion of peace."

When asked about the allegations that he told students that Islam was evil, Islam caused people to do evil things, called the Muslim culture a "terrorist culture", and said that a student "was just as brainwashed as the terrorists were" and "maybe you are a terrorist", the Respondent replied, "During my Cross Cultural Psychology courses, when it's time to cover Arabs/Muslims, I start out by pointing out many things to the students. I point out how there is over 1.5 billion

---

[19] During the 2019 Summer Cross Cultural Psychology recording (*see Recordings 2019 Summer -13*), the Respondent told students, "The Bible instructs Christians if you see your neighbor mowing his lawn on a Sunday, you are supposed to go kill him."

Muslims in the world and that most of them are regular people like you and me, but there is another smaller group (hundreds of thousands) that some people call Islamists, and some might call them jihadists or radical Muslims. Those Muslims will kill and die for their religion. Fundamental Muslims would not kill anyone, but they want Sharia law, and they are in the tens of millions. I make the case for students to keep separate these various groups of Muslims. Having said all that, I never said that maybe a student is a terrorist - this is totally false. … I tell the students that there are very troubling aspects of Islam. There is a lot to Islam. I don't spend much time pointing out the love your neighbor parts. I'm pulling out things that Americans don't want to face up to." When asked if he lectured about these details about Islam in his General Psychology courses, the Respondent replied, "Never, not because I'm opposed, but because it's not relevant to the General Psychology course curriculum."

OIE's review of the 2019 Summer Cross Cultural Psychology recordings and Power Point slides related to this lecture revealed the following: The Respondent stated, "Despite that there are hundreds of millions of Muslims who are nice people, there are also hundreds of millions of Muslims who have some very disturbing attitudes. We are going to look at some data, and of course you can form your own opinion about this situation." On one of the slides, the Respondent defined fundamentalists as "not violent, nor political, but desire Sharia Law as 'law of the land'". With regard to one of the slides, the Respondent stated, "We are fortunate in the United States in that the majority of Muslims who come to the U.S. from other countries are vetted at some level from the U.S. government, so we haven't had tons of refugees, Muslims, just pouring into the U.S. without knowing who they are and what their motives are for coming to the U.S. … This Pew survey found that 1 out of 4 Muslims [in slide, 26%] between the ages of 18 and 29 think that suicide bombs are sometimes justified in order to defend Islam. When I say suicide bombs, I'm talking about random acts of violence toward innocent people, like in malls or driving trucks through crowded malls." When reviewing versus from the Quran, including versus about Muhammad instructing Muslims to be harsh towards disbelievers and that wherever you find non-Muslims, you kill them ("You should put terror into non-Muslims and strike off their heads."), the Respondent stated, "Another idea that defensive Muslims will say that Islam is a religion of peace and a religion of love (slight laugh). I don't feel the love, I don't know about you."

The Respondent's Power Point slides also set forth PEW survey data from 2013 regarding the opinion that honor killings are justifiable for women (ranging from Morocco being 35% in support to Iraq being 78% in support); PEW data from 2013 regarding the belief that homosexuality is immoral (ranging from 77% in Uganda and Iraq in support to Cameroon and Ethiopia being 99% in support); PEW data from 2013 regarding Muslims that want Sharia law (ranging from Tunisia with 56% support to Afghanistan with 99% support); PEW data from 2013 regarding Muslims who support Sharia Law that favor "stoning to death" as punishment for adultery (ranging from Turkey being 29% in support to Pakistan being 89% in support); PEW data from 2013 regarding Muslims who support Sharia Law that also support "corporal punishment" for theft and other crimes (ranging from Tunisia with 44% in support to Pakistan with 88% support); and, PEW data from 2013 regarding Muslims who support Sharia Law that also support "death" as punishment for apostasy (ranging from Turkey being 17% in support to Egypt being 86%). His slides further presented PEW survey data from 2015 regarding countries' populations that have an "unfavorable view" of Jews (ranging from Turkey with 60% support to

Jordan with 100% support), an "unfavorable view" of Christians (ranging from Lebanon being 7% in support to Morocco being 61% in support), and, an "unfavorable view" of Muslims (ranging from Britain with 14% support to the Netherlands with 51% in support).

When discussing the slide related to homosexuality and Sharia law, the Respondent stated that the slide regarding homosexuality also included a few African countries that are not Muslim-majority, and explained that while these statistics only reflected the views of Muslims within those countries, "all these Black African countries, sub-Saharan African countries, are terribly anti-gay".  He continued and said, "I'm not an authority, obviously, on Sharia Law, but I do know that some of these laws are regular laws… like how you should handle inheritances, but also in Sharia Law is the idea that anyone who has sex outside of marriage should be murdered, if you steal a loaf of bread you should get your hand cut off… look at the number of people in these countries who would like to have Sharia Law" When covering the slide related to Muslims who support death for apostasy under Sharia Law, he stated, "This should be a red flag for people, for this particular religion-slash-myth…"  Later in the lecture, the Respondent stated, "I know for many of you, this is the first time you're being exposed to these attitudes that are held by many people in the Muslim world… at some point, I want you to forget about the numbers and just let it sink in how so many Muslims in the world have so many disturbing attitudes that are not compatible with our values in the Western world." *See Recordings – Spring 2020 Arab and Muslim Lecture 2.*

The Respondent's Power Point slides included versus from the Quran, some of which he titled "advice for jihadists", including the following:

- When the four forbidden months are over, wherever you encounter idolaters, kill them, seize them, besiege them, wait for them at every lookout post; but if they turn (to Allah), maintain the prayer, and pay the prescribed alms, let them go on their way, for Allah is most forgiving and merciful (Qur'an: 9:5).
- O you Jews to whom the Scripture has been given, believe in what We have (now) revealed, confirming and verifying what was possessed by you, before We destroy your faces beyond all recognition ("we'll wipe out your sense of direction" in 2004 version), turning you on your backs, and curse you as We cursed the Sabbath-breakers, for the decision of Allah must be executed. (Qur'an: 4:47)
- Remember when Allah revealed His will to the angels: "I am with you; so give courage to the believers. I shall cast terror into the hearts of the infidels [non-Muslims]. Strike off their heads ("strike them above their necks" in 2004 version), strike off the very tips of their fingers!" That was because they defied Allah and his Messenger; and he that defies Allah and his Messenger shall be sternly punished by Allah. "That is it: taste it." (Qur'an 8:12-14)
- If you suffered a defeat, so did the enemy. We alternate these vicissitudes among mankind so that Allah may know the true believers and choose martyrs from among you (Allah does not love evil-doers); and that Allah may test the faithful and annihilate the infidels. (Qur'an: 3:140)
- Whoever changes his religion, execute him.

- If you find anyone doing as Lot's people did, kill the one who does it, and the one to whom it is done.[20]

With regard to the available 2018 General Psychology recordings, OIE's review did not reveal the Respondent having said that with regard to Islam, it was a myth that they were peaceful, the religion was founded on violence, they remain violent today, and they forced people to convert to Islam. The available recordings also did not capture the Respondent stating that radical Islam was evil and caused people to do evil things, nor the Respondent telling a Muslim student that her culture was a "terrorist culture", she "was just as brainwashed as the terrorists were," and "maybe you are a terrorist".

Taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that, during his Cross Cultural Psychology courses, the Respondent spent a portion of the course discussing Muslims and Islam and that, during this portion, the Respondent told students that despite there being hundreds of millions of Muslims "who are nice people", there are also "hundreds of millions of Muslims who have some very disturbing attitudes".  He then shared 2013 and 2015 PEW survey data related to opinions from Muslim populations that honor killings are justifiable for women, homosexuality is immoral, Sharia law was desirable, "stoning to death" was appropriate punishment for adultery, "corporal punishment" for theft and other crimes was acceptable, and, "death" was appropriate punishment for apostasy.  The Respondent also shared versus from the Quran to illustrate the difficulty in convincing him that Islam is a religion of peace. Furthermore, the Respondent conceded that during his lectures regarding Muslims and Islam, he did not present a full picture of the teachings of Islam or Muslim opinions ("I don't spend much time pointing out the love your neighbor parts. I'm pulling out things that Americans don't want to face up to."). It also is undisputed that the Respondent required students to review *By the Numbers – The Untold Story of Muslim Opinion & Demographics* video as part of the course curriculum, wherein the narrator presented her viewpoint that most of the terrorism in the world today involved Muslims.  This limited and generalized presentation of Islam and Muslims was understandably upsetting and offensive to a number of students and corroborated by multiple students throughout OIE's investigation (both those that said they had a positive experience in the course and those that said they had a negative experience in the course) who indicated that the Respondent was "harsh" in his treatment of Muslims and Islam.  For instance, Witness 52 alleged that during the 2019 Spring Cross Cultural course, the Respondent only presented bad developments related to Muslims, such as radicalized factions, and failed to present a balanced or complete view of this religion (referring to it as a "lop-sided view" of Muslims).  Witness 117 recalled that during this course, the Respondent said that "Muslims like to bomb stuff". Witness 73 described the presentations regarding Muslims as "misleading". However, there was insufficient evidence to support that he targeted particular students or referred to them as terrorists if they were Muslim as this evidence did not appear in any of the recordings reviewed by OIE.

---

[20] The Power Point slides continue with versus pulled from the Bible.

**49. Whether the Respondent told female Muslim students that they were oppressed, and insulted Muslim women when they provided information different from this opinion.**

Witness 123, who was a student in the Respondent's 2013 Spring Cross Cultural Psychology course, stated in her post related to the Change.org seeking the Respondent's termination that the Respondent told a Muslim woman in the class that was wearing hijab that she was oppressed and that's why she doesn't lead prayer, which caused the student to cry. Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent told a female student, who was wearing a hijab, that she had been brainwashed by her religion and country of origin, and the wearing of the hijab was her submitting to her culture's stereotypes about women being servants.  Witness 95 further alleged that when this student stated a very personal reason why she wore a hijab, the Respondent replied that was not really the reason why women wear hijabs and that she was wrong about her reason for wearing one. Witness 58, who was in this same course, recalled a female student wearing a hijab being offended by something the Respondent said about her culture or race.  Witness 58 could not recall specifically what had been said, but recalled that she and the Respondent had a conversation during which the student "was distraught." Similarly, Witness 58 and Witness 107 alleged that the Respondent also told students that Saudi Arabia still oppressed its people and oppressed its women especially.  When a Saudi Arabian student responded that her country was not like that, the Respondent replied, "You're wrong and you've been brainwashed by your government".

Similarly, Witness 137, who submitted an Integrity Line report (#877) and participated in an OIE interview, stated that during the 2019 Fall Cross Cultural Psychology course when "a Muslim student in the class tried to correct [the Respondent] and help the remainder of the class understand why Muslim women wear" a hijab, he "was very disrespectful toward her telling her she really had no understanding. He was rolling his eyes the entire time she was speaking disregarding her ideas." When the student finished, the Respondent allegedly said, "If you want to believe that, that's fine, but that's not really the reason why they wear those." Witness 169 expanded on this and alleged that during this course, the Respondent had the following exchange with this female Muslim student:  Respondent said that Muslim women were ashamed of their bodies which was why they wore a hijab; the female student stated that she wore the hijab for her own values and not because men told her to do so; the Respondent replied, "that's what you do but not all do", "you're not following the faith because it says here that women are less" [referencing text in the Quran], and "your religion doesn't respect you as a woman ... that's what your faith is telling you"; she then explained that religious texts can be interpreted in many ways; he replied, "That's not what I'm teaching right now" and ended the discussion.

During his OIE interview, when asked if a Muslim student wearing a hijab or any other student ever walked out of class due to being offended, he stated, "My classes are large, typically anywhere from 100-450 students, and students intermittently walk out for all sorts of reasons, but I don't know because I don't ask. I tell them I don't take attendance, and if they come in late or leave early to do so quietly. I have no idea why they leave." In response to the allegation that during his 2018 Cross Cultural Psychology course, he said that he thinks all religious people are brainwashed and referred to Muslims wearing hijabs and said they were "socialized", the Respondent stated, "If it comes up about the hijab, most women have been socialized that they

have to do this starting at the age of 9. I deny using the term 'brainwashed.'" When asked about allegations related to discussions with female students that wore a hijab, the Respondent replied, "I never talk to any one specific group or student like that. Rather, I talked to a broad group of students across race, gender, and religion. I'm not talking to any specific group as has been alleged. In my Cross Cultural Psychology classes, I do make the case - and I'm defending them somewhat-that women who wear the hijab to represent their religion have been socialized to do so. I pointed out that all students wearing clothes have been socialized to do that. There is a good chance that when they were children, they liked playing naked in the tub or outside, and at some point, their parents told them that they needed to wear clothes. Most people today would not feel comfortable walking around without clothes on. This same logic applies to women wearing the hijab." When asked if any students ever challenged him on this assertion, the Respondent replied, "I don't recall a single time. I maybe have had one or two students wearing a hijab at most in my classes. I think that they appreciated the discussion that we are all products of our culture and are conforming. No one has ever complained in my student evals or to my chair about this discussion point, until now."

When asked to respond to allegations that during his 2013 Cross Cultural Psychology course, he told a Muslim woman wearing hijab that she was oppressed, which caused the student to cry and leave the class, the Respondent replied, "No, I walked the students through aspects of different customs within the Middle Eastern world, which clearly suggest that women are oppressed as a group. There are Muslims who claim that women are not oppressed, but I tell my students that I just presented facts of oppression when I showed that women in Saudi Arabia can't leave their home without a male escort, and cannot initiate a divorce. I tell the students that they can fact check those facts. I tell them that they then can decide for themselves if women are oppressed or not. I'm not there to force students to buy into what I say, I'm there to get them to come to their own conclusions and think independently." Similarly, when asked about the exchange with a student about Saudi Arabia, the Respondent stated, "I don't remember having that conversation. However, if it occurred, I would have pointed out to the student the specific examples about whether they could go out alone, divorce their husbands, drive a car, and then ask her to provide examples of her views that would refute mine. I would not say that the student was wrong and had been brainwashed by their government."

When asked if he recalled having an argument with a student about wearing a hijab during his 2019 Fall Cross Cultural Psychology course, the Respondent replied, "[I]n Fall 2019, there was a woman who was totally covered who prayed outside my classroom and reacted strongly to the things I said about Islam. She raised her hand and started proclaiming what she believed, and I told her I had to stop her because I was teaching from a secular point of view and not a believer's point of view." The Respondent was then asked about the alleged exchange as described by Witness 169. In response, the Respondent stated, "That's a very personal back and forth that I would unlikely ever engage in with a student. What's being reported to you is something that – that's lot. I want to comment on each point. I didn't personalize anything to her, and I didn't mention anything about Muslims being ashamed of their bodies. I have already shared my perception that she didn't like me saying negative things about Islam, and she almost started proselytizing. I don't remember what she said, and the class was looking at me like, how long are you going to let this go on? I said, 'You're a Muslim and that's fine, but I'm not teaching this from a believer's point of view.' Students can look up the verses themselves and

form their own opinions. I'd say 70% of the things that she reported, I did not say." The Respondent then denied that he said that "women are ashamed of their bodies which is why they wear a hijab", denied that he responded to the student saying that she wore the hijab for her own values and not because men told her to do so, and denied that he told the student "you're not following the faith because it says here that women are less" and "your religion doesn't respect you as a woman ... that's what your faith is telling you." He also stated that he could not recall referencing text from the Quran during this exchange. During his OIE interview, the Respondent further stated, "There is a tiny grain of truth to what the students are saying, but they are gross distortions of what I said. There are several verses from the Quran that clearly say that women are not equal to men. There are verses that point out that women are not the same as men, and they are counted as half. These are the texts that I referenced in my courses."

The Respondent's Power Point slides also set forth information related to "Is Middle Eastern Culture Oppressive to Women?" The slides thereafter indicated that this question has "diverse views" and is "debatable". The slides then noted that, depending on the country of origin, community or family, head (and to a lesser extent, face) coverings are required for women, polygyny is legal in most Muslim countries, women may or may not be permitted to work outside home, women may or may not be permitted to drive, most women, but not all, are permitted to attend school, women may or may not be permitted to vote, women's testimony counts as "half" as men's testimony, and, women may or may not be permitted to travel alone. The slides then note a discussion regarding virginity tests for women, the concept of "marital rape" being non-existent, honor killings, and "Compensation marriages". When covering the honor killings data, the Respondent told his students, "This is one of the most bizarre things that exists among some to many Muslim people. The idea that a female's value is so linked to her virginity that if anyone defiles that, or she does, then she needs to be killed. But please understand that even if your sister or your mom or your wife was sexually assaulted by others, for some Muslim families the thing to do is to kill her as though she has brought shame to the family." *See Recordings – Spring 2020 Arab and Muslims Lecture 2*. The slides also set forth the following versus from the Quran:

- In the Qur'an, women are to be treated equally as men…
- Men have authority over women because Allah has made one superior to the other, and because they spend their wealth to maintain them. Good women are obedient. They guard their unseen parts because Allah has guarded them.
- If you fear high-handedness from your wives, remind them [of the teachings of Allah], then forsake them in beds apart, then beat them ("hit" in newer version). Then if they obey you, take no further action against them. (Qur'an, 4:34).
- Concerning your children, Allah commands you that a son should have the equivalent share of two daughters. (Qur'an, 4:11) (in reference to inheritance).
- And do not give your women in marriage to idolaters until they believe… Qur'an: 2:221
- Women are your fields: go then, into your fields and plow them as you please. Qur'an: 2:222

In the recordings related to this lecture, the Respondent referred to marital rape and stated that there was no such thing as marital rape (as a social construct) in the Muslim world and that it did not exist in the majority of Latin American, African, or Asian countries as well. The

114

Respondent explained that, "Any time a woman is sexually assaulted, if she were to go and complain to the police and press charges, they are going to find the man and bring the man in with her. The man will say he did not sexually assault her … it was consensual. Her testimony only counts as half of his… they will turn and accuse her of having sex with someone who is not her husband, and there are severe consequences for her… for the police station and for her family. She will most likely end up dead as a consequence. … A lot of women in the Muslim dominated world experience sexual abuse and they never come forward about it."

Taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that the Respondent spent a portion of his General Psychology and Cross Cultural Psychology courses discussing Muslims and Islam and that, during this portion, discussed whether Muslim women are oppressed.  He then shared information related to head and face coverings, polygyny, the weight of women's testimony, and restrictions on working outside the home, driving, attending school, voting, traveling, and filing for divorce. The Respondent also presented information related to virginity tests for women, marital rape, honor killings, and compensation marriages. When students challenged him on the concept that Muslim women were oppressed, he relied on this information and asked students to provide information that refuted what he presented. With regard to Muslim women wearing a hijab, the Respondent taught students that Muslim women had been socialized that they have to do this starting at the age of 9.

With regard to the allegation that in 2013, the Respondent told a Muslim woman wearing a hijab that she was oppressed and that's why she didn't lead prayer, taking into consideration the lack of corroboration of this specific incident and the length of time between the incident and reporting, OIE finds that there is insufficient evidence in the current record to support that this occurred as alleged. However, with regard to the allegations related to interactions with students in the 2018 General Psychology course and 2019 Cross Cultural Psychology course, this is a closer question as there are two witnesses in each course that corroborated the events.  That said, when OIE spoke with multiple other students from these courses, they did not identify. Notwithstanding, taking the record as a whole into consideration, including the corroboration of the students in those courses, the specificity provided regarding the alleged incidents, the students' lack of motivation to lie, and the Respondent's inconsistencies (as set forth in the *Consistency* section above), OIE finds that there is sufficient evidence to support finding that: (1) During the 2018 General Psychology course, the Respondent told a female student who was wearing a hijab that she had been brainwashed by her religion and country of origin, and the wearing of the hijab was her submitting to her culture's stereotypes about women being servants; and that when this student provided a personal reason for why she wore a hijab, the Respondent replied that was not really the reason why women wear hijabs; (2) During the 2018 General Psychology course, the Respondent told students that Saudi Arabia still oppressed its people and especially oppressed its women and when a Saudi Arabian student responded that her country was not like that, the Respondent replied, "You're wrong and you've been brainwashed by your government"; and, (3) During the 2019 Cross Cultural Psychology course, when a female Muslim student who wore a hijab stated that she wore the hijab for her own values and not because men told her to do so, the Respondent replied, "that's what you do but not all do", "you're not following the faith because it says here that women are less" (referencing text in the Quran), and "your religion doesn't respect you as a woman ... that's what your faith is telling

you"; she then explained that religious texts can be interpreted in many ways and the Respondent replied, "That's not what I'm teaching right now" and ended the discussion.

### 50. Whether the Respondent told students that that there was no "ism" for Jewish people.

Witness 80 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent stated that there was no "ism" for Jewish people.  Witness 80 indicated that this statement ignored antisemitism.  In response to this allegation, the Respondent stated, "That's not true as there's antisemitism. What I said to the students was that there are twice as many hate crimes directed at Jews as there are directed at Muslims. However, we tend to ignore the hate crimes directed at Jews and focus only on Muslims. That's what I said. I'm acutely aware of the term 'antisemitism'."  OIE's review of the 2019 Summer Cross Cultural recording (*see Recordings – 3*) revealed that the Respondent discussed hate crimes and said that there were twice as many hate crimes against Jews than there were against Muslims, and that antisemitism was more prevalent. No other students, including the 16 students spoken to from the 2018 course, alleged that the Respondent stated that there was no "ism" for Jewish people. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that there was no "ism" for Jewish people.

### 51. Whether the Respondent issued lower grades to individuals with religious beliefs.

The anonymous reporter in IL #802 alleged that the Respondent "would intentionally ensure that anyone with a different religious belief system than him would either be humiliated or receive a lower grade." The Respondent denied this allegation and no evidence in the record supports that the Respondent lowered the grades of individuals with different religious belief systems.  Rather, the record demonstrates that the Respondent issued multiple choice exams to students, which the GTAs handled and entered the grades for the Respondent.  None of the GTAs interviewed supported the allegation that the Respondent handled students' grades differently based on their religion.  Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent issued lower grades to individuals with religious beliefs.

### 52. Whether, during class, the Respondent told students that Muhammed was a "pedophile" or "child rapist".

Witness 73 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent told the students that Muhammad was a "child rapist". Witness 64 alleged that during this same course, the Respondent stated that Muhammad was a "pedophile". In response to the allegation that he called Muhammad a "child rapist", the Respondent stated, "I don't use that word. I hate to admit it, but in this case, I defend him. In my classes, I share that when Muhammad was 50 years of age, he was given a six-year-old child to marry, and he married her. As part of their custom at the time, he wasn't supposed to consummate the marriage until she had her first period. She had her first period, supposedly, at age 9. The nutrition was not that good living in the desert back then so it's doubtful she got her period at age 9. Now, here is a 53-year-

116

old man having sex with a 9-year-old girl. Muslims tell this story as if it's nothing. I almost defend Muhammad on this point, and I also defend slave owners in that I share with students that we have this bad habit of judging people in the past based upon the current social norms. People who owned slaves did not think they were doing anything bad. The conversation is much more nuanced than the students are claiming. We used to have children working in factories, and we now judge the people who used to let their children work in factories as evil people. I have told my classes that what Muhammad was doing at the time 1400 years ago was probably not perceived as something wrong. Of course, today that would be child sexual abuse. There are people who are not as dispassionate in this treatment of Muhammad's conduct as I am, and rather call him a pedophile, but I do not do this. Instead, I explained to the students that his conduct at the time may not have been judged as bad."  When asked if he referred to Muhammed as a pedophile, the Respondent replied, "Well, I've already explained that. My position is that he was consistent with his culture at the time. However, by today's standards, in our culture, he would be viewed as a pedophile, except maybe not so much in Saudi Arabia."

OIE's review of the 2020 Spring Cross Cultural recordings revealed that the Respondent stated the following with regard to Muhammad: "Now, there are some strange things about Muhammad **in light of his culture during his time**. One thing that was strange about him was he got married at the age of 25… the typical person during that time and in that location would get married at 13 or 14 or 15… if that weren't strange enough, he married to a woman who was…widowed and… 40 years of age… I'm telling you from different angles, there aren't many 25-year-old men anywhere in the world, even today, who would like to be involved in a romantic relationship with a 40-year-old woman. I'm not saying it never exists, but to go forward with a marriage like that, that was strange, but especially strange during his time." In the *Arabid Diaspora* recording reviewed by OIE, the Respondent referred to Muhammad's marriage to a 40-year-old woman as being odd and said, "Why is that odd? Because there aren't many men who want to be married to an old hag." In none of the other recordings reviewed by OIE was there a reference by the Respondent that Muhammad was a pedophile or child rapist.  In the *Arabid Diaspora* recording reviewed by OIE, the Respondent discussed the sources he relies on with regard to Muslims wherein he referenced that he ignores information from those that hate Muslims and refer to Muhammad as a pedophile.  The Respondent did not himself refer to Muhammad as a pedophile during this discussion. Also, of the 31 students from the Spring Cross Cultural Psychology course, Witness 73 and Witness 64 were the only students to have made an allegation of this nature and they alleged different terms (one said "child rapist" and the other said "pedophile").  Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that Muhammed was a "pedophile" or "child rapist".

*Race/Ethnicity-Based Comments*

**53. Whether the Respondent told students that he hated Black people.**

An anonymous reporter alleged that on the first day of class, the Respondent said that he hated Black people.  In response to this allegation, the Respondent stated, "Absolutely not. I have never made that statement." None of the individuals that OIE communicated with as part of this investigation alleged that the Respondent stated that he hated Black people.  OIE's review of

the class recordings also did not reveal the Respondent having made a statement of this nature. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that he hated Black people.

**54. Whether the Respondent told students about "people as primates" and said, "he [the primate] had the personality of a person of color" and named the primate "Leroy".**

Witness 53, who was a student in the Respondent's 2019 Summer Sexual Behavior course, alleged that the Respondent talked about "people as primates" and said, "he [the primate] had the personality of a person of color" and named the primate "Leroy". When asked if he made a statement of this nature, the Respondent replied, "Never, I have no idea what this is." Aside from Witness 53, none of the individuals that OIE communicated with as part of this investigation alleged that the Respondent made a statement of this nature.

OIE's review of the class recordings also did not reveal the Respondent having made a statement of this nature. Rather, the closest reference to this was a discussion during the Respondent's 2019 Summer Cross Cultural Psychology course wherein the Respondent discussed how isolated humans were during the 1800s and the origins of religion – namely, humans' awareness of death. During this discussion, the Respondent stated, "We supposedly share, and I can't defend this, we share 95 to 98% of our genes with Chimpanzees, which is pretty incredible. But we have enough distinction in our genes to make us different. How are we different from our closest relatives? Well, Chimpanzees … and other types of primates don't do anything other than eat, drink, screw – I am sorry – have sex and fight. That's pretty much all they do. They do not ever make plans for the future or travel any place else unless they are following a food source. I mean, what are the odds that chimpanzees sitting on a tree chatting with each other saying, **hey Leroy**, remember last year when we almost fell off that tree and an alligator bit you on the ass and they were laughing about that. The odds are they only think about the past. Maybe I am wrong, but they did not plan for anything. You and I plan, you planned to come on this trip to Peru, and not planning to go somewhere else. There is no evidence that they (chimps) plan for anything – just eat, drink, have sex and fight." There was no reference in this recording of the Respondent saying that a primate had the personality of a person of color.

Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent talked about people as primates and said that the primate, who he named Leroy, had the personality of a person of color.

**55. Whether, during class, the Respondent used negative race-based terms during lectures, such as "coon", "porch monkey" and "wetback".**

Witness 47, who submitted JKRT Report #00047707, participated in an OIE interview and was a student in the Respondent's 2020 Spring Cross Cultural Psychology course, alleged that the Respondent "attempted to start arguments in class by deliberately making people uncomfortable, such as in the use of listing off racial slurs for shock value, specifically including 'coon' and 'porch monkey'". Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent said that White people gave Blacks the nickname "porch monkey"

because it made sense in that Blacks were being lazy and hanging out on the porch. Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent said that people called him a "wet back" so "why can't I call them a 'porch monkey'".

The Respondent denied all these allegations. When asked if there was any context for use of these terms in his courses, the Respondent replied, "It would be a rare event for this term to ever come up in my classes. If it were to come up, it would be me pointing out that other African Americans who don't like the views of conservative African Americans use the terms 'porch monkey', 'porch n-----', or 'coon'. You gave an example in the letter, but no one has ever called me a 'wetback,' and I've never called others 'coon' or made the alleged statement that people call me a 'wetback so why can't I call them a porch monkey'".

Witness 1, who was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, stated that the use of the term "porch monkey" sounded familiar as having been used by the Respondent, but in the context of explaining how some people use the term. Similarly, Witness 41, who was a student in the Respondent's 2019 Fall Cross Cultural Psychology course, stated that the Respondent did not use terms like "coon" or "porch monkey".

OIE's review of the 2019 Summer Cross Cultural Psychology recordings (*see Recording – 12*), demonstrated that while discussing survey data related to opinions about why Black individuals are not successful in the U.S., the Respondent stated that the surveyors "asked the question of Whites, Blacks and Hispanics about Blacks, the question is about Blacks, okay? They ask Whites, Hispanics and Blacks about Blacks. If a Black person in the United States is not successful, do you think that it is due to discrimination or their own personal shortcomings? And these are the percentages of the ethnic groups that think if you are Black in the United States and you are not successful, it is because of you and your own problems, not because of racial discrimination.  (Pause) So, we have kind of a bi-polar group of African Americans in the United States.  And, just so you know, the African American who seems to be really bounced upon in the United States by Blacks is the conservative African American. The conservative African American, they have nasty names for them, 'coon, porch monkey, Uncle Tom.'"

None of the other recordings reviewed by OIE had an incident of the Respondent using the terms "coon", "porch monkey" or "wetback".  Also, with the exception of Witness 47 and Witness 95 (who were in different courses), no other students corroborated the use of these terms outside the context of the Respondent describing how these terms are used by some Black individuals against other Black individuals.  Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent used the term "wetback" during his classes, including that he said that people called him a "wet back" so "why can't I call them a 'porch monkey'".  Although the record supports that the Respondent used the terms "coon" and "porch monkey" during his Cross Cultural Psychology courses, OIE finds that they were used in the context of the Respondent discussing data related to opinions about the cause of some Black individuals' lack of success in the U.S. and how some in the Black community use those terms in reference to other Black individuals.

**56. Whether the Respondent stated that Black and Native American people are inferior to other races because they did not have cerebral cortices.**

The anonymous reporter in IL #805, who allegedly was a student in the Respondent's 2017 Fall Cross Cultural Psychology course but withdrew, alleged that the Respondent "claimed that Black and Native American people did not have cerebral cortices and were therefore inferior to White people. This is blatantly false as you can see the cerebral cortex of a Black or Native American person on a brain scan. Claiming that certain 'inferior' races are missing a fundamental part of the brain - a claim that's easily disproved- is incredibly racist and ignorant." Witness 88, who was a student in this same course, alleged that the Respondent made this statement about cerebral cortices.  Similarly, Witness 95 alleged that during the 2018 Fall General Psychology course, while the Respondent talked about the evolution of homo sapiens, he stated that Blacks and Native Americans did not have cerebral cortices, Blacks and Native Americans were inferior to White Europeans, being White was superior because they had cerebral cortices, and Black people and Native Americans were inferior from an evolutionary standpoint. The Respondent denied these allegations and stated, "I have never used the words inferior or superior in my classes when discussing these issues, and I never talked to my students about cerebral cortices."

When reviewing the recordings available to OIE, only one instance was identified wherein the Respondent made a reference to a cerebral cortex.  Specifically, during the 2019 Summer Cross Cultural Psychology course (*see Recordings – 6*), the Respondent discussed how isolated humans were during the 1800s and the origins of religion – namely, humans' awareness of death.  During this lecture, he stated, "Our cerebral cortex is very distinct from other animals' cortices.  It is much more complicated and much more complex.  That allowed us to do things that all the other animals can't do."  He then discussed how humans make plans in their life in a way that other species do not, and how humans' closest relative, the chimpanzee, only plans "to eat, drink, have sex and fight. So, one thing that distinguishes us from our closest relative is our cerebral cortex.  It allows us to be aware that we exist.  That we have a past." Witness 95 and the anonymous reporter in IL #805 were the only individuals out of the more than 300 individuals that OIE spoke with that alleged that the Respondent told students that Black and Native American people were inferior to other races because they did not have cerebral cortices. Although the Respondent's statement that he "never talked to my students about cerebral cortices" is clearly inconsistent with the recordings, the recordings demonstrated that the context for the discussion was humans' awareness of death and thus, the possible origins of religion, rather than in the context of racial inferiority. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that Black and Native American people were inferior to other races because they did not have cerebral cortices.

**57. Whether, during class, the Respondent correlated penis size with race, including that he told students that "Asians were superior but Black men have bigger penises"; while discussing circumcision in class, told students, "Good for Black guys that they have a bigger penis"; told students about research that found, on average, that the claim that Black males have larger penises than other races was valid; told students, "You (in reference to Black people) may not have everything, but at least you have bigger penises", hopped off the stage, approached some Black male students, and high fived them; told students, "Black men have the biggest dicks, followed by Whites and Latinos who are similar in size, and Asians have the smallest dicks"; and, asked the class to identify "good stereotypes" that they know about Black people and when someone raised their hand and said, "they have big man parts", he responded "that was the one I was looking for".**

Witness 99, who submitted a Student Google Form, alleged that during the Respondent's 2012 Fall General Psychology course, he told students "you (black people) may not have everything, but at least you have bigger penises". He then hopped off the stage, found some black male students and high fived them. Witness 88 alleged that during his 2017 Fall Cross Cultural Psychology course, the Respondent told students that Asians were superior but Black men having bigger penises. Also, while discussing circumcision, he said, "Good for Black guys that they have a bigger penis". Witness 83 stated that the Respondent made a similar comment about Black men having bigger penises during his 2017 Fall Sexual Behavior course.

Witness 117 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent told the class that African Americans had the largest penises, followed by Hispanics and Caucasians, and that Asians had the smallest penises. Witness 117 further alleged that this discussion had nothing to do with class at the time and the Respondent instead referenced that he taught a sexuality class that they could take to learn more about penis size. Witness 73 alleged that the Respondent told students in this same course that "Black men have the biggest dicks", followed by "Whites and Latinos who are similar in size", and "Asians have the smallest dicks". Witness 56 stated that during this same course, the Respondent asked the class to identify "good stereo types" that we know about Black people. When one person raised their hand and said, "They are good at sports", the Respondent replied that this was not the one he was looking for. Someone else raised their hand and said, "They have big man parts". The Respondent replied, "That was the one I was looking for." He allegedly then stated that this stereotype was true and commented that Black males have the largest penises compared to other races. Similarly, Witness 119, who was enrolled in the Respondent's 2010 Fall Sexual Behavior course and 2013 Spring Cross Cultural Psychology course, alleged that the Respondent talked about research that found, on average, that the claim that Black males have larger penises than other races was valid. Witness 45 alleged that the Respondent told an Asian student that he "should be happy there are certain stereotypes. Don't we all wish we were part of the group that is stereotyped as well-endowed." The Respondent denied ever saying this.

When asked during his OIE interview whether he had made reference to the size of penises as correlated to race during his classes, the Respondent stated, "As a general rule, I never have, but it might be the case that I have said that on average, different ethnic groups differ on all sorts of human qualities and there may have been one semester that I shared a study that said that

on average there are differences in penis size by ethnicity. It would be among other examples of human qualities such as height, running ability, etc. I am not averse to talking about sex. One of my missions in teaching human sexuality is to get students to understand sexuality as a normal part of life. I generally use professional terms."  The Respondent further stated that with regard to making a statement that Black men have bigger penises, "I don't think it's part of my normal lecture but some student might have asked me that question, and I would tell them that there are different studies, including one from a condom company that recruited people from various backgrounds to make sure their condoms were appropriately sized and they incidentally discovered that African Americans have larger penises than other groups. I was not trying to get a reaction from people. It was not gratuitously provocative."

The Respondent specifically denied that he stated that Asians were superior but Black men have bigger penises. The Respondent indicated, "I never use the word 'superior' when comparing groups. Superior is a very judgmental term. Whatever behavior specifically I'm discussing, I talk about statistics or how they (Asians) get higher points. I never use the terms 'superior,' 'inferior,' 'worse,' or 'better'". The Respondent also denied that, while discussing circumcision in class, he said, "Good for Black guys that they have a bigger penis." The Respondent indicated that this allegation was a "complete fabrication."  As to the allegation that he talked about research that found, on average, that the claim that Black males have larger penises than other races was valid, the Respondent replied, "I don't want to misrepresent myself. It might have come up. I've taught over 30,000 students over 22 years. I can assure you it was in the context of the conversation, and that I used appropriate language. I don't try to be provocative just to get a crowd riled up, but I am controversial and willing to discuss topics other professors are not. I use data and I use professional terms."

Further, with regard to the allegation the Respondent said "you (in reference to Black people) may not have everything, but at least you have bigger penises", hopped off the stage, approached some Black male students and high fived them, the Respondent stated that the statement attributed to him ("you may not have everything, but at least you have bigger penises") was a "total fabrication".  As to the remainder of this allegation, the Respondent stated that when he covered how people varied in class, he "mentioned at the end 'even in penis size.' I did, during a summer course, walk over and high five an African American student after making this reference about penis size. He laughed and the whole class laughed."  As to the allegation that Respondent told students that "Black men have the biggest dicks, followed by Whites and Latinos who are similar in size, and Asians have the smallest dicks," the Respondent stated, "This is a complete fabrication. I don't address this in cross-cultural. I don't address this in general, but it comes up occasionally. No one alleged that in my class comments. I did not make comments about the sizes of ethnic groups 'dicks'".  When asked about the allegation that he asked students to identify stereotypes, the Respondent replied, "I'm talking about stereotypes. I'm letting them know that there are positive stereotypes, not just negative stereotypes. I asked them to provide examples of positive stereotypes. I don't ask about any group specifically, I let them tell me. They will offer that Black people are better athletes, and Asians are smart at math. I'm sure I said at least on one occasion that there are other positive stereotypes about Blacks, and they all snicker and they know exactly what I'm talking about, but I never say it (Black men having bigger penises). My opinion is measured. It's not grotesque like it's being portrayed. This

is a distortion: I say that there is a grain of truth to all stereotypes, both negative and positive. I don't start focusing on the Black penis."

In addition to speaking with the Respondent and witnesses, OIE reviewed course recordings. In one recording during the 2019 Summer course, the Respondent told students that stereotypes are very hard to avoid and that all of us, no matter what group we belong to, have stereotypes.  He further stated that, in the U.S., we are taught that stereotypes are bad but they are not.  He then asked the class to provide examples of stereotypes. The students appeared to be hesitant to respond so the Respondent said, "We are big boys and girls," asked what were negative stereotypes about Americans, and suggested that American are rude and materialistic. He told the class to not censor their ideas and asked for positive stereotypes.  He then asked for a positive stereotype about Asians and a student responded that they are good at math. The Respondent then asked what a popular stereotype about black men was, and a student responded with "sexual performance". The Respondent then said, "Someone said it—they have large penises, right?" The Respondent then moved on to discussing neutral stereotypes.

Although OIE did not have audio recordings related to the five identified courses (2010 Fall Sexual Behavior or 2013 Spring Cross Cultural Psychology, 2012 Fall General Psychology, 2017 Fall Cross Cultural Psychology, 2017 Fall Sexual Behavior, and 2019 Spring Cross Cultural Psychology) to review for corroboration, it is important to note the consistency of the allegation by individuals in different courses at different timeframes, as well as the detailed nature of the allegations. These factors both lend credibility to the allegations. Equally important, Witness 117 and Witness 73 corroborated that this kind of statement was made during the 2019 Spring Cross Cultural Psychology course. Furthermore, the Respondent acknowledged that, on one occasion *during a Summer course*, he covered how people varied in class and mentioned "even in penis size", and then walked over and high fived a Black student. It also is important to note that Witness 119, Witness 99, Witness 88, Witness 83, Witness 117, and Witness 73 were never enrolled in one of the Respondent's *Summer courses*.  Accordingly, taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that during some of the Sexual Behavior, General Psychology and Cross Cultural Psychology courses, the Respondent told students that Black men have the biggest penises, followed by Whites and Hispanics, followed by Asians.  In addition, the record supports that on at least one occasion, the Respondent made reference to the difference in penis sizes and then high fived a Black male student.

## 58. Whether, during class, the Respondent told students that minorities should be thanking White men for creating a modern society for them because nothing important was ever invented by someone who was not White.

Witness 122 alleged that during the 2013 Fall General Psychology course, the Respondent told students that Black people should thank White people for our modern society. Similarly, an anonymous reporter alleged that during the 2015 Spring Cross Cultural Psychology course, the Respondent "informed the class that White people are the sole contributors to progress and that minority populations would still be 'uncivilized' if white colonizers didn't make the contributions they had, ignoring a myriad of human achievements originating outside of Europe. In his chapter about white people, he said that their Protestant work ethic made them

work too hard and caused anxiety, and didn't touch on pathologies like addiction, mental illness, and antisocial behaviors like the chapters for minorities did." *See Student Google Form – Anonymous*.

Witness 68, who submitted IL #851, similarly alleged that during the 2016 Fall Cross Cultural Psychology course, the Respondent said that "minorities should be thanking white men for creating a modern society for them." Witness 88 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent said that minorities should thank Whites for creating a modern society for them, we should have a White History Month to acknowledge these contributions, and Whites had created and made more than minorities. Witness 144, who also was a student in the 2017 Fall course, alleged that the Respondent stated that cultures other than White culture had problems, but because Whites had introduced technology and other inventions to the world, Whites represented a better culture. Witness 133 alleged that during the 2018 Fall General Psychology course, the Respondent said that minorities in general should thank Whites for paving the way for minorities. The anonymous reporter in IL #924/925 alleged that during the 2018 Spring Cross Cultural Psychology course, the Respondent told students "how everything valuable that has ever been made is all thanks to a white person."  A Black female student then raised her hand and "countered this (respectfully) to which he asked her to name one thing Black people have made that is beneficial to society. … The student could not name a specific person or invention but she began to talk about hair products that cater to Black hair, which are obviously important. But this was not a good enough response for the professor, and he essentially started laughing and said something along the lines of 'let me know when hair products are as important as planes'". Witness 103 also alleged that during this 2018 Spring course, the Respondent told students that "nothing important was ever invented by someone who wasn't White".  Similarly, Witness 81 alleged that during this same course, the Respondent stated that African Americans had not contributed to any life changing inventions or contributions in society. Witness 150 alleged that during the 2019 Fall Cross Cultural Psychology course, when discussing things invented by Blacks, the Respondent attributed them to White people and said that "many people think a Black person invented" that, "but really it was" this White person.

When asked whether he said that minorities should thank Whites for creating a modern society for them, the Respondent stated, "I've never said that. I think I overheard a Hispanic student say that when talking with a group of other people at one point in my class. I know how hard that comment would be to discuss with the class so I chose to ignore it."  When asked to respond to allegations that he stated that there should be a White History Month and Whites have created and made more than other ethnicities/races, the Respondent replied, "Here's a situation where I have covered some things that you alluded to but presented them vastly differently in class. During this part of my Cross Cultural Psychology class, I'm covering the paradoxes of Whites. I have shared with the students that one of the other paradoxes is the intellectual paradox. As a group, the majority of Whites are pretty uncultured and unsophisticated. About 70% of Whites don't own a passport. Despite the U.S. making it so easy to attend college compared to other countries, including community colleges for people who aren't quite ready for real college, grants for low income, etc. - despite all that, the majority of Whites do not graduate from a university. Some Whites advocate for English-only as if they don't understand that people who are truly cultured speak more than one language. Nevertheless, from that particular group

124

(Whites) have come some of the world's most creative inventors who invented all of the most innovative things in the world. I'm not saying minorities never invented anything. I show them a PowerPoint of inventions by White Americans or White Europeans. I have never said that minorities owe White people anything, or that they should thank them." The Respondent denied saying that Whites were a "better culture."

When asked if he told students that minorities never invented anything that impacted society, the Respondent replied, "No, I have said that non-whites have invented things on a smaller scale or improved upon things that were already invented. However, the major inventions that changed the world the way we know it were all invented by white individuals, and those are facts - computers, cell phone, planes, trains, automobiles. I have told my students that the fact that we don't have a White History Month is because it makes people feel bad. I'm sure I've said at some point that if every other group can have an ethnic student organization that exists to celebrate their culture and race, Whites ought to have that same right as well. I wouldn't put it past me, but I don't recall saying there should be a White History Month."

Turning to the documentary evidence, on March 18, 2018, the Respondent sent an announcement to students wherein he stated the following: I was covering some "paradoxes" about Whites and when I started discussing the "intellectual paradox" of Whites, I informed you that, on one hand, the majority of Whites are rather unsophisticated intellectually speaking (the vast majority have not graduated from a university, believe in "Satan," blah, blah, blah). And, on the other hand, I told you that despite that most Whites are quite mundane intellectually, from that group the world's brightest and most creative inventors have emerged to date. As I told you, **every single modern invention that changed life as we know it has been invented by a White person**." *See Announcement – March 18, 2018 Email Re White Accomplishments*. Also, in Respondent's Power Point presentation related to Whites, slide 63 appears to list the inventions the Respondent referred to as inventions by Whites that were major inventions that changed the world. *See Power Point White American*. Therein, the Respondent listed the train, refrigerator, camera, computer, telephone, cell phone, automobile, radio, air conditioner, planes, television, communication satellites, and the world wide web (internet).

Turning to the recordings (*see Recordings – 2019 Summer – 15*), as set forth in Section VI (Material Facts Not in Dispute) above, during the Respondent's 2019 Summer course, the Respondent referenced Whites in the U.S. not knowing the identity of the Prime Minister of England and that there was a White paradox. He then stated that from this group of people (Whites), "the world encountered the most creative and cutting-edge inventions – far more than any other group on the planet." He then stated that people in the U.S. actively try to suppress this information and, apparently in response to reactions students were having, said, "just relax, just relax, this is a university and you can talk about anything". He then discussed the progress humans had made over the last two hundred years, such as with regard to the ability to travel. He then referred to the refrigerator and how prior to this invention, humans had to go out and find fresh meat every day. He then told the class that he suspected that some students in the class believed that an African American invented the refrigerator – specifically, Frederick Jones. The Respondent then said, "First off he's not that black, he's more White than Black." The Respondent then explained that Mr. Jones did not invent the refrigerator, but instead made the refrigerator (which had already been invented by a White person) portable and "kudos to him"

because people could now transport food from one place to another, but he shouldn't get credit for inventing the refrigerator. He then walked through the items listed on his slide as having been invented by White people (camera, telephone, cellphone, and automobile) and said that these were "incredible inventions that changed our life the way we know it". He then discussed the inventions of planes, the television, satellites and the internet, and stated that these inventions were found in other countries, and that "**White culture brought all of this to the rest of the world**". He then said to the students, "I told you this is suppressed." Later in the lecture, the Respondent stated, "We don't have a White month heritage", but we do have months to celebrate the contributions of Blacks, Hispanics and Asians. He then said, "And it's because **if you compare what Whites have contributed to the world compared to all the non-Whites, it's embarrassing, it's embarrassing the discrepancy**".

In another lecture during the 2019 Summer course (*see Recordings – 2019 – 9*), the Respondent told students that they will find almost all of the literature on racism to be about White racism, which created the image that only Whites were prejudiced. A student asked whether the focus was on White racism because people in power, like Congress, were "mainly White". The Respondent replied, "No, there are people in the U.S. who that fall under different categories, liberal, progressive, left people, Democrats, who feel guilty over European conquest and **the fact that the whole modern world has been created by Whites**".

Taking the record as a whole into consideration, including the consistency of the allegations in multiple reports over different timeframes from students in different courses, the corroboration of multiple students in the same course (such as 2018 Spring Cross Cultural Psychology), the corroboration of the statements as set forth in the Respondent's March 18, 2018 email and the audio recordings as set forth above, the lack of students' motivation to lie and the Respondent's motivation to do so, and the Respondent's inconsistencies as noted in the *Consistency* section above, OIE finds that there is sufficient evidence to support finding that, in the context of discussing the paradoxes of Whites, the Respondent told his Cross Cultural Psychology students that, as a group, the majority of Whites are pretty uncultured, unsophisticated and fail to graduate from universities despite resources available to them to do so. He further told students that, nevertheless, the world's most creative and cutting-edge inventions were from Whites, every single modern invention that changed life as we know it has been invented by a White person, the whole modern world was created by Whites, modern inventions were invented by Whites "far more than any other group on the planet", White culture brought all of this (planes, the television, satellites and the internet) to the rest of the world, and that the reason why there is not a White heritage month like there is for other races and ethnicities is because when comparing Whites' contributions to the world with non-Whites' contributions to the word, it would be an embarrassing discrepancy. During this discussion, he showed students a Power Point slide listing inventions by White Americans or White Europeans. For the reasons set forth above, OIE further finds that there is sufficient evidence to support finding that, during these discussions, the Respondent told students that minorities should be thanking Whites for creating a modern society.

OIE would note that this lecture failed to acknowledge numerous significant contributions by non-Whites. For instance, it failed to acknowledge Black inventors, including but not limited to Mark Dean (who was a Black male, worked as a chief engineer for IBM and

126

was part of a 12-person team that developed the first IBM PC, the color monitor, the first gigahertz processor, and the technology that enables printers, keyboards, and mice to communicate with computers), Mary Van Brittan Brown (who was a Black female and devised an early home security unit), James West (who was a Black male and invented the foil electret microphone, which are included on most telephones, hearing aids, tape recorders, and baby monitors), Garrett Morgan (who was a Black male and expanded on the current traffic light by adding a "yield" component), Granville Morgan (who was a Black male and invented the induction telegraph system, which allowed traveling trains to communicate with one another while also allowing dispatchers to locate them), Charles Richard Drew (who was a Black male and has been dubbed "the Father of the Blood Bank" as his research led to the effective long-term preservation of blood plasma), and, Shirley Jackson (who is a Black female and whose telecommunications research led to products such as the touch-tone phone, portable fax, fiber optic cables, and caller ID).

**59. Whether the Respondent stated that affirmative action constituted racism against White individuals and constituted "Black privilege".**

Witness 96, who submitted IL #783, alleged that during the 2005 Fall General Psychology course, the Respondent told students that affirmative action was a form of racism against White people. Witness 88 alleged that he made a similar statement during the 2017 Fall Cross Cultural Psychology course.  Witness 103 alleged that during the 2018 Spring Cross Cultural course, the Respondent said that White people were oppressed and he did not support affirmative action programs. Witness 40, Witness 111, Witness 92, Witness 140, Witness 144, Witness 52 and Witness 54 alleged that the Respondent told students in the 2017 and 2018 Spring General Psychology course, as well as the 2018 Fall, 2019 Spring and 2020 Spring Cross Cultural Psychology courses, that affirmative action was "Black privilege".  Witness 115 alleged that during the 2019 Spring General Psychology course, the Respondent said that affirmative action was "Black privilege", minorities were abusing the privilege to get into college, and Whites were being shamed and were now the minority. Witness 125 alleged that during the 2019 Summer Cross Cultural Psychology course, the Respondent gave his opinion that Martin Luther King, Jr. had "Black privilege" that protected him from ethical scrutiny. The anonymous reporter in IL #827, who allegedly was a student in the Respondent's 2019 Fall Personality Theory and Research course, similarly alleged that the Respondent told students that "Black privilege is a thing".

When asked to respond to these allegations, the Respondent stated, "If someone asked me whether affirmative action was racism against Whites, I would say yes, but this isn't part of my regular lecture. … The students can express their views, and I can express my displeasure on affirmative action. [As to use of the term 'Black privilege',] I've only done that in my Twitter account, not in class, but I'm also not opposed to saying that."

Turning to the documentary evidence, on July 15, 2019, the Respondent sent an announcement to students in his 2019 Summer Cross Cultural Psychology course, which stated, in part, "I promise you (although I can't prove this): If MLK, Jr., were not black, the social justice warriors who are influenced by the "me-too" movement would be throwing him under the bus. But…**black privilege** protects him.  Political correctness at its best." *See Announcement,*

127

*July 15, 2019 Re Judging Past with Contemporary Standards & Black Privilege Reference.*
Taking the record as a whole into consideration, including the consistency of allegations among multiple students across multiple semesters, the documentary evidence contradicting the Respondent's denial of using the term "Black privilege" in his classes, and the Respondent's agreement that he agreed with the nature of the comment regarding affirmative action, OIE finds that there is sufficient evidence to support finding that the Respondent repeatedly told students in his General Psychology and Cross Cultural Psychology courses that affirmative action constituted racism against White individuals and constituted "Black privilege".

**60. Whether, during class, the Respondent told students that people of color tended to not perform as well in math or standardized testing as Whites, told students that Whites were more educated than Blacks, and questioned how diversity efforts could make UCF stronger if we were inviting students in who didn't do well on math tests.**

Witness 82 alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent said that White people were more educated than Black people. Witness 111 alleged that on the first day of class in the 2017 Fall General Psychology course, the Respondent stated that Whites were more educated than Blacks and that his class "would not be self-esteem building and that most students do not usually graduate from college, especially not African Americans". Witness 133 alleged that during the 2018 Fall General Psychology course, the Respondent stated that Asians were smarter than minorities (Blacks) because they were more educated. Witness 95 alleged that, during this same course, the Respondent stated that all Asians were smart, and that Whites were more educated than Black people who were also traditionally poorer than Whites. Witness 92 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent stated that Whites were more educated than Black people and Black people will not stay in college. Witness 81 alleged that during the 2018 Spring Cross Cultural Psychology course, the Respondent sent the class a copy of a letter to John McWhorter about African Americans being anti-intellectuals and that not being related to slavery, Jim Crow laws and colonialism. Witness 53 alleged that during the 2019 Fall Cross Cultural Psychology course, the Respondent told students that colleges should just give African Americans and Hispanics a degree if they're going to let them in because they are not educated. Similarly, Witness 73 alleged that during the 2019 Spring Cross Cultural Psychology course, while discussing affirmative action, the Respondent told students that people of color tended to not perform as well in math or standardized testing, and questioned how diversity efforts could make UCF stronger if we were inviting students in who didn't do well on math tests.

When asked to respond to these allegations, the Respondent replied, "They (those making this allegation) have taken something I've said and added to it things I haven't said. In my Cross Cultural Psychology classes, I have a lecture that I tell the students is a tough lecture, which is titled 'How do we know it's racism?' I put on the screen … charges that Black kids are referred more for discipline than White kids, expelled more than White kids, police shoot more Blacks than Whites, and three or four other claims that people think reflect systemic racism. I explain to the students that unless you do a study on any one of these issues, you can't know for sure that racism explains these differential outcomes. I then walk the students through some of the examples. For instance, if I wanted to do a study to determine if racial discrimination is happening in public schools, we could look at whether Black kids are referred to the office more

than White kids. I then tell them how I would do that. I would find what constitutes a misbehavior, then find a White grad student and a Black grad student so there was no bias, and then train them to look for behaviors according to the handbook that constitute a violation. I would send them to a classroom, have them make note of the students' behavior, the students' race, and whether or not the student was sent to the office. They'd bring me the data, and I'd subject the data to interrater reliability to ensure they are in agreement and that the observations are not junk data. If the two judges are in agreement, then I put on the screen a graph that shows one bar for Blacks and one for Whites. If the reality is what they are looking at, that the two bars are equal and both Black and White students commit the same number of behavior infractions, but Blacks are referred more than Whites, then there is evidence of racial discrimination. If Blacks are actually misbehaving more than Whites, then this is just reflecting the reality of the situation. I explain to the students that unless you conduct a study like I just described, you can't just look at a discrepant outcome and assume it was discrimination."

When asked again whether he asserted that people of color do not perform well on math or standardized tests, the Respondent replied, "I have told my students that you can't just look at a discrepant outcome and assume it's due to racial malfeasance. I show them data from the National Council on Education and the College Board and show them the average scores on math and reading by race. On average, I tell them as they look at the data, I want them to know there are Black people who get PhDs in math and Asians who can't do math at all. However, on average, on verbal and math tests, Asians score highest, followed by Whites, followed by Hispanics, followed by African Americans. I showed the student that on high school exit exams and SATs, the pattern remains the same. You need to understand that discrepant outcomes are tied to performance in school. We all talk about the need to diversify STEM fields, but this data is the reason why there are less Blacks in STEM fields because, on average, from day one African Americans on average are underperforming in reading skills. I have told the students don't always assume a discrepant outcome is due to race. Look at the NBA - no one says this reflects Black racism or Black privilege. Just because you observe a disparate outcome, there is an assumption in this country that there is racial malfeasance, but unless you do a study you don't know what is causing that disparity. One of my big missions is to get them to understand that evidence matters, and we should be trying to ground our assertions in evidence not feelings. That was the whole message to the students about people of color's performance in math and standardized tests." As to the allegations that he said Asians were smarter than Blacks, the Respondent stated, "I never used the word 'smart' or 'smarter'. That's a value judgment. I used the term 'more educated'."

When asked to respond to the allegation that he told students that White people were more educated than Black people, the Respondent stated, "when I give that lecture and I look at stats, throughout my whole Cross-Cultural class, when I'm describing groups, I put on the screen for every group I'm covering the average years of education for all those groups. I bold the group that I am talking about at that time. It's the same data reordered depending on which group I'm covering, the latest educational statistics for Asians, Whites, Hispanics, and Blacks. It's just a descriptive statistic. I think the "graduated from college" statistic is the one I cover. The way I am alleged to say it out of the blue sounds derogatory. Again, if you look at my slides, for every group I cover, I get into descriptive information from a variety of sources, such as annual incomes, and put them all up together. It's the same data for every group. When I cover

Hispanics, I cover a slide that shows what their annual income is, and what the annual income is for Blacks, Whites, and Asians. It's the same data." When asked about the allegation that he told students that Whites were more educated than Black people and Black people will not stay in college, the Respondent stated, "When I'm covering that tough lecture in my class, I mentioned a bunch of facts, including that on average, African Americans drop out of high school more so than Whites, on average they attend college less than Whites, on average have lower GPAs than Whites, and on average drop out of college more than Whites. These are the facts shared in my classes."

With regard to the McWhorter letter allegations, the Respondent stated, "I don't have any letter from John McWhorter - he is a brilliant man who wrote the book *Losing the Race*. He makes an argument that there is a victim mentality that holds Black people back. He also argues that there is an anti-intellectualism among Black Americans. There is a third assumption which is that they are special. My students were assigned to read that book, but I don't share a letter with them." With regard to the allegation that he said that colleges should just give African Americans and Hispanics a degree if they're going to let them in because they are not educated, the Respondent stated, "No, I deny saying this to any of my classes. However, in my book *White Shaming*, I'm quoting some administrators from one or more universities who stated that the reason they want to get rid of the SAT or ACT is to make it easier for minorities to get into college. In my *White Shaming* book, I said something along the lines of, why not just avoid the whole hassle of college and just give them degrees when they apply and put sarcasm after this statement in parentheses.

Turning to the documentary evidence, OIE's review of the *White Shaming* book revealed the following statements by Respondent:  "Increasingly, universities are devising clever ways to increase their enrollments of African-Americans and Hispanics without the hassle of demanding more scholastic dedication from such students to make themselves more competitive for admission. Lowering admission standards for African-American and Hispanic applicants is the norm at competitive institutions and is rationalized as necessary for a diverse student body. Other universities have given up and now have eliminated entry tests such as the SAT. A report on the University of Chicago after it eliminated the SAT and ACT stated, 'It continues a years long effort by the university to make it easier for first-generation, low income and minority students to apply and get into the school.' Really? Make it easier for minorities to get into college? How patronizing. I ask, tongue-in-cheek, why not skip that whole college hassle and just mail minorities a university degree whenever they apply for admission?"

In addition, OIE received a copy of the Respondent's March 18, 2018 announcement to his Cross Cultural students wherein he stated, "I also hope you've been reading John McWhorter's book, 'Losing the Race: Self-Sabotage in Black America.' I've communicated with him a few times (he responded once)(he's a big fish at Columbia University; I'm a small fish at UCF…:( I've attachment my latest communication with him that I thought I'd share with you."  In his attached letter, the Respondent stated, "At the risk of possibly offending you (which is not my intent), I disagree with one point you made in the book, where you said you did not blame African Americans for being 'anti-intellectual' because their anti-intellectualism was related to having been deprived an education during the slavery years here in the U.S. I—like you—know very well, that there are many African Americans (and Africans) who do not fit that

description, so as I say what I'm about to say, please know I'm fully aware of the great variation among Black people (i.e., I'm not stereotyping Africans or African Americans). That said, as someone who has been studying culture for over three decades, I assure you—despite beliefs that are popular to espouse in the U.S., -- not all cultures value science and education equally."  The letter then referenced practices in Africa and Haiti, such as putting curses on others, voo-doo and treatment of albino children.  Therein, the Respondent stated, "Sub-Saharan Africans and Haitians, on average, are very 'anti-intellectual.'"  Following this paragraph, the Respondent stated, "The Black African culture has an anti-science (or anti-intellectual) history that is independent of colonialism, slavery, Jim Crow laws, etc." *See Announcement – March 18, 2018 Letter to Dr. John McWhorter & Attachment.*

Turning to OIE's review of the recordings (*see Recordings – 2019 Summer – 16*), during the Respondent's 2019 Summer course, he discussed statistics related to grades and success in college and emphasized that the data represented groups' performance, on average, and that every group had variation.  Therein, the Respondent referred to Black people holding less college degrees than White people; on average, in K-12 schools, African American students received lower grades than White students; on average, Black students graduated from high school at a lower rate; on average, Blacks attend college less than Whites; on average, in college, Black students had a lower GPA; and, on average, Blacks fail out of college more than Whites.  He further told the students that, on average, in terms of disciplines and areas of study, African American students chose areas of study that were less rigorous than those chosen by White students. The Respondent then advised students that Blacks end up earning less money than Whites.  At this point, he reminded students to "take a deep breath" and offered to give them "a hug after this."  The Respondent continued and said that, on average, Whites earn less than Asians; on average, in K- 12 schools, Whites have lower GPAs than Asians; Whites graduated from high school less than Asians; Whites attended college less than Asians; in college, Whites had lower GPAs than Asians; and that Whites were more likely to gravitate towards softer majors than Asian students.  The Respondent further told the students to step into a computer science, physics, or biochemistry class at the senior level and "you will see a lot of Asians".  The Respondent then said, "I will do something I probably shouldn't do. I am going to pretend to speak for all White people. You don't hear White people running around saying this is Asian privilege and structural racism." Rather, "Whites accept that Asians are more dedicated to their studies than Whites".

The lecture continued with the Respondent mentioning standardized testing and the SAT, and that he had received training in that part of his doctoral research focused on the SAT and potential biases therein.  He also mentioned that he taught this issue at the graduate level for four years.  The Respondent referenced that some people say that the SAT is biased.  The Respondent told students that "just because you don't like the outcome of your group's results doesn't make it [the test] biased"; that metric studies have been performed to measure whether there is bias; and, the SAT is not biased against any group.  The Respondent continued and said that "the SAT is telling you where you are, at that point in your life, at math and reading". He then shared information related to how earnings and unemployment numbers were impacted based on the amount of education a person received. The Respondent then stated, "Instead of looking at the data that is based on education and based on a person's ability to do math and read well, people waste their time blaming White privilege". The Respondent continued and stated that the

"solution is to work with an individual, no matter what color they are".  The Respondent concluded with stating that "as long as they are barking up the wrong tree going after White privilege, things will not improve."

During another class related to the 2019 Summer course (*see Recordings – 2019 Summer – 12*), the Respondent stated, "It is my opinion, that I have already expressed to you before, that I think collectively that Black people in the United States experience collectively the most rejection from society overall.  And I am not saying, an African American who stays in school, does well in school and avoids committing crimes will have as good a life as you and I will have. There are tons of them who do that. We have Black police officers, we have Black professors, engineers, in every occupation you will find Black people."

Taking the record as a whole into consideration, including the detailed recording set forth above, OIE finds that there is sufficient evidence to support finding that during the Respondent's Cross Cultural Psychology courses, he shared statistical data about Blacks', Whites', and Asians' performance, on average, in high school and college, and a correlation between earnings and the amount of education individuals received.  Specifically, he shared data that, on average, Black people hold less college degrees than White people, Black students received lower grades than White students in K-12, Black students graduated from high school at a lower rate than White students, Blacks attended college less than Whites, Black students had a lower GPA than Whites in college, and Blacks failed out of college more than Whites.  He also stated that Black students, on average, chose areas of study that were less rigorous than White students.  He then shared statistical data that, on average, Whites had lower GPAs than Asians in K-12; Whites graduated from high school less than Asians, Whites attended college less than Asians, Whites had lower GPAs than Asians in college, and Whites were more likely to gravitate towards softer majors than Asian students.  During this lecture, the Respondent shared that, on average, Blacks earned less than Whites and Whites earned less than Asians. The Respondent concluded with despite the underperformance of Whites compared to Asians, society does not refer to this as "Asian privilege" and "Whites accept that Asians are more dedicated to their studies than" them.

Furthermore, taking the record as a whole into consideration, including the detailed recording set forth above, OIE further finds that there is sufficient evidence to support finding that during the Respondent's Cross Cultural Psychology course, he told students that the SAT was not biased against any racial or ethnic group and showed them data from the National Council on Education and the College Board of the average scores on math and reading by race. The Respondent explained that, on average, with regard to verbal and math tests, Asians scored highest, followed by Whites, followed by Hispanics, followed by Blacks. He also showed students' performance on high school exit exams and SATs where the pattern remained the same. He told students that they needed to understand that discrepant outcomes were tied to performance in school, and this data showed that the reason why there were less Blacks in STEM fields was because, from day one, Blacks, on average, were underperforming in reading skills. The Respondent concluded that, instead of looking at the data that was based on education and a person's ability to do math and read well, people were wasting their time blaming White privilege, which will not improve things, and that the solution was to work with an individual, "no matter what color they are".

With regard to the allegation that the Respondent questioned how diversity efforts could make UCF stronger if we were inviting students in who didn't do well on math tests, although no other students described this besides Witness 73 and OIE's review of the available recordings did not reveal that the Respondent made such a statement, the Respondent's book clearly made a statement to this effect. Accordingly, taking the record as a whole into consideration, including that the Respondent's book was required reading for some of his Cross Cultural Psychology courses, OIE finds that there is sufficient evidence that the Respondent made a comment of this nature to students.

Lastly, with regard to the allegation about the John McWhorter letter, the record established that on March 18, 2018, the Respondent provided his Cross Cultural Psychology students with a copy of his letter to John McWhorter wherein he stated that "Sub-Saharan Africans and Haitians, on average, are very 'anti-intellectual'" and that the "Black African culture has an anti-science (or anti-intellectual) history that is independent of colonialism, slavery, Jim Crow laws, etc."

**61. Whether, during class, the Respondent said that Black individuals who reference being oppressed were "making it up"; systematic racism wasn't real so "Black people should get over it"; Black people needed to "get over slavery"; Black individuals were fully responsible for their struggles, including being in poverty; and White privilege did not exist.**

With regard to racism in the U.S., the anonymous reporter in IL #785 alleged that the Respondent told students that if Blacks acted the same as Asian Americans with performing "best academically, having highest income, committing the lowest crime", systematic racism would not occur. Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent told students that Blacks had advantages and were given extra privileges in society, yet they created a self-narrative that they were disadvantaged. He further stated that racism was a myth and lie. The anonymous reporter in IL #813 alleged that the Respondent told students that minorities were inferior, believed that White people "do not cause the problems that African Americans and Hispanics go through", and White people had been "vaccinated" against racism. The anonymous reporter in IL #828 alleged that the Respondent said that "racism wasn't real anymore in the U.S., that it used to be, but not anymore and not for a long time (his words)". Witness 208 alleged (via email) that during the 2016 Fall Cross Cultural Psychology course, the Respondent said that Black people in America suffered problems of their own making and not as a result of 400 years of oppression. The anonymous reporter in IL #828, who allegedly was a student in the Respondent's 2017 Fall Cross Cultural Psychology course, similarly alleged that the Respondent told students that there was "no such thing as systemic racism" and "that the problems with the African-American community were solely due to their nature and that White Americans were just as disadvantaged as minorities". The anonymous reporter in IL #801, who allegedly was a student in one of the Respondent's 2017 Spring courses and withdrew from the class, alleged that the Respondent "made it seem as if the societal problems were created solely by that race instead of the systematic oppression that has been ongoing for centuries." Witness 111, who was enrolled in the 2017 Fall General Psychology course, alleged that the Respondent stated that Blacks can only blame themselves for living in poverty.

In addition, Witness 140, who submitted IL #871 and #874 and participated in an OIE interview, alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that "racism wasn't real" and "showed racist propaganda in class like videos of people saying how police brutality is deserved and violence against Black people is Black peoples fault." Witness 92 alleged that the Respondent made similar comments in this 2018 Fall course. Witness 140 further alleged that the Respondent stated in this course that "if minorities claim they can't get a job they are just being lazy – it's only a small amount of people who may discriminate against them", and claimed that students were "inflating racism". The anonymous reporter in IL #832, who allegedly was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, alleged that the Respondent told students that systematic racism was not "real" and "Black people should get over it." Witness 150 and Witness 159 (via email) alleged that during the 2019 Fall Cross Cultural Psychology course, the Respondent said that there was no racism and Black people just "need to get over it". Witness 54, who submitted IL #859 and participated in an OIE interview, alleged that during the 2020 Spring Cross Cultural Psychology course, the Respondent told students that there was no racism in the U.S.; the struggles that Black people faced were not the fault of White people; if you believed differently, then you were misguided, misinformed and brainwashed; and, our generation couldn't look at culture critically because we had been brainwashed by political correctness.

With regard to alleged statements about slavery, the anonymous reporter in IL #976 alleged that "on the topic of race, [the Respondent] told the class that Black people had to 'get over slavery'. It happened 400 years ago. …  His emphasis on the ideas that Black people need to 'catch up' with other groups and that is their own fault fails to acknowledge years of oppression, violence and systematic silencing of an entire people." Witness 88 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent stated that, with regard to racism, Black people "need to get over it" by now and they were wasting time still being upset over slavery and past discrimination. Witness 95 alleged that the Respondent made a similar statement during the 2018 Fall General Psychology course. Witness 117 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent stated that Blacks shouldn't bring up slavery like they are victims and that they choose their lifestyle.

With regard to alleged statements about White privilege, Witness 96, who submitted Integrity Line #783, alleged that during the 2005 Fall General Psychology course, the Respondent insisted that White privilege was made up. Witness 68, who submitted IL #851, alleged that during the 2016 Fall Cross Cultural Psychology course, the Respondent "spoke about how Black people are the problem with their own communities, and they can only blame themselves for living in poverty", as well as that "white privilege does not exist." Witness 144 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent stated, "If we have systematic racism and White privilege - why do so many people of color from around the world want to live here?"  Witness 40, who was enrolled in the 2018 Spring General Psychology course, recalled that the Respondent told students that White privilege did not exist.

With regard to students sharing their personal experiences of racism during class, students alleged that during the discussions regarding systemic racism and White privilege, the Respondent disregarded students described experiences of racism.  Specifically, the anonymous reporter in IL #796 alleged that the Respondent told students that Black people "who feel they

are oppressed are simply making it up. He challenged the class to prove him wrong. A student explained a situation when he was younger and a police officer followed him around the store at a distance as if to signal that they thought he was going to steal something. It was a store with several other people inside who were clearly not being followed. [The Respondent] condemned this as a misconstrued idea of what oppression is and said that he probably did something suspicious to prompt such an action." Another anonymous reporter alleged that at the end of the 2015 Spring Cross Cultural Psychology course, the Respondent asked students "to give examples of racism because he believed that systemic racism was a myth, and proceeded to condescend and invalidate the experiences of every person of color in the classroom, going so far as to suggest that unarmed Black men were getting shot not because of the police but because of some 'Black pathology' that made Black communities terrible places to live." Witness 107 alleged that during the 2018 Fall General Psychology course when a Black student discussed having experienced racism and oppression, the Respondent disagreed and said, "Only idiots still believe that propaganda from the liberal media".

When asked if he taught about systemic racism in his courses, the Respondent stated, "I have an opinion about this topic and tell my students that they don't have to share the same opinion as me. I have told my students that I was born in the 1960s in Texas. I didn't see this because it was all gone, but in the U.S., there were separate restrooms for Blacks and Whites, and separate hotels for Blacks and Whites. By the time I came of age, Black people were everywhere, in the stores where we shopped. I have told my students that we (my family) were poor. Black people were all around me on the bus. I attended integrated schools all my life. I tell the students that even when we had the Civil Rights Act of 1964 that legally stopped formal discrimination, there were still people who did not hire Blacks, which is why I was on board with affirmative action in the 1970s. However, now today I don't think there is systemic racism and there is no need for affirmative action. I asked my students if there is systemic racism, how did you get into UCF? How would you expect to get a job after UCF? You got here on your own merit and you are here to get a job corresponding to your education after you graduate."

The Respondent shared that when students have countered his opinion about systemic racism, they typically referenced police brutality or the criminal justice system as current examples of systemic racism. In response, "I tell them that is the one that I'm not sure of, I have a question mark about it. I tell them that I could talk about data, but I don't delve into those studies, so I don't talk about them. I do share that I am aware of a statistic that more White people are shot by police than Black people. But I tell them that's the one area I am not qualified to get into. I share with students that in terms of buying houses, I live in a neighborhood where houses are $600K and one third of the residents are Black so where is the systemic racism?" The Respondent denied having said that racism is not real, and denied having said that people who claim they were treated differently based on race isn't true.

When asked if he asserted that White people were not responsible for Black people's struggles and referred to the students who resist this idea as "misguided", the Respondent stated, "I don't remember having such a direct comment or conversation with students about that. Again, my position, which comes out in one way or another in lectures, is that all of us, especially Blacks, are going to encounter sporadic mistreatment, but the systemic part, I don't find the evidence for that. Some students I ask to give me an example, and they provide

135

something that happened in another state as evidence - I point out to them that they had to travel across states for as an example." When asked if he called the students "brainwashed" or being "politically correct" when they disagreed with his presentation regarding systemic racism, the Respondent stated, "It sounds like the way it was just presented that I tell the students that if you don't accept what I say, you're misguided or confused. If I did that, I'm psychoanalyzing and judging them, which is not true. I explain my position to the students as to why I don't think there's much systemic racism. I don't start judging them, but they do me a lot - they dismiss me by describing me as White-privileged. I tell them to please stop that and express why they think my views are incorrect, in detail. I'm trying to model for them not to do that. I don't dismiss them. I talk about the issue at hand." Also, the Respondent denied that he told students that Whites should have the power, minorities are inferior, and Whites do not cause the problems that African Americans and Hispanics go through as Whites have been "vaccinated" against racism. He also denied that he told a student that "only idiots still believe that propaganda from the liberal media" in response to them sharing an experience of discrimination.

When asked whether he told students that Black people "need to get over" slavery and discrimination, the Respondent stated, "My position, which I have said in class, is that sporadic racism exists because humans are always going to be human. All groups experience it from all other groups in any different direction. In terms of slavery and Jim Crow laws, it is my opinion that slavery does not explain anything happening today. I have told my classes, who are mostly psychology majors, that a popular opinion held by Freud was that anything that you experience as children influences you as an adult. That's just a theory, and we can't test that. I have told the students now, imagine asserting that something that happened hundreds of years ago impacts people today-we can't prove that. It's absurd. It doesn't explain why African Americans don't perform as well in school or why they commit more crimes. I don't think I used the phrase 'get over it' with the students, but I'm sure my point of view comes across that way. Frederick Wilson, in that YouTube video, does tell them that they are not slaves, they don't know anyone who is a slave, and if your life is messed up today, you're the reason it's messed up."

In response to allegations that he told students that "if minorities claim they can't get a job, they are just being lazy" because it's only a small amount of people who experience discrimination, the Respondent stated, "You know, I didn't say the lazy part. I think I've said to the students that in the past, my sons - I have adult sons - they are 75% Hispanic, but they have my surname, which doesn't indicate that they are Hispanic, and they got the genes that they look White. There is nothing to indicate that they are Hispanic. I told them at age 16 that although they don't have to work, I wanted them to have a job so that they can learn a work ethic. I told my classes that, although they appear as White, it took them about 20 different applications and interviews to get a job at Publix as a bagboy and cleaning tables at a restaurant. They look White and have a European last name. The few times I've told this story, minority people who look like a minority, they probably have to apply for a job 10 or 20 times, and it's easy for them to walk away saying that they didn't get a job because they are minority, but there is a lot of competition for jobs. I don't remember the context for sharing this story, but it may be in the conversation about systemic racism." In response to the allegations that he suggested that unarmed black men were getting shot not because of the police but because of some "black pathology" that made black communities terrible places to live, the Respondent stated, "That is complete nonsense and I deny saying that." Respondent denied that he stated that individuals "are inflating racism."

Respondent also denied that he said that racism was a myth and lie, and stated "No, again, racism is real. What we differ on is its prevalence."[21]

When asked to respond to allegations that during his 2018 Fall Cross Cultural Psychology course when students indicated that they knew a Black person who had experienced racism every day, he sarcastically said, "Life must be really hard!", the Respondent stated, "There's a context for that statement, and it wasn't directed at any specific student. Rather, while talking about racism, I told the students that I am sure some of you know of individuals who think they've experienced racism every day in their life. This is to the whole class, not directed at a student. I said that if someone is experiencing racial mistreatment every day of their life, that must really suck to be them. I then showed data from national data sets that the majority of them cannot recall being racially mistreated in the last three months. That's what I've said in a broad way but not directed at specific students."

Turning to the documentary evidence in the record, Witness 170, who was a GTA for the Respondent's 2016 Fall Cross Cultural Psychology course and submitted IL #825, provided OIE with following statements from a message that Respondent had sent to his students on October 21, 2016 class:[22]
  •  A small number of you are stuck in the past, claiming that Jim Crow laws (that happened in the first part of the last century) and slavery (which ended in the middle of two centuries ago) explain why a minority of African Americans struggle with poverty.  You cannot prove that. We in psychology cannot even prove—as some "Freudians" assert—that what happened to us in childhood explains how we are as adults. That's just a theory.  So, imagine how untenable it is to try and explain individuals' behaviors today based on events that happened to people that they never knew from other centuries. A pretty absurd idea, despite how popular that idea is in contemporary United States.
  •  There are more proximal causes for the poverty experienced by African Americans—causes that equally explain poverty among Whites, Hispanics, and Asians.  Those who are poor (if they are born in the U.S. and are 60 years of age or younger) make bad decisions in life, starting with their conscious decision to quit school.  That is a decision they made. No one made them quit school. For the majority of people from poor backgrounds (irrespective of ethnicity), that is the beginning of the end in terms of achieving upward social mobility. Now, add to that bad decision (quitting school) having unprotected sex that can lead to teen pregnancy (and sometimes HIV). Or getting involved in crime. Or using or selling drugs. Those behaviors are behaviors individuals choose to do and the only solution to those problems is to encourage people to: (a) accept responsibility for their lives and (b) make wise decisions. As I said in class, when you misidentify the causes of problems (as religion has done for 1000s of years), you can never solve any problem. As long as people in the U.S. want to explain poor people's problems based on nebulous notions such as "White privilege" and "racism," the problems that afflict such individuals will never be solved.
  •  For those of you who are "believers" in systematic racism and White privilege, you must explain why the majority of African Americans and Hispanics are doing well in society. How did they achieve relative success in the U.S. while a subgroup of African

---

[21] In his book *White Shaming*, the Respondent stated, "Racism against non-Whites still exists in various degrees." (pg. 6)
[22] This letter also appeared in the Respondent's book *White Shaming*, pp. 23-24.

Americans (and Hispanics, Whites, and Asians) cannot? You must explain how systematic racism causes a minority of African Americans to be poor yet does not stop the majority of African Americans from attaining a middle and upper class life style. No logic can explain such a selective wrath of systematic racism.

- Those of you who are believers in systematic racism and White privilege—why do so many people of color from around the world want to live here? Wouldn't word have gotten out and reached their native lands that the U.S. is a horrible place to live due to racial oppression? But they keep on coming, many of them, desperately. What is it that you know about the U.S. that millions of immigrants do not understand?

In addition, in his book *White Shaming*, the Respondent stated, "By holding onto the myth that all groups are equal in every human quality, we may misattribute some groups' under-achievement or relatively low socioeconomic status to incorrect causes, such as white racism or white privilege. And if we misidentify the real causes of social disparities, we will not direct our interventions at the true causes of inequalities and thus, never reduce them." (pg. 102)

Turning to OIE's review of audio recordings, during the 2019 Summer course (*see Recordings - 2019 Summer -7*), the Respondent discussed Hispanics and stated, "Right now we are talking about Hispanics and you should write down $42,000 for Hispanics. Notice that on average that the group that earns the most in the United States is Asians. So, we hear a lot of talk about White privilege and how the system was created to advantage Whites and yet people just gloss over that fact that, on average, Asian Americans in the United States are more educated than any other group, they earn more than any other group, but that does not fit the narrative of White privilege."

In another lecture in this course (*see Recordings – 2019 summer - 12*), the Respondent discussed surveys related to Blacks indicating whether they experienced discrimination in the last 30 days in different contexts (restaurants, employment, police, etc.). When discussing the medical question context, the Respondent said, "I am sure that you American students have heard that at least once in a while an African American who claimed that living in the United States that they experienced racism all the time. I have too, and of course I tell them, 'It must suck to be you.'" *See Power Point African – African (Black) American*.

During that same class, the Respondent discussed the correlation between individuals that were hit as children by their parents (corporal punishment) and those individuals having problems later in life, such as experiencing anxiety, difficulty with relationships, and depression. He then shared that "there is a little bit of evidence showing that African Americans hit their kids on average more than Whites do. Of course, we have some problems with African Americans who are involved in crime and delinquency and also being hit by parents often causes people to have problems with authority figures. …Teachers, professors, police officers, supervisors at the place of employment, etc. … Look at how many African Americans in the United States are having encounters with police officers. Again, the majority of African Americans do not, but we see on the news and you watch the news and it does not matter in which city you live, there are African Americans arguing with the police. … In every ethnic group, in every ethnic group, you will find people who do not value education. You will find people in every ethnic group who do not value education. But this is something that is unique to African Americans I think, in

addition to finding African Americans whose parents have not taught them the value of education, you will find a sub-group of African Americans who think education means that you are trying to be White.  So, they purposely want to sabotage and do poorly in school and any African American when one of their peers tries to do well in school, they will ridicule that person and accuse that person of trying to act like they are White."  The Respondent further told students that this was counterproductive to changing the status of their life. He went on and stated, "We also have a subgroup of African Americans who think that society owes them something.  Owes them something because of slavery that happened in the United States and they refuse to work and they live off welfare. Again, you can find people in every group. … So moving on here, please don't walk away from my class thinking that the majority of African Americans are on welfare, they are not."

In his September 4, 2018 General Psychology course (*see Recordings - 9/4/18 (2nd)*), the Respondent gave a similar lecture regarding the correlation of physical punishment to later problems.  Specifically, the Respondent stated that there is a "fairly large body of literature in social sciences that show young adults that were previously spanked or hit when [they] misbehaved, on average, they suffer a lot of things, which varies, sometimes anxiety, sometimes depression, sometimes difficult relationships.  One common consequence of hitting kids is kids form hostile attitudes towards adults. Kids when you mistreat them and hit them, they want to hit you back but realize they can't strike back and must endure it.  They carry hostility with them and displace it on other adults, like fights with police officers, teachers, bosses at work and lose their job. … All races use corporal punishment."  The Respondent then discussed his experience providing therapy to low income minority families in Texas and asked parents who used corporal punishment how they would feel if their boss came over and slapped them when they didn't perform well, and how this wasn't inconsistent with hitting their child. He then suggested using other forms of discipline.

With regard to comments on slavery, during the 2019 Summer courses (*see Recordings – 2019 Summer – 9*), the Respondent discussed the hypocrisy of some individuals position with regard to illegal immigration -namely, if an individual is an illegal immigrant in the U.S., they advocate for a humanitarian response but in that individual's own country, they would not allow illegal immigration and deport people that enter illegally.  He then stated that Blacks "were fine with slavery, no problem with slavery until they themselves were put on a ship and sold to be a slave. Now all of a sudden slavery is horrible, unethical, it's cruel, it's inhumane. Do you see the hypocrisy there?"

Lastly, it is important to again note that during the 2019 Summer course (*see Recordings – 2019 Summer – 12*), the Respondent stated, "It is my opinion, that I have already expressed to you before, that I think collectively that Black people in the United States experience collectively the most rejection from society overall.  And I am not saying, an African American who stays in school, does well in school and avoids committing crimes will have as good a life as you and I will have.  There are tons of them who do that. We have Black police officers, we have Black professors, engineers, in every occupation you will find Black people."

Taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that during the Respondent's Cross Cultural Psychology and General

Psychology courses, the Respondent told students that although he believed that Black individuals in the U.S. continue to experience racism, he did not believe that White privilege and systemic racism existed and were the causes of struggles that the Black community experiences such as poverty. The Respondent further told students that Jim Crow laws and slavery did not explain why some African Americans struggle with poverty. Rather, the Respondent explained that individuals' experiences with poverty were the result of making bad decisions in life, which he identified as the decision to quit school, have unprotected sex (which can lead to teen pregnancy and sometimes HIV), get involved in crime, and use or sell drugs. The Respondent further told students that these behaviors were behaviors that individuals had chosen to do rather than these being imposed by a system, and thus, the only solution was to encourage people to accept responsibility for their lives and make wise decisions.  These concepts were reinforced with the Respondent's showing of the Frederick Wilson II 2014 video.  He also taught that as long as people in the U.S. wanted to explain poor people's problems based on "nebulous notions" such as White privilege and systemic racism, the problems that afflict such individuals will never be solved.  That said, OIE finds that here is insufficient evidence to support finding that during the 2015 Spring Cross Cultural Psychology course, the Respondent suggested that unarmed Black men were getting shot not because of the police but because of some 'Black pathology' that made Black communities terrible places to live."

**62. Whether, during class, the Respondent taught students that minorities were predisposed to be inferior to Whites and, to demonstrate this, showed students the high incarceration rate for Blacks and told students that Blacks just needed to stop committing crimes; showed students data that most single parent households were Black households and told students that Blacks just needed to stop getting divorced; and, told students that "Black people should stop having babies."**

The anonymous reporter in IL #813 alleged that since 1998, the Respondent told students that "70 percent of the African American children would be raised in fatherless homes, that 50 percent of the African American community would drop out of high school, and that 25 percent of the African American community would have criminal records. [The Respondent] also said that African Americans would kill 7,000 African Americans per year. These statistics are actually related to the African American community being constantly oppressed." Witness 122 alleged that during the 2013 Fall General Psychology course, the Respondent told students that Black people who want to get ahead should stop having babies, and that Black people only have themselves to blame for the impoverished situation they find themselves in. Witness 82 stated that during the 2014 Cross Cultural Psychology course, the Respondent stated that Whites were better than other ethnicities.  In support of this, the Respondent referred to the story set forth in *Sun Chief* where even though the individual was raised in White culture, he returned to his native culture.  The Respondent then said that some people were predisposed to be a certain way.

Also, the anonymous reporter in IL #834, who allegedly was a student in the Respondent's 2015 Fall Cross Cultural Psychology course, alleged that the Respondent "touched on the subject of African Americans' high incarceration rate for 'committing crimes', stating his opinion was to 'Just stop doing them' if they wanted things to change. This appeared on one of his tests, in which a question was asked something along the lines of 'What did your professor say his solution to reduce the amount of crimes African Americans are committing?'" Witness

88, who submitted IL #800, JKRT report #00047725 and participated in an OIE interview, alleged that during the 2017 Spring Cross Cultural Psychology course, the Respondent told students that minorities were predisposed by nature to be poor and have babies, which was why they utilized welfare and food stamps. Further, the Respondent remarked in class that "Black people should stop having babies" to try to control the population and stop making the income levels go down. Witness 111 alleged that on the first day of class in the 2017 Fall General Psychology course, the Respondent stated that Blacks should just stop committing crimes to improve their lives. Witness 57, who was enrolled in the Respondent's 2018 Spring Cross Cultural Psychology, alleged (via email) that the Respondent told students that "if minorities tried harder, they would do better."

Witness 73 alleged that the Respondent made a similar statement during the 2019 Spring Cross Cultural Psychology course, and stated that the reason for the achievement gap between races was Blacks growing up in single parent households, their love for being on welfare, and not wanting to work. Witness 116, who was a student in the Respondent's 2019 Summer Cross Cultural Psychology course, alleged that the Respondent sometimes "would present things that are true, but his conclusions based on those things did not make sense. For example, he would present two different facts – first that most single parent households are Black households, and second that most people in prison are Black, and then he would conclude that if the Black population would stop getting divorced, there would be less crime." Witness 116 alleged that the Respondent also said that if Blacks had the same education rate as Asian Americans, there would not be the type of problems that we see with the unemployment rate and the crime rate. Witness 169, who was enrolled in the 2019 Fall Cross Cultural course, alleged that the Respondent said that minorities were not doing enough to be successful and blamed Whites as the oppressor, and Hispanics and Blacks would have a better future but they were stuck in gang violence, teen pregnancy, government welfare and not getting jobs.  Accordingly, these shortcomings were based off their own actions.  Witness 169 further alleged that the Respondent then stated that Blacks had the least amount of effort towards making their lives successful compared to Whites.

When requested to respond to allegations that he said minorities were built or predisposed to be poor and have babies, the Respondent stated, "All of that is 100% a fabrication." When asked to respond to the allegations about minorities' predisposition to be a certain way, e.g. to not perform well in life, the Respondent stated, "Never. I'm a data driven person. Who has measured a predisposition?" When asked to respond to the allegations related to single parent households, welfare and not wanting to work, the Respondent stated, "OK, so here is a case that someone is taking little bits and pieces from other lectures and trying to tie them together in a bullet point. What I have shared with students is that about 70% of African Americans live in single-parent households, and that alone ought to explain social inequality because they only have one adult with income. I don't get into welfare in my lectures and I never said that minorities don't want to work. I'm sorry- there is a segment in the course when I cover challenges to the different ethnic groups. When I talked about African Americans, I talked about things that are disproportionately found in a subgroup of African Americans. One is the idea that working is the same as modern slavery. I've had Black parents tell me this. I address the idea that some Black people have that doing well in school is tantamount to trying to be like a White person, and I have had numerous Black students say that they've been told this. I shared with students that some Black people ridicule any Black student who tries to do well in school and tell

them that they are trying to act White. So, there are some things that I cover that might tap into what you said was alleged."

When asked about the allegations that he said minorities were not doing enough to be successful, and Hispanics and Black would have a better future but they are stuck in gang violence, teen pregnancy, government welfare and not getting jobs, the Respondent replied, "I never said that. That statement would only apply to a subgroup of Blacks or Hispanics". When asked whether he had told students that African Americans had made the least amount of effort towards making their lives successful compared to Whites, the Respondent replied, "No, I did not say that to students. However, I can see myself telling the class on day one that every group is equal and open to scrutiny, and if you think your group is immune to scrutiny, you think your groups is superior, that is not the case. Many individuals in each group make good decisions but all are subject to scrutiny. That is a very different statement than what was reported."

In response to allegations the he stated that Blacks who want to get ahead should stop having babies, issues faced by Blacks are not the fault of Whites, and Blacks only have themselves to blame for the impoverished situations that they find themselves in, the Respondent stated, "Everything you said is totally false. The last comment about blaming others - I don't have a formal lecture that addresses that, except when I point out the slide that 50% of African Americans and 60-something percent of Hispanics and 70-something percent of Whites think that if someone is unsuccessful in life, it's not due to racism, it's due to their own bad decisions. I cover it just like I just said it."

In response to the allegation that he had an exam question asking that the resolution of high crime rates was for Blacks to just stop committing crime, the Respondent stated, "That has never been an exam item. What I recall on one occasion was an African American student who was being nice, not antagonistic, engaged me in class about the criminal justice system being biased against Blacks. We talked for 15 seconds or less about what would be the solution to that. I said, 'I don't have experience in criminal justice,' and asked her what she thought would be the solution to the overrepresentation of African Americans in the criminal justice system. She asked what my solution would be, and I said if individuals stopped committing crime, they wouldn't have to worry about being accused of committing a crime or not."

Turning to the documentary evidence, the Respondent's book, *White Shaming*, which was used as course material for the 2019 Fall semester and 2020 Spring semester, set forth in the chapter titled "Can the United States Keep It Together? Is There Hope for the Future?", that "some groups, on average, may be relatively less motivated to excel academically or achieve occupationally and may even differ in the value they place on education" (p. 101).  He further stated, "Does anyone really believe that non-Asian ethnic groups, on average, are as equally dedicated to their studies as are Asian Americans?" In the Chapter titled "Are All Cultures Equally Good", the Respondent stated, "Two ethnic groups, on average, commit disproportionate crime, including murders, compared to the two other ethnic groups. There are ethnic differences in the United States, on average, with respect to teenage pregnancies, HIV infection, high school and college dropout rates, and so on. Suspect readers have noticed that I didn't even have to name which ethnic groups are, on average, afflicted by this array of social ills." (p. 72) In addition, as set forth in Section VI (Material Facts Not in Dispute) above, the Respondent told

his 2019 Summer course students, "We also have a subgroup of African Americans who think that society owes them something. Owes them something because of slavery that happened in the United States and they refuse to work and they live off welfare. … Again, you can find people in every group. … Whites, Hispanics, Black, Natives, but there is a slightly higher percentage of Africans who live off welfare than the other groups. … so moving on here, please don't walk away from my class thinking that the majority of African Americans are on welfare, they are not."

Taking into consideration the record as a whole, OIE finds that there is sufficient evidence to support finding that during his Cross Cultural Psychology and General Psychology courses when he discussed racial issues, the Respondent told students that 70% of Blacks lived in single-parent households; that some groups were less motivated to achieve academically or occupationally, including a subgroup of Blacks who claim that working is the same as modem slavery, and doing well in school is tantamount to trying to be like a White person; that Blacks and Hispanics, on average, committed disproportionate crime (including murders) compared to Whites and Asians; that Blacks and Hispanics, on average, had a higher rate of teenage pregnancies, HIV infection, and high school and college dropout rates compared to Whites and Asians; and, that Blacks should stop having babies and committing crimes to improve their lives. However, OIE finds that there is insufficient evidence to support finding that the Respondent told students that minorities did not want to work or that the achievement gap existed because of minorities love of welfare and not working. With regard to an alleged exam question asking that the resolution of high crime rates was for Blacks to just stop committing crime, no other students besides the anonymous reporter in IL #834 made this allegation. Also, OIE's review of exam questions and answers during the last three years did not reveal a question of this nature. Accordingly, OIE finds that there is insufficient evidence to support finding that the Respondent issued an exam question of this nature.

### 63. Whether, during his Fall 2018 Cross-Cultural Psychology class, the Respondent said that in White culture, sex is taboo; Latin Americans don't see sex that way and have a lot of children because they like sex; and Blacks just don't use birth control.

Witness 92 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent said that in White culture, sex is taboo; Latin Americans don't see sex that way and have a lot of children because they like sex; and Blacks just don't use birth control. The Respondent denied this allegation and stated, "The whole thing in its entirety is a complete fabrication. When I cover Whites in my Cross-Cultural [Psychology] class, I share that there are paradoxes about Whites. One is that as a group they tend to love and hate sex, and I provided multiple examples of how Whites try to prevent teenagers from getting medically accurate information about sex and are told that they should wait for sex until marriage. However, in this country, which is predominantly White, there are sex scenes in movies and sex lyrics and pornography, and it's illegal to produce pornography but in every state it's legal to buy it. That's what I said. I just don't know how to respond to this. This is what I cover about Whites and sex." Similar to this statement here, Witness 47 alleged during the 2020 Spring Cross Cultural Psychology course when discussing White Americans, the Respondent "went off on a tangent about how porn is illegal in Alabama, but sex toys are legal." Also, as to stating that Blacks don't use birth control, the Respondent denied this allegation and stated, "I know nothing about this,

and I did not say anything about this. I bring in a UCF ex-professor who is a nurse to give the lecture on birth control in my Sexual Behavior course. I know nothing about birth control."

No other students, including 15 students from this particular course, who communicated with OIE made allegations similar in nature to the allegations made by Witness 92.  Also, none of the recordings reviewed by OIE revealed the Respondent making statements of this nature. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support that during the 2018 Fall Cross Cultural Psychology course, the Respondent told students that in White culture, sex is taboo; Latin Americans don't see sex that way and have a lot of children because they like sex; and Blacks just don't use birth control.

**64. Whether the Respondent told students that there was evidence of Native Americans killing each other before White people came to America, Native Americans weren't peaceful prior to colonization, and Native Americans had no problem having sex in the presence of their children.**

Witness 81 alleged that during the 2018 Spring Cross Cultural Psychology course, the Respondent told students that Native Americans weren't peaceful prior to colonization. Witness 73 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent said that Native Americans were very sexual people who had no problem having sex in front of their children. The University also received an allegation that during the 2020 Spring Cross Cultural Psychology course, he said that there was evidence of Native Americans killing each other before White people came to America.

When asked to respond to allegations that during his classes, including the 2020 Spring 2020 Cross Cultural Psychology course, he said that there was evidence of Native Americans killing each other before White people came to America, the Respondent stated, "That's another lecture and a different topic when I cover Native Americans. I told my students that Native Americans are the most romanticized ethnic group in the U.S. I can give you lots of evidence and books. I've interviewed tons of anthropologists who are scholarly, not activist anthropologists. As a group, Native Americans were slaughtering each other, enslaving each other, and raping women they took from other tribes. I told the students that the Native Americans are not worse than any other group, but rather that they are the same as all other groups."

When asked to respond to the allegation that he told students that Native Americans were very sexual people who have no problem having sex in front of their children, the Respondent stated, "This is a conversation/lecture that I have that has lots of context to it. Rather, I shared with the students that the Native Americans are a group that is opposite of Middle Eastern people in their attitudes about sex and sexuality. Middle Eastern people have many rigid and restrictive views on nudity and sexuality. As part of the course, the students read *Sun Chief*, written by a Hopi Indian, and the book is saturated with sexual scenes, even though the book has nothing to do with sex. In my classes, I covered that Native Americans do not perceive sex as sinful or evil prior to European contact."

Turning to the audio recordings, during the 2019 Summer course (*see Recordings – 2019 Summer -9*), the Respondent discussed that almost all of the literature regarding racism talks only

144

about White racism and that there are people who feel guilty over that. He then discussed how there is a fight among anthropologists who are battling Anti-Western Culture's portrayal of Native Americans as "warm [and] fuzzy loving until those mean Europeans came along" and individuals who "don't want to acknowledge that Indians Native Americans were slaughtering, conquering, taking territories from other Native Americans just like every other group" before Europeans' arrival. Equally important, the Respondent shared a CNN article and his response to the article with students wherein he stated, "Native Americans -- depending on their size and strength of their military -- raided and attacked other tribes, stealing their women, seizing their territory (keep in mind how expansive the Maya and Inca territories were), and even enslaved people.  In that process, they engaged in torture and slaughtered Native Americans from other tribes."  There was no reference to having sex in the presence of children.  That said, during the November 27, 2018 General Psychology recording, the Respondent discussed the practices of the Hopi tribe and stated, "The kids routinely see their parents having sex."

Taking the record as a whole into consideration, OIE finds that there is sufficient evidence that the Respondent told students that there was evidence of Native Americans killing each other before Europeans came to America and Native Americans were not peaceful prior to colonization.  However, there is insufficient evidence that the Respondent told students that all Native Americans had no problem having sex in the presence of their children.  Rather, the record supports that a comment of this nature was made with regard to the Hopi tribe.

**65. Whether the Respondent told students that other cultures were "savage" and "barbaric", and White people never started out that way with the exception of the Vikings.**

Witness 51 alleged that during the 2012 Fall General Psychology course, the Respondent talked about his trips to Peru, referred to the population as "barbaric", and stated that it was "like watching a freak show" because of the ways that the Peruvians had sex. Witness 82 alleged that during the 2014 Fall Cross Cultural Psychology course, the Respondent told students that certain Blacks were "savage" and "barbaric". Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent stated that Islam was "savage", and that Jews and Muslims were "savage" for circumcising sons. Witness 88 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent told students that other cultures are "savage" and "barbaric", and that White people never started out that way except the Vikings. During that same course, Witness 144 alleged that the Respondent talked about Islam, Saudi Arabia and Afghanistan's culture being "savage" and "barbaric", and after watching a documentary regarding an indigenous tribe in South America, the Respondent commented that the people were "savage" and "barbaric". Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, he said that different cultures were savages and barbaric, Islam was barbaric, and Blacks were more violent. For this same course, Witness 92 alleged that the Respondent referred to Native Americans as "savages". Also, for this same course, Witness 167 recalled the Respondent saying that Islam was barbaric. Witness 167, who indicated that she was raised in an Islamic household, further shared that the Respondent "tried to use the Quran to say that people who don't follow the religion deserve to be punished. It does contradict what I have learned being raised in an Islamic household. I was raised to be loving and accepting of people. While it is nice to get converts, we still accept others with different beliefs." Witness 47 alleged that during the 2020

145

Spring Cross Cultural Psychology course, the Respondent repeatedly referred to Arabs or Muslims as "savage", "barbaric", or "barbarians".

When asked to respond to the allegation that he stated that other cultures were "savage" and "barbaric" and that White people never started out that way with the exception of Vikings, the Respondent stated, "That is a gross distortion of what I said. What I have said is that based on Spanish chroniclers, when they found Native Americans, they were doing things that surprisingly shocked European Americans, such as human sacrifice and torture. All groups practice torture and barbaric practices, but Europeans saw human sacrifices as well as the fairly extensive nudity or partial nudity and they (Europeans) ended up labelling them as savages or barbaric people. That's the only time I used those terms in my classes." The Respondent denied the remaining allegations.

Turning to the audio recordings, OIE's review revealed that during his 2019 Summer course, the Respondent told students that some Muslims will pressure a family member who has been sexually assaulted to commit suicide and asked, "Is this fucking for real? This is just barbaric as shit". Taking the record as a whole into consideration, including the general consistency of the allegations among multiple students over different timeframes (2014, 2017, 2018 and 2020), the recollection of multiple students in the same course recalling the use of the terms "savage" and "barbaric" outside the context provided by the Respondent, the students' lack of motivation to lie, the Respondent's motive to do so and previous noted inconsistencies in testimony, and the audio recording evidence, OIE finds that there is sufficient evidence to support finding that the Respondent told students, primarily who were in the Cross Cultural Psychology courses, that other cultures were savage and barbaric, including in reference to Muslims and Islam. However, there is insufficient evidence to support finding that the Respondent told students that White people never started out that way except the Vikings, that Blacks were savage and barbaric, and that it was like watching a freak show in Peru because of the ways that the Peruvians had sex.

**66. Whether the Respondent told students that Trayvon Martin "was a thug and deserved to be killed".**

Witness 135, who was a student in the Respondent's 2014 Sexual Behavior course and 2015 Cross Cultural Psychology course, alleged via email that the Respondent said that Trayvon Martin "was a thug and deserved to be killed". In response to this allegation, the Respondent stated, "That's a distortion of what I said. If the Trayvon Martin incidents comes up once in a class, I have told students that putting emotions aside, the reason why Eric Holder, an African American Attorney General who investigated George Zimmerman - the reason they could not press charges against George Zimmerman was because there was evidence that Trayvon Martin initiated a physical attack on George Zimmerman and was banging his head on the concrete, and George Zimmerman had a legal right to defend himself and had a legal weapon. Eric Holder could not press charges as a result. I mentioned this in response to someone who brought this case up. I did not refer to Trayvon Martin as a thug or state that he deserved to be killed." No other students made an allegation of this nature and no statements of this nature were noted in the audio recordings reviewed by OIE. Accordingly, taking the record as a whole into

consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students that Trayvon Martin was a thug and deserved to be killed.

**67. Whether the Respondent told students that he was cheating on his wife, who was a professor in the department at the time; said that infidelity was "common for Hispanic males and they can't help themselves"; and, referenced men from Central America and South America as being "hypersexual" and that he himself, who was from this group, was "hypersexual".**

Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent joked that he was cheating on his wife, who was a professor in the department at the time, and said that infidelity was "common for Hispanic males and they can't help themselves". Witness 37 further alleged that during this same course, the Respondent referenced men from Central America and South America as being "hypersexual" and that he himself, who was from this group, was "hypersexual".

In response to these allegations, the Respondent stated, "I don't talk much about my personal life and wouldn't talk about it this way. Of all the ethnic groups that I have covered, the one group that I am considered to be an expert on is the Hispanic culture. George Bush Jr. commissioned a group of people to come together and discuss how to fortify Hispanic families. A lot of my past research focused on Hispanics. I got flown to [Washington] D.C. and participated in the discussion on how to fortify Hispanic families. A number of months later I got to fly out to San Antonio to participate in a follow up to this conversation. Even though I don't have the final word on Hispanics, it's an area of my expertise. When I discussed Hispanics in class, I told the students that there is a much more relaxed attitude in general toward male infidelity. To be honest with you, the whole world including Western Europe has less rigid views on male infidelity. That's what I said, not what the student reported." The Respondent also denied both comments related to hypersexual. Taking the record as a whole into consideration, although the detailed nature of the allegations lends credibility, in light of the context provided by the Respondent and the delay between the incident and reporting, OIE finds that there is insufficient evidence that the Respondent told students that he was cheating on his wife, who was a professor in the department at the time; said that infidelity was common for Hispanic males and they can't help themselves; and, referenced men from Central America and South America as being hypersexual and that he himself, who was from this group, was hypersexual.

**68. Whether the Respondent awarded grades based on race.**

Witness 76, who submitted IL #836 and participated in an OIE interview, alleged that he had been a student in the Respondent's 2015 Spring General Psychology course. He further alleged, "Prior to the final exam of an undergraduate psychology class instructed by [the Respondent], I mathematically calculated what grade I would need to achieve on the exam to get a B. Mathematically it wasn't possible, even factoring in perfect marks on all ungraded works, my final grade would be a C. Following the final exam and end of the semester I noticed my reported grade was indeed a B. I didn't think twice about it. But in light of [the Respondent's] recent remarks [on social media] showing prejudice against students of color it's become clear to me I (a white male) might be the beneficiary of discriminatory behavior that students of color are

not." To assess this generalized claim, OIE reviewed and analyzed the grades of 1,814 students in 12 different classes taught by the Respondent during four different semesters. Based on this analysis, OIE found that there was insufficient evidence to support finding that student grades in the Respondent's courses were impacted by their sex or race (separately or in combination). *See Attachment B OIE Grade Analysis Memo.*

*Quid Pro Quo Based on Religion*

**69. Whether the Respondent offered extra credit to students who would renounce their faith.**

The anonymous reporter in IL#802 alleged that the Respondent "offered extra credit if students would renounce their faith in front of the class." No timeframe was provided for this alleged conduct. Similarly, Witness 138 alleged in her IL report (#811) that the Respondent "often offered students extra credit for renouncing religious beliefs". During her OIE interview, Witness 138 elaborated and stated that she had heard that someone (unidentified) in one of the Respondent's classes (not Witness 138's course) was offered extra credit if they would denounce their religious beliefs in front of the class. Witness 138 did not know which class nor the identity of the student involved. Witness 138 did not witness this, and it did not occur in her class. The rumor Witness 138 heard was that a student went up in front of the class and said, "I am now atheist and am no longer religious," and supposedly got extra credit. Witness 233 indicated that she also heard a similar rumor, but did not witness this occur or know the identity of the student involved. Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent offered extra credit for writing a paper that denounced one's own religion. Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent made a joke and said something about if students renounced their faith, he would give them extra points.

On the other hand, Witness 235, who stated that she was a student in the Respondent's course during the 2008 Spring semester, denied that the Respondent required or encouraged students to renounce their faith. Similarly, Witness 4 (2011 Cross Cultural Psychology), Witness 76 (2015 Spring General Psychology), Witness 160 (2018 Spring General Psychology), Witness 3 (2018 Fall Sexual Behavior), Witness 167 (2018 Fall Cross Cultural Psychology), Witness 1 (2019 Spring Cross Cultural Psychology), Witness 110 (2019 Summer Cross Cultural Psychology), Witness 104 (2019 Summer Cross Cultural Psychology), Witness 116 (2019 Summer Cross Cultural Psychology) Witness 5 (2019 Summer Cross Cultural Psychology), and Witness 2 (2019 Fall Sexual Behavior) denied that the Respondent required or encouraged students to publicly denounce their religion. During OIE's outreach to more than 300 students, none identified an instance in which the Respondent required or offered extra credit if a student denounced or renounced their faith. Also, none of the recordings reviewed by OIE captured the Respondent offering extra credit to students who denounced or renounced their faith.

When asked to respond to allegations that he offered extra credit for students to denounce their religious beliefs in front of the class, the Respondent stated, "This never happened. Not even as a joke. I did not say anything like this to my students." When asked to respond to allegations that he had offered extra credit for students to write a paper that denounced their religion, the Respondent replied, "Never. I never did that. Remember, I advocate for everyone to believe how they want to believe - freedom of speech and freedom of religion are important. I'm

a double minority and a religious minority. I support each person's right to believe whatever they'd like."

Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent required or offered extra credit to students to renounce or denounce their religious faith.

### 70. Whether the Respondent issued exam questions that forced students to select statements contrary to their religious beliefs to receive credit.

The anonymous reporter in IL#802, alleged that during 2012-2013, the Respondent "included test questions to force those who believe in a religion to either select his beliefs were the correct answer otherwise receive a penalty on the exam."  Witness 50, who submitted IL #845 and was a student in the Respondent's 2014 Spring Cross Cultural Psychology course, alleged, "I thought that some of the ways he phrased certain questions regarding religion in his tests were designed to anger and upset his religious students, although as it has been quite some time I cannot remember the exact phrasing, however."  In response to this allegation, OIE reviewed the quiz questions and answers for the Respondent's courses between 2017 and 2020. Therein, OIE located the following questions related to religion:

- Whether Jesus and Muhammad were well-received by people when they began to proclaim they were "prophets" of God (answer was false);
- Whether according to Jesus, except in cases of adultery, divorce is not permitted (answer was false);
- Who Muhammad married (answer was his son's wife);
- What animal did Muhammad report that he rode to Jerusalem (choices were donkey, camel, horse with wings, white horse, black horse);
- What did Lot and his daughters do when living in the mountain in the Sodom and Gomorrah story (answer was engaged in incest);
- Whether many Muslims throughout the world believe that if any Muslim "defects" from Islam, they should be murdered (answer was true);
- Various versus in the Quran appear to promote prejudice, or even hatred, toward which group(s) of people (answer was Christians, non-Muslims, and Jews).

*See Quiz Questions and Answers 2017-2020*. Also, as set forth in Section VI (Material Facts Not in Dispute) above, the Respondent issue the following exam question:  According to any *reasonable* and *rational* person, telling children that someone is watching them 24/7 and knows every "move they make" and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection.  Students needed to select option "B. child abuse" to receive credit for answering this question correctly. Also, the Respondent issued an exam question asking students what Muhammad and Jesus had in common. To get credit for a correct answer, the students needed to select the option that stated there was no evidence of them being who they claimed to be.

Upon review, OIE finds that some of the Respondent's test questions required students to select an answer that was contrary to their religious beliefs in order to receive credit for answering correctly.  For instance, Christians who believe that there is a God watching over

them at all times and believe that it is important to teach their children about God would have to select that teaching their faith in this manner to their children is child abuse.

*Comments Related to Validity of Sexual Assault Reports*

**71. Whether, during class, the Respondent referenced that sexual assault victims lie about their attackers, which inflates sexual assault statistics; that the statistic that one in four women are raped was fabricated by feminists as less than 1% of women are in fact raped; and, blamed victims for the sexual assault.**

In addition to the above, Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent said that women make up the allegation of having been raped because it helps them from a virtue perspective. Specifically, rather than admitting to themselves that they chose to have sex (which may violate a virtue they hold), they allege that they were raped. An anonymous reporter alleged that during one of the Respondent's 2014 Fall semester courses, the Respondent shared "his belief that rape was inherent to human and animal behavior". *See Student Google Form – Anonymous*. The anonymous reporter in IL #801 alleged that friend who took one of the Respondent's courses during the 2016 Fall semester said the Respondent "made a remark in class that blamed rape victims for their assault." Witness 111 alleged that during the 2017 Fall General Psychology course, the Respondent stated that women liked to accuse men of sexual assault for fun and to ruin their lives. Witness 133 alleged that during the 2018 Fall General Psychology course, the Respondent said that women make up stories about sexual assault. Witness 95, who also was a student in the same course, alleged that the Respondent told students that women claim to have been sexually assaulted or raped to ruin men, and there usually is so little evidence to prove the rape. Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent asked, "Do you know how many times women lie about sexual assault?", and then stated that they lied to get attention.

Similarly, Witness 120, who submitted IL #790 and participated in an OIE interview, alleged that she took Respondent's 2019 Spring Sexual Behavior course wherein the Respondent made comments that insinuated that sexual assault victims lie about their attackers, thereby causing an inflation of the statistics of sexual assault. Witness 66, who was enrolled in this same course, submitted IL #789 wherein she alleged that the Respondent said that "rape is extremely rare and that statistics that 1 in 4 women are raped are fabricated by feminists (google ACEs study and you'll find that 1 in 4 PEOPLE experience sexual violence before age 18, let alone women and rape in their lifetimes). He had no statistics to back up his statement that less than 1% of women are raped. He went off on a tangent about how false rape allegations ruin careers and how boys have their lives ruined by allegations at universities. He said that men are afraid to ask women out now, and opened the floor to men to share about that." During her OIE interview, Witness 66 alleged that the Respondent told students that kissing someone without their consent was not an assault, there were so many false rape accusations that plague college campuses, the statistic of one in four was just a feminist stunt, Title IX doesn't let you have a lawyer and they're unfairly treating men accused of sexual assault, less than 1% of people may experience sexual assault, and there is an epidemic of men being kicked out of the university because of false allegations under Title IX. The Respondent then allegedly opened the floor to male students who have said they were afraid to ask women out nowadays since they were afraid of being accused of sexual misconduct. Witness 66 also alleged that the Respondent discussed the

arrest of Robert Kraft, NFL Patriots owner, and said that Mr. Kraft had done nothing wrong as it was not rape if you had sex with a victim of human trafficking.

The University also received allegations of a general overall insensitivity to sexual assault issues.  For example, Witness 106 alleged that during the 2019 Fall Sexual Behavior course, "we were speaking about sexual assault. [The Respondent] asked the class their thoughts and a girl in my class spoke up about her experience. When she stated that she had been assaulted when she was 15, [the Respondent] rolled his eyes, made a face, and made a quick remark about it was 'off topic.'" When asked about this allegation, the Respondent replied, "I don't remember that, and if someone were to tell me that in my office or in a class, I would not react this way." Also, Witness 88 alleged that during the 2016 Spring Sexual Behavior course when the Respondent showed the *Consent (2004)* video, he joked, "Oh take me now" or "You can have sex with me now".  Witness 100 alleged that in her 2019 Summer course, the *Consent* video was sent to students on the day that Harvey Weinstein was sued for sexual assault. With regard to this video, the Respondent denied that he made a joke out of it with comments like "oh take me now" or "you can have sex with me now." Rather, "I told the students that this is the way we're heading."

During his OIE interview, when asked to respond to allegations that he said that women make up the allegation of having been raped because it helps them from a virtue perspective, the Respondent stated, "I think I have had discussions with my students along that line. I think it was in my Sexual Behavior courses, but I'm not sure. It's not like how it was presented though. It sounds like I said that I'm claiming people who say they were raped are not being honest, and that's not true. I did say that there are individuals who regret having sex and the way they deal with that is to say that they were forced into it. That came up once in the context of a Dear Colleague Letter and we had a brief conversation about, that when it came out. I'm sure I mentioned that there are individuals who claim they have been sexually assaulted when they really just regretted having sex. One student started telling me that she knew someone who was raped and it really happened, and I said in front of everyone that she's talking about something that really happened and I'm talking about cases where it didn't happen but it was reported, and let's not conflate the two. That was in response to the Dear Colleague Letter."

The Respondent denied that he told students that women liked to accuse men of sexual assault for fun and to ruin their lives; denied saying "do you know how many times women lie about sexual assault?" and that they lied to get attention; denied saying that less than 1% of people may experience sexual assault; denied saying that Robert Kraft did nothing wrong; and denied saying that it was not rape if you have sex with a victim of human trafficking. In response to the allegation that he said the statistic of one in four women had been sexually assaulted was just a feminist stunt, the Respondent stated, "I didn't say it was a stunt, but that it was conducted by a feminist activist."  When asked if he told students that rape was inherent to human and animal behavior, the Respondent replied, "I think somewhere in some context, but I don't remember the context or in what class, I said that if we look at the animal world, rape is a part of mammals' behaviors."

When asked if he opened the floor to male students who have said that they were afraid to ask women out nowadays since they were afraid of being accused of sexual misconduct, the

Respondent replied, "I deny as this is alleged. Rather, this is a reference to an exercise I do in the Sexual Behavior class, during which I ask - starting with one of the groups, either men or women, and clarify it's a heterosexual exercise - for those of you who are heterosexual, and I assume most of you are based on statistics, I start with one of the groups and say I want to hear personally, since I'm so removed from the current dating scene, what the norms are for dating these days. I ask if they prefer to have a man initiate a date, and different women debate different things. Then I ask the men are you OK with women asking you out for a date or do you feel you ought to be the one asking, then they debate. That is pretty much the extent of the exercise. It sounds like someone does not recall this exercise well."

When asked to respond to the allegations that he said that Title IX doesn't let you have a lawyer and they're unfairly treating men accused of sexual assault, and that there is an epidemic of men being kicked out of the university because of false allegations under Title IX, the Respondent replied, "I deny this as I don't know the specifics of Title IX. I do know that males accused of sexual assault are not given permission to have a representative on their behalf that is able to speak in the process."

OIE's review of the available recordings did not reveal the Respondent having made comments of this nature. Taking the record as a whole into consideration, including the inconsistency as to the specific statements (women "make up" allegations, women lie to get attention, women lie for fun and to ruin men's lives) and lack of corroboration, OIE finds that there is insufficient evidence to support finding that the Respondent blamed victims of sexual assault for the assault and said that all sexual assault victims lied about their attackers.  However, based on the Respondent's response to the allegations, OIE finds that there is sufficient evidence to support finding that the Respondent told his Sexual Behavior students that if we look at the animal world, rape is a part of mammals' behaviors; there are individuals who regret having sex and the way they deal with that is to say that they were forced into it; and that a study finding that one in four women experienced sexual violence before age 18 was conducted by feminists. Lastly, although denied by the Respondent, OIE found the detailed nature of Witness 66's testimony persuasive (particularly when considering her lack of motive to lie, the Respondent's motive to lie, and the Respondent's other inconsistencies in testimony noted herein), and, thus, finds that there is sufficient evidence to support finding that during the 2019 Spring Sexual Behavior course, the Respondent criticized the manner in which data had been collected for the study (such as counting kissing without consent as an assault) and the study's conclusion (arguing that rather than 25%, the number was more like less than 1%), stated that there were many false rape accusations that plagued college campuses and the campuses were unfairly treating men accused of sexual assault, and there was an epidemic of men being kicked out of the university because of false allegations under Title IX.  OIE further finds that there is sufficient evidence (for the reasons noted above) that during the 2019 Sexual Behavior course, the Respondent referenced the arrest of Robert Kraft, NFL Patriots owner, and said that Mr. Kraft had done nothing wrong as it was not rape if you had sex with a victim of human trafficking.[23]

---

[23] On February 22, 2019, Robert Kraft was arrested for solicitation of prostitution in connection with alleged visits to the Orchids of Asia Day Spa located in Jupiter, Florida. In September, 2020, Florida prosecutors dropped the charges.

**72. Whether, around the time of the Congressional hearings related to Brett Kavanaugh being nominated to the U.S. Supreme Court, the Respondent told students that the accuser was just imagining things.**

The anonymous reporter in IL #794, who allegedly was a student in one of the Respondent's 2018 courses, alleged that "when the Brett Kavanaugh controversy was going on. He came forward alleging the accuser was just imagining things." A similar allegation was made by another anonymous reporter (IL #810) for the same timeframe. When asked about this allegation, the Respondent stated, "I never brought that up in my classes."

However, OIE's review of the September 18, 2018 recording of the Respondent's General Psychology course revealed that in response to a student's question about guided therapy to help recover memories, the Respondent stated that the following: "I am going to make some vague comments. My colleagues and I are probably divided on this. Some people think that memories of trauma can come out later for various reasons, and others in my profession think that if someone experiences trauma they can't get it out of their heads. …. Two pools of people – experience trauma and can't recall it and others that can't stop thinking about it… So I don't know what the reality is as I don't do anything with memory. We have a situation right now, not sure if you're aware of it where… and I'm very apolitical, remember I hate all politicians, okay so keep that in mind. We have a judge who is trying to become confirmed to become the ninth judge on the Supreme Court. How many of you know about this? … I've seen him on TV and he seems to be a squeaky clean conservative person but a lady has come forward that knew him in high school about 35 years ago and reports that (she is in her 50s and so is he) that when they were in high school, he sexually assaulted her. And he was drunk and that she forgot all about it until 2012 which is um about 30 something years later. She was in couple's therapy and she claims that, as a result of couple's therapy, she recalled that this guy that is now trying to become a judge on the Supreme Court had sexually assaulted her 30 something years earlier. So now the politics are going to get involved. … He may not get confirmed… don't really care. Another situation where if you're claiming something that happened traumatic … trauma has come to the surface. Again, I don't know what the reality is."

Taking the record as a whole into consideration, including the anonymity of the two reports and the inconsistency between the Respondent's statement to OIE that Brett Kavanaugh's confirmation hearings (which occurred on September 4-7, 2018) were not referenced in class and the class recording, OIE finds that there is sufficient evidence to support finding that in September 2018, the Respondent referenced the Brett Kavanaugh's hearings in his General Psychology course during a discussion about therapy, memories, and the impact of trauma. However, the record does not support that the Respondent stated that the accuser was just imagining things.

**73. Whether, during class, the Respondent told students that Brock Turner got off easy because he had so much ahead of him, he had a 4.0 GPA, there was little evidence to prove the rape, and it appeared that the victim had been lying.**

Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent stated that Brock Turner (the Stanford swimmer) got off easy because he had so much ahead of

him, he had a 4.0 GPA, there was little evidence to prove the rape, and it appeared that the victim had been lying. When asked about this during his OIE interview, the Respondent did not recall the Brock Turner case, including after OIE provided a brief summary, and stated, "I just don't know this case, and what this student reported goes way beyond what I know about the case and they added some nefarious things."  No other students shared allegations of this nature with OIE. Also, OIE's review of the available recordings related to this course did not reveal statements of this nature having been made.  Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told his 2018 Fall General Psychology students that Brock Turner got off easy because he had so much ahead of him, he had a 4.0 GPA, there was little evidence to prove the rape, and it appeared that the victim had been lying.

*Student's Sexual Assault Report*
**74. Whether in February 2014, Witness 34 disclosed to the Respondent that she had been sexually assaulted by one of the Respondent's teaching assistants, Witness 36.**

The anonymous reporter in IL #844, alleged that a student "was sexually assaulted by a TA. When she went to her professor ([the Respondent]) he told her to not report it because she would not be believed, and tried to convince her that due to medications she was taking at the time she was partially at fault."  The reporter further alleged that following the sexual assault, the student "approached [the Respondent] after class to request a discussion on the topic. He initially refused to hear her experience, and after her persistence scheduled an office hour meeting to discuss. During office hours she told him the story and [the Respondent] told her that she shouldn't file charges and that 'no one would believe you let him come over just for that.' He also insinuated that due to her taking anxiety medications (benzodiazepines) she should have been more 'on guard.' His only accommodation was to allow her to take exams in his office instead of in class (where the TA would be). Even with this accommodation he scheduled them so she had to run into the TA leaving [the Respondent's] office when she arrived to take the exam. … I did not witness [the Respondent's] exact words, but I met with my friend after the meeting and was the one who encouraged her to disregard what he said and still file a report."

After a review of University records, OIE was able to determine that this IntegrityLine report likely referred to Witness 34, who had been enrolled in the Respondent's 2012 Spring Sexual Behavior and 2014 Spring Cross Cultural Psychology courses.  OIE contacted Witness 34 and she agreed to participate in an interview.  Witness 34 stated that in February 2014, she and another female student, Witness 35, met with the Respondent and disclosed that they had been sexual assaulted by one of his teaching assistants, Witness 36 ("we explain[ed] the whole scenario to him"). Specifically, Witness 34 advised the Respondent that on February 14, 2014, she had talked with Witness 36 about her disappointment with her boyfriend having to work on Valentine's Day, but she nevertheless planned to bake him a cake.  Witness 36 indicated that he was disappointed with his recent breakup with his girlfriend.  They agreed that Witness 36 could come to Witness 34's apartment to "hang out" while Witness 34 baked the cake.  After baking the cake, Witness 34 and Witness 36 watched television, and Witness 36 attempted to kiss Witness 34 multiple times without consent.  Witness 34 told the Respondent that, thereafter, she fell asleep on the couch and woke up to Witness 36 running his hands along and in between her legs and her butt without her consent.

During his OIE interview, the Respondent denied that Witness 34 told him that she had been sexual assaulted by Witness 36 during that initial meeting.  Rather, he recalled that "two young ladies in general psych came to me on the day of an exam and they told me that they were at some gathering - and I don't remember if it was a party or off or on campus - they told me that my undergrad TA sat right next to them, and he started talking to them in a way indicating that he wanted to have some romance with them. I asked if he touched them and they both said no, he did not. I said I don't know what I can do about that. I said for today's test, and this was in a large auditorium full of 460 students, that they could sit up front and I would send the TA to the back of the classroom to monitor for cheating. I said if they felt he did something to them, they could go talk to the Office of Student Conduct. I asked them one more time if he touched them, and they said he did not. A day or two later, I got a call from someone in your office or the Office of Student Rights and Responsibilities asking what they said and what happened. This person said he actually touched them, and I said they did not tell me that and I can only go by what they told me. This person said that the two young ladies were afraid of telling me that my TA had touched them. This person might have said to me that if someone is sexually assaulted, I had to report, and I said I was not aware of this. I never heard anything more about this case. I had never been trained in the Clery Act like I have now. One, they told me that he never touched them. Two, your office never contacted me again about that. Three, I had never been trained on the Clery Act."

Although outreach was made to Witness 35, she did not respond or participate in OIE's investigation.  However, OIE was able to connect with Witness 171, who appears to have been the anonymous reporter in IL #844, and was friends with Witness 34 at the time of the alleged report.  Witness 171 stated that with regard to the incident between Witness 34 and Witness 36, Witness 34 "was uncomfortable going to class, so she went to [the Respondent] to discuss the incident and to ask if she could take the exams outside of class since the TA would be present. She shared with me that [the Respondent] responded that none of this would hold up in court. Her takeaway from the conversation was that [the Respondent] said that she shouldn't report it to the authorities because [the Respondent] did not believe she was assaulted based upon what she shared with him. I encouraged her to report regardless, and she did."

In addition, Witness 34 provided OIE with a document titled "UCF Timeline" that included copies of communications she had with Victim Services, other UCF offices and the Respondent in February and March, 2014.  Therein, Witness 34 set forth a copy of her February 28, 2014 message to Victim Services wherein she stated, "The perpetrator is a TA and I was told last time that I should meet with my professor to discuss the situation since he is the one who hands out and collects my exams and I wanted the professor to be aware. He didn't respond very positively at all ('I don't understand why you're telling me this.' 'There's really nothing I can do.' '**He was probably confused about the situation and thought you wanted it.**' 'I can only hope that in the future you can prevent this from happening again by being more conscientious when choosing your friends.' etc.) Needless to say, I don't completely feel comfortable in my class at the moment because I don't feel like my professor is on my side at all and now I feel like he has a negative attitude about me. I don't believe that the perpetrator is present in my (fairly large) class except on test days, but my professor has already made it clear that he will continue to be in the class during our exams, one of which is next Tuesday. Is there any provision for

accommodations in a situation like this where I might be able to take my exam somewhere else if I decide that it will make me too uncomfortable?" (*Emphasis added.*)

Witness 34 also set forth a copy of her March 11, 2014 email to the Respondent reminding him that she had spoken to him "before Spring Break about an issue that I had with one of the TAs.  Since I knew he would be present in your class during the exams, I've been working on trying to get an alternative testing area through student disability services."  She acknowledged having not been present for the exam scheduled that day and stated that she and Victim Services had "determined that it was best for me not to come in contact with that individual at all, so one of their representatives will be emailing you soon with more information."  Witness 34 then set forth a copy of the Respondent's response (also dated March 11, 2014) that stated, "The best way to have handled this is to communicate with me about this before the exam, not afterwards.  You could have come to my office at 3 p.m. today to have taken the test right outside my office. I will work with you on this exam, but please note that the way to handle these matters (particularly the situation as I understand it) is to go through the professor."  The following day, Witness 34 submitted a report of the sexual assault to Student Development and Enrollment Services (SDES).

Witness 34 further set forth a copy of her March 23, 2014 email to the Office of Student Conduct (which OIE confirmed viewing the matter in the Maxient Database).  Therein, she stated, "[T]he first time that I went to Victim Services, they told me that I needed to bring up the issue with my professor since it involves his TA and I turn my exams into him on exam day. I went to his office hours and brought along a girl named [Witness 35] as support since she's also filing against the same individual (along with 2 other girls). The professor was [the Respondent], a psychology instructor. We brought up the issue and he basically kept asking why we were even telling him and saying that he couldn't do anything about the situation. **He asked us for more details and then when it came out that we had been friends and he'd been at our houses, he sort of rolled his eyes laughed, and acted like of course something would have happened. He said the guy must have misinterpreted the situations and thought we'd wanted more**. We told him that we had been very clear. He said that there was nothing that he could do to remove him from the class and that the only way he would do anything was if a police officer came straight to him and said that his TA was a criminal, but that from what we were saying, he didn't cross any lines and that the only way we'd have a case would be if we were to 'fabricate information' to the police, which he 'wouldn't recommend.'" (*Emphasis added.*)

Taking the record as a whole into consideration, including the corroboration provided by Witness 171 that close to the time of the conversation between Witness 34 and the Respondent, Witness 34 advised him that she had alerted the Respondent to having been sexually assaulted, as well as the documentation at the time capturing Witness 34's detailed description of her conversation with the Respondent, OIE finds that there is sufficient evidence that in February 2014, prior to reporting to SDES, Witness 34 disclosed to the Respondent that she had been sexually assaulted by one of his teaching assistants, Witness 36, and the Respondent did not report this disclosure to the University.

**75. Whether the Respondent asked Witness 34 to provide details about her interactions with Witness 36, and then responded by blaming Witness 34 for Witness 36's misinterpretation of the situations and initially refused to assist with limiting interactions with Witness 36 for the remainder of the semester.**

Witness 34 alleged that following the disclosure of her sexual assault, the Respondent demanded that she provide him with details about the interactions with Witness 36. When she told Respondent that she had been friends with Witness 36 and he had been to her house, the Respondent allegedly rolled his eyes, laughed and said Witness 36 must have misinterpreted the situation and thought that she wanted more.  The Respondent then said, "Well, that's what happens when you bring boys to your apartment". In response to these allegations, the Respondent stated, "Those two students said that? … I'm shocked. I could tell they were upset about this. I put on my clinical psychologist hat and tried to be very empathic when something came up. There is no evidence that this was reported then? This is only happening now? I told you I did not report it because they said he didn't touch them, I hadn't been trained, and I deny that I dismissed them like has been described."

Witness 34 further alleged that when she requested assistance with limiting interactions with Witness 36, the Respondent said that there was nothing he could do about removing Witness 36 from the class, and the only way he would do anything is if a police officer came and said that Witness 36 was a criminal.  The Respondent further told Witness 34 that Witness 36 had not crossed the line; that the only way she would have a case against Witness 36 is if she fabricated information to the police, which he wouldn't recommend as she would get in trouble for falsifying evidence; and that if she brought her allegations the police, they would have to twist around what happened since there was no evidence of the assault.  He ended with suggesting that they pick better friends moving forward.  With regard to these allegations, the Respondent denied having made the statements attributed to him and the conversation having occurred as described by Witness 34.

Witness 34 further alleged that the Respondent initially refused to allow her to take his exams elsewhere or remove Witness 36 from proctoring the exams.  The Respondent told her that the best he could do was tell her not to sit on an aisle seat so that Witness 36 did not have to hand her anything.  Witness 34 stated that she then spoke with UCF's Office of Student Rights and Responsibilities, who contacted the Respondent.  Witness 34 alleged that the Respondent refused to allow her to use the testing center for exams but allowed her to take the exam in his office.  When she arrived, the Respondent did not recognize her and then said, "Oh you're the one with an issue with my TA".  When asked about the refusal to use the testing center and comment on his arrival to his office, the Respondent stated that he did not remember Witness 34 taking the exam in his office, and his recollection was telling her to sit in the front "of the huge auditorium" while he made sure Witness 36 was in the back.

In her March 23, 2014 email to the Office of Student Conduct, Witness 34 stated, "the first time that I went to Victim Services, they told me that I needed to bring up the issue with my professor since it involves his TA and I turn my exams into him on exam day. I went to his office hours and brought along a girl named [Witness 35] as support since she's also filing against the same individual (along with 2 other girls). The professor was [the Respondent], a psychology

instructor. We brought up the issue and he basically kept asking why we were even telling him and saying that he couldn't do anything about the situation. He asked us for more details and then when it came out that we had been friends and he'd been at our houses, he sort of rolled his eyes laughed, and acted like of course something would have happened.  He said the guy must have misinterpreted the situations and thought we'd wanted more. We told him that we had been very clear. He said that there was nothing that he could do to remove him from the class and that the only way he would do anything was if a police officer came straight to him and said that his TA was a criminal, but that from what we were saying, he didn't cross any lines and that the only way we'd have a case would be if we were to 'fabricate information' to the police, which he 'wouldn't recommend.' We thought that was pretty rude and dismissive from a professor, especially one with a psychology background. We made a point to explain that the TA seemed to be doing this repeatedly to many females and that our goal was to stop it and he said that he hopes that what we get out of this is that it won't happen again...because hopefully we'll start 'picking better friends.' We were very frustrated with this especially, as he seemed to be blaming the whole situation on the fact that we were friends with the individual in the beginning. We left feeling kind of defeated and upset."

As set forth above, although outreach was made to Witness 35, she did not respond or participate in OIE's investigation.  However, OIE did speak with Witness 171, who stated that Witness 34 told him that after sharing what had occurred with Witness 36 with the Respondent, he told her "that none of this would hold up in court" and he "did not believe she was assaulted based upon what she shared with him."  Also, documentation around the time of the conversation noted Witness 34's description of the Respondent's reaction to her disclosure – namely, telling Witness 34 that he didn't understand why she was telling him this, there was nothing he could do, Witness 36 was probably confused about the situation and thought she wanted it, her claim lacked evidence, he couldn't remove the TA unless the police instructed him on this, and "I can only hope that in the future you can prevent this from happening again by being more conscientious when choosing your friends."

Taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that in February 2014, when Witness 34 disclosed to the Respondent that one of his teaching assistants had sexually assaulted her, the Respondent asked why she was telling him, asked for details about the incident, denied that the teaching assistant had "crossed the line", said that the teaching assistant must have misinterpreted the situation and thought she wanted more, said that the only way she would have a case would be to fabricate information to the police (which he didn't recommend), said that he could "only hope that in the future" she could "prevent this from happening again by being more conscientious when choosing" her friends, and denied that he could do anything about the situation (such as removing the teaching assistant from the class during exams) as the only way he would do anything was if a police officer came straight to him and said that his teaching assistant was a criminal. The record further supports that, thereafter, the Respondent allowed Witness 34 to make up an exam she missed by taking it in his office and when she arrived, he did not recognize her and then said, "Oh, you're the one with the issue with my TA."

*Tenure-Related Comments*

**76. Whether the Respondent told students that he could say whatever he wanted in class without repercussions because he was tenured.**

Witness 147, who submitted IL #815 and was a student in the Respondent's 2009 Fall Sexual Behavior course and 2010 Fall Cross Cultural Psychology courses, alleged that the Respondent used "his tenure like a child, repeatedly chanting, 'you can't touch me'." Witness 37 alleged that during the 2009 Psychology of Prejudice course, the Respondent often arrived late for the course and reminded students that he was tenured so "what are you going to do". Witness 91 alleged that during the 2016 Spring Cross Cultural Psychology course, the Respondent told students that he couldn't be touched because he was tenured. Witness 88, who submitted IL #800 and participated in an OIE interview, alleged that during 2016 Fall Sexual Behavior and 2017 Spring Cross Cultural Psychology courses, the Respondent "discouraged students from reporting him to UCF higher ups because 'they won't do anything because I'm tenured'. He presented himself as untouchable."  Witness 85 similarly alleged that during the 2016 Fall General Psychology, the Respondent brought up being tenured all the time and told students that they could complain but he was pretty much "untouchable" because he was tenured. Witness 111 alleged that during the 2017 Fall General Psychology, the Respondent said that he can't be touched because he's tenured. Witness 87 alleged that during the 2017 Spring Cross Cultural Psychology course, the Respondent said that some students had complained about the way he treated them but, "I'm tenured, and you can't get rid of me."  Similarly, Witness 144 alleged that during the 2017 Fall Cross Cultural Psychology course when the Respondent advocated for a White history month and students challenged him, the Respondent said the students could "complain to whatever office you want, but I am tenured".  Witness 144 further alleged that the Respondent mentioned being tenured in "just about every class".

In addition, the anonymous reporter in IL #794, who allegedly was a student in one of the Respondent's 2018 courses, stated, "I kept my mouth shut, because [the Respondent] said he could say whatever he wanted whenever he wanted because he had tenure". Witness 160 alleged that during the 2018 Spring General Psychology course, the Respondent said that he was tenured and "I can do what I want." Similarly, Witness 172, who was a student in this 2018 Spring course, alleged that the Respondent "told class that there were previous complaints filed against him but that he was tenured so they couldn't do anything about it." Witness 121, Witness 107, Witness 133, Witness 95 and Witness 57 (via email) alleged that during the 2018 Fall General Psychology course, the Respondent said that UCF was not able to fire him and boasted how UCF couldn't get rid of him and  he could say whatever he wanted with no repercussions. Witness 92 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent stated that he was tenured so he could say what he wanted. Witness 167, who also was a member of the 2018 class, alleged that the Respondent made it "a point to tell us how people have tried to report him to higher authorities. He basically said there is not anything you can do. He would say that the department and the university knew how he teaches and know his teaching methods. He said they can't take action against him because he is tenured faculty. He mentioned how students have tried to report him in the past and it won't work." Witness 56 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent made his comments about Mary and Jesus (as set forth above), showed the class an email he received from a former student about this type of conduct, and commented that "if we were offended, we can report it to UCF but added

they can't do anything about it".  Witness 56 and Witness 117 recalled that the Respondent also told students that "the school can't touch me" and "there is not much the school can do because I am tenured". Witness 98 recalled that during this discussion, the Respondent stated that if UCF tried to fire him, they would have to pay a hefty lawsuit.

Witness 115 recalled that during the 2019 Spring General Psychology course, the Respondent said, "I am a fucking tenured professor and nobody can fucking touch me.  I dare them to even try." Witness 120 recalled that during the 2019 Spring Sexual Behaviors course, the Respondent told the students, "Just try and go tell someone about me – I have tenure, and no one can touch me." Witness 66, who also was a student in this 2019 course, alleged that on the first day of class, the Respondent said that people complain about him every year and try to have him removed, but that it never works. Witness 53 alleged that during the 2019 Summer Sexual Behavior course, the Respondent made a similar statement that tenure protected him from repercussions. Witness 116 alleged that during this same course, the Respondent made a comment about being tenured while discussing something related to religion.  The Respondent referenced an old Reddit post by a student who had been upset with him a few years prior, and said that people had tried to stop him from talking about certain things, but "I can say these things because I have freedom of speech and tenure," and that the things he said would not get him removed from his position. Witness 129 alleged that during the 2020 Spring Personality Theory class, the Respondent said he was tenured so he could not get in trouble.

In contrast, an anonymous reporter, who allegedly was a student in the Respondent's 2008 Spring General Psychology course, stated that the Respondent did not make any comments about being tenured or untouchable, or that left the impression that complaining about him would be a waste of time. *See Phone Log 7-22-2020 Witness 235*.

When asked if he talked to his students about being tenured during his courses, the Respondent replied, "I do talk about this with the students. I do this to encourage students to say anything they want in class. Someone on Twitter, an African American student, said that 'this guy said that in class that because he has tenure, he can rape the students and get away with it.' This is one of those occasions where I just couldn't let it go. Instead of ignoring it, I said, 'did it ever occur to you that I didn't say such a vile thing?' She wrote back and said, 'I don't care, I've heard what other students have said.' I do let students know that I have tenure and that allows me to address these controversial issues - or at least I thought until now - and express my beliefs that are in data and are not popular in the orthodoxy in higher education and protect me from critique from administrators and others. It gives me the freedom to address issues that others don't want to express and to express unpopular views." The Respondent denied that while discussing tenure, he said, "You can't touch me," "I'm untouchable" or similar statements. He also denied that he told students that if they wanted to reach out to UCF about him, nothing would be done because "I am tenured"; denied that he told students that they could "complain to whatever office you want, but I am tenured"; denied that he told students that "UCF was not able to fire me, boasted how UCF couldn't get rid of me, and I could say whatever I wanted with no repercussions"; denied that he said that if UCF tried to fire him, they would have to pay a hefty lawsuit; and, denied that he said, "I am a fucking tenured professor, and nobody can fucking touch me.  I dare them to even try." When asked whether when some students complained in class about the way he treated them, he replied, "I'm tenured, and you can't get rid of me", the Respondent replied,

"I might have said, when this has come up, that it's hard to get rid of a tenured professor unless they do something egregious."

With regard to allegations that he showed the students letters of prior students' complaints, the Respondent stated, "What I showed students was, and you may recall in 2009 I think, I had a student in my large class who stood up and told the whole 450 students, I invite all of you in the name of Jesus to ignore this man and not pay attention. I was furious but just told him to sit down. I left that day still angry and wrote a letter to my students about religious bigotry and the purpose of the university. It got a lot of national attention. In response to this incident, which went national and I got interviewed by news agencies, a few people wrote negatively to me. One sent a letter that I was going to burn in hell, etc. For a couple of semesters after that incident, I read this letter about burning in hell to the class during the first day of the semester. When I showed the letter, I said that I would be covering controversial things, and had endured the fact that people think I should be punished for my views. That was the purpose of sharing the letter. … No other complaints about me like this were shared with students." *See Announcement Jan. 2012 Re Religious Bigotry.*

As set forth in Section VI (Material Facts Not in Dispute) above, OIE's review of the 2019 Recordings revealed that at one point, a student asked if she could take a picture (presumably of his slide) and the Respondent replied in the affirmative stating, "my life is an open book". He then said that he had students at UCF complain, he has gotten investigated, and he "laughs the whole way through". Also, the Respondent stated, "At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me." On another day when talking about how U.S. universities operated and students are customers, the Respondent referenced professors who are not tenured, but how he is tenured "which means they can't fire me unless I do something outrageous". Similarly, in the August 28, 2018 General Psychology course, the Respondent told students, "I can say what I said, and that I the way it goes. No one cares, UCF will not say a thing to me."

Taking the record as a whole into consideration, including the general consistency of allegations among multiple students over different timeframes (2009, 2010, 2016, 2017, 2018, 2019 and 2020), corroboration of allegations within the same courses, and the Respondent's questionable credibility on this point after denying that he referenced rape while discussing tenure (which was refuted by the audio recordings), OIE finds that there is sufficient evidence to support finding that for multiple years, the Respondent told his students in each of his Sexual Behavior, General Psychology and Cross Cultural Psychology courses that he was tenured, which meant that he could not be touched, he was untouchable, he could not be fired, he could not be gotten rid of, nothing would be done if students complained about him to administrators or offices at the University, and he could say what he wanted to say in class without repercussions, as well as that other students had complained about him and were unsuccessful because of the protections provided by tenure.

**77. Whether, during class, the Respondent told students that, due to be tenured, he could not be fired unless he raped them.**

Witness 95 and Witness 58 alleged that during the 2018 Fall General Psychology course, he told the students that unless he engaged in sexual assault or rape, there was nothing that could be done about what he says because he has tenure. The anonymous reporter in IL #832, who allegedly was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, stated, "I wanted to report him sooner but he told the class that unless he rapes us that he could not be fired so I felt hopeless." Witness 125 alleged that during the 2019 Summer Cross Cultural Psychology course, the Respondent said that he "was tenured, which gave him protections, and that the only way he could have his tenure revoked is if he did something like rape a student." Witness 110 and Witness 104, who also were students in the 2019 Summer course, corroborated that he made a statement that essentially he could do anything except rape a student and remain tenured. Witness 5 stated that the Respondent referenced the attention that he had received in 2012 related to a letter he sent to students about his discussion pertaining to religion.  He then stated that in the end, "he had tenure, so they [the University] didn't do anything. He said the department told him, 'We got your back', and said 'unless I hit a kid or something, I'm good.'" The Respondent may have referenced rape but Witness 5 was not sure. Similarly, Witness 137, who submitted IL #877 and participated in an OIE interview, alleged that during the 2019 Fall Cross Cultural Psychology course, the Respondent "discuss[ed] tenured professors and he made the statement that he cannot be fired. Several students have tried unsuccessfully. He state[d] 'I cannot be fired, basically I would have to rape one of you to be fired and that's not happening.' He left the students feeling there was no recourse if anyone was in disagreement with his discriminatory statement." Witness 150, who was a student in this same 2019 Fall course, stated that the Respondent said "that because he is tenured the university can't get rid of him unless he 'raped us'.  It just felt hopeless at that point." Witness 173 similarly alleged that the Respondent made a statement of this nature.

When asked to respond to the allegations that he told students that unless he engaged in sexual assault or rape, there was nothing that could be done about what he said in class because he was tenured, the Respondent replied, "I say unless I do something egregious, but not this." When asked to respond to allegations that during a summer trip to Peru, he said the only way he would lose tenure is if he raped a student, the Respondent said, "I deny that completely."

As set forth in Section VI (Material Facts Not in Dispute) above, during the 2019 Summer audio recordings, the Respondent is heard saying, "At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me."

Taking the record as a whole into consideration, including the general consistency of allegations among multiple students over different timeframes (2018 and 2019), corroboration of allegations within the same courses, and the Respondent's questionable credibility on this point after denying that he referenced rape while discussing tenure (which was refuted by the audio recordings), OIE finds that there is sufficient evidence to support finding that during 2018 and

2019, the Respondent told his students in each of his General Psychology and Cross Cultural Psychology courses that, due to being tenured, he could not be fired unless he raped them.

*Mocking of or Being Condescending Toward Students*:

The record has evidence of students having enjoyed the Respondent's classes, including the content of the course and the manner in which the content was delivered.  That said, the record also has evidence that at least a portion of students found the Respondent to have been disrespectful and condescending towards students throughout his courses and described him as not allowing space for debate of the issues he presented, such as rolling his eyes in response to students disagreeing with him, laughing at students' statements, and telling students that they were not using their brains or lacked experience to refute the issues he presented.  *E.g.* IL#803 (anonymous) (when students attempted to refute Respondent's statements, he seemed "to find entertainment in watching students become frustrated and upset", laughed "at their statements," and did not engage in thoughtful debate); IL #871/#874 (Witness 140) (Respondent "constantly made fun" of students); IL #894 (anonymous) (Respondent often insulted, belittled and made fun of students that spoke about their religious views); IL #924/925 (anonymous) (laughed at student's questions); Witness 51 Witness Interview Summary (Respondent made fun of students); and, Witness 233 Witness Interview Summary (when students countered his opinions regarding affirmative action, he said "you're so young" or "talk to me again after you've worked in the field for 20 years").[24]  Below, OIE assesses out some of the specific examples of these alleged concerns.

OIE also notes that during his interview, OIE asked the Respondent if when a student shared a different viewpoint than him, did he act hostile, laugh, chuckle, cross his arms, roll his eyes, put his hand out for students to stop talking, not give students a chance to defend themselves or tell the students they were childish, the Respondent replied, "It depends on the issue, the comment, the mood of the class - all kinds of things. I am used to those negative comments in my student evaluations. All I can say is that I am a blunt person, with a certain personality, and you've gotten a little taste of it during these interviews. There are some students who have an issue with that. I don't allow my students to proclaim something or pound their chest. I tell them they are wasting class time and it's a large class, so you have to be pithy and focused on the evidence. I'm sure those individual students walk away thinking I dismissed them and was rude or condescending to them. Those are subjective evaluations of my handling of the situation."

It is important to note that the audio recordings reviewed by OIE did not support the allegations that the Respondent disallowed questions or challenges from students. *E.g. Recordings – 2019 Summer – 16* (after discussing why he does not believe systemic racism exists in the U.S., the Respondent stated, "I am trying to be anti-racist. I wish racism would go away," and then said, "I am going to get off my soap box and will let you tell me how wrong I am," and opened the issue up to class discussion).

---

[24] This is not meant to be a full list of where this nature of allegations was made.  Rather, these kinds of allegations were a common theme throughout the investigation when speaking with many students.

**78. Whether the Respondent called students derogatory names such as "stupid", "absolute idiot", "baby", "morons", "idiots", "weird", or "jackass".**

Witness 37 alleged that during the 2009 Psychology of Prejudice course, a Black female student shared her personal experiences with racism, and the Respondent told her that she was an "absolute idiot" if she believed that her experiences were because she was Black. Witness 37 further alleged that when students asked him a question about his opinion or made a statement that the Respondent disagreed with, he responded by calling them "stupid" or an "idiot". The Respondent also told one of his teaching assistants, "You're too stupid to answer questions so don't email the students back." Witness 37 also shared that the Respondent called students who advocated for safe space for Black people "idiots" and "crazy".

Witness 51 alleged that during the 2012 Fall General Psychology course, when students provided their opinions on class discussion, the Respondent told them that their response, idea or opinion was "so stupid or silly" or "that they have nothing to base the views on". Also, when Witness 51 needed to take the final exam early to return home due to illness, the Respondent allegedly told her she was a "baby" and "physical illness is in your brain". He then required her to take the exam sitting in the front of an upper level Psychology class with approximately 100 juniors and seniors, and referenced that she "was a baby and wanted to go home early". Witness 43 alleged that during the 2014 General Psychology course, the Respondent had an exchange with a student that led to the student walking out of class. When the student left, he called the student a "jackass".

Witness 88, who submitted IL #800 and JKRT report #00047725 and participated in an OIE interview, alleged that during the Fall 2016 Sexual Behavior course and 2017 Spring Cross Cultural Psychology course, the Respondent "called students 'idiots'" (including that they were "idiots" for having their beliefs) and said that he knew he was doing his "job when people leave". Witness 85 alleged that during the 2016 Fall General Psychology course, the Respondent belittled students using the terms "stupid" or "idiotic". Witness 87 alleged that during the 2017 Spring Cross Cultural Psychology course, the class, which was approximately nine months after the Pulse shooting in Orlando, were discussing the LGBTQ movement. During the class, a Muslim female student stood up and discussed support for the LGBTQ community because Muslims knew what it felt like to be hated and for people to be hard on you. The Respondent allegedly replied that what she said was "dumb", he is a gay man, "we don't need anyone's help," and "who wants hugs from Muslims". Witness 111 alleged that during the 2017 Fall General Psychology course, when students challenged him, he responded that this was an example of people being "idiots" or "stupid". Witness 140 alleged that during the 2018 Cross Cultural Psychology course, the Respondent called students "stupid" or "ridiculous" when they disagreed with him. Witness 174 stated that during the 2018 Spring Sexual Behavior course, the Respondent "bragged" about previously arguing with a female Muslim student leading to her leaving the class, and then referred to her as a "dummy".

Similarly, Witness 63 alleged that during the 2019 Spring Cross Cultural Psychology course, the Respondent told students who shared their ideas that their ideas were "stupid". Witness 63 further alleged that Respondent said, "Put your hand down if you are offended, because we are not going to waste class time on you. I am right and you are wrong". Witness 73

stated that during this same course when people did not agree with his perspective, particularly with regard to religion, the Respondent said that their ideas were "stupid". Witness 52 alleged that during that same course, the Respondent showed letters or emails from previous students wherein they had complained about his conduct.  He then refuted their allegations, and said that the students were "morons", "idiots" and "ignorant". Witness 117 corroborated that the Respondent showed previous students' emails, and said it was "ridiculous" that the students were defending a non-existent God. Witness 115 alleged that during the 2019 Spring General Psychology course when students didn't respond to him, the Respondent mumbled into his microphone, "Oh, these are just a bunch of fucking morons". Witness 131 alleged (via email) that during the 2019 Fall Sexual Behavior course, the Respondent called students an "idiot" if they disagreed with his opinions.

        In contrast, an anonymous reporter, who alleged having been a student in the Respondent's 2008 Spring General Psychology course, stated that the Respondent did not mock students or call them names.  Witness 4, who was a student in the Respondent's 2011 Cross Cultural Psychology course, stated that he did not recall the Respondent using any derogatory terms at all in class, just the terms "silly" or "ridiculous." Witness 175, who was enrolled in the 2018 Spring Sexual Behavior course, stated that the Respondent did not engage in calling students derogatory names.  Witness 6, who was enrolled in the 2018 Fall Cross Cultural Psychology course, stated that the Respondent "didn't call students stupid and he never implied this." Witness 104 stated that during the 2019 Summer Cross Cultural Psychology course, the Respondent did not call his students derogatory names, like moron or idiot, but he did use those terms to discuss some of the people that he taught about, like religious figures.  Similarly, Witness 125 stated that during the 2019 Summer Cross Cultural Psychology and 2020 Spring Sexual Behavior courses, the Respondent did not call students any derogatory names or mock them. Witness 110, who was enrolled in the 2019 Summer Cross Cultural Psychology, stated that the Respondent did not use these terms directed at a specific person.  Rather, he said, "You have to be a moron to believe …" Witness 116 corroborated that during that same course, the Respondent did not call students names, like moron or idiot or anything like that.

        When asked whether he called students derogatory names as alleged, the Respondent replied, "No, I would never do that…. I never called students 'stupid' or 'idiot'." He also denied that he said "these are just a bunch of fucking morons" as alleged by Witness 115.  With regard to the incident described by Witness 37 about calling a Black female an "absolute idiot" when she described an experience of discrimination, the Respondent said, "I never did this."  The Respondent also denied that he ever called a student "stupid", "idiot" or something similar when they challenged his lectures, and denied telling a teaching assistant, "You're too stupid to answer questions so don't email the students back."  When asked if he referred to students who advocated for a safe space for Black people as "idiots" and "crazy", the Respondent replied, "No, I explained to them how it reflected that they are not into diversity. I did not use those terms (idiots or crazy)."  With regard to the incident described by Witness 51, the Respondent stated, "No, I deny all of that with the exception that I have had students take an exam in a different class because of some legitimate reason. I'm pretty rigid about not letting people stray from my set exam times. I would've made a decision that I rarely make for people." When asked about the incident described by Witness 87 pertaining to the LGBTQ discussion with a female Muslim student, the Respondent stated, "This is completely false. To stand in front of an audience and

say what was just reported is so outrageous, especially after the Pulse massacre; surely someone would have gone and complained about that if I had done that."

With regard to the allegation that he said he knew he was doing his job when people leave the class, the Respondent stated, "[I]n these large classes, students come and go for all types of reasons, and I've already told them on day one that I don't take attendance, and to minimize noise if they have to come in late or leave early. I'm in my own world lecturing and not paying attention to what's on their face if they leave. I can't imagine I ever said that."  With regard to the allegation that he referred to a student as a "jackass" after they walked out of his class, the Respondent stated, "This never happened. Respectfully, if I were to tell any student or the whole class that they were 'stupid' or 'idiots' or 'jackass', I assure you that students would have complained, and there is no evidence that they reported this in the course evaluation comments. If I'd said this, others would have complained. I've said less things that made students go to the chair. If I'd said these more egregious things, I assure you I would have heard about it then."

Turning to the audio recordings, the Respondent was never heard calling a student or referring to a student's idea as stupid, idiot, baby, morons, idiots, or jackass.  As to the term "weird", the only statement heard in the recordings related to the Respondent's September 4, 2018 General Psychology class wherein he asked students if they had to give up all their senses except one, which one would it be.  After students provided some different responses, he replied, "You guys are really weird, at least the ones that participated so far."  Taking the record as a whole into consideration, including the lack of evidence on the audio recordings, the mixed information from student witnesses, the students' lack of motivation to lie, and the Respondent's motive to lie and inconsistent information during this investigation (see *Consistency* section), OIE finds this to be a close question as to whether there is a preponderance of evidence that the Respondent directed derogatory names (such as stupid, moron, idiot or jackass) at students or their ideas.  Accordingly, OIE finds that the current record is insufficient to support finding that the Respondent engaged in this conduct. Notwithstanding, OIE finds that there is sufficient evidence to support finding that when Witness 51 needed to take the final exam early to return home due to illness, the Respondent told her she was a "baby", told her that "physical illness is in your brain", required her to take the exam sitting in the front of an upper level Psychology class with approximately 100 juniors and seniors, and then referenced that she "was a baby and wanted to go home early". Similarly, OIE finds that there is sufficient evidence to support finding that during one of the 2017 Spring Cross Cultural Psychology classes, which was approximately nine months after the Pulse shooting in Orlando, the class discussed the LGBTQ movement and a Muslim female student discussed support for the LGBTQ community because Muslims knew what it felt like to be hated and for people to be hard on you.  The Respondent then replied that what she said was "dumb", he is a gay man, "we don't need anyone's help," and "who wants hugs from Muslims".

**79. Whether during the 2013 Fall semester when a General Psychology student visited him during office hours to discuss an exam, the Respondent "made fun" of her answers on the test and told her, "If you can't even pass this class, you're not going to be smart enough to graduate at UCF, and will eventually fail at life".**

Witness 70 alleged that she had been a student in the Respondent's 2013 Fall General Psychology course and had visited him during office hours to discuss an exam. At this meeting, the Respondent "made fun" of her answers on the test and said, "If you can't even pass this class, you're not going to be smart enough to graduate at UCF, and will eventually fail at life." *See Student Google Form Report*. In response to these allegations, the Respondent stated, "I never said this. By the way, just for the record, I, for personal reasons, leave my office door wide open, and when students close my door, I tell them, 'no, leave the door open.'" Witness 70 did not respond to multiple outreaches from OIE to discuss her allegations. Without any further information or witness corroboration, OIE finds that there is insufficient evidence that during the 2013 Fall semester when a General Psychology student visited him during office hours to discuss an exam, the Respondent "made fun" of her answers on the test and told her, "If you can't even pass this class, you're not going to be smart enough to graduate at UCF, and will eventually fail at life".

**80. Whether, during a Spring 2019 Sexual Behavior class, a female student raised her hand while the Respondent was discussing rape allegations at universities, and the Respondent yelled at the student, "Can you let me finish? No? You can't let me finish?"; and, when the student lowered her hand, the Respondent said, "Oh did I hurt your feelings?" and repeatedly referred to the student's "hurt feelings" later in the class.**

Witness 66, who submitted IL #789 and participated in an OIE interview, alleged that during the 2019 Spring Sexual Behavior course – specifically, on February 19, 2019, the class was having a discussion regarding sexual assault and Title IX. While the Respondent was presenting his lecture, a female student raised her hand. She did not say anything or "make a face" when she raised her hand. The Respondent allegedly "screamed" at the student to let him finish his sentence. The student's mouth opened but she did not say anything. He then mocked her and said, "Oh, did I hurt your feelings?" The student responded, "I raised my hand. This is a class and I'm allowed to raise my hand". The Respondent then told her to "chill out" and referred to her "hurt feelings" later in the class.

In response to these allegations, the Respondent stated, "I don't know that student's name, but I know who she is. She came to my office and unloaded on me and told me she had been sexually abused and she had refused to give me her name. I spoke with a male person in your office [OIE] and asked what I needed to do, and no one ever got back to me. As to what happened in class, she raised her hand, and I only said, 'Can you relax/chill out and let me finish my sentence first?'" First, OIE notes that this report was received on February 27, 2019, and was reviewed by the Title IX Coordinator, who made outreach to and spoke with the Respondent. Second, although denied by the Respondent, OIE found the detailed nature of Witness 66's testimony persuasive (particularly when considering her lack of motive to lie, the Respondent's motive to lie, and the Respondent's other inconsistencies in testimony noted herein), and, thus,

167

finds that there is sufficient evidence to support finding that on February 19, 2019, the Respondent's Sexual Behavior class had a discussion regarding sexual assault and Title IX. While the Respondent was presenting his lecture, Witness 66 raised her hand.  The Respondent screamed at the student to let him finish his sentence, and then mocked her and said, "Oh, did I hurt your feelings?" Witness 66 responded, "I raised my hand. This is a class and I'm allowed to raise my hand.  The Respondent then told her to "chill out" and referred to her "hurt feelings" later in the class.

81. **Whether, during class, the Respondent mocked a student when she provided an example of a religiously charged terrorist attack that was not committed by Muslims – namely, in a higher pitched voice said, "Oh look, she was able to answer, awe, wow, good for her."**

The anonymous reporter in IL #832, who alleged they were a student in the Respondent's 2019 Spring Cross Cultural Psychology course, alleged that the Respondent stated that "all Muslims are terrorists, he backed this claim by saying fundamentalists are all terrorist which is not true. Fundamentalism in religion is following religious text as it is written. There is fundamentalism is every religion that has a scripture. When I tried to mention this fact [the Respondent] told me that I condone terrorism and that I should be ashamed. He then asked me to name one religiously charged terrorist attack that wasn't done by Muslims, so I answered. Being Jewish, it is not difficult to think of multiple terror attacks. He then mocked me for answering the question he proposed. He made his voice higher pitched and mockingly said 'Ohhh look she was able to answer awwww wooow good for her'." Witness 150, who was a student in the Respondent's 2019 Fall Cross Cultural Psychology course, alleged that after watching a video regarding the Muslim religion and fundamentalism, she stated that there was fundamentalism in most religions, and the text allowed for interpretations and different translations. The Respondent then allegedly replied, "Oh, so what I'm hearing is that you support terrorism" and asked me to name one non-Muslim terrorist attack.  Witness 150, who identified as Jewish, responded with identifying the New Zealand attack on the synagogue.  She alleged that the Respondent then mocked her saying, "Oh look, she had an answer, oh wow…"

In response to these allegations, the Respondent stated, "So, the first half of what you said (statement of 'oh, so what I'm hearing is that you support terrorism'), that is not accurate. I deny it. Rather, a student was claiming that White nationalists or White supremacists have attacked people more than Muslims in the U.S., and I replied that is not accurate and asked for an example. The student mentioned an example, I think it was Dylan, the guy who walked into a Black church and started gunning down people, and I said that's one example, but what is another example of a person doing this. I shared that the guy in Las Vegas, there was no indication that there was motivation based on race so that's not an example. That student couldn't give me another example of White nationalists/supremacists' attacks. That was the end of the discussion. I did not mock with 'oh look, s/he had an answer, oh wow ...' I assumed that the student got mad at me. They were claiming that more White people, in the name of being White, killed more people than Muslims. I can only speculate that this student felt humiliated, but I am not there to allow inaccurate things to be said. The last part is very personalized, and I don't characterize my correcting people's inaccurate statements as mocking them, but they may characterize it that way."

Although the specificity of the student's description of the incident lends credibility to the allegation, the Respondent's specific recollection of the interaction also has credibility. Taking the record as a whole into consideration, including that none of the other 21 students spoken to from this course corroborated either version of this incident, OIE finds that there is insufficient evidence to support finding that during this class discussion, the Respondent mocked the student by saying, "Oh look, she had an answer, oh wow…"

*Repeated Use of Profanity*:

**82. Whether the Respondent repeatedly used profanity throughout his lectures.**

Witness 158, the Director of the Psychology Advising Center, alleged that some students said that the Respondent used foul language and the "F" word "too much" in class leading them to withdraw from the course. Witness 88, who was a student in the Respondent's 2016 Spring Sexual Behavior and 2017 Cross Cultural Psychology courses, alleged that the Respondent used profanity "all the time in class", including having used the terms "fucking homosexual" and "fucking lesbian". Witness 111 alleged that during the 2017 General Psychology course, the Respondent said "fuck a lot" and recalled that he referred to Peru as a "shithole". Witness 144 alleged that during the 2017 Fall Cross Cultural Psychology course, the Respondent used the "F" word "every now and then". Witness 151, one of the Respondent's GTAs for 2018 Spring Cross Cultural Psychology, stated that the Respondent "frequently used profanity. It occurred regularly in our conversations in his office and in our conversations in the classroom in front of students – it was frequent. One of his favorite words was 'bullshit,' which he used very frequently, and also 'bitch' and 'fuck' which he used more occasionally."  Witness 151 also recalled the Respondent referring to a female faculty member as a "bitch". Witness 121 and Witness 95 alleged that during the 2018 Fall General Psychology course, the Respondent used profanity but not the "F" word. However, with regard to this same course, Witness 107 alleged that the Respondent used profanity in the classroom every time the class met, including words like "fuck", "shit," and "asshole". Witness 48 who also was enrolled in this same course, the Respondent used profanity in class including "shit", "fuck", "that's a bitch" and "stop bitching around". Witness 140 alleged that during the 2018 Fall Cross Cultural Psychology course, the Respondent used the term "fucking homosexual".  For the same course, Witness 92 recalled that the Respondent referred to Peru as a "shithole".  Witness 78 recalled that during the 2018 Fall Sexual Behavior course, the Respondent used the word "fuck". Witness 81 recalled that during the 2018 Spring semester when the Respondent spoke about a Voodoo priest in West Africa, he said that everything the priest said was "bullshit" and that he couldn't believe people actually believe in this.

Similarly, Witness 115 alleged that during the 2019 Spring General Psychology course, the Respondent said "fuck this", "fuck that" or this "fucking institution" at least twice during every class.  He also allegedly referenced the Colbourn Hall issue and said, "You should be fucking angry at the fucking morons you have leading your university.  Speak up! Don't just sit there like fucking morons yourselves without questioning what they are doing." Witness 41 recalled that during the 2019 Fall Cross Cultural Psychology course, the Respondent referred to the U.S. Supreme Court case involving a bakery that refused to make a wedding cake for a gay couple and stated that the bakers were "assholes" and "shitheads". Witness 2, who was enrolled in the 2019 Fall Sexual Behavior course, stated that the Respondent used profanity in class,

which she described as simple cuss words like "F-bombs and stuff like that." Witness 47 recalled that during the 2020 Spring Cross Cultural Psychology course, the Respondent referred to Peru as a "shithole".

In contrast, Witness 4, who was a student in the 2011 Cross Cultural Psychology course, stated that he did not hear the Respondent use profanity. Witness 1, who was a student in the Respondent's 2019 Spring Cross Cultural Psychology course, stated that the Respondent may have used some profanity in the classroom but could not recall specific examples. Witness 104, who was a student in the Respondent's 2019 Summer Cross Cultural Psychology course, stated, "The only profanity I recall him using was the 'B-word,' but it was done in a joking manner during a story to make a point, and all the students thought it was funny."  Similarly, Witness 110, who was in the same course, stated that the Respondent used some profanity during his lectures but "it was not overt or excessive. He used profanity to emphasize his point." Witness 5, who also was in the 2019 Summer course, stated that she did not specifically remember the Respondent using profanity during lectures.  There "might have been a time or two that he cursed by accident. We're in class three hours a day and then taking tours … so it was a more personal, friendly environment, more casual."  Witness 3 had a similar experience in the 2018 Fall Sexual Behavior course.

During his OIE interview, when asked to respond to the above allegations, including that he repeatedly used profanity in class, the Respondent stated, "I've never said the first 90% of what is alleged, but on occasion I have said the F word. It's rare, but it does come out every now again."  With regard to the Colbourn Hall allegations, the Respondent stated, "I didn't even address the Colbourn Hall issue. I'm not that passionate about what UCF does with its money. I deny all of that." When asked to describe how often he used profanities in the classroom, the Respondent stated, "Once in a while. Remember, I've been teaching 22 years, over 30,000 students, and I've said a lot. I've said those things my entire career, but it's sporadic and not aimed at any student." When asked what he meant by "sporadic", the Respondent replied, "Maybe once a week, but I don't keep track." As to the phrases "that's a bitch" and "stop bitching around", the Respondent stated, "I don't say that directed at students, but I've said sometimes 'son of a bitch', and I have on occasion said when people bitch about something, I've used that phrase." The Respondent denied that he referred to Peru as a "shithole", and denied that he referred to the bakers as "assholes" and "shitheads". The Respondent did not recall making the statement related to voo doo, but indicated that he would not deny it. OIE notes that the Respondent used the phrase "son of a bitch" during his OIE interview when asked to respond to the allegation he said, "I am a fucking tenured professor, and nobody can fucking touch me. I dare them to even try." In response, the Respondent stated, "What a cocky son of a bitch I would be if I said that. I deny this allegation."

Turning to the audio recordings available for OIE's review, during the 2019 Summer course, the Respondent told students that he would be talking about multiple groups and that "there is good and bad in every group and I treat them all like shit". Later, when discussing practices in Saudi Arabia, he asked, "How on earth can people in the U.S. proclaim that all cultures are equally good?"  He then responded, "The answer is, they are just fucking crazy". On another day, the Respondent told students that some Muslims will pressure a family member who has been sexually assaulted to commit suicide and asked, "Is this fucking for real?  This is

170

just barbaric as shit".  On another day, the Respondent discussed the amenities available at American Universities, including fancy apartments, restaurants, stores for shopping and "shit like that."  He added, "American students bitch about how much they have to pay in tuition."  Later in the discussion, the Respondent stated that those who were not tenured were "kissing your ass" by" letting students retake tests, access Power Point slides, and other things.  When discussing the motivation to believe in religion, the Respondent stated that "life is a bitch and then you die" was his motto in life.  In another lecture, when discussing the story of Noah's ark, he referred to the individuals on the boat "shoveling shit 24/7". In another recording, the Respondent discussed whether systemic racism existed in the U.S. and noted that if he was at a party, he "wouldn't be saying this shit because it's upsetting."  In a separate discussion regarding systemic racism, a student mentioned Casey Anthony, and the Respondent replied, "I hate that bitch but go ahead." On another day, the Respondent discussed the U.S. Supreme Court case related to bakers that refused to make a wedding cake for a gay couple.  The Respondent told students that if he had encountered such a baker, he would have told the baker, "Sir, you are not invited to the fucking wedding or to be a part of the party.  You aren't celebrating shit.  Do your job and make the cake." Lastly, when talking about how stereotypes can be negative, positive or neutral, the Respondent provided the example of Italians liking pasta and stated, "Because many of you are not independent thinkers, you buy into all this bullshit of political correctness."  During the Indentured Slaves recording, the Respondent discussed Whites and how there are sub-groups that think they are better than other groups of Whites (i.e. California Whites, Southern Whites, etc.) and stated, "We humans are a fucked up group. We have a pathological need to see ourselves as superior to someone."

OIE would note that its review of the audio recordings did not reveal lectures inundated with Respondent's profanity nor would the use of profanity be characterized as infrequent or rare.  That said, taking the record as a whole into consideration, OIE finds that there is sufficient evidence to support finding that the Respondent repeatedly used profanity throughout his course lectures, including the words "fuck", "bitch" and "shit."

*Misinformation Regarding HPV Vaccine*
**83. Whether the Respondent told students to not get the vaccination for HPV.**

Witness 111 alleged that during the 2017 General Psychology course, the Respondent told students that they should not get the HPV vaccine and that the vaccine was just a way of discouraging sexual activity. In response to this allegation, the Respondent stated, "I recall discussing this vaccine. I talked about this during a discussion on STIs at the end of general psych and during the sexual behavior course. I told students the pros and cons of getting the vaccine. I told the students that the virus infects almost everyone who has ever had sex, it's considered the common cold of STIs, and it won't cause any problems for 90% of those infected. The facts come from the CDC website, and I said that if they are that concerned about getting cervical cancer, which is very rare, to get the vaccine but otherwise I don't think it's necessary."

Witness 120, who submitted IL #790 and participated in an OIE interview, alleged that during Spring 2019 Sexual Behavior course, the Respondent encouraged the students "to not get a vaccination for HPV (if we hadn't already) because 'HPV won't kill you, you'll likely never have symptoms'". Witness 120 raised her hand and responded, "Well, you may not know you

171

have HPV, but it could cause cervical cancer." He allegedly replied, "Yeah, but you'll die of old age before you ever die of cervical cancer." Witness 120 noted that it was a slow killing cancer, but if you could prevent cancer, why wouldn't you? She also noted that cervical cancer can cause infertility, and having children is important to a lot of people and this could take their options away for having children later. The Respondent then said something to the effect of, "Whatever, why would anyone want kids anyway?" When asked to respond to these allegations, the Respondent stated, "No, I said that about prostate cancer in men (you'll die of old age before you ever die of prostate cancer). If you get cervical cancer, you need to get that addressed, but it is slow as it takes 10-20 years for it to kill someone."  When asked about the alleged comment about infertility and children, the Respondent replied, "That is total nonsense. I have kids."

Although the detailed nature of the two students' allegations lends credibility to their allegations, the Respondent's response provides a different context.  OIE would note that no other students identified these discussions as areas of concern nor provided information that corroborated either the students' or Respondent's version of these discussions. The audio recordings reviewed by OIE did not corroborate either version. Accordingly, taking the record as a whole into consideration, OIE finds that there is insufficient evidence to support finding that the Respondent told students to not get the vaccination for HPV.

*Alleged Bribe*:

84. **Whether while traveling out of Peru, where he had been located for the UCF study abroad program, the Respondent paid a health clinic representative $17.00 to issue a certificate falsely stating that he had received the yellow fever vaccine.**

Witness 80, who had been enrolled in the Respondent's 2018 Fall Cross Cultural Psychology course, vaguely recalled that the Respondent shared an alleged bribery story related to Venezuela and that there was a question on the exam related to this. Also, in the Respondent's *White Shaming* book, he referenced that during his study abroad trip to Peru, he paid a health clinic representative in Peru $17 in exchange for a certificate falsely stating that he had received the yellow fever vaccine so that he could travel to El Salvador unencumbered. *See White Shaming, pp. 78-79.*  Specifically, therein, the Respondent stated, "I'll disclose another example in which I partook in the corruption permeating much of Latin America. In 2011, after having lived in El Salvador, I immediately went to Lima, Peru for a month with a group of university students (I was leading a study abroad program there). Peru was having a 3-day weekend due to their Independence Day celebration and I wanted to take a quick excursion back to El Salvador to visit friends. With my plane ticket in hand, an airlines employee at the Lima Airport told me I could not fly to any Central American country without showing proof of vaccination against yellow fever. I panicked, as I had no such proof **(and I had never even been vaccinated against yellow fever)**. After some back-and-forth with that employee, he told me to visit the Health Clinic on the Airport premise. I walked in, and being familiar with how things operate in Latin America, I audaciously (but with a facade of humility and respect) asked the attending nurse if I could pay her 60 soles (the equivalence of $17 U.S. at that time) to provide me with a certificate indicating I had received not one, but two doses of the yellow fever vaccine (the vaccine required two doses spaced 10 days apart). She said she had to consult with someone about that, and returned within minutes with a certificate in hand, willing to pre-date the recording of a **vaccine I had never received**. All for just $17 (to show what a farce all of this was, when I arrived in

San Salvador, El Salvador, I pulled out my vaccination certificate to present to the Immigration officer only to be told he didn't care to see it)." *Emphasis added*.

When asked to respond to allegations that he had bribed a health clinic representative to travel, the Respondent replied, "That's a total fabrication and I deny this allegation. In my *White Shaming* book, I discussed the corruption endemic to Latin America. In that anecdote, I shared how an airport employee in Peru erroneously informed me, just before I was set to board a plane for El Salvador, that I could not travel to any Central American country without proof of a yellow fever vaccination. I further shared how I offered a nurse at the airport health clinic the equivalent of $17.00 to provide me with a vaccination certificate. **I actually had received a vaccination shot and never bribed anyone.** As further proof of the corruption, I related the fact that it appeared that I fell prey to a scam because I was never even required to present the certificate to enter El Salvador."

In addition to reviewing the Respondent's *White Shaming* book, OIE reviewed the audio recordings related to his 2019 Summer course (*see Recordings – 2019 Summer – 9*).  During one of his classes, the Respondent told the students how when he was teaching his first study abroad program in Peru, there was a four day weekend and he didn't want to stay in Peru.  He wanted to go back to El Salvador to see his husband so he bought an airline ticket to El Salvador.  When he arrived at the airport, the "Copa airline person asked for a certificate for vaccination for yellow fever" and said that the Central America countries would not allow anyone to fly from South America countries without a vaccination certificate because of yellow fever problem in certain parts of South America.  The Respondent then told the students, "I told him I don't have that.  He said well you can't fly.  I asked where can I go quickly in Lima to get that vaccination" as his flight was scheduled to leave in two hours. The airline person "said you can't do that because it's given to you on two separate days – two dosages 10 days apart.  I said who can I talk to about this. The man replied, 'I'm the person you need to talk to.'  We argued about whether I needed the vaccine.  The man said at the end of the Lima airport is a health clinic, go talk to them, maybe they can help you. I went to the health clinic, advised that I am about to fly to El Salvador and being told that I need a yellow fever vaccination certificate.  If I were to give you $17, can you give me that certificate? She **agreed to give me the vaccination certificate for $17.00, and she dated [it] so that I had gotten one dosage 10 days before and the second dose today**. Then immigration at El Salvador said he didn't care about seeing the vaccination certificate."

During this same recording, the Respondent shared a story about when he was teaching at a different university and planned to drive into Mexico, four hours south of Texas. He explained that he didn't know that he needed permission to take his vehicle into Mexico at the time. Once they stopped him and asked for his proof of permission, which he did not have, he asked if he could "pay a fine here" and admitted that this was a bribe. Rather than saying it's a bribe (which is offensive to the person), he offered to "pay the fine here."  He provided $10 and they let him continue on "without that piece of paper."

The documentary evidence and audio recordings clearly demonstrate that, while in Peru for a UCF study abroad program in 2011, the Respondent paid an individual at a health clinic located in the airport in Peru to provide him with a certificate falsely indicating that he had been

vaccinated against yellow fever in exchange for $17.00 so that he could board a plane for a personal trip to El Salvador.

## VIII.  FIRST AMENDMENT & ACADEMIC FREEDOM

### A. Respondent's Twitter Posts & First Amendment

The First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern as "a citizen who works for the government is nonetheless a citizen."[25] The courts have noted that it is their "responsibility" to "ensure that citizens are not deprived of fundamental rights by virtue of working for the government."[26] Courts also have noted that the First Amendment reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[27] "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'"[28]  The "essential question is whether the speech addressed matters of public as opposed to personal interest."[29] If an employee has not spoken as a citizen on a matter of public concern, then there is no First Amendment protection for the speech.[30]

In the present matter, although many of the reports received in this matter pertained to sharing negative experiences with the Respondent and requesting his termination, the University also received reports acknowledging the importance of First Amendment protections.  For instance, the anonymous reporter in IL #831 stated, "As a UCF graduate and former employee, I want to express my concern and urge that UCF unconditionally support faculty/staff/students in their personal lives be afforded protection under the First Amendment of the U.S. Constitution. UCF stands for diversity, this doesn't mean just skin color, it includes different opinions and perspective." Similarly, the anonymous report in IL #839 alleged that they were a former student of the Respondent's Cross Cultural Psychology course, they believed that the class taught them "to learn how to defend what I believe while also being willing to listen to another view point", and, "I do not believe [the Respondent's] voice should be removed [from] the classroom. [The Respondent] isn't a racist."

Witnesses alleged that the Respondent's Twitter posts were integrated into the course curriculum and, accordingly, do not merit First Amendment protection.  As set forth above, there is insufficient evidence in the current record to support finding that the Respondent required students to follow and/or review his Twitter account posts as part of his course curriculums. Although he advised students of the existence of his Twitter account, his messages were clear that reviewing them was optional.  Equally important, no exam questions or classroom assignments required students to review the Twitter posts. In other words, the Twitter posts themselves were not integrated into the classroom curriculum.

---

[25] *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006)
[26] *Connick v. Myers*, 461 U.S. 138, 147 (1983).
[27] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).
[28] *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461, U.S. 138, 146 (1983) (whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement).
[29] *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009)
[30] *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).

That said, the question remains whether the content in the Respondent's Twitter posts are subject to review for the hostile environment harassment analysis below or remain protected by the First Amendment. This question turns on whether the Twitter posts, however controversial or repugnant, addressed a matter of public concern as described in First Amendment jurisprudence. OIE's review of the Respondent's Twitter posts supports the conclusion that they involve matters of public concern and, accordingly, are protected by the First Amendment. It is important to note that this question does not turn on whether the Respondent's posts are offensive as the First Amendment protects speech that may be offensive and distasteful to listeners. In other words, the "inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern."[31] OIE would further note that this analysis also does not take into consideration the Respondent's tenure status as that is irrelevant to whether the Twitter posts are protected by the First Amendment.  This analysis would be applied to any UCF employee in this situation, tenured or not. The sole question is whether the posts involve matters of public concern.  A review of the Twitter posts demonstrates that the Respondent commented on a variety of social and political issues, including but not limited to issues related to racial tensions in the U.S., sexual harassment in the workplace cases that were receiving national attention, gender issues, religious issues, immigration policies, education trends, effectiveness of affirmative action programs, and, effectiveness of diversity initiatives. The posts did not focus on a personnel issue related to the Respondent's employment with UCF or a matter of personal interest.  Also, the manner in which the messages were distributed reinforces the conclusion that the posts addressed matters of public concern as they were not distributed to a limited audience, but rather were part of a public social media platform unaffiliated with UCF. Accordingly, OIE finds that the Respondent's Twitter posts are subject to First Amendment protection.

### B.  Classroom Conduct & Academic Freedom

In matters involving in-class comments by professors, any analysis of statements that are alleged to constitute harassment must consider whether the speech was protected under the doctrine of academic freedom. "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."[32] It consists of "the right of an individual faculty member to teach ... without interference from ... the university administration, or his fellow faculty members."[33]  That said, it is important to take into "account the unique context in which a college professor speaks such that his students are a 'captive audience' who may find themselves intimidated by the person who has the ability to pass

---

[31] *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

[32] *University of California Regents v. Bakke*, 438 U.S. 265 (1978).  *See also Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("The essentiality of freedom in the community of American universities is almost self-evident. … To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. … Scholarship cannot flourish in an atmosphere of suspicion and distrust.  Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.")

[33] *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) (citations omitted).

upon them a poor grade."[34] The "principle of academic freedom under the First Amendment serves to protect the utterances in question <u>only</u> if they are germane to course content."[35]

   As part of this investigation, the Respondent shared the *UCF Faculty Resolution 2017-2018-6 Endorsement of University of Chicago Statement on Freedom of Expression*, which was approved by the Faculty Senate on January 25, 2018 and approved by the UCF Provost on February 26, 2018.  Specifically, the Respondent highlighted the following language therein:  Of course, the ideas of different members of the University of Central Florida community will often and quite naturally conflict. But it is not the proper role of the University to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive. … The University of Central Florida's fundamental commitment is to the principle that debate or deliberation may not be suppressed because the ideas put forth are thought by some or even by most members of the University community to be offensive, unwise, immoral, or wrong-headed. *See Respondent's Letter to OIE 8-4-20*.  OIE would note that this resolution also contains the following language:  Although the University greatly values civility, and although all members of the University community share in the responsibility for maintaining a climate of mutual respect, concerns about civility and mutual respect can never be used as a justification for closing off discussion of ideas, however offensive or disagreeable those ideas may be to some members of our community. The freedom to debate and discuss the merits of competing ideas does not, of course, mean that individuals may say whatever they wish, wherever they wish. The University of Central Florida may restrict expression that violates the law, that falsely defames a specific individual, that constitutes a genuine threat or harassment, that unjustifiably invades substantial privacy or confidentiality interests, or that is otherwise directly incompatible with the functioning of the University.

   During the investigation, OIE received feedback from students similar to what the anonymous reporter in IL #828 alleged, which was that the Respondent's "class wasn't about cross-cultural psychology, superficially it was about him getting off on trashing people, gaslighting them about their personal experiences with discrimination and ridiculing their beliefs, but beneath that it was about trying to convince, even brainwash us, into believing that racism wasn't real anymore in the U.S."  During his OIE interviews, the Respondent acknowledged that he made some of the statements that were attributed to him by witnesses, but explained that these statements were relevant to the course content, arose from his efforts to make the subject matter relevant and engaging for the students, and constituted protected speech.  Thus, before analyzing whether the statements established above created a hostile learning environment, OIE must first determine which statements were protected expressions of academic freedom and which statements fell outside of this protection.  To make this determination, OIE must analyze which of the

---

[34] *Bonnell v. Lorenzo*, 241 F.3d 800, 819 (6th Cir. 2001) (quoting *Martin v. Parrish*, 805 F.2d 583, 585-585 (5th Cir. 1995)).

[35] *Bonnell v. Lorenzo*, 241 F.3d 800, 804 (6th Cir. 2001). (Emphasis added.) In addition to the First Amendment, academic freedom is grounded in contract law and the custom of the academy.  *See, e.g., Greene v. Howard Univ.*, 412 F.2d 1128 (D.C. Cir. 1969) (faculty handbooks and contracts); *Browzin v. Catholic Univ. of America*, 527 F.2d 843, 848 n8 (D.C. Cir. 1970) (interpreting academic contracts in light of "widely shared norms in the academic community," such as jointly issued statements by AAUP and higher education organizations on academic freedom).

substantiated or undisputed statements were germane to the content of the Respondent's courses.[36] As part of this analysis, OIE examines the age and sophistication of the students, the relationship between the teaching method used and a valid educational objective, and the context and manner of the presentation.[37]

Guided by this framework, OIE first reviewed the learning objectives set forth in each course's syllabi as well as the Respondent's descriptions of each learning objectives. Specifically, as to the Sexual Behavior course, the Respondent stated, "The goal of the course is to learn more about the social aspects of sex from a scientific perspective, with minimal coverage of biology. I talk about the social context of relationships, adolescent and adult sexuality, paraphilias and other proclivities that fall outside mainstream, and STIs." As to the learning objectives of the General Psychology course, the Respondent stated, "My hands are somewhat tied because I need to cover a certain amount of content that one would normally have in such a course as set forth by the college; however, I do use my academic freedom to cover cross-cultural issues and human sexuality during the last portion of the semester (about three weeks)." When asked about the learning objectives of the Theories of Personality course, the Respondent stated, "The course primarily covers the salient theories of personality and the theorists that have shaped the practice. I add some empirical research that fits with each theory."

Lastly, with regard to the learning objectives of the Cross Cultural Psychology course, the Respondent stated, "Many people across the country and at UCF would typically teach this course from a point of view that minorities are victims of racism and Whites have perpetrated racism, which is a very political point of view. I have travelled to many countries and lived in three countries, and being that I am data-driven with my teaching, I do not teach the course that way. All cultures have their pros and cons, not necessarily in equal amounts, and all ethnic groups have their pros and cons. I tell the students that we'll take a critical look at these issues and most of the content I share is neutral. I reserve a portion at the end of each of the four sections (Hispanics/Latinos, Native Americans, African/African Americans and Arabs/Muslims) to cover challenges and problems that are relatively unique to that group. I try to tie all that information to national surveys or data to the best I can. … At the end of the first section [during which Respondent has trained students that "scientifically that evidence matters"], I cover religious bigotry and religion. … Then I talk about Hispanics, Native Americans, African Americans, Whites, White Europeans, and Arabs/Muslims." When asked why he selected these groups to

---

[36] *See, e.g., Hardy v. Jefferson Community College*, 260 F.3d 671 (6th Cir. 2001) *cert. denied*, 535 U.S. 970 (2002) ("Reasonable school officials should have known that … speech, when it is germane to the classroom subject matter and advances an academic message, is protected by the First Amendment."); *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir.), *cert. denied*, 534 U.S. 951 (2001) ("While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment" and the professor's vulgar language was "not germane to the subject matter.") *See also* American Association of University Professors – *Academic Freedom of Students and Professors, and Political Discrimination*.

[37] *See Silva v. University of N.H.*, 888 F.Supp. 293 (D.N.H. 1994). For example, in a challenge to an English professor's use of sexual analogies in a creative writing class, a court determined that the language was protected by academic freedom. In reaching this decision, the court noted that college students were older and sophisticated enough to handle such speech, the metaphors were connected to an educational objective trying to convey principles related to the subject matter, and the statements were presented in a class lecture in a professionally appropriate manner.

structure this course, the Respondent stated, "These are the groups that are most visible and prevalent in our society."

Taking the above into consideration, OIE finds that the following statements from the Material Facts Not in Dispute section (Section VI) and Disputed Material Facts section of this report (Section VII) are protected expressions of academic freedom because they were germane to the subject matter of the courses at issue:[38]

- Disputed Fact No. 10 (story related to Sambia tribe and oral sex)
- Disputed Fact No. 12 (nudity in the classroom comment)
- Undisputed Fact No. 18 (latest terms of genitals exercise in Sexual Behavior course)
- Undisputed Fact No. 19 (G-spot comments)
- Undisputed Fact No. 21 (comments related to Sambia tribe)
- Undisputed Facts Nos. 22-23 (comments related to Hopi tribe)
- Undisputed Fact No. 24 (Girls Scouts comment)
- Undisputed Fact No. 25 (argument against social construct theory related to gender)
- Disputed Fact No. 25 (question regarding all-female construction crew and all-male daycare facility)
- Undisputed Fact No. 26 (girls and checkbooks comment)
- Disputed Fact No. 29 (asking students to participate on LGBTQ+ panel and voluntarily share sexual orientation and gender identity)
- Undisputed Fact No. 38 (PRIDE parade participant comments)
- Undisputed Fact No. 39 (prevalence of discrimination based on sexual orientation comments)
- Undisputed Fact No. 40 (showing of *Consent (2004)* video)
- Undisputed Fact No. 41 (sexual assault statistics being highly inflated comments)
- Undisputed Fact No. 43 (no evidence of God and religion being a mythology comments in Cross Cultural Psychology courses)
- Undisputed Fact No. 44 (indoctrination comments)
- Undisputed Fact No. 45 (2012 letter to Cross Cultural Psychology students)
- Undisputed Fact No. 47 (portion of Jan. 10, 2018 message regarding honor killings)
- Disputed Fact No. 48 (statistics regarding Muslims and not being a religion of peace comments)
- Disputed Fact No. 49 (oppression of Muslim women and wearing hijab comments in Cross Cultural Psychology classes)
- Undisputed Fact No. 49(g) (comments related to missionaries)
- Undisputed Fact No. 51 (showing of *By the Numbers* video)
- Disputed Fact No. 55 (use of terms "coon" and "porch monkey")
- Undisputed Fact No. 56 (comments related to Muhammad being a con artist/conman, sociopath, psychopath, crackpot and liar)
- Undisputed Fact No. 57 (comments related to Jesus being schizophrenic)

---

[38] OIE notes that this section does not consider the comments described in Nos. 2-3, 5-11, 14-18, 20, 22-29, 31-32, 34-44, 46(a), 46(d), 47, 49-56, 62-67, 71-73, 78-79, 81 and 83 of the Disputed Material Facts Section of this report because the current record did not substantiate that the comments had occurred as alleged.

- Undisputed Fact No. 58 (comment that it would be hard to convince him that Islam is a religion of peace)
- Undisputed Fact No. 59 (November 15, 2018 message related to some Muslim women supporting oppression)
- Disputed Fact No. 59 (Black privilege comment in Cross Cultural Psychology course)
- Undisputed Fact No. 60 (the Respondent's 24-hour challenge)
- Disputed Fact No. 60 (statistics regarding education, income and race comments; White privilege not being responsible for statistical differences comments; affirmative action comments; McWhorter letter)
- Undisputed Facts Nos. 61-62 (October 21, 2016 letter to Cross Cultural Psychology students)
- Disputed Fact No. 61 (lack of systemic racism comments in Cross Cultural Psychology course)
- Disputed Fact No. 62 (statistics regarding single parent household, crime rate data, teenage pregnancy data, and college dropout rate data comments in Cross Cultural Psychology course)
- Undisputed Fact No. 63 (stereotypes being good, bad and neutral comments)
- Undisputed Fact No. 64 (Black people's historical involvement in the slave trade comments)
- Disputed Fact No. 64 (Native Americans not being peaceful before Europeans' arrival comments)
- Undisputed Disputed Fact No. 66 (White History Month should be permitted comment)
- Undisputed Fact No. 67 (lack of systemic racism and lack of need for affirmative action comments)
- Undisputed Fact No. 68 (showing of Frederick Wilson video)
- Disputed Fact No. 71 (comments regarding rape being a part of mammals' behavior, false rape allegations, and prevalence of false accusations against men on college campuses; criticism of study regarding prevalence of rape)
- Disputed Fact No. 72 (Brett Kavanaugh comments)
- Undisputed Fact No. 72 (July 15, 2019 announcement regarding standards and Black privilege)
- Undisputed Fact No. 73 (comment regarding scholarships)
- Undisputed Fact No. 74 (statistics related to Asians and White privilege)
- Undisputed Fact No. 75 (discussion regarding a sub-group of Blacks and welfare)
- Undisputed Fact No. 76 (Blacks and racism)
- Undisputed Fact No. 81 (autism related comments)

After excluding statements that fell within the protections of academic freedom, OIE considers whether the remaining statements relating to protected classes created a hostile learning environment for students in the Respondent's courses because these statements were not germane to the subject matter of the courses at issue. Specifically, OIE found the following statements to not be protected by academic freedom:

- Disputed Fact No. 4 (all men are a little bit gay comment);

- Disputed Fact No. 13 (hope you're getting compensated comment to GTA)
- Undisputed Facts Nos. 15-16 (nudist beach comments)
- Undisputed Fact No. 17 (identity as a gay man previously married to a woman)
- Disputed Fact No. 19 (sex is only fun for men and is for men's pleasure comment)
- Undisputed Fact No. 20 (women were like a Ford pickup truck comment)
- Disputed Fact No. 21 (women who sleep with a lot of men are my best friends comment)
- Undisputed No. 21 (semen is high in protein, it's a protein drink comment)
- Undisputed Fact No. 27 (email to GTA regarding compensation comment)
- Undisputed Fact No. 28 (likes sex comment)
- Undisputed Fact No. 29 (women attracted to those with money comment)
- Undisputed Fact No. 30 (gym, piece of meat, and masturbation comments)
- Disputed Fact No. 30 (transgender-related comments)
- Undisputed Fact No. 31(b) (asked if student had an erection before comment and comment regarding getting a boner when antiracist and looking in the mirror)
- Undisputed Fact No. 32 (humans have sex with animals comment)
- Undisputed Fact No. 33 (25-year-old men not wanting 40-year-old women comment; Muhammed being married to an "old hag" comment; and who wants to bang an 80-year-old woman comment))
- Disputed Fact No. 33 (transgender-related comments)
- Undisputed Fact No. 34 (transgender male penis being unattractive comment)
- Disputed Fact No. 35 (use of terms "fag" and "faggot")
- Undisputed Fact No. 36 (misgendered LGBTQ+ panelist)
- Undisputed Fact No. 43 (believing in a religion is delusional and like believing in flying elephants)
- Undisputed Fact No. 43 (religion being a mythology comments in General Psychology courses)
- Disputed Fact No. 46(a) (derogatory names for believers)
- Disputed Fact No. 46(b) (believing in God is like believing in fairy tales, purple flying elephants and Santa Claus comments; and during a 2019 Fall course, as students left for the holiday break, the Respondent said something to the effect of "have a great Christmas. Enjoy praying to a fake man who lives in the sky")
- Disputed Fact No. 46(c) (God does not exist comments)
- Disputed Fact No. 46(e) (religious upbringing constitutes child abuse comments)
- Disputed Fact No. 47 (Virgin Mary comments)
- Undisputed Fact No. 48 (Aug. 21, 2018 General Psychology comments regarding no heaven, no guy with tail and horns, childish idea, crackpots who run the cult called Islam)
- Undisputed Fact No. 49(a)-(g) (religion is make-believe, Catholic church is boring, imaginary God, believers are irrational, figment of imagination comments, Allah does not exist, religious upbringing is child abuse, teaching religion to children is bizarre, abusive and pathological comments)
- Disputed Fact No. 49 (oppression of Muslim women and wearing hijab comments in General Psychology courses; comment to student that she was brainwashed by religion; comment to student that she was wrong about her country of Saudi Arabia; comment to student that was wearing a hijab that her religion doesn't respect her)

- Undisputed Fact No. 50 (existence of heaven being absurd comment)
- Undisputed Fact No. 52 (Islam being a toxic mythology and toxic cult comments)
- Undisputed Facts Nos. 53-54 (exam questions regarding religious upbringing being child abuse, souls not being real and Jesus and Muhammad not being who they claimed to be)
- Undisputed Fact No. 57 (comments that Jesus did not have a virgin birth and did not come into the world to die for everyone)
- Disputed Fact No. 57 (penis size related to race comments)
- Disputed Fact No. 58 (Whites being uncultured and unsophisticated but responsible for all modern inventions comments)
- Disputed Fact No. 59 (Black privilege comment in General Psychology course)
- Disputed Fact No. 61 (lack of systemic racism comments in General Psychology course)
- Disputed Fact No. 62 (statistics regarding single parent household, crime rate data, teenage pregnancy data, and college dropout rate data comments in General Psychology course; Blacks should stop having babies and committing crimes comments)
- Undisputed Fact No. 65 (a)-(b) (Whites invented far more than any other group, White culture brought all of this to the rest of the world, no White history month because it would be embarrassing to other races, and whole modern world was created by Whites comments)
- Undisputed Fact No. 65(a) (Frederick Jones comment of "not that Black, he's more White than Black")
- Disputed Fact No. 65 (barbaric and savage comments)
- Undisputed Fact No. 69 (March 18, 2018 email comments that Whites are unsophisticated intellectually speaking and every single modern invention comments)
- Undisputed Fact No. 70 (April 4, 2018 email to General Psychology students regarding White History Month, orange orangutan v. black chimpanzee comment, political correctness, Islam is very misogynistic and very racist and not a religion of peace, African American' murder rate and political correctness)
- Disputed Fact No. 70 (exam questions contrary to religious beliefs)
- Undisputed Fact No. 71 (announcement regarding Latinx)

OIE further notes that the following statements also are not protected by academic freedom: Undisputed Facts Nos. 10-14 (tenure-related comments); Undisputed Fact No. 31(a) (called students weird and asexual during senses activity); Undisputed Fact No. 47 (portion of Jan. 10, 2018 message commenting on students having only lived a sheltered life); Disputed Fact No. 71 (Robert Kraft arrest comments); Disputed Fact No. 76 (tenure-related comments); Undisputed Fact No. 77 (treat all groups like shit comment); Disputed Fact No. 77 (tenure comment related to rape); Undisputed Fact No. 78 (use of profanity); Undisputed Fact No. 29 (blood in the toilet comment); Undisputed Fact No. 80 (HPV-related message); Disputed Fact No. 80 (mocking of student that raised her hand); and, Disputed Fact No. 82 (use of profanity).  Since these comments do not constitute protected-class-based statements, they are not included in the discriminatory harassment analysis below.

## IX.      ANALYSIS RE:  DISCRIMINATORY HARASSMENT

In IntegrityLine #833, the anonymous reporter, who identified as a former teaching assistant, alleged that the Respondent preferred male students over female students.  In support of this allegation, the reporter referenced the Respondent's rejection of the reporter's proposed dissertation topics.  However, the reporter did not identify any comparator evidence to support differential treatment related to dissertation topics or any evidence supporting the allegation of preference for male students.  Based on the lack of details and evidence, as well as the anonymity of the reporter, OIE's investigation of this claim was limited and resulted in there being insufficient evidence in the record to support this claim.  Throughout OIE's investigation, no other substantiated claims were set forth pertaining to a disparate treatment claim (including that the Respondent issued grades based on religion or race).  Accordingly, the analysis below is limited to analyzing whether the Respondent subjected students to discriminatory harassment (hostile environment harassment).

In analyzing a claim of discriminatory harassment, OIE is guided by UCF Regulation 3.001 and UCF Policy 2-004.1 which prohibit discriminatory sexual harassment and harassment…based upon an individual's race, … ethnicity, national origin, religion, … sex (including gender identity and sexual orientation) … disability…or membership in other protected classes set forth in state or federal law that interferes with that individual's educational opportunities, participation in a University program or activity, or receipt of legitimately requested services meeting the description of hostile environment harassment. Sexual harassment is any unwelcome sexual advances, request for sexual favors, and other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, or otherwise, when the conditions for hostile environment are present.

Hostile environment harassment is discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment) … or participation in a university program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective, meaning "that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  In applying the objective standard, OIE must "adopt the perspective of a reasonable person's reaction to a similar environment under similar or like circumstances."  In evaluating whether a hostile environment exists, the university will consider the totality of known circumstances, including, but not limited to: 1) the frequency, nature and severity of the conduct; 2) Whether the conduct was physically threatening; 3) The effect of the conduct on the complainant's mental or emotional state; 4) Whether the conduct was directed at more than one person; 5) Whether the conduct arose in the context of other discriminatory conduct or other misconduct; 6) Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or University programs and activities; and 7) Whether the conduct implicates concerns related to academic freedom or protected speech.

A hostile environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is

physical. However, an isolated incident, unless sufficiently serious, does not amount to hostile environment harassment. In evaluating the severity and pervasiveness of the conduct on the part of the Respondent described in this Investigative Report, OIE must consider all relevant circumstances, i.e. "the constellation of surrounding circumstances, expectations and relationship which are not fully captured by a simple recitation of the words used or the physical acts performed" using "common sense and an appropriate sensitivity to social context" to determine "conduct which a reasonable person… would find severely hostile or abusive."

Turning to the present matter, the conduct subject to analysis must first be discriminatory, meaning that the conduct is biased, negative or derogatory with regard to a protected class. Clearly, many of the Respondent's comments satisfy this definition.

With regard to evidence of individuals having been subjectively offended, multiple students alleged that, due to the impact of the Respondent's derogatory statements, they dropped the Respondent's class. Others expressed difficulty enduring the course but remained and completed the course. Also, many students indicated a hesitancy to participate in class because of the Respondent's classroom conduct. Although the cause of their understandable offense was based on a number of comments set forth above that are protected by academic freedom, the students also expressed discomfort with the comments outside the protections of academic freedom. Accordingly, the record satisfies the requirement that students were subjectively offended by the Respondent's conduct.

Turning to whether the Respondent's classroom conduct was severe or pervasive, the record here demonstrated that the Respondent made multiple unwelcome comments of a sexual nature, such as on at least one occasion told students that all men were a little bit gay because if someone was sucking their dicks and they were going to cum and they then realized that it was a guy doing the sucking, they would still finish. In one or two semesters during 2018, the Respondent joked with his Sexual Behavior students that, "You're in this class because you either want to know more about sex or just like sex. I'm in the category that just likes sex." During his 2018 Fall General Psychology course, the Respondent said to his students, "I work out in the gym for different reasons. Postponing death. You young people are there because you are a piece of meat trying to put yourself on the meat market. Right? I love it when I see mostly guys at the gym working out and looking at themselves in the mirror as they are working out. I am tempted to tell them to masturbate in the bathroom with the mirrors." During this course, the Respondent also discussed sensory information and how a smell can trigger thinking about a specific person and said to a student, "Really, you haven't had that experience? Have you even had an erection before?" Also, during the 2018 Spring semester, he insinuated to a male GTA that he should be compensated with sexual favors by a female GTA when the male GTA covered her exam proctoring tasks. The Respondent routinely advised his General Psychology and Cross Cultural Psychology students that he visited a beach for nudists in Florida. In this regard, during his 2019 Summer course, he told students that he identified as a nudist, being a nudist was "very fun" and "liberating", and he tried to get to Haulover Beach, his favorite hangout, every chance he got. He then told a student, "I didn't mean to get you so excited." He also made an off-hand comment about humans having sex with animals during this course and another offhand comment about individuals who are antiracist getting a "boner" when they looked in the mirror. During his 2020 Sexual Behavior course, he told students that, biologically, sex was only fun for

men and was only made for a man's pleasure whereas women were not biologically made to enjoy sex as their purpose in sexual relations was impregnation.

With regard to sex-based comments, on at least one occasion during a 2009 Summer course, the Respondent joked with students that most people referred to women who slept with a lot of men as whores and sluts, but he just called them his best friends. Also, on at least one occasion during the 2015 Fall semester, the Respondent told students that a woman was kind of like a Ford pickup truck, built to take a pounding. During his 2019 Summer course, the Respondent discussed the reasons why people get married and said, "Or maybe you like them because they make a lot of money, you can relate to that ladies?  I am talking about heterosexual women, not lesbians." He later commented that a 24-year-old man was unlikely to be romantically interested in a 40-year-old woman.

With regard to gender-identity comments, the Respondent made offensive comments related to individuals that are transgender (such as a transgender man is a woman, transgender is not a thing, transgender individuals should learn to be the sex they were born with, transgender penises are unattractive, and people are only transgender because they want to feel special), which were made sporadically during courses in 2005-2006, 2014, 2015, 2018, 2019 and 2020. Also, during the 2020 Spring semester, the Respondent misgendered one of the LGBTQ+ panelists on an exam question. With regard to sexual orientation, from 2016-2019, the Respondent used the term "fag" or "faggot" during his courses on a sporadic basis, including referring to himself as a "fag." Although the record indicated that the Respondent discussed his sexual orientation with students, OIE did not further analyze herein as his statement of identifying as a gay man and having previously been married to a woman is not derogatory.

With regard to religion, the Respondent regularly shared with his General Psychology students that religion was a mythology and there was no evidence of a God. Also, the Respondent routinely told students throughout his courses over multiple years that believing in religion was delusional and like believing in flying elephants, fairytales, and Santa Claus; stated that believing in heaven was absurd; repeatedly made derogatory statements about believers being delusional, childish, unintelligent, irrational and ignorant; and, repeatedly told students that there was no God, God was not real, God was imaginary, God was a figment of their imagination, and God did not exist. He also regularly taught students that having a religious upbringing constituted child abuse and designed exam questions so that, in order to receive credit, some students had to state things counter to their beliefs such as that a religious upbringing constituted child abuse or Jesus and Muhammad were not who they claimed to be. On occasion, the Respondent discussed the Virgin Mary and told students that she could not get pregnant without sex, got pregnant out of wedlock, and then concocted a story about being impregnated divinely so that she was not killed due to the culture at that time regarding premarital sex. He also told students that Jesus did not have a virgin birth and did not come into the world to die for everyone. During the 2018 Fall General Psychology course, the Respondent told students that there was no heaven, mocked the idea of Satan, and referred to the "crackpots who run the cult called Islam." He also referred to Islam as a toxic mythology and toxic cult.  At the end of the 2019 Fall semester as students were leaving, the Respondent said, "have a great Christmas.  Enjoy praying to a fake man who lives in the sky." Moreover, as set forth in detail above, the Respondent also directed comments at Muslim women about them being brainwashed

and not wearing their hijab for the reasons they identified.  He used the terms "barbaric" and "savage" when referring to other cultures, including in reference to Islam, and stated that Islam was not a religion of peace.

With regard to race, during some of the Sexual Behavior, General Psychology and Cross Cultural Psychology courses, the Respondent told students that Black men have the biggest penises, followed by Whites and Hispanics, followed by Asians.  In addition, on at least one occasion the Respondent referred to the difference in penis sizes and then high fived a Black male student. During his Cross Cultural Psychology courses, the Respondent taught students that the majority of White people were pretty uncultured, unsophisticated intellectually and failed to graduate from universities despite resources available to them to do so. However, every single modern invention that changed life as we know it has been invented by a White person, the whole modern world was created by Whites, and that the reason why there is not a White heritage month like there is for other races and ethnicities is because when comparing Whites' contributions to the world with non-Whites' contributions to the word, it would be an embarrassing discrepancy. The Respondent further told students that minorities should be thanking Whites for creating our modern society. During his 2019 Summer course discussion on this issue of inventions, the Respondent referred to Frederick Jones, who was a Black inventor, and said, "First off he's not that Black, he's more White than Black."  Also, following his discussion regarding his belief that systemic racism and White privilege did not exist, he told his General Psychology students that Blacks should stop having babies and committing crimes.

Based on the information herein, including the highly offensive and derogatory protected-class statements combined, the pattern and frequency of derogatory protected-class statements that were outside the protections of academic freedom, and the significant impact this had on students, who were a captive audience to the Respondent's conduct, OIE finds that the Respondent's conduct meets the threshold of pervasive conduct and therefore, constitutes discriminatory harassment in violation of  *UCF's Nondiscrimination Policy and Regulation*. Had this conduct fell short of the threshold for discriminatory harassment, it nevertheless would have violated UCF's *Code of Conduct* as the Respondent's conduct fell woefully short of UCF's expectations regarding respect, inclusion and professionalism.

## X.      ANALYSIS RE:  FAILURE TO REPORT AND APPROPRIATELY RESPOND TO STUDENT'S SEXUAL ASSAULT DISCLOSURE

In analyzing a claim of a failure to report and appropriately respond to a student's sexual assault disclosure, OIE is guided by UCF Regulation 3.001, which was in effect during the relevant time period (February 2014), and set forth that an employee "who has actual knowledge by … receipt of a complaint of discrimination involving any of those employees he or she supervises or over whom he or she has managerial authority, and who does not investigate or report the matter to an appropriate university official with authority to take action with regard to the matter, shall be subject to disciplinary action up to and including dismissal…" As set forth above, OIE found that in February 2014, a student (Witness 34) disclosed to the Respondent that she had been sexually assaulted by a male teaching assistant (Witness 36) over whom the Respondent exercised managerial authority, and requested accommodations related to an exam. It is undisputed that the Respondent failed to report this to any university official with the

authority to take action (either the Title IX Coordinator or the Office of Student Conduct). Rather, the Respondent asked Witness 34 why she was telling him about the incident, asked for details about the incident, denied that the teaching assistant had "crossed the line" during the incident, said that the teaching assistant must have misinterpreted the situation and thought she wanted more, said that the only way she would have a case would be to fabricate information to the police (which he didn't recommend), said that he could "only hope that in the future" she could "prevent this from happening again by being more conscientious when choosing" her friends, and denied that he could do anything about the situation (such as removing the teaching assistant from the class during her exams) as the only way he would do anything was if a police officer came straight to him and said that his teaching assistant was a criminal.

During his OIE interview, the Respondent claimed that he "might" not have been aware of his reporting obligation until he received a phone call from a person in SDES about Witness 34 wherein the person "might" have advised him of this reporting obligation. The Respondent stated, "I had never been trained in the Clery Act like I have now." The Respondent further stated that the person from SDES indicated that Witness 34 had alleged a sexual assault and had been afraid to share this with him. The Respondent claimed that he then replied that he had not known that Witness 34 was claiming that she had been touched. First, OIE's review of SDES' file related to this case did not reveal any notes supporting the Respondent's version of events with regard to his communications with the person from SDES. Second, as set forth in detail in the disputed facts section of this report, the documentary evidence also does not support that Witness 34 chose not to share that she had been sexually assaulted with the Respondent. In fact, the evidence demonstrates the opposite in that she shared with the Respondent that she had been sexually assaulted by his GTA. Third, the university had notified the Respondent in both October 2013 and January of 2014 of his "Title IX obligations relating to students who experience sexual violence", offered him a training that covered the definitions of discrimination and his reporting obligations, and set forth "Seven Steps to Assist Students" when dealing with harassment concerns. *See Emails Re UCF Actions to Prevent and Correct Discrimination (10-2013 & 1-2014) & 2008 Training*. Taking the record as a whole into consideration and the substantiated facts found herein, OIE finds that the Respondent violated UCF Regulation 3.001 in February 2014, when he failed to report, but more importantly, failed to appropriately respond to a student's disclosure of having been sexually assaulted by one of his teaching assistants - namely, he attempted to dissuade her from pursuing her allegations against the teaching assistant, placed responsibility for the incident on the student, determined that Witness 36 must have misinterpreted her actions without speaking with Witness 36, and, rather than providing resources to the student, advised her to be "more conscientious when choosing" her friends.

## XI.   ANALYSIS RE: OTHER MISCONDUCT

### A.   Respondent's Deterrence of Filing Complaints

As set forth in detail above, OIE found that for multiple years, at the beginning of each of his courses, and at multiple other times throughout the Cross Cultural Psychology course, the Respondent referenced that he had tenure, which meant that he could not be touched, he was untouchable, he could not be fired or gotten rid of, and he could say what he wanted to say in class without any repercussions. The Respondent further told his students that previous students

had complained about him and were unsuccessful because he was tenured. During 2018 and 2019, the Respondent also told his students in his General Psychology and Cross Cultural Psychology courses that, due to being tenured, he could not be fired unless he raped them.

Turning to UCF's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1*, it is prohibited under this policy for an individual to engage in identifiable actions with the intention of preventing or deterring a reasonable person from submitting a report of potential misconduct or participating in a misconduct investigation.  Throughout OIE's investigation, multiple students indicated that Respondent's tenure-related statements did in fact deter them from sharing their concerns about the Respondent's classroom conduct with university administrators. OIE is not persuaded by the Respondent's statement that his intent behind making the tenure-related statements was to bolster students' comfort to engage in controversial class discussions.  Rather, his references to prior unsuccessful student complaints and "laughing all the way" through the process clearly demonstrated active discouragement on his part to deter students from filing complaints about him.  Accordingly, OIE finds that the Respondent violated *UCF's Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1*.

### B.    Respondent's Alleged Unprofessional & Uncivil Classroom Conduct

As set forth in detail above, the *Code of Conduct* states that employees are required to "treat everyone with respect and dignity …We do not tolerate harassment, mistreatment, belittling, harming, or taking advantage of others." (*Respect*) "Here at UCF, we treat each other with dignity and respect. We embrace, celebrate, and value diversity, equity and inclusion and that means that we respect the ideas of others, even when they differ from our own." (*Dignity and Respect*) The *Code of Conduct* further states, "We are strongest as an educational institution, employer, and community leader when we bring diverse thought and experience to our decision-making, teaching, research, and interactions with community members. Accordingly, all members of our university community have a responsibility to treat each other with consideration and respect." (*Engaging, Exploring, and Advancing an Inclusive Culture*)

In addition to claims of discriminatory behavior and other misconduct allegations described above, witnesses alleged that the Respondent engaged in unprofessional and uncivil conduct in the classroom. As set forth above, the record supports that the Respondent told students that he would be talking about multiple racial, ethnic and religious groups during his Cross Cultural Psychology course and that "there is good and bad in every group and I treat them all like shit". Respondent repeatedly used profanity throughout his course lectures, including the terms "fuck", "bitch", and "shit".  The Respondent also told students in his Sexual Behavior courses that the study representing that one in four women experience sexual assault by the age of 18 was not an accurate representation of the prevalence of sexual assault and the number was more likely less than 1%.  He also told students that many women on college campuses were making false allegations of rape, which was leading to an epidemic of men being kicked out of universities. Shortly after the arrest of Robert Kraft (NFL Patriots owner), the Respondent told students that Mr. Kraft had done nothing wrong and it was not rape if someone has sex with a victim of human trafficking.

Also, witnesses alleged that the Respondent resorted to "humiliation tactics" if students challenged the viewpoints he shared with the class. (*See IL #824 (Witness 91)*).   For instance, the anonymous reporter in IL #828 alleged that during 2017 Fall Cross Cultural Psychology course, the Respondent was "deliberately combative with students and would then accuse them of being too sensitive and immature. Yet it was obvious that his intent wasn't an adult conversation about difficult topics as he would often claim, but instead to 'trigger' people with not only the content of his statements but the delivery. I have never witnessed a more crass, callous and deliberately unprofessional professor."  Similarly, the anonymous reporter in IL #828 alleged that the Respondent's "loved to chastise and berate students for being too sensitive to his nonsensical and deliberately tactless statements." Witness 68 (IL #851) stated, "Any time someone in the class would oppose what he was saying, he would immediately shut them down and act as if they were the ignorant ones … He was not able to have a civil debate with the very people he was talking so poorly about without demeaning them, and as a psychology major, I find it disgusting that he was not able to understand someone else's standpoint. It was not an effective form of education." Witness 38 (IL #838) alleged that there "were several times in class [the Respondent] would voice his biased opinions without being open to healthy discussions with other students. There was one student in our class who would disagree with him and he would belittle and embarrass her for speaking up." Similarly, the anonymous reporter in IL #820 stated, "As a result of his insults to the gender, sex, religion and race, I decided to withdraw myself from the course. It was not a healthy environment. It never allowed for respectful debates or a learning environment."  Similarly, Witness 50 (IL #845) stated that the Respondent "was consistently rude towards his students. He says he encourages dialogue and challenges people, but anyone who disagreed was basically told in front of the entire class of 400+ people that they were wrong, and closed minded."  *See also IL #872* (anonymous) (Respondent "uses his position of power to berate and abuse students' beliefs" and "chooses to invalidate rather than empower students"). Similarly, Witness 167 stated that there "were students who disagreed and tried to comment but he would respond by laughing them off and basically telling them that they don't know what they are talking about. He would say things like, 'I don't have time for this', 'it doesn't matter', 'provide evidence of this' or 'I am going to move on' and he would do so. His responses were, like, almost pretentious."

In contrast, the University also received positive feedback regarding the manner and content of the Respondent's courses.  For instance, Witness 104 stated, "Overall, I think that [the Respondent] is a very nice individual. He's knowledgeable, and I enjoyed both classes and learned a lot in them. His Cross-Cultural Psychology class challenged me in a way – a good way – that no other Psychology class did. [The Respondent] gave us a lot of hard numbers and statistics that most people don't realize, and he made us think out of the box. He's a great professor, but his Twitter is unfortunate." Witness 235 stated that she "appreciated him encouraging students to get outside of what celebrities, etc. would tell you to think or the media tells you to think.  You might only be hearing one side.  I appreciated his teaching style.  You should not be offended by this teaching style.  All of this is just a character assassination attempt." Also, Witness 106 stated, "In terms of my personal experience, I have seen other people insinuate that the opinions reflected upon [the Respondent's] Twitter effected his class and their grades. I want to say that in my experience, his online opinions were not expressed blatantly throughout his class. Regardless, students' grades were not impacted by [the Respondent's] views or opinions as a student's overall grade was based strictly upon exams

administered over scantron. There were no other graded assignments or activities that could have been influenced in this regard."

In his OIE interview, the Respondent stated, "If you look at the student comments, about 80% are all positive, and 10-20% are negative. Of the negative comments, they are not the egregious one that we are discussing. They are things like I am rude, that I shut students down, that I am opinionated, etc. I get their point, but you also need to understand that my class is not a class where we're going to have a group therapy session or sit around and talk about how we feel. If they have a point they can back up with facts or logic, I give them time. If they present their own opinions or feelings, I say to them, 'Stop.' I'm sure that hurts their feelings. I think people walk away feeling shut down, which is why they report this. My class is not a free-for-all where people get to say what they want to say. I will give them due time if they have evidence. I don't tell them to shut up, but I tell them they can express their sentiment, but they have no data, so we move on."

Witnesses also alleged that the Respondent utilized the classroom more as a space to air his personal opinions rather than a place of learning.  OIE's review of audio recordings of his Cross Cultural Psychology classes captured the Respondent talking about poor White parents who don't use their money for intellectual outings, and instead use the money for a TV, cell phones, and gas to go fishing. Later in the class, the Respondent shared his view that prostitution should be legal (*see – Recordings – 2019 Summer - 2019010101334-015*). In another lecture, the Respondent talked about corruption existing all over the world, and how "anyone who wants to be a leader is a magnet for psychopaths." He referenced Barack Obama who people think "is a really nice guy" but who was part of the corrupt system.  He then told the students that, within two weeks of leaving office, Obama received $400,000 for a 50-minute speech on Wall Street, which he insinuated was a payout that they held onto until he left office because if he took the check while still serving as President, the corruption would be "obvious". He stated, "All politicians do it but it's such corruption how they enrich themselves right after they get out of office. Because while they are in office, they are doing things that favor corporations, the pharmaceutical industry, the oil industry, lottie dottie da. And if the industries paid them while they were in office, it's total corruption and they'd be arrested so they wait until after they leave office and then they go give a little presentation and they get a big check." (*See – Recordings - Summer 2019 Recording – 9*).  During this same class, the Respondent shared his opinion that Obama discontinued the wet foot dry foot policy for Cubans two weeks before he left office "because he was mad at Hispanics in Florida for voting for Trump rather than Hillary."  He then stated that Obama wanted to "castigate" and "punish" Hispanics.  When a student asked, "With the Obama thing, are you just assuming that he's pissed, I'm just asking, is that your personal assumption?" The Respondent replied, "You're correct." Following this class, the Respondent sent an announcement to his students that said, "I've tried to state whenever relevant when some idea is (was) my opinion.  Today, a student pointed out that the idea that 'Obama was pissed and wanted to punish Floridian Cubans' was my opinion.  She was correct, and I applaud her willingness to single me out on that (I hate her guts, but I applaud her HA HA HA HA HA). Just kidding about the guts part😊 … I will step up my efforts to make disclaimers when I present my educated opinions (most of my opinions are not simply pulled out of my @#$%! On the spur of the moment…" *See Announcement, July 22, 2019, titled "Opinions v. data…"*

In another recording (*see – Recordings – 2019 Summer – 5*), the Respondent referenced the lack of criticism of Martin Luther King and said, "The dude was a horn dog—he slept with everyone he could get his hands on".

Some witnesses alleged that the Respondent provided misinformation during his courses (*e.g. Witness 66 Interview Summary*). OIE's review of the 2019 Summer recordings captured an example of this. Therein, the Respondent discussed Trump's Muslim ban related to immigration and how "many Muslims come from cultures that have values which are in conflict with our modern liberal values." He stated that, unlike many Muslim countries, in the U.S. there is freedom of speech, an ability to access pornography, an ability to purchase alcohol and cigarettes, an ability to visit nude beaches as recreational places and women are permitted to vote, drive, work and have abortions. He then stated, "I used to be able to say that female circumcision is illegal in the United States, but now it is legal." However, this is not an accurate representation of the law as female circumcisions is illegal in 39 of the 50 states.[39] Also, the Respondent went on and said, "So that is the case of female circumcision in the U.S. because a federal judge decided that that is part of their religion and they should be able to do that if they want to. I am opposed to male circumcision. I wish they would make that illegal too." (*See Recording – 2019 Summer – 13*).

Taking the record as a whole into consideration, OIE finds that the Respondent violated the *Code of Conduct* with regard expectations of professionalism, including those set forth in the *Code's* sections designated as Respect, Dignity and Respect, and Engaging, Exploring, and Advancing an Inclusive Culture.

### C.    Providing False Information During a University Investigation

As set forth in detail above, during OIE's investigation, OIE identified instances wherein the documentary or audio evidence clearly conflicted with what the Respondent had represented to OIE. Specifically, the Respondent provided false information with regard to the tenure-related comment about the university being unable to fire him unless he raped a student, denied having bribed a health clinic representative while in Peru for UCF's study abroad program, denied having told students that God did not exist, denied having told students that minorities never invented anything that impacted society, denied that he ever used the term "Black privilege" with his students, denied that he told a male GTA that he hoped the female GTA "was compensating him but that is none of my business", denied ever using the term "faggot" in class, denied discussing the sexual assault allegations against Brett Kavanaugh and related congressional hearings, and denied ever discussing cerebral cortices during his class lectures. Turning to UCF's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1*, employees are required to provide truthful information during university investigations as "providing false information in an [university] investigation could result in disciplinary action up to and including

---

[39] It appears that the Respondent was referring to the Female Genital Mutilation Act (1996), which made performing FGM on anyone under age 18 a felony in the U.S. In 2018, the act was stuck down as unconstitutional by a U.S. federal district judge in Michigan, who argued that the federal government did not have authority to enact legislation outside the "Interstate commerce" clause. As part of the ruling, the judge ordered that charges be dropped against eight people that had performed FGM. The Department of Justice decided not to appeal the ruling; however, the US House of Representatives has appealed it.

termination." Accordingly, in light of the false information provided, OIE finds that the Respondent violated UCF's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1* and *Code of Conduct (Honesty and Integrity)*.

### D.   Bribe of Health Care Clinic Representative

As set forth in detail above, during OIE's investigation, OIE found that while in Peru for a UCF study abroad program in 2011, airport personnel instructed the Respondent that regulations prohibited him from traveling from Peru to El Salvador without a yellow fever vaccination certificate. The Respondent then paid $17.00 to an individual at a health clinic located in the airport in Peru to provide him with a certificate falsely indicating that he had been vaccinated so that he could board a plane for his personal trip to El Salvador.

Per the university's *Code of Conduct*, employees are required "to comply with all applicable laws, regulations, and policies" to ensure "that all of our decisions are legal and ethically sound." (*Responsibility and Accountability*) Also, "[t]hrough our international partnerships and study abroad programs, some of our actions and activities will be subject to the laws of other countries. In addition to following the Employee *Code of Conduct*, we are required to know and follow these laws." (*Complying with laws of other countries*). Furthermore, "[e]ach of us has an obligation to comply with the U.S. Foreign Corrupt Practices Act and all country-specific anti-bribery and anticorruption laws. These laws generally state that you may not give, promise, or offer anything of value, no matter how small, to anyone for the purpose of improperly influencing a decision, securing an advantage, avoiding a disadvantage, or obtaining or retaining business." (*Anti-corruption and Bribery*) Although the *Code of Conduct* was first issued by the University in 2017, these ethical obligations were captured by other applicable provisions, including the 2010-2012 UCF BOT-UFF Collective Bargaining Agreement – namely, Article 5.3(a)(responsibility of employee to "observe and uphold the ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge); Article 5.3(f) (responsibility of employee to "observe the regulations of the University, provided they do not contravene the provisions of this Agreement"); and, Article 5.3(g) (responsibility of employee to "be forthright and honest in the pursuit and communication of scientific and scholarly knowledge"). Based on the current record, OIE finds that the Respondent violated the 2010-2012 UCF BOT-UFF Collective Bargaining Agreement when he bribed a health clinic representative to provide him with a falsified yellow fever vaccination certificate in 2011.

### E.   Respondent & *White Shaming* Book

During the course of OIE's investigation, it was confirmed that during the summer of 2019, the Respondent requested a Graduate Teaching Assistant assigned to his Sexual Behavior course to perform a research project related to the book he later authored titled *White Shaming*. In March 2019, December 2019 and March 2020, the Respondent also distributed announcements regarding his book using UCF resources (i.e. Canvas) to current and former students. In the December 2019 and March 2020 messages, the Respondent provided details on how students could purchase a copy of the book. OIE finds that both matters were resolved at the time by the Chair of the Department and no further action is required.

In addition, during the course of OIE's investigation, witnesses alleged that the Respondent had assigned his book *White Shaming* as required reading material for the courses and was keeping those related profits.  It is undisputed that the Respondent required students in his 2019 Fall Cross Cultural Psychology course and 2020 Spring Cross Cultural Psychology course to read *White Shaming* as part of the course materials.  It also is undisputed that the Respondent completed the required AA-21 form disclosing this activity, which was reviewed and approved by UCF.  The Respondent, who represented that he recently donated proceeds to St. Jude and Make a Wish, has complied with the requirements set forth in university regulation and procedures.  Accordingly, no further action is required at this time.

## F.    Respondent's Alleged Performance as an Instructor

In addition to the above, the university received reports regarding the Respondent's overall performance as an instructor. Below is a summary of these allegations but no further analysis will be provided by OIE as that is outside the scope of OIE's role.  The appropriate content and structure of courses is within the authority of faculty, the Department, College and Provost.  However, this information is being captured herein to alert management of the remaining concerns receiving during the investigation that have not been addressed above.

Some witnesses alleged that the Respondent failed to teach appropriate content for the General Psychology and Cross Cultural Psychology courses or give any context or in-depth review of the information presented (particularly with regard to the statistics related to race and religion).  For instance, the anonymous reporter in IL #924/925 alleged that while the Respondent taught Cross-Cultural Psychology, "it felt like the material had more to do with statistics on what race participated in what more (such as attend college, or teen pregnancy, etc.) rather than the actual psychological aspect. Second, none of his class material contained any history."  Witness 47 alleged that the Respondent based "his curriculum on racial groups in the US, rather than cultural groups as they course indicates (Cross-cultural psychology). … [The Respondent] [d]id not teach anything about cultures throughout the entirety of the Cross-Cultural psychology course." *See also* IL #809 (Witness 49) ("information we learned was HIS opinion on the matter, not the scientific specifics").

Similarly, Witness 122 (IL #877) alleged that the Respondent "taught us that certain stereotypes (whether based in race, gender, creed, etc.) are not harmful. The problem is that they most certainly are. His argument was that 'Italians like spaghetti' or 'black people are good at basketball' isn't harmful since it isn't the same as 'black people are rapists.' However, stereotypes are bad because they create a divide and barrier between people. They prevent people from getting to know an individual personally because they base their knowledge on stereotypes. An Italian with a gluten allergy doesn't necessarily like spaghetti. A black software engineer isn't necessarily good at basketball. I could go on forever, but my point is that by assuming these things about these people, we ignore the individual's value. We also uphold a system of racism and prejudice by permitting the spread and belief in stereotypes, whether or not [the Respondent] believes they are harmful or not. He's a terrible educator spreading misinformation based in his own racism and prejudice."

Witness 66 alleged that during the 2019 Spring Sexual Behavior course, the Respondent minimized the harm caused by child sexual abuse.  In support of this allegation, Witness 66 explained that when the Respondent talked about the age of consent, he talked about age of consent around the world, how it's much lower in other parts of the world, and how one is not a pedophile if one has sex with teenagers because of their sexual maturity.  He then cited a study "that was bad".  Witness 66 indicated that the Respondent "said it was censored, but if you look at it, it is not methodologically sound and was over 20 years old". Also, it only sampled college students (those who are most traumatized may never get to college), and only looked at victims whose abuser was more than five years older than them. When asked to respond to these allegations, the Respondent stated, "I don't minimize or maximize the effect of childhood sexual abuse. … What I do in class is that I go over the age of consent around the world and tell the students that the age of consent varies by state even. I have told my students that the idea of when an 'adult' can have sexual relations with a 'minor' seems to be somewhat arbitrary because of all these different ages. I explained that the word 'pedophilia' does not refer to an adult having sex with a teenager, but rather that term means someone having sex with a prepubescent child. I also have shared multiple studies that have shown that there are variables that influence to what extent someone would be adversely affected by childhood sexual misuse or abuse. … I explained that it's impacted by variables such as the relationship the perpetrator has with the minor, whether they are family or a stranger, whether the perpetrator is threatening - that alone is traumatizing - and the child's resiliency (such as when a family loses a whole house when it burns down; and one kid is fine while the other is devastated). … Then I shared an APA journal article that detailed how 20,000 college students reported that when they were a minor, they had some kind of sexual contact with an adult. There were two major findings in the article. One is that the majority felt like the incident did not have much of an impact on them, the other is that women on average reported being more adversely harmed than the men. So, I shared that with the students, then I said that three years later the public learned of the study and they went crazy … and denounced them [the researchers] all for political reasons."

Witness also alleged that the Respondent's exams asked about irrelevant material rather than the pertinent subject matter of the course, and were poorly structured for the courses. For instance, the anonymous reporter in IL #794 alleged that "test questions were absurd and incredibly specific. In one of his 10 question exams, he asked what a lady in one of the 3 movies he showed us was eating in a food court." Similarly, the anonymous reporter in IL #801 alleged that "[h]is tests didn't make sense. They were mainly statistics that proved his points and his comments. The questions were too specific and random that it made no sense."  *See also* IL #802 (anonymous) (Respondent "would tailor tests and class room participation to support his agenda"); IL #810 (anonymous) (test questions asked about irrelevant details from videos); IL #845 (Witness 50)(Respondent's "tests were poorly structured - 5 20 question tests for the entirety of the grade. I don't think that getting 1 question wrong should = 1% of a grade"); IL #894 (anonymous) (Respondent "would put a lot of questions that were completely unrelated to the course material, such as specifics about his personal experiences traveling in different countries"); IL #881 (Witness 83) (Respondent "also made exams difficult by not giving clear instruction of what students needed to know").

## XI:      PRIOR COMPLAINTS & UNIVERSITY RESPONSE

In addition to the concerns noted above, the university received multiple reports alleging that it was well-known among students that the Respondent made discriminatory statements during his courses, which deterred students from taking the Respondent's courses. Specifically, the university received the following anonymous reports: IL #792 (student reported that they never took Respondent's courses because other students had shared that he made discriminatory statements); IL #798 (student knew he had discriminatory views way before the Twitter posts and "strayed from taking his classes because of it"; further stated that it was well known among students that he was discriminatory so students strayed from taking his class); and, IL #858 (student knew he had these [racially discriminatory] views and strayed from taking his classes because of it; it was indeed well known among students that he had these views and many students strayed from taking the classes he taught because of it). Similarly, Witness 177 (IL #855) alleged that the Respondent "has had a problematic and racist history at the school for as long as I attended the school 2011-2017 and perhaps even longer. [T]here have been a variety of comments made to myself and my friends included about refraining to take courses offered by [the Respondent] being that I, and my friends, are people of color. We had been warned in taking his courses for the sheer fact that we would not be treated equally to how white students and we would be talked down to and disrespected constantly."

Equally important, in multiple reports, individuals alleged that complaints had previously been submitted to the University regarding the Respondent's classroom conduct, the response to the complaints had been ineffective, and this ineffectiveness deterred individuals from reporting further misconduct. For instance, the University received multiple reports from anonymous individuals alleging that prior complaints had been submitted and ignored – specifically, IL #769 (Respondent "had complaints made against him before"), IL #787 ("This is not the first time it happens (there have been past complaints I believe)"), IL #796 ("hateful conduct was reported on" the 2017 Fall General Psychology student evaluation form, "but was either ignored or never read"), IL #803 ("It has been brought to UCF's attention that [Respondent] is disrespectful to his students many times, and they have done nothing about it. This has been said by [Respondent] himself, who gloated to my class that students have tried to get him fired before but UCF ignores it and allows him to continue teaching there), IL #817 (students "complained about [the Respondent] to administration, which made [the Respondent] apologize by email about the statements he said, but [the Respondent] has continued to say his statements), IL #823 ("He has been reported multiple times and nothing has happened."), IL #833 (former teaching assistant spoke "to other professors who's seen him be inappropriate and unprofessional but because of his status as a professor they decided to ignore it"), and IL #883 (student shared concerns with a former Assistant Director of OIE in 2016/2017).  OIE would note that the Respondent's student evaluations set forth mixed reviews regarding his performance, and included concerns related to discriminatory comments.

Similarly, Witness 68 (IL #851) alleged, "I know for a fact other people did report him back in 2016 and it probably wasn't the first time, and yet nothing has been done to correct it, why is that?" Witness 85 alleged that several student athletes had complained during the 2016 Fall semester to two academic advisors, but no tangible action was taken except that student athletes avoided registering for the Respondent's classes. Witness 87 alleged that a student spoke

with the Psychology Department's advisors about the Respondent during the 2017 summer, and the advisors responded, "We know that students don't like him, but he's tenured so we really can't do anything." Witness 4 told OIE, "I knew that some students that every semester would file complaints, because he told me from time to time that there was 'another' complaint that had been filed. He was accustomed to getting complaints, usually from Christians. He's extremely, extremely opinionated."

Witness 129 posted a message on Facebook along with a link to a change.org petition demanding the Respondent's termination wherein she stated, "For those of you that are impressed by the universities prompt public response to this, it is simply for show. I have photos of emails i have sent out and received from UCF admin stating that there was no discrimination evident, and no harm done, my concerns and worries were dismissed. Only now is it being considered after things were made public. But, plot twist, UCF has been receiving complaints for nearly a decade over this man and nothing has been done. He has physically grabbed girls, has forced them to watch pornography for lectures, has humiliated students for being committed to their beliefs and not cowering to his. Don't for a second think this is any different unless we apply the utmost pressure to this situation. Attached is the petition." In addition to the Facebook message, it appears that Witness 129 submitted IL#862 anonymously wherein she alleged that the Respondent was dismissive of a doctor's note and related information that she had provided. She further alleged that she had spoken with the department chair about the issue, and "NOTHING WAS DONE." She further alleged that she had "written documentation of no discrimination being evident."

OIE reviewed the grade appeal documentation submitted by Witness 129.  Although she checked the box titled "alleged lowering of grades for non-academic reasons including discrimination", the narrative document accompanying her appeal did not include any statement that she or other students had been subjected to discrimination.  Instead, she made allegations related to the Respondent's attitude and style of communications, bias that students were cheating, and lack of empathy under COVID 19. Accordingly, since the appeal did not include discrimination concerns, the department correctly moved forward with assessing the appeal rather than forwarding it for OIE's review.  *See Student Grade Appeal, Student Grade Appeal – Administrator Email, and Student Grade Appeal – Chair Decision*. Although OIE acknowledges that the grade appeal decision referred to there being no evidence of discrimination, since the appeal was determined to not be a discrimination case, it would be preferable to not have such language in the final decision.  That said, OIE acknowledges that the "other reasons" basis for an appeal is combined with the discrimination basis for an appeal on the grade appeal form, and likely led to the language having been included therein. To reduce confusion moving forward, OIE will work with the appropriate university officials to make these separate grounds for appeal on the form.

Notwithstanding, based on the other allegations referenced in the Facebook post, OIE contacted Witness 129 for an interview. During her OIE interview, Witness 129 described her experience in the Respondent's 2019 Spring Personality Theory and Research course. When asked if the Respondent ever directed hostile or discriminatory statements in the classroom, Witness 129 responded, "Not that I remember. … My main concern wasn't the racial comments that were made on Twitter.  My main concern was [the Respondent's] response to COVID."

195

When asked about the allegation that the Respondent "physically grabbed girls", Witness 129 stated that she had seen this allegation in a tweet wherein someone alleged that a female student had to leave class due to a doctor's appointment, and the Respondent grabbed her by the arm demanding to know why she was leaving. Other than this tweet, no other evidence in support of this allegation was provided by the more than 300 individuals that communicated with OIE. Accordingly, OIE finds that there is insufficient evidence to support finding that the Respondent physically grabbed any student. When asked about the allegation that the Respondent forced students to watch pornography, Witness 129 stated that other unidentified students had shared this and she believed that the pornography was shown in the Respondent's Cross Cultural Psychology course. However, the record in this matter demonstrates that pornography was only shown during the Respondent's Sexual Behavior courses, which is germane to the subject matter of that course, and thus, not a violation of University policy.

In addition, Witness 66, who submitted IL #789, participated in an OIE interview, and was a student in the Respondent's 2019 Spring Sexual Behavior course, alleged that "[a]t the end of the semester (May 2019), I complained about everything to an administrator in the department. Not long before, he direct messaged us through either UCF email or Webcourses (can't remember which) to follow him on Twitter and included his username. I cited his racist tweets in my complaint more than a year ago. I was told that nothing would be done because the university protects his free speech above all else". During her OIE interview, Witness 66 indicated that she had provided a verbal report to Witness 178 (Associate Chair for Instruction & Students, Director of the Bachelor's in Psychology Program) wherein she shared her concerns that the Respondent provided misinformation about childhood sexual abuse, the prevalence of rape, college campuses being plagued with false accusations of sexual assault, and human trafficking, and failed to discuss consent despite it being a sexual behavior course. Witness 66 believed that the Respondent was propagating the myth that sexual assault allegations are generally false. Witness 66 stated that when she shared this information, Witness 178 took notes, said she would pass the concerns onto Witness 154, advised her that the Respondent had "academic freedom and freedom of speech, plus twenty years of experience, he could say what he wanted and teach what he wanted", and asked if she wanted to submit her concerns to the Title IX office (OIE). Witness 66 declined as she "didn't feel like [she] had enough of a case."

When OIE spoke with Witness 178, she acknowledged that students had brought concerns about the Respondent to her attention, which she stated were "usually based on a class conversation where something he said bothered them", and that he had made "comments about women or comments about religion" that bothered them. Witness 178 stated that the students "usually just say, he said something in class that I did not care for. They've never asked to formally file a complaint. They would come to my office hours and throw out a general concern, and most don't share their names. When I would ask if they wanted to file a complaint, they would say no." OIE also spoke with Witness 154, who had been Chair of the Department of Psychology since August 2017. Witness 154 indicated that, prior to June 4, 2020, during his time as Chair, he was "never advised of any students complaining that [the Respondent] subjected them or others to discrimination." He further stated that he "was never advised of concerns that [the Respondent] was engaging in racist, homophobic, sexist, anti-Semitic, or any other ---ist or ---phobic discriminatory behavior. … June 4, 2020 was the first time I became aware of discrimination concerns related to [the Respondent]."

196

In addition to speaking with the individuals above, OIE reviewed university records related to prior complaints about the Respondent. This review demonstrated the following:

- In July 2006, the Respondent's supervisor (Witness 179) issued a written reprimand to the Respondent for failing to be physically present to perform his duties as Clinical Director of Training and instructor of record for a General Psychology course during the 2006 Summer session, and assigning his course duties to a graduate assistant in his absence.

- In August 2006, the Respondent's supervisor (Witness 179) issued a letter of instruction to the Respondent for violating IRB protocols by asking students under the age of 18 to obtain a letter from their parents granting them approval to participate in experiments, and then show the letter to the experimenter in the studies in which they wished to participate.  The Respondent was instructed that, moving forward, he was to instruct students under the age of 18 that separate parental approval is required for each experiment in which they participate.

- In December 2006, two students (one identified and one unidentified) reported that the Respondent "bashed Christianity" multiple times in the classroom, which led to one of the students withdrawing from the Respondent's course.  The report was shared with various administrators at that time. It appears that the Chair spoke with the Respondent regarding the concerns raised, and the Respondent explained that he lectured on the psychological needs underlying religious beliefs and the lack of evidence supporting many religious beliefs.  No disciplinary action was taken at that time. During his OIE interview, the Respondent indicated that he did not recall the 2006 complaint and noted that the phrase "bashing" is someone's "subjective view of the situation.  What I call offering a critical analysis of religion, including Christianity, a believer is likely to interpret as me bashing Christianity."

- In August 2012, the university was alerted to an email that the Respondent sent to the students of his Cross-Cultural Psychology course following a January 2012 class discussion regarding religious bigotry that got posted to Reddit in August.  *See Announcement Jan. 2012 Re Religious Bigotry*. Both the then-Chair (Witness 152) and then-Provost (Witness 153) supported the Respondent's response and took no disciplinary action. Witness 152 said in an e-mail, "I view [the Respondent's] discussion as protected by the fundamental principles of academic freedom. I am encouraged by the worldwide positive response to his letter, because if critical thinking and debate were not permitted in our public universities, I believe the future of all human rights would be at risk."  Witness 153 said in an e-mail that the university encouraged faculty members to have classroom discussions that help students think critically and, "We also hope our students will arrive at their own opinions based on those thought-provoking discussions."

- In September 2013, a student reported to the former Director of OIE (formerly named Equal Opportunity and Affirmative Action Programs Office; Witness 180) that the Respondent made inappropriate comments of a sexual nature.  Specifically, the student reported that on the first or second day of class, after discussing gay men, anal sex, and safe sex, he stated, "Technically, abstinence is the best protection, but who's going to do that. We like sex, or okay, I like sex."  He then shared that he had been married, was divorced, and now had a sexual partner. Also, during the first week of class, some students in the back of the room were having trouble hearing him, so they requested that the Respondent raise the microphone higher to his mouth. He allegedly then responded, "But I don't like having something so close to my mouth because then I can't suck."  In a later class, the student reported that there was a discussion "on sensory information, so he asked if one could give up all their senses but one,

which one would it be. Every student that raised their hand and told their honest opinion, he ridiculed, except one girl who said she would give up every sense but touch, for sex. He gave her a high five. One girl said she would give up everything but taste.  When he asked her why, she said it was because she liked food. He said, 'I would ask you to stand up so we could take a look at you (he was referring to her weight), but I won't.'  Then after he had finished asking the class their opinions, he said he was between sight and touch, but he was leaning more towards touch because he liked sex. He said he didn't particularly care who it was with or what they looked like; they could wear a paper bag over their heads for all he cared."  The student also reported that the Respondent frequently used profanity in the class, including "son of a bitch, shit and ass".  Based on the limited nature of the conduct reported, OIE referred the matter to the Respondent's supervisor at the time (Witness 152), who agreed to work with Witness 178 on how to address this with the Respondent. Neither the Respondent nor Witness 178 had a recollection of this complaint or a follow up.

- In November 2016, a student reported to the former Interim Director of OIE (formerly named Equal Opportunity and Affirmative Action Programs Office; Witness 181) that the Respondent had sent a discriminatory message to students. *See Announcement Oct. 21, 2016 Re System Racism*.  Witness 181 met with the Respondent individually to discuss the concerns raised and his course objectives.  Witness 181 then met with students in the Respondent's 2016 Fall Cross Cultural Psychology class to discuss that concerns had been raised. Thereafter, Witness 181 was a guest speaker during one of the Respondent's 2017 Fall classes. When OIE spoke with Witness 154, he indicated that he had observed one of the Respondent's Cross Cultural Psychology classes during the 2017 Fall semester in which the Respondent and a Civil Rights attorney presented opposing views on topics of religion and race.  It is believed that Witness 181 was the attorney that presented. Witness 154 stated that the presentation was professional and appropriate, and that he was not aware that the presentation had been arranged in connection with a prior student complaint. During his OIE interview, the Respondent stated, "OIE investigated me in 2016 because a group of students complained, I presume, about racism. OIE sent an attorney to investigate me, and OIE sent the attorney to my class, who interviewed all my students, interviewed me, and reviewed all my material, and dismissed the case in 15 minutes. I asked her (the attorney) what the students were complaining about, and she said they simply didn't like my views." The record does not contain any formal OIE finding or there having been any discipline issued to the Respondent as a result of the report.

- In May 2019, Student Accessibility Services (SAS) alerted OIE that they were getting some resistance from the Respondent with allowing a student, Witness 44, to attend the 2019 study abroad trip to Peru because she had disclosed having previously been diagnosed with bipolar disorder.  OIE advised SAS that the student could not be prohibited from attending based on assumptions about her medical condition.  SAS and the Respondent discussed the concerns and developed a plan thereby allowing the student to attend the program in Peru.

- As set forth in detail above, in December 2019, OIE received a report related to the Respondent's Twitter posts.  Although OIE did not contact the Respondent as part of this review, he learned of the report. Witness 154 stated that in December 2019, he was alerted by UCF's Communications and Marketing Department and the Provost's Office that the university had been contacted by media regarding comments that the Respondent had made on his personal Twitter account.  Thereafter, Witness 154 was advised that although the views did not represent the university's position, no further university action was being taken

as this was the Respondent's personal account.  Witness 154 then advised the Respondent about what had occurred and the Respondent "responded positively about the university's support for free speech protected by the First Amendment." Following OIE's review, the matter was initially closed in January 2020 and was re-opened on June 4, 2020.

The record demonstrates that students had the perception that multiple complaints were submitted and had not been addressed effectively by the university.  Part of that perception was created by the Respondent delivering the message during his courses that there had been complaints against him, but nothing came of them because the university can't fire him due to his tenure.  Part of that perception was created by noting their concerns in the student evaluations on the understandable assumption that they would be reviewed and acted upon.  Taking the record as a whole into consideration, OIE found that the record did not support that management or central University offices had been notified of the full nature and scope of the allegations against the Respondent until June, 2020.  Nevertheless, OIE reviewed the current reporting options and messaging regarding how to report concerns of this nature, including the University-wide *Let's Be Clear* campaign and website related to reporting sex-based and sexual harassment concerns, the University-wide *Speak Up* campaign related to reporting any concerns of misconduct via the IntegrityLine, the required trainings provided to students that cover how to report concerns of discrimination (*Let's Be Clear* training), and the information related to how to report provided to students during their orientations. Based on this review, OIE recommends that the university continue the current University-wide messaging and providing the available reporting avenues to students.  That said, based on the information related to students' discussions with academic advisors, OIE recommends that additional training be provided to academic advisors regarding how to respond to and how to report concerns of this nature.

## XII:   OIE FINDINGS

After carefully reviewing the testimonial and documentary evidence and in light of the evidentiary principles discussed in this report, OIE makes the following findings:

1.      OIE finds that the Respondent violated the University's *Non-Discrimination Regulation UCF 3.00*1 and *Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy UCF 2-004.1* as his conduct created a hostile learning environment for students.

2.      OIE finds that the Respondent violated *UCF Regulation 3*.001 *Non-Discrimination; Affirmative Action Programs* when in February 2014, he failed to report and appropriately respond to a student's disclosure of having been sexually assaulted by one of his teaching assistants, including that he attempted to dissuade her from pursuing her allegations against the teaching assistant, and, rather than providing resources to the student, advised her to be "more conscientious when choosing" her friends.

3.      OIE finds that the Respondent violated the *University's Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1* by deterring students from filing complaints related to his classroom conduct.

4.      OIE finds that the Respondent violated UCF's *Reporting Misconduct and Protection from Retaliation Policy, No. 2-700.1* and *Code of Conduct (Honesty and Integrity)* by providing false information during OIE's investigation.

5.      OIE finds that the Respondent's classroom conduct also violated the University's *Code of Conduct*.

6.      OIE finds that the Respondent violated the *2010-2012 UCF BOT-UFF Collective Bargaining Agreement* when he paid bribed a health clinic representative to provide him with a falsified yellow fever vaccination certificate in 2011.

OIE would remind all parties of their obligation pursuant to the University's *Reporting Misconduct and Protection from Retaliation Policy* and *Nondiscrimination Policy*, which strictly prohibit retaliation "against anyone who, in good faith, reports misconduct, or who participates in an investigation of misconduct."

## APPENDIX:  MATERIALLY RELEVANT DOCUMENTS

Although the Appendix' list of evidentiary material is typically set forth in detail in this section of OIE's Investigative Report, due to the length of the Appendix in this matter (approximately 10 pages), this summary has been set forth in Attachment C.

# ATTACHMENT A

## SECTION III: OIE INVESTIGATION

## III.  OIE INVESTIGATION

1.      From June 4, 2020 through August 2020, OIE received reports from multiple sources (including phone calls, emails, IntegrityLine reports, Just Knights Response Team (JKRT) reports, and Office of Student Conduct reports) wherein individuals alleged that the Respondent, an Associate Professor in the Department of Psychology, had subjected students to discriminatory harassment in the classroom based on race, ethnicity, national origin, sex, sexual orientation, gender identity, disability, and religion; subjected students to sexual harassment; subjected students to *quid pro quo* harassment based on religion; engaged in unprofessional conduct; and, failed to appropriately report and respond to a student's disclosure of a sexual assault to the University. Some reports indicated support for the Respondent and denied misconduct in the classroom, while others shared their reactions to the Respondent's social media activity and did not identify specific classroom or workplace misconduct. Specifically, OIE initially reviewed approximately 400 hundred emails, over 100 IntegrityLine reports, 10 Just Knights Response Team reports, and two Office of Student Conduct reports related to the Respondent.

2.      As part of OIE's procedures, on June 4-5, 2020, OIE obtained class roster data pertaining to the prior two years of courses taught by the Respondent, and assigned class rosters to investigators to make outreach to a portion of students in each course inquiring whether they had experienced or witnessed discrimination in the classroom, and to describe their experiences in the Respondent's classroom.  Specifically, OIE made outreach to students in the following courses taught by the Respondent:  Honors Thesis; Cross Cultural Psychology; Sexual Behavior; and Personality Theory and Research.

3.      Also, on June 4, 2020:
        a.      OIE requested the identities and contact information of the former Graduate Assistants/Teaching Assistants that were assigned to work with the Respondent during the prior two years.  That same day, the Psychology Department provided the requested data.  On June 7, 2020, this list was assigned to an investigator to make outreach to the students.
        b.      OIE requested copies of the Respondent's Performance Evaluations and Student Evaluation of Instructor Summaries for the previous five years, as well as any complaint and disciplinary history related to the Respondent.  That same day, the Psychology Department and Academic Affairs provided the requested data.
        c.      OIE requested copies of the Respondent's class exams and grading keys related to his UCF courses for the last two years.  The data was provided on June 8, 2020.
        d.      OIE sent an email to Witness 115, who had advised President's Office personnel that she previously had been a student in the Respondent's course and had concerns, and requested her to participate in a substantive interview.  That same day, Witness 115 participated in a substantive interview. Witness 115 was informed of her rights and options as a witness in this matter, and Witness 115 was afforded an opportunity to review her statement. After making minor changes, Witness 115 signed and submitted her statement to OIE on June 11, 2020.
        e.      OIE made outreach to Witness 135, who had contacted the President, Academic Services and the College of Sciences regarding the Respondent. Witness 135

responded via email on July 5, 2020 indicating interest in making an appointment with OIE but did not respond to OIE's subsequent attempts to schedule an interview.

4.    On June 5, 2020:

a.    OIE began an in-depth review of social media connected to the Respondent.

b.    OIE observed students' and employees' participation in *UCF's Virtual Conversation about Race and Unity*. Based on the information provided, an investigator was assigned to make outreach to some of the participants.

c.    OIE requested that the Registrar's Office gather the following data for the prior two years: the identities and dates of each course taught by the Respondent; course enrollment number on the first day of each course; course enrollment number on the last day of each course; and, whether the withdrawal/dropout rate was consistent with other comparable psychology courses. The Registrar's Office provided this data on June 8, 2020.

d.    OIE began gathering data related to grades assigned by the Respondent and students' demographics for the 2019 Fall semester and 2020 Spring semester. Data was gathered to determine whether there were any statistical patterns based on sex and/or race.

e.    OIE made outreach to Witness 66, who contacted the President and UCF's Board of Trustees about the Respondent and submitted an IntegrityLine report, and invited her to participate in a substantive interview. On June 8, 2020, Witness 66 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 9, 2020, Witness 66 was afforded an opportunity to review her statement and she provided an addendum to her statement.

f.    OIE made outreach to Witness 173, who had shared concerns about the Respondent during a June 4, 2020 student forum, and invited her to participate in a substantive interview. OIE made additional outreach to Witness 173 on June 9 and June 24, 2020. Witness 173 did not respond to OIE's outreach.

g.    OIE made outreach to Witness 53, who had shared concerns about the Respondent with Faculty Excellence, and invited her to participate in a substantive interview, which was scheduled for June 8, 2020. Witness 53 indicated that her roommate, Witness 100, would be present. On June 8, 2020, Witness 53 requested to reschedule her interview for June 10, 2020. On June 10, 2020, Witness 53 and Witness 100 called to reschedule their meeting to June 12, 2020. On June 12, 2020, Witness 100 contacted OIE to reschedule their meeting to June 15, 2020. Witness 100 and Witness 53 participated in a substantive interview on June 15, 2020. Both were provided with their rights and options as witnesses in this matter. Both were provided with an opportunity to review their statement on June 18, 2020. Neither responded to OIE's request to review their statements, and their unsigned statements were adopted into the record. However, both subsequently provided additional documentation to OIE on June 22, July 14, August 4 and August 5, 2020, including audio recordings of class lectures. Witness 53 contacted OIE on July 30, 2020 by email for a status update regarding the investigation and to provide additional information obtained from their Google form (this information was provided on August 4 and 5). OIE called Witness 53 and Witness 100 to provide this update. In response to this phone call, wherein Witness 53 expressed that she wanted to interview with OIE separately regarding her concerns about Respondent, OIE contacted Witness 53 on July 31, 2020 by email and offered multiple available times to meet. Witness 53 was unresponsive to this outreach and no additional interview was conducted.

h.      On this date, witnesses provided OIE with a list of named individuals with concerns about the Respondent and a list of anonymous reports that they received in response to a Google form they posted online.[40]

5.      Between June 5, 2020 and June 26, 2020, OIE made outreach to all twenty-three graduate and undergraduate teaching assistants previously identified as having been assigned to the Respondent during the prior two years to request information about their experience in that role.  The following thirteen individuals responded to OIE's outreach.

a.      On June 5, 2020, OIE made outreach to Witness 233, who also had sent an email to the President and the Office of Diversity and Inclusion (ODI) about concerns related to the Respondent.  OIE invited Witness 233 to participate in a substantive interview.  On June 8, 2020, Witness 233 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 9, 2020, Witness 233 was afforded an opportunity to review her statement.  On June 11, 2010, Witness 233 signed her statement.

b.      On June 5, 2020, OIE made outreach to Witness 150, who also had contacted the College of Sciences and UCER about the Respondent, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 150 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 22, 2020, Witness 150 was afforded an opportunity to review her statement.  On June 27, 2020, Witness 150 signed her statement

c.      On June 9, 2020, OIE made outreach to Witness 45, who also had submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 45 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  Witness 45 was afforded an opportunity to review her statement.  On July 21, 2020, Witness 45 signed her statement.

d.      On June 11, 2020, OIE made outreach to Witness 168 and invited her to participate in a substantive interview.  On June 12, 2020, Witness 168 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  Witness 168 was provided with an opportunity to review her statement.  Witness 168 did not respond, and her unsigned statement was adopted into the record.

e.      On June 19, 2020, OIE made outreach to Witness 1 and invited him to participate in a substantive interview.  Witness 1 participated in a telephone call with OIE on June 24, 2020. This information was captured in OIE's phone log and incorporated into the record.

f.      On June 19, 2020, OIE made outreach to Witness 182 and invited him to participate in a substantive interview.  On June 24, 2020, Witness 182 participated in a telephone call with OIE.  This information was captured in OIE's phone log and incorporated into the record.

---

[40] On June 9, 2020, these witnesses created a Google form called "Report UCF Professor [Respondent]" and this form was published in a *Knight News* article and on Twitter. The form, which will hereinafter be referred to as the Student Google Form, was designed to provide concerned individuals with an avenue to report their concerns directly to these witnesses rather than the University. These witnesses, in turn, agreed to relay the information provide by others to OIE. These witnesses provided two lists based upon responses they received – a list of anonymous (unnamed by request) reports and a list of named individuals with concerns. These lists were initially provided to OIE on June 15, 2020.

g.      On June 23, 2020, OIE made outreach to Witness 183 and invited her to participate in a substantive interview.  That same day, Witness 183 participated in a telephone call with OIE but she did not have detailed information to contribute to this matter.

h.      On June 25, 2020, OIE made outreach to Witness 184, Witness 185, Witness 186, Witness 110 and Witness 2, and invited them to participate in a substantive interview.  That same day, Witness 184, Witness 185, Witness 110 and Witness 2 participated in separate telephone calls with OIE. On June 26, 2020, Witness 186 participated in a telephone call with OIE. This information was captured in OIE's phone logs and incorporated into the record.

i.      On June 26, 2020, OIE made outreach to Witness 3 and invited her to participate in a substantive interview.  That same day, Witness 3 participated in a telephone call with OIE.  This information was captured in OIE's phone log and incorporated into the record.

6.      On June 6, 2020, OIE made outreach to Witness 164, who submitted an IntegrityLine report of concerns regarding the Respondent, and invited her to participate in a substantive interview.  On June 9, 2020, Dr. Witness 164 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  That same day, Witness 164 was afforded an opportunity to review her statement.  On June 25, 2020, Witness 164 signed her statement.

7.      On June 7, 2020:

a.       OIE requested copies of the Respondent's class Announcements for the last three years.  The requested data was provided on June 8, 2020.

b.      OIE requested documentation from the Psychology Department pertaining to the Respondent allegedly issuing a written apology to students.  That same day, the Department responded to OIE's request.

8.      Between June 8, 2020 and June 10, 2020, OIE contacted 6 students in the Respondent's Summer 2018 Cross Cultural Psychology Class to request information about their experience in the course. Two (2) students responded to OIE's outreach, and neither could remember any misconduct during the course.

9.      Between June 8, 2020 and June 10, 2020, OIE contacted fourteen (14) students in the Respondent's Fall 2019 Personality Theory and Research Class to request information about their experience in the course. Nine (9) responded to OIE's outreach.  Of the students who responded, seven (7) indicated that they had observed some negative conduct in the course, one (1) just referred to the Respondent's email about the term "Latinx", and one (1) provided detailed information about her experience, which is set forth in an interview summary (Witness 162). With the exception of Witness 162, most of the information provided by the students was generalized recollections.

10.      Between June 8, 2020 and June 11, 2020, OIE contacted thirteen (13) students in the Respondent's Spring 2020 Sexual Behaviors course to request information about their experience in the course. Eleven (11) students responded to OIE's outreach. Of the eleven students, seven (7) provided detailed information about their experience that is summarized in a witness statement (*see* Witness 39, Witness 71, Witness 101, Witness 187, Witness 109, Witness

132, Witness 134 interview summaries) and four (4) indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide.

11.     On June 8, 2020:

a.     OIE made outreach to Witness 188, Witness 189, and Witness 190 regarding their concerns expressed during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*. Witness 188, Witness 189 and Witness 190 advised OIE that they had no direct information related to this investigation and declined to provide the identities of students who they believed had relevant information.  Accordingly, summary interview statements were not prepared for the record.

b.     OIE made outreach to Witness 191, who participated during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*, and invited her to participate in a substantive interview. On June 9, 2020, Witness 191 spoke with OIE but indicated that she had no direct relevant information related to this investigation. Accordingly, a summary interview statement was not prepared for the record.

c.     OIE made outreach to Witness 192 and Witness 193, who participated during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*, and left voicemails for each of them. On July 14, 2020, OIE attempted to contact Witness 192 and Witness 193 again. Witness 192 spoke with OIE but indicated that he had no direct information related to this investigation. Accordingly, a summary interview statement was not prepared for the record. On July 20, 2020, OIE sent an email to Witness 193 requesting to speak with her. Witness 193 did not respond to OIE's outreach.

d.     OIE made outreach to Witness 194, who participated during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*. On June 12, 2020, Witness 194 provided information related to the Respondent's study abroad program including student applications and survey responses by students who completed the 2019 program.  However, he did not provide direct information about his experiences.  Accordingly, a summary interview statement was not prepared for the record.

e.     OIE made outreach to Witness 120, who had submitted an IntegrityLine report and email to the College of Sciences regarding concerns with the Respondent.  OIE invited Witness 120 to participate in a substantive interview. This same day, Witness 120 contacted OIE to ask to schedule an interview for later the same week, and available times were provided. Witness 120 participated in a substantive interview on June 18, 2020 and was provided with her rights and options prior to participating. On June 18, 2020, Witness 120 was provided with an opportunity to review her statement and on this same day, Witness 120 signed her statement.

f.     OIE made outreach to Witness 177, who submitted an IntegrityLine report regarding the Respondent.  OIE made outreach first by phone and then by email. OIE made outreach to Witness 177 again on June 18, 2020. On June 20, 2020, Witness 177 replied indicating that she did not wish to participate further.

g.     OIE made outreach to Witness 38, who had submitted an IntegrityLine report regarding the Respondent. Witness 38 responded on June 9, 2020, indicating her willingness to participate as a witness, if needed. However, Witness 38 did not reply further to OIE outreach attempting to schedule her interview.

h.     OIE made outreach to Witness 39, Witness 14, and Witness 71, who were identified in class rosters.  OIE invited each student to participate in a substantive interview on

206

this same date. All three students were provided with their rights and options as a witness in this matter and participated in separate substantive interviews.  On this same date, all three students were afforded an opportunity to review their respective statements.  On this same date, Witness 14 reviewed and provided an addendum to her statement.  Witness 39 and Witness 71 did not respond to OIE, and their unsigned statements were adopted into the record.

        i.      OIE made outreach to Witness 176, who had sent an email to ODI regarding a student's experience with the Respondent and invited her to participate in a substantive interview.  On June 11, 2020, Witness 176 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 11, 2020, Witness 176 was afforded an opportunity to review her statement.  Witness 176 did not respond, and her unsigned statement was adopted into the record.

        j.      OIE made outreach to Witness 195, who had contacted the College of Sciences regarding the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreach to Witness 195 on June 11, 2020.  Witness 195 did not respond to OIE's requests for a substantive interview.

        k.      OIE made outreach to Witness 67, who had contacted the President, College of Sciences and Risk Management regarding the Respondent.  OIE invited Witness 67 to participate in a substantive interview.  OIE made additional outreach to Witness 67 on June 11, 2020.  Witness 67 did not respond to OIE's requests for a substantive interview.

        l.      OIE made outreach to Witness 196, who contacted the President and ODI regarding the Respondent, and invited her to participate in a substantive interview.  On June 11, 2020, Witness 196 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 11, 2020, Witness 196 was afforded an opportunity to review her statement.  On June 11, 2020, Witness 196 signed her statement.

        m.      OIE made outreach to Witness 114, who contacted the President, Provost and College of Sciences regarding the Respondent, and invited her to participate in a substantive interview. OIE made additional outreach to Witness 114 on June 11 and 19, 2020.  Witness 114 did not respond to OIE's outreach.

        n.      OIE made outreach to Witness 37, who contacted OIE and ODI regarding the Respondent, and invited her to participate in a substantive interview.  After not receiving a response, OIE followed up on June 11, 2020.  Witness 37 responded and agreed to participate in a substantive interview.  On June 15, 2020, Witness 37 was provided with rights and options as a witness in this matter and participated in a substantive interview.  That same day, Witness 37 was afforded an opportunity to review her statement.  Witness 37 did not respond, and her unsigned statement was adopted into the record.

        o.      OIE made outreach to Witness 49, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 9, 2020, Witness 49 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 9, 2020, Witness 49 was afforded an opportunity to review her statement, and signed her statement.

        p.      OIE made outreach to Witness 111, who had reported concerns about the Respondent to the media, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 111 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 10, 2020, Witness 111 was afforded an opportunity to review her statement.  On June 11, 2020, Witness 111 signed her statement.

q.      OIE made outreach to Witness 82, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 82 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 82 was afforded an opportunity to review her statement.  On June 23, 2020, Witness 82 signed her statement.

r.      OIE made outreach to Witness 144, who contacted Human Resources regarding the Respondent, and invited her to participate in a substantive interview.  On June 9, 2020, Witness 144 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 9, 2020, Witness 144 was afforded an opportunity to review her statement.  On June 10, 2020, Witness 144 signed her statement.

s.      OIE made outreach to Witness 197, who submitted an IntegrityLine report alleging that her former co-worker had complained to her about the Respondent's classroom conduct.  OIE invited Witness 197 to provide OIE with her former coworker's name and contact information.  On June 30, 2020, Witness 197 informed OIE that she had been unable to reach her former coworker and did not want to give OIE her name without first obtaining permission from the former coworker.

t.      OIE made outreach to Witness 198, who contacted the Department of Psychology regarding his brother's experiences in the Respondent's class.  On June 8, 2020 and June 23, 2020, OIE reached out to Witness 198 and requested that he provide OIE with his brother's contact information or that he ask his brother to contact OIE.  Witness 198 did not respond to OIE's requests.

u.      OIE made outreach to Witness 102, who submitted an IntegrityLine report regarding the Respondent, and invited him to participate in a substantive interview.  OIE made a second outreach on June 23, 2020.  Witness 102 did not respond to OIE's outreaches.

v.      OIE made outreach to Witness 199, who was identified on a class roster and initially agreed to participate in an OIE substantive interview, which was scheduled for June 12, 2020.  Witness 199 did not participate in her interview as scheduled.  OIE made additional outreach to Witness 199 on June 12, 2020 and June 19, 2020, but Witness 199 did not respond to OIE's requests for a substantive interview.

w.      OIE made outreach to Witness 118, who had contacted the College of Sciences about the Respondent, and invited her to participate in a substantive interview.  On June 18, 2020, OIE made a second outreach.  Witness 118 did not respond to OIE's outreaches.

x.      OIE made outreach by phone to Witness 147, who submitted an IntegrityLine report regarding the Respondent, and invited him to participate in a substantive interview.  Witness 147 did not respond to OIE's outreach.

y.      OIE reviewed university grant funding records and determined that no federal agencies with reporting requirements regarding sexual and discriminatory harassment provided funding to the Respondent as an investigator or key personnel.

12.     Between June 8 and June 30, 2020, OIE contacted 90 students in the Respondent's 2018 Fall General Psychology course to request information about their experience in the course.  Forty-four (44) students responded to OIE's outreach.  Of the forty-four (44) individuals that responded, five (5) could not recall their experience in the class, twenty-six (26) indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide, seven (7) provided detailed information about their experience that is summarized in a witness statement (*see* Witness 58, Witness 95, Witness 107,

Witness 121, Witness 133 Interview Summaries, and Witness 48, Witness 200 Phone Log Summaries), and six (6) indicated they had negative experiences in the course but could not provide detailed information.

13.     Between June 9, 2020 and July 7, 2020, OIE contacted 22 students in the Respondent's online 2018 Summer Sexual Behaviors course to request information about their experience in the course. Eleven (11) students responded to OIE's outreach. Of the eleven students, six (6) indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide, four (4) indicated that they could not recall their experience in the class, and one (1) indicated that they had a negative experience in the class but could not provide detailed information.

14.     Between June 9, 2020 and June 24, 2020, OIE contacted 61 students in the Respondent's 2018 Spring Cross Cultural Psychology class. Of the 20 students that responded to OIE's outreach, one (1) student could not recall the class, eight (8) students responded that they did not have any concerns or detailed information to share, and eleven (11) students responded that they had concerns with how the course was conducted. Of these eleven students, two indicated that they could provide detailed information and would participate in a further interview on a different date. Witness 234's interview was scheduled for June 12, 2020, but Witness 234 did not respond to OIE contact. The second student, Witness 103, participated in an interview on June 18, 2020 (*see* interview summary).

15.     On June 9, 2020:

a.     OIE conducted a substantive interview with Witness 170, Witness 84, and Witness 137, who each submitted IntegrityLine reports related to the Respondent. All three students were provided with their rights and options as a witness in this matter and participated in a substantive interview.  On this same date, Witness 170 and Witness 84 were afforded an opportunity to review their respective statements. Witness 137 was afforded an opportunity to review her statement on June 10, 2020. Witness 170 provided OIE with a syllabus for the Respondent's Fall 2016 Cross-cultural Psychology course. Witness 137 stated that she would provide audio recordings of the Respondent's course lectures from Fall 2019. Also on June 10, 2020, Witness 170 provided an addendum to his statement, and Witness 137 signed her statement.  Witness 84 did not respond, and her unsigned statement was adopted into the record.

b.     OIE made outreach to Witness 89, who contacted the College of Sciences about the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreach to Witness 89 on June 11 and 19, 2020.  Witness 89 did not respond to OIE's outreach.

c.     OIE made outreach to Witness 145, who contacted the President and College of Sciences regarding the Respondent, and invited her to participate in a substantive interview.  On June 12, 2020, Witness 145 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  That same day, Witness 145 was afforded an opportunity to review her statement.  On June 15, 2020, Witness 145 signed her statement.

d.     OIE made outreach to Witness 107, who was identified on a class roster, and invited him to participate in a substantive interview.  On June 18, 2020, Witness 107 was provided with his rights and options as a witness in this matter and participated in a substantive

interview.  On June 19, 2020, Witness 107 was afforded an opportunity to review his statement. Witness 107 did not respond, and his unsigned statement was adopted into the record.

       e.     OIE made outreach to Witness 88, who submitted an IntegrityLine report and Just Knights Response Team report regarding the Respondent, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 88 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 88 was afforded an opportunity to review her statement.  Witness 88 did not respond, and her unsigned statement was adopted into the record.

       f.     OIE made outreach to Witness 140, who submitted an IntegrityLine report regarding the Respondent, and invited him to participate in a substantive interview.  On June 11, 2020, Witness 140 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 140 was afforded an opportunity to review his statement and signed it on June 16, 2020.

       g.     OIE made outreach to Witness 92, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 11, 2020, Witness 92 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 16, 2020, Witness 92 was afforded an opportunity to review her statement and she signed her statement on June 17, 2020.

       h.     OIE requested that the Department Chair provide contact information related to employees who worked closely with the Respondent.  That same day, the Chair responded with the requested information.

       i.     OIE made outreach to Witness 101, who was identified on a class roster, and invited her to participate in a substantive interview. On this same date, Witness 101 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On this same date, Witness 101 was afforded an opportunity to review her statement. Witness 101 did not respond, and her unsigned statement was adopted into the record.

       j.     OIE made outreach to Witness 162, who was identified on a class roster, and invited her to participate in an interview. On June 12, 2020, Witness 162 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 162 was afforded an opportunity to review her statement and subsequently signed her statement on June 18, 2020 with a minor edit.

       k.     OIE made outreach to Witness 58, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 19, 2020, Witness 58 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  Witness 58 was provided with an opportunity to review her statement.  On June 25, 2020, Witness 58 signed her witness statement.

16.     On June 10, 2020:

       a.     OIE made outreach to Witness 201, who reported concerns about the Respondent to the media, and invited him to participate in a substantive interview. On June 21, 2020, Witness 201 was provided with his rights and options as a witness in this matter and participated in a substantive interview. On June 24, 2020, Witness 201 was provided with an opportunity to review his statement. Witness 201 did not respond, and his unsigned statement was adopted into the record.

       b.     OIE made outreach to Witness 202, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 10,

2020, Witness 202 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  At that time, it was determined that Witness 202 had inadvertently identified the incorrect person as the Respondent.  Witness 202 had not taken a course with the Respondent in this matter.

   c. OIE made outreach to Witness 203, who sent an email to the Provost regarding the Respondent, and invited him to participate in a substantive interview.  OIE made additional outreaches to Witness 203 on June 12, 2020 and June 13, 2020.  Witness 203 did not respond to OIE's outreach.

   d. OIE made outreach to Witness 54, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 10, 2020, Witness 54 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 54 was afforded an opportunity to review her statement.  On June 18, 2020, an addendum was completed.  On June 18, 2020, Witness 54 advised OIE that she was unable to sign the statement and addendum but reported that both were accurate and complete.  Accordingly, her unsigned statement was adopted into the record.

   e. OIE made outreach to Witness 187 (who was identified on a class roster), Witness 132 (who contacted the President and JKRT) and Witness 109 (who was identified on a class roster), and invited each of them to participate in a substantive interview. On this same date, all three students were provided with their rights and options as a witnesses in this matter and participated in separate substantive interviews.  On this same date, Witness 187 and Witness 109 were afforded an opportunity to review their statements. On June 11, 2020, Witness 132 was afforded the opportunity to review his statement.  All three students did not respond, and their unsigned statements were adopted into the record.

  17. June 11, 2020:

   a. OIE made outreach to Witness 130, who was identified by another witness (Witness 196) as having information relevant to the investigation, and invited her to participate in a substantive interview.  Witness 130 did not respond to OIE's outreach.

   b. OIE made outreach to Witness 85, who was identified by another witness (Witness 196) as having information relevant to the investigation, and invited her to participate in a substantive interview. On June 16, 2020, Witness 85 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On August 4, 2020, Witness 85 was afforded an opportunity to review her statement.  On October 30, 2020, Witness 85 signed her statement.

   c. OIE made outreach to Witness 87, who was identified by another witness (Witness 196) as having information relevant to the investigation, and invited her to participate in a substantive interview. On June 15, 2020, Witness 87 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On July 23, 2020, Witness 87 was afforded an opportunity to review her statement.  Witness 87 did not respond, and her unsigned statement was adopted into the record.

   d. OIE made outreach to Witness 60, who had contacted the Provost, and invited her to participate in a substantive interview.  Witness 60 did not respond to OIE's outreach.

   e. OIE made outreach to Witness 178, who was identified as the Respondent's coworker, and invited her to participate in a substantive interview. Witness 178

participated in an interview that same day. Witness 178 was provided with her rights and options as a witness in this matter. On June 12, 2020, Witness 178 was afforded an opportunity to review her statement. Witness 178 did not respond, and her unsigned statement was adopted into the record.

        f.      OIE made outreach to Witness 75, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview. On June 12, 2020, Witness 75 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 24, 2020, Witness 75 was afforded an opportunity to review her statement. Witness 75 did not respond, and her unsigned statement was adopted into the record.

        g.      OIE made outreach to Witness 68, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview. OIE made additional outreach to Witness 68 on June 12, 2020 and June 15, 2020. Witness 68 did not respond to OIE's requests.

        h.      OIE made outreach to Witness 91, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview. On June 18, 2020, Witness 91 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 24, 2020, Witness 91 was afforded an opportunity to review her statement. Witness 91 did not respond, and her unsigned statement was adopted into the record.

        i.      OIE made outreach to Witness 134, who was identified on a class roster, and invited her to participate in a substantive interview. On this same date, Witness 134 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 15, 2020, Witness 134 was afforded an opportunity to review her statement. Witness 134 did not respond, and her unsigned statement was adopted into the record.

        j.      OIE made outreach to Witness 124, who contacted the College of Sciences about the Respondent. On June 15, 2020, Witness 124 spoke with OIE about her experience in the Respondent's General Psychology course. Witness 124 did not have detailed information to contribute to this matter.

    18.      On June 12, 2020:

        a.      OIE made outreach to Witness 86, who participated during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*, and invited her to participate in a substantive interview. On June 16, 2020, Witness 86 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 18, 2020, Witness 86 was afforded an opportunity to review her statement. That same day, Witness 86 affirmed the accuracy of her statement (other than "typos") via email.

        b.      OIE made outreach to Witness 204, who participated during UCF's June 5, 2020 *Virtual Conversation about Race and Unity*, and invited her to participate in a substantive interview. That same day, Witness 204 was provided with her rights and options as a witness in this matter and participated in a substantive interview. Witness 204 expressed general concerns regarding her experience at UCF, which were unrelated to the present matter. Accordingly, a summary interview statement was not prepared for the record.

        c.      OIE made outreach to Witness 129, who expressed concerns regarding the Respondent on social media, and invited her to participate in a substantive interview. That same day, Witness 129 was provided with her rights and options as a witness in this matter and

participated in a substantive interview. That same day, Witness 129 was afforded an opportunity to review her statement. Witness 129 did not respond, and her unsigned statement was adopted into the record.

        d.      OIE made outreach to Witness 138, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 12, 2020, Witness 138 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 15, 2020, Witness 138 was afforded an opportunity to review her statement.  Witness 138 did not respond, and her unsigned statement was adopted into the record.

        e.      OIE made outreach to Witness 65, who contacted the College of Sciences Academic Services about the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreaches to Witness 65 on June 16, 2020 and June 30, 2020. Witness 65 responded on July 1, 2020 and advised that she did not wish to be interviewed regarding this matter.

        f.      OIE made outreach to Witness 139, who contacted the College of Sciences, and invited her to participate in a substantive interview.  OIE made additional outreaches to Witness 139 on June 16, 2020 and June 23, 2020.  On June 23, 2020, Witness 139 contacted OIE and explained that she changed her mind and did not wish to be interviewed or provide a statement.

      19.      Between June 15, 2020 and July 21, 2020, OIE contacted 37 students in the Respondent's 2018 Spring Sexual Behavior course to request information about their experience in the course. Twenty-one (21) students responded to OIE's outreach. Of the 21 students, two declined to participate, three (3) provided detailed information about their experience that is summarized in a witness statement (*see* Witness 46, Witness 78 and Witness 81 interview summaries), six (6) indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide, and ten (10) indicated that they had a negative experience in the class but did not have detailed information to provide.

      20.      On June 15, 2020:

        a.      OIE made outreach to Witness 158 and Witness 43, who the Psychology Department identified as both having experience working with the Respondent, and invited them to participate in a substantive interview. On June 17, 2020, both were provided with their rights and options as a witness in this matter and both participated in separate substantive interviews. On June 18, 2020, Witness 158 and Witness 43 were afforded an opportunity to review their respective statements. On June 18, 2020, Witness 158 signed her statement with notations. On June 19, 2020, Witness 43 signed her statement with minor corrections.

        b.      OIE made outreach to Witness 46, who was identified on a class roster, and invited him to participate in a substantive interview. On this same date, Witness 46 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On this same date, Witness 46 was afforded an opportunity to review his statement. Witness 46 did not respond, and his unsigned statement was adopted into the record.

        c.      OIE made outreach to Witness 103, who had been identified in a class roster, and invited her to participate in an interview. On June 18, 2020, Witness 103 was provided with her rights and options as a witness in this matter and participated in a substantive

interview. On July 16, 2020, Witness 103 was afforded the opportunity to review her statement. Witness 103 did not respond, and her unsigned statement was adopted into the record.

21.     On June 16, 2020:

a.     Between June 16, 2020 and July 24, 2020, OIE contacted 40 students in the Respondent's 2019 Spring Cross Cultural Psychology course to request information about their experience in the course. Twenty-one (21) students responded to OIE's outreach.  Of the 21 individuals, four (4) students declined to participate in the investigation, three (3) students tentatively scheduled to speak with OIE but were unresponsive to OIE's subsequent follow-up outreach efforts, five (5) students indicated that they did not have any concerns with how the course was conducted and did not have detailed information to provide, and nine (9) students provided detailed information about their experience that is summarized in witness statements (*see* statements summaries of Witness 52, Witness 56, Witness 63, Witness 62, Witness 64, Witness 9, Witness 73, Witness 98 and Witness 117).

b.     OIE made outreach to Witness 56, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 19, 2020, Witness 56 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 25, 2020, Witness 56 was afforded an opportunity to review her statement. On July 2, 2020, Witness 56 responded indicating that she approved of the accuracy of the statement.

c.     OIE made outreach to Witness 63, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 17, 2020, Witness 63 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 26, 2020, Witness 63 was afforded an opportunity to review her statement. On July 3, 2020, Witness 63 responded indicating that she was unable to sign the statement but advised that she approved of the accuracy of the statement.

d.     OIE made outreach to Witness 62, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 17, 2020, Witness 62 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 25, 2020, Witness 62 was afforded an opportunity to review her statement. On June 29, 2020, Witness 62 signed her statement.

e.     OIE made outreach to Witness 64, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 23, 2020, Witness 64 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 24, 2020, Witness 64 was afforded an opportunity to review her statement. On June 25, 2020, Witness 64 signed her statement.

f.     OIE made outreach to Witness 9, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 18, 2020, Witness 9 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 25, 2020, Witness 9 was afforded an opportunity to review her statement.  Witness 9 did not respond, and her unsigned statement was adopted into the record.

g.     OIE made outreach to Witness 73, who was identified on a class roster, and invited him to participate in a substantive interview.  On June 18, 2020, Witness 73 was provided with his rights and options as a witness in this matter and participated in a substantive

interview.  On June 25, 2020, Witness 73 was afforded an opportunity to review his statement.
Witness 73 did not respond, and his unsigned statement was adopted into the record.

       h.      OIE made outreach to Witness 117, who was identified on a class roster,
and invited her to participate in a substantive interview.  On June 16, 2020, Witness 117 was
provided with her rights and options as a witness in this matter and participated in a substantive
interview.  On June 26, 2020, Witness 117 was afforded an opportunity to review her statement.
On June 28, 2020, Witness 117 signed her statement.

       i.      OIE made outreach to Witness 126, who submitted an IntegrityLine
report regarding the Respondent, and invited her to participate in a substantive interview.  On
June 18, 2020, Witness 126 was provided with her rights and options as a witness in this matter
and participated in a substantive interview.  On June 18, 2020, Witness 126 was afforded an
opportunity to review her statement.  On June 26, 2020, Witness 126 signed her statement.

       j.      OIE made outreach to Witness 122, who submitted an IntegrityLine report
regarding the Respondent, and invited him to participate in a substantive interview.  On June 19,
2020, Witness 122 was provided with his rights and options as a witness in this matter and
participated in a substantive interview.  On June 23, 2020, Witness 122 was afforded an
opportunity to review his statement.  On June 23, 2020, Witness 122 signed his statement.

       k.      OIE made outreach to Witness 95, who was identified in a class roster,
and invited her to participate in a substantive interview.  On June 18, 2020, Witness 95 was
provided with her rights and options as a witness in this matter and participated in a substantive
interview.  On June 22, 2020 and June 29, 2020, Witness 95 was afforded an opportunity to
review her statement.  Witness 95 did not respond, and her unsigned statement was adopted into
the record.

       l.      OIE made outreach to Witness 133, who was identified on a class roster,
and invited him to participate in a substantive interview.  On June 23, 2020, Witness 133 was
provided with his rights and options as a witness in this matter and participated in a substantive
interview.  On June 24, 2020 and July 13, 2020, Witness 133 was afforded an opportunity to
review his statement.  Witness 133 did not respond, and his unsigned statement was adopted into
the record.

       m.      OIE made outreach to Witness 123, who posted comments about the
Respondent to a Change.org petition, and invited her to participate in a substantive interview.
OIE made a second outreach to Witness 123 on June 23, 2020.  Witness 123 did not respond to
OIE's outreach.

       n.      OIE made outreach to Witness 127, who posted comments about the
Respondent to a Change.org petition, and invited her to participate in a substantive interview.
Witness 127 did not respond to OIE's outreach.

       o.      OIE made outreach to Witness 108, who contacted the College of
Sciences, and invited him to participate in a substantive interview.  On June 25, 2020, Witness
108 was provided with his rights and options as a witness in this matter and participated in a
substantive interview.  On July 29, 2020, Witness 108 was afforded an opportunity to review his
statement.  Witness 108 did not respond, and his unsigned statement was adopted into the record.

       p.      OIE made outreach to Witness 52, who was identified on a class roster,
and invited her to participate in a substantive interview.  On July 14, 2020, Witness 52 was
provided with her rights and options as a witness in this matter and participated in a substantive
interview.  On July 17, 2020, Witness 52 was afforded an opportunity to review her statement.
Witness 52 did not respond, and her unsigned statement was adopted into the record.

q.      OIE made outreach to Witness 131, who contacted OIE about the Respondent, and invited her to participate in a substantive interview. Witness 131 did not respond to OIE's outreach.

r.      OIE made outreach to Witness 78, who was identified on a class roster, and invited him to participate in a substantive interview. On this same date, Witness 78 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On July 14, 2020, Witness 78 was afforded an opportunity to review his statement. Witness 78 did not respond, and his unsigned statement was adopted into the record.

s.      OIE made outreach to Witness 159, who responded to the Student Google Form, and invited her to participate in a substantive interview. On June 18, 2020, Witness 159 participated in a phone call with OIE but did not have substantive information to contribute to this matter. Accordingly, a summary interview statement was not prepared for the record.

t.      OIE made outreach to Witness 51, who was identified by another witness (Witness 100) as having relevant information. Witness 51 participated in a phone call with OIE but did not have detailed information to contribute to this matter at that time. On June 17, 2020, OIE followed up with Witness 51, provided with her rights and options as a witness in this matter.  Witness 51 chose to participate in a substantive interview.  On June 20, 2020, Witness 51 was afforded an opportunity to review her statement.  Witness 51 did not respond, and her unsigned statement was adopted into the record.  On June 30, 2020, OIE made a follow up outreach to Witness 51 regarding her Student Google Form submission.  OIE made additional outreaches to Witness 51 on July 14, 2020 and July 15, 2020, but Witness 51 did not respond.

u.      OIE made outreach to Witness 205, who contacted OIE about the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreach on June 19, 2020.  Witness 205 did not respond to OIE's outreach.

v.      OIE made outreach to Witness 163, who had contacted ODI about her partner's experience with the Respondent, and invited her to participate in a substantive interview.  On June 30, 2020, Witness 163 participated in a telephone call with OIE.  This information was captured in OIE's phone log and incorporated into the record.

22.     On June 17, 2020, OIE made outreach to Witness 206, who responded to the Student Google Form, and invited her to participate in a substantive interview.  On June 30, 2020, OIE made a second outreach to Witness 206.  On June 30, 2020, Witness 206 responded and declined to be interviewed.

23.      On June 18, 2020:

a.      OIE made outreach to Witness 93, who had responded to the Student Google Form, and invited her to participate in a substantive interview. On June 30, 2020, Witness 93 participated in a phone call with OIE but did not have detailed information to contribute to this matter.

b.      OIE made outreach to Witness 121, who was identified on a class roster, and invited him to participate in a substantive interview. That same day, Witness 121 was provided with his rights and options as a witness in this matter and participated in a substantive interview. On July 20, 2020, Witness 121 was afforded the opportunity to review his statement. Witness 121 did not respond, and his unsigned statement was adopted into the record.

c.      OIE made outreach to Witness 207, who had responded to the Student Google Form, and invited her to participate in a substantive interview. On June 26, 2020, OIE

made additional outreach to Witness 207 via telephone and left a voicemail. Witness 207 did not respond to OIE's outreach.

        d.     OIE made outreach to Witness 57, who contacted OIE about the Respondent.  On June 24, 2020, Witness 57 denied witnessing the Respondent engage in discrimination against or singling out students and did not have further detailed information to provide.

24.     On June 19, 2020:

        a.     OIE made outreach to Witness 47, who had provided information regarding the Respondent to the JKRT, and invited her to participate in a substantive interview. On June 23, 2020, Witness 47 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On June 24, 2020, Witness 47 was afforded an opportunity to review her statement. Witness 47 affirmed her statement, with minor corrections, on June 29, 2020. Witness 47 also provided a copy of *White Shaming* to OIE for review.

        b.     OIE made outreach to Witness 183, who was identified on a class roster, and invited her to participate in a substantive interview.  On June 23, 2020, Witness 183 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On July 23, 2020, Witness 183 was afforded an opportunity to review her statement. On July 23, 2020, Witness 183 signed her statement.

25.     On June 22, 2020:

        a.     OIE made outreach to Witness 136, who had contacted Human Resources regarding the Respondent, and invited her to participate in a substantive interview.  On June 22, 2020, Witness 136 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  Witness 136 had taken Respondent's class during the summer of 2005-06 and did not recall many of the specific statements made by Respondent. Accordingly, a summary interview statement was not prepared for the record.

        b.     OIE made outreach to Witness 48, who was identified on a class roster, and invited him to participate in a substantive interview.  On June 22, 2020, Witness 48 participated in a telephone call with OIE. This information was captured in OIE's phone log and incorporated into the record.

26.   On June 24, 2020:

        a.     OIE made outreach to Witness 83, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On June 25, 2020, Witness 83 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On June 29, 2020, Witness 83 was afforded an opportunity to review her statement.  On June 30, 2020, Witness 83 signed her statement.

        b.     OIE made outreach to Witness 59, who contacted the President regarding the Respondent, and invited her to participate in a substantive interview.  On June 25, 2020, Witness 59 was provided with her rights and options as a witness in this matter.  Witness 59 declined to participate in a substantive interview with OIE but agreed to provide information to OIE regarding transcripts of some of Respondent's class lectures obtained as part of her approved accommodations from Student Accessibility Services (SAS).  On June 25, 2020, OIE obtained and reviewed two SAS transcripts related to the Respondent's General Psychology course, which met on Tuesdays from 6:00 PM to 08:50 PM – namely, the transcripts for classes

held on August 21, 2018 and August 28, 2018. SAS also advised that they did not have the transcripts for the remaining classes that semester.

       c.     OIE made outreach to Witness 42, who had contacted the President regarding the Respondent, and invited him to participate in a substantive interview.  On June 30, 2020, OIE made additional outreach to Witness 42.  On July 1, 2020, Witness 42 was provided with his rights and options as a witness in this matter and participated in a substantive interview. On July 1, 2020, Witness 42 was afforded an opportunity to review his statement.  On July 7, 2020, Witness 42 signed his statement.

       d.     OIE made outreach to Witness 128, who had contacted the Provost regarding the Respondent, and invited her to participate in a substantive interview.  OIE made a second outreach on June 30, 2020.  Witness 128 did not respond to OIE's outreaches.

       e.     OIE made outreach to Witness 149, who had contacted the College of Sciences, and invited her to participate in a substantive interview.  OIE made a second outreach on June 30, 2020.  Witness 149 did not respond to OIE's outreaches until November 18, 2020. On November 30, December 1 and 2, 2020, OIE invited Witness 149 to participate in a substantive interview and thereafter did not hear further from Witness 149 regarding her participation in a substantive interview.

       f.     OIE made outreach to Witness 208, who had contacted ODI, and invited her to participate in a substantive interview.  OIE made additional outreach on June 29, 2020. Witness 208 did not respond to OIE's outreaches.

       g.     OIE made outreach to Witness 4, who had contacted the President, Provost and College of Sciences regarding the Respondent, and invited him to participate in a substantive interview.  On June 26, 2020, Witness 4 participated in a telephone call with OIE. This information was captured in OIE's phone log and incorporated into the record.

       h.     OIE made outreach to Witness 76, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  On July 1010, Witness 76 participated in a telephone call with OIE. This information was captured in OIE's phone log and incorporated into the record.

     27.     Between June 24, 2020 and July 6, 2020, OIE made outreach to ten (10) students in the Respondent's Summer 2019 Cross-Cultural Psychology Class to request information about their experience in the course.  Four (4) students responded to OIE's outreach and each provided detailed information about their experience that is summarized in a witness statement or phone log (*see* Witness 5, Witness 104, Witness 110, and Witness 125 Witness Statements or OIE Phone Logs)[41].

     28.     Between June 25, 2020 and July 1, 2020, OIE contacted thirty-four (34) students in the Respondent's 2019 Fall Cross Cultural Psychology course to request information about their experience in the course. Nineteen (19) students responded to OIE's outreach. Of the 19 students, four (4) declined to participate, five (5) indicated that they had a negative experience but did not have detailed information to provide, and ten (10) indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide.

---

[41] Witness 110 was contacted by OIE as part of OIE's outreach to prior GTAs, as well as having been enrolled in the 2019 Summer Cross Cultural Psychology course.

29.     On June 25, 2020, OIE made outreach to Witness 70, who had responded to the Student Google Form, and invited her to participate in a substantive interview.  OIE made a second outreach on June 30, 2020 and a third outreach on July 2, 2020.  Witness 70 did not respond to OIE's outreach.

30.     On June 26, 2020:

a.      OIE made outreach to Witness 44, who had submitted an email to PsychologyFeedback@ucf.edu about the Respondent, and invited her to participate in a substantive interview.  OIE made a second outreach on June 30, 2020 and a third outreach on July 2, 2020.  Witness 44 responded and declined to be interviewed.

b.      OIE attempted to make outreach to Witness 209, who had responded to the Student Google Form.  However, OIE was unable to locate a working phone number or email address to make contact.

31.     On June 29, 2020:

a.      OIE made outreach to Witness 34, whose experience was referenced in an anonymous IntegrityLine report, and invited her to participate in a substantive interview. On July 2, 2020, Witness 34 was provided with her rights and options as a witness in this matter and participated in a substantive interview. Witness 34 was provided with her statement for review on the same day. On July 10, 2020, Witness 34 affirmed her statement via email and provided a timeline of events regarding her interactions with the Respondent and other UCF offices.

b.      OIE made outreach to Witness 35.  Witness 35 did not respond to OIE's outreach.

32.     On June 30, 2020:

a.      OIE made outreach to Witness 146, who had contacted the President regarding the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreaches to Witness 146 on July 2, 2020 and July 8, 2020.  Witness 146 did not respond to OIE's outreach.

b.      OIE made outreach to Witness 69, who had contacted ODI and the President's Office regarding the Respondent, and invited her to participate in a substantive interview.  On July 2, 2020, OIE made a second outreach to Witness 69.  On July 9, 2020, Witness 69 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On July 11, 2020, Witness 69 was afforded an opportunity to review her statement.  Witness 69 submitted clarifications to the statement on July 17, 2020, which have been adopted into the record.

c.      OIE made outreach to Witness 18, who had responded to the Student Google Form, and invited her to participate in a substantive interview.  On July 2, 2020, OIE made second outreach to Witness 18.  That same day, Witness 18 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On July 11, 2020, Witness 18 was afforded an opportunity to review her statement.  Witness 18 did not respond, and her unsigned statement was adopted into the record.

d.      OIE made outreach to Witness 210, who had responded to the Student Google Form, and invited her to participate in a substantive interview.  Witness 210 declined to be interviewed.

    e.  OIE made outreach to Witness 77, who had responded to the Student Google Form, and invited her to participate in a substantive interview.  OIE made additional outreaches on July 2, 2020 and July 8, 2020.  Witness 77 did not respond to OIE's outreach.

    f.  OIE made outreach to Witness 211, who submitted an IntegrityLine report regarding the Respondent, and invited her to participate in a substantive interview.  OIE made additional outreaches on July 2, 2020 and July 8, 2020.  Witness 211 did not respond to OIE's outreach.

    g.  OIE made outreach to Witness 212, who had contacted the President regarding the Respondent, and invited him to participate in a substantive interview.  OIE made a second outreach to Witness 212 on July 2, 2020.  Witness 212 did not respond to OIE's outreach.

  33.  On July 2, 2020:

    a.  OIE made outreach to Witness 40, who had been identified on a class roster, and invited him to participate in a substantive interview.  On July 8, 2020, Witness 40 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  Witness 40 took Respondent's class during the spring of 2018 and did not recall many of the specific statements made by Respondent.  This information was captured in OIE's phone log and incorporated into the record.

    b.  OIE made outreach to Witness 169, who had been identified on a class roster, and invited her to participate in an interview. On July 8, 2020, Witness 169 was provided with her rights and options as a witness in this matter and participated in a substantive interview. On July 17, 2020, Witness 169 was afforded the opportunity to review her statement.  Witness 169 did not respond, and her unsigned statement was adopted into the record.

    c.  OIE made outreach to Witness 98, who had been identified on a class roster, and invited her to participate in a substantive interview.  On July 7, 2020, Witness 98 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On July 24, 2020, Witness 98 was afforded an opportunity to review her statement. Witness 98 did not respond, and her unsigned statement was adopted into the record.

    d.  OIE made outreach to Witness 160, who had been identified on a class roster, and invited him to participate in a substantive interview. On July 8-9, 2020, Witness 160 participated in telephone calls with OIE.  This information was captured in OIE's phone log and incorporated into the record.

  34.  Between July 2 and July 10, 2020, OIE contacted 36 students in Respondent's 2018 Spring General Psychology course to request information about their experience in the course.  Twenty (20) students responded to OIE's outreach.  Of the twenty (20) individuals that responded, one (1) could not recall their experience in the class, thirteen (13) indicated they did not have any concerns with how the course was conducted but did not have detailed information to provide, three (3) provided detailed information about their experience that is summarized in a witness statement (*see* Witness 169 Interview Summary, Witness 40 and Witness 160 Phone Log Summaries), and three (3) indicated that they had a negative experience in the course but could not provide detailed information.

  35.  On July 6, 2020:

    a.  OIE made outreach to Witness 41, who was identified as a prior GTA for the Respondent, and invited him to participate in a substantive interview.  Witness 41

participated in a telephone call with OIE on July 14, 2020. This information was captured in OIE's phone log and incorporated into the record.

        b.     OIE made outreach to Witness 213, who was identified on a class roster, and invited her to participate in a substantive interview.  OIE made additional outreach to Witness 213 on July 9, 2020.  Witness 213 did not respond to OIE's outreach.

        c.     OIE made outreach to Witness 72, who was identified on a class roster, and invited her to participate in a substantive interview.  On July 14, 2020, OIE made additional outreach to Witness 72.  Witness 72 did not respond to OIE's outreach.

        d.     OIE made outreach to Witness 5, who was identified on a class roster, and invited her to participate in a substantive interview, which was initially scheduled for July 14, 2020 but had to be postponed.  On September 8, 2020, Witness 5 participated in a telephone call with OIE. This information was captured in OIE's phone log and incorporated into the record.

        e.     OIE made outreach to Witness 125, who was identified on a class roster, and invited her to participate in a substantive interview.  On July 10, 2020, OIE made additional outreach to Witness 125.  On July 28, 2020, Witness 125 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On August 14, 2020, Witness 125 was afforded an opportunity to review her statement, and she provided corrections and clarifications.  On September 2, 2020, Witness 125 was afforded an opportunity to review a revised witness statement, and she provided additional clarifications.  On September 14, 2020, Witness 125 was afforded an opportunity to review a second revised witness statement. On September 14, 2020, Witness 125 signed her statement.

        f.     OIE made outreach to Witness 116, who was identified on a class roster, and invited her to participate in a substantive interview.  On July 9, 2020, Witness 116 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On August 13, 2020, Witness 116 was afforded an opportunity to review her statement.  On October 28, 2020, Witness 116 signed her statement.

        g.     OIE made outreach to Witness 104, who was identified on a class roster, and invited her to participate in a substantive interview.  On July 13, 2020, Witness 104 was provided with here rights and options as a witness in this matter and participated in a substantive interview.  On August 13, 2020, Witness 104 was afforded an opportunity to review her statement.  On August 17, 2020, Witness 104 signed her statement.

      36.     Between July 6, 2020 to July 15, 2020, OIE contacted 31 students in the Respondent's 2019 Spring General Psychology class to request information about their experience in the course. Of the eight (8) students that responded to OIE's outreach, two (2) had no information to share, one (1) student responded positively about her experience, and five (5) indicated having a negative experience.  Of the six students that recalled their experience, most could not provide detailed information.

      37.     On July 7, 2020, OIE made outreach to Witness 55, who was identified on a class roster, and invited him to participate in an interview. Witness 55 was provided with his rights and options as a witness in this matter and participated in a substantive interview. On July 20, 2020, Witness 55 was afforded the opportunity to review his statement.  Witness 55 did not respond, and his unsigned statement was adopted into the record.

38.     Between July 7 and July 22, 2020, OIE transcribed three (3) recordings of lectures that Respondent gave during the summer of 2019 while teaching in Peru (lectures 3, 4, and 5). During this time, OIE transcribed three (3) recordings of lectures that Respondent gave during his online Spring 2020 course (lecture regarding Arab and Muslim Americans, parts 1, 2, and 3).

39.     On July 8, 2020, OIE made outreach to Witness 97, who had contacted the College of Sciences, and invited her to participate in a substantive interview.  On July 14, 2020, OIE made a second outreach.  On August 7, 2020, Witness 97 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On August 11, 2020, Witness 97 was afforded an opportunity to review her statement. Rather than sign her statement, Witness 97 submitted an addendum to her statement to be incorporated into the record.  Her unsigned statement and addendum were adopted into the record.

40.     Between July 9 and July 15, 2020, OIE made outreach to 18 students in Respondent's 2020 Spring Personality Theory & Research course to request information about their experience in the course. Thirteen (13) students responded to OIE's outreach. Of the thirteen (13) individuals, twelve (12) indicated that they did not have any concerns with how the course was conducted, and one (1) indicated that they had a negative experience.  The individuals did not have detailed information to provide.

41.     On July 10, 2020, OIE made outreach to Witness 214, who had contacted the President regarding the Respondent, and invited him to participate in a substantive interview. OIE made additional outreach to Witness 214 on July 13, 2020.  Witness 214 did not respond to OIE's outreach.

42.     On July 13, 2020, OIE obtained a series of messages posted by Witness 100 on Twitter. This thread included additional documentation regarding the Respondent's syllabus, textbook requirement, and comparisons between the Respondent's assertions on Twitter and in his textbook with other data points.

43.     On July 14, 2020:
        a.      OIE made outreach to Witness 113, who had contacted the Provost regarding the Respondent, and invited him to participate in a substantive interview.  On July 20, 2020, OIE made a second outreach to Witness 113.  On August 6, 2020, Witness 113 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On August 7, 2020, Witness 113 was afforded an opportunity to review his statement. On August 11, 2020, Witness 113 signed his statement.
        b.      OIE made outreach to Witness 148, who had contacted the Board of Trustees regarding the Respondent, and invited him to participate in a substantive interview.  On July 20, 200, OIE made a second outreach to Witness 148.  Witness 148 did not respond to OIE's outreach.
        c.      OIE made outreach to Witness 61 and Witness 74, who had contacted the President regarding the Respondent, and invited them to participate in a substantive interview. On July 14, 2020, Witness 74 requested dates to schedule an interview. On July 15, 2020, OIE provided dates to schedule but did not receive a response. On July 20, 2020, OIE emailed Witness 74 again but did not receive a response. On July 20, 2020, Witness 61 scheduled an

interview for July 28, 2020. On July 28, 2020, Witness 61 was provided with her rights and options as a witness in this matter and participated in a substantive interview. That same day, Witness 61 was afforded the opportunity to review her statement.  Witness 61 did not respond, and her unsigned statement was adopted into the record.

44.     Between July 15 and July 31, 2020, OIE transcribed five (5) recordings of lectures that Respondent gave during the summer of 2019 while teaching in Peru (lectures 6, 7, 8, 12, and 13).

45.     Between July 16, 2020 and July 22, 2020, OIE contacted 21students in Respondent's 2018 Fall Sexual Behavior Class to request information about their experience in the course.  Eleven (11) students responded to OIE's outreach.  Of the eleven (11) individuals, nine (9) indicated that they did not have any concerns with how the course was conducted and two (2) indicated that they had a negative experience in the course. However, detailed information could not be provided.

46.     Between July 16, 2020 and July 22, 2020, OIE contacted 23 students from Respondent's 2019 Fall Sexual Behavior course to request information about their experience in the course.  Eleven (11) students responded to OIE's outreach.  Of the eleven (11) individuals, nine (9) indicated that they did not have any concerns with how the course and two (2) indicated that they had a negative experience in the course.  However, detailed information could not be provided.

47.     On July 16, 2020, OIE made outreach to Witness 79, who responded to the Student Google Form, and invited him to participate in a substantive interview.  On August 13, 2020, Witness 79 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On August 13, 2020, Witness 79 was afforded an opportunity to review his statement.  Witness 79 did not respond, and his unsigned statement was adopted into the record.

48.     On July 17, 2020, OIE issued a Notice of Investigation to the Respondent.

49.     On July 20, 2020, OIE made outreach to Witness 119, who had contacted OIE about the Respondent, and invited him to participate in a substantive interview.  On July 23, 2020, Witness 119 was provided with his rights and options as a witness in this matter and participated in a substantive interviewed.  On July 27, 2020, Witness 119 was afforded an opportunity to review his statement.  Witness 119 provided OIE with a signed statement on August 12, 2020.

50.     On July 21, 2020, OIE made outreach to Witness 81, who was identified on a class roster, and invited her to participate in a substantive interview. That same day, Witness 81 was provided with her rights and options as a witness in this matter, participated in a substantive interview, and was afforded the opportunity to review her statement. On July 23, 2020, Witness 81 provided OIE with clarifications which were adopted into the record.

51.     Between July 22 and August 11, 2020, OIE transcribed four (4) recordings of lectures that Respondent gave during Cross Cultural Psychology in 2019 (lectures 5, 8, 15, 16).

52.     Between July 22 and August 11, 2020, OIE transcribed three (3) recordings of lectures that Respondent gave during the summer of 2019 while teaching in Peru (lectures 9, 10, and 11).

53.     On July 23, 2020, Witness 105, who had contacted OIE about the Respondent, and invited him to participate in a substantive interview.  That same day, Witness 105 was provided with his rights and options as a witness in this matter, participated in a substantive interview, was afforded the opportunity to review his statement, and subsequently provided a signed edited statement to OIE.

54.     On July 27, 2020 OIE contacted eighteen (18) students in the Respondent's 2019 Spring Sexual Behavior course to request information about their experience in the course. Of the ten (10) students that responded, nine (9) recalled generalized experiences of the Respondent being dismissive of students and stating that he was tenured. The remaining student reported a positive experience but could understand how others might have been impacted.

55.     Between July 31, 2020 and August 4, 2020, OIE contacted 40 students in the Respondent's 2018 Fall Cross Cultural Psychology course to request information about their experience in the course.  Thirteen (13) students responded to OIE's outreach.  Of the 13 individuals, one (1) student declined to participate, two (2) students tentatively scheduled to speak with OIE but were unresponsive to OIE's subsequent follow-up outreach efforts, two (2) students indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide, four (4) students indicated they had concerns but did not have detailed information to provide, and four (4) provided detailed information about their experience that is summarized in witness statements (*see* statements summaries of Witness 215, Witness 216, Witness 80, Witness 167).

56.     On July 31, 2020:
     a.     OIE made outreach to Witness 80, who was identified on a class roster, and invited him to participate in a substantive interview.  On August 3, 2020, Witness 80 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On August 4, 2020, Witness 80 was afforded an opportunity to review his statement. Witness 80 did not respond, and his unsigned statement was adopted into the record.
     b.     OIE made outreach to Witness 216, who was identified in a class roster, and invited him to participate in a substantive interview.  On August 3, 2020, Witness 216 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On August 4, 2020, Witness 216 was afforded an opportunity to review his statement. On August 6, 2020, Witness 216 signed his statement.
     c.     OIE made outreach to Witness 167, who was identified on a class roster, and invited her to participate in a substantive interview.  On August 4, 2020, OIE made additional outreach to Witness 167.  On August 13, 2020, Witness 167 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On

August 14, 2020, Witness 167 was afforded an opportunity to review her statement.  On August 17, 2020, Witness 167 sent a response via email affirming her statement.

        d.     OIE made outreach to Witness 215, who had been identified on a class roster, and invited him to participate in a substantive interview.  On August 3, 2020, OIE made additional outreach to Witness 215.  On August 13, 2020, Witness 215 was provided with his rights and options as a witness in this matter and participated in a substantive interview.  On August 18, 2020, Witness 215 was afforded an opportunity to review his statement.  Witness 215 did not respond, and his unsigned statement was adopted into the record.

57.     Between July 31, 2020 and August 6, 2020, OIE contacted 28 students in the Respondent's 2019 Summer Sexual Behavior course to request information about their experience in the course.  Thirteen (13) students responded to OIE's outreach.  Of the 13 individuals, two (2) students tentatively scheduled to speak with OIE but were unresponsive to OIE's subsequent follow-up outreach efforts, six (6) students indicated that they did not have any concerns with how the course was conducted but did not have detailed information to provide, two (2) students indicated they had concerns but did not have detailed information to provide, and three (3) students could not recall their experiences in the class.

58.     On August 5, 2020, OIE made outreach to Witness 106, who was identified on a class roster, and invited her to participate in a substantive interview.  On August 12, 2020, Witness 106 was provided with her rights and options as a witness in this matter and participated in a substantive interview.  On August 14, 2020, Witness 106 was afforded an opportunity to review her statement.  On August 14, 2020, Witness 106 signed her statement.

59.     On August 21, 2020, OIE made outreach to Witness 154.  On August 25, 2020, OIE invited Witness 154 to participate in a substantive interview.  Witness 154 was provided with his rights and options as a witness in this matter and participated in a substantive interview. That same day, Witness 154 was afforded the opportunity to review his statement.  On September 15, 2020, Witness 154 supplemented and signed his statement.

60.     Throughout September through December, 2020, OIE continued its review of the evidence in the record, including but not limited to the review of multiple class recordings totaling approximately 37 hours (2018 General Psychology classes on September 4 & 18, 2018, October 9 & 23, 2018, and November 6, 13 & 27, 2018, Indentured Slaves recording, Arabid Diaspora recording, 2019 Peru recordings) and verification of witnesses' enrollment in the Respondent's courses, as well as OIE's preparation of the lengthy OIE Investigation Report and assembly of its related Appendix materials.

61.     On December 7, 2020, OIE made outreach to Witness 151.  On December 8, 2020, OIE invited Witness 151 to participate in a substantive interview, was provided with his rights and options as a witness in this matter, and participated in a substantive interview. On December 15, 2020, Witness 151 signed his statement.

62.     On December 7, 2020, OIE contacted Faculty Excellence to determine whether UCF maintained any records related to the identities of the presenters or attendees at new faculty orientation in 2006 and 2007.  On that same date, OIE contacted Student Accessibility Services

and requested a copy of any records pertaining to implementation of accommodations for Witness 82 in the Respondent's 2014 course.  On December 8, 2020, Faculty Excellence and SAS responded to OIE's requests and provided relevant information.

63.     On December 13, 2020, OIE requested three documents from CDL related to the Respondent's courses – namely, two course syllabi and one extra-credit questionnaire.  The documentation was provided to OIE the next day.

64.     On December 14, 2020, OIE made outreach to Witness 217, Witness 218, and Witness 219, who were identified by Witness 158 as possibly having relevant information, and invited them to participate in a substantive interview. Witness 218 agreed to participate.  On December 16, 2020, Witness 218 was provided with her rights and options as a witness in this matter, and participated in a substantive interview.  That same day, Witness 218 was afforded the opportunity to review her statement and subsequently signed her statement. On December 15, 2020, Witness 217 declined to participate in a substantive interview with OIE. Witness 219 did not respond to OIE's outreach.

65.     On December 16, 2020, OIE made outreach to Witness 171, who was identified by Witness 151 as possibly having relevant information and invited him to participate in a substantive interview. Witness 171 agreed to participate. On December 18, 2020, Witness 171 was provided with his rights and options as a witness in this matter, and participated in a substantive interview. That same day, Witness 171 was afforded the opportunity to review his statement and did not respond prior to issuance of this report.  Accordingly, his unsigned statement was adopted into the record.

# ATTACHMENT B

## OIE GRADE
## ANALYSIS MEMORANDUM



U N I V E R S I T Y   O F   C E N T R A L   F L O R I D A

**Office of Institutional Equity**
12701 Scholarship Drive, Suite 101
Orlando, FL  32816-0030

# MEMORANDUM

To:　　　Nancy Myers, Director, Office of Institutional Equity

From:　　OIE EEO Investigator

Date:　　August 12, 2020

Re:　　　OIE File No. 2019-01225 – Grade Analysis

---

## I.　Summary

To determine whether there was an indication that student grades in the Respondent's classes were impacted by their membership in certain protected classifications,[42] I reviewed and analyzed the grades of 1,814 students in 12 different classes taught by the Respondent during four different semesters.  I also interviewed 11 Graduate Teaching Assistants (GTA) for the Respondent, with at least one GTA from each class taught by the Respondent during the last 5 semesters during which he used a GTA.

Based on this analysis of student grades and the GTA interviews, I find that there is insufficient evidence to indicate that student grades in the Respondent's classes were impacted by their sex or race (separately or in combination).

## II.　Methodology

My grade analysis was based on records provided by the Registrar's Office containing the name, sex, race, and final grade of each student in the following classes taught by the Respondent:

1. Cross-Cultural Psychology:  Spring 2018, Fall 2018, Fall 2019, Spring 2020
2. Sexual Behavior:  Spring 2018, Fall 2018, Fall 2019, Spring 2020
3. General Psychology:  Spring 2018, Fall 2018
4. Personality Theory and Research:  Fall 2019, Spring 2020

---

[42] Although UCF's policies prohibit discrimination based on a wide variety of protected classifications, the University does not actively track student membership in most of those classifications, such as religion, non-religion, gender identity or expression, sexual orientation, etc.  Accordingly, my analysis was focused on sex and race (separately and in combination), which are classifications regularly maintained in the University's records.

In addition, for each student who received a failing grade in or withdrew from the Respondent's class, I reviewed the grades/withdrawal status for that student for all other classes during the same semester that they received a failing grade in or withdrew from the Respondent's class. Similarly, I spot checked the overall semester performance for other students where I believed it would be helpful to my understanding of the issues.

The GTAs were asked to describe their duties, including their participation in the grading process. The GTAs provided a consistent description of a grading process where the Respondent took no active role. According to these interviews, student grades were based on a set number of exams (usually 4) plus an optional extra credit assignment. According to the interviews, students in each class took their exams on scantrons, with no free response section. At the end of the exam, the GTA would either take the scantrons from the classroom or pick them up in the Respondent's office, run them through the grading machine, and enter the grades in Webcourses. The extra credit assignment for each class was to prepare a three-page paper on any topic related to the course, so long as it was based on research material outside of the required class material. According to the interviews, the Respondent instructed the GTAs to provide full credit to any student who completed the assignment, without concern for the quality of the content. Several GTAs described being instructed by the Respondent to provide one extra credit point per page completed, up to three extra credit points.

## III.    Key Data Points and Limitations

### a.    Analysis based on student sex

Total students:  1814
- female students:  1183 (65.2%)
- male students:     631 (34.8%)

Students withdrawing:[43]  111
- female students:  74 (66.6%)
- male students:     37 (33.3%)

Total number of A grades:  384
- female students:  274 (71.4%)
- male students:     110 (28.6%)

Total number of F grades:  96[44]
- female students:  61 (63.6%)

---

[43] The data reviewed included information on students being marked as withdrawing from the class, but it did not include students who left the class during the add/drop period.

[44] 72 of the 96 students receiving a grade of F in [the Respondent's] class received multiple grades of F, U, NC, W, or D in that same semester. The remaining 24 students were well-distributed in terms of sex and race. I therefore concluded that receiving an F in [the Respondent's] class was a better indicator that the student experienced academic distress during that semester than it was an indicator of whether disparate treatment occurred. Accordingly, grades of F were not included when analyzing GPA performance based on sex and race (separately or in combination).

-   male students:    35 (36.5%)

With regard to GPA, female students received incrementally higher grades (on average 0.32 grade points) in 11 of the 12 classes analyzed, with the greatest differential being 0.6 grade points in Sexual Behavior Spring 2020.  See chart below for additional details.



#### b.  Analysis based on student race

The overall distribution of grades by race showed fluid change between classes, with no clear patterns emerging suggestive of differential treatment based on race.

Several different race populations had an insufficient number of students in a given class to enable meaningful or statistically significant comparison.  For example, there was never more than 1 Native American/Pacific Islander in a class and there was an average of 1.67 students who did not specify a race.  Accordingly, those two populations are not represented in the chart below.  Further, with regard to the students who identified as Asian or Multi-Racial and received a grade, there were five or fewer members of that group in a majority of the classes analyzed.

It was noted that Black/African American students, as a group, scored slightly lower than White students, as a group, in every class that was analyzed, but given the small number of Black/African American students in many classes, the differential could not be determined to be statistically significant.  It was also noted that in many classes, the percentage of Black/African American students receiving an A was equivalent to the percentage of White students receiving an A.  For example, in Cross Cultural Psychology Fall 2018, 22.7% of Black/African American students received an A while 22.4% of White students did, and in General Psychology Fall 2018 24.2% of Black/African American students received an A while 24.5% of White students did.



### c.  Analysis based on student sex and race

The overall distribution of grades by sex and race also showed fluid change between classes, with no clear patterns emerging suggestive of differential treatment based on sex and race.  The small number of students in particular groups discussed above with respect to race was magnified when further analyzing groups by combining sex and race.  In many classes, there were only 1-3 members of a given sex/race group, and in several instances, there was not a single member of a particular sex/race group.  For example, there were no students who identified as Asian males who received a grade in Sexual Behavior in three of the four semesters examined.



## IV.    Conclusion

For the reasons discussed above, I find that there is insufficient evidence to indicate that student grades in the Respondent's classes were impacted by their sex or race (separately or in combination).

# ATTACHMENT C

## APPENDIX: DOCUMENTS REVIEWED DURING OIE INVESTIGATION

## APPENDIX:  MATERIALLY RELEVANT DOCUMENTS

Numerous documents were submitted by the witnesses and Respondent, as well as gathered by OIE, during this investigation. OIE is limiting this list to those documents that were materially relevant to the allegations involved.

*Witness/Party Statements*:
1.   June 4, 2020, OIE Interview Statement of Witness 115
2.   June 8, 2020, OIE Interview Statement of Witness 66
3.   June 8, 2020, OIE Interview Statement of Witness 233
4.   June 8, 2020, OIE Interview Statement of Witness 14
5.   June 8, 2020, OIE Interview Statement of Witness 71
6.   June 8, 2020, OIE Interview Statement of Witness 39
7.   June 9, 2020, OIE Interview Statement of Witness 164
8.   June 9, 2020, OIE Interview Statement of Witness 137
9.   June 9, 2020, OIE Interview Statement of Witness 144
10. June 9, 2020, OIE Interview Statement of Witness 49
11. June 9, 2020, OIE Interview Statement & Addendum of Witness 170
12. June 9, 2020, OIE Interview Statement of Witness 84
13. June 9, 2020, OIE Interview Statement of Witness 101
14. June 10, 2020, OIE Interview Statement of Witness 45
15. June 10, 2020, OIE Interview Statement of Witness 88
16. June 10, 2020, OIE Interview Statement of Witness 150
17. June 10, 2020, OIE Interview Statement of Witness 82
18. June 10, 2020, OIE Interview Statement of Witness 54
19. June 10, 2020, OIE Interview Statement of Witness 111
20. June 10, 2020, OIE Interview Statement of Witness 132
21. June 10, 2020, OIE Interview Statement of Witness 109
22. June 10, 2020, OIE Interview Statement of Witness 187
23. June 11, 2020, OIE Interview Statement of Witness 178
24. June 11, 2020, OIE Interview Statement of Witness 58
25. June 11, 2020, OIE Interview Statement of Witness 176
26. June 11, 2020, OIE Interview Statement of Witness 92
27. June 11, 2020, OIE Interview Statement of Witness 134
28. June 11, 2020, OIE Interview Statement of Witness 140
29. June 11, 2020, OIE Interview Statement of Witness 196
30. June 12, 2020, OIE Interview Statement of Witness 162
31. June 12, 2020, OIE Interview Statement of Witness 168
32. June 12, 2020, OIE Interview Statement of Witness 129
33. June 12, 2020, OIE Interview Statement of Witness 138
34. June 12, 2020, OIE Interview Statement of Witness 75
35. June 12, 2020, OIE Interview Statement of Witness 145
36. June 15, 2020, OIE Interview Statement of Witness 46
37. June 15, 2020, OIE Interview Statement of Witness 53 & Witness 100
38. June 15, 2020, OIE Interview Statement of Witness 37
39. June 15, 2020, OIE Interview Statement of Witness 87

40. June 16, 2020, OIE Interview Statement of Witness 117
41. June 16, 2020, OIE Interview Statement of Witness 86
42. June 16, 2020, OIE Interview Statement of Witness 85
43. June 17, 2020 OIE Interview Statement of Witness 62
44. June 17, 2020, OIE Interview Statement of Witness 63
45. June 17, 2020, OIE Interview Statement of Witness 158
46. June 17, 2020, OIE Interview Statement of Witness 43
47. June 18, 2020, OIE Interview Statement of Witness 54
48. June 18, 2020, OIE Interview Statement of Witness 95
49. June 18, 2020, OIE Interview Statement of Witness 9
50. June 18, 2020, OIE Interview Statement of Witness 73
51. June 18, 2020, OIE Interview Statement of Witness 91
52. June 18, 2020, OIE Interview Statement of Witness 107
53. June 18, 2020, OIE Interview Statement of Witness 120
54. June 18, 2020, OIE Interview Statement of Witness 126
55. June 18, 2020, OIE Interview Statement of Witness 121[45]
56. June 19, 2020, OIE Interview Statement of Witness 56
57. June 19, 2020, OIE Interview Statement of Witness 122
58. June 22, 2020, OIE Interview Statement of Witness 201
59. June 23, 2020, OIE Interview Statement of Witness 133
60. June 23, 2020, OIE Interview Statement of Witness 64
61. June 23, 2020, OIE Interview Statement of Witness 47
62. June 23, 2020, OIE Interview Statement of Witness 183
63. June 25, 2020, OIE Interview Statement of Witness 83
64. June 25, 2020, OIE Interview Statement of Witness 108
65. July 1, 2020, OIE Interview Statement of Witness 42
66. July 2, 2020, OIE Interview Statement of Witness 34
67. July 2, 2020, OIE Interview Statement of Witness 18
68. July 7, 2020, OIE Interview Statement of Witness 55
69. July 7, 2020, OIE Interview Statement of Witness 98
70. July 8, 2020, OIE Interview Statement of Witness 169
71. July 9, 2020, OIE Interview Statement of Witness 69 & July 17, 2020 Addendum
72. July 9, 2020, OIE Interview Statement of Witness 116
73. July 13, 2020, OIE Interview Statement of Witness 104
74. July 14, 2020, OIE Interview Statement of Witness 52
75. July 17, 2020, OIE Interview Statement of Witness 51
76. July 21, 2020, OIE Interview Statement of Witness 81 & Addendum
77. July 23, 2020, OIE Interview Statement of Witness 119
78. July 23, 2020, OIE Interview Statement of Witness 105
79. July 28, 2020, OIE Interview Statement of Witness 125
80. July 28, 2020, OIE Interview Statement of Witness 61
81. August 3, 2020, OIE Interview Statement of Witness 80
82. August 6, 2020, OIE Interview Statement of Witness 113
83. August 6, 2020, OIE Interview Statement of Witness 216

---

[45] This statement was inadvertently titled "Witness Statement of Witness 55" but captured the information provided by Witness 121 and is titled as such in the Appendix documents.

84. August 7, 2020, OIE Interview Statement and August 20, 2020 Addendum of Witness 97
85. August 7, 2020 and August 14, 2020, OIE Interview Statements of the Respondent & August 24, 2020 Addendum
86. August 12, 2020, OIE Interview Statement of Witness 106
87. August 13, 2020, OIE Interview Statement of Witness 215
88. August 13, 2020, OIE Interview Statement of Witness 167
89. August 13, 2020, OIE Interview Statement of Witness 79
90. August 25, 2020, OIE Interview Statement of Witness 154
91. December 8, 2020, OIE Interview Statement of Witness 151
92. December 16, 2020, OIE Interview Statement of Witness 218
93. December 18, 2020, OIE Interview Statement of Witness 171

*OIE Phone Logs*:

94. Phone Log 6-4-2020 3:01 PM
95. Phone Log 6-5-2020 Witness 53
96. Phone Log 6-8-2020 Witness 100
97. Phone Log 6-9-2020 Witness 49
98. Phone Log 6-9-2020 Witness 144
99. Phone Log 6-10-2020 Witness 82
100. Phone Log 6-10-2020 Witness 88
101. Phone Log 6-10-2020 Witness 100
102. Phone Log 6-10-2020 Witness 111
103. Phone Log 6-11-2020 Witness 92
104. Phone Log 6-11-2020 Witness 196
105. Phone Log 6-11-2020 Witness 140
106. Phone Log 6-11-2020 Witness 176
107. Phone Log 6-12-2020 Witness 168
108. Phone Log 6-12-2020 Witness 145
109. Phone Log 6-17-2020 Witness 206
110. Phone Log 6-18-2020 Witness 95
111. Phone Log 6-18-2020 Witness 126
112. Phone Log 6-19-2020 Witness 122
113. Phone Log 6-22-2020 Witness 136
114. Phone Log 6-22-2020 Witness 48
115. Phone Log 6-23-2020 Witness 133
116. Phone Log 6-24-2020 Witness 1
117. Phone Log 6-24-2020 Witness 182
118. Phone Log 6-25-2020 Witness 2
119. Phone Log 6-25-2020 Witness 185
120. Phone Log 6-25-2020 Witness 110
121. Phone Log 6-25-2020 Witness 83
122. Phone Log 6-25-2020 Witness 184
123. Phone Log 6-25-2020 Witness 59
124. Phone Log 6-26-2020 Witness 4
125. Phone Log 6-26-2020 Witness 3
126. Phone Log 6-26-2020 Witness 186

| | |
|---|---|
| 127. | Phone Log 6-29-2020 Witness 34 Parent |
| 128. | Phone Log 6-30-2020 Witness 163 |
| 129. | Phone Log 7-1-2020 Witness 42 |
| 130. | Phone Log 7-8-2020 Witness 40 |
| 131. | Phone Log 7-8-2020 Witness 160 |
| 132. | Phone Log 7-10-2020 Witness 76 |
| 133. | Phone Log 7-14-2020 Witness 41 |
| 134. | Phone Log 7-22-2020 Witness 235 |
| 135. | Phone Log 7-30-2020 Witness 220 |
| 136. | Phone Log 7-30-2020 Witness 53 & Witness 100 |
| 137. | Phone Log 7-30-2020 Witness 5 |
| 138. | Phone Log 7-31-2020 Witness 221 |
| 139. | Phone Log 7-31-2020 Witness 222 |
| 140. | Phone Log 7-31-2020 Witness 223 |
| 141. | Phone Log 7-31-2020 Witness 224 |
| 142. | Phone Log 7-31-2020 Witness 225 |
| 143. | Phone Log 7-31-2020 Witness 226 |
| 144. | Phone Log 7-31-2020 Witness 227 |
| 145. | Phone Log 8-3-2020 Witness 6 |
| 146. | Phone Log 8-4-2020 Witness 7 |
| 147. | Phone Log 8-11-2020 Witness 228 |

*OIE Climate Checks*:

| | |
|---|---|
| 148. | OIE Outreaches (Individual & 2019 Spring CCP Climate Check Notes) |
| 149. | OIE Climate Check Notes (2018 Spring Sexual Behavior, 2018 Summer Sexual Behavior, 2019 Fall Cross Cultural Psychology, 2020 Spring Sexual Behavior) |
| 150. | OIE Climate Check Notes (2019 Fall Sexual Behavior) |
| 151. | OIE Climate Check Notes (2018 Fall Sexual Behavior) |
| 152. | OIE Climate Check Notes (2020 Spring Personality Theory) |
| 153. | OIE Climate Check Notes (2018 Spring General Psychology) |
| 154. | OIE Climate Check Notes (2018 Fall General Psychology) |
| 155. | OIE Climate Check Notes (2019 Fall Sexual Behavior) |
| 156. | OIE Climate Check Notes (2019 Summer Sexual Behavior) |
| 157. | OIE Climate Check Notes (2019 Sexual Behavior) |

*IntegrityLine Reports*:

| | |
|---|---|
| 158. | IntegrityLine #768 (June 4, 2020) |
| 159. | IntegrityLine #769 (June 4, 2020) |
| 160. | IntegrityLine #770 (June 4, 2020) |
| 161. | IntegrityLine #771 (June 4, 2020) |
| 162. | IntegrityLine #772 (June 4, 2020) |
| 163. | IntegrityLine #774 (June 4, 2020) |
| 164. | IntegrityLine #775 (June 4, 2020) |
| 165. | IntegrityLine #776 (June 4, 2020) |
| 166. | IntegrityLine #777 (June 4, 2020) |
| 167. | IntegrityLine #778 (June 4, 2020) |

| | |
|---|---|
| 168. | IntegrityLine #779 (June 4, 2020) |
| 169. | IntegrityLine #780 (June 4, 2020) |
| 170. | IntegrityLine #781 (June 4, 2020) |
| 171. | IntegrityLine #782 (June 4, 2020) |
| 172. | IntegrityLine #783 (June 4, 2020) |
| 173. | IntegrityLine #784 (June 4, 2020) |
| 174. | IntegrityLine #785 (June 4, 2020) |
| 175. | IntegrityLine #786 (June 4, 2020) |
| 176. | IntegrityLine #787 (June 4, 2020) |
| 177. | IntegrityLine #788 (June 4, 2020) |
| 178. | IntegrityLine #789 (June 4, 2020) |
| 179. | IntegrityLine #790 (June 4, 2020) |
| 180. | IntegrityLine #791 (June 4, 2020) |
| 181. | IntegrityLine #792 (June 4, 2020) |
| 182. | IntegrityLine #794 (June 4, 2020) |
| 183. | IntegrityLine #795 (June 4, 2020) |
| 184. | IntegrityLine #796 (June 4, 2020) |
| 185. | IntegrityLine #797 (June 4, 2020) |
| 186. | IntegrityLine #798 (June 4, 2020) |
| 187. | IntegrityLine #799 (June 4, 2020) |
| 188. | IntegrityLine #800 (June 4, 2020) |
| 189. | IntegrityLine #801 (June 4, 2020) |
| 190. | IntegrityLine #802 (June 4, 2020) |
| 191. | IntegrityLine #803 (June 4, 2020) |
| 192. | IntegrityLine #804 (June 4, 2020) |
| 193. | IntegrityLine #805 (June 5, 2020) |
| 194. | IntegrityLine #806 (June 5, 2020) |
| 195. | IntegrityLine #807 (June 5, 2020) |
| 196. | IntegrityLine #809 (June 5, 2020) |
| 197. | IntegrityLine #810 (June 5, 2020) |
| 198. | IntegrityLine #811 (June 5, 2020) |
| 199. | IntegrityLine #813 (June 5, 2020) |
| 200. | IntegrityLine #814 (June 5, 2020) |
| 201. | IntegrityLine #815 (June 5, 2020) |
| 202. | IntegrityLine #817 (June 5, 2020) |
| 203. | IntegrityLine #818 (June 5, 2020) |
| 204. | IntegrityLine #819 (June 5, 2020) |
| 205. | IntegrityLine #820 (June 5, 2020) |
| 206. | IntegrityLine #821 (June 5, 2020) |
| 207. | IntegrityLine #822 (June 5, 2020) |
| 208. | IntegrityLine #823 (June 5, 2020) |
| 209. | IntegrityLine #824 (June 5, 2020) |
| 210. | IntegrityLine #825 (June 5, 2020) |
| 211. | IntegrityLine #826 (June 5, 2020) |
| 212. | IntegrityLine #827 (June 5, 2020) |
| 213. | IntegrityLine #828 (June 5, 2020) |

214.      IntegrityLine #829 (June 5, 2020)
215.      IntegrityLine #830 (June 5, 2020)
216.      IntegrityLine #831 (June 5, 2020)
217.      IntegrityLine #832 (June 5, 2020)
218.      IntegrityLine #833 (June 5, 2020)
219.      IntegrityLine #834 (June 5, 2020)
220.      IntegrityLine #836 (June 5, 2020)
221.      IntegrityLine #837 (June 5, 2020)
222.      IntegrityLine #838 (June 5, 2020)
223.      IntegrityLine #839 (June 5, 2020)
224.      IntegrityLine #840 (June 5, 2020)
225.      IntegrityLine #841 (June 5, 2020)
226.      IntegrityLine #842 (June 5, 2020)
227.      IntegrityLine #843 (June 5, 2020)
228.      IntegrityLine #844 (June 5, 2020)
229.      IntegrityLine #845 (June 5, 2020)
230.      IntegrityLine #847 (June 5, 2020)
231.      IntegrityLine #849 (June 5, 2020)
232.      IntegrityLine #850 (June 5, 2020)
233.      IntegrityLine #851 (June 5, 2020)
234.      IntegrityLine #852 (June 5, 2020)
235.      IntegrityLine #853 (June 5, 2020)
236.      IntegrityLine #855 (June 5, 2020)
237.      IntegrityLine #856 (June 5, 2020)[46]
238.      IntegrityLine #858 (June 5, 2020)
239.      IntegrityLine #859 (June 5, 2020)
240.      IntegrityLine #862 (June 6, 2020)
241.      IntegrityLine #863 (June 6, 2020)
242.      IntegrityLine #864 (June 6, 2020)
243.      IntegrityLine #865 (June 6, 2020)
244.      IntegrityLine #866 (June 6, 2020)
245.      IntegrityLine #868 (June 6, 2020)
246.      IntegrityLine #869 (June 6, 2020)
247.      IntegrityLine #870 (June 6, 2020)
248.      IntegrityLine #871 (June 6, 2020)
249.      IntegrityLine #872 (June 6, 2020)
250.      IntegrityLine #873 (June 6, 2020)
251.      IntegrityLine #874 (June 6, 2020)
252.      IntegrityLine #875 (June 7, 2020)
253.      IntegrityLine #877 (June 8, 2020)
254.      IntegrityLine #878 (June 8, 2020)
255.      IntegrityLine #880 (June 8, 2020)
256.      IntegrityLine #881 (June 8, 2020)
257.      IntegrityLine #883 (June 9, 2020)

---

[46] Although the Respondent was identified as the individual who allegedly engaged in misconduct in this IntegrityLine report, the reporter later clarified that her allegations pertained to another individual.

258.    IntegrityLine #886 (June 9, 2020)
259.    IntegrityLine #894 (June 11, 2020)
260.    IntegrityLine #902 (June 12, 2020)
261.    IntegrityLine #904 (June 12, 2020)
262.    IntegrityLine #924 (June 18, 2020)
263.    IntegrityLine #925 (June 18, 2020)
264.    IntegrityLine #943 (June 25, 2020)
265.    IntegrityLine #970 (July 19, 2020)
266.    IntegrityLine #976 (July 22, 2020)

*Just Knights Response Team Reports*:
267.    JKRT Report, #00047696 (June 3, 2020) (Witness 229)
268.    JKRT Report, #00047703 (June 4, 2020)
269.    JKRT Report, #00047706 (June 4, 2020) (Witness 230)
270.    JKRT Report, #00047707 (June 4, 2020) (Witness 47)
271.    JKRT Report, #00047712 (June 4, 2020) (Witness 231)
272.    JKRT Report, #00047713 (June 4, 2020)
273.    JKRT Report, #00047716 (June 4, 2020)
274.    JKRT Report, #00047719 (June 4, 2020)
275.    JKRT Report, #00047725 (June 4, 2020) (Witness 88)
276.    JKRT Report, #00048928 (September 1, 2020)

*Office of Student Conduct Incident Reports*:
277.    Office of Student Conduct Incident Report, #00047701 (June 4, 2020)
278.    Office of Student Conduct Incident Report, #00047709 (June 4, 2020)

*Initial Communications from Community Regarding Respondent*:
279.    Reports of Personal Experiences (58 Emails, 6 Audio Voicemails, 1 President's Office Excel Sheet Summary List, 4 Social Media Posts, and Witness 100 Twitter 7-13-2020)
280.    Reports of Reactions to Social Media (314 Emails)
281.    Student Google Form – Anonymous
282.    Student Google Form – With Names
283.    Equity & Inclusion Forum – OIE Emails
284.    Equity & Inclusion Forum (CC Transcript Inclusion Conversation Zoom) (text)
285.    Equity & Inclusion Forum Q&A Report (excel)
286.    Change Org Petition titled "Diversity, Equity, Justice and Inclusion #UCFfirehim"
287.    Change Org Petition Email (Witness 123 & Witness 127)

*Respondent's Communications to Students*:
288.    Announcement Re Headlines & Race
289.    Announcement Re CNN Letter Re Native Americans & Respondent's Response Letter
290.    January, 2012 Email to "Cross-Cultural students" (Re Religious Bigotry)

240

291.    Announcement, September 20, to Sexual Behavior students, titled "Follow up to Gender and Biology Discussion"

292.    Announcement, Jan 7 titled "Quick follow up" re Religious Discussions

293.    Announcement, Jan 16 Re Yellow Hammer Article

294.    Announcement, October 23, 2013 Re Religion & Rape

295.    Announcement, October 21, 2016 Re Lack of Systemic Racism

296.    Announcement, January 10, 2018 Re Honor Killings

297.    Announcement, February 19, 2018 Re Invitation for LGBTQ Panel

298.    Announcement, March 18, 2018 Re White Accomplishments

299.    Announcement, March 18, 2018 Re Letter to John McWhorter

300.    Announcement, March 18, 2018 Re Letter to John McWhorter Attachment

301.    Announcement, April 4, 2018 Re Political Correctness

302.    Announcement, April 28, 2018 Message to Witness 151 & Witness 45

303.    Announcement, April 29, 2018 Message to Witness 151 & Witness 45

304.    Announcement, Nov. 15, 2018 Re PEW data & Muslim Women

305.    Announcement, Nov. 15, 2018 Letter Re PEW data & Muslim Women

306.    Announcement, Jan. 7, 2020 titled "Follow me on Twitter (optional, of course)"

307.    Announcement, March 11, 2019, titled "Follow me on Twitter"

308.    Announcement - Twitter

309.    Announcement, July 15, 2019 Re Judging Past with Contemporary Standards & Black Privilege Reference

310.    Announcement, July 22, 2019, titled "Opinions v. data…"

311.    Announcement, September 12, 2019 Re Religion

312.    Announcement, October 26, 2019, titled "re: Latinx" (1)

313.    Announcement, October 26, 2019, titled "re: Latinx" (2)

314.    Announcement, October 26, 2019, titled "re: Latinx" (3)

315.    Announcements, December 10, 2019, March 7, 2020, March 16, 2020 Re Book Assignment

316.    Email, January 28, 2020, titled "Follow up to Gender and Biology Discussion: SOP2772-20Spring 0001"

317.    Emails, March 13, 2020 (Re Book Promotion)

318.    Undated message, titled "Potentially bad items on Exam 3…"

319.    Email, March 31, 2020, titled "Exam 3 updates:  SOP2772-20Spring 0001" (Exam & Apology)

320.    Announcement, April 6, 2020 Re Free Speech & Muslims

321.    Announcement, April 8, 2020, titled "Important Youtube to watch" (*By the Numbers* video)

322.    Email, April 14, 2020, titled "Follow up on HPV, Vaccines, and Cancer: SOP2772-20Spring 0001"

323.    Course Announcements 2017-2020

*Respondent's Course Recordings & Materials*:

324.    Recordings – 20190101013334-015

325.    Recordings – 20190101013334-015 Review

326.    Recordings – 20190106023050-016

327.    Recordings – 20190106023050-016 Review

| 328. | Recordings – 20190910163446-005 |
|------|----------------------------------|
| 329. | Recordings – 20190910163446-005 Review |
| 330. | Recordings – 20190912163436-008 |
| 331. | Recordings – 20190912163436-008 Review |
| 332. | Recordings – Arabid Diaspora |
| 333. | Recordings – Gen Psych 8-21-2018 SAS Transcript |
| 334. | Recordings – Gen Psych 8-28-2018 |
| 335. | Recordings – Gen Psych 8-28-2018 SAS Transcript |
| 336. | Recordings – Gen Psych 9-4-2018 |
| 337. | Recordings – Gen Psych 9-4-2018 (2) |
| 338. | Recordings – Gen Psych 9-18-2018 (2) |
| 339. | Recordings – Gen Psych 9-18-2018 (3) |
| 340. | Recordings – Gen Psych 10-9-2018 |
| 341. | Recordings – Gen Psych 10-23-2018 |
| 342. | Recordings – Gen Psych 11-6-2018 |
| 343. | Recordings – Gen Psych 11-13-2018 |
| 344. | Recordings – Gen Psych 11-27-2018 |
| 345. | Recordings – Indentured Slaves |
| 346. | Recordings – Peru – Summer 2019 - 3 |
| 347. | Recordings – Peru - Summer 2019 - 3 Review |
| 348. | Recordings – Peru – Summer 2019 - 4 |
| 349. | Recordings – Peru - Summer 2019 - 4 Review |
| 350. | Recordings – Peru – Summer 2019 - 5 |
| 351. | Recordings – Peru - Summer 2019 - 5 Review |
| 352. | Recordings – Peru – Summer 2019 -6 |
| 353. | Recordings – Peru - Summer 2019 - 6 Review |
| 354. | Recordings – Peru – Summer 2019 - 7 |
| 355. | Recordings – Peru – Summer 2019 -7 Review |
| 356. | Recordings – Peru – Summer 2019 – 8 |
| 357. | Recordings - Peru - Summer 2019 -8 Review |
| 358. | Recordings – Peru – Summer 2019 -9 |
| 359. | Recordings – Peru - Summer 2019 -9 Review |
| 360. | Recordings – Peru – Summer 2019 - 10 |
| 361. | Recordings - Peru - Summer 2019 - 10 Review |
| 362. | Recordings – Peru – Summer 2019 – 11 |
| 363. | Recordings – Peru – Summer 2019 – 11 Review |
| 364. | Recordings – Peru – Summer 2019 - 12 |
| 365. | Recordings - Peru - Summer 2019 - 12 Review |
| 366. | Recordings – Peru – Summer 2019 - 13 |
| 367. | Recordings - Peru - Summer 2019 - 13 Review |
| 368. | Recordings – Spring 2020 Arab and Muslim Americans Lecture 1 |
| 369. | Recordings - Spring 2020 Arab and Muslim Americans Lecture 1 Review |
| 370. | Recordings – Spring 2020 Arab and Muslim Americans Lecture 2 |
| 371. | Recordings - Spring 2020 Arab and Muslim Americans Lecture 2 Review |
| 372. | Recordings – Spring 2020 Arab and Muslim Americans Lecture 3 |
| 373. | Recordings - Spring 2020 Arab and Muslim Americans Lecture 3 Review |

374.     Summary of Video *By the Numbers – The Untold Story - Muslims*
375.     Power Point White Americans
376.     Power Point Arab & Muslim Americans Lecture 1
377.     Power Point Arab & Muslim Americans Lecture 2
378.     Power Point Arab & Muslim Americans Lecture 3
379.     Consent (2004) Video
380.     Fredrick Wilson II 2014 Video
381.     A copy of the book *White Shaming*, written by the Respondent
382.     Syllabus for Cross Cultural Psychology 2016 Fall
383.     Syllabus for Cross Cultural Psychology 2018 Spring
384.     Syllabus for Cross Cultural Psychology 2019 Summer
385.     Syllabus for Cross Cultural Psychology 2019 Fall
386.     Syllabus for Cross Cultural Psychology 2020 Spring
387.     Syllabus for Sexual Behavior 2020 Spring
388.     Syllabus for General Psychology 2017 Fall
389.     Syllabus for General Psychology 2018 Spring
390.     Syllabus for Personality Theory & Research 2020 Spring
391.     Quiz Questions & Answers 2017-2020
392.     Respondent's August 14, 2020 Email to OIE Re Exam Questions
393.     Power Point African – African (Black) American
394.     Power Point White – White American

*Respondent's Evaluations and Student Evaluation of Instructor Summaries*:
395.     Respondent's Annual Evaluation 2014-2015
396.     Respondent's Annual Evaluation 2015-2016
397.     Respondent's Annual Evaluation 2016-2017
398.     Respondent's Annual Evaluation 2017-2018
399.     Respondent's Annual Evaluation 2018-2019
400.     Notifications of TIP Awards 2003 & 2009
401.     Notification of TIP Award 2015
402.     Respondent's Student Eval 2015 Summer
403.     Respondent's Student Evaluation 2015 Fall
404.     Respondent's Student Evaluation 2016 Spring
405.     Respondent's Student Evaluation 2016 Summer
406.     Respondent's Student Evaluation 2016 Fall
407.     Respondent's Student Evaluation 2017 Spring
408.     Respondent's Student Evaluation 2017 Summer
409.     Respondent's Student Evaluation 2017 Fall
410.     Respondent's Student Evaluation 2018 Spring
411.     Respondent's Student Evaluation 2018 Summer
412.     Respondent's Student Evaluation 2018 Fall
413.     Respondent's Student Evaluation 2019 Spring
414.     Respondent's Student Evaluation 2019 Summer
415.     Respondent's Student Evaluation 2019 Fall
416.     Respondent's Student Evaluation 2020 Spring
417.     Respondent's Evaluation from Witness 232 3-21-2019

418.     UCF Student Abroad Return Survey 2019 Summer
419.     Respondent's Discipline History
420.     Email Re Allegation of Respondent Apology

*Other*:

421.     Respondent's Twitter Page
422.     Respondent's Twitter Posts
423.     Respondent 2018 Spring Schedule
424.     Respondent 2018 Summer Schedule
425.     Respondent 2018 Fall Schedule
426.     OIE Grade Analysis Memorandum
427.     Inside Higher Education 2012 Article
428.     Email August 13, 2020 Re Witness Name Recognized from Witness List
         Provided to Respondent
429.     Email March 13, 2020 Respondent & Dept Chair Re Book Outreaches
430.     Agenda 2006 New Faculty Orientation
431.     Agenda 2007 New Faculty Orientation
432.     2007 New Faculty Orientation Participants
433.     Course Drop Comparison Data
434.     Witness 34 UCF Timeline
435.     Witness 34 SDES Correspondence
436.     Respondent's Letter to OIE 8-4-20
437.     UCF Faculty Senate Resolution about Free Speech (2017-2018)
438.     Facebook Post by Student (redacted) (7-16-20)
439.     Student Grade Appeal
440.     Student Grade Appeal – Administrator Email (5-2020)
441.     Student Grade Appeal – Chair Decision
442.     Email Re UCF Actions to Prevent and Correct Discrimination (1-27-2014) &
         2018 Training
443.     Rate My Professor Reviews
444.     Student Grade Data
445.     Witness 100 Transcript Notes & Responses to Recordings

# EXHIBIT X



**Michael Preston** @MPrestonEdD · Apr 6, 2019                    000

This is such a sham, Be it for liberal or conservative purposes. A University Wants to Assess Bias in the Classroom. Are Student Evaluations the Best Way to Do It? chronicle.com/article/A-Univ... via @chronicle

○ 3          ⊔ 1          ♡ 1          ⬆



**Michael Preston** @MPrestonEdD · Apr 6, 2019                    000

For the most part faculty like myself are overwhelmed with the act of teaching, writing, and research to worry about turning our students into one thing or another.

○ 2          ⊔          ♡ 1          ⬆



**Peter Thorsett** @pthorsett · Apr 6, 2019                    000

I think that's a typical refrain from my faculty friends and family. It's also the pain point that those of us wanting entree into classrroms should keep in mind as we propose solutions for the curriculum. It's this space where we can help and add value for students AND faculty.

○ 3          ⊔          ♡ 1          ⬆



**Michael Preston**                    000
@MPrestonEdD

Replying to @pthorsett

Third, I am not sure we can actually define bias. It's too subjective. Do I think some faculty get too hype in the classroom? I'm sure it happens but that is the exception that proves the rule. Almost all faculty are pros who love their subject and their students.

4:13 PM · Apr 6, 2019 · Twitter for Android

# EXHIBIT Y



# BIAS RESPONSE TEAM

## REPORT 2017

  

  

The mission of FIRE is to defend and sustain individual rights at America's colleges and universities. These rights include freedom of speech, legal equality, due process, religious liberty, and sanctity of conscience—the essential qualities of individual liberty and dignity. FIRE's core mission is to protect the unprotected and to educate the public and communities of concerned Americans about the threats to these rights on our campuses and about the means to preserve them.



**510 WALNUT ST.**
**SUITE 1250**
**PHILADELPHIA, PA 19106**

 

# TABLE OF CONTENTS

**4**  EXECUTIVE SUMMARY

**6**  METHODOLOGY

**7**  FINDINGS

**9**  DISCUSSION

9  WHY BIAS RESPONSE TEAMS EXIST

10  HOW MANY BIAS RESPONSE TEAMS EXIST

12  WIDELY DEFINING "BIAS"

15  EXAMPLES OF REPORTED INCIDENTS

19  WHO SERVES ON THE BIAS RESPONSE TEAM: THE SPEECH POLICE

20  THE RISK OF FIRST AMENDMENT LAWSUITS

23  A LACK OF TRAINING ON FREEDOM OF SPEECH

24  HOW SOME UNIVERSITIES ARE RESISTING TRANSPARENCY

26  NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

28  STRIKING A BALANCE

**29**  APPENDICES

29  APPENDIX A: CATEGORIES OF BIAS

31  APPENDIX B: INSTITUTIONS WITH BIAS REPORTING SYSTEMS

# EXECUTIVE SUMMARY

Over the past several years, the Foundation for Individual Rights in Education (FIRE) has received an increasing number of reports that colleges and universities are inviting students to anonymously report offensive, yet constitutionally protected, speech to administrators and law enforcement through so-called "Bias Response Teams." These teams monitor and investigate student and faculty speech, directing the attention of law enforcement and student conduct administrators towards the expression of students and faculty members.

To better understand this phenomenon, FIRE gathered data throughout 2016 on every bias reporting system we could locate. FIRE sought to determine who reviews the reports, what categories of bias they are charged with addressing, and whether the institution acknowledges that the system generates a tension with free speech and academic freedom.

FIRE discovered and surveyed **231 Bias Response Teams at public and private institutions** during 2016. The expression of at least **2.84 million American students** is subject to review by Bias Response Teams. While most students in higher education do not yet appear to be subject to bias reporting systems, we believe that the number of Bias Response Teams is growing rapidly.

The composition of Bias Response Teams is not always made public. About 28% did not reveal the names or rules of any team members. Of those whose membership FIRE could ascertain:

- 42% report speech to members of law enforcement or campus security officers, even though the teams deliberately solicit reports of a wide variety of non-criminal speech and activity.
- 12% of teams include at least one administrator dedicated to media relations, suggesting that part of the purpose of such teams is to deter and respond to controversies that might embarrass the institution.
- Fewer than a third of teams included faculty members, whose absence diminishes the likelihood that the team will have a meaningful understanding of academic freedom.

Teams tend to cast a wide net when defining "bias." Almost all use categories widely found in discrimination statutes (race, sex, sexual orientation, etc.), while others investigate bias against obscure categories, such as "smoker status," "shape," and "intellectual perspective." A significant minority include **political affiliation or speech as a potential bias, inviting reports of and investigations into political speech by law enforcement and student conduct administrators**.

In responding to reports regarding this wide array of protected expression, administrators are frequently armed with vague or overly broad rules granting them leeway to impose sanctions for speech they dislike. In December 2016, FIRE found that some 92.4% of the 449 schools surveyed for our annual speech code report maintain policies that either clearly and substantially restrict speech, or can otherwise be interpreted to punish protected speech. At such schools, a Bias Response Team's practice of broadly defining and identifying "bias" may expose a wide range of protected speech to punishment. Even where schools purport only to provide "education" to the offending speaker, instead of formal punitive sanctions (such as suspension or expulsion), this response is often undertaken by student conduct administrators, not educators, and more closely resembles a reprimand.

There is an unavoidable tension between promoting free speech and academic freedom and working to combat the presence of "bias" (however defined) on campus. Yet **only 84**

**(50.6%) of the teams surveyed acknowledged a tension with freedom of speech**, freedom of inquiry, or academic freedom on their websites or in their policies.

FIRE also used public records requests to discover the reports made at some institutions, how the schools responded to those reports, and the teams' policies and training. Many institutions complied with these requests. Others stonewalled, hid records, deleted websites, or demanded thousands of dollars to view records, claiming that knowing how Bias Response Teams operate is not in the public interest.

Further, how universities respond to bias reports may expose them to First Amendment lawsuits. Individual team members risk being held personally liable for violating constitutional rights in some circumstances. They may not even be aware of where the lines are drawn. FIRE found little evidence that Bias Response Teams are trained on First Amendment issues.

Bias Response Teams, when armed with open-ended definitions of "bias," staffed by law enforcement and student conduct administrators, and left without training on freedom of expression, represent an emerging risk to free and open discourse on campus and in the classroom. Bias Response Teams create— indeed, they are intended to create—a chilling effect on campus expression. Even if a Bias Response Team does not have the power to take punitive action, the prospect of an official investigation may make students and faculty more cautious about what opinions they dare to express.

Beyond First Amendment concerns, encouraging students and faculty to anonymously report one another to administrators for subversive or offensive views is illiberal, and antithetical to a campus open to the free exchange of ideas. While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their lives on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus.

# METHODOLOGY

### WHAT IS A BIAS REPORTING SYSTEM?

In order to distinguish bias reporting systems from other speech codes, and to identify systems that may not be explicitly identified as a "bias reporting" system,[1] FIRE applied a three-part definition. Where it was unclear whether a particular element was met, we used our best judgment.  Links to the websites of all Bias Response Teams are provided in Appendix B so that the reader may form his or her own opinion.

FIRE defines a bias reporting system as any system identified as such, or that provides:

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Under FIRE's definition, a school policy or reporting system limited to criminal offenses involving hate or bias does not constitute a bias reporting system.

### LOCATING AND OBSERVING BIAS REPORTING SYSTEMS

FIRE relied on a number of methods to locate bias reporting systems, including mining schools' websites for information, using tools to monitor websites for changes, and issuing public records requests to collect additional information.

We first gathered state-by-state lists of public and private institutions on Wikipedia, as well as in FIRE's own Spotlight database,[2] to identify leading institutions in the United States. We then reviewed each school's website and Google presence, searching for references to bias reporting systems. To locate other systems, we searched for reporting forms provided by Maxient and other companies known to host reporting forms. The location process also utilized Google alerts and media reports concerning bias reporting systems.

Once the institutions were identified, FIRE monitored each Bias Response Team page for changes in text—a practice we will continue in order to observe whether, or how, institutions change their systems over time.[3]

FIRE also reviewed the public-facing websites of reporting systems to identify relevant policies, definitions, forms, and other information. We recorded the definitions of "bias" in both policies and reporting forms, which often differed from one another, to determine the categories of bias defined by each institution.

Finally, we utilized public records requests at some institutions to uncover the types of reports being made and how the Bias Response Teams acted in response to each submission.

### A NOTE ABOUT LIMITATIONS

This survey documents how Bias Response Teams operate and who serves on them. Given the number of higher education institutions in the United States, this survey was not intended to identify the rate at which institutions have adopted such systems.

---

[1] For simplicity's sake, this report uses the phrase "Bias Response Team" broadly to encompass both the teams and the reporting systems, even if there is no dedicated, independent team in place.
[2] FIRE's Spotlight database is a collection of policies at over 400 of our nation's biggest and most prestigious universities, collected in an effort to document institutions that ignore students' rights, or

don't tell them the truth about how they've taken them away. Spotlight is available at https://www.thefire.org/spotlight.
[3] In doing so, we have observed a number of institutions delete, modify, or hide their bias reporting systems following media criticism or public records requests.

**BIAS REPORTING SYSTEMS ARE WIDESPREAD**

During the course of 2016, at least **231** Bias Response Teams were publicized on American university or college campuses. **143** are at public institutions and **88** are at private institutions.[4] At least 2.84 million students are enrolled in these schools.

Of the 471 institutions catalogued in FIRE's Spotlight database, 181 (or 38.4%) maintain bias reporting systems. The committees that administer these systems are known by a variety of names, usually a variation on "Bias Response Team." Some schools do not provide an independent "team," instead channeling reports directly to existing offices or departments, including law enforcement or security, human resources departments, or campus housing authorities.

**CASTING A WIDE NET: WHAT CATEGORIES OF "BIAS" ARE REPORTED?**

### IMMUTABLE CHARACTERISTICS AND OTHER CATEGORIES OF BIAS

The most common categories of bias reports solicited[5] come from federal and state laws governing educational and employment discrimination. Every system surveyed invites reports of bias concerning race or religion, and most invite reports concerning sex, sexual orientation, gender identity or expression, age, disability, and so on. Some are unusual, such as bias against "behavior" (**Macalester College**), which appears to define criticism of behavior of any kind as "bias."

### POLITICAL AND SOCIAL BELIEFS

Some systems define "bias incidents" to include expressions of bias against political and social affiliations. 14% of institutions include "political affiliation" among their categories of bias. Still others include bias against similar categories such as "intellectual perspective" (**University of Central Arkansas**), "political expression" (**Dartmouth**), or "political belief" (**University of Kentucky**). It is critical to note that by soliciting reports of speech that is biased against political views, universities are expressly requesting that their students report one another to the authorities for expressing divergent political views.

### DEFINITIONS OF "BIAS INCIDENTS" BROADLY ENCOMPASS SPEECH

Bias reporting systems raise free speech concerns because they solicit reports of legal, protected speech and expression in addition to unprotected conduct such as actionable discrimination or harassment. The definitions often explicitly state that students should report speech protected by the First Amendment.

Many policies include catch-all categories of bias—*e.g.,* "other" biases. In such cases, the definition of a bias incident encompasses not only protected speech, but also any speech that offends ***anyone*** for ***any*** reason. The net effect is that broad definitions of "bias" invite reports of any offensive speech, whether or not it is tethered to a discernable form of bias, thereby inviting scrutiny of student activists, organizations, and faculty engaged in political advocacy, debate, or academic inquiry. For examples of reported political expression, see the Discussion section at page 15.

---

[4] For a list of schools with bias reporting systems observed in FIRE's survey, see **Appendix B**.
[5] For a list of the categories of bias observed in FIRE's survey, see **Appendix A**.

## FINDINGS

**WHO'S ON A BIAS RESPONSE TEAM? OFTEN, LAW ENFORCEMENT**

FIRE was unable to determine the makeup of every Bias Response Team. Of the 166 teams whose composition FIRE could determine, almost half include law enforcement ("speech police," in a quite literal sense) and more than half include what appear to be student conduct administrators. Only 27% include faculty members, reducing the likelihood that a Bias Response Team will have members likely to recognize issues of academic freedom. And 12% contain public relations administrators, raising the possibility that a team's decisions, including about whether to seek discipline for those displaying "bias," may be made on the basis of an institution's desire to avoid public embarrassment. Both common sense and FIRE's extensive experience suggest that public and donor relations can be significant factors driving universities' decisions.

|  | All institutions (166) | Public (104) | Private (62) |
|---|---|---|---|
| Law Enforcement[6] | 42% (70) | 41% (43) | 43% (27) |
| Student Conduct[7] | 63% (105) | 56% (59) | 74% (46) |
| Public or Media Relations | 12% (21) | 14% (15) | 9.7% (6) |
| Faculty | 27% (45) | 24% (25) | 32% (20) |
| Students | 21% (35) | 18% (19) | 26% (16) |

**ACKNOWLEDGING A TENSION WITH FREEDOM OF EXPRESSION AND ACADEMIC FREEDOM, BUT PROVIDING LITTLE (IF ANY) TRAINING**

84 institutions (50.6%) acknowledged freedom of speech, freedom of inquiry, or academic freedom in the descriptions or policies of their Bias Response Teams. Of these, 50 are public and 34 are private.

However, despite professing a dedication to free expression and academic freedom, few schools provide meaningful training to Bias Response Teams on recognizing these issues. Public records requests issued to dozens of schools have revealed only one Bias Response Team, at Louisiana State University, that offered any substantial training whatsoever on First Amendment concerns.

---

[6] "Law enforcement" includes campus police departments and their equivalents at private schools.

[7] Determining whether an administrator serving on a Bias Response Team is responsible for implementing disciplinary procedures can be difficult. FIRE views the inquiry from the student's perspective: What will a reasonable student perceive the administrator's role or authority to be? This number excludes administrators affiliated with diversity offices and includes administrators affiliated with dean of students' offices, absent specific information concerning an administrator's responsibilities or authority.

## WHY DO BIAS RESPONSE TEAMS EXIST?

University administrators receive many complaints about criminal conduct on campus. They also learn of students who encounter "offensive" but legally protected speech or expression.[8] A proper response to these incidents would involve prompt, fair, and impartial discipline for instances of physical misconduct, true threats, and harassment, while fostering an environment in which offensive speech would be answered with more speech.

Campuses with Bias Response Teams have chosen to go further, often deploying administrators to conduct an "investigation" of the incident and, if the "respondent" is found "guilty," summon them for a "hearing" or an "educational" discussion, which may more closely resemble a reprimand than an enlightening exchange of views.

Such procedures risk becoming tools not only for imposing some form of political or intellectual orthodoxy, but also for policing politeness or civility.[9] They invite law-enforcement authorities and administrators, who are likely to be wary of expression that can cause conflict of any kind, to scrutinize activism, debate, and political speech regarding every ideology and viewpoint. Yet the essential elements of free discourse, whether on campus or off, *require* that people have right to offend or to cause conflict through speech.[10]

Other factors may also contribute to a university's decision to implement a Bias Response Team, such as:

- **Inability to implement speech codes.** FIRE has seen a continuous, nine-year decline in the maintenance of speech codes that prohibit speech,[11] and courts routinely strike down speech codes at public universities on First Amendment grounds.[12] In fact, some bias reporting systems, such as **Longwood University's**, have cited the unconstitutionality of speech codes as a reason for their existence.[13]

- **The low cost of expanding employment-based anti-discrimination systems.** A university cannot function as a true "marketplace of ideas" if campus expression is as

---

[8] Eugene Volokh, *No, It's Not Constitutional for the University of Oklahoma to Expel Students for Racist Speech*, WASH. POST, Mar. 10, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/03/10/no-a-public-university-may-not-expel-students-for-racist-speech; *see also* Susan Svrluga, *Student Arrested After Wearing Gorilla Mask, Handing Out Bananas at Black Lives Matter Protest*, WASH. POST, Sept. 29, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/09/29/student-arrested-after-wearing-gorilla-mask-handing-out-bananas-at-black-lives-matter-protest.

[9] *See, e.g.,* José A. Cabranes, *If Colleges Keep Killing Academic Freedom, Civilization Will Die, Too*, WASH. POST, Jan. 10, 2017, https://www.washingtonpost.com/opinions/if-colleges-keep-killing-academic-freedom-civilization-will-die-too/2017/01/10/74b6fcc2-d2c3-11e6-9cb0-54ab630851e8_story.html (Judge on the U.S. Court of Appeals for the 2nd Circuit arguing that Bias Response Teams indicate that "campus administrators have morphed into civility police.").

[10] For example, in overturning a man's conviction for wearing a jacket reading "Fuck the Draft" in a courthouse hallway, the Supreme Court noted that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us," and that words can serve an "emotive function" and are "often chosen as much for their emotive as their cognitive force." Cohen v. California, 403 U.S. 15, 25-26 (1971). In other words, words chosen because they convey hostility or incivility are as deserving of protection as calm, polite debate.

[11] *Spotlight on Speech Codes 2017*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf.

[12] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309, slip op. (Cal. Super. Ct. Feb. 27, 1995); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989).

[13] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on June 14, 2016 and *available at* http://archive.is/uUQic; *see also*, *No Hate Initiative*, MIAMI UNIV., archived on Dec. 15, 2005 and *available at* http://web.archive.org/web/20051215002453/http://www.miami.muohio.edu/documents_and/nohate/index.cfm#hc9 (noting that "[e]very college hate speech code reviewed in the federal courts has been struck down").

## DISCUSSION

highly regulated as expression among employees in business corporations. Borrowing well-developed and widely available corporate procedures is a tempting shortcut. For as little as $8,600, schools can create reporting forms derived from existing systems used by employers to permit employees to report employment-based sexual harassment.[14] But using the tools of corporate anti-discrimination systems—perhaps even those used internally among their own employees—to solicit bias reports from and about the larger campus community sets colleges on a collision course with free discourse.

- **Avoiding public controversy**. By learning of events and disputes quickly, public and media relations administrators can attempt to frame the institution's response in the media. At the **University of New Mexico**, for example, administrators pushed to release a statement "rather than waiting for the media to get ahold of" flyers criticizing UNM's logo (which involves a conquistador) that were reported to the Bias Response Team.[15] Some 12% of Bias Response Teams include media relations administrators.

- **Student demand**. Certain student groups have called upon administrators to implement bias reporting systems.[16] But this seems to be relatively rare: Of

the various recent demands from students across the country, few have involved requests for reporting systems,[17] and one institution's audit suggested that students are unfamiliar with the term "bias incident."[18]

Whatever their motivations, universities implementing Bias Response Teams have cast a wide net, inviting reports of any offensive speech, on virtually any topic, for any reason. The result is that speech on political and social subjects, which is likely (and may be intended) to offend, gets reported to law enforcement and student conduct administrators, and bias reporting systems serve to "alert administrators to specific individuals ... who would benefit most from diversity inclusion training."[19] This institutionalizes surveillance of activists of all political persuasions, exposes universities (and their administrators) to the prospect of costly First Amendment claims, and encourages an illiberal culture of anonymously reporting students or faculty for subversive or offensive speech—on hundreds of campuses across the country.

## BIAS RESPONSE TEAMS ARE FOUND ON HUNDREDS OF AMERICAN COLLEGE CAMPUSES

In early 2016, when Appalachian State University explored a proposal to create a Bias Response Team, administrators wanted to see what other schools were doing. They didn't have

---

[14] *Statement of Work*, ETHICSPOINT, July 12, 2010, produced to the Foundation for Individual Rights in Education by the University of California Office of the President in response to a public records request, *available at* https://www.documentcloud.org/documents/3418749-University-of-California-EthicsPoint-Statement.html.

[15] *See*, emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[16] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action.

[17] *See, e.g.*, *The Demands*, WETHEPROTESTERS, *available at* http://www.thedemands.org (last visited Jan. 9, 2017) (tracking demands of student protesters across the country).

[18] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[19] Liz Fonseca & John Tannous, PROMOTING DIVERSITY AND INCLUSION IN THE CLASSROOM: STRATEGIES TO FOSTER INCLUSIVE ACADEMIC ENVIRONMENTS AT LARGE RESEARCH UNIVERSITIES, EDUCATION ADVISORY BOARD (2013), *available at* https://www.mga.edu/student-affairs/docs/Promoting_Diversity_and_Inclusion_in_Classrooms.pdf.

to look far; one said she was "hard pressed to find a school without" a Bias Response Team.[20] Boston College's student government described them as "ubiquitous."[21]

To a certain extent, FIRE found this to be true. According to publicly available records, there were at least 231 Bias Response Teams publicized by four-year or post-graduate institutions during 2016. Of these, 143 were at public institutions, all of which are bound by the First Amendment, while 88 were at private institutions, most of which advertise or commit to respecting students' freedom of expression and freedom of academic inquiry in official policy. At a conservative estimate,[22] at least 2.84 million American students are subject to often-anonymous reporting systems monitored by administrators and police officers.[23] But while Bias Response Teams are in use at hundreds of institutions, and appear to be growing in number, it does not appear that they can yet be found on a majority of campuses.

The names and acronyms used for bias reporting systems vary from campus to campus. The **University of Oregon**'s team is currently known as the "Bias Education and Response Team,"[24] and the **University of North Carolina at Asheville**'s team is the "Bias Incident Response Team."[25] While most team names appear to include some variation on "Bias Response Team," some do not. **Arizona State University** previously hosted a "Campus Environment Team,"[26] and **Illinois State University** currently utilizes an "Inclusive Community Response Team."[27] The **University of Central Florida**'s "Just Knights Response Team" reflects the name of its athletic teams.[28] And some institutions do not have a separate team for bias reports, instead relying on existing offices or departments. Some direct reports to police departments,[29] various deans[30] or human resources offices,[31] or housing authorities.[32]

To better understand these report-and-response systems, and to distinguish them from other types of speech codes, FIRE views "Bias Response Teams" as identified as such or generally adhering to three criteria:

---

[20] Email from Bindu Jayne, Assoc. Vice Chancellor for Equity, Diversity & Compliance, Appalachian State Univ. (Feb. 4, 2016), *available at* https://www.documentcloud.org/documents/3233900-Appalachian-State-University-Email-Re-Forming.html.

[21] Boston College UGBC Student Assembly, *A Resolution Concerning Bias Incidents, available at* https://www.documentcloud.org/documents/3233930-Boston-College-UGBC-Resolution-Concerning-Bias.html.

[22] This estimate assumes that each bias reporting system applies only to (1) undergraduate students, unless it is expressly dedicated to a graduate program or campus; (2) at the primary or main campus, unless it is expressly dedicated to a particular campus. It does not include faculty, staff, or (for the most part) post-graduate students or undergraduate students at satellite campuses.

[23] Enrollment statistics were calculated using data from the Integrated Postsecondary Education Data System, which is compiled by the U.S. Department of Education's National Center for Education Statistics. *About IPEDS*, NATIONAL CENTER FOR EDUCATION STATISTICS, https://nces.ed.gov/ipeds/Home/AboutIPEDS (last visited Jan. 8, 2017).

[24] Office of the Dean of Students, *Bias Education and Response Team*, UNIV. OF OREGON, http://dos.uoregon.edu/bias (last visited Jan. 1, 2017).

[25] *Bias Incident Response Team (BIRT)*, UNIV. OF N.C., https://msp.unca.edu/bias-incident-response-team-birt (last visited Jan. 2, 2017).

[26] ALLAN MICHAEL HOFFMAN ET AL., VIOLENCE ON CAMPUS: DEFINING THE PROBLEMS, STRATEGIES FOR ACTION, 300 (1998).

[27] Division of Student Affairs, *Inclusive Community Response Team*, ILLINOIS STATE UNIV., http://studentaffairs.illinoisstate.edu/who/diversity/icrt (last visited Jan. 1, 2017).

[28] *Just Knights Response Team*, UNIV. OF CENT. FLA., http://jkrt.sdes.ucf.edu/bias (last visited Jan. 1, 2017).

[29] *See, e.g.*, USM Public Safety Anonymous Crime Reporting Form, UNIV. OF SOUTHERN MAINE, https://usm.maine.edu/police/usm-public-safety-anonymous-crime-reporting-form (last visited Jan. 2, 2017) (form for reporting "Bias/hate activity" to campus police); *Human Dignity – Reporting Process*, DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 2, 2017) ("any victim" of a "Bias Incident [...] must report the incident to the Public Safety Office" in order to be investigated).

[30] *See, e.g.*, *Office of Student Conduct*, PENSACOLA STATE COLLEGE, http://www.pensacolastate.edu/studentconduct (last visited Jan. 2, 2017) (directing reports of bias incidents to the Office of Student Conduct); *Report an Incident*, BOWLING GREEN STATE UNIV., https://www.bgsu.edu/dean-of-students/student-conduct/report-an-incident.html (last visited Jan. 2, 2017) (directing reports to the Office of the Dean of Students).

[31] *See, e.g.*, *Bias Incident Report Form*, WASH. STATE UNIV., http://public.wsu.edu/~hrd/programs/hbreport.pdf (last visited Jan. 2, 2017) (directing reporting party to forward the form to the Human Relations and Diversity office).

[32] *See, e.g.*, *Bias Protocol & Illinois Intervenes*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, http://housing.illinois.edu/living-options/why-housing/inclusive-communities/bias-protocol (last visited Jan. 2, 2017) (directing reports to a "Residential Life professional").

## DISCUSSION

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.[33]

These criteria are designed to include systems that invite reports of protected speech without specifically labeling it as "bias," while distinguishing speech codes unaccompanied by formal or explicit policies for reporting such incidents.

### CASTING A WIDE NET FOR BIAS INCIDENTS

What constitutes a "bias incident" varies widely from campus to campus. As the **University of West Florida** puts it, defining the term "seem[s] like a murky ground to traverse."[34]

Even the use of the term "bias incident" engenders debate and confusion. In a February 2015 audit of **Colgate University**'s bias reporting system, a campus committee reported that, although the sample size was small, *no*

student was aware that they could file bias reports online, most had never heard the phrase "bias incident" before, and the majority had "incorrect interpretations" about its meaning.[35]

Broad applications of the term can diminish serious misconduct by equating political squabbles and caustic speech with violent criminal conduct. For example, *The New York Times* was widely and credibly criticized[36] for an article[37] noting that "[b]ias incidents on both sides have been reported" at the **University of Michigan**, with one student alleging[38] that she had been "threatened with being lit on fire because she wore a hijab." The article continued: "Other students were accused of being racist for supporting Mr. Trump ... ."[39]

Such political criticism can hardly be placed under the same umbrella as true threats of violence. Yet this is precisely what many bias reporting systems do. Schools largely define bias incidents to encompass more than hate crimes or actionable conduct. Hate crimes—criminal conduct undertaken on the basis of a protected characteristic of the victim, which is *not* protected by the First Amendment[40]—are always bias incidents. "Bias incidents," however, include speech or expressive conduct that is not necessarily criminal or in violation of applicable policy.

---

[33] The U.S. Department of Justice employed a similar definition of "bias incident" in a 2001 report: "acts of prejudice that are not accompanied by violence, the threat of violence, property damage, or other illegal conduct." U.S. DEPT. OF JUSTICE BUREAU OF JUSTICE ASSISTANCE, HATE CRIMES ON CAMPUS: THE PROBLEM AND EFFORTS TO CONFRONT IT 5 (Oct. 2001), *available at* https://www.ncjrs.gov/pdffiles1/bja/187249.pdf.

[34] *What is Bias?*, UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/what-is-bias (last visited Jan. 5, 2017).

[35] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[36] *See, e.g.*, John K. Wilson, *Safe Spaces for Conservatives: Why Being Called a Racist Is Not a Bias Incident*, ACADEME BLOG, Dec. 11, 2016, https://academeblog.org/2016/12/11/safe-spaces-for-conservatives-why-being-called-a-racist-is-not-a-bias-incident; *see also*, Andre Segura (@andresegura), TWITTER (Dec. 8, 2016, 5:01 PM), http://twitter.com/andresegura/status/806982019674677248; Jessica Valenti (@JessicaValenti), TWITTER (Dec. 8, 2016, 4:17

PM), http://twitter.com/JessicaValenti/status/806971007307280384.

[37] Anemona Hartocollis, *On Campus, Trump Fans Say They Need 'Safe Spaces'*, N.Y. TIMES, Dec. 8, 2016, http://www.nytimes.com/2016/12/08/us/politics/political-divide-on-campuses-hardens-after-trumps-victory.html.

[38] Police later alleged that the report was false. John Counts, *U-M Student's Claim of Threat for Wearing Hijab Is False, Police Say*, MLive.com, Dec. 21, 2016, http://www.mlive.com/news/ann-arbor/index.ssf/2016/12/police_say_no_evidence_muslim.html. While some reports of bias incidents, as with any type of report to authorities, may be false, there is no shortage of true threats (if not acts) of violence similar to that alleged at the University of Michigan.

[39] Erik Wemple, *New York Times Deserts 'Both Sides' Language in Story on Campus Trump Supporters*, WASH. POST, Dec. 9, 2016, https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/12/09/new-york-times-deserts-both-sides-language-in-story-on-campus-trump-supporters/?utm_term=.341a5dd304a5.

[40] Wisconsin v. Mitchell, 508 U.S. 476, 484-490 (1993).

Take, for example, the **University of Northern Iowa**'s definition:[41]

> A bias-related incident is any word or action directed toward an individual or group based upon actual or perceived identity characteristics or background of a group or person that is harmful or hurtful. Some bias-related incidents may be contrary to law or policy, while some may be speech protected by the First Amendment of the Constitution of the United States.

**Western Washington University**'s definition extends to "demonstrations" of bias, including "language, words, signs, symbols, threats, or actions that could potentially cause alarm, anger, or fear in others[.]"[42] Moreover, the existence of a bias incident under the policy turns entirely on whether the complainant subjectively perceived the incident to be motivated by bias, rather than on the intent of the speaker.[43]

In targeting speech that may cause "alarm, anger, or fear," or that might otherwise offend on the basis of a proscribed subject, universities expressly set their sights on constitutionally protected speech. All speech is presumptively protected by the First Amendment unless it falls within certain narrow exceptions carved out by the Supreme Court: incitement to immediate violence; so-called "fighting words"; harassment[44]; true threats and intimidation; obscenity; child pornography; and defamation. Speech is *not* unprotected simply because it is offensive,[45] insulting,[46] causes anger,[47] or is viewed as prejudiced or as "hate speech."[48] If the speech in question does not fall within one of the listed exceptions, it most likely is protected speech.[49]

Most reporting systems are predicated on specific, enumerated characteristics. Of the systems identified by FIRE, 199 (or 86%) explicitly set forth these characteristics. Among them, the categories vary widely on different campuses. Each of these teams solicits reports about bias against race or religion, and all but one explicitly solicit reports about disability or sexual orientation.[50] There is less agreement on more specific categories. For example, while 94.5% seek reports of bias based on national origin or nationality, only 14.1% explicitly seek reports of bias against immigration or citizenship status.

Some categories of "bias" are peculiar. For example, the **University of Kentucky** permits

---

[41] *Bias Response Protocol*, UNIV. N. IOWA, https://uni.edu/brt/bias-response-protocol#overlay-context=bias-response-protocol (last visited Jan. 5, 2017).

[42] *Bias Incident Reporting Form*, WESTERN WASH. UNIV., http://www.wwu.edu/eoo/bias-incident-response.shtml (last visited Jan. 5, 2017).

[43] *See, e.g.*, *Florida State University Bias Incident Response System*, FLA. STATE UNIV., http://thecenter.fsu.edu/article/florida-state-university-bias-incident-response-system (last visited Jan. 5, 2017) ("An incident of bias may occur whether the act is intentional or unintentional").

[44] For more on the application of peer harassment law on campus, see Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009), *available at* https://ssrn.com/abstract=1400300.

[45] Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[46] Boos v. Barry, 485 U.S. 312, 322 (1988) (First Amendment protects "insulting, and even outrageous, speech").

[47] Terminiello v. Chicago, 337 U.S. 1, 4 (1949) (A "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").

[48] Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, WASH. POST., May 7, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/05/07/no-theres-no-hate-speech-exception-to-the-first-amendment/?utm_term=.2cca993394b8.

[49] For a more in-depth discussion of the application of the First Amendment to public universities, and of the principles of freedom of speech to the private institutions that promise it, see FIRE's *Spotlight on Speech Codes 2017*, *supra* note 11, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf#page=10.

[50] The anomaly, at Baylor University, appears to be the result of a lack of effort to promulgate a complete definition, providing that bias incidents relate to "race, nationality, religion, gender, age, etc." *Bias Motivated Incident Support Team*, BAYLOR UNIV., http://www.baylor.edu/student_life/index.php?id=85780 (last visited Jan. 5, 2017).

## DISCUSSION

reports of bias against "smoker status,"[51] perhaps as a result of borrowing language from a state law concerning employment discrimination against tobacco users.[52]

There is also significant divergence when it comes to reporting bias based on political affiliation, views, or conduct. Worryingly, 21% of public institutions seek out reports of bias on the basis of political affiliation, as opposed to 2.6% of private institutions. Among them, concerns regarding bias against political and social views vary:

- **Dartmouth College** lists "political expression" as a potential motivation on its reporting form[53] and defines bias to include "[t]reating someone negatively because of their actual or perceived .... [p]olitical or social affiliation."[54] This broad wording could encompass voting against a person for campus political offices or simply criticizing their political speech.

- The **University of North Carolina at Charlotte** includes "[p]olitical beliefs" in its definition of bias, and provides the following example: "Drawing pictures or cartoons that belittle someone because of their beliefs ... or political affiliation."[55] This would apply to virtually all political cartoons.

- Examples of bias incidents at **Williams College** include "comments on social media about someone's ... political affiliations/beliefs."[56] This definition could include any response to any political view posted on social media, or even simple criticism of elected officials.

- The **University of Colorado** included both "political philosophy" and "political affiliation" as protected classes.[57] (It has since shut down its Bias Response Team.)

- The **University of Kentucky**'s definition targets, in part, bias against a person for his or her "political belief."[58]

Other systems invite reports of even broader ranges of criticism and discussion:

- **Macalester College**'s now-deleted definition included "bias against another person based on ... his or her membership in a group ... or an individual's particular characteristics, *role*, or *behavior*."[59] This definition could apply to almost any criticism of anyone.

- Both **Syracuse University** and **Longwood University** list political and "social affiliation" as unacceptable grounds for bias.[60] It is nearly impossible

---

[51] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[52] Unlawful discrimination by employers – Difference in health plan contribution rates for smokers and nonsmokers and benefits for smoking cessation program participants excepted, KY. REV. STAT. § 344.040.
[53] *Bias Reporting Form*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[54] *Achieving Community Together (A.C.T.) Program*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[55] *What is Bias*, UNIV. N.C. BIAS ASSESSMENT AND RESOURCE TEAM, http://unccdso.uncc.edu/org/biasassessmentandresourceteam145871/What_Is_Bias (last visited Jan. 31, 2017).

[56] *Questions about Bias and Bias Reporting*, WILLIAMS COLLEGE, http://speakup.williams.edu/faq (last visited Jan. 6, 2017).
[57] *Definitions*, UNIV. OF COLO., archived on July 25, 2016 and available at http://archive.is/hR0ps.
[58] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[59] *What is a bias-related incident?*, MACALESTER COLLEGE, archived on Sept. 12, 2016 and available at http://archive.is/27e8C (emphasis added).
[60] *What is bias?*, SYRACUSE UNIV., http://www.syracuse.edu/currentstudents/stopbias/whatisbias.html (last visited Jan. 5, 2017); *What is Bias?*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/what-is-bias (last visited Jan. 5, 2017).

to discern a meaningful limit to this category.

Some of these examples are likely the result of definitions borrowed from state employment discrimination statutes. Yet asking students to report one another for broadly defined bias against their voluntary political or social affiliation invites surveillance of and intrusion into political speech, subjecting it to the scrutiny of administrators and police.

### EXAMPLES OF REPORTED INCIDENTS: CAUGHT IN A WIDE NET, UNIVERSITIES ENTANGLE THEMSELVES INTO REFEREEING POLITICAL SPEECH

It is not mere speculation that core political speech, academic discourse, and outspoken activists are likely to become the subjects of bias incident reports. FIRE used public records requests, reviewed similar requests by media outlets, and examined the sparse public disclosures by Bias Response Teams to discern what gets reported.

The reports we reviewed, which often fail to disclose what action (if any) was undertaken in response, span the ideological spectrum:

- **Appalachian State University**: A student filed a report regarding the 2016 presidential election, claiming to be "offended by the politically biased slander that is chalked up everywhere reading 'TRUMP IS A RACIST'" and describing the "slander" as "unlawful." Another report stated that supporters of then-candidate Bernie Sanders were "destroying" messages chalked by

Trump supporters by drawing penises next to them. Yet another report complained that a pro-Trump student organization was using chalk to write "hate speech" in support of Trump.[61]

Another series of reports was filed against a student activist on several grounds: tweeting that she "hate[s] white men"; "refus[ing] to support all students if a student fits the certain stereotype of a white male"; "display[ing] disturbing apathy [and] ignorance and bitterness"; and "express[ing] profound disregard for the lives of students based on race and gender and for [police] officers based on their careers."[62]

- **Texas Tech University**: The Black Student Union (BSU) was reported to administrators for tweeting "All lives don't matter... White lives don't matter... Blue lives don't matter... #BlackLivesMatter." The complainant wanted the BSU characterized as a "Hate Group" and complained that the student chapter of the College Democrats planned to release a statement in support of BSU.[63]

- **University of California, San Diego** (UCSD): A student humor publication, *The Koala*, lost its student funding after satirizing "safe spaces" on campus.[64] Spurred by bias incident reports, specifically one calling on UCSD to "stop funding" *The Koala*, administrators asked the university's lawyer to "think creatively" about how to address the newspaper, which they felt "crosse[d]

---

[61] Spreadsheet of Incidents Reported, APPALACHIAN STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* http://www.documentcloud.org/document/3255183-Appalachian-State-University-Bias-Incident.html.
[62] APPALACHIAN STATE UNIV., *supra* note 61.
[63] Texas Tech University Campus Climate & Incident Reporting Form Submitted on July 14, 2016, produced to the Foundation for Individual Rights in Education in response to a public records

request, *available at* https://www.documentcloud.org/documents/3255186-Texas-Tech-BSA-Black-Lives-Matter-tweet.html.
[64] Adam Steinbaugh, *As 'The Koala' Files Lawsuit Against University of California, San Diego, Public Records Reveal Administration's Censorship*, NEWSDESK, June 1, 2016, https://www.thefire.org/as-the-koala-files-lawsuit-against-university-of-california-san-diego-public-records-reveal-administrations-censorship/.

## DISCUSSION

the 'free speech' line."[65] It didn't, and *The Koala* is suing UCSD with the assistance of the ACLU of Southern California.[66]

- **John Carroll University**: A summary report recounted that an "[a]nonymous student reported that [the] African-American Alliance's student protest was making white students feel uncomfortable."[67]

- **University of Northern Colorado** (UNC): Two professors were investigated for encouraging students to debate gay and transgender rights in class—including one professor who was responding to a student's comments on the issue and encouraging his students to confront arguments they find uncomfortable.[68] Other reports indicated that students were ordered to remove a Confederate flag from their dormitory room because it might offend someone.[69] These disclosures spurred letters of inquiry from two state senators,[70] a condemnation from the *Denver Post* editorial board,[71] and

concessions from a UNC administrator that the Bias Response Team's efforts may have been improper in some cases.[72] UNC subsequently shuttered its Bias Response Team.[73]

- **University of Oregon:** The Bias Response Team intervened to explain "community standards and expectations" when students had the audacity to "express[] anger about oppression."[74] In a separate incident, the Bias Response Team intervened with the reporter and editor of a student newspaper after an anonymous report that the "newspaper gave less press coverage to trans students and students of color."[75]

- **University of Michigan**: A snow sculpture perceived to be a "snow penis" was reported.[76]

- **Connecticut College**: Pro-Palestinian students were reported over flyers mimicking Israeli eviction notices to Palestinians, sparking an investigation

---

[65] Email from Becky Pettit, Univ. of Cal. San Diego Vice Chancellor for Equity, Diversity, and Inclusion, to Daniel Park, Univ. of Cal. San Diego Chief Campus Counsel, Nov. 13, 2016, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/01095740/Koala-v-UCSD_Public-Records-and-Bias-Incident-Reports.pdf#page=8.

[66] *Defending Freedom of Speech for Everyone, ACLU Sues UCSD to Enforce First Amendment Rights of the Student Press*, AM. CIVIL LIBERTIES UNION OF SAN DIEGO, May 31, 2016, https://www.aclusandiego.org/defending-freedom-speech-everyone-aclu-sues-ucsd-enforce-first-amendment-rights-student-press/.

[67] JOHN CARROLL UNIV., INTERIM REPORT ON BIAS REPORTING SYSTEM SUMMER-FALL 2015 4 (2015) *available at* http://webmedia.jcu.edu/bias/files/2016/02/Bias-Reports-Fall-2015-web-rev.-2.24.2016.pdf.

[68] Adam Steinbaugh & Alex Morey, *Professor Investigated for Discussing Conflicting Viewpoints, 'The Coddling of The American Mind'*, NEWSDESK, June 20, 2016, https://www.thefire.org/professor-investigated-for-discussing-conflicting-viewpoints-the-coddling-of-the-american-mind/.

[69] Tyler Silvy, *University of Northern Colorado's Handling of Speech Deemed Offensive Raises Questions, Concerns*, GREELEY TRIBUNE, June 28, 2016, http://www.greeleytribune.com/news/local/university-of-northern-colorados-handling-of-speech-deemed-offensive-raises-questions-concerns/.

[70] Tyler Silvy, *Sen. John Cooke Rips University of Northern Colorado in Scathing Letter*, GREELEY TRIBUNE, July 2, 2016, http://www.greeleytribune.com/news/local/sen-john-cooke-rips-university-of-northern-colorado-in-scathing-letter/.

[71] Denver Post Editorial Board, *UNC's Weak-Kneed Commitment to Free Speech*, DENVER POST, July 5, 2016, http://www.denverpost.com/2016/07/05/uncs-weak-kneed-commitment-to-free-speech/.

[72] Alex Morey, *Facing More Troubling Details and Public Outcry, Northern Colorado Vows to Reconsider Bias Response Team*, NEWSDESK, June 27, 2016, https://www.thefire.org/facing-more-troubling-details-and-public-outcry-northern-colorado-vows-to-reconsider-bias-response-team/.

[73] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[74] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[75] UNIVERSITY OF OREGON BIAS RESPONSE TEAM, ANNUAL REPORT 2014-2015 10 (2015), archived at http://web.archive.org/web/20151015075754/http://uodos.uoregon.edu/Portals/0/BRT/Annual%20Report%202014-2015.pdf.

[76] Erin Dunne, *Snow Penis Reported as Bias-Incident*, MICH. REVIEW, Feb. 25, 2016, http://www.michiganreview.com/snow-penis-reported-as-bias-incident/.

## DISCUSSION

by a dean.[77] The college's response led to students occupying the president's office, inquiring "about the differential treatment of alleged bias incidents on campus, particularly why some bias incidents warrant all-campus communications and administrative actions while others do not."[78]

- **Colby College**: Logs of bias incident reports—which are now hidden from public view[79]—show one student reported for claiming that a student group was racist against white people, while another was reported for using the phrase "on the other hand," which was perceived as ableist.[80]

- **University of New Mexico** (UNM): A student member of the College Republicans was reported and investigated by the office of the dean of students for criticizing a student and her organization by name[81] during a public debate over whether UNM should cut ties with Chick-fil-A.[82]

- **Cornell University**: A professor was reported for speaking at a rally as a private citizen and referring to police as "terrorists." The complaint was referred to human resources administrators, who discussed freedom of speech policies with the complainant.[83]

In a separate instance, an anonymous person reported the student government for participating in efforts to encourage Cornell to become a sanctuary campus.[84]

- **Ohio State University**: A group of students was reported for sharing memes comparing Hillary Clinton to Adolf Hitler in a "political discussion," resulting in a housing employee holding a "mandatory floor meeting about triggering events."[85]

Another student called upon administrators to compel the College Democrats to allow anyone to attend their meetings after the Democrats had asked the student to leave, believing him to be a member of the College Republicans sent to observe the meeting.[86]

Yet another student reported a chalk message stating "Build the Wall," which the student wanted "erased"; the student also requested "a clear message from the

[77] Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, ALGEMEINER, May 16, 2016, https://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices/.

[78] *Why We're Here*, OCCUPY FANNING, May 13, 2016, http://occupyfanning2.blogspot.com/2016/05/why-were-here.html.

[79] Colby College's bias incident policy earned that institution the dubious honor of being FIRE's July 2016 Speech Code of the Month. Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/.

[80] *Bias Incident Log*, COLBY COLLEGE, archived on July 23, 2016 and *available at* http://archive.is/wRwfw.

[81] University of New Mexico Hate/Bias Incident Reporting Form, Feb. 27, 2013, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3234843-University-of-New-Mexico-Chick-Fil-a-Report.html.

[82] Astrid Galvin, *UNM Board: Chick-fil-A to Stay*, ALBUQUERQUE JOURNAL, Feb. 27, 2013,

https://www.abqjournal.com/173096/unm-board-chick-fil-a-to-stay.html; *Chick-fil-A to Stay on UNM Campus*, KOAT-TV, Feb. 27, 2013, https://www.youtube.com/watch?v=LYUCfnstTro.

[83] *Bias Incident Summaries: July 1 – August 31, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Aug2016_Incident%20Summaries.pdf.

[84] *Bias Incident Summaries: July 1 – November 30, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Nov2016_Incident%20Summaries.pdf.

[85] Bias incident report dated Oct. 23, 2015, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3255200-Ohio-State-University-Bias-Assessment-and.html. How OSU responded to these reports is unclear, as OSU declined to produce "voluminous" records relating to its responses.

[86] Bias incident report dated Feb. 1, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418811-Ohio-State-University-College-Democrats-Report.html.

## DISCUSSION

university that this type of hate speech will not be allowed."[87]

(OSU's police chief, in an article posted on OSU's Bias Assessment and Response Team's website, recommends that students who are "verbally insulted or confronted by someone with whom you strongly disagree" should "not engage in debate.")[88]

- **University of Texas at Austin**:[89] The Campus Climate Response Team (CCRT) fielded dozens of reports about a conservative student group's protest of affirmative action in the form of an "affirmative action bake sale."[90] 94% of the reports sought disciplinary action. Administrators met with the student group following the reports and acknowledged in an open letter that it was the student group's "right to" engage in the protest.[91] The CCRT's annual report also disclosed that "[f]aculty and student commentary in the classroom perceived as derogatory and insensitive" was an example of the "types of incidents" reported to the CCRT.[92]

- **University of Wisconsin—Platteville**: Documents acquired by *Heat Street* showed that students were reported for

dressing up as the "Three Blind Mice" for Halloween, which the complainant feared *might* offend others who *might* believe the costumes were making fun of disabilities.[93]

- **Case Western Reserve University** (CWRU): A professor was reported for a writing assignment that challenged students to "[w]rite about a gay child being kicked out of their house, and make the audience feel sorry for the person kicking them out."[94]

Another CWRU professor was reported because, among other things, students were "required to read plays with racist depictions of First Nations people."[95]

A third CWRU professor was reported for asking students who were neither citizens nor permanent residents to raise their hands, then pointing out that they could be sued anywhere.[96] This appears to have been an exercise in explaining residency and venue during a law school course on civil procedure.[97]

There is no public indication as to whether CWRU intervened in any of these cases.

[87] Bias incident report dated Apr. 18, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418842-Ohio-State-University-Build-the-Wall-Report.html.

[88] Paul S. Denton, *How OSU Police Respond to Incidents of Bias or Intimidation*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/pdfs/how-osu-police-respond-to-incidents-of-bias-or-intimidation.pdf (last visited Jan. 31, 2017); *see also, Bias Response Tools*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/bias-response-tools.aspx (last visited Jan. 6, 2017) (linking to Chief Denton's article as one of its "bias response tools").

[89] UT Austin asked FIRE to pay $2,437.20 for records relating to how its CCRT responded, although other Texas institutions provided such records at no cost. We declined.

[90] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, CAMPUS CLIMATE TREND REPORT, 2013-2014 20 (2014), *available at* http://utexas.app.box.com/s/88ccrqlayd41b1nzqjos7z3izkrepol3.

[91] *Statement From Dr. Gregory Vincent About the Young Conservatives of Texas's Bake Sale*, UNIV. OF TEXAS AT AUSTIN, Sept. 27, 2013, http://diversity.utexas.edu/news/2013/09/27/statement-from-dr-gregory-vincent-about-the-young-conservatives-of-texass-bake-sale/.

[92] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, *supra* note 90 at p. 15.

[93] Jillian Kay Melchior, *'Bias Incident Team': Students' Three Blind Mice Halloween Costume 'Makes Fun of a Disability'*, HEAT STREET, Aug. 3, 2016, https://heatst.com/culture-wars/bias-incident-team-students-three-blind-mice-halloween-costume-makes-fun-of-a-disability/.

[94] *Bias Reporting System (BRS)*, CASE WESTERN RESERVE UNIV., archived on Sept. 12, 2016 at http://archive.is/kpceX.

[95] *Id.*

[96] *Id.*

[97] 28 U.S.C. § 1391 (2011).

To be sure, Bias Response Teams also field a number of reports of conduct *not* protected by the First Amendment. For example, many reports involve vandalism, assault, or true threats motivated by bias. These, however, are acts that may be reported to existing resources, such as student conduct administrators or police departments. Schools could also invite students to report unlawful conduct using online reporting systems, or even to a team set aside to address unlawful conduct motivated by bias. But schools are implementing broad definitions of "bias" to expressly invite reports of protected *speech*, including a broad range of political speech, and they often do so without any training on First Amendment rights.

### WHO SCRUTINIZES THE SPEECH? POLICE, CONDUCT ADMINISTRATORS, AND MEDIA RELATIONS STAFF

Having cast a wide net, who reviews the reported speech? Bias Response Teams are often populated by police and student conduct administrators. They also include, to a lesser extent, media relations administrators, faculty members, and students.

Some institutions, including the **University of West Florida**[98] and **Montana State University**,[99] embed police or security officials within their Bias Response Teams. Others, such as the **University of Montana**[100] and **DePaul University**,[101] direct reports straight to police or security officers.

Some 42% of Bias Response Teams include police or security officials. By including police and student conduct administrators on their Bias Response Teams, schools send a message to students that undercuts claims of respect for freedom of expression: If you say something that offends someone, you may (or in some cases *will*) be investigated by police. Their inclusion can also lead universities to use police to investigate offensive speech or anonymous speakers.[102] For example, at **Evergreen State College**, administrators responded to anonymous flyers critical of, among other things, Black Lives Matter, by emailing students:[103]

> The College wants to identify the individual(s) engaged in posting and distributing these flyers. If you have any information about who may be doing this, it is critical that you contact Police Services or provide information anonymously using the online incident report form.

Including student conduct administrators, as do approximately 63% of Bias Response Teams, also sends a chilling message. Students summoned to meet with a member of the office of the dean of students are likely to view the meeting not as educational, but as punitive. Even when the intention is not punitive, administrators are likely to approach "offensive" speech or sharp disagreement from a conflict-resolution perspective. This approach may conflict with a student speaker's purpose; many use speech to heighten or clarify conflict and disagreement in order to further their message.

---

[98] *About Us,* UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/about-us (last visited Jan. 9, 2017) (including Chief of University Police on its Bias Response Team).
[99] *Bias Incident Response Team,* MONT. STATE UNIV., http://www.montana.edu/biasreporting/BIRT.html (last visited Jan. 9, 2017) (Bias Incident Response Team includes a "representative from the Montana State University Police Department").
[100] *Hate Crime Form,* UNIV. OF MONT., http://www.umt.edu/police/Police/Hate%20Crime%20Form.php (last visited Jan. 9, 2017) (Police department soliciting reports of bias incidents, including "Leafleting" and the use of slurs).

[101] *Reporting Process,* DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 9, 2017) (directing reports to the DePaul Public Safety Office).
[102] The First Amendment protects anonymous speech and association. *See, e.g.,* Talley v. California, 362 U.S. 334, 357 (1960) (anonymous pamphleteering), NAACP v. Alabama, 357 U.S. 449, 462 (1958) (anonymous association).
[103] *Bias Related Incident – April 19 Flyers,* EVERGREEN STATE COLLEGE, Apr. 19, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3418430-Evergreen-State-College-April-19-2016-Flyers.html.

## DISCUSSION

Including media relations administrators is also concerning, because it suggests that a school's decision to respond to offensive speech may be driven by the potential impact to the school's reputation. Where this is the case, it undermines the notion implicitly underlying Bias Response Teams that universities are primarily concerned with providing a safe environment.

And there is reason to be concerned that universities' responses may be driven by a desire to manage the institutions' reputation at the expense of protecting freedom of expression. At the **University of New Mexico**, administrators wanted to rush to release a statement from the



Office of the President "rather than waiting for the media to get ahold of" flyers critical of the university's logo, which included conquistadors but not Native Americans.[104] These flyers were perceived by the Bias Response Team as a threat to Native Americans because the mock logo incorporated skulls and bones underneath the feet of conquistadors—a rather obvious criticism of the treatment of Native Americans in the New Mexico area. Ultimately, it was faculty members on the Diversity Council who placed the flyers in context. Without their intervention, it is possible that administrators who erroneously viewed the flyers as threatening could have continued their investigation and initiated charges.

In other words, the lack of faculty or student membership may deprive Bias Response Teams of valuable insight into instances of purportedly

offensive speech, as well as principles of academic freedom. That may explain why the **University of Northern Colorado**'s Bias Response Team warned at least one professor that he could face lengthy, intrusive investigations for permitting students to debate controversial issues in class.[105]

## BIAS RESPONSE TEAMS MAY EXPOSE UNIVERSITIES TO FIRST AMENDMENT LAWSUITS

To date, FIRE is aware of no legal challenges to a bias reporting system. It's unclear whether a legal challenge could be mounted by a student or faculty member based on the mere existence of such a system. However, each time a Bias Response Team embarks upon an investigation or intervention with the reported person, it risks exposing the institution and its administrators to claims under the First Amendment.

That a university provides a mechanism for community members to share information concerning offensive speech may not, alone, amount to a justiciable First Amendment controversy. In *Laird v. Tatum* (1972), the Supreme Court of the United States held that the "mere existence" of broad, intelligence-gathering programs does not, "without more," impermissibly chill speech.[106]

The First Amendment, however, does not simply restrict the government from expressly *penalizing* or *prohibiting* speech. It also prohibits "adverse government action against an individual because of First Amendment freedoms."[107] When universities depart from the *Laird* baseline by mounting investigations or interventions with offending speakers, they expose themselves to the possibility of a First

---

[104] *See* emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[105] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.

[106] Laird v. Tatum, 408 U.S. 1, 10 (1972).

[107] Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005).

## DISCUSSION

Amendment retaliation claim. This exposure isn't limited to legal action against the university; because many First Amendment principles are so well established under the law, members of a Bias Response Team risk being held *personally* liable for their actions in some circumstances.

To mount a First Amendment retaliation claim, for example, an aggrieved party must demonstrate three things: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech."[108] Whether government conduct has an adverse effect is determined by an objective standard: if the retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights."[109] The retaliatory conduct need not be successful, as the cause of action is intended to address "conduct that tends to *chill* [speech], not just conduct that *freezes* it completely."[110]

To the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds. But the reality is that Bias Response Teams are generally intended to deter offensive speech and conduct. Their goal is to chill speech that the institution or its constituents find offensive or unkind.[111]

When Bias Response Teams intervene directly with the reported student, the risk of exposing the university to First Amendment claims increases. Bias Response Teams often submit speech to the review of police and campus conduct administrators, who launch an "investigation"[112] or bring "charges"[113] against the "respondent,"[114] who may be summoned for a "hearing"[115] and found "guilty"[116] or be provided with an "educational"[117] reprimand—or, in the case of **Longwood University**, "education sanctions."[118] This is the language of punitive systems, not educators, and it is likely to be perceived as such by students and by courts. Simply calling a quasi-punitive response system "educational" doesn't make it so. After all, many institutions already describe at least some of their *punitive* measures as "educational" in nature.[119]

---

[108] Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).
[109] *Id.*
[110] Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original).
[111] Rio Fernandes, *In a Charged Climate, Colleges Adopt Bias-Response Teams*, CHRON. OF HIGHER EDUC., Feb. 1, 2016, http://www.chronicle.com/article/In-a-Charged-Climate-Colleges/235120 (describing how Ohio State University formed a bias response team because "they needed a proactive means to prevent occurrences of offensive speech").
[112] *See, e.g.*, *Discrimination Cases, Fall 2015*, UNIV. OF CAL. DAVIS, http://reporthateandbias.ucdavis.edu/fall_2015.html (last visited Jan. 30, 2017) ("Offensive classroom comments, course content" resulted in an "Investigation").
[113] *See, e.g.*, *Student Reporting of Bias-Related Incidents*, STATE UNIV. OF N.Y. GENESEO, https://www.geneseo.edu/diversity/procedures (last visited Jan. 30, 2017) (in a "Level I" incident, "the accused student is made aware of the charges and has a hearing with the Student Conduct Administrator").
[114] *See, e.g.*, *Tolerance Program Annual Report: 2014-2015*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, at 4, *available at* http://www.conflictresolution.illinois.edu/tolerance/downloads/toleranceReport_1415.pdf ("If a meeting with the respondent(s) occurs, the assigned [Bias Incident Investigation Team] member will provide her/him with general information about bias-

motivated incidents and the Tolerance Program and will give her/him the opportunity to respond to the report.").
[115] *See, e.g.*, *Student Reporting of Bias-Related Incidents, supra* note 113 (describing a "hearing with the Student Conduct Administrator").
[116] *See, e.g.*, *Difference Between a Hate Crime and a Bias Incident*, DAVIDSON COLLEGE, http://www.davidson.edu/student-life/multicultural-life/hate-crime-and-bias-incidents (last visited Jan. 30, 2017) ("Professors who make pejorative comments or stereotypes about a protected class of people ... are also guilty of commiting [*sic*] a bias incident.").
[117] *See, e.g.*, *Bias and Discrimination Response Protocol*, COLUMBIA COLLEGE, https://www.cc-seas.columbia.edu/studentlife/bias/protocol (last visited Jan. 30, 2017) ("Columbia College and Columbia Engineering students involved in perpetrating a hate crime/ bias incident will be subject to an educational and/or disciplinary process determined by Judicial Affairs.").
[118] *Bias & Hate Incidents*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/bias--hate-incidents (last visited Jan. 9, 2017).
[119] *See, e.g.*, Missouri State University, which promises not to "discipline" through its Bias Response Team, but instead "provide educational opportunities for those engaging in speech contrary to ... values [of diversity and inclusion]." Its Code of Conduct, however, is *also* "intended to be educational in nature[.]" If

## DISCUSSION

Even the public pronouncement that an investigation is underway—particularly when conducted by law enforcement—can itself have a chilling effect.[120] While universities need not remain silent about offensive speech, going "beyond simple vocal condemnation" and implying that particular instances of protected speech may be punished can amount to a violation of the First Amendment.[121]

The Supreme Court's perspective in *Bantam Books, Inc. v. Sullivan* (1963) is instructive. There, the state of Rhode Island established a commission whose goal was to, among other things, "educate the public" about books and printed materials it viewed as obscene, acting as a gatekeeper to "investigate and recommend the prosecution" of persons found to be distributing obscene materials.[122] The commission promulgated lists of "objectionable" publications to police departments and, when booksellers were reportedly selling objectionable material, the commission sent them notices suggesting that the commission had the power to recommend prosecution if materials were found to be obscene.[123] The Supreme Court held that the commission's claim that it simply "exhort[ed]" publishers to avoid distributing obscenity, and could not itself punish booksellers, was "untenable":[124]

It is true that [the] books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications ... .

Bias Response Teams are arguably quite comparable to the Rhode Island commission discussed in *Bantam Books*. While they might protest that they are intended not to punish speech but to discourage speech contrary to the values of the institution, even if that speech is protected, Bias Response Teams are nevertheless intended to chill speech. By using the language, tools, and administrators associated with disciplinary systems, Bias Response Teams risk being perceived as intimidating, not educating. While some systems strike an appropriate balance by, among other things, limiting their definitions of reportable conduct to speech unprotected by the First Amendment,[125] the vast majority do not.

---

discipline can be described as educational, then an "educational" response which is mandatory or lacks substance may be perceived as disciplinary. *Cf. Bias Response Team,* MO. STATE UNIV., https://www.missouristate.edu/dos/268885.htm (last visited Jan. 11, 2017); *Code of Student Rights and Responsibilities*, MO. STATE UNIV., https://www.missouristate.edu/policy/G5_01_StudentRightsand Responsibilities.htm (last visited Jan. 11, 2017).

[120] *See generally* Adam Steinbaugh, *The Chilling Effect of Investigations*, NEWSDESK, May 11, 2016, https://www.thefire.org/the-chilling-effect-of-investigations/; *see also* Sweezy v. New Hampshire, 354 US 234, 245 (1957) ("There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press,

freedom of political association, and freedom of communication of ideas, particularly in the academic community."); *see also* Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) (an "unwarranted disciplinary investigation" alone amounted to an adverse employment action in a First Amendment retaliation case).

[121] Levin v. Harleston, 966 F.2d 85, 89-90 (2d Cir. 1992); *but see* Stolle v. Kent State Univ., 610 Fed. App'x 476, 482-83 (6th Cir. 2015) (faculty member verbally reprimanded for sending letter to legislator on university letterhead in violation of policy amounted to "de minimus" act insufficient to deter person of ordinary firmness from First Amendment activities).

[122] Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 59-60 (1963).

[123] *Id.* at 62-63.

[124] *Id.* at 66-67 (footnotes omitted).

[125] *See, e.g.*, Azhar Majeed, *UW-Madison Demonstrates What a 'Green Light' Definition of a Bias Incident Looks Like*, NEWSDESK, Oct. 6, 2016, https://www.thefire.org/uw-madison-demonstrates-

The prospect of a retaliation claim should alarm colleges and universities. The central question of such a claim—whether the conduct would deter a person of ordinary firmness from continuing to speak—is fact-based, meaning it's unlikely to be resolved before summary judgment, increasing universities' legal exposure.[126] Additionally, many of the scattered decisions on what meets the "ordinary firmness" test are based in the context of government employment, where the government's interest is given substantially more weight, than in the context of retaliation against a non-employee.[127]

This is not to say that universities must refrain from criticizing or condemning offensive conduct or speech. Criticism is not censorship, whether it is broadcast to the student body or public at large or instead sent directly to a student. University officials retain their own First Amendment right to contribute to discourse on campus and can do so without creating a substantial risk of a First Amendment retaliation claim.[128] The tools universities deploy in response to speech, how they are deployed, and how universities describe these systems to students matter.

Finally, because universities often keep opaque records documenting their interventions with reported speakers (discussed below), universities have a diminished ability to argue that such interventions provided meaningful education, as opposed to a chilling instruction to stop speaking.

## DESPITE ACKNOWLEDGING FIRST AMENDMENT TENSIONS, UNIVERSITIES PROVIDE LITTLE IF ANY TRAINING

The First Amendment issues faced by Bias Response Teams are complex, nuanced, and fraught with potential pitfalls that may lead public institutions into costly lawsuits. Leaving aside legal risks, Bias Response Teams also risk conflicting with essential principles of academic freedom, freedom of expression, and freedom of inquiry. Yet despite these risks, few Bias Response Teams receive meaningful training, if any, on the contours of these issues.

Of institutions surveyed, **84** (50.6%) acknowledge a tension with freedom of speech, freedom of inquiry, or academic freedom on their websites or in their policies. Of these, 50 are public institutions and 34 are private.

While Bias Response Team training requirements and materials were not part of FIRE's survey, FIRE has utilized state public records requests to explore the types of training required of members of Bias Response Teams. Although FIRE has issued or reviewed dozens of public records requests to universities seeking training materials distributed to Bias Response Teams, we've only seen materials from one school, **Louisiana State University**, that provided substantive training on First Amendment issues.[129]

---

what-a-green-light-definition-of-a-bias-incident-looks-like (definition of bias incidents consistent with standard for peer-on-peer hostile environment harassment standard in an educational setting, as set forth in Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651 (1999)).

[126] Thompson v. Ohio State Univ., 990 F. Supp. 2d 801, 809 (S.D. Ohio) (retaliation claim against professor proper where the professor allegedly filed charges against a student in retaliation for criticism of a colleague, as issue of whether an action is sufficient to deter a person of ordinary firmness) (citing Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 584 (6th Cir. 2012)).

[127] *See generally* Kinney v. Weaver, 367 F.3d 337, 358-60 (5th Cir. 2004) (noting that First Amendment analyses proceed on a "spectrum").

[128] *See, e.g.*, Samad v. Jenkens, 845 F.2d 660, 663 (6th Cir. 1988) (university's statement to outgoing dean that it would release

information to defend itself against any criticism by the dean was a reservation of "their own first amendment right to speak out," and the subjective chill resulting was insufficient to establish a justiciable controversy); *see also,* Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998) (concluding in the employment context that merely being "bad-mouthed and verbally threatened" by supervisors was insufficient, and that it "would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation"); *but see* De Leon v. Little, 1999 U.S. Dist. LEXIS 23091, at *13-14 (D. Conn. Sept. 29, 1999) (criticizing Nunez as inconsistent with Supreme Court precedent in that threats of dismissal can support First Amendment retaliation claims).

[129] FIRE is currently sponsoring a First Amendment lawsuit against Louisiana State University over its treatment of a former

## DISCUSSION

Other institutions, despite acknowledging that identifying First Amendment issues can be nuanced, do not appear to provide training. For example, the **University of California, San Diego (UCSD)** notes on its website that "[i]ssues pertaining to freedom of speech and expression can be very complicated and confusing."[130] The university's definition of "bias incidents" likewise observes that the "protection of freedom of expression, including controversial speech and sometimes even offensive or hurtful words, is vital to a community of teachers and learners" and that some "acts of bias may either not be severe enough to violate policy or be protected expressions of speech."[131] Yet despite freedom of expression being both "complicated" and "vital," the University of California's Office of the President, responding on UCSD's behalf to a public records request issued by FIRE, did not produce any training materials relating to the First Amendment at UCSD.

Another school, **Longwood University**, claimed as recently as August 2016 that because universities could not impose "campus judicial codes that include specific prohibitions related to bias and hate" under the First Amendment, it instead "train[s] board members to identify bias-related behavior and include appropriate education sanctions when a student is found responsible."[132] An August 2016 "Bias Response Team Training" memorandum, in discussing

"consequences" for bias incidents, asserted that there are "no laws for bias incidents" and that the team doesn't "get the firm backing through law or the institution in general about these topics."[133] A contemporaneous training slideshow indicated that Bias Response Team members would be trained on "legal issues" without elaboration.[134] None of the materials provided to FIRE indicate that any training on First Amendment issues was provided.

## A RESISTANCE TO TRANSPARENCY

With few exceptions, Bias Response Teams suffer from a lack of transparency, and universities are too often willing to stonewall public records requests concerning their teams. While protecting the privacy of both reporting and reported parties is important, this hesitance to engage in meaningful transparency is worrisome. The ways in which universities respond to offensive speech and discrimination are of particular public concern,[135] and doing so without being transparent, or being selectively transparent,[136] risks being seen as an effort to hide incidents from the community.

Approximately 28% of institutions with bias reporting systems do not even disclose who reviews the reports. If universities are unwilling to publicly identify who is responsible for

---

faculty member, Teresa Buchanan, but the case does not involve the school's Bias Response Team.

[130] *Freedom of Speech and Expression at UC San Diego*, UNIV. CAL., SAN DIEGO, https://students.ucsd.edu/student-life/diversity/expression (last visited Dec. 29, 2016).

[131] *Frequently Asked Questions*, UNIV. CAL., SAN DIEGO OFFICE FOR THE PREVENTION OF HARASSMENT & DISCRIMINATION, http://ophd.ucsd.edu/faq/index.html#What-are-bias-incidents? (last visited Dec. 29, 2016).

[132] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on Aug. 26, 2016 and *available at* http://web.archive.org/web/20160826220917/http://www.longwood.edu/diversity/45365.htm.

[133] *Bias Response Team Training (Handout)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288823-Longwood-University-Bias-Response-Team-Training.html.

[134] *Bias Response Team Training (Slideshow)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in

Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288824-Longwood-University-Bias-Response-Team-Training.html.

[135] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action (student group, "disheartened by the lack of communication and transparency" concerning a student's conduct, calls upon administrators to take acts "to ensure that hate bias on this campus is heavily policed, reported, and made transparent").

[136] *See, e.g.*, Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, THE ALGEMEINER, May 16, 2016, http://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices (students protest, in part, over mass email concerning political protest labeled as a bias incident, when other bias incidents weren't similarly announced).

reviewing and responding to reports, then students, faculty, and the public will be hindered in holding public servants accountable. Similarly, a refusal to identify Bias Response Team members does not instill confidence that schools take complaints seriously by devoting capable people to overseeing them.

And while many Bias Response Teams purport to exist for the purpose of keeping statistics, the statistics themselves are rarely published. The **University of California**, for example, developed its multi-campus reporting system in 2010 with the "[p]rimary purpose" of "statistical reporting,"[137] yet it appears to have *never* published statistics. The University of California Office of the President, in response to a public records request for all statistics,[138] only provided statistics last compiled in 2012 and apparently never published.[139] Some institutions publish statistics on periodic bases, with varying degrees of transparency. And while the Clery Act requires federally funded institutions to publish statistics concerning hate crimes,[140] most schools define "bias incident" more broadly than criminal acts. In any event, most institutions publish neither statistics nor reports.

FIRE has utilized public records requests under state law—similar to requests pursuant to the federal Freedom of Information Act—to ask dozens of schools to produce records relating to complaints; how they responded to those

complaints; and the composition, policies, and training of their Bias Response Teams. While most complied with both the letter and spirit of the law,[141] a number have resisted. Ominously, even where schools produce records, those records often fail to substantially document the actions the university took in response to the report, instead stating that the respondent was provided with "education." This does not inspire confidence that the response was meaningful education, as opposed to a reprimand.

Justice Louis Brandeis famously opined that sunlight was the best of disinfectants.[142] But a popular tactic of sunshine-shy administrators is the employment of hefty fees to locate and redact public records, notwithstanding open records laws encouraging universities to reduce or waive fees when releasing documents that would serve the public interest. The **University of Northern Colorado** attempted to charge FIRE hundreds of dollars for records eventually obtained by a media outlet, *Heat Street,* which revealed that UNC's Bias Response Team had discouraged professors from discussing subjects of debate raging in legislatures and the media.[143] That blast of sunlight caused UNC to shutter its Bias Response Team.[144]

Similarly, the **University of Oregon** concluded that releasing its records would not be in the public interest,[145] demanding that FIRE pay

---

[137] Meg Carter & Jerlena Griffin-Desta, *Campus Climate Project Requirements*, UNIV. OF CAL., June 16, 2010, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288857-University-of-California-Campus-Climate-Project.html.

[138] California Public Records Act Request from Adam Steinbaugh to the University of California Office of the President, Apr. 8, 2016, *available at* https://www.documentcloud.org/documents/3288861-2016-04-08-Public-Records-Request-to-the.html.

[139] *Update on Universitywide Campus Climate Incidents Reporting System*, UNIV. OF CAL. ETHICS, COMPLIANCE AND AUDIT SERVICES, Feb. 7, 2012, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288860-University-of-California-Feb-7-2012-Update-on.html.

[140] Institutional Security Policies and Crime Statistics, 34 C.F.R. § 668.46(c)(1)(iii).

[141] Evergreen State College merits an honorable mention, having produced over seven *thousand* pages of thorough records on a timely basis, in a response to a records request by FIRE. Contrast this with the University of California, which produced scant records after months of delay and obfuscation.

[142] Louis D. Brandeis, *Other People's Money*, HARPER'S WEEKLY, Dec. 20, 1913, at 92.

[143] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.

[144] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[145] *See* In Defense of Animals v. Oregon Health Sciences University, 112 P.3d 336, 354 (Or. Ct. App. 2004) (agencies may reduce or waive fees if it determines that the records relate to a matter which "affects the community or society as a whole, in contrast to a concern or interest of a private individual or entity").

## DISCUSSION

$1,483.30 to review its team's records.[146] The university's steadfast refusal to acknowledge the public interest was plainly belied by criticism by national media outlets,[147] which spurred a faculty inquiry into the team's activities. When the records were eventually produced, Oregon was unable to locate records of some incidents, including one pilloried in the media.[148]

Other institutions have been quick to delete or hide once-public websites documenting bias incidents following public criticism. **Colby College** placed its log of bias incidents behind a password-protected field after it was publicly criticized.[149] So, too, did **Skidmore College**.[150] More alarmingly, several institutions responded to FIRE's public records requests by initially claiming that there were no records to produce. When FIRE issued additional requests seeking records of what efforts the school made to search for records, the originally-requested records were suddenly located and produced. This suggests a certain lack of good faith from these institutions in following their legal obligations.

Other institutions found more creative ways to stonewall. The **University of California**'s Office of the President (UCOP), for example, intervened to respond on behalf of its subsidiary campuses after FIRE issued records requests to each campus about its processes. Months later, UCOP professed that it would be too difficult for the central office to locate records of how its campuses responded to reported incidents. UCOP also refused to produce records of any reported incident whatsoever, claiming that it would be too difficult to redact students'

names—a task somehow accomplished without complaint by dozens of other schools, many of which boast far fewer resources than the University of California system.

## NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

Given that reported incidents of perceived "bias" run the ideological gamut, subjecting campus speech to review by conflict-averse administrators runs the risk of chilling speech from any and every perspective. This illiberal approach invites administrative intervention whenever there are impolite words or disagreement of any sort. College campuses must remain open for vehement disagreement and impolite rhetoric lest they invite administrators to limit speech and debate.

This view is not FIRE's alone. Writing in the *New Republic*, Carleton College professors Jeffrey Aaron Snyder and Amna Khalid aptly observed the limitations of Bias Response Teams and their potential chilling effects on academic discourse and campus speech:

> We do not want our campuses overrun with eager "see something, say something" "student informants." Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College student asserted, encourage "students to ask the administration to solve problems

[146] Adam Steinbaugh, *University of Oregon on 'Bias Response Team': Nothing to See Here*, NEWSDESK, May 27, 2016, https://www.thefire.org/university-of-oregon-on-bias-response-team-nothing-to-see-here/.

[147] *See, e.g.*, Catherine Rampell, *College Students Run Crying to Daddy Administrator*, WASH. POST, May 19, 2016, https://www.washingtonpost.com/opinions/college-students-run-crying-to-daddy-administrator/2016/05/19/61b53f54-1deb-11e6-9c81-4be1c14fb8c8_story.html?utm_term=.f2f5652cd55c; *see also, e.g.*, Robby Soave, *The University of Oregon's Thought Police Investigate Students for Saying Anything*, REASON, May 10, 2016, http://reason.com/blog/2016/05/10/the-university-of-oregons-thought-police.

[148] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[149] Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/; Robby Soave, *Saying 'On the Other Hand' Got a Student Reported to the Campus Bias Police*, REASON, June 22, 2016, http://reason.com/blog/2016/06/22/saying-on-the-other-hand-got-a-student-r.

[150] Blake Neff, *Skidmore College: 'Make America Great Again' Is A 'Racialized Attack'*, THE DAILY CALLER, July 1, 2016, http://dailycaller.com/2016/07/01/skidmore-college-maka-america-great-again-is-a-racialized-attack/.

instead of solving them amongst themselves."

[...]

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints is profoundly misguided.

[...]

BRTs will result in a troubling silence: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints.[151]

At **John Carroll University**, a private, Catholic institution, Bias Response Team administrators acknowledged that critiques concerning freedom of speech "must be taken seriously."[152] Troubled both by the potential for "malicious-anonymous" abuse of the ability to anonymously report others and by the possibility that the system might have a chilling effect on speech, the university's annual report observed:[153]

If a person is able to report a peer, professor, supervisor, or other community member for "speech code violations," and particularly if those reports result in punitive action toward the offender, the system could shut down, rather than open up, critically important dialogue. On a university campus with an implicit commitment to the free exchange of ideas, such a result must be considered unacceptable.

Other institutions have recognized these risks. In August 2016, the **University of Iowa** scrapped a planned Bias Response Team, observing a "high failure rate in the [teams] at other institutions" as they became "almost punitive in nature," rendering them "scolding panels." Although the University of Iowa's planned team did not involve a punitive component, the type of response undertaken by other BRTs "accomplishes nothing," said one administrator.[154]

As academic freedom expert Donald Downs, professor of political science, law, and journalism at the University of Wisconsin—Madison, observed, Bias Response Teams attempt to strike a difficult balance:[155]

In some telling respects, some of these new policies [including Bias Response Teams] do not overtly call for censorship, as the old speech codes did. Rather, they are meant to "educate" the academic community about the negative impact that certain types of speech can have. Such educational schemes can be consistent with the goals of higher education if

---

[151] Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, THE NEW REPUBLIC, Mar. 30, 2016, https://newrepublic.com/article/132195/rise-bias-response-teams-campus.
[152] JOHN CARROLL UNIVERSITY, BIAS REPORTS 2014-2015, *available at* http://webmedia.jcu.edu/diversity/files/2015/12/2014-2015-Bias-Report-web-version.pdf.
[153] *Id.*

[154] Jeff Charis-Carlson, *University of Iowa Changing Course on Bias Response Team*, IOWA CITY PRESS-CITIZEN, Aug. 18, 2016, http://www.press-citizen.com/story/news/education/university-of-iowa/2016/08/18/university-iowa-changing-course-bias-response-team/88962048.
[155] Donald Downs, *The Good, the Less-Good, and the Path Forward: Thoughts on FIRE's Annual Report*, OPEN INQUIRY PROJECT, Jan. 4, 2017, http://openinquiryproject.org/blog/thoughts-on-fires-annual-report/.

## DISCUSSION

done right and in the right spirit. There is nothing intrinsically wrong with educating students and others about the potential impacts of speech, so long as such educational endeavors are not smokescreens for informal or formal ideological bullying. However, given the climates on many campuses today, such educational efforts too often amount to speech codes in disguise. The new policies may not be overt speech codes, but they can accomplish censorship by other means.

### STRIKING A BALANCE

It is understandable that universities wish to monitor the climate for students on their campuses and to have support systems in place for students who, for one reason or another, may be struggling to feel at home on campus. But it does not follow from these precepts that universities must effectively establish a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration.

While not every Bias Response Team impermissibly limits protected speech, the reality is that it is extremely difficult to have a system in place for the reporting of protected speech without creating a risk that speech and expression on campus will be chilled as a result. As lawyer, writer, and former FIRE President David French wrote, universities with Bias Response Teams are playing a "dangerous constitutional game" by not explicitly prohibiting protected speech but creating a "process-is-punishment" mechanism that deters people from speaking out.[156]

When setting parameters for their teams and implementing responses, universities must be cognizant of the risks created by broad definitions, anonymous reporting systems, unclear policies, and lack of training, and must take steps to minimize or eliminate these risks. While some Bias Response Teams have demonstrated familiarity with freedom of speech in their responses to reports of offensive speech, such actions are too often *not* the result of effective training and policies.

If bias reporting systems are to exist on campuses, they should describe reportable situations narrowly, excluding protected speech, or at the very least avoid characterizing the teams and their responses in ways that convey a punitive message. Universities should also recognize that even narrow definitions of bias are likely to result in reports of protected speech, and provide accurate and impartial training to Bias Response Team members so that they are able to identify protected speech.

Universities would do best to focus on how they can help the reporting student, not on the reported speaker. Unless a community member has engaged in conduct *unprotected* by the First Amendment or academic freedom, any institutional response to bias should avoid uninvited intervention with the speaker and instead focus on providing resources to the reporting student. In doing so, they will help encourage all community members to express themselves and participate in the marketplace of ideas that our nation's colleges and universities are uniquely suited to provide.

---

[156] David French, *Campus Ideologues Double Down on Censorship—Beware the 'Bias Response Team,'* NAT'L REVIEW, Feb. 3, 2016, http://www.nationalreview.com/corner/430750/campus-ideologues-bias-response-teams-first-amendment.

The following is the percentage of schools that promulgate the following categories of bias:

**Race and Culture**
Race: 100%
National Origin or Nationality: 94.5%
Ethnicity or Ethnic Origin: 73%
Color: 60.3%
Ancestry: 25.6%
Immigration Status or Citizenship: 14.1%
Language or Accent: 2%
Culture: 2%
Geographic Origin: 1%
Anti-Semitism: 0.50% (U. Vermont)
Place of Birth: 0.50% (Middlebury)

**Religion or Existential Beliefs**
Religion or Spiritual Beliefs: 100%
Creed: 22%
Spirituality: 0.50% (Middlebury)

**Sex, Gender, and Sexuality**
Sexual Orientation: 99.5%
Gender Identity or Expression: 81%
Gender: 61%
Sex: 41.2%

**Military Service**
Veteran Status: 60%
Military Status: 9%
National Guard Status: 0.50% (SUNY Potsdam)

**Family and Relationships**
Marital Status: 36.2%
Familial or Parental Status: 7%
Victim of Domestic Violence: 1%
Relationship Status: 0.50% (U. Nebraska—Omaha)
Civil Union Status: 0.50% (Rutgers)
Domestic Partnership: 0.50% (Rutgers)
Spousal Relationship to Current Employee: 0.50% (N. Dakota State U.)
Childbirth: 0.50% (Grinnell College)

**Ex-Offender Status:** 4%

**Ability, Disability, Health, or Physical Attributes Unrelated to Race or Gender**
Disability: 99%
Age: 81.4%
Genetic Information: 19%
Pregnancy: 15%
Mental Health: 7%
Physical Appearance: 7%
Medical Condition: 5%
Size: 2.5%
Height: 2%
Weight: 2%
Shape: 0.50% (U. Northern Colorado)
Atypical Heredity: 0.50% (Rutgers)
Cellular Blood Trait: 0.50% (Rutgers)
Positive HIV-Related Blood Test Results: 0.50% (Middlebury)
Intellectual Ability: 0.50% (Clemson)
Emotional Ability: 0.50% (Clemson)
Smoker Status: 0.50% (U. Kentucky)

**Views and Beliefs**
Political Affiliation: 14%
Membership Affiliation: 3.5%
Group Affiliation: 1.5%
Intellectual Perspective: 0.50% (U. Central Arkansas)
Participation in Lawful, Off-Campus Activity: 0.50% (North Dakota State U.)
Role: 0.50% (Macalester College)
Political Expression: 0.50% (Dartmouth)
Religious Expression: 0.50% (Dartmouth)
Social Affiliation: 1% (Syracuse, Longwood U.)
Social Standing: 0.50% (UNC Charlotte)
Belief System: 0.50% (UNC Charlotte)
Political Belief: 1% (U. Kentucky, U. Central Arkansas)

**Income, Housing, and Welfare**
Socioeconomic Status: 23.6%
Public Assistance Status: 1.5%
Homelessness: 1 %

<u>APPENDIX A</u>: CATEGORIES OF BIAS

**Miscellaneous Categories of Bias**[157]

Anti-Semitism: University of Vermont

Atypical Heredity: Rutgers University

Behavior: Macalester College

Belief System: University of North Carolina, Charlotte

Cellular Blood Trait: Rutgers University

Characteristics: Macalester College

Childbirth: Grinnell College

Cultural: University of Wisconsin, Madison

Emotional Ability: Clemson

Intellectual Ability: Clemson

Intellectual Perspective: University of Central Arkansas

Major of Study: Missouri University of Science and Technology

National Guard Status: SUNY Potsdam

Participation in Lawful, Off-Campus Activity: North Dakota State University

Place of Birth: Middlebury College

Political Belief: University of Central Arkansas, University of Kentucky

Political Expression: Dartmouth

Positive HIV-Related Blood Test Results: Middlebury College

Religious Expression: Dartmouth

Role: Macalester College

Shape: University of Northern Colorado

Smoker Status: University of Kentucky

Social Affiliation: Syracuse University, Longwood University

Social Standing: University of North Carolina, Charlotte

Spirituality: Middlebury College

Spousal Relationship to Current Employee: North Dakota State University

Victim of Domestic Violence: SUNY Potsdam, University of Denver

---

[157] These categories of bias are unique to only one or two institutions. Some are identified in subcategories above and repeated here.

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Alabama**
University of Alabama at Birmingham

**Alaska**
None observed

**Arizona**
Arizona State University
Northern Arizona University
University of Arizona

**Arkansas**
University of Central Arkansas

**California**
California Polytechnic State University,
  San Luis Obispo
California State Polytechnic Institute,
  Pomona
California State University, Chico
Humboldt State University
Loyola Marymount University
Occidental College
Pepperdine University
Pomona College
Sonoma State University
University of California, Berkeley
University of California, Los Angeles
University of California, Davis
University of California, Irvine
University of California, Merced
University of California, Riverside
University of California, San Diego
University of California, San Francisco
University of California, Santa Barbara
University of California, Santa Cruz
University of Southern California
University of the Pacific
Whittier College

**Colorado**
Colorado State University
University of Colorado at Boulder
University of Denver
University of Northern Colorado

**Connecticut**
Central Connecticut State University
Connecticut College
Trinity College
University of Connecticut
University of New Haven

**Delaware**
None observed

**Florida**
Florida International University
Florida State University
Pensacola State College
Stetson University
University of Central Florida
University of Florida
University of West Florida

**Georgia**
Armstrong State University
Emory University
Georgia Southern University
Kennesaw State University

**Hawaii**
None observed

**Idaho**
Boise State University

**Illinois**
DePaul University
Illinois State University
Loyola University Chicago
Northeastern Illinois University
Northern Illinois University
Northwestern University
Saint Xavier University
University of Chicago
University of Illinois at Urbana—
  Champaign

**Indiana**
Ball State University
DePauw University
Indiana University—Bloomington
Purdue University

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Iowa**
Coe College
Grinnell College
University of Northern Iowa

**Kansas**
Kansas State University

**Kentucky**
Georgetown College
Kentucky State University
University of Kentucky
University of Louisville

**Louisiana**
Louisiana State University—Baton Rouge
Tulane University

**Maine**
Bates College
Bowdoin College
Colby College
University of Southern Maine

**Maryland**
St. Mary's College of Maryland
Towson University

**Massachusetts**
Babson College
Boston College
Clark University
Emerson College
Framingham State University
Harvard University
Mount Holyoke College
Northeastern University
Smith College
Tufts University
University of Massachusetts Amherst
Williams College

**Michigan**
Grand Valley State University
Michigan State University
University of Michigan—Ann Arbor

**Minnesota**
Carleton College[j]
Hamline University
Macalester College
Minnesota State University, Mankato
University of Minnesota—Morris
University of Minnesota—Twin Cities

**Mississippi**
University of Mississippi

**Missouri**
Missouri State University
Missouri University of Science and
   Technology
Saint Louis University
Southeast Missouri State University
University of Central Missouri
University of Missouri—Columbia
Washington University in St. Louis

**Montana**
Montana State University
University of Montana

**Nebraska**
University of Nebraska—Lincoln
University of Nebraska—Omaha
University of Nebraska Medical Center

**Nevada**
None observed

**New Hampshire**
Dartmouth College
Plymouth State University
University of New Hampshire

**New Jersey**
Montclair State University
Rowan University
Rutgers University
The College of New Jersey

**New Mexico**
University of New Mexico

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**New York**
Alfred University
Bard College
Buffalo State College
Colgate University
Columbia University
Cornell University
Empire State College
Fordham University
Hamilton College
Le Moyne College
New York University
Skidmore College
SUNY Binghamton
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Fredonia
SUNY Geneseo
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Potsdam
Syracuse University
Union College
University of Rochester
Vassar College

**North Carolina**
Appalachian State University
Davidson College
Duke University
Elon University
Fayetteville State University
North Carolina State University—Raleigh
University of North Carolina, Asheville
University of North Carolina, Charlotte
Wake Forest University
Western Carolina State University

**North Dakota**
North Dakota State University
Valley City State University

**Ohio**
Bowling Green State University
Case Western Reserve University
John Carroll University
Kenyon College
Miami University of Ohio
The Ohio State University
University of Cincinnati
Wright State University

**Oklahoma**
University of Oklahoma

**Oregon**
Lewis & Clark College
Oregon Institute of Technology
Oregon State University
Portland State University
Reed College
Southern Oregon University
University of Oregon

**Pennsylvania**
Albright College
Allegheny College
Bryn Mawr College
Bucknell University
Dickinson College
Gettysburg College
Lafayette College
Lehigh University
Muhlenberg College
Pennsylvania State University—
    University Park
Swarthmore College
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania
Widener University

**Rhode Island**
Providence College
Rhode Island College
University of Rhode Island

**APPENDIX B:** INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**South Carolina**
Clemson University
Furman University
University of South Carolina
Winthrop University

**South Dakota**
None observed

**Tennessee**
Sewanee, The University of the South
University of Tennessee, Knoxville

**Texas**
Baylor University
Southern Methodist University
Texas A&M University—College Station
Texas Tech University
University of Texas at Austin

**Utah**
University of Utah

**Vermont**
Middlebury College
University of Vermont

**Virginia**
George Mason University
Longwood University
University of Mary Washington
University of Richmond
University of Virginia
Virginia Commonwealth University
Virginia Polytechnic Institute
  and State University

**Washington**
Central Washington University
Evergreen State College
Washington State University
Western Washington University
Whitman College

**Washington, D.C.**
Georgetown University

**West Virginia**
None observed

**Wisconsin**
Marquette University
St. Norbert College
University of Wisconsin—Eau Claire
University of Wisconsin—Green Bay
University of Wisconsin—La Crosse
University of Wisconsin—Madison
University of Wisconsin—Milwaukee
University of Wisconsin—Oshkosh
University of Wisconsin—Platteville
University of Wisconsin—River Falls
University of Wisconsin—Stevens Point
University of Wisconsin—Stout
University of Wisconsin—Whitewater

**Wyoming**
None observed

---

[i] **Correction:** Carleton College was included due to a misinterpretation of a proposed policy found on its website. FIRE has since been informed that the proposal was rejected and was not implemented, and we regret the error. This report has been updated to reflect minor changes in figures impacted by the removal of Carleton College, but no findings were significantly impacted.



510 WALNUT ST.
SUITE 1250
PHILADELPHIA, PA 19106

 

# EXHIBIT Z

# University of Iowa changing course on bias response team

Citing concerns about the possible impact on academic freedom, the University of Iowa's chief diversity officer said Thursday that her office no longer is planning to develop a bias assessment and response team on campus.

In January, UI Chief Diversity Officer Georgina Dodge [proposed such a team at UI](#) — which would be known by the acronym BART — to address complaints of racial or other bias on campus concerning incidents that "skirt the line between a policy violation or even a crime."

Dodge said UI officials remain committed to developing a centralized resource for students experiencing bias on campus, but that team no longer will be based on the BART model.

"After working thoughtfully and carefully on how to develop such a team here, we came to conclusion that how we initially had envisioned the BART might not be effective," she said.

Over the past eight months, she said, bias response

teams at other institutions have become more punitive in their focus and overreached their authority and good intentions.



"There has been a high failure rate in the BARTs at other institutions," she said. "By that I mean we are seeing the way in which they are not meeting the needs of any of the parties involved. ... Frankly, the (word) BART has become a bit tainted because of the actions that these people have taken."

## PAST COVERAGE:

Free speech advocates raise concerns about UI bias team
UI expects to create bias response team this semester

Dodge specifically pointed to concerns at the University of Northern Colorado, in which the bias response team recently received criticism nationally for overreaching its authority and improperly instructing professors to avoid

"One of the things that we've seen at many schools is that the BARTs have become almost punitive in nature," she said. "When we are dealing with incidents that do not rise to the level of a policy violation, how you are going penalize someone is a big question."

The initial plans for a BART at UI called for the team serving only as a means of identifying and assessing questionable incidents in a more timely fashion. There were no plans to include any disciplinary components.

Dodge said some of the BARTs across the nation have begun to sound more like "scolding panels."

"That's not what we want," she said. "That accomplishes nothing."

Initial plans were to have BART in place by the end of the spring semester. Those plans were pushed back until the end of the summer.

Dodge said she hopes to work with the UI Student Government and the UI Office of Student Life to have a new, as-of-yet unnamed team named in place by the end of the fall semester.

"(Our goal remains) to ensure that there is a well known and

safe place in which anyone who is subjected to biased treatment can go to find resources and to get help in coping," she said.

The final version is likely to resemble [UI's Office of the Sexual Misconduct Response Coordinator](#) in terms of providing a centralized structure for addressing student concerns, Dodge said. It also is likely to be housed in the Center for Diversity and Enrichment because "that's a venue that the students already use."

"Other than that, everything else is up in the air," she said.

Over the past two years, there have been repeated calls from students for UI to create a bias assessment team — especially after [a visiting UI art professor displayed a controversial KKK-effigy on the Pentacrest](#). Although the artist said the unauthorized sculpture was intended to raise awareness of ongoing racial violence in the U.S., many students viewed the sculpture as a threat.

The December 2014 incident — which violated no university policy other than the unauthorized use of the Pentacrest — sparked [a campuswide debate](#) over the conflicts between the university's commitment to academic freedom and its responsibility to create a safe and inclusive environment for all students.

Free speech advocates have said their there is "reason to be wary" about UI making plans for a bias response team, but described such policies as being "not impermissible" as long as they are not tied in any way to disciplinary action.

*Reach Jeff Charis-Carlson at jcharisc@press-citizen.com or 319-887-5435. Follow him on Twitter at @jeffcharis.*

# EXHIBIT AA














# 2020 CLIMATE SURVEY

**JUNE 2020**

KEY FINDINGS FROM THE
STUDENT SURVEY

## UNIVERSITY OF CENTRAL FLORIDA
### OPERATIONAL EXCELLENCE AND ASSESSMENT SUPPORT
OEAS SUPPORTS EFFORTS TO IMPROVE THE QUALITY OF STUDENT LEARNING OUTCOMES AND THE
EFFECTIVENESS AND EFFICIENCY OF UNIVERSITY OPERATIONS THROUGH ASSESSMENT AND ANALYTICS

# EXECUTIVE SUMMARY FOR STUDENT SURVEY

Most important findings from the 2020 Campus Climate Survey for students:

**Survey administration:** Campus Climate Surveys, LLC administered three Viewfinder® Campus Climate Survey instruments to faculty and administrators, staff members, and students in spring 2020. Of the 64,928 students invited to participate, 1,207 responded to the survey (response rate: 1.9%). Majority (76%) of the student respondents indicated that they were pursuing a bachelor's degree, while 13% indicated they were pursuing a master's degree and 10% a doctoral degree. Majority of the student respondents (79%) indicated that they were enrolled full-time (over 12 hours).  Almost two in three respondents were female (62%) and more than quarter of the respondents (30%) self-identified as students of color. One in three student respondents (33%) were not employed, 31% were employed 1-20 hours per week, and 36% were employed more than 20 hours per week.

**Analysis and Limitations:** Data analysis was conducted and reported separately for the different stakeholder groups. An empirical approach was designed by Operational Excellence and Assessment Support (OEAS) where multiple criteria were applied. Criteria used to identify key findings included the following: a) Chi-square group difference statistical tests for the following groups – gender, number of hours of employed, student level & classification, and student of color and b) thresholds for percent positive, negative, "I don't know," and "not applicable" responses on survey items.

Please note that caution must be exercised when drawing inferences as the response rate for the student survey is not adequate. It is not representative to generalize to the overall UCF student population. Additionally, it is important to note that the conclusions in this report are based solely on univariate and bivariate analyses.

**Overall learning experience:** An overwhelming majority of student respondents indicated that they were satisfied with the quality of the education (80%) and with the faculty (78%[1; c]). More than five in six (85%[1; c]) student respondents "agreed" or "strongly agreed" that the faculty create a safe and welcoming environment for everyone in the classroom and classroom

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

experiences at UCF promote students from all backgrounds to interact together (84%[1:b]). Students noted they received support for advancement and success in their classes (70%), yet nearly two in three (65%) students indicated that "the process by which my voice can be heard is effective." Lower percentages of respondents endorsed positively that the courses they took fostered an appreciation for diversity (56%) or that their current degree program included sufficient content on diversity related issues (58%[1: a,c]). However, it should be noted that most student respondents would recommend UCF to high school students (82%) as well as someone considering transferring from another college (81%).

**Campus diversity:** More than four in five student respondents (81%[1:a,d]) endorsed that campus diversity and inclusion is "very important" or "somewhat important" to the campus leadership. About two in three (>66%) student respondents indicated that UCF is "very welcoming" or "welcoming" to the following groups – Caucasian/Whites (positive: 81%; negative: 2%[1:a,b,c]), Women (positive: 79%; negative: 3%[1: a,b,c]), First-generation students (positive: 69%; negative: 3%[1: a,b,c,d]), and LGBTQIA+ people (positive: 67%; negative: 2%[1:b,c]). About two out of three student respondents (67%[1: a,b,c,d]) indicated UCF promotes racial/cultural interaction between different groups "very well" or "somewhat," while about one in nine (11%[1: a,b,c,d]) indicated "not very well" or "not at all."

**Personal experiences of discrimination, bias, or harassment:** Majority of student respondents (56%) know where to report incidents of discrimination, bias, or harassment at UCF. Almost four in five (78%) respondents agreed or strongly agreed they know how to support someone who shared with them their experience of sexual or relationship violence. More than one in two (54%[1: a,b]) respondents endorsed that they have not witnessed or experienced any of the following: illegal activity, bullying, discrimination, bias, harassment, relationship or sexual violence, stalking, or retaliation. However, respondents also reported to have witnessed or experienced illegal activity (19%[1: a,b,d]), discrimination/bias/harassment based on political views/affiliations (16%[1: a]), bullying (14%), discrimination/bias/harassment based on religion (13%[1: c]), discrimination/bias/harassment based on lack of English language proficiency (13%[1: b]), discrimination/bias/harassment based on race/ethnicity (13%[1: d]), discrimination/bias/harassment based on gender (11%), or sexual harassment (10%).

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

**Safety on campus and in the surrounding community:** An overwhelming majority of student respondents endorsed positively ("agree" or "strongly agree") that they feel safe on campus (positive: 85%; negative: 6%[1: b,d]) while the student respondents endorsed lower positive rates for the survey item: "my family feels I am safe on campus" (positive: 76%; negative: 5%[1: a,b,c,d]). Similarly, two in three student respondents endorsed positively ("agree" or "strongly agree") that they feel safe off campus (positive: 68%; negative: 15%[1: a,b,c.]) while the student respondents endorsed lower positive rates for the survey item: "my family feels I am safe off campus" (positive: 61%; negative: 15%[1: a,b,c,d]).

At least three in four student respondents indicated the following safety measures must exist to feel safe: a) parking lot lighting (83%[1: a,c,d]); b) street lighting (82%[1: a,c,d]); c) walkway lighting (81%[1: a,d]); d) ability to anonymously report concerns about a student or employee (someone who may be suicidal, mentally unstable, engaged in an illegal activity, etc.) (81%[1: a]); and e) emergency call boxes (77%[1: a]).

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].



UNIVERSITY OF CENTRAL FLORIDA

# INTRODUCTION

The Interim Chief Equity, Inclusion and Diversity Officer contracted with Viewfinder® Campus Climate Surveys, LLC to conduct three (faculty and administrators, staff members, and students) Campus Climate Surveys in spring 2020 to inform strategic planning. Operational Excellence and Assessment Support (OEAS) was contacted by Dr. S. Kent Butler, Interim Chief Equity, Inclusion and Diversity Officer, in May 2020 to assist with the analysis and summary of the findings gleaned from the Campus Climate Surveys.

# METHODOLOGY

**Survey Instruments, Administration, and Data Sources**

Campus Climate Surveys, LLC administered three Viewfinder® Campus Climate Survey instruments to faculty and administrators, staff members, and students in spring 2020. A total of 64,928 students were invited to participate in the Campus Climate Survey study through eight email invitations during the period February 24, 2020 to March 16, 2020. Campus Climate Surveys, LLC provided three SPSS data files and frequency reports as well as the final survey instruments.

**Demographics and Respondent Characteristics**

Of the 64,928 students invited to participate, 1,207 responded to the survey (response rate: 1.9%). The characteristics and demographics of the students who responded to the survey items are summarized below:

- **Student level:** 906 (76%) student respondents indicated they were pursuing a bachelor's degree, 156 (13%) were pursuing a master's degree, and 116 (10%) a doctoral degree. There were 15 student respondents who indicated they were pursuing an associate degree (1%).

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

- **Student classification:** 147 (16%) student respondents were in their first year in college, 166 (18%) in their second year, 307 (33%) in their third year, 230 (25%) in their fourth year, and 84 (9%) in their fifth year or beyond.

- **Student type:** 950 (79%) student respondents self-identified as being enrolled full-time (over 12 hours), 268 (22%) self-identified as part-time, 278 (23%) responded as first-generation students (neither parent has a four-year degree), 279 (23%) as transfer students, 248 (21%) as commuter students, and 191 (16%) indicated they are Pell grant recipients.

- **Gender:** Of the respondents who answered this survey item, 603 (62%) indicated female, 325 (33%) indicated male, 18 (2%) identified as non-binary/nonconforming, 9 (<1%) identified as transgender man, 5 (<1%) identified as transgender woman, and 24 (2%) preferred not to answer.

- **Number of Hours Employed**: 320 (33%) student respondents said they were not employed during the academic year. However, most students worked while in school as follows: 85 (9%) worked 1-10 hours per week, 214 (22%) 11-20 worked hours per week, 138 (14%) worked 21-30 hours per week, 125 (13%) worked 31-40 hours per week, and 88 (9%) worked 41 hours or more per week.

- **Military Veterans and Disability:** 38 (3%) respondents identified as military veterans while 106 (9%) self-identified as having a disability.

- **LGBTQIA+:** 205 (18%) respondents self-identified within the LGBTQIA+ community.

- **Student of Color:** 336 (30%) respondents self-identified as a student of color.

- **International student:** 69 (6%) of the respondents were an international student.


**Analysis Strategy and Limitations**

Data analysis was conducted and reported separately for the different stakeholder groups. An empirical approach was designed by Operational Excellence and Assessment Support (OEAS) where multiple criteria were applied. Criteria used to identify key findings included the following: a) Chi-square group difference statistical tests for the following groups – gender, number of hours employed, student level & classification, and student of color and b) thresholds for percent positive, negative, do not know and not applicable responses on survey items. Findings were flagged that reached a certain critical threshold for negative responses (depending on the survey item, above 20%) and the aggregate of "I don't know" and "not applicable" response categories (depending on the survey item, above 20%). Positive responses at or above 66% were also flagged for examination using this threshold analysis approach.

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

For identifying statistical differences, Chi-square tests of independence were performed, at 95% confidence level, for the four groups – gender, number of hours employed, student level & classification, and student of color – where enough counts and responses by all levels were available. Group membership used for Chi-square tests were self-reported by student respondents as follows:

- Gender [female (n = 603), male (n = 325), and undisclosed (n = 261)]

- Number of Hours Employed [not employed (n = 320), 1-20 hours per week (n = 299), more than 20 hours per week (n = 351)]

- Student Level and Classification [pursuing a bachelor's degree in their first or second year (n = 292), pursuing a bachelor's degree in their third year or beyond (n = 610), and pursuing a master's or doctoral degree (n = 272)]

- Student of Color [yes (n = 336) and no (n = 776)]

Statistical differences between groups are noted throughout the document using a superscript "1" with the group(s) that were significant: a) by gender; b) by number of hours employed; c) by student level and classification; and d) by student of color.

**Limitations**

Please note that caution must be exercised when drawing inferences as the response rate for the student survey is not adequate. It is not representative to generalize to the overall UCF student population. Additionally, it is important to note that the conclusions in this report are based solely on univariate and bivariate analyses.

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

## OVERALL LEARNING EXPERIENCE AT UCF

An overwhelming majority of student respondents indicated that they were satisfied with the quality of the education (80%) and with the faculty (78%[1: c]) at UCF. Similar positive sentiments ("agree" or "strongly agree") were found for other items in this survey section: a) "I would recommend my campus to high school students" (positive: 82%; negative: 8%[1: c]); b) "I would recommend my campus to someone considering transferring from another college" (positive: 81%; negative: 9%[1: c]); and c) "Support for my advancement and success is evident in my classes" (positive: 70%; negative: 14%).  More than five in six (85%[1: c]) student respondents "agreed" or "strongly agreed" that the faculty create a safe and welcoming environment for everyone in the classroom and classroom experiences at UCF promote students from all backgrounds to interact together (84%[1:b]). Also, three in four (76%[1: c,d]) student respondents endorsed positively to the survey item: "I feel safe among other students expressing my views and opinions in the classroom."

Almost three in four student respondents disagreed or strongly disagreed (note: disagreement is a positive response) that: "This is a hostile study/living environment" (74%[1: b,c]) and  "I want to leave this campus" (73%[1: b,c]). However, only 44%[1:a,c] agreed or strongly agreed that "there is a great sense of belonging," while 23% "disagreed" or "strongly disagreed" and 29% "did not know".



In contrast, a notable portion of student respondents had a negative opinion ("disagreed" or "strongly disagreed") about the following items related to their overall learning experience: a) "Courses I have taken actively foster an appreciation for diversity" (positive: 56%; negative: 16%[1: a]); b) "My current degree program includes sufficient content on diversity related issues" (positive: 58%; negative: 19%[1: a,c]); c) "The process by which my voice can be heard is effective" (positive: 43%; negative: 19%[1: a,b]); d) "Our school puts too much emphasis on diversity." (positive: 22%; negative: 57%[1: a,c,d]); e) "Leaders are held to appropriate measures of accountability and responsibility for campus climate" (positive: 41%; negative: 14%[1: a,c]); f) "Public announcements regarding internal communications and practices are honest and

truthful" (positive: 60%; negative: 9%[1; a,c]); and g) "Multiculturalism is a core value of our institution's mission" (positive: 65%; negative: 8%[1; a]).

Correspondingly, almost one in four student respondents endorsed "I don't know" for the following survey items: a) "Courses I have taken actively foster an appreciation for diversity" (21%[1; a]); b) "Public announcements regarding internal communications and practices are honest and truthful" (29%[1; a,c]); c) "The process by which my voice can be heard is effective" (34%[1; a,b]); d) "Leaders are held to appropriate measures of accountability and responsibility for campus climate" (40%[1; a, c]); e) "Faculty accept my points of view even if they disagree with them" (27%[1; b,c,d]); f) "Multiculturalism is a core value of our institution's mission" (23%[1; a]); g) "Our school engages with external communities to understand their interests and responds to their needs" (36%[1; a,c,d]).



More than one in three student respondents "disagreed" or "strongly disagreed" (note disagreement is a positive response) with the statements: a) "My academic workload is too heavy" (32%[1; a]) and b) "There are too many expectations of me" (41%[1; a]). Further, more than one in two (51%) student respondents disagreed or strongly disagreed that their school/life balance is perfect and one in three (33%[1; a]) endorsed that there were too many expectations of them (agree/strongly agree). About 12%[1; b,c] of the student respondents reported that they would like to leave the campus, whereas 10%[1; b,c] endorsed "I don't know" to that item. Almost half the student respondents endorsed "I don't know" or "not applicable" to survey items designed to gauge their interest in: a)  "A certificate program that focuses on diversity related issues (51%[1; a,b,d]) and b) "A minor that focuses on diversity related issues?" (55%[1; a,d]).

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

## WHY UCF?

Geographic location (74%[;·b,c]) and distance from home (76%[;·1;b,c]) were endorsed by three in four student respondents as "very important" or "somewhat important" reasons for choosing to attend UCF. About nine in ten student respondents rated the following items as important for choosing UCF: a) "Offers program or degree in my field of interest" (92%[1; a]); b) "Academic reputation" (88%[1; a,c]); and c) "Cost of attendance" (86%[1; a,c]). Almost two in three student respondents identified internship opportunities (66%[1; a,b,c]) and post-graduation job placement rates (62%[1; a,b,c]) as the reasons for attending UCF.

Almost half the student respondents identified student diversity (53%[1;a,c,d]), campus



commitment to diversity (54%[1; a,c,d]), and faculty diversity (44%[1; a,b,c,d]) as being "very important" or "somewhat important" reasons for attending UCF, along with receiving a scholarship (47%[1; b,c,d]) and research opportunities (45%[1; b,c]). Also, about one in three student respondents identified community service opportunities (33%[1; a,b,c,d]), clubs/organizations of interest (34%[1; b,c]), and work-study opportunities (38%[1;b,c,d]) as important reasons for choosing UCF.

## STUDENT OUTREACH AT UCF

About two in three student respondents endorsed positively ("very satisfied" or "satisfied") to the following survey items: a) "faculty office hours" ,(73%[1;d]); b) "easy communication with faculty" (76%[1;a]); c) "accessible academic advisors" (64%[1;a,b,c,d]); d) "knowledgeable academic advisors" (62%[1;a,b,c,d]); e) "free tutoring support" (63%[1;c]); and f) "community service opportunities" (61%[1;c]). About one in five student respondents endorsed negatively ("somewhat dissatisfied" or "very dissatisfied") to the following survey items: a) "accessible academic advisors" (20%[1;a,b,c,d]); b) "knowledgeable academic advisors" (21%[1;a,b,c,d]); c) "need-based scholarships" (18%[1;a,c,d]); d) "merit-based scholarships" (18%[1;b,c]); and e) "knowledgeable career advisors/staff" (15%[1;a,c,d]).

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

# CAMPUS DIVERSITY

The campus diversity section focused on the following aspects: a) how welcoming UCF is to different groups; b) level of interactions among racial/ethnic groups; c) how well UCF promotes racial/cultural interactions between different groups; d) campus diversity training; and e) the importance of diversity and inclusion to campus leadership.

**How welcoming UCF is to different groups of people:** The question on the survey was: "Q29: How welcoming is our campus to different groups?" The response categories were: "very welcoming," "somewhat welcoming," "I don't know," "not very welcoming," "not at all welcoming," and " I don't know" (inadvertently listed twice on the survey instrument). The responses "very welcoming" and "somewhat welcoming" were considered positive sentiments and "not very welcoming" and "not at all welcoming" were considered negative.

About two in three (>66%) student respondents endorsed positive responses for the following groups – Caucasian/Whites (positive: 81%; negative: 2%[1;a,b,c]), Women (positive: 79%; negative: 3%[1: a,b,c]), and First-generation students (positive: 69%; negative: 3%[1: a,b,c,d]), and LGBTQIA+ people (positive: 67%; negative: 2%[1;b,c]). However, there were several stakeholder groups that respondents felt were not welcomed at the same high rates. These groups were – Hispanic/Latinos (positive: 65%; negative: 2%[1: c,d]), Military and Veterans (positive: 63%; negative: 2%), African Americans (positive: 62%; negative: 2%[1: a,c,d]), People with Disabilities (positive: 62%; negative: 5%[1: b,c,d]), International students and employees (positive: 62%; negative: 3%[1: a,b,c,d]), Asian Americans (positive: 60%; negative: 2%[1: a,d]), People from the Middle East (positive: 55%; negative: 4%[1: a,b,c,d]), Muslims (positive: 53%; negative: 4%[1: a,b,c,d]), and Undocumented students (positive: 32%; negative: 4%[1: c]).



It should be noted that, on average, more than one in three (37%) respondents gave an answer of "I don't know" to how welcoming UCF is to other groups of people. However, statistical differences were found across groups by gender, number of hours of employed, student level & classification, and student of color at UCF. This suggests that

different groups of student respondents have differing impressions about how welcoming UCF is to others.

**Level of interactions among racial/ethnic groups:** The question on the survey was: "Q30: How would you categorize the level of interactions among racial/ethnic groups?" The response categories were: "very integrated," "somewhat integrated," "neutral," "not very integrated," "not at all integrated," and "I don't know". A majority of student respondents endorsed their interactions, irrespective of the type, were positive ("very integrated" and "somewhat integrated):



on campus (73%[1: b,c,d]); in residence halls (42% [1: a,b,c]); in campus dining areas (46%[1: a,c]); during student activities on campus (61%[1: b,c,d]); and during sporting events on campus (56%[1: a,c,d]). On average, about four in ten student respondents endorsed "I don't know" or "not applicable" to survey items related to interaction among racial/ethnic groups for different campus experiences. Items with significantly large "not applicable" responses were as follows: "in residence halls" (46%); "in campus dining areas" (41%); "during sporting events on campus" (32%); and "during student activities on campus" (25%). Only a small proportion of students endorsed negatively to these survey items.

**How well UCF promotes racial/cultural interaction between different groups:**  The question on the survey was: "Q31: How well does our institution promote racial/cultural interaction between different groups?" The response categories were: "very well," "somewhat," "not very well," "not at all," and "I don't know."  About two out of three student respondents (67%[1: a,b,c,d]) indicated UCF promotes racial/cultural interaction between different groups "very well" or "somewhat," while about one in nine (11%[1: a,b,c,d]) indicated "not very well" or "not at all." More than one in five (22%[1: a,b,c,d]) reported "I don't know" on this item.

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

**Campus diversity training:** The question on the survey was: "Q28: The following groups should be required to participate in mandatory diversity training." The response categories were: "strongly agree," "agree," "I don't know," "disagree," "strongly disagree," and "not applicable." About four in five student respondents indicated that the following stakeholders should be required to participate in mandatory diversity training: campus police (85%[1: a,d]), administrative leadership (82%[1: a,b,d]), faculty (81%[1: a,d]); residence assistants (81%[1: a,b,d]), and board of trustees (80%[1: a,b,d]).

**Importance of diversity and inclusion to campus leadership:** For the survey item: "Q32: How important, in your opinion, is diversity and inclusion to the campus leadership?" More than four in five student respondents (81%[1:a,d]) endorsed that it is "very important" or "somewhat important," while a little less than one in eight students (12%[1:a,d]) endorsed negatively "not that important" or "not at all important" to the survey item.



## PERSONAL EXPERIENCES OF DISCRIMINATION/BIAS/HARASSMENT

The personal experiences of discrimination, bias, or harassment section consisted of questions focused on the following aspects: a) if the respondent has witnessed or experienced discrimination, bias, or harassment; b) who caused the offense; c) if the offense was reported; d) the result of the incidence if it was reported; e) sexual and relationship violence; f) perceived support if they or someone they know experience sexual or relationship violence; and g) the university's preventative measures.



**Experienced discrimination, bias, or harassment:** The question on the survey was: "Q38: Have you experienced/witnessed any of the following while at our institution? Check all that apply." More than half (54%[1: a,b]) of the respondents endorsed that they have not witnessed or experienced any of the following: illegal activity, bullying, discrimination, bias, harassment, relationship or sexual violence, stalking, or retaliation.

However, respondents also reported to have witnessed or experienced illegal activity (19%[1: a,b,d]), discrimination/bias/harassment based on political views/affiliations (16%[1: a]), bullying (14%), discrimination/bias/harassment based on religion (13%[1: c]), discrimination/bias/harassment based on lack of English language proficiency (13%[1: b]), discrimination/bias/harassment based on race/ethnicity (13%[1: d]), discrimination/bias/harassment based on gender (11%), and sexual harassment (10%).

The top groups reported by student respondents to have caused the offense of discrimination, bias, or harassment were as follows: other students (80%[1,b,c]), faculty members (27%[1: b,c]), or persons unaffiliated with UCF (22%). Although a majority of respondents (56%) knew where to report the incident at UCF, less than one in seven (15%) reported the incident(s). When the incident was reported, it was typically reported to a faculty member (40%), campus police (35%), or a friend (24%). In other instances, the incident was reported to the counseling center (13%), the Office of Student Rights and Responsibilities (including Student Care Services and Office of Student Conduct) (13%), or a family member (11%). It is important to note that

these endorsements were not unique as the same incident could have been reported to multiple entities.

Of the 59 student respondents who submitted written discrimination/ bias/harassment complaints over the past two years, 33% reported that their complaint was taken seriously while another 33% reported that their complaint was addressed but not resolved to their satisfaction. Nearly one third of the respondents (30%) indicated that nothing was done after their complaint was reported while 6% indicated the complaint was resolved to their satisfaction. About one in eight (12%) indicated that criminal action was taken based on their reporting.

Reasons shared by respondents for not reporting the incident(s) included: a) I decided it wasn't important enough (54%[1: a,b,c]); b) not sure if anything would happen (46%); c) there was not enough evidence (36%); d) the respondent did not think the school would support them (22%[1: b,c]); e) there was no witness (19%); f) the respondent feared retaliation (17%[1:c]); and g) the respondent felt embarrassed (10%).

**Sexual or Relationship Violence:** The question on the survey was: "Q35: To what extent do you agree or disagree with the following statements regarding perceived University responsiveness?" The response categories were: "strongly agree," "agree," "I don't know," "disagree," "strongly disagree."



Almost four in five (75%[1: c]) student respondents endorsed positive responses ("agree" or "strongly agree") to the statement "UCF would take a report of sexual or relationship violence seriously," while about 7%[1: c] endorsed negative responses ("disagree" or "strongly disagree"). About seven in ten students endorsed positively ("strongly agree" or "agree") that UCF would maintain their privacy (70%[1: a,b,c]) or would take steps to protect their safety (71%[1: a,c]) if they were to file a report regarding sexual or relationship violence.

Similarly, 68%[1: c] and 57% responded positively to the statements, "I know how to contact confidential resources on campus" and "I know how to request an investigation regarding sexual or relationship violence," respectively, while 14%[1: c] and 19% endorsed negatively. One in two respondents (50%) responded "I don't know" when asked if, "students

who file reports of sexual or relationship violence are treated fairly during an investigation."

**Perceived student support if they or someone they know experienced sexual or relationship violence:** The question on the survey was: "Q36: To what extent do you agree or disagree with the following statements regarding student support?" The response categories were: "strongly agree," "agree," "I don't know," "disagree," "strongly disagree." More than three in four (78%)



student respondents endorsed positively ("agree" or "strongly agree") to the statement – "I would know how to support someone who shared with me that they experienced sexual or relationship violence" while about 8% endorsed negatively ("disagree" or "strongly disagree"). More than half (53%) of the respondents also positively endorsed ("agree" or "strongly agree") the following statement – "My peers would know how to support someone who shared with me [*sic. them*] that they experienced sexual or relationship violence." Similarly, two in three (66%[1: a,d]) student respondents disagreed or strongly disagreed that their peers would label them as a troublemaker if they were to file a report regarding sexual or relationship violence.

Majority of student respondents endorsed positive responses ("agree" or "strongly agree") to the following survey items: a) "I have received information from UCF (e.g. orientation session, email, poster, written notice) regarding the University's prohibition of sexual and relationship violence" (81%[1: a,c]) and b) "I am aware of the resources available to me if I were impacted by sexual or relationship violence" (72%[1: c]). Though, 47%[1: c] endorsed positively ("agree" or "strongly agree") that the University regularly hosts workshops on sexual or relationship violence, 46%[1: c] endorsed "I don't know." While about one in four (23%[1: b,c]) have attended a workshop on sexual or relationship violence on campus, nearly two in three (65%[1: b,c]) student respondents have not.

## SAFETY ON CAMPUS AND IN THE SURROUNDING COMMUNITY

**Feeling Safe:** The question on the survey was: "Q45: To what extent do you agree or disagree with the following statements about safety on/off campus? The response categories were:

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

"strongly agree," "agree," "I don't know," "disagree," "strongly disagree," and "not applicable." An overwhelming majority of student respondents endorsed positively ("agree" or "strongly agree") that they feel safe on campus (positive: 85%; negative: 6%[1: b,d]) while the student respondents endorsed lower positive rates for the survey item: "my family feels I am safe on campus" (positive: 76%; negative: 5%[1: a,b,c,d]). Similarly, two in three student respondents endorsed positively ("agree" or "strongly agree") that they feel safe off campus (positive: 68%; negative: 15%[1: a,b,c,]) while the student respondents endorsed lower positive rates for the survey item: "my family feels I am safe off campus" (positive: 61%; negative: 15%[1: a,b,c,d]). Notably, more than one in three respondents indicated "I don't know" to the items "students are supportive of other students who have experienced incidences of physical confrontation" (34%[1: c]) and "students are supportive of other students who have experienced incidences of emotional confrontation (discrimination, sexual harassment, bullying)" (28%[1: b,c]).

**Campus police:** The question on the survey was: "Q28: The following groups should be required to participate in mandatory diversity training." A vast majority (85%[1: a,d]) of the student respondents affirmed that the "campus police should be required to participate in mandatory diversity training". Similar sentiments were captured in "Q46: To what extent do you agree or disagree with the following statements regarding campus police?" The response categories were: "strongly agree," "agree," "I don't know," "disagree," "strongly disagree," and "not applicable." Student respondents agreed or strongly agreed that the "campus police should be required to participate in ongoing diversity training" (81%[1: a,d]).



Additionally, about half the student respondents agreed or strongly agreed that "campus police are qualified/trained to deal with all aspects of diversity" (49%[1; a]) and "campus police should be reflective of the diversity of our students" (76%[1; a,d]). More than one in three (37%[1; a]) endorsed "I don't know" to the following survey item: "Campus police are qualified/trained to deal with all aspects of diversity." Almost one in ten student respondents endorsed that the campus police were not qualified/trained to deal with all aspects of diversity (9%[1; a]).



**Improving safety on campus:** The question on the survey was: "Q47:  Which of the following safety measures must exist on campus in order for you to feel safe? Check all that apply." More than two in three (>67%) student respondents endorsed the following safety measures must exist to feel safe: a) parking lot lighting (83%[1; a,c,d]); b) street lighting (82%[1; a,c,d]); c) walkway lighting (81%[1; a,d]); d) ability to anonymously report concerns about a student or employee (someone who may be suicidal, mentally unstable, engaged in an illegal activity, etc.) (81%[1; a]); e) emergency call boxes (77%[1; a]); f) maintenance of improperly working safety items (lightbulbs that are out, call boxes not working, etc.) (71%[1; d]); g) interior lighting in campus buildings after dark (71%[1; a,d]); h) surveillance cameras (69%[1;a]); and i) quick response by administration to campus emergencies (68%[1; a,d]).

---

Chi-square test of independence to detect statistical differences with 95% confidence by gender [a], number of hours employed [b], student level and classification [c], student of color [d].

## RELIGION/NON-RELIGION/SPIRITUAL AFFILIATION

The question on the survey was "Q17:  To what extent do you agree or disagree with the following statement related to Religion." The response categories were: "strongly agree," "agree," "I don't know," "disagree," "strongly disagree," and "not applicable." While 62%[1;b,c] and 63%[1; c] of student respondents endorsed positive responses ("strongly agree" or "agree") to the items "I can openly express my religious/spiritual beliefs on campus" and "in the surrounding community," respectively, about 10%[1;b,c] and 7%[1; c] of the respondents endorsed negative responses ("disagree" or "strongly disagree"), respectively.  About one in five respondents reported "I don't know" when asked if their religious/spiritual beliefs are treated with respect by specific groups such as administrators (23%[1; b,c]); staff (22%[1; c]); faculty (21%[1; c]), and other students (19%[1; b,c]).

## POLITICAL AND WORLDVIEWS

The question on the survey was: "Q18: To what extent do you agree or disagree with the following statement related to Political and World Views." While 59%[1; a,b,c,d] of the student respondents endorsed positive responses ("agree" or "strongly agree") to the statement, "I can openly express my political views/worldviews on campus," about 17% of the respondents endorsed negative responses ("disagree" or "strongly disagree"). Similar patterns could be found for the item, "I can openly express my political views/worldviews in the surrounding community" (positive: 57%; negative: 19%[1; a,c]).



A little more than half (>50%) of student respondents also positively endorsed ("agree" or "strongly agree") that their political views/worldviews are treated with respect by various stakeholders: a) faculty (57%[1; a,c,d]); b) students (56%[1; a,c,d]); c) staff (54%[1; a,c]), and d) administrators (52%[1; a,c]). Other items in this survey section had high endorsements of "I don't know." These items were that "my political views/worldviews are treated with respect by": a) administrators (29%[1; a,c]); b) staff (28%[1; a,c]); c) faculty (24%[1; a,c,d]); and d) students (20%[1; a,c,d]).



**JUNE 2020 | KEY FINDINGS FROM THE STUDENT SURVEY**

# CLIMATE SURVEY

**UNIVERSITY OF CENTRAL FLORIDA**
OPERATIONAL EXCELLENCE AND ASSESSMENT SUPPORT
12424 RESEARCH PARKWAY, SUITE 225, ORLANDO, FL 32826

# EXHIBIT BB

Search UCF

**Just Knights Response Team** | Student Development and Enrollment Services

HOME    WHO WE ARE    WHAT WE COVER    REPORT INJUSTICE    **RESOURCES**    CONTACT

# Bias-Related Incident Report

## What can you do if you experience acts of bias or hate?

Report the incident to the Just Knight Response Team (JKRT). This team was created to help individuals who have  been impacted by hate or bias-related incidents. Please take
the time to complete this form to the best of your ability. The team makes a strong attempt to follow up on all reports within  48 hours.

This website has a variety of links and resources available for your use. Whatever your reasons are for visiting this site, we  hope that you leave with the sense that the University of  Central Florida is committed to creating an open and welcoming environment for all people, all races and cultures.

JKRT Intake Form



**UPCOMING EVENTS**

**FEB 22** — FreshU Kitchen Virt

**FEB 22** — Yoga on the Terrace
RECREATION AND WELLNESS CENTER: PATIO

MORE EVENTS

**PAGE NAVIGATION**

HOME

WHO WE ARE

WHAT WE COVER

REPORT INJUSTICE

RESOURCES

CONTACT

**CONTACT US**

Just Knights Response Team

407-823-1535

JKRT@UCF.EDU

## UNIVERSITY OF CENTRAL FLORIDA

A-Z Index | About UCF | Contact UCF | Internet Privacy Policy | Online Degrees | Pegasus | Policies | Regulations | UCF News

4000 Central Florida Blvd. Orlando, Florida 32816 | 407.823.2000 | Accessibility Statement

© University of Central Florida

# EXHIBIT CC

# The Rise of "Bias Response Teams" on Campus

## Colleges across America are creating shadowy groups to handle complaints. Will they end up muzzling students instead?

[Amna Khalid](#)   March 30, 2016

"Trump 2016." After this message was [scrawled](#) in chalk across the Emory University campus earlier this month, some 40 students [met](#) with President James Wagner to express their "fear" and "frustration," insisting that "Trump's platform and his values undermine Emory's values [of] diversity and inclusivity." Wagner reassured the students that the university would review the footage from security cameras to identify the culprit. "If they're students," he said, "they will go through the conduct violation process." In a subsequent campus-wide email, Wagner declared that Emory's "commitment to respect, civility, and inclusion calls us to provide a safe environment." He also emphasized that the school would make "immediate refinements" to the "procedural deficiencies" of its "bias incident and response process."

[Bias incident reporting](#) is not unique to Emory. More than

100 colleges and universities have Bias Response Teams, which aim to [foster](#) "a safe and inclusive environment" by [providing](#) "advocacy and support to anyone on campus who has experienced, or been a witness of, an incident of bias or discrimination." These teams have multiple missions, [including](#) educational "prevention," investigating alleged bias incidents, disciplining offenders, and organizing "coping events" after such incidents. Depending on the campus, these teams are known as [BRTs](#), [BARTs](#), [BERTs](#) or [BIRTs](#). Students and faculty occasionally serve on BRTs, but they are [largely composed of administrators](#), with sizable representation from Residential Life and Dean of Students offices. As committees with unelected members that meet behind closed doors, they lack both transparency and accountability.

> *BRTs are rapidly becoming part of the institutional machinery of higher education, but have yet to face any real scrutiny.*

BRTs are rapidly becoming part of the institutional machinery of higher education, but have yet to face any real scrutiny. As Carleton College faculty members committed to ["rigorous studies in the liberal arts disciplines"](#) and the vitality of diverse campus communities, we believe that the

proliferation of BRTs is a grave mistake. They degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important—and controversial—topics across all academic disciplines. They are inherently anti-intellectual enterprises, fundamentally at odds with the mission of higher education. And ultimately they will undermine a bedrock principle of the modern university: that more diversity leads to better learning.

New year, new adminstration sale:
3 months for $5Subscribe

The dramatic diversification of the student body is one of the most significant trends in higher education over the past half-century. Circa 1965, about 94 percent of the nation's college students were white and 61 percent were men; today, those figures have fallen to 59 percent and 43 percent, respectively.

That shift was encouraged by the pivotal 1978 Supreme Court decision on affirmative action, *Regents of the University of California* v. *Bakke*, a 5-4 ruling that banned racial quotas for college admissions but deemed it permissible to include race as one of a broad "array of qualifications and characteristics" in a "highly

individualized, holistic review of each applicant's file." (This is the policy under consideration in *Fisher* v. *University of Texas*.) In his majority opinion, Justice Lewis Powell rejected the social justice rationale for affirmative action but endorsed the diversity rationale, asserting that an otherwise qualified student "with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged" may bring "outlooks and ideas" that enrich "the atmosphere of speculation, experiment and creation" on campus.

Colleges and universities promote the benefits of a multicultural student body, calling diversity "a defining institutional value" that adds "depth, richness and excitement" to campus life. There has always been tension, though, between the rhetoric and the reality of diversity on college campuses—between the slogans that celebrate "differences" and how these differences really shape campus life. If the photographs of smiling students in college catalogs depict a multicultural utopia, the groups of students sitting in the cafeteria often tell a different story. Admissions officers would have you believe that campus life is a bubble, sealed off from the social inequities of the "real world" such as racism, sexism and homophobia. The news proves otherwise, whether it be the University of Oklahoma fraternity members singing a racist song or the explosion of student protests this past fall.

From an administrative point of view, there is a pressing need to more effectively "manage" campus diversity, and BRTs are at the heart of this effort. (Ohio State University founded one of the first in 2007 after "racist letters" were distributed to students through campus mail. Most are only a few years old.) Public relations, not surprisingly, have spurred the growth of BRTs, with "institutional reputation" and the desire to "reassure campus communities that administrators [are] addressing bias" as main concerns.

Definitions of bias incidents vary by campus but have the following key features: They encompass "any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics." These characteristics include "race, color, ethnicity, social class, national origin, religion, sexual orientation, gender identity and/or expression, age, marital status, veteran status, and physical and mental health"—sometimes even "height" and "weight."

New year, new adminstration sale:
3 months for $5Subscribe

*Last month, at the University of Michigan, a hall director reported a "phallic snow object."*

A bias incident can occur "whether the act is intentional or unintentional," meaning that "microaggressions" (subtle, often unintended slights) are squarely within bias incident territory. All "verbal, written or physical" conduct is fair game, whether it transpires in actual spaces such as cafeterias and classrooms or in the endless virtual world of social media. Examples include "symbols, language and imagery objectifying women" (University of Utah); "name calling," "avoiding or excluding others" and "making comments on social media about someone's political affiliations/beliefs," (Syracuse); "I don't see skin color," "I was joking. Don't take things so seriously," and "Thanks, Sweetie." (University of Oregon). Given the expansive definitions of bias incidents, it is no surprise that some dubious complaints are filed: Last month, at the University of Michigan, a hall director reported a "phallic snow object." "It is the height of privilege and entitlement to be obsessively concerned with utterly inconsequential events such as this," a member of the university's residential staff said.

Anyone can report a "bias incident," including "faculty, staff, students, as well as parents, alumni and visitors to campus." Reporters may be "victims," "witnesses" or even "third parties"—and they may choose to remain anonymous. That opens the door to hoaxes. Indeed, more than 20 percent of all the bias incident reports filed at one university during a

single academic year were "pranks," the investigation of which "occupied a great deal of time and attention for multiple staff members and senior level administrators."

We do not want our campuses overrun with eager "see something, say something" "student informants." Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College student asserted, encourage "students to ask the administration to solve problems instead of solving them amongst themselves." At University of California, Santa Cruz, a student filed a bias incident complaint that a single poster advertising a college "mafia" game was "extremely offensive to me as an Italian American woman" and "could result in harassment of Italian American students on campus"; the poster was removed. As the aforementioned Boston College student lamented, BRTs create "a false, and dangerous impression that the administration can/should police speech on campus to ensure everyone is 'comfortable.'"

"Police" is an apt word. A vice chancellor at University of California, Santa Barbara encouraged students to report "hate crimes or bias incidents" to the campus police department and the Office of Judicial Affairs. (Santa Clara University even instructed students to call 911 if a "bias incident is in progress or just occurred," a policy

subsequently revised.) A study based on extensive interviews with BRT members representing 17 colleges and universities found they devoted more time to "punishing and condemning the perpetrators of specific acts" than to community-wide education. A criminal justice framework informs much of the work done by BRTs, with terms such as "victim," "perpetrator" and "offender" being used. Punishment was swift indeed in the recent "ethnic stereotyping" brouhaha at Bowdoin, where students who hosted a "fiesta" featuring tequila and mini-sombreros were forced to move out of their room, placed on social probation, and required to complete future educational programming. The college president described the party as an "act of bias."

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints is profoundly misguided. They run counter to the basic conviction that we learn best through experimental trial-and-error: changing our minds voluntarily, not because

we are told to. Nothing quite kills intellectual exploration like the fear of causing offense. "How are students supposed to feel empowered to share their honest opinions on social issues," a student at UC Santa Barbara [asked](#) about the campus' BRT, "when they run the risk of being accused of 'undermining our culture of inclusivity?'"

Peer learning, the hallmark of a residential liberal arts campus, is immeasurably better when students are not mirror images of one another. But diversity works its magic only through meaningful contact between people with varying "identity characteristics." Contact, by definition, will sometimes lead to conflict. Imagine a conversation between an evangelical student and a gay student on same-sex marriage, or a discussion about U.S. drone policy between a dove and a hawk. Such conversations are invaluable. But without the space to debate and argue, students won't ever be forced to [confront](#) the underlying assumptions framing their worldviews. BRTs threaten to drive students into their own corners with peers who look and think like them, reducing the potency of diversity to a glib slogan on admissions brochures.

In addition to threatening the vitality of informal peer learning, BRTs pose a threat to the basic integrity of classroom teaching. Among the most frequently [reported](#) bias incidents are classroom comments perceived as

"derogatory" or "insensitive." Apart from flagging intentionally fraudulent reports, BRTs [rarely] determine that a particular complaint does not qualify as a "bias incident." At the very least, then, "accused" professors will need to have a "professional development" conversation with a BRT member as a result. At the most extreme, they may find themselves in the position of University of Colorado, Boulder sociologist Patricia Adler, who [faced pressure] to resign after some students complained about a prostitution lecture she regularly delivered. Faculty, of course, are not paragons of virtue and will no doubt sometimes make obtuse comments, but BRTs will prevent us from doing our jobs the best way we know how.

> *Much of what we teach and how we teach could come under fire with BRTs in place.*

Much of what we teach and how we teach could come under fire with BRTs in place. They would, for instance, undermine co-author Amna's strategic use of provocation, a pedagogical device that yields some of the best educational moments in her course. In a class on women in South Asia, Amna screens the controversial film *Bandit Queen*—a biopic of Phoolan Devi, a low-caste woman who endured extreme sexual violence, ultimately becoming a Robin Hood-esque outlaw. Amna uses the film knowing that students will be

outraged by both the content and the director's approach. Students' strong reactions, in fact, lay the necessary groundwork for a critical discussion about the politics of representation. Does the film exploit—or challenge—stereotypical depictions of "third-world" women? Is there a limit to artistic license when a creative work is presented as a true story?

The advent of academic tracking in the early twentieth-century is a key topic in co-author Jeff's field, the history of American education. It requires a close look at Stanford University psychologist Lewis Terman (1877-1956), chief architect of the first intelligence tests used to place students in different educational programs (college prep, vocational ed. and the like). Terman was a card-carrying eugenicist who believed that "racial differences in general intelligence" could not be "wiped out by any scheme of mental culture." "Mexicans," "Indians" and "negroes," according to Terman, were innately "dull," destined to be the "world's hewers of wood and drawers of water." When students engage with Terman's work, they begin to understand how powerful social currents such as racism, Social Darwinism, and anti-immigration sentiment informed IQ testing, academic tracking, and the shape of the modern high school.

More broadly, this example speaks to the kind of imaginative

critical analysis essential to history as a discipline. We have to contemplate and discuss how it is possible that people in the past held views we find morally reprehensible today, an undertaking rife with "bias incident" pitfalls. Just imagine tentative answers to the following question: Why do you think Terman and other highly educated people of his generation found racial hierarchies so attractive? We would not feel comfortable posing questions like this knowing that one student's response might result in a bias incident complaint from a peer. This would only ramp up the all-too-common student fear of saying "the wrong thing."

Bias reporting policies blur the all-important [distinction](#) between articulating a position and endorsing it—a distinction many no longer see. At Dartmouth, student activists [demanded](#) that the college ban from campus the use of "any racially-charged term" such as "illegal immigrants." Similarly, the BRT at Oregon [suggests](#) faculty add the following "classroom behavior" statement to their syllabi: "no racist, ableist, transphobic, xenophobic, chauvinistic or otherwise derogatory comments will be allowed."

A recent draft [report](#) on Title IX by the American Association of University Professors concludes that universities sometimes "overreach and seek to punish protected academic speech" in adjudicating sexual harassment

charges. There is "a tendency," for example, "to treat academic discussion of sex and sexuality as contributing to a hostile environment." Consider too last year's controversy at the University of Minnesota over a poster advertising a panel discussion about free speech, which featured a *Charlie Hebdo* cover illustration of the Prophet Muhammad. In response to a petition signed by over 300 people condemning the "blasphemous" use of the image, the university's Equal Opportunity and Affirmative Action office held a formal investigation and concluded that "university members should condemn insults made to a religious community in the name of free speech."

Bias reporting puts at undue risk those of us who teach in the humanities and social sciences, fields that explicitly address "identity characteristics" such as race, social class, and sexual orientation. In an *Inside Higher Ed* piece on the flaws of trigger warnings, seven humanities professors maintain that "faculty of color, queer faculty, and faculty teaching in gender/sexuality studies, critical race theory, and the visual/performing arts will likely be disproportionate targets of student complaints about triggering, as the material these faculty members teach is by its nature unsettling." The same could be said about the faculty most likely to be subject to bias incident complaints. At a community college in Minnesota three years ago, a female African American professor was reprimanded by the

administration for "offending" three white male students during a discussion of "structural racism" in a communications course. With BRTs in place, white students will be more likely to file complaints against faculty of color as well as students of color for "offensive" remarks and actions. There is a real danger that these policies will boomerang to harm the very groups they were intended to protect. (This, for example, is a recent BRT complaint from John Carroll University: "Anonymous student reported that African-American Alliance's student protest was making white students feel uncomfortable.")

At the University of Richmond in the spring of 2008, a black doll was found hanging from a noose in a campus theater, with a note that read, "Art is dead. Long live art." In the aftermath of this incident, Glyn Hughes—sociologist and administrator—led the effort to create a BRT and formulate the university's "bias incident protocol." As chair of the Richmond BRT, Hughes mediated bias incidents on campus, while also closely following national BRT policies and trends. In a candid essay, Hughes explained how he became increasingly skeptical of BRTs overwhelming public relations function. Incidents were presented as "scandals," isolated instances of "hatred or ignorance" perpetrated by bad apples, he wrote. Through BRTs, campus communities could profess that everybody was "shocked" and congratulate themselves on taking a righteous stand, all the

while ignoring institutionalized prejudice and discrimination. Hughes's damning conclusion: "diversity and social justice efforts" such as BRTs too often "reproduce rather than challenge systemic inequities."

BRTs are fatally flawed. Adjudicating "he said, she said" incidents is a logistical nightmare, if not downright impossible for thinly stretched administrators. There will no doubt be examples of injustice where the "accused" are investigated—even penalized—over paltry evidence, or where the discipline meted out is far too harsh for the alleged "crime." What's more, BRTs will result in a troubling silence: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints. BRTs will substitute diktats for debate when what we need most is constant, frank conversation. By almost any measure, colleges and universities are more diverse today than they have ever been, and that's the paradox: BRTs will turn the genuine, transformative educational power of diverse voices into a farce.

*Correction: A previous version of this article incorrectly stated that Glyn Hughes is an administrator in the University of Richmond's Office of Multicultural Affairs. He is the director of the school's Common Ground initiative.*