## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

SPEECH FIRST, INC.,

        Plaintiff,

v.                                                    Case No:   6:21-cv-313-GAP-GJK

ALEXANDER CARTWRIGHT,

        Defendant.

_____

### ORDER

      This matter comes before the Court on Plaintiff's Motion for Preliminary

Injunction (Doc. 3). In ruling on this Motion, the Court considered Defendant's

Response in Opposition (Doc. 36) and Plaintiff's Reply in support of its Motion

(Doc. 39). The Court heard oral argument on May 17, 2021. Doc. 44.

### I.    Background

      Plaintiff Speech First, Inc., ("Speech First") is a freedom-of-speech advocacy

organization with a membership base that includes students at public universities

and colleges. It sues Defendant Alexander Cartwright ("Cartwright") in his

personal capacity and in his official capacity as president of the University of

Central Florida ("UCF").[1]  UCF is a public university organized and existing under

---

[1] Speech First in its initial Complaint (Doc. 1) named multiple UCF officials, including
Cartwright and the members of UCF's board of trustees, as defendants. The parties stipulated to

the laws of Florida. Speech First claims that several UCF student conduct policies violate the First and Fourteenth Amendments of the Constitution. Speech First seeks a declaration that these challenged policies are unconstitutional, a permanent injunction barring UCF from enforcing those policies, and nominal damages.

Speech First has three anonymous members who are students at UCF (Students A, B, and C, hereinafter referred to as the "Members"). Speech First states in its verified Amended Complaint that the Members each hold beliefs that are unpopular at UCF and that they are afraid of being disciplined under the challenged policies if they express those beliefs. None of the Members have been disciplined under those policies.

Speech First now asks the Court to enter a preliminary injunction barring UCF from enforcing three of the challenged policies: the Discriminatory-Harassment Policy, the Computer Policy, and the Just Knights Response Team.[2]

---

the dismissal of all defendants except for Cartwright. Doc. 23. The parties agreed that any injunctive or declaratory relief in this action as to Cartwright will be binding on UCF. Doc. 23 ¶ 3. The Court entered an order dismissing those other defendants on March 1, 2021 (Doc. 24). Speech First has filed an Amended Complaint with Cartwright as the only defendant (Doc. 30).

[2] Speech First also moved to enjoin UCF's "ResNet User Agreement." However, Speech First confirmed at oral argument on May 17, 2021 that, while it has not dropped its overall challenge to the ResNet Agreement, it has now abandoned its request for a preliminary injunction as to that policy. Therefore, the Court will not address the ResNet Agreement in this order.

a. *Discriminatory-Harassment Policy*

Speech First seeks to enjoin UCF's Discriminatory-Harassment Policy, which is identified in UCF's handbook as Policy 2-004.2(IV)(B). This policy reads as follows:

> Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status, gender identity or expression, or sexual orientation), marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting the description of either Hostile Environment Harassment or Quid Pro Quo Harassment, as defined above.
>
> Discriminatory harassment may take many forms, including verbal acts, name-calling, graphic or written statements (via the use of cell phones or the Internet), or other conduct that may be humiliating or physically threatening.

Doc. 3-1 at 17–18.

The Discriminatory-Harassment Policy prohibits student conduct that meets the description of "Hostile Environment Harassment."[3]  Hostile Environment

---

[3] "Quid Pro Quo Harassment" is also prohibited, but Speech First does not present any argument as to this prohibition so the Court will not address it.

Harassment is defined as:

> Discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective.
>
> In evaluating whether a hostile environment exists, the university will consider the totality of known circumstances, including, but not limited to:
>
> > • The frequency, nature and severity of the conduct;
> > • Whether the conduct was physically threatening;
> > • The effect of the conduct on the complainant's mental or emotional state;
> > • Whether the conduct was directed at more than one person;
> > • Whether the conduct arose in the context of other discriminatory conduct or other misconduct;
> > • Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or university programs or activities; and
> > • Whether the conduct implicates concerns related to academic freedom or protected speech.
>
> A hostile environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. However, an isolated incident, unless sufficiently serious, does not amount to Hostile Environment Harassment.

Doc. 3-1 at 14. Students can be subject to discipline for violating this policy.

   *b. Computer Policy*

The Computer Policy that Speech First challenges is UCF's Use of

Information Technologies and Resources Policy 4-002.2(B)(7)(b), which reads:

> 7. The university provides email and other electronic messaging systems only for official university business. University employees are allowed to make incidental use of such systems for necessary personal messaging. The following uses of university messaging systems by students and employees are prohibited under this policy:
>
> …
>
> b. harassing or hate messages

Doc. 3-1 at 173.[4]

### c. *Just Knights Response Team (JKRT)*

Speech First also seeks to enjoin the operation of the JKRT. The JKRT is an interdisciplinary team of UCF officials that responds to reports of "bias-related incidents."[5] The parties have not submitted an official policy governing the JKRT. Instead, information on the JKRT's functioning is presented through screenshots of the JKRT's web pages that Speech First submitted, as well as from affidavits

---

[4] Speech First notified the Court shortly before the hearing that UCF updated this policy on April 29, 2021 to change the terms "harassing or hate messages" to "harassment as prohibited by university policy." Doc. 43. Cartwright has not informed the Court of this change in policy or argued that this change in policy renders consideration of the old Computer Policy moot. Indeed, counsel for Cartwright argued at the hearing that both the old and new policies are constitutionally sound. While "voluntary cessation" of a policy can render a challenge moot, the party defending the policy "bears a heavy burden" in demonstrating mootness. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013) (quotation omitted). This is especially so where the party continues to defend the constitutionality of the old policy. *See id.* at 532. Therefore, the Court will consider the parties' arguments on this policy in full.

[5] Speech First submitted a blank "Intake Form" that contains fields for a student to provide details of an incident. *See* Doc.3-1 at 195–98.

from UCF officials.

According to the webpage, JKRT acts as "a resource for anyone who wants to examine issues of bias, discrimination, or hate." Doc. 3-1 at 180. The webpage further states that:

> The JKRT creates timely interventions to incidents that are sensitive to the rights of all parties involved. It is intended that any JKRT programming or intervention will be educational at its core. It will involve a variety of activities including discussion, mediation, training, counseling and consensus building. Through the voluntary participation of the persons involved in and impacted by bias incidences, the JKRT's interventions and prevention programming will foster a sense of civility and campus community encompassing respect and understanding that supports a multicultural and diverse campus environment.

Doc. 3-1 at 182.

Another webpage defines a "bias-related incident" as "any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics or background." Doc. 3-1 at 191. The JKRT has broad latitude to respond to incidents, including those that are otherwise "not covered by formal policies or procedures but have the effect of harming individuals or groups." *Id.* at 191–92. The JKRT webpage provides examples of incidents which can prompt a report, including physical injury, stalking, bullying, verbal or written harassment, gestures, and others. *Id.* at 192–93.

## II.     Legal Standard

To obtain a preliminary injunction, a party must establish that: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020).

## III.    Analysis

Speech First argues that it is substantially likely to succeed on the merits of its challenge because UCF's policies, on their face, violate the constitutional rights of Speech First's Members. Cartwright contends that Speech First is unlikely to be successful in establishing that the Members have standing and, even if the Members have standing, UCF's policies do not violate the Constitution.

### A. Article III Standing

When a defendant challenges a motion for preliminary injunction on Article III grounds, the movant must demonstrate a substantial likelihood of success on the merits with respect to the issue of standing.[6]  This burden is equivalent to a

---

[6] The Eleventh Circuit has not directly addressed this issue. However, in *Church v. City of Huntsville*, the Court held that district courts should not "impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, *unless the defendant puts the plaintiff on notice that standing is contested*." 30 F.3d 1332, 1336 (11th Cir. 1994) (emphasis added). Thus, when a defendant has challenged standing in response to a motion for a preliminary injunction, then it is appropriate to impose a higher burden. Here,

plaintiff's burden at summary judgment.[7]

A litigant must have standing under Article III of the Constitution to sue in federal court, which requires an injury-in-fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An association like Speech First has standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Cartwright argues that Speech First's Members lack standing because they were not injured under UCF's policies.

Speech First acknowledges that its Members have not been disciplined under any of UCF's policies. Instead, Speech First argues that the Members have been injured because they avoid expressing their views out of fear of discipline under the policies. To establish an injury-in-fact in a "threat of enforcement"

---

Cartwright challenged standing in his Response and Speech First had an adequate opportunity to respond through its Reply and oral argument.

[7] When a court considers the likelihood of success on the merits, "this necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring). "It follows that the specificity required for standing allegations to secure a preliminary injunction will normally be no less than that required on a motion for summary judgment." *Id.; see also Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)).

lawsuit like this one, a plaintiff must demonstrate: (1) an intent to engage in the "conduct arguably affected with a constitutional interest"; (2) that the future conduct is arguably proscribed by the statute or rule at issue; and (3) that "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). The parties primarily dispute the third element with respect to the JKRT.

To satisfy the third element, a plaintiff must establish an objectively reasonable fear of prosecution. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) ("[I]f no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes.") (quoting *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996)). Mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

> i.    *Discriminatory-Harassment and Computer Policies*

Cartwright argues that Speech First lacks standing with respect to the Discriminatory-Harassment Policy and the Computer Policy, mainly because those policies do not encompass the Members' views. In other words, the Members cannot fear those policies because they do not punish constitutionally protected speech. But whether the policies encompass protected conduct is

entangled with the merits of Speech First's facial challenge and is better addressed there. Further, disclaimers alone will not defeat standing. *See ACLU v. Fla. Bar*, 999 F.2d 1486, 1493–95 (11th Cir. 1993). Considering the subject matter of the challenged policies and the fact that UCF can discipline students for violating those policies, the Court finds Speech First has satisfied its standing burden at this stage.

        *ii.*     *JKRT*

Cartwright argues that Speech First's Members have not been injured by the JKRT because the JKRT has no disciplinary authority and, therefore, there is no threat of future enforcement. Other colleges and universities have implemented "bias-response teams" like the JKRT. While a comparable program has not been analyzed within the Eleventh Circuit, other circuits provide helpful analysis.

Other circuit courts of appeals are split on whether the implementation of a bias-response team—like the JKRT—can support standing in the context of a pre-enforcement constitutional challenge. The Fifth and Sixth Circuits both held that Speech First had standing to challenge bias-response teams implemented by the University of Michigan and University of Texas at Austin. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (Michigan); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020) (Texas). The Sixth Circuit in *Schlissel* held that an invitation and the ability to refer were sufficient to chill speech and support

standing. *Schlissel*, 939 F.3d at 765. *Schlissel* reasoned that the bias-response team's involvement was an "objectively implied threat" to Speech First's members, even absent any evidence that the team disciplined students. *See id.* The Fifth Circuit ruled similarly in *Fenves*, but also credited evidence that the bias-response team had "'referred' a large number of reporting individuals" to other university entities as further chilling speech. *Fenves*, 979 F.3d at 338.

The Seventh Circuit in *Killeen* held that a bias-response team that cannot discipline students does not objectively chill speech and students do not have standing to challenge its policies. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 644 (7th Cir. 2020). The Seventh Circuit reasoned that the voluntariness of the team's meetings, combined with the fact that the team lacked authority to discipline students, undermined any credible threat of prosecution. *Id.* at 639–44. According to *Killeen*, students do not have standing to challenge a bias-response team unless there is some evidence that contact with the bias-response team is compulsory or that the team's involvement is tantamount to a disciplinary referral. *See id.*

The Seventh Circuit's reasoning in *Killeen* is persuasive. A program that has no authority to discipline students and cannot compel students to engage with it does not objectively chill conduct unless there is evidence to the contrary. Here, the parties do not dispute that, according to the website, contact with the JKRT following an incident report is voluntary and the JKRT does not have the

independent authority to discipline students. Instead, Speech First contends that an invitation from the JKRT is implicitly authoritative and compulsory because the JKRT is a university entity. Speech First thus argues that its Members' belief that they cannot ignore the JKRT is reasonable. However, under this logic, just about any communication from a university official or department to an individual student could potentially chill speech. Without some evidence suggesting that the JKRT compels student involvement, Speech First cannot establish that its Members' fears are objectively reasonable.

Speech First also argues that the JKRT's ability to refer incidents to other UCF entities supports a finding that the JKRT objectively chills its Members' speech. But UCF submitted affidavits representing that the JKRT virtually never refers students for student conduct issues. Doc 36-1 ¶ 21 (stating that the JKRT has not referred a student to the conduct office in three years). The fact that the JKRT refers matters that fall within the jurisdiction of another university entity—such as a Title IX issue or potential criminal activity—relates more to the fact that the JKRT is staffed by university officers rather than anything unique to the JKRT.

Because Speech First has failed to show that the JKRT creates a reasonable fear of prosecution, it cannot establish its Members' standing to challenge the JKRT at the preliminary injunction stage. Speech First's Motion will therefore be denied as to the JKRT.

**B. Likelihood of Success on the Merits**

Speech First claims that UCF's policies violate the First and Fourteenth Amendments of the Constitution.

        *i.*     *Discriminatory-Harassment Policy*

Speech First contends that UCF's Discriminatory-Harassment Policy (hereinafter, the "Policy") is unconstitutionally overbroad under the First Amendment and engages in impermissible viewpoint discrimination.[8]

The First Amendment's overbreadth doctrine is an exception to the general rule that "a facial attack must usually prove 'that no set of circumstances exists under which the [policy] would be valid.'" *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). A plaintiff bringing a facial overbreadth challenge "must show that the statute 'punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (emphasis in original) (citations omitted). This requires "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* (quoting *Members of the City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801

---

[8] Speech First does not contend that the Discriminatory-Harassment Policy is unconstitutionally vague, as it does with the Computer Policy.

(1984)). "[T]he party claiming overbreadth 'bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists.'" *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)).

When a plaintiff challenges a public university's policies, the question is whether those policies simply address unprotected conduct under *Tinker* or whether they also reach constitutionally protected conduct.[9] "The Supreme Court has held that public schools may regulate student expression when it 'substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students.'" *Valencia Coll.*, 903 F.3d at 1229 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969)). Conduct that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, *not immunized by the constitutional guarantee of freedom of speech.*" *Tinker*, 393 U.S. at 513 (emphasis added).

Speech First contends that the Court must apply strict scrutiny because the Policy is content based and viewpoint discriminatory. Before the Court can reach that question, it must first consider whether the Policy, "when read as a whole, covers conduct that *Tinker* allows schools to regulate." *See Valencia Coll.*, 903 F.3d

---

[9] Although universities and colleges have less latitude to regulate the speech and conduct of their adult students, *Tinker* still applies to them. *See Doe v. Valencia Coll.*, 903 F.3d 1220, 1229 (11th Cir. 2018); *DeJohn v. Temple Univ.*, 537 F.3d 301, 317 (3d Cir. 2008); *Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1346–47 (11th Cir. 1989).

at 1232. If the terms of the Policy can only be read to reach unprotected conduct, then strict scrutiny does not apply.

Beginning with the text of the Policy, "discriminatory harassment" is defined as "verbal, physical, electronic, or other conduct based upon" a list of characteristics that are protected under the Policy. Doc. 3-1 at 17–18. These include race, color, ethnicity, national origin, religion, non-religion, genetic information, sex, disability, marital status, political affiliation, and veteran's status. *Id.* Conduct is punishable under the Policy if it "interferes with [an] individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services" *and* it rises to the level of "Hostile Environment Harassment." *Id.* To qualify as Hostile Environment Harassment, the conduct must be "so *severe or pervasive* that it *unreasonably interferes with, limits, deprives, or alters* the terms or conditions of" education, employment, or participation in university programs or activities when viewed subjectively *and* objectively. *Id.* at 14. (emphasis added). In evaluating whether conduct creates a hostile environment, UCF applies a totality test and enumerates several factors it considers. These considerations include the "frequency, nature, and severity of the conduct," the impact of the conduct, and whether a physical threat occurred. *Id.* Finally, the Policy indicates that a single act could qualify as a violation if sufficiently severe. *Id.*

The Policy is clearly aimed at regulating unprotected conduct under *Tinker*—conduct that unreasonably invades the rights of other students. The issue is whether the Policy can be read to encompass protected conduct that does not invade the rights of others. Read as a whole, the Policy does not prohibit all conduct that pertains to any of the protected categories. Instead, it only prohibits conduct that is "severe or pervasive" and that "unreasonably interferes" with the rights of other students.

The Eleventh Circuit considered a similar facial overbreadth challenge under the First Amendment in *Valencia College*. There, the Court held that a stalking prohibition was valid under *Tinker* because: (1) it regulated willful, malicious, and repeated conduct; and (2) it relied on an objective threshold of harm, rather than a subjective or minimal one. *Valencia Coll.*, 903 F.3d at 1232–33. While UCF's Policy considers the intent of the actor in an incident, it also considers the effect of the allegedly harassing activity on others and whether any reaction or detriment is objectively reasonable. The fact that the Policy only prohibits severe or pervasive conduct means that the Members cannot reasonably believe that they would be punished for simply expressing unpopular viewpoints as Speech First contends.[10]

_____

[10] Speech First argues that single-instance harassment policies were deemed constitutionally impermissible in the Supreme Court's ruling in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). However, the majority in that case did not conduct any

Speech First also argues that an otherwise permissible general harassment policy under *Tinker* can be rendered unconstitutional if it prohibits discrimination. *See* Doc. 3 at 15. But as discussed, so long as a harassment policy is aimed at severe or pervasive conduct that invades the rights of others, it does not encompass protected speech. It is unreasonable to assume that drafting a harassment policy to target severe and pervasive *discriminatory* conduct motivated by characteristics like race or sex somehow broadens the core prohibition in an unconstitutional way. Indeed, in other cases where discriminatory policies were struck down, courts found that the prohibitory language itself was problematic, rather than the simple fact that a policy was aimed at discrimination. *See, e.g., DeJohn*, 537 F.3d at 317–18 (harassment policy unconstitutionally overbroad where it prohibited "hostile" and "offensive" conduct without further definition and made conduct punishable based solely on the intent of the actor); *Saxe v. State Coll. Area School Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (policy overbroad where it broadly prohibited speech that created an "intimidating, hostile or offensive environment" and "does not, on its face, require any threshold showing of severity or pervasiveness").

---

constitutional analysis of single-instance harassment policies. Instead, the Court simply held that Congress did not intend to prohibit single-instance harassment when it enacted Title IX. *Id.* at 649–54. Speech First mistakenly reasons that Justice Kennedy's dissent in *Davis* provides the controlling rationale from the majority's decision. *See* Doc. 3 at 15 (citing *Davis*, 526 U.S. at 667 (Kennedy, J., dissenting)).

Therefore, the Court finds that the Discriminatory-Harassment Policy is sufficiently constrained to permissible regulation under *Tinker* and is not fatally overbroad.

       ii.      *Computer Policy*

Speech First contends that UCF's Computer Policy is vague and overbroad. In addition to the overbreadth standard discussed above, "[v]agueness arises when a statute is so unclear as to what conduct is applicable that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Gilbert*, 130 F.3d 1458, 1462 (11th Cir.1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim . . . ." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010).

UCF's Computer Policy is plainly vague and overbroad. It simply prohibits "harassing or hate messages" without defining the terms. A student reading the policy would have no way of knowing whether his or her conduct was proscribed, and the policy creates a strong risk that it could sweep in conduct that is protected under the First Amendment. Cartwright does not offer any substantive argument that the policy is constitutional, other than denying that the policy is applied to constitutionally protected activities. Such a disclaimer alone cannot save an

otherwise vague policy. Therefore, the Court finds that Speech First is likely to succeed on the merits of its challenge to UCF's Computer Policy.

### C. Remaining Preliminary Injunction Factors

The only remaining question is whether Speech First can establish the other elements for a preliminary injunction with respect to the Computer Policy: irreparable injury, the balance of the harms, and the public interest. It is well accepted in the Eleventh Circuit that a constitutional injury is a "per se irreparable injury" and Speech First has established that element. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). Likewise, the remaining elements are satisfied because neither UCF nor the public have "any legitimate interest in enforcing an unconstitutional ordinance." *See id.*

### IV.   Conclusion

Accordingly, it is **ORDERED** that:

1. Plaintiff's Motion for Preliminary Injunction is **GRANTED** in part and **DENIED** in part.

2. Defendant is enjoined from enforcing the University of Central Florida's Use of Information Technologies and Resources Policy 4-002.2(B)(7)(b) until further order of the Court.[11]  In all other respects, the motion is **DENIED**.

---

[11] Speech First also asks the Court not to impose an injunction bond. The Court sees no

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 29, 2021.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

reason to impose one here and Cartwright does not argue that a bond is necessary.